# REPORTER'S RECORD

74829

## VOLUME 58 OF 73 VOLUMES

### TRIAL COURT CAUSE NO. 20020D00230

### COURT OF APPEALS NO. 74,829

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| v. | ) | OF EL PASO COUNTY, TEXAS |
| | ) | |
| DAVID RENTERIA | ) | 41ST JUDICIAL DISTRICT |

FILED IN
COURT OF CRIMINAL APPEALS

AUG 2 6 2004

**TRIAL ON THE MERITS**

Troy C. Bennett, Jr., Clerk

         On Wednesday, the 17th day of September 2003, the
following proceedings came on to be heard in the above-entitled
and numbered cause before the **Honorable Mary Anne Bramblett**,
Judge of the 41st Judicial District Court in El Paso County,
Texas.

         Proceedings reported by computer-aided machine
shorthand.

ORIGINAL

**A P P E A R A N C E S**

JAIME ESPARZA, ESQ.
SBOT NO. 06666450
LORI SWOPES, ESQ.
SBOT NO. 00786275
JOHN GIBSON, ESQ.
SBOT NO. 00793803
500 E. San Antonio Rm. 201
El Paso, Texas  79901
(915) 546-2059
ATTORNEYS FOR THE STATE

SCOTT SEGALL, ESQ.
SBOT NO. 17990600
ROBERT RILEY, ESQ.
SBOT NO. 16931100
DANIEL G. MARQUEZ, ESQ.
SBOT NO. 24004795
500 E. San Antonio Rm. 401
El Paso, Texas  79901
(915) 546-8185
ATTORNEYS FOR DEFENDANT

# CHRONOLOGICAL INDEX

## TRIAL ON THE MERITS

**Wednesday, September 17, 2003**                    **PAGE**   **VOL.**

**STATE'S WITNESSES        DIRECT    CROSS    VOIR DIRE    VOL.**

Objections to Court's Charge                          4        58
Court's Ruling                                        8        58
Charge Read to Jury                                  11        58

Closing Argument by Mr. Gibson                       19        58
Closing Argument by Mr. Riley                        29        58
Closing Argument by Mr. Segall                       37        58
Closing Argument by Mr. Esparza                      54        58

Jury Retired for Deliberations                       69        58
Verdict Received                                     70        58
Jury Polled                                          70        58

Court Reporter's Certificate                         73        58

1    Wednesday, September 17, 2003.

2                    (After recess, Defendant present,

3                    no Jury, 9:35 a.m.)

4                    THE COURT:  Has the State had an opportunity to

5    examine the charge of the Court?

6                    MS. SWOPES:  Yes, Your Honor.

7                    THE COURT:  Do you have any objections to the

8    charge?

9                    MS. SWOPES:  No.

10                    THE COURT:  Has the Defense had an opportunity to

11    examine the charge of the Court?

12                    MR. SEGALL:  Yes, ma'am.

13                    THE COURT:  Do you have any objections to the

14    charge?

15                    MR. SEGALL:  Yes, ma'am.  May we dictate them into

16    the record?

17                    THE COURT:  Yes, you may.

18                    MR. SEGALL:  In the presence of both the district

19    attorney's office and the Defendant.

20                    THE COURT:  Yes.

21                    MR. SEGALL:  Your Honor, our first objection is a

22    directed verdict of not guilty because the State has failed to

23    prove each and every element of the offense.

24                    THE COURT:  Your motion is denied.

25                    MR. SEGALL:  Your Honor, we would request that a

1   term, beyond a reasonable doubt, be defined, and suggest to the

2   Court that the definition in *Geesa v. State* would be the proper

3   definition to give.  Specifically note to the Court that due

4   process would require the definition be given, that -- under

5   federal, United States Constitution, and therefore we request

6   that a definition of beyond a reasonable doubt be included in

7   this charge.

8          THE COURT:  Based on the state of the law at this

9   time, you know that I must deny that request.

10         MR. SEGALL:  If I don't object, I waive.

11         Now, Your Honor, we would request that in addition

12  to the lesser-included offense that the Court has included, that

13  the lesser-included offense of murder under felony murder with an

14  application paragraph be submitted to the Jury.  We would request

15  that in addition to that, that the law -- that an inference -- a

16  final fact cannot be based upon an inference upon an inference be

17  included in this charge.  We would request that the Jury be

18  charged that evidence received -- obtained illegally be not

19  considered by the Jury, specifically drawing the Court's

20  attention to, I believe, our written submitted charge, which

21  requested that if they have a doubt as to whether the officers

22  obtained a free and voluntary consent to the palm print, that

23  they are to discount the palm print and any evidence obtained

24  thereafter, such as the search warrant based thereupon and the

25  results thereof.

1    In support of that argument, we would note to the

2 Court specifically that the officer testified that it was freely

3 and voluntarily obtained, that there was, in fact, an outstanding

4 arrest warrant for the Defendant, that he was therefore in their

5 custody, that they received permission not to execute that

6 warrant, that that warrant was then not executed, the Defendant

7 was told about it, the issue being whether he was told about it

8 prior to being released or whether prior to the consent was given

9 or not. That that is a fact issue that has been raised by the

10 evidence and we request that it be submitted to the Jury, along

11 with requesting that the Court admitted oral statements made by

12 the Defendant at that time, and we would respectfully submit to

13 the Court that the issue of whether or not he was in custody at

14 the time, and since those oral statements were neither recorded

15 nor reduced to writing and signed, that they should have been

16 excluded.

17    And we'd request the Court so instruct the Jury,

18 that if they find that he was in custody at that time pursuant to

19 that arrest warrant, that the statute was not followed, and

20 therefore the evidence obtained as a result of it, including the

21 oral statements, the consent, the palm print, and search of the

22 van, should not be considered by them.

23    The Defense would specifically object to the

24 failure to include those instructions.

25    We would object to the lesser offense being

1  referred to as a lesser offense as that is a comment on the legal

2  effect.  In other words, quite clearly, to anyone reading the

3  charge, that that conveys to them the information that they

4  should decide this case on basis of punishment, that if they want

5  to give a greater punishment for this person, then they better

6  not go with a lesser crime.

7           And specifically, I would note to the Court, since

8  the Court -- that during voir dire, the Jury -- I do not believe

9  that the jurors were told about manslaughter, about it being a

10  lesser -- about the range of punishment of it.  But by calling it

11  a lesser, then what the Court is informing them is some

12  information that they don't have which may affect their decision

13  as to whether to go with the offense or not.  And so we'd request

14  that the word lesser be removed, because lesser is a punishment

15  issue.

16           If I may have one moment.

17           Your Honor, the Defense would request an

18  instruction that any evidence which has been mutilated or

19  destroyed by a party would indicate to the party -- to the Jury

20  that they should hold their -- any inferences drawn from that

21  should be negative to the party having the evidence and who has

22  destroyed it.  I do not have the exact language, but I believe

23  that this language is found in civil cases where someone fails to

24  produce evidence that they have or has destroyed evidence that

25  would bear upon the issue.  And we would request that this Jury

1   be so instructed, that they are to take as a negative inference

2   and construe against the party that had the information and/or

3   exhibits and/or other evidence and then wilfully destroy it, that

4   they should take a negative inference against that party for

5   having done so.

6           Those are our objections to the charge.  Thank

7   you, Your Honor.

8           THE COURT:  I'll give the State an opportunity to

9   respond and I'll go subject at a time.

10          Felony murder, the request for the felony murder

11  instruction.

12          MS. SWOPES:  There's no evidence suggesting that

13  this is a felony murder.  And the way that the indictment reads

14  is murder by causing the death of an individual under six years

15  of age.  There's no lesser included of felony murder under that

16  particular form of capital murder.

17          THE COURT:  That request for the instruction is

18  denied.

19          The request for the instruction of inference upon

20  inference.

21          MS. SWOPES:  It's not proper under the law.

22          THE COURT:  Be denied.

23          The instruction regarding the palm print and the

24  outstanding warrant regarding whether or not it was illegally

25  obtained.

1          MS. SWOPES:  The state of the evidence at this

2    point is that there was no illegality.  The Court has ruled on

3    this issue and determined that the search and consent were all

4    legally and voluntarily obtained.  There's no factual dispute in

5    regards to this issue and it should not be submitted to the Jury.

6          THE COURT:  Request for the instruction is denied.

7          There has been a request to instruct the Jury that

8    the oral statement should have been excluded if the Defendant was

9    in custody based on an arrest warrant.  I'm just trying to

10   paraphrase this as best I can.

11         MS. SWOPES:  The evidence clearly shows the

12   Defendant was not in custody when he made those oral statements

13   on November 20th of 2001.  He was, in fact, released at his own

14   home and advised of the warrants after everything had been --

15   he'd been spoken to and the consent.  There's no factual dispute

16   in the evidence.

17         THE COURT:  That request will be denied.

18         And the request to strike the words, lesser

19   offense, regarding the manslaughter charge.

20         MS. SWOPES:  The lesser offense refers to an

21   offense wherein the elements are less, meaning if it's a murder

22   of a child under six, the lesser offense would be murder if the

23   child is not under six.  So lesser offense refers to the fact of

24   the elements that the Jury must find.  I don't think there is any

25   basis to object to that language.

1    THE COURT: All right. Here's what I'm going to

2 do then. I'm going to put this on the record, so if you have any

3 further objections to it -- on page 4, the second paragraph,

4 there right above numeral V where it says, "next consider whether

5 the Defendant is guilty of the lesser. . ." then I'm going to add

6 in there, "included offense," which I believe probably better

7 tracks the law. So it's whether or not he's guilty of the

8 lesser-included offense of manslaughter. And then down at this

9 very bottom, the last paragraph, the last sentence regarding you

10 must resolve that doubt in his favor and find him guilty of

11 manslaughter, and I'm going to take out "the lesser offense of

12 manslaughter." So it is stricken from the last paragraph, but

13 the one right before numeral V will be lesser-included offense.

14    MR. SEGALL: Your Honor, our objection -- we think

15 the Court improves the charge by doing so, but our objection is

16 that while Counsel is perfectly correct legally, that is not --

17 that bit of law is still not before this Jury, such that they

18 would understand that this lesser refers to the elements of the

19 offense, rather than refers to the punishment range. And that's

20 why we continue to object, although I believe the Court has

21 improved the charge. Also, we'd note the verdict form, it

22 says --

23    THE COURT: You're right. I'll change that, too.

24 So the verdict form page C and D, will just say, "guilty of the

25 offense." Lesser -- the word lesser will be stricken from the

1  Verdict Forms C and D. I'll make those changes and make sure

2  that you get them. So that request has been granted in part and

3  it's denied in part.

4  And the last is to request an instruction

5  regarding any destruction or mutilation of evidence should be held

6  against the person who has destroyed or mutilated any evidence.

7  MS. SWOPES: There's no instruction required under

8  the law.

9  THE COURT: That instruction will be denied. So

10  the Court will make the changes and give you a copy of those.

11  MS. SWOPES: Thank you.

12  MR. SEGALL: Thank you, ma'am.

13  THE COURT: We're waiting on the Jury.

14  (Recess.)

15  (Jury in, Defendant present, 10:24 a.m.)

16  THE COURT: Good morning, Ladies and Gentlemen.

17  MEMBERS OF JURY: Good morning.

18  THE COURT: I have provided you with a copy of the

19  charge. I'm now going to read it to you. You may take those

20  copies with you in the jury room to assist you in your

21  deliberations. However, it is -- my original charge has my

22  signature on it and it is upon the original charge that you

23  should place your verdict.

24  **CHARGE OF THE COURT**

25  THE COURT: Ladies and Gentlemen, after the

1    attorneys have prepared their summations, you will go to the jury

2    room.  You will then select one of your members as your presiding

3    juror.  It shall be your presiding juror's duty to preside over

4    your discussions of and deliberations upon the case, vote with

5    you, and when you have unanimously agreed upon a verdict, to

6    certify your verdict by signing the same as your presiding juror.

7            You will have this charge with you in the jury

8    room and you shall refer to it for guidance during your

9    deliberations.  Suitable forms for your verdict are attached

10   hereto.  Your verdict must be in writing and signed by your

11   presiding juror.  Your sole duty at this time is to determine the

12   guilt or innocence of the Defendant under the indictment in this

13   case and restrict your deliberations solely to the issue of

14   whether the Defendant is guilty or not guilty.  Do not let bias,

15   prejudice, or sympathy play any part in your deliberations.

16           After you have arrived at your verdict, you will

17   notify the Bailiff that you have reached your verdict.

18           You are the exclusive judges of the facts proved

19   or the credibility of the witnesses and of the weight to be given

20   to the testimony.  But you are bound to receive the law from the

21   Court as it is given to you in this charge, and you are bound to

22   be governed thereby.

23           You shall consider only the evidence and exhibits

24   presented here in the courtroom through the witnesses who have

25   testified.  If you want to have the exhibits with you in the jury

1 room for your deliberations, advise the Bailiff.  In deliberating

2 on this case, you shall not talk to anyone except the members of

3 the Jury about it until you have been finally discharged from

4 service on this Jury.

5          If you want to communicate with the Court, explain

6 what you want in writing and deliver your message, signed by your

7 presiding juror, to the Bailiff, who will deliver it to the

8 Court.  Do not orally explain to the Bailiff what you want.

9          You are instructed that the grand jury indictment

10 is not evidence of guilt.  It is a means whereby the Defendant is

11 brought to trial in a felony prosecution.  It is not evidence,

12 nor can it be considered by you in passing upon the innocence or

13 guilt of the Defendant.

14          Our law provides that a defendant may testify in

15 his own behalf if he elects to do so.  This however, is a

16 privilege accorded a defendant, and in the event he elects not to

17 testify, that fact cannot be taken as a circumstance against him.

18          In this case the Defendant has elected not to

19 testify and you are instructed that you cannot and must not refer

20 or allude to that fact throughout your deliberations, or take it

21 into consideration for any purpose whatsoever as a circumstance

22 against him.

23          All persons are presumed to be innocent, and no

24 person may be convicted of an offense unless each element of the

25 offense is proved beyond a reasonable doubt.  The fact that a

1  person has been arrested, confined, or indicted for, or otherwise

2  charged with the offense does not give rise to any inference of

3  guilt at the trial.  The law does not require a defendant to

4  prove his innocence or produce any evidence at all.  The

5  presumption of innocence alone is sufficient to acquit the

6  Defendant unless the jurors are satisfied beyond a reasonable

7  doubt of the Defendant's guilt after careful and impartial

8  consideration of all the evidence in the case.

9          The prosecution has the burden of proving the

10 Defendant guilty, and it must do so by proving each and every

11 element of the offense charged beyond a reasonable doubt.  And if

12 it fails to do so, you must acquit the Defendant.  In the event

13 you have a reasonable doubt as to the Defendant's guilt after

14 considering all the evidence before you, and these instructions,

15 you will acquit him and say by your verdict not guilty.

16         When words are used in this charge in a sense that

17 varies from the meaning commonly understood, you are given a

18 proper legal definition which you are bound to accept in place of

19 any other meaning.  Bold-face lettering of words or phrases

20 indicates that such words or phrases are defined in this charge,

21 and nothing else.

22         The Defendant, David Rentería, stands charged with

23 capital murder, alleged to have occurred on or about the 18th day

24 of November 2001.  To this charge the Defendant has pled not

25 guilty.

1    The Court will now instruct you on the applicable

2    law.

3    Our law provides that a person commits murder if

4    he intentionally or knowingly causes the death of an individual.

5    A person commits the offense of capital murder if

6    he commits murder and the person murders an individual under six

7    years of age.

8    Our law provides that a person commits

9    manslaughter if he recklessly causes the death of an individual.

10    So that you may better understand the nature of

11    the offense, the Court will now define certain terms.

12    A person acts intentionally, or with intent, with

13    respect to a result of his conduct when it is his conscious

14    objective or desire to cause the result.

15    A person acts knowingly, or with knowledge, with

16    respect to a result of his conduct when he is aware that his

17    conduct is reasonably certain to cause the result.

18    A person acts recklessly, or is reckless, with

19    respect to circumstances surrounding his conduct or the result of

20    his conduct when he's aware of but consciously disregards a

21    substantial and unjustifiable risk that the result will occur.

22    The risk must be of such a nature and degree that its disregard

23    constitutes a gross deviation from standard of care that an

24    ordinary person would exercise under all the circumstances as

25    viewed from the Defendant's standpoint.

1    Now, if you find from the evidence beyond a

2 reasonable doubt that on or about the 18th day of November 2001,

3 in El Paso County, Texas, the Defendant, David Rentería, did then

4 and there intentionally or knowingly cause the death of an

5 individual, namely, Alexandra Flores, by choking Alexandra Flores

6 about the neck by unknown means, or, by choking Alexandra Flores

7 about the neck with the Defendant's hand, and the said Alexandra

8 Flores was then and there an individual younger than six years of

9 age, then you will find the Defendant guilty of capital murder as

10 charged in the indictment.  Verdict Form A.

11    Unless you so find beyond a reasonable doubt, or

12 if you have a reasonable doubt thereof, you will acquit the

13 Defendant, David Rentería, of capital murder, Verdict Form B, and

14 next consider whether the Defendant is guilty of the

15 lesser-included offense of manslaughter.

16    Now, if you find from the evidence beyond a

17 reasonable doubt that on or about the 18th day of November 2001,

18 in El Paso County, Texas, the Defendant, David Rentería, did then

19 and there recklessly cause the death of an individual, namely,

20 Alexandra Flores, by choking Alexandra Flores about the neck by

21 unknown means, or, by choking Alexandra Flores about the neck

22 with the Defendant's hand, then you'll find the Defendant guilty

23 of manslaughter.  Verdict Form C.

24    You are instructed that you may consider all

25 relevant facts and circumstances surrounding the killing, if any,

1    and the previous relationship existing between the accused and

2    the deceased, together with all relevant facts and circumstances

3    going to show the condition of the mind of the accused at the

4    time of the offense, if any.

5             Unless you so find beyond a reasonable doubt, or

6    if you have a reasonable doubt thereof, you will acquit the

7    Defendant, David Rentería, of manslaughter.  Verdict Form D.

8             If you believe from the evidence beyond a

9    reasonable doubt that the Defendant is guilty of either capital

10   murder or manslaughter, but you have a reasonable doubt as to

11   which offense he is guilty, then you must resolve that doubt in

12   favor of the Defendant and find him guilty of manslaughter.

13   Verdict Form C.

14             Manner of deliberations:

15             In order to return a verdict, each juror must

16   agree thereto.

17             Jurors have a duty to consult with one another to

18   deliberate with a view of reaching an agreement if it can be done

19   without abrogating individual judgment.

20             Each juror must decide the case for themselves,

21   but only after an impartial consideration of the evidence with

22   their fellow jurors.

23             In the course of deliberations, a juror should not

24   hesitate to reexamine their own views and change their opinion if

25   convinced it is erroneous.

1    No juror should surrender their honest conviction
2  as to the weight or effect of the evidence only because of the
3  opinion of fellow jurors, or for the mere purpose of returning a
4  verdict.

5    The presiding juror, or any other juror who
6  observes a violation of the Court's instructions, shall
7  immediately warn the one who's violating the same and caution the
8  juror not to do so again.

9    In arriving at your verdict, it will not be proper
10 to fix the same by lot, chance or any other method than by full,
11 fair and free exercise of the opinion of the individual jurors
12 under the evidence admitted before you.

13   The last page is your verdict form page.

14   Verdict Form A.  We, the Jury, find the Defendant,
15 David Rentería, guilty of the offense of capital murder, as
16 charged in the indictment.

17   Verdict Form B.  We, the Jury, find the Defendant,
18 David Rentería, not guilty of capital murder.

19   Verdict Form C.  We, the Jury, find the Defendant
20 David Rentería, guilty of the offense of manslaughter.

21   Verdict Form D.  We, the Jury, find the Defendant,
22 David Rentería, not guilty of the offense of manslaughter.

23   Mr. Gibson.

24   MR. GIBSON:  Thank you, Your Honor.  If it please
25 the Court, Counselors.

Good morning, Ladies and Gentlemen of the Jury.

MEMBERS OF JURY:  Good morning.

### STATE'S ARGUMENT

MR. GIBSON:  First thing I'd like to talk to you is the charge, which is basically the document you have in front of you.  These are the instructions the Court has given you.  And at the end you'll be asked to consider the crimes.  And there are two crimes in this particular charge that are submitted to you; one is capital murder, intentionally causing the death of a child less than six, and manslaughter, which is recklessly causing the death of the individual.

Now, whether something is intentional or reckless, you're bound by the Court's definitions as to those terms.  Those are on page 3 and paragraph III.  Obviously, something intentional is you intend that result.  The death of Alexandra Flores is intended.  Something that's reckless is something much less.  You read the definitions.  It's the facts and circumstances.  Somebody knew that that result might happen.

I'll submit to you, Ladies and Gentlemen, that the facts as you have in front of you, suggest that there can only be one answer as to whether or not -- not getting to who did this, but whether or not it was intentional or reckless.  That evidence comes from the autopsy report and comes from the testimony from Dr. Contín.  Dr. Contín testified that in order for someone to be choked to death, manual strangulation, asphyxiation, it requires

1   no less than one to three minutes of constant pressure to the

2   neck.  I submit to you, Ladies and Gentlemen, if somebody puts

3   their hand or some other object to a child five years of age for

4   a period of that long, they know what's going to happen, and they

5   intend the death of Alexandra Flores.

6          In addition to that, we know a lot of things about

7   the autopsy.  That it was a very violent strangulation.  That the

8   bruising and the hemorrhaging of the neck was from the esophagus,

9   all the way from the larynx, all the way down to the spinal

10  column.  That this entire area was bruised up.  There can be only

11  one answer as to whether or not this act was intentional or

12  reckless, and it was intentional.  I can think of no scenario in

13  which someone would place pressure on the child, a five-year-old,

14  for a period of time of no less than one minute without intending

15  to cause the death of that child.

16         Now, yesterday Mr. Segall gave an opening

17  statement.  He talked about this case.  This really is a

18  circumstantial case.  There's no direct evidence involving

19  Mr. Rentería in this crime.  You know what, he's right.  The

20  direct evidence is someone saying, you know what, I saw David

21  Rentería choke to death Alexandra Flores.  We don't have that

22  kind of evidence here.  But what we do have here is

23  circumstantial evidence.  While I was in law school they kind of

24  gave us a real simple definition.  Circumstantial evidence is

25  like this.  If you go to sleep at night, it's cold and it's

1    cloudy.  You go to bed, it's dry, wake up the next morning, open

2    the blinds, and there's snow as far as you can see.  That's

3    circumstantial evidence.  You look at the circumstances before,

4    you look at the circumstances after, and you can come to the

5    conclusion, yes, it snowed.

6              Now, direct evidence would be, you wake up in the

7    morning without looking.  Someone tells you that it snowed.

8    Without looking or investigating yourself, that's direct

9    evidence.  Sometimes circumstantial evidence has the -- can have

10   the advantage that you don't have to rely on what someone is

11   telling you because you look at the evidence and you see if it

12   equates to what people are saying it equates to.

13             And the first piece of circumstantial evidence we

14   have here is the autopsy.  Doesn't tell us who killed Alexandra

15   Flores.  It tells us she's dead, tells us it was intentional,

16   given the doctor's reports, that she was 47 inches and 56 pounds.

17   Strangulation was violent and that she had orange in her stomach.

18             That day, about 17 miles away from the site at

19   which Alexandra Flores was found, there was other circumstantial

20   evidence that was being investigated and being looked into.  That

21   was there at the Wal-Mart.  The next circumstantial evidence,

22   State's Exhibit Number 50.  It's a log from International

23   American Security.  If you look down there at 5:05 p.m. on

24   November 18, 2001, Wal-Mart, Alameda -- it was filled in by

25   Corporal J. D. Trujillo -- found a van, Chevy, Texas, N4FHLN,

1    with its motor running. It's the next piece of circumstantial

2    evidence. Does that tell us that any particular person killed

3    Alexandra Flores? No. But what does it tell us? That there was

4    a van there and it was running.

5            Next piece of circumstantial evidence, State's

6    Exhibit Number 51. The title history for that particular

7    driver's license or that license tag. And there's quite a few.

8    You can tell this particular van has been through many different

9    owners, and the entire registration history is here, but on

10   November 18, 2001, that van was registered to David Rentería.

11           To Lee Trujillo, the next piece of circumstantial

12   evidence we have. She testifies, on November 18, 2001, she's

13   working there at the Wal-Mart. When she's out there at 5:05 she

14   sees an individual and she sees a van and the van is running.

15   She writes down the license plate number and she's waiting there

16   for the individual to return. An individual with a white shirt,

17   dark hair, dark shorts walks up with Wal-Mart bags. They have a

18   conversation. They talk about why the van is running. They have

19   a brief conversation, they go on their way. She sees that

20   individual unlock the van and go into it.

21           She goes over to give someone a boost in front of

22   the east entrance of the Wal-Mart. A few minutes later she has a

23   second encounter with this individual and shakes his hand. He

24   thanks her for not towing the vehicle and says he's going to go

25   back in and do some more shopping. She doesn't say that David

1   Rentería is that person.  She doesn't say that David Rentería

2   isn't that person.  It's because J.D. Trujillo cannot tell you

3   that that person she remembers was David Rentería or wasn't David

4   Rentería, because that's the state of the evidence and that's

5   what the facts show.

6            But we also have other evidence.  The next piece

7   of circumstantial evidence will be from the Defendant himself.

8   Detective Martínez talks to the Defendant on November 20th of

9   2001 and surprisingly enough, he gives -- he talks in this

10  conversation.  He gives conversation that just matches the

11  testimony of J.D. Trujillo.  Yes, he was shopping November 18th,

12  2001.  Yes, he left his van running.  Yes, that is his van.  Yes,

13  he did have an encounter with a female security guard.  Yes, he

14  was carrying bags.  Yes, he had a conversation regarding the van

15  running.  Yes, there was a second encounter as he was reentering

16  the store for whatever reason.  He shook her hand and thanked her

17  for not towing the van and told her he was going to go back in

18  and shop.

19           Does that prove he committed the murder of

20  Alexandra Flores?  No.  Does it prove that is his van?  Yeah,

21  certainly that's some circumstantial evidence showing that.

22           The next piece of evidence I would ask you to look

23  to is State's Exhibit Number 38.  This is the Wal-Mart video.

24  And I ask you to look at it carefully and look at it

25  frame-by-frame, if you need to.  What does that show us?  Well,

1    it shows us the last known images of Alexandra Flores on

2    approximately 5:15 on November 18, 2001, and she's being enticed

3    out.  You can look at that evidence.  By an individual who's

4    wearing a light ball cap, he's got dark hair, he's got a dark

5    shirt which appears to be on top of a lighter shirt.  He has dark

6    shorts.  He has white tennis shoes and white socks with a dark

7    stripe on them, whoever this individual is.

8         But we also track this individual in his movements

9    before he lures Alexandra out.  We know that at 5:07 p.m. a

10   person, that same person, is seen exiting that Wal-Mart at 5:07

11   p.m. with bags in his hand and he exits out of the east entrance

12   just about the time J.D. Trujillo is over there at the van

13   labeled in State's Exhibit Number 44.  We know that at 5:13 p.m.,

14   just about the time J.D. Trujillo is having that second encounter

15   with that individual in front of the east entrance, 5:13 p.m., we

16   see this individual with the light-colored ball cap, the dark

17   shirt with a white shirt underneath it, the dark shorts, the

18   white tennis shoes and white socks with a dark stripe on it, is

19   walking through.  At 5:15 we see that man exiting with Alexandra

20   Flores.

21        The next group of circumstantial evidence I ask

22   you to look at is in regards to Sam's store, State's Exhibit

23   Number 92, membership records to a David Rentería, 11/22/61.

24   Does this show us in and of itself?  No.  But it's evidence this

25   is an individual who does have a Sam's card and that he used that

1  Sam's card on November 18, 2001. At approximately 2:54 p.m. he

2  made a purchase at Sam's on Pellicano. We know that because the

3  next piece of circumstantial evidence is State's Exhibit Number

4  93, which is a Sam's receipt which is a member I.D., David

5  Rentería, his name; Sam's store there on Pellicano; checkout time

6  of 14:54:52, 2:54:52.

7  　　　　　The next piece of evidence we have is a Sam's

8  video, State's Exhibit Number 95. And this video is taken at the

9  entrance of Sam's approximately one hour earlier that shows David

10  Rentería was using his card, checked out. On that video there's

11  an individual who's been identified as Santiago Rentería. We had

12  Detective Martínez, who was familiar with him, come and testify,

13  you saw, for himself. And next to this individual, Santiago

14  Rentería, was an individual with a white ball cap, with dark

15  hair, with a dark shirt with a light shirt underneath it with

16  dark shorts, with white tennis shoes with white socks and a dark

17  stripe on them.

18  　　　　　Does that prove that David Rentería killed

19  Alexandra Flores? No, it doesn't. Is it pretty good

20  circumstantial evidence that the person who's in the video at

21  Wal-Mart is David Rentería? Yes, it is.

22  　　　　　The next set of evidence, swabs taken from the

23  van. This van was seized on December 3, 2001, was searched by El

24  Paso Police Department pursuant to a valid warrant on December 4,

25  2001. And in those swabs there it was determined there were

1  seven stains in that van in the back bench area. And those

2  stains came back to blood, and that blood came back to Alexandra

3  Flores. What else do we know? We know from testimony from

4  Sandra Rubio Flores that prior to December of 2001 they did not

5  know, see, or hear of an individual by the name of David

6  Rentería.

7           The final piece of circumstantial evidence, a palm

8  print card and a piece of plastic, evidence gathered at the scene

9  there behind Dr. Schecter's office on December 3rd, 2001. There

10 was evidence collected there. There was -- and this particular

11 evidence didn't come off a beer bottle down the alley. Didn't

12 come off the floor where people had been walking around. Didn't

13 come off some beer can. It came off the face of Alexandra

14 Flores. And that palm print came back to David Rentería. That's

15 your case, Ladies and Gentlemen.

16           Now, there's always going to be questions

17 circumstantial evidence can't answer, always those whys. Well,

18 you know, we had evidence about contamination logs. Ladies and

19 Gentlemen, there's only one reason that contamination log is being

20 brought up, is because the Defense wants you to believe that the

21 van was contaminated by either Detective Martínez, Pantoja, or

22 both of them. And if you believe they contaminated, you have to

23 believe that it wasn't an accidental contamination. You're going

24 to have to believe that was an intentional contamination, because

25 her blood is found in six different locations.

            We had discussions about, well, DNA can come from

molecular things smaller than the eye, but I know this isn't a

lot of evidence.  But if you look at these State's exhibits and

you can see that, and that's blood.  It's not a nanogram, it's

not a molecule.  Somebody put blood in there.  You can tell the

blood looks to be put on fresh.  If you also believe that the

detectives contaminated the scene --

            MR. SEGALL:  Your Honor, we will object to Counsel

testifying about the fresh blood, in his opinion.

            THE COURT:  What the Court is going to do is

instruct you that what the attorneys say is not evidence.  The

only evidence that you are to consider is the testimony of

witnesses from the witness stand plus the exhibits admitted into

evidence.

            MR. GIBSON:  You take a look at that yourself and

you determine for yourselves what type of evidence this is.

Don't take my word for it.  If you believe that the officers

contaminated the van, then you also have to believe they can look

13 days in the future, because it's not for another 13 days that

palm print comes back to David Rentería, when they were in that

van November 20th, 2001.  The officers testified they never went

into the autopsy, never were involved in the crime scene.

There's a lot of whys.

            But if you keep your eye on the ball, what is

important lays with these exhibits and the evidence that was

1  presented to you. We don't know why a lot of things, but keep

2  your eye on the ball. Why does somebody lure a child away from

3  the family she loves, strip her naked, put a bag over her head,

4  choke her and set her on fire? No amount of circumstantial

5  evidence is going to answer that question. I ask that you keep

6  your eyes on the ball.

7        In closing, I'd like to recap the evidence of

8  circumstantial evidence that's in front of you. The Defendant's

9  van is at Wal-Mart when Alexandra Flores is abducted. And that

10  fact is uncontroverted. The Defendant's van is running and

11  unoccupied when Alexandra Flores is abducted from the Wal-Mart.

12  That fact is uncontroverted. The Defendant, through his own

13  statements through Detective Martínez, admits to being at the

14  Wal-Mart when Alexandra Flores is abducted. Through the

15  testimony of J.D. Trujillo and through the Defendant's own

16  admissions, his movements in and out of that east entrance match

17  the movements of the individual who is shown in the Wal-Mart

18  video to have abducted Alexandra Flores. That an individual who

19  went shopping with David Rentería's Sam's card with David

20  Rentería's father dressed exactly like the man who abducted

21  Alexandra Flores is seen at the Sam's two hours before.

22        THE COURT: Mr. Gibson, 15 minutes.

23        MR. GIBSON: Thank you, Your Honor.

24        MR. SEGALL: Your Honor, we will object to

25  stacking inferences upon inferences.

1          THE COURT: Objection is overruled.

2          MR. SEGALL: Thank you.

3          MR. GIBSON: That blood belonging to Alexandra

4 Flores, which has no good reason for being in the van of David

5 Rentería, is found in the van of David Rentería. And a palm

6 print on a plastic bag which has no body, no business being fused

7 to the dead, lifeless body of Alexandra Flores, is found fused to

8 the face of Alexandra Flores.

9          And Ladies and Gentlemen, that is the state of the

10 case against David Rentería. I ask that you do justice by your

11 verdict, whatever that verdict is.

12         THE COURT: Mr. Riley or Mr. Segall, who's going

13 first?

14         MR. RILEY: Thank you. May I have just a moment,

15 Your Honor?

16         THE COURT: Yes, you may.

17         MR. RILEY: Thank you. May it please the Court.

18         THE COURT: Yes, you may.

19         MR. RILEY: Counsel, Co-counsel. Ladies and

20 Gentlemen of the Jury, good morning.

21         MEMBERS OF JURY: Good morning.

22         **DEFENSE'S ARGUMENT**

23         MR. RILEY: The stuff I moved will still be

24 available to you. I just wanted to be able to address you about

25 my issues. I'm not going to be talking to you for very long. Of

1 course, as you know, when attorneys say that, from sitting back

2 in that jury room all this week and last week, you know that

3 that's not necessarily true.  But I just want to talk to you

4 about a couple of things.

5           Essentially, I want to talk to you to refresh your

6 memory with regard to voir dire.  Typically, I would not do this

7 in closing argument, but because each of you had a completely

8 different voir dire, each of you had an individual voir dire and

9 because none of us can remember exactly what we said to each and

10 every one of you because we interviewed something over a hundred

11 people, I want to refresh your memories in that regard, then I'll

12 speak briefly of the charge.

13           Now, the first thing that I want to talk about is

14 what's called the burden of proof.  I'm fairly certain that I

15 talked, or we talked, with most of you about this.  And as you'll

16 recall, the burden of proof is on the State.  And it's not partly

17 on the State, it's not kind of on the State, it's not a little

18 bit on the State.  It is all and always one hundred percent on

19 the State.  And you promised us at that time during your

20 individual voir dires that you would hold the State to that

21 burden.

22           Now, they might say to you -- and I can't possibly

23 tell you what the State will be arguing during their argument --

24 but they might say something to you like, well, the Defense

25 should have brought you this or that or the other.  And I would

suggest to that you that is burden shifting, because they are the
ones that need to answer the questions. We did more than we
actually had to, as you'll recall. We don't have to put on any
case, but we did put on a case. In fact, we used police
witnesses, FBI witnesses, to put on our case.

Now, the next thing I want to talk to you about is
the standard of proof. As you recall, the standard of proof in a
criminal case in Texas is beyond a reasonable doubt. And I don't
know who we talked to about what, but we had a chart with
increasing burdens. The lowest would be reasonably articulable
suspicion. That's the suspicion by which a police officer might
stop somebody and be able to say, hey, what are you doing here.

The next one would be probable cause. Probable
cause would be the proof necessary to obtain a search warrant or
to get an indictment presented from a grand jury. That's the
standard of proof. It's higher, but it's not the highest.

And the next is what's called the preponderance of
the evidence, or what they taught me in law school is more likely
than not. And that's just more than 50 percent. Whoever has
more than 50 percent, that side wins. So already on our chart
we're at 50 percent, okay.

The next highest is what's called clear and
convincing. As you'll recall, some of you will recall, clear and
convincing is higher than a preponderance, and clear and
convincing is the standard which is used in a child custody

1  dispute, okay. It's higher because we're dealing with something

2  more important than mere money. We're dealing with a child,

3  okay.

4  And finally, the highest standard known to our law

5  is beyond a reasonable doubt. It's even higher than the standard

6  used for determining the custody of a child. Why? Because we're

7  talking about the life and liberty of a human being. So that is

8  the highest level and that's the standard that they have to prove

9  their case to you by.

10  What is it that they have to prove? They have to

11  prove the elements. The elements are stated in the charge that

12  the Court has given you. One way to think of the elements is a

13  recipe for a cake. If you have a recipe and you want to make a

14  cake, you need eggs and water, milk, flour, so forth, sugar. And

15  you're going to make a cake, but you determine that you're going

16  to leave some of the ingredients out. You're going to leave the

17  baking soda and the sugar, and you're going to mix the rest of

18  the stuff together, and you're going to pop it in the oven.

19  You're going to bake something, but whatever comes out of there

20  won't be a cake because you didn't have all of the ingredients.

21  Well, elements are just like ingredients. If they don't have all

22  of the elements of their case, then they can't make a cake, all

23  right? That's the way it is.

24  And finally, the last thing I want to touch on is

25  the Fifth Amendment privilege of a person accused of an offense.

1 This is a right which the founding fathers placed in the

2 Constitution of the United States because they did not want the

3 authorities to drag somebody off to some dark room and have a

4 little discussion with them for a while with whips and chains and

5 so forth, and then bring them back and have that person then

6 enter their plea before the Court. So everybody has the right to

7 remain silent.

8 Now, there is one last thing I want to talk about

9 in this regard. I like Mr. Gibson very much, but I need to take

10 exception with what he said about his snow example. He

11 indicated, from my understanding, and perhaps I misunderstood

12 him, was that if you go to sleep at night and you wake up in the

13 morning and the ground is covered with snow and you see it, he

14 suggested that that is circumstantial evidence. But I believe

15 that that is direct evidence. You open the blinds or the

16 curtains and you see the snow, you see it with your own eyes,

17 that is direct evidence. Circumstantial evidence, however, would

18 be you draw the blinds, you see the snow and across the street on

19 your neighbor's sidewalk you see footprints. That is

20 circumstantial evidence that somebody walked on the sidewalk

21 across the street, okay. That's the difference. And the only

22 reason I bring it up is because this case does involve

23 circumstantial evidence.

24 Now, the charge of the Court is the Court giving

25 you the law as it applies to this case. You, you all, the Jury,

1   are the people who determine the facts, any facts that are

2   presented, these pieces of evidence, the testimony that you

3   heard, the video, all of that.  You were the ones that determined

4   how to piece those pieces of evidence together to determine the

5   facts as you see fit, and then to apply them to the law as the

6   Judge has given you, okay.  But you were the ones who determined

7   what the facts are.  And nobody out here, not the Judge, not the

8   State, not me, none of us, can tell you what the facts are.  That

9   is solely up to you, all right?

10          Now, in this part of the trial, you may not let

11  bias or prejudice influence you with regard to your vote or your

12  thinking.  And what does that mean?  It means that -- this is bad

13  from my perspective -- that you can't, for example, let sympathy

14  influence your vote with regard to David.  However, conversely,

15  you can't let sympathy influence your vote with respect to the

16  facts in this phase of the trial with respect to what happened to

17  Alexandra, okay.  This is not where this comes in at all in any

18  way, shape, or form.  You are simply to consider the facts and

19  apply those facts to the law.

20          Now, the Judge has defined for you on page 3

21  different mental states, culpable mental states, okay.  She's

22  defined for you intentionally, knowingly, and reckless, or

23  recklessly.  And clearly, they're defined right here, but I've

24  got some examples to explain what they -- how you might think

25  about them in determining how you should think about them.

An example of intentionally would be I'm in my office and I push a heavy box out my window. And I do that knowing that there's somebody down there below my window standing and I want to hit that person. That's intentional, okay.

Now, the next one is knowing, or knowingly. In that kind of culpable mental state, I push the box out the window and I know that there's somebody down there, but I don't necessarily care that I hit them. And that's taking a really great risk, okay. So that's knowing or knowingly. Because, obviously, if it hits the person, it's going to damage them, okay.

Now, in reckless -- reckless, it's like I'm cleaning my office and I push the box out the window and I don't know whether there's anybody out there, but neither do I care, okay. I don't know and I don't care. And in the terminology it says, and this action is a gross deviation from the standard of care which an ordinary person would exercise under similar circumstances.

Well, probably, certainly none of us would push a heavy box out a window without looking and checking and yelling "fore" or something like that, so that's what it's like. So if that helps you to understand the definitions, I'm glad.

On page 4 the Judge has applied the law to the facts as they might apply for manslaughter. And in that case it uses recklessly. So think about the definition. And I think

1   that you'll see that after Mr. Segall is finished discussing the

2   case with you, that it is a clear case of manslaughter here.

3            Finally, on the last paragraph there on page 4,

4   you'll see that if you have a difficult time determining whether

5   it's capital murder or manslaughter, something else or nothing

6   else, then you must resolve the issue in favor of David and you

7   must find him not guilty, okay.  That's the way the law is.

8   Again, you all decide the facts.  But the Judge gives you the

9   law.  And you must follow the law as it's given to you by the

10  Judge.

11           The last thing I think I want to talk to you

12  about -- Mr. Segall will get mad at me if I take very long -- is

13  that on page 5 you'll see under "e" it says, "no juror should

14  surrender their honest conviction."  I believe that we talked to

15  some, if not all of you, about that during voir dire.  If you

16  really believe a particular point or issue, you have a duty to

17  discuss that with other people.  But you also have the right, as

18  well as the duty, to hold on to that conviction.  And I'm fairly

19  certain we discussed with a number of you that you, as a juror,

20  should not browbeat that person who has that conviction.  I know

21  that we discussed that with you.

22           I believe that after a fair view of the evidence

23  that you will see that Mr. Rentería is not guilty of the offense

24  with which he is charged, that the State has clearly failed to

25  prove each and every element of the offense beyond a reasonable

1    doubt, which is their burden.

2            And with that I thank you very much.  And I will

3    pass you off to Mr. Segall.

4            MR. SEGALL:  May it please the Court.

5            THE COURT:  Yes.

6            MR. SEGALL:  My colleagues.

7            Good morning.

8            MEMBERS OF JURY:  Good morning.

9                    **DEFENSE'S CLOSING ARGUMENT**

10           MR. SEGALL:  That was a little bit better than you

11   gave Mr. Riley.

12           The first thing you did when we went over to

13   Liberty Hall was you took an oath.  And the oath was to give true

14   answers to the questions to be propounded to you.  And then when

15   we started the evidence here, each witness was asked to swear to

16   tell the truth, the whole truth, and nothing but the truth.  For

17   that is the foundation upon which you must look at this evidence

18   to try to make a determination, to try to find things.  If you're

19   not getting truth from the witnesses, your verdict will not be

20   true.  Because like one witness said, garbage in, garbage out.

21   If it's not truth coming from the witness stand, you can't find

22   the truth.  It's the basis.  It's the bedrock.  If we don't have

23   it, if we don't have candor and honesty coming to you, then I

24   submit to you, you cannot do what the law wants you to do.

25           What we had in this case -- it's a terrible case.

1    The other side has not put up the pictures.  You've seen them

2    briefly.  I'm sure you'll see them again.  There's no question

3    this is a bad, bad case.  And that's why the police officers got

4    up here and lied to you.  They don't want the person whom they

5    think is guilty to get off in any way.  And that's why they

6    destroyed their notes, that's why they changed their testimony.

7    That's because they looked at this case on the 19th, they decided

8    that this was a one-person case, that the person responsible is

9    the person in the video, that the person who left the print was

10   guilty, guilty of not only wanting -- guilty of wanting the

11   victim dead, not of wanting to stop her from crying.

12           You know, a house gets burglarized, police go in,

13   find a palm print on a surface, find the person who put the palm

14   print there, and there's absolutely no explanation of how that

15   print can get there other than with a burglar.  That's a very

16   good circumstantial evidence case.  That's open and shut.  And

17   you know, that's what they thought they had here.  That's what

18   they claim they have here, is an open-and-shut circumstantial

19   evidence case, because as Mr. Gibson said, the print was found

20   on her face.  Isn't that what he just told you?  That's what I

21   heard.  He said the print was found on her face.  I submit to

22   you that if the print were found on her face, that that ought

23   to be a guilty plea.  But we all know that's an exaggeration.

24   we all know the print was found on a plastic bag, not on her

25   face.

1  　　　　Is there a difference between on her face and on

2  the plastic bag?  And the answer is there most certainly is.

3  There is a world of difference.  It's kind of like that burglary.

4  If we find somebody's palm print outside the burglarized house

5  and not in the house, does that prove to us beyond a reasonable

6  doubt that the person who left the print outside the house was

7  the burglar?  No, it does not.  But the police, the police

8  decided that this was one person involved, that the person left

9  their print on the plastic bag was the guilty person, and it

10  would be the same person as seen in the video.  And they decided

11  this before they got any evidence, before they did any

12  investigating.  And anything that didn't match that conclusion

13  was ignored, was set aside.

14  　　　　And you know, as a lawyer, the saddest part about

15  this case is the destruction of our system.  We had three

16  detectives get up there and tell you at least one or more lies.

17  Not maybe.  We had Detective Martínez, who told you that -- he

18  swore in court that J.D.'s description of the clothing matched

19  what he saw in the videotape.  He swore to it.  And why did he do

20  that?  Because it helps their case immensely.  And is it true?

21  No, it is not true.  And did he know it was not true?  Well, he

22  finally said nope, finally was forced to admit to it.  But he had

23  sworn in court.  Got up there on that witness stand, raised his

24  hand, told something that wasn't true.

25  　　　　How about Detective Ruíz, the case agent?  Well,

1   never saw the FBI.  The FBI remembers him.  He told you that the

2   contamination log was everybody in the green zone, except the

3   media, which was in the green zone, wasn't listed.  Then he told

4   you that the log only records the red zone.  Under the law when

5   you change your testimony from one side to the other and they're

6   inconsistent, this is called lying.  It's called perjury.  This

7   is inconsistent statements.  Was it that form, the green zone?

8   Or was it the red zone?  Well, then he says he is the first

9   detective on the scene.  He's assigned the scene.  Remember that?

10  Very clear.  But the paperwork says he got there after Detective

11  Baca.  And he told you that this paperwork was wrong, that this

12  paperwork was a lie, until the State read it to him and then he

13  said, no, it's right.  It's true.  We're going to try to kill

14  this man based on lies.  Based on lies.

15      Then we have Detective Pantoja who testified

16  clearly and unequivocally that the Defendant did not talk to the

17  FBI.  Then he said, well, I don't remember.  But the FBI was in

18  my office talking to him, talking to me, I don't remember.  So

19  when I said he wasn't there, that was a lie.  Because I really

20  just don't remember.  But I remember everything.

21      Then he got in the van and searched it.  He told

22  the Judge, he swore to the Judge that the answer to the question

23  was "yes."  "Did you get in the van?"  He said, "yes."  And then

24  gets up here when he discovers that that's a bad answer, he says,

25  "No, I stood outside and just looked in the back."

1    Then they admitted to you that they lied on the

2 search warrant application. Here's the start of a police state.

3 Because what we have is our law says that you must accurately

4 tell the Judge why it is that you want to search for something,

5 why you think that something is there. And what they said was,

6 we searched the place, we didn't see anything, we then tell the

7 Judge all the good reasons to search the thing and we don't tell

8 him that we've already looked and the stuff wasn't there. When I

9 asked him, well, how do you justify that, he says, anything could

10 appear there for any reason at any time.

11    Well, Ladies and Gentlemen, if you permit that,

12 you have just surrendered to a police state because that's what a

13 police state is, is the police think that for no reason

14 whatsoever, if they're out there to protect us from the

15 criminals, they ought to be permitted to search whatever they

16 want whenever they want, however they want, because if you're not

17 guilty, you won't mind. Right? I mean, that's the basis of a

18 police state, is the police state is not there because the police

19 are evil, they're not there because the people doing it think

20 they're doing it to oppress, they think they're doing it because

21 it's the right thing to do. That's the bottom line on a police

22 state.

23    That's what we had in this case, is they went to

24 the judge and lied to the judge. They didn't have to lie to the

25 judge. They could have told him, we've looked in there. There

was no clothes, there was no blood, but now we want to go back there and check again. But they didn't. They chose the easy way, the slight exaggeration.

You know, they said he freely and voluntarily consented to giving his palm print. Here's a stack of palm prints that were collected in this case by other persons. Guess what's attached to them? Guess what's attached to them? Piece of paper signed, says, "I freely and voluntarily consent." 'Tain't there. 'Tain't there.

Then we get to the problem of the destroyed evidence. Why do they destroy the handwritten notes? They destroy the handwritten notes so I cannot catch them in lies. That's why they destroy the handwritten notes. Now, they said, well, other people have difficulty reading them. I don't doubt that. They say that the D.A.'s office wants it in typed up. I don't doubt that a bit. I'm sure they do. Does that excuse them for destroying the evidence? And the answer is no. They said, it's not evidence. Of course it's evidence. That's why the FBI keeps it. It's evidence. It will find errors, mistakes, and if you're being honest -- remember that first officer, Officer Lloyd? He got up there and he said that the Defendant came down and he was in the company of a detective and I said, are you sure that it's the detective who you mentioned? And he said, nope, I'm not sure.

Does that hurt him? Does that somehow prove that

they're anything other than a human being?  Absolutely not.  Does
it destroy their case?  Absolutely not.  In any way, shape, or
manner, honesty, fairness, candor does not destroy good cases.
Honest, correct cases can withstand cross-examination.  You can
wave the original notes around.  The FBI wins their cases across
the street all the time without destroying their notes.

They destroyed their notes so I wouldn't be able
to cross-examine them so they can lie with impunity.  They
destroyed the contamination sheet.  There's no question in our
mind they destroyed it.  I made a big deal about it on Thursday.
I expected when I walked in here Friday morning that it would be
in their hot little hand.  We gotcha.  You wanted to see it.
There it is.  Huh-uh.  It's been destroyed.  Why has it been
destroyed?  Why?  Because they're afraid it will destroy their
case.

What else is missing?  Well, there's the outside
videotape.  You'll remember the FBI said they were given a tape
and that at 5:17 the child is getting into a dark minivan.
Defense didn't make this up.  This is not something within our
possession.  This is what?  Back in November they have this piece
of tape and now suddenly when the van turns out not to be a
minivan, dark color, red, suddenly that evidence is gone.  The
young man says we can't see anything in that videotape, it's
nothing, it's garbage, I can't see anything.  At 5:17 the child
is seen getting into a dark-colored minivan.  Please enhance.

1   Where is it?  It is not the Defense's job to find evidence and

2   bring it for you that is in the possession of the State.  That

3   can't be done.  That's their job.  Present their evidence.

4   David's van is not a minivan.  Gets arrested and the evidence

5   gone.  He's trying to shift the burden to say otherwise.

6              Now, let's look at some problems in their case

7   because their case has problems.

8              The security guard.  Anybody here think she was

9   dishonest, she was lying, she was trying to make things up?

10  She's trying to help David?  Very funny.  Okay.  She doesn't say

11  it's him.  Let's say it's not him because she is an honest

12  person.  Didn't say a thing.  Doesn't say it now.  Even though

13  they took a single photograph of him and say, is this the guy,

14  and she said, I can't tell.  But she does say that he had six

15  Wal-Mart bags and a white shirt, no hat.  And so I guess what the

16  State is going to maintain is that the Defendant wanders through

17  the Wal-Mart with this dark-colored shirt on over a light-colored

18  T-shirt, that he exits the store and in between the store and the

19  van, for some reason takes off the green shirt and the baseball

20  cap and hides them, figuring he's going to talk to a security

21  guard when he gets out.

22             Gets out there, talks to a security guard, comes

23  back over to the store, and you'll remember he comes from down

24  here at the gas station, back here to the store, because this is

25  right where she's fixing the person's jumper cable.  Shakes her

1  hand.  You know, he's going to rob a bank, shakes the hand of a

2  security guard to make sure they identify him, and goes inside.

3  And between here and here he puts his shirt back on.  Somehow

4  that circumstance doesn't help.  Well, I guess she's just wrong.

5  Okay.  She doesn't know what she's talking about.

6  We can just dismiss anything that doesn't fit in

7  this case, just like all those tips.  This person doesn't look

8  like so-and-so.  Their fingerprint didn't match.  They got to go

9  home free, even if they murdered this child.

10  Okay, what else do we have wrong?  The minivan.

11  She's seen getting into a minivan at 5:17.  Boy, that doesn't fit

12  the State's case.  The van, David's van, was searched by two very

13  experienced officers November 20th.  What were they looking for?

14  They were looking for two things.  They were looking for her

15  clothing and they were looking for blood.  Bloodstains.  Two days

16  after the crime.  They get in there, one of them at least.  At

17  the very least, one of them gets in there and searches for

18  bloodstains.  That's what he's looking for.  And does he find

19  them?  No, doesn't find them.

20  We're not talking about somebody who's -- you

21  know, doesn't care and is lackadaisical.  I didn't get that

22  impression.  In fact, I get the opposite impression.  That if

23  there was anything in that van, anything, that van would have

24  been towed that night right there, right then.  But nope.

25  Nothing found.  Now, they find, you know -- you look at those

1    pictures with blood on her arms and legs and you're left with

2    this very strange, strange thing; that remember, there's

3    supposedly some DNA found, bloodstains found on the top of the

4    rear seat where like if somebody put their hand there.  So the

5    person whose bloody hand is there doesn't put any blood on the

6    steering wheel.  Remember, it's covered with one of those little

7    plastic things with little holes that would clearly hold blood.

8    But there's no blood there.  There's no blood on the shifter.

9    There's no blood on the pedal.  No blood in any of those places.

10            Now, the blood on the shoe.  This one was

11   fascinating.  This one educated me for he had a pair of white

12   tennis shoes the police seized.  And one of them was perfectly

13   clean and the other one had a weak response on -- for blood.  But

14   no DNA.  But no DNA.  What does this tell us?  What did we learn?

15   Learned something very strange that didn't even occur to me.

16   Blood is not DNA.  DNA and blood are not always together.

17            MR. ESPARZA:  Your Honor, I'm going to object.  I

18   think that is outside the record and that's not the evidence in

19   this case.

20            THE COURT:  The Jury will remember the evidence

21   from the witnesses.

22            MR. SEGALL:  You'll remember what she said was

23   that there had to be enough DNA present; that there could be

24   blood without DNA.  The amount of DNA necessary was two nanograms

25   or one nanogram.  What in the world is a nanogram?  A nanogram is

a billionth, a billionth of a gram.  I can't conceive of how small this is.  This is inconceivably tiny, just amazingly tiny.  There was none in this state on this shoe.

Two days after the fight and struggle that left her knuckles -- the Defendant was inspected and no injuries found.  His hands looked at.  Nothing found.  And none of the decedent's hair was found.  You'll remember the stipulation, because the one officer was willing to say, oh, yeah, there was hair found.  There was hair found.  That must have been hers.  Remember that?  He said it was tested positive.  But point of fact, there is no lab report from the Federal Bureau of Investigation indicating that the hair similar to Alexandra Flores was located in the Defendant's van.  Hair was found, not hers.  Some other evidence that we'll just ignore.  Tire prints don't match.  We'll just ignore it.  Footprint doesn't match.  Just ignore it.

Fingerprints both at the scene and in the van don't match anybody.  We don't care.  This is a one-person crime.  This is the person in the videotape.  We don't need to explain anything else.  DNA was found on the decedent.  Not David's.  Who cares?  Not important.  DNA was found on the decedent.  No one says it's David's, no one cares.  Okay.

Gas can comes and goes.  Well, I don't have any doubt in my mind gas cans come and go.  That's normal.  That's expected.  But does this gas can that they have in evidence here

1   have anything to do with this crime?  The answer is there's no

2   evidence that it does.  It's just a gas can found in an old

3   vehicle.  What a surprise.

4          Then we have the rest of the case, the basis of

5   this case, which is just a puzzlement.  If David grabbed the

6   decedent for sex for which, by the way, there was absolutely no

7   evidence -- he gently fingered her and then brutally strangled

8   her to death, doesn't make any sense -- if he did so and killed

9   her for that purpose, we know to the east of that store within

10  two miles it was vacant.  There was privacy to do your dirty

11  work.  But that's not where the child was found.  Why go the

12  wrong way?  Miles and miles to a place surrounded by apartments,

13  surrounded by hotels with people.  That's what this crime is all

14  about.  Doesn't make sense.

15         Now, let me suggest to you that that bag was

16  touched by David, was used by the killer.  That the DNA was

17  contamination.  Those officers were at that scene.  Those

18  officers walked around that body.  They were listed.  They're

19  listed as having done so, even in the edited contamination sheet

20  because it doesn't make a bit of sense to make a list of people

21  who walk down the street who don't go anywhere near the red zone.

22  It don't make a bit of sense.  Why in the world do that?

23  Incompetence.

24         So what we're going to say is, well, our police

25  department is incompetent, and therefore he's guilty?  No.  No.

This is the biggest case they've had. They made sure it was done correctly. And they kept a correct log of who all was at that red zone. They walked around that van and they spread DNA. Micrograms are enormous compared to what we're talking about. Nanograms, just nanograms. No evidence that this was not contamination. Did their expert say this is not contamination? No, she didn't. She said garbage in, garbage out. Their evidence custodian said -- what happens if two of your officers walk around the scene and walk around the van? He said, well, it's all garbage. It's ruined. All right.

The only eyewitness to describe the driver of the van comes up with a different description than in the video. She's trained to be honest. I thought she was caring. You're going to be asked to ignore her. You're going to be asked to do something which, it don't work, it don't help, so it must be wrong.

Ladies and Gentlemen, they destroyed the evidence that can help us prove David's innocent. Hold it against them. Don't let them put police on the witness stand who lie. I know we don't want our police to lie. We know we want them to be honest. We want them to solve crimes. We want them to do what's necessary to protect us. That's what their job is, but this is the point where we say, huh-uh. Be a man. When you're wrong, say you're wrong. You misinterpret a question, that's fine. We're all human. I've done it. Be a man. Because what you're

trying to do is to have him die in prison. I'm trying to have you put your name on a piece of paper so that that man dies and you're going to make me do it on lies, on exaggerations.

How dare they? How dare they? We don't know what happened. I can't prove it to you. Bad defense work. Good defense lawyer gets up on a circumstantial evidence case and tells you what happened, fits all the pieces together. See, the Defendant didn't do it. I can't do it. Can't do it because I've been given lies. I've been given exaggerations.

Now you're going to hear Mr. Esparza, who is excellent. One of the things he's going to do, I suspect, one of the things I object to, is he's going to say, well, the person in the Sam's club is the same person in the Wal-Mart, which is David Rentería, because someone used David Rentería's card to buy $80 worth of groceries some hour or so before and he stood near David Rentería's father.

You see how this is a chain of inferences? This goes from one inference to another inference. We infer that the person standing near whom the police officer swears is Mr. Santiago Rentería, is somehow related to him. It's an inference. We infer that that's the person who used the Sam's Club card. When we looked through the exhibit, we saw Mr. Santiago Rentería does not have a Sam's Club card. So we know that when he walked in that door and when that card got used, that clerk didn't check. And indeed, they said that they

1   don't, really. They'd like to. But they really don't. It's not

2   a positive identification. It's not a police officer checking

3   you against your driver's license. After all, they're in the

4   business to sell you merchandise, right. Take the cash.

5           Then they want to infer from that that that's the

6   same person in the other film. Then they want to infer from that

7   that that person is the person who lured the child out. You see

8   the length of inferences? And they're all inferences and they

9   don't have any separate bases. They're piled one on another, a

10  series of guesses. And as they move away from reality, from a

11  basis, from evidence, they become less and less reality and more

12  and more do they become good guess, could be, good probable

13  cause. And then we're going to do a circular. We are going to

14  do a circular and the circular is, okay, we have found a palm

15  print, and that palm print then supports all our inferences. And

16  that DNA supports all our inferences, when in point of fact, they

17  do not, because the palm print proves he touched the plastic bag.

18  That's all it proves, not that he intended this child die.

19          The DNA, the DNA doesn't prove it. Well, no, if

20  the officer entered the van, saw the bloodstains, said, you know,

21  there's fresh blood here, maybe we should have this tested today,

22  that sounds pretty good to me. Didn't happen. Blood wasn't

23  there. And what do we know about blood and DNA? And the hair?

24  It's just not all there. So that's why I'm left with a can't

25  tell you what happened. Because job wasn't done right. People

1   were accused of being involved in this crime who were released.

2   Their stories not even taken, their palm print didn't match,

3   adios.

4           Ladies and Gentlemen, when I look at a

5   circumstantial evidence case -- I would think that when you look

6   at a circumstantial evidence case -- that you would say to prove

7   it beyond a reasonable doubt, there must not be circumstances

8   which contradict the conclusion.  I have tried to point out to

9   you a number of evidence, not speculation, not hope, but evidence

10  that weighs against it, that does not add.  I'm sure after you've

11  had an impartial and full look at all of the evidence, that you

12  will understand David didn't do this.  Thank you.

13          THE COURT:  Mr. Esparza.

14          MR. ESPARZA:  Your Honor, can we approach?

15          (At the bench, on the record.)

16          MR. ESPARZA:  Do you want to let them just stretch

17  a little while I collect my evidence?  It's going to take me a

18  bit to put it in order.

19          THE COURT:  While you're up here, do you want to

20  release the two alternates?  It's going to be right at lunchtime.

21  Do you have an objection to me allowing them not to go into the

22  jury room, but to go to the cafeteria with the Jury downstairs

23  with the Bailiffs to have lunch, and then when they come back the

24  Bailiff will make sure they don't go in.  They won't have any

25  type of deliberation.

1    MR. SEGALL:  They will not discuss the case prior

2  to -- after lunch?

3    THE COURT:  Right.  I'll have Louie make sure to

4  be in the jury room with them at all times while they collect

5  their stuff so there's no discussion of the case.

6    MR. SEGALL:  Your Honor, we would have no

7  objection to that.

8    We further would like the record to reflect that

9  we understand that some of the jurors separated from the other

10  ones for the purposes of the De La Hoya fight, and we have no

11  objection to that and we had none before it happened.

12    THE COURT:  Thank you.

13    MR. ESPARZA:  You want them to stretch?

14    (Open court, Jury hearing.)

15    THE COURT:  He's going to gather up some of the

16  exhibits, and so if you want to stand up and take a little

17  stretch break, I'm going to.

18    The Jury has indicated they need a real break for

19  just a few minutes.  Leave the charges here on your chair.  Do

20  not discuss the case, please.

21    (Recess.)

22    (After recess, Defendant and Jury present.)

23    THE COURT:  You may proceed.

24    MR ESPARZA:  May it please the Court.

25    THE COURT:  Yes.

### STATE'S CLOSING ARGUMENT

MR. ESPARZA:  Counsel for Defense, Ms. Swopes,
Mr. Gibson, Ladies and Gentlemen of the Jury.

It's my final opportunity to speak to you to tell
you what I believe, based on the evidence, what the evidence
showed.  So I'm going to spend a little time talking about this
case.  And when I get done, I'm going to ask you to find the
Defendant guilty of capital murder beyond a reasonable doubt.  No
question.  There's no doubts.  You already know that's the right
answer and you probably think I ought not talk.

But my client, the State of Texas, says we want to
make sure that you understand the evidence.  And I know you've
been here five days and I know it's been more than that and it's
been long and hard.  But now is not the time to rest because
there is lots to do still.  As a matter of fact, I get to rest
because you go to work.  And when you go to work, I want to make
sure you have the tools you need to make the right decision.

Now, somewhere on that charge you're going to find
something about reckless, and the lesser of manslaughter.  You're
going to see that in the charge.  You will never need to get
there.  There is no lesser here.  This is an intentional and
knowing killing, period.  It's clear.  There's nothing here.

This little part about maybe stopping her from
crying, did you hear that?  I mean, get real.  That didn't
happen.  Dr. Contín said if you had to rate the strangulation

from one to four, it's a four.

I'm going to talk to you a little bit about circumstantial evidence. I'm going to talk a little bit about direct evidence. And you know, if you're just real, real quiet, just real quiet, all of this speaks to you. You may not hear it right, right now. But when you get back to look at it, it will talk to you. Is circumstantial evidence better than direct evidence? I'll argue that it is.

On direct evidence, you have someone testifying that something happened. And you know what the attack is on direct evidence? That they couldn't see, that they were biased, that they're wrong. They needed eyeglasses. There's something wrong with direct evidence.

But you know what circumstantial evidence and physical evidence says? It doesn't lie. It certainly can be misinterpreted. But it never, never lies. And that's what makes this case. But you know, to put all these pieces together, to make it all fit -- because what circumstantial evidence does is you put the circumstances together, just like Mr. Gibson did. He piled it one after another. And in circumstantial evidence cases, sometimes there's a little gap, sometimes there's a big gap. Sometimes in circumstantial evidence cases you can't make a decision. But not this case. But in this case it's a little bit different. Because in this case I have the glue that holds my circumstances together. So I want to spend just a little time

1   talking to you about the glue that holds this together.  And that

2   is the Defendant.

3           Let's take a look at the killer.  For the last

4   hour I didn't hear anything about the killer.  So let's take just

5   a little bit -- take a little time and talk about the killer.

6   And this is what I know about the Defendant.  One, he committed a

7   violent, vicious, horrendous act.  He strangled that little girl

8   to death.  It took from a minute to three minutes to kill that

9   little girl.  And we went from there, to this.  This is his

10  handiwork.  You will see these in the jury room.  And I'm sorry,

11  but I do not apologize.  This is vicious.  This was beautiful.

12  He touched her and we ended up with this.  This is beautiful;

13  this is his handiwork.

14          And you know, let's talk a little bit about our

15  killer.  Let's talk a little bit about him.  Just think about how

16  smart he is.  Think about how he left the body.  He took the

17  clothing away.  Why would he take the clothing away?  Because

18  he's trying to destroy evidence.  He doesn't want to leave

19  anything behind.  So he takes her clothing.  Why does he set her

20  on fire?  To destroy evidence.  To destroy evidence.  That's the

21  whole purpose.  He's cold, he's methodical, and it's planned.

22          Why leave your van running?  Because he's cold,

23  and he's methodical, and knows exactly what he's going to do.

24  There was no need to return to the store.  He'd already done his

25  shopping.  He'd already taken care of his business.  But he left

1   that van running. And there's some talk here about maybe there's

2   some other person involved. Well, we heard about the troubles

3   with the van. And don't you know if you've got a partner, you

4   just have him drive the van up, open that sliding door, shove the

5   girl in there, and you're gone.

6          There's no one else here. You know why there's no

7   one else here? Because our killer is smart. Because he's

8   thought about it. And he has to have complete control over the

9   evidence. Complete control, because that's the only way he's not

10   going to get caught. Because he thought he was going to get

11   away. But he's not going to get away because you're not going to

12   let him get away with it. He thought he was.

13          That's why on the 20th of November, when they came

14   to talk to him, he's a pretty cool customer, isn't he? He knows

15   exactly what he's doing. Because he doesn't know we have the

16   print. Nobody knew. He didn't know we had made a match. He

17   didn't know we were going to make that match about a week later,

18   and neither did those officers.

19          So when they went to talk to him, all they were

20   doing was well, guess what. We got a plate. We got a plate

21   number from the security guard. Had he planned on that? He

22   hadn't planned on it. I mean, come on. What are the odds? What

23   are the odds that the security guard would write the plate

24   number? If she doesn't write the plate number, we're probably

25   still looking.

1    And it's true.  No matter what they say, how bad
2  our investigation was, that we're telling you lies, that this is
3  a police state, that we want you to convict the wrong person,
4  it's not true.  Because if it was true, don't you think we'd just
5  orchestrate our lies just a little bit better?  But the fact of
6  the matter is, a trial, an investigation is human.  And there are
7  tensions and struggles just like you have in your life.  And
8  nothing fits perfect.  I wish it would.  But you know what, if
9  things would fit perfectly, if they had to be perfectly fit,
10  perfect, then the burden of proof for the State would not be
11  beyond a reasonable doubt.  It would be beyond all doubt if that
12  was the way we lived in this world.  But we don't.  It's not
13  beyond all doubt.  It's beyond a reasonable doubt.
14    And this thought that this investigation was
15  flawed, and that we are trying just to get anybody, is ludicrous.
16  We didn't put his print there.  Oh, we can't tell the timing of
17  the print.  Well, that's true, we can't.  Maybe he had it when he
18  was buying some bread and that's a loaf of bread.  That's a bunch
19  of hogwash.  There's no bread.  It's nothing like that.  Why is
20  it, looking to the circumstances of that?  Why is the print right
21  here?  Why is that?  Why would it be there if he just touched the
22  bag?  It would be a circumstance that was not related to the
23  case, not related at all if, if, and only if that print was
24  somewhere else.  But what a coincidence that the print is right
25  here.

1    Is it a coincidence or is it a fact?  It's a fact.

2    Is it a coincidence that he happens to be in the video with his

3    dad at the Sam's where he went to just before?  Is it a

4    coincidence that he happened to purchase oranges and we find

5    oranges in that little girl's stomach?  It's a fact.  It's a

6    fact.

7    This thing about the contamination log.  They want

8    you to believe that peace officers from the El Paso Police

9    Department, that they somehow spread, like some sort of fairy

10   dust, DNA over this chair.  But you know what happened?  He

11   didn't think he left anything here.  He probably thought that

12   plastic bag caught all the blood.  But it didn't.  It didn't.

13   It's right here.  You can hardly see it.  It's right here and

14   right here.  It's right here and right here.  It's right here and

15   right here.  He didn't think we were going to find it.  He

16   probably thought after the 20th, he was scot-free.  He didn't

17   think we'd find it.  And come on, look at this.  It's kind of

18   filthy, isn't it?  They're never going to find any blood there.

19   Plus, he probably thought it was all in the bag.  But it's not

20   true.  And only two places on her body, I believe, there are some

21   co-mingling of DNA.  Don't get strayed on that.

22   The problem is is we don't know whose it is, or

23   why it's there.  Don't misinterpret that evidence.  Could it have

24   been the Defendant?  It could have been.  Could it be someone she

25   touched during the day?  It could be.  The FBI said there is no

1  way to make a determination. The fact of the matter is, there
2  just is. But if we wanted to lie to you, if we wanted this to be
3  a police state, I guess we'd hide that from you. Wouldn't it be
4  a nice and pretty case if all I had was her DNA there and I don't
5  have to deal with this co-mingling issue? The problem is, is
6  that we tried very hard to identify it. You saw that FBI agent.
7  She's a sharp lady. She knew her business. And as a scientist
8  she could not. But she knew this much. That that little girl's
9  DNA was in the blood, and it was right here, right here, and
10  right here.

11         They spent quite a bit of time talking about
12  footprints and tips and so forth. It's all speculation. All
13  speculation. This is a very good case. You can pass it from one
14  to the other. It's a very good case. She's only 47 inches tall,
15  cute as a little button. You can see her little hands moving in
16  the Wal-Mart. 56 pounds versus someone who's five-seven, 185
17  pounds. And he manhandled her. And he wanted to get away with
18  it. And when he was done, he thought he had hidden all the
19  evidence. But not only did he leave stuff behind, we have him on
20  film. Now, if you don't think this is a cold, methodical killer,
21  you think twice.

22         In my opinion, this is the most damning evidence.
23  He already has gone in and out. When he goes back the second
24  time, don't forget who we're dealing with here, okay. He goes
25  through the extraordinary step of thanking the security guard for

1  not towing him when he's just about, he's just about to take that

2  little girl, he's just about to take her and he knows it.  He

3  goes out of his way to do that.

4          He goes in at 1713 on the second time in.  He goes

5  out at 1715.  On opening I told you that it was 129 seconds.  I'm

6  off by 11.  140 seconds, depending on when you count him going

7  in.  140 seconds.  We know it's 126 feet from here to here, and

8  the evidence was that it takes 30 seconds, 30 seconds to get from

9  the door to here.  You must have been amazed at that, knowing how

10  big those Wal-Marts are.  They're huge, huge.  That would be clip

11  13 when you look at it.

12          Clip 14 says -- we catch him and the times are off

13  just a little bit because they're using different VCRs and

14  they're just off just a bit.  So it won't be tracking the 1713

15  time.  I believe this time is like 1710, 1711.  But here's the

16  important thing to look at.  You see him walk by.  And when you

17  get back in that jury room, you go look and count it.  He goes

18  this way, and then he goes this way.  She walks on this side of

19  the podium, and he pushes his cart on this side.  Count the time.

20  I count it to be 48 seconds.  I might be off a second or two.  But

21  I count 48 seconds.  48 plus 30.  I'm not a mathematician, but

22  that's over a minute.  I say he's got a minute and 10 seconds, a

23  minute and 10 seconds to somehow lure her out through here.

24          Now, if you ask me, that's a surgical strike.  He

25  knows exactly what he's doing.  And you know what's even more --

1 you look at this. This is clip 14 that I think is relevant. 13,

2 14, then 15. You look at clip 15 and it is the most telling, if

3 you wonder, why do we have to struggle over the evidence. What

4 was he thinking, because he thought he had destroyed it. Because

5 he's smart. He's cunning. It's diabolical what he's about to do

6 here. And guess what he does. Did you notice this? I'm sure

7 you did. He is about from here -- from that corner to here from

8 that little girl.

9        And you know why he does that? Because what if

10 mama shows up? He just keeps right on walking. And guess what?

11 Just keep on walking. It just didn't work today. Just keep

12 right on walking. I can't stand too close because then mama will

13 say, what are you doing with my little girl. So he leaves a

14 little distance here because he knows. It's a plan. He already

15 left the van running. So he knows he's moving from there to

16 there to the car.

17        And then you've just got to think, why would

18 anybody abduct a little girl on the Sunday before Thanksgiving

19 when the Wal-Mart is the busiest? Why would you do that? Do you

20 know why? Because on a Sunday before Thanksgiving, when

21 everybody is buying their turkeys and whatever, it's full and it

22 is extremely chaotic. And he can take advantage of the chaos.

23 He can take advantage of how busy it is. He knows it. So that's

24 why he hit that day. And if he happens to go fishing, and while

25 he doesn't quite snag them because mom comes along, it was a good

1 day anyway to go hunting.

2 Don't let this killer loose. There's nothing

3 wrong with this case. He said Detective Pantoja -- if they

4 talked to the FBI, if they didn't talk to the FBI, does that

5 affect the quality of this case? Does it come to an issue of

6 importance to you in this case? Does it matter to you if the FBI

7 was physically present there? It does not. Let's say you heard

8 both those officers testify, we did not go to the contamination.

9 We did not. All they got is this contamination log. You get to

10 see everything that happens here. Everything that happens, you

11 got to see it. You get to judge their demeanor, you get to judge

12 whether they're telling you the truth or not. And do you think

13 those officers are lying? They are not.

14 They want you to believe that they went into a

15 zone and somehow, somehow, they got DNA and they put it in here?

16 It can't happen. It can't happen. Because not only can they

17 just sort of spread that little fairy dust, not only can they do

18 that, it has to be blood. Because that's what she said she saw.

19 That's what she tested. She tested blood. And Mr. Segall got up

20 here and said the blood and the DNA are separate. No. No. I'm

21 a lawyer for a very good reason. That's why I'm not a scientist.

22 But I understood this answer from the witness. That you can get

23 DNA from several sources, blood, saliva, your skin, there's a

24 variety of ways. But they're together. Your DNA is in the cell.

25 There's not this little DNA component floating around. So they

1  didn't do that.  They didn't come in here and contaminate this.

2  They don't.

3             And that contamination log means nothing and guess

4  what?  If this is the police state that he says it is, if this is

5  the farce that he says it is, if this entire process is a farce,

6  we should have just shredded the contamination log.  He says,

7  well, I thought the very next day they'd come in with their

8  little contamination log and say, here it is.

9             This is the state of the evidence.  No one is

10  making it up.  No one is writing it as we go along.  You have it.

11  That's it.  We could have gone back, I guess, and rewritten it.

12  His suggestion is that's something the State would think about.

13  Let's just write the evidence the way we want it.  My guess is, I

14  would rewrite it just a little differently.  Because it would be

15  a heck of a lot easier case, wouldn't it?  But that's not the

16  state of the evidence.  And they've got the chance to

17  cross-examine everyone.  They got a chance to test our evidence.

18  That's how you search for the truth in a courtroom.  You test the

19  evidence.

20             And you need to go back and, oh, it's been so long

21  ago, but Officer Monday, now there's a guy who knew exactly what

22  he's doing when he got there and took care of his business.  He

23  saw her down there.  He saw her down there and he took real care,

24  real care over her body because he was looking for prints.  He

25  wanted to know, is there any evidence here, and so he took the

precaution of watching over her body. After he left it out there

lonely in the night, in the cold all by herself, Officer Monday

came to protect her, to protect her so that she could tell us her

story, so she could tell us what happened.

And that's the only reason we found that print.

It's the only reason. Did Officer Monday say someone else

touched that body? No. Did Officer Monday say he's experienced?

He knows what it takes, he knew what he had to do, and he took

control. Because that was his responsibility. And so he didn't

put her in a black bag so they could transport the body because

he was afraid of the moisture. He put a sheet over her. And

they had the opportunity to fully cross-examine him. They had an

opportunity to fully test the truth of what he was saying.

Instead, instead they come from way left field and say, oh, this

contamination log, and that means this whole case, just trash

this whole case. Trash in, trash out. That's bull. That's

bull. This poor little girl, she was lying there and Officer

Monday protected her. He put the sheet on her and he protected

her. He was very careful.

Dr. Contín was very careful. Officer Monday and

Dr. Contín see the body, and then, and then he did that superglue

process and wow. I mean, it's almost a movie. It's almost a

movie. Can you believe it? That little plastic bag. It had a

print. It had a print. She still had her story to tell. She

wasn't going to go away without telling you what happened to her.

It wasn't going to happen.  And the El Paso Police Department wasn't going to let it happen, either.  And yeah, there were like 460 tips, and yes, it was investigated, and there's no evidence before you linking this to anybody else.  None.  None.  None.  It's a pipe dream, a rabbit trail somewhere else.  They weren't in the same courtroom I was in.  It wasn't true.

Officer Monday does his job.  He's the one that's got to protect this.  Don't you know if one of those officers gets too close and just touches this body he's got to explain why that print is there?  It's not going to happen.  So Detective Martínez and Detective Pantoja, if they got in the van or if they didn't get in the van -- okay, I wish it was cleaner.  And I wish we lived lives in straight lines.  I wish there were no corners, no crosses, no circles.  We just moved forward and in a straight line and life was good.  But that's not your life, and it's not my life, and that's not the life of this case.

But did it matter?  Do you actually believe that those two detectives put the evidence there?  That they were skilled enough to somehow manage to put her blood in such minute amounts that it took the FBI to figure out it was there?  Do you believe that they did that?  Do you honestly think that's true?  No, you don't.  And don't let them sell you that bill of goods.  It's not true, as hard as they tried.  It's as if implying that he was trying to stop the little girl from crying, because that would be a reckless act.  It's as sound -- that's a theory of

1  stopping as sound as the theory they spread this fairy dust.

2         Is DNA a precise science?  It's a great science.

3  When you get back there, you can look at it.  You can tell her

4  and then you can tell where it's found.  It's good science.  It's

5  accurate science, it's science we depend on.  It's science that

6  tells a story and you can't misinterpret it.  Nobody is coming in

7  here and telling you it's not.

8         I don't think there's any question as to the

9  identity.  This is him, and this is his handiwork.  This was bad,

10  and this got worse.  This is him, and this is his handiwork.  And

11  he left her to die.

12         I don't get to go back to the jury room and argue

13  my case again.  And if you haven't figured it out by now, I

14  would.  I would.  And I wish I could go back there and tell you

15  this is what the evidence says and this is what we're trying to

16  tell you.  But it's not permitted by the law.  And sometimes my

17  mom says that I get way too sarcastic.  And so if I did that

18  during argument, I apologize.  But in the search of truth and in

19  this courtroom where we'll ask you to do the right thing, to do

20  what is right and just, I might get just a little passionate.

21  But it's important.

22         Because in the final analysis in this case, he's a

23  cold and methodical killer.  And every step of the way in this

24  case you can see it.  There's planning, there's organization,

25  there's thought.  He knows exactly what he's doing.  And that's

1   what makes this even a more horrendous case.  If it couldn't get

2   any worse, that poor little girl walking down that little toy

3   aisle, and when you see that video -- my guess is you'll see it

4   more than once -- you'll see her little hands kind of free, the

5   innocence of a child.  It was bad enough that we had to find her

6   body dead, and it's bad enough that she was out there lonely all

7   night, but what makes this capital murder is not that it's

8   murder, it's that she was under six years of age.  And she didn't

9   ask for any of this.  A stranger attacked a stranger.

10          Don't let him get away.  There's nothing reckless

11  about this conduct.  It's all purposeful, it's all thoughtful.

12  It's all planned.  It's all organized.  He got caught because

13  there was some really great investigation, because the technology

14  and the science allows us to retrieve evidence when never before.

15  Fate gave us some luck because that print wasn't consumed in the

16  fire and we had evidence left over.  And hard work and the cold

17  and callous nature in which he committed this offense left him

18  just to miss just a little bit.  He slipped just a little bit.

19          In my final minutes I would just ask you to do

20  this.  Look real hard at the evidence.  It's a serious case.

21  Every time we're in here there are important issues.  I want you

22  to take a good, hard look at this.  I'm not afraid of you testing

23  my evidence.  I have no problems.  Take a look at it.  Turn it

24  upside down, kick the tires, take a look, jack it up, change the

25  oil.  I don't care what you do to it.  No matter how you look at

1   it, forward, backwards, up or down, it's all the same.  Get on

2   your knees, doesn't matter to me what you do.  No matter how you

3   look at it, doesn't matter what vantage point, no matter what

4   theory you think of, it's always going to come to the Defendant.

5   It's always going to come to the Defendant, no matter what you

6   do.

7           And you find him guilty.  You find him guilty of

8   capital murder.  On your jury charge you sign only one verdict

9   form, and that's Verdict Form A.  There isn't any other form, any

10  other verdict form that's proper under the law and the facts in

11  this case.  There's none.  Take a good hard look at it.  You're

12  going to come to the same conclusion.  It's guilty of capital

13  murder.  Take your time and do what's right.  Review the

14  evidence.  But do what's just and based on the evidence.  I wish

15  you Godspeed.

16          THE COURT:  All right, Ladies and Gentlemen,

17  before I allow you to go to the jury room to begin any

18  deliberations, we have made arrangements to take you to lunch.

19  You must remember the instructions you are not allowed to discuss

20  this case among yourselves or allow anyone to discuss it within

21  your hearing.  After you come back from lunch, you may only

22  discuss this case when the 12 members of the Jury are present in

23  the jury room by themselves.  And I will speak with the

24  alternates after lunch.

25          (Recess at 12:28 p.m.)

1    (After deliberations, Jury and Defendant

2    present, 2:26 p.m.)

3    THE COURT:  Has the Jury reached a verdict?

4    PRESIDING JUROR:  Yes, we have.

5    THE COURT:  Will the presiding juror hand the

6    charge to the Bailiff.

7    Will the Defendant please rise.

8    THE COURT:  "We, the Jury, find the Defendant,

9    David Rentería, guilty of the offense of capital murder as

10   charged in the indictment."

11   You may be seated.

12   Do you wish to have the Jury polled?

13   MR. SEGALL:  Yes, Your Honor.

14   THE COURT:  All right.  What I'm going to do, I'm

15   going to ask each and every one of you if what I have read out

16   loud in the courtroom is, in fact, your verdict.

17   Number 1, is this your verdict?

18   JUROR NUMBER 1:  Yes, ma'am.

19   THE COURT:  Number 2, is this your verdict?

20   JUROR NUMBER 2:  Yes, ma'am.

21   THE COURT:  Number 3, is this your verdict?

22   JUROR NUMBER 3:  Yes, ma'am.

23   THE COURT:  Number 4?

24   JUROR NUMBER 4:  Yes, ma'am.

25   THE COURT:  Number 5?

1    JUROR NUMBER 5:  Yes, ma'am.

2    THE COURT:  Number 6?

3    JUROR NUMBER 6:  Yes, ma'am.

4    THE COURT:  Number 7?

5    JUROR NUMBER 7:  Yes, ma'am.

6    THE COURT:  Number 8?

7    JUROR NUMBER 8:  Yes, ma'am.

8    THE COURT:  Number 9?

9    JUROR NUMBER 9:  Yes, ma'am.

10    THE COURT:  Number 10?

11    JUROR NUMBER 10:  Yes, ma'am.

12    THE COURT:  Number 11?

13    JUROR NUMBER 11:  Yes, ma'am.

14    THE COURT:  Number 12?

15    JUROR NUMBER 12:  Yes, ma'am.

16    THE COURT:  All right.  Your verdict is accepted.

17  The charge will be filed with the other papers in this case.

18    It's going to take the attorneys some time to

19  organize witnesses for the second phase of this trial.  I do need

20  to meet with them to find out how quickly they can get anything

21  organized today.  In the meantime, I'm going to send you to the

22  jury room.  Now you are going to again be admonished.  From here

23· on you are not allowed to discuss the case among yourselves any

24  more until you have heard the evidence from the punishment phase,

25  you've been given the law and the charge by the Court, and the

1    attorneys have made their arguments.  And at such time I will

2    release you to begin your deliberations.  But now while you're

3    waiting, you are not allowed to discuss the case any more among

4    yourselves.

5                    (Jury exits courtroom.)

6                    (Recess until September 18, 2003.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE**

1

2   THE STATE OF TEXAS              )
                                   )
3   COUNTY OF EL PASO              )

4            I, MARIA C. CHAVEZ, Official Court Reporter in and

5   for the 168th District Court of El Paso County, State of Texas,

6   do hereby certify that the above and foregoing contains a true

7   and correct transcription of all portions of evidence and other

8   proceedings requested in writing by counsel for the parties to be

9   included in this volume of the Reporter's Record in the

10  above-styled and numbered cause, all of which occurred in open

11  Court or in chambers and were reported by me.

12           I further certify that this Reporter's Record of

13  the proceedings truly and correctly reflects the exhibits, if

14  any, offered by the respective parties.

15           WITNESS MY OFFICIAL HAND this the _15th_ day of

16  _July_, 2004.

17

18           MARIA C. CHAVEZ
19           Official Court Reporter
             Certificate No. 2090
20           Date of Expiration: 12/31/04
             602 El Paso County Courthouse
21           El Paso, Texas 79901
             (915) 546-2141
22           E-mail: machavez@co.el-paso.tx.us

23

24

25