**REPORTER'S RECORD**



**74829**

**VOLUME 66 OF 73 VOLUMES**

**TRIAL COURT CAUSE NO. 20020D00230**

**COURT OF APPEALS NO. 74,829**

| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
|---|---|---|
| | ) | |
| v. | ) | OF EL PASO COUNTY, TEXAS |
| | ) | |
| DAVID RENTERIA | ) | 41ST JUDICIAL DISTRICT |

**TRIAL ON THE MERITS - PUNISHMENT PHASE**

**MORNING SESSION**

**FILED IN**
**COURT OF CRIMINAL APPEALS**

AUG 2 6 2004

Troy C. Bennett, Jr., Clerk

On Tuesday, the 23rd day of September 2003, the following proceedings came on to be heard in the above-entitled and numbered cause before the **Honorable Mary Anne Bramblett**, Judge of the 41st Judicial District Court in El Paso County, Texas.

Proceedings reported by computer-aided machine shorthand.

**ORIGINAL**

1    **A P P E A R A N C E S**

2

3

4

5    <u>JAIME ESPARZA, ESQ.</u>              <u>SCOTT SEGALL, ESQ.</u>
     SBOT NO. 06666450                  SBOT NO. 17990600
6    <u>LORI SWOPES, ESQ.</u>               <u>ROBERT RILEY, ESQ.</u>
     SBOT NO. 00786275                  SBOT NO. 16931100
7    <u>JOHN GIBSON, ESQ.</u>               <u>DANIEL G. MARQUEZ, ESQ.</u>
     SBOT NO. 00793803                  SBOT NO. 24004795
8    500 E. San Antonio Rm. 201         500 E. San Antonio Rm. 401
     El Paso, Texas  79901              El Paso, Texas  79901
9    (915) 546-2059                     (915) 546-8185
     ATTORNEYS FOR THE STATE            ATTORNEYS FOR DEFENDANT
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# CHRONOLOGICAL INDEX

## TRIAL ON THE MERITS - PUNISHMENT PHASE

**Tuesday, September 23, 2003**           **PAGE**   **VOL.**

| | PAGE | VOL. |
|---|---|---|
| Objections to Court's Charge | 4 | 66 |
| Court's Ruling | 4 | 66 |
| Charge Read to Jury | 7 | 66 |
| Closing Argument by Ms. Swopes | 12 | 66 |
| Closing Argument by Mr. Riley | 22 | 66 |
| Closing Argument by Mr. Segall | 32 | 66 |
| Closing Argument by Mr. Esparza | 40 | 66 |
| Jury Retired for Deliberations | 55 | 66 |
| Verdict Received | 55 | 66 |
| Jury Polled | 56 | 66 |
| Court Reporter's Certificate | 58 | 66 |

1  **Tuesday, September 23, 2003**.

2                    (After recess, Defendant present, no Jury.)

3            THE COURT:  Has the State received a copy of the

4  additional objection to the punishment charge?

5            MR. GIBSON:  Yes, Your Honor.

6            THE COURT:  And you are objecting to the

7  definition of mitigation as it is stated in the Code of Criminal

8  Procedure.

9            MR. SEGALL:  Yes, ma'am.

10            THE COURT:  That objection is overruled.

11            MR. SEGALL:  Thank you, ma'am.

12            THE COURT:  It will be filed with the other

13  objections in this case.

14            MR. SEGALL:  Thank you, Your Honor.

15            THE COURT:  Anything else we need to do before the

16  Jury comes in?

17            MR. RILEY:  Yes, Your Honor.  There was one

18  exhibit, Defense Exhibit Number 49, which does not appear to

19  exist.  We believe it was just a misnumbering problem.  So we

20  have agreed to agree that there is no Exhibit Number 49, Defense

21  Exhibit.

22            THE COURT:  Punishment exhibit?

23            MR. RILEY:  Yes, Your Honor.

24            THE COURT:  Okay.  That was in that packet of

25  original documents?

1          MR. RILEY:  Yes, Your Honor.

2          THE COURT:  And there is no 49?

3          MR. RILEY:  There is no 49.

4          MR. ESPARZA:  We don't have any objection to that,

5   Your Honor.

6          MR. RILEY:  Thank you, Your Honor.

7          THE COURT:  Thank you.

8          MR. SEGALL:  Your Honor, we also would bring to

9   the Court's attention that there are members in the gallery who

10  have victim badges on.  We believe it to be improper.

11         THE COURT:  I can't see any.  Are there any on?

12         MR. ESPARZA:  They may have removed them.  He told

13  me he was going to make that --

14         THE COURT:  If anybody has them on, please remove

15  them.

16         MR. SEGALL:  I don't see them right now.

17         THE COURT:  Anything else?  You all want me to

18  notify you of any times?  Who's going to go first for the State?

19         MS. SWOPES:  I will, Your Honor.  Would you let me

20  know at 14 minutes?

21         THE COURT:  Are you all going to split up your

22  time?

23         MR. RILEY:  Yes, Your Honor.

24         THE COURT:  You want me to notify you of any --

25         MR. RILEY:  No.  I don't think it will be

1    necessary, Your Honor.

2                MR. ESPARZA:  Your Honor, if you'll let me know at

3    five minutes.

4                THE COURT:  Are all the exhibits in here so you

5    can use them if you need them?

6                MR. ESPARZA:  I think everything is here, Your

7    Honor.

8                THE COURT:  Are you going to use ELMO?

9                MR. ESPARZA:  I'm not.

10               THE COURT:  Do we need to turn them on?

11               MR. SEGALL:  No, ma'am.

12               MR. ESPARZA:  I will use the charts.

13               THE COURT:  Ms. Swopes, are you going to do the

14   first argument?

15               MS. SWOPES:  Yes, ma'am.

16               MR. ESPARZA:  Will you excuse the jury or have me

17   set up --

18               THE COURT:  I'm just going to have you set up.

19               (Jury in, Defendant present.)

20               THE COURT:  Good morning, Ladies and Gentlemen.

21               MEMBERS OF JURY:  Good morning.

22               THE COURT:  I have provided you with a copy of the

23   charge.  You will be able to take those copies with you to the

24   jury room to assist you in your deliberations.  However, the

25   original charge has my signature on it and it is upon the

1  original that you should place your verdict.

## CHARGE OF THE COURT

3  THE COURT: Ladies and Gentlemen of the Jury, by
4  your verdict returned in this case, you have found the Defendant
5  guilty of the offense of capital murder.

6  In order for the Court to assess the proper
7  punishment, it is necessary now for you to determine from all the
8  evidence in the case the answers to certain questions, called
9  special issues, in this charge. The Court instructs you in
10 answering these special issues as follows:

11 The mandatory punishment for the offense of
12 capital murder, of which you have found the Defendant guilty, is
13 death, or confinement in the Institutional Division of the Texas
14 Department of Criminal Justice for life.

15 You shall return a special verdict of "yes" or
16 "no" on special issue number 1. The State must prove special
17 issue number 1 beyond a reasonable doubt in order for you to
18 return a special verdict of "yes" to special issue number 1.

19 In deliberating on special issue number 1, you
20 shall consider all the evidence at the guilt or innocence stage
21 and the punishment stage, including evidence of the Defendant's
22 background or character, or the circumstances of the offense that
23 militates for or mitigates against the imposition of the death
24 penalty.

25 You may not answer special issue number 1 "yes"

1   unless you agree unanimously, and you may not answer special

2   issue number 1 "no" unless 10 or more jurors agree.

3   Members of the Jury need not agree on what

4   particular evidence supports a "no" answer to special issue

5   number 1.

6   You are further instructed that you are not to be

7   swayed by mere sentiment, conjecture, sympathy, passion,

8   prejudice, public opinion or public feeling in considering all of

9   the evidence before you and in answering special issue number 1.

10  You are instructed that if you return a "yes"

11  answer to special issue number 1, then and only then are you to

12  answer special issue number 2.

13  You are instructed that in answering special issue

14  number 2, you shall answer the issue "yes" or "no."

15  You may not answer special issue number 2 "no"

16  unless you agree unanimously, and you may not answer special

17  issue number 2 "yes" unless 10 or more of you agree to do so.

18  You need not agree on what particular evidence

19  supports a "yes" answer on special issue number 2.

20  In answering special issue number 2, you shall

21  consider mitigating evidence to be evidence that a juror might

22  regard as reducing the Defendant's moral blameworthiness.  You

23  shall also consider all of the evidence, including the

24  circumstances of the offense and the Defendant's character and

25  background, and the personal moral culpability of the Defendant.

1    You're again instructed that you are not to be

2 swayed by mere sentiment, conjecture, sympathy, prejudice, public

3 opinion or public feeling in considering all of the evidence

4 before you in answering special issue number 2.

5    Under the law applicable in this case, if the

6 Defendant is sentenced to imprisonment in the Institutional

7 Division of the Texas Department of Criminal Justice for life,

8 the Defendant will become eligible for release on parole, but not

9 until the actual time served by the Defendant equals 40 years,

10 without consideration of any good conduct time.  It cannot

11 accurately be predicted how the parole laws might be applied to

12 this Defendant if the Defendant is sentenced to a term of

13 imprisonment for life because the application of those laws will

14 depend on decisions made by prison and parole authorities, but

15 eligibility for parole does not guarantee that parole will be

16 granted.

17    In arriving at the answers to the special issues

18 submitted, it will not be proper for you to fix the same by lot,

19 chance, or any other method than by a full, fair, and free

20 exchange of the opinion of each individual juror.

21    You are instructed that the Defendant may testify

22 in his own behalf if he elects to do so, but if he elects not to

23 do so, that fact cannot be taken by you as a circumstance against

24 him nor prejudice him in any way.  The Defendant has elected not

25 to testify in the punishment stage of this trial, and you are

1  instructed that you cannot and must not refer to or allude to

2  that fact throughout your deliberations, or take it into

3  consideration for any purpose whatsoever.

4        After argument of Counsel, you will retire and

5  consider your answers to the special issues submitted to you.  It

6  is the duty of your presiding juror to preside in the jury room

7  and vote with you on the answers to the special issues submitted.

8        You are the exclusive judges of the facts proved

9  and of the credibility of the witnesses and of the weight to be

10  given to their testimony, but you are bound to receive the law

11  from the Court as it is given to you, and you are bound to be

12  governed thereby.

13        You shall consider only the evidence and exhibits

14  presented here in the courtroom through the witnesses who have

15  testified.  If you want to have the exhibits with you in the jury

16  room for your deliberations, advise the Bailiff.  In deliberating

17  on this case, you shall not talk to anyone except the members of

18  the Jury about it until you have been finally discharged from

19  service on this jury.

20        If you want to communicate with the Court, explain

21  what you want in writing and deliver your message, signed by your

22  presiding juror, to the Bailiff, who will deliver it to the

23  Court.  Do not orally explain to the Bailiff what you want.

24        After you have arrived at your verdict, you will

25  notify the Bailiff that you have reached your verdict.

1        Special issue number 1.  Do you find from the

2    evidence beyond a reasonable doubt that there is a probability

3    that the Defendant, David Rentería, would commit criminal acts of

4    violence that would constitute a continuing threat to society?

5        Answer:  We, the jury, unanimously find and

6    determine beyond a reasonable doubt that the answer to this

7    special issue is "yes."

8        Or, we, the jury, because at least 10 jurors have

9    a reasonable doubt as to the probability that the Defendant,

10   David Rentería, would commit criminal acts of violence that would

11   constitute a continuing threat to society, determine that the

·12   answer to this special issue is "no."

13       In the event that the jury has answered special

14   issue number 1 "yes," and only then, shall the jury answer

15   special issue number 2 to be found on the following page.

16       Special issue number 2.  Taking into consideration

17   all of the evidence, including the circumstances of the offense,

18   the Defendant's character and background, and the personal moral

19   culpability of the Defendant, do you find that there is a

20   sufficient mitigating circumstance or circumstances to warrant

21   that a sentence of life imprisonment rather than a death sentence

22   be imposed?

23       Answer:  We, the jury, unanimously find that the

24   answer to this special issue is "no."

25       Or, we, the jury, because at least 10 jurors find

1  that there is a sufficient mitigating circumstance or

2  circumstances to warrant a sentence of life imprisonment rather

3  than a death sentence be imposed, find that the answer to this

4  special issue is "yes."

5          After the jury has answered each of the special

6  issues under the conditions and instructions outlined above, the

7  presiding juror should sign the verdict form to be found on the

8  last page of this charge.

9          Verdict: We, the jury, return in open court the

10  above answers to the special issues submitted to us, and the same

11  is our verdict in this case.

12          Ms. Swopes, you may proceed.

13          MS. SWOPES:  Thank you, Your Honor.

14                      **STATE'S ARGUMENT**

15          MS. SWOPES:  Chances, opportunities, advantages,

16  benefits, all against lies, deceit, and manipulation.  Two

17  questions have been submitted to you.  Is David Rentería likely

18  to be a future danger, and is there any reason we should spare

19  his life.  Those are the issues before you now.

20          The evidence of the facts of this case of the

21  death of Alexandra Flores tell you the answers to those

22  questions.  You knew he is a future danger and you knew there is

23  nothing, nothing to say he deserves life instead of death.  It

24  was best put by his own sister.  His own sister said after this

25  offense, "Mom, be very careful.  This person is out there very

1    close to our home.  If you can't pick the kids up, I will.  Do

2    not let them out of your sight."  She knew whoever committed this

3    offense was a very, very dangerous person and was capable of

4    doing it again.  What she didn't know was that he lived with her

5    children.  What she refuses to acknowledge is what he has done.

6            You know from the evidence that he is a future

7    danger.  And the facts of this case alone are so horrible, so

8    heinous, that you know there's no mitigation.  But you have more

9    evidence.  And the evidence that you have, the evidence that you

10   heard during punishment simply reinforces what you already know.

11   You've heard no evidence to convince you that he's not a future

12   danger.  You've heard no evidence to convince you that there is a

13   mitigating circumstance.

14           Just think, just think what you thought when you

15   heard that he was on probation for indecency with a child.  How

16   did you feel?  Everything was clear.  You understood exactly what

17   the death of Alexandra Flores was all about.  You understood why

18   he lured her out of that Wal-Mart and you understood why he had

19   to kill her.  He's on probation for sexually touching an

20   eight-year-old child, for requiring that eight-year-old child,

21   someone who was a stranger to him, to touch him.  You knew he was

22   a future danger.

23           You can consider State's Exhibits 158 and 159.

24   This is where it shows you what he had done to Erica McDonald,

25   that eight-year-old child back in 1992.  You can consider that in

1    1994 he pled guilty to that offense. You've heard all of the

2    chances, all of the opportunities, all of the advantages, all of

3    the benefits.

4              If you look at the first question, page 4 on your

5    charge, if you look at the question, it asks you, do you find

6    beyond a reasonable doubt that the Defendant is a future danger?

7    Is that what it says? Does it ask you beyond a reasonable doubt

8    that the Defendant is absolutely a future danger? No. What does

9    it say? Do you find from the evidence beyond a reasonable doubt

10   that there is a probability. The Defense would have you believe

11   that you have to decide without any doubt, without any reasonable

12   doubt that he is a future danger. I will submit to you --

13             MR. SEGALL: Your Honor, we would object. That

14   would be a misstatement to the law and Counsel for the Defense is

15   not going to misstate the law.

16             THE COURT: Sustained.

17             MS. SWOPES: You will recall the questioning of

18   Dr. Gripon. Dr. Gripon, can you tell us beyond a reasonable

19   doubt that he is a future danger? That was the question.

20   Dr. Gripon said, as anyone in his position will say, I can tell

21   you he probably is. We don't expect you to answer a question

22   that an expert can't even answer. The question is, is he

23   probably a future danger? Is it likely that he will commit

24   criminal acts of violence? You know that. You knew that when

25   you heard the facts of this case, and it's simply been reinforced

1   by what you heard at punishment.

2        So let's look at it. He's on probation for

3   indecency with a child as of 1994. That's what those exhibits

4   are about. 1994 he's on probation for indecency with a child, up

5   to that point, his only contact with law enforcement. His only

6   contact with the criminal justice system has been his arrest for

7   the indecency. He's had a charmed life. He had every advantage.

8   For most people in that situation, the thought of spending a

9   single day in prison, for you all, for me, a day in prison is

10   enough for us to change our behavior. He's looking at years in

11   prison if he does not comply with the terms and conditions of his

12   probation. Does it deter him? No.

13        Not only does he not do well on probation, which

14   is what Martha Cortez told you, he was not a good probationer.

15   What else did she tell you? What else do you have? Three, three

16   arrests. You all looked at each other. Three. Three. When

17   he's looking at years in the penitentiary, he cannot stay out of

18   trouble. What happens on the first DWI? We send him to jail.

19   What happens on the second? We put him in the Intermediate

20   Sanction Facility for 180 days, six months of his life. What

21   happens on the third one? We send him to the pen. This is what

22   it's going to be like if you don't straighten up and fly right.

23        Does he change? Does any of that deter him? No.

24   Because he will not change.

25        You heard their own expert. You heard Dr. Quijano

1   yesterday with the video.  You heard him say, the way they are

2   when they go in is the way they are when they're in.  They don't

3   change.  All we to is try to minimize what they can do.  He will

4   not change.  And you have seen it.  We've tried counseling, we've

5   tried consistent reminders from the probation officer.  We've

6   tried the threat of jail.  We've tried the threat of prison.

7   He's gone to prison.  Has he changed?  Has he clued in?

8          The pattern doesn't change.  And Dr. Gripon told

9   you who he is.  And you know this instinctively.  You don't need

10  an expert to tell you.  You know this.  This is someone who will

11  do whatever is necessary to avoid consequences, to the point of

12  killing an innocent five-year-old child.  You saw the pictures,

13  you saw what he did.  Do you think he will have any problems

14  assaulting, hurting, stabbing, threatening, murdering someone in

15  prison?  Do you think he will have any problem doing that?

16         The answer to question number 1 is "yes."  The

17  answer to question number 1 has been proven to you beyond a

18  reasonable doubt.  He is a continuing threat.  To answer it any

19  way would be to disregard all of the evidence that you've heard

20  in this case.

21         Now, let's look at question number 2.  Question

22  number 2 asks you, is there a reason this person deserves to

23  live?  Is there some thing that makes me think this person

24  deserves to live?  The answer is no.  There is no reason this

25  person deserves to live.  Where we started, chances,

1   opportunities, benefits, advantages.  And what did we get in

2   return when he had all of those things?  What did we get?  Lies,

3   manipulation, and deceit.  Every chance in the world and we have

4   Alexandra Flores.

5              You know about all the probation.  You know all

6   the chances he had.  You know, you know from Norma Reed he had

7   over a hundred sessions individually, or group, with her.  A

8   hundred times where he is being told, this is what you did wrong,

9   this is what you need to be doing, this is how you avoid this

10  situation.  You've got to figure out how to make this not happen

11  again.  And it's not just that he's being told that.  It's not

12  just that he's hearing it.  He says it.  He says it.  I did do

13  this offense.  I do understand that I caused harm to the victim

14  and I'm identifying the factors that led to this offense, and

15  I've developed my relapse prevention program.  It won't happen

16  again.  He says whatever he has to to avoid the consequences.  He

17  does whatever he has to to avoid the consequences.  And he fooled

18  everybody.

19             Does he tell his probation officer that his

20  eight-year-old niece is living with him?  Does he tell his

21  employer, "I am a sex offender"?  The question on that

22  application was clear.  No.  No.  Why?  Because it doesn't suit

23  him.  It doesn't suit him to tell the truth.  He wants the job.

24  He wants to work.  He wants to be able to live with his mom and

25  dad.

1    Does he tell his probation officer he has an

2  18-year-old high school student in his bed?  Do you think that

3  could be a violation?  Do you think that could be something that

4  would cause him to reoffend?  You have not only everything, every

5  chance, every opportunity he was given on probation, from 1994 to

6  2001, seven years of chance after chance after chance, you have

7  all the chances he had during the offense itself.  And you will

8  collectively come up with more chances than I would be able to

9  tell you.

10    He goes into the Wal-Mart and buys what he needs.

11  Before he exits that Wal-Mart the first time, you know he knows

12  what he is going to do.  He goes out to his van and how far is it

13  to his van?  Over 500 feet, over 500 steps that he takes to get

14  to that van.  What happens when he gets to that van?  He's

15  confronted by a stranger, someone who has the authority.  Now you

16  and I would say, okay, I'm not doing this.  He has the tools.  He

17  knows what he's supposed to do, Norma Reed, counseling, therapy,

18  probation.  He knows what he's supposed to do.  Does he do it?

19  No.  He consciously makes the choice to go back into that store.

20  500 chances, 500 more steps that Alexandra had to live.

21    And he makes the wrong choice.  And as he's going

22  in, he stops with the security guard.  "Thanks for not towing my

23  van."  That's how bold he is.  That's how audacious he is.  Does

24  he go and say, no, I'm not going to do this?  No, he goes in.

25  How long is he in?  140 seconds.  140 seconds.  30 seconds for

1 him just to get to the area where she was. In less than two

2 minutes he gets out of the store. That's 140 seconds for him to

3 make the right choice, for him to just walk out. He doesn't.

4 What does he do? He walks all the way across the

5 parking lot again. Another 500 steps. Then what does he do?

6 Let's look at the van. What does he have to do at that van? He

7 gets to the van, she's there with him. He has to open the door,

8 he has to get her inside, and he has to slam that door shut. You

9 can hear it shut. That little girl is inside. And what does he

10 do? He goes around to the driver's side, he gets in.

11 Could he have made this choice there? Could he

12 have decided, "I'm going to go to the front of the store and make

13 her get out?" Yes. Does he? No. Because it's all about him.

14 It's not about the child. It's not about empathy. It's not

15 about relapse prevention. It's about him, what he wants and what

16 he needs.

17 He drives away, he stops, he takes her clothes

18 off, he hits her, he does whatever it is he got her for. And

19 then he kills her. She's not a threat to him. She's not going

20 to harm him. Could he have done whatever he needed and let her

21 live? Of course he could have. And he goes even further.

22 Doesn't just kill her, as if that's not enough. He leaves her

23 naked and burnt.

24 And why does he burn her? You know why. To

25 destroy the evidence, because it's all about him. He has no

1   sensitivity for her family or her community.  He doesn't care

2   that you had to look at those photos.  Didn't bother him at all.

3   You saw those photos and you thought, I cannot even imagine, I

4   cannot even think that someone could think to do such a thing,

5   much less do it.  Every chance that he has and doesn't take is

6   the lack of mitigation.

7          And what does he do after?  The day, not even 24

8   hours later, his probation officer comes.  Does he tell her, "I

9   might have done something really bad"?  Two days later the

10  officers are there.  Does he tell them?  No.  He's so bold

11  because he thinks he's gotten away with it.  "Go look in my van.

12  Sure, you can have my prints.  You're not going to find

13  anything."  What made you sick to your stomach was to see him

14  want a beer.  There's no mitigation.  He has had every single

15  chance in the world.

16         Now, you also look at before his criminal career.

17  You heard testimony about all the advantages he had, all the

18  benefits he had.  He had a good family, he had a great education.

19  He went to private schools.  He was accepted to college.  People

20  vouched for him.  He deserves a scholarship, he deserves to be

21  employed.  Every benefit, every advantage, every opportunity.

22  What does he do with it?  He took his intelligence and he took

23  what he had and he took his ability and he uses it for an evil,

24  horrible purpose.  And he tries to outsmart all of us.  Don't be

25  outsmarted.

1    Did he use any of the good that he had in his life

2 for good?  Did he ever do anything to actually help another

3 person?  He used it for his own benefit.  Everything he did is

4 for himself.  The fact that he came from a good family, the fact

5 that people love him, only shows you more chances, more

6 opportunities, and shows you there is no excuse.  There is no

7 mitigation.  He's been given every opportunity, every benefit,

8 and he has chosen, every single time, he has consciously decided

9 to make the wrong choice.

10    That he has been able to get away with it for so

11 long is a disgrace.  All of this shows you the chances, the

12 opportunities, the advantages and the benefits with the lies, the

13 manipulation and deceit, shows you beyond a reasonable doubt that

14 he's a future danger.

15    Question number 1 should be answered "yes."  And

16 it shows you there's absolutely no excuse, there is no

17 mitigation.

18    Question number two should be answered "no."  The

19 death penalty is the only verdict that is just in this case.

20    THE COURT:  Mr. Riley.

21    MR. RILEY:  Thank you, Your Honor.  If it please

22 the Court.

23    THE COURT:  Yes.

24    MR. RILEY:  Counsel for the State, co-counsel.

25 Ladies and Gentlemen of the Jury, good morning.

1    MEMBERS OF JURY:  Good morning.

2    **DEFENSE'S ARGUMENT**

3    MR. RILEY:  Before I get started, I want to

4  correct something.  Ms. Swopes had said that my client was

5  sleeping with an 18-year-old high school girl in his house and

6  that was somehow some violation.  Clearly, this is not a

7  violation of any laws in the State of Texas.  By the way, the

8  18-year-old girl is sitting back there right now.  Her name is

9  María and that's his wife, and she's sitting back there with the

10  rest of his family.

11    Now, primarily what I'm going to do is talk to you

12  about the charge and the evidence that we've presented.  Before I

13  do that, I would like to extend my sympathy for the two of you

14  who are Green Bay Packer fans who suffered the indignity of

15  losing to the Cardinals.  I don't know who you are, but I would

16  ask you not to take it out on us.

17    In that vein, I would ask you not to take it out

18  on us if you think or believe or feel that the attorneys have

19  been scratching and clawing at each other, kicking and biting,

20  cussing, feuding, fighting over what may appear to be nothing.  I

21  assure you that we view this matter very, very seriously.  A

22  man's life is at stake, literally, so we take our duties very

23  seriously.  By the same token, I hope and believe that you all,

24  each and every one of you will take your duties seriously.

25    Now, with respect to the charge, I just have a few

1   things to talk to you about. The first one is in the middle of

2   page two. It's the paragraph that talks about parole

3   eligibility. And you see on this that if David receives life, a

4   life sentence, that he will not be eligible for parole for at

5   least 40 years. Now, granted, you have to backtrack that a bit

6   for almost two years that he's been in jail, and still that means

7   he would not become eligible for parole, eligible, until he's 71

8   years old. All right. 71 is a fairly old age. And that would

9   be when he first becomes eligible; doesn't mean he would get it.

10   So I want you to consider that when answering the special issues,

11   please.

12         The other thing I would like to point out to you

13   is on the last page in the second full paragraph, it points

14   out -- I think we talked about this with some of you during the

15   voir dire -- that you are the exclusive judges of the facts

16   proved and the credibility of the witnesses. The Judge gives you

17   the law, but you decide the facts. And you take those facts as

18   you determine them, as you believe them to be, and you apply them

19   to the law as the Judge gives it to you. That's what this charge

20   is.

21         When you go back and you vote, obviously, what we

22   want is for you to answer special issue number 1, "We, the jury,

23   because at least 10 jurors have a reasonable doubt as to the

24   probability that the Defendant, David Rentería, would commit

25   criminal acts of violence that would constitute a continuing

1  threat to society, determine that the answer to this special

2  issue is 'no.'" That will mean that you will not get to special

3  issue number 2. The reason that I believe that will be shown

4  momentarily.

5         Now, what David did is commit a monstrous deed,

6  but you must ask yourself, is David a monster. Well, in a sense

7  you've said that he's clearly committed a monstrous deed, but I

8  assure you that David is, in fact, not a monster, but in fact, a

9  man, an actual human being. These are just some of the family

10  photos that we have of him. This is him with the bishop. That's

11  him with the priest. That's him with a little child in a crib,

12  okay. It's an actual human being. I know this is tough and you

13  all have a very tough job ahead of you. Here he is when he

14  was -- I think his mother said he was seven or eight years old.

15  And here he is with his godmother, his *nina*, on their way to the

16  baptism. I realize that the State will attempt to -- and it's

17  their job -- to demonize him. But it's important that each of

18  you remember that he is a human being.

19         Now, remembering back to voir dire, I'm sure that

20  each of you was asked this by somebody on one side or the other.

21  If you would be able to consider these special issues that we

22  talked about, the State had their chart and we had our chart and

23  they both had the issues on them. And one of the main things

24  that we pointed out, that each side wanted to point out to you at

25  that time was that in considering these special issues, you would

1   be considering them only if you had already convicted David of

2   capital murder. And each of you assured us that you would.

3            Well, that's the difficult part now, isn't it?

4   You've already said he's a capital murderer, but now I have to

5   keep my mind open, like I promised when I took my oath as a juror

6   to do, to follow the law.

7            Now, the two issues, of course, are future

8   dangerousness and mitigation. And what does the evidence show?

9   Let me run through some of the people. I need bifocals. Sorry

10  about that. All right. Norma Reed, she was a State's witness.

11  She was the registered sex therapist. And she had met with David

12  on a large number of occasions. As Ms. Swopes suggested,

13  something on the order of over a hundred times and known him for

14  several years. And when asked, she said that she was, in fact,

15  shocked to learn that David was the one that had been accused of

16  having committed this offense because she didn't believe that he

17  was a dangerous person. It was very shocking to her.

18           Ms. Angie Olivas, perfectly neutral party. The

19  State used her as the custodian of records. She signed the

20  affidavit for the Lowe's company records. We brought her in to

21  say that she had worked with David for a period of time, that he

22  was a good worker, got along with everybody, never caused any

23  trouble. So that's a sign that David is not a future danger,

24  because as both the psychologist -- excuse me -- the psychiatrist

25  and our experts said, our psychologist and our other expert, the

1 best predictor of future behavior is the past. So Angie tells

2 you he didn't do anything bad in the past.

3 Joe Reyes, his lifelong friend, I think he said he

4 met him in second or third or fourth grade when they were at Mt.

5 Carmel. That David had actually tutored him. That David is very

6 helpful. That David was never violent. That he never saw him in

7 all those years, never even once, get in a fight. So if the past

8 is a predictor of the future, then that shows you that David is

9 not a future danger.

10 Jane Mendez, she's known David for 12 years. She

11 met him and they danced. And they never had an affair or

12 relationship or anything like that. They just became very good

13 friends. And she says David is the most helpful individual, he

14 would do this and that for you, whatever you needed. Never asked

15 a thing, and she knew that even though they danced together in

16 the club Dallas as part of the Dallas dance troupe, that she

17 never saw him even in a bar environment being violent, getting in

18 a fight, or being an ugly drunk or anything like that.

19 Steven Elliott, the detention officer in

20 classification, he said that the entire time that David has been

21 in the jail, which has been since December of 2001, almost two

22 years, he's had the one incident and that incident was with

23 Corporal Martínez. And Corporal Martínez says, yeah, I went

24 there and he had some, what they call contraband, but by

25 contraband he didn't mean drugs or knives or anything. It was a

1 mop and broom and soap for cleaning a commode and stuff like

2 that. Apparently they can only have so much of it. And when

3 Corporal Martínez told David that he needed to get rid of it and

4 actually, I guess, entered his cell, this infuriated David to the

5 point where he yelled at the corporal. Mind you, he yelled at

6 the corporal. He didn't hit him, he didn't swing at him, he

7 didn't take a broom handle and whack him over the head. He

8 didn't break it, stab him, nothing like that. Even in his

9 frustration, what David did was yell at the man. That was it.

10 That's in almost two years.

11 Now Ceci Rentería. Cecilia is what her actual

12 name is. But her nickname is Ceci and she is David's sister. Of

13 course, she's known him all of her life. She, too, describes him

14 as helpful, a person who would go out of his way to do things for

15 you, not ask anything in return. She says she's known him all

16 her life and she's never seen him in a fight. Ever. And that

17 he's not violent. If the past is a predictor of the future,

18 she's got 31 years of history to give you.

19 Eva Rentería, that's his mother. His mother said

20 he was a good boy growing up, that he never caused trouble. I

21 used her to get in all of these awards. And you can look at them

22 and the State has chosen to refer to these as chances and

23 opportunities. Yeah. He made some of these opportunities. Some

24 things just came naturally to him. There are other things in

25 there. His confirmation, his baptism certificate, things of that

nature. Why? Because he is a real human being. This is a man we're talking about.

Jeffrey Gibson. He's the man that came in and talked to you about gangs. He's a gang expert for the sheriff's department. I believe he said he's been doing it for 10 or 12 years. And that when he read that letter, what he sees is what's called a green light or a threat by a gang on David, okay. So that means he believes that that is one of the reasons why he is in administrative segregation or separation here in the El Paso County Jail, and that that will have an influence on where he's classified and where he's placed in TDC.

Dr. Quijano, he showed you the video. If you need to see this video, wherever it is, we have agreed that because it has volume in certain places, which we didn't allow you to hear, that if you want to see parts of it again --

MR. ESPARZA: Your Honor, I apologize. I have to object. That videotape is not in evidence, as I understand it. We allowed him to take it with him. I don't believe it's one of the exhibits. I don't mean to disrupt his argument.

THE COURT: Right. It was not admitted into evidence. It was shown to the jury.

MR. RILEY: My understanding was if they wanted to see part of it again, they could ask to see it out here.

THE COURT: I don't even know if it's here. He might have taken it with him.

1          MR. ESPARZA:  I think he took it with him.

2          THE COURT:  Because of the agreement between the

3    two sides.

4          MR. RILEY:  Okay.  Well, you have the image of the

5    video in your mind.  The way we presented it does not mean it is

6    any less evidence.  And you saw the fact that each of the cells,

7    every cell at TDC is six by ten.  Six feet by ten feet.  Ten feet

8    is only about from here to that wall right there.  And six feet

9    is only about that wide.  That's the space a person gets to live

10   in for the rest of their life for 23 hours a day, seven days a

11   week, 365 days a year forever and ever.

12         Now, the State brought in a woman named Pamela

13   Franks.  She is apparently a member of the classification board

14   at TDCJ.  And what she said truly amazed me.  When she was asked

15   by Mr. Segall about how a person such as a person in David's

16   situation would be classified if there was a gang threat, and

17   what she said was -- and this just amazed me -- the question by

18   Mr. Segall is, "Now, if the local sheriff held the person in

19   administrative segregation because the local sheriff felt there

20   was a bona fide risk, would that be a factor you would consider

21   in placing someone in administrative segregation?"  Answer --

22   this is what she said.  "It would be considered, but not until he

23   was released into general population and we were able to verify

24   that information ourselves."  So I don't know what she means by

25   that.  Do they test out whether you have a threat on your life by

throwing you out into general population and if you get stabbed five times they go, well, I guess he did have a threat? That's what it sounded like to me. And that sounds very unlawyerlike and I can't imagine the lawyers at TDCJ allowing that.

So it gives me pause and it makes me question her credibility as a witness for the State. It makes me believe that she simply wants to show the jury that the person may or may not go to administrative segregation and that therefore, there's no reason for you to consider giving him a life sentence. That's what I think.

Now, Dr. Sorenson had a study, and it's called actuarial -- an actuarial study. It's like what life insurance companies do, or insurance companies do. This type of approach is so good that even TDC uses it. The prison system itself uses it for classification of prisoners. What he does is he tests not a sample of people, he doesn't test one hundred people out of a population of 10,000 or a thousand, he checks out every single murderer that was at that time in the Texas prison system, which was over 6,000 people.

And according to that, he determined there were certain factors which would act as -- I'm not a statistician, or anything like that -- that were important factors, okay, and that there were some that were not. Blue eyes, for example, is not an important factor. Whether you were committing a robbery or a burglary at the time you committed your murder apparently was an

1   important factor. When he put the factors together, with regard

2   to David specifically, the number he came out with was a 9.4

3   percent chance of David ever committing any act of criminal

4   violence over the next 40 years. That's what that number means.

5   A 9.4 chance, a less than one-in-10 chance that he will commit

6   some sort of violent criminal offense while in prison over the

7   next 40 years. That's what that number means, okay. To me, what

8   that proves is that the State cannot prove that David is a danger

9   in the future. Because that number is very, very low. And the

10   doctor said that he had over a 95 percent confidence that that

11   number was accurate. All right.

12          I don't like throwing numbers at people because

13   sometimes it turns people off. I apologize if I did that to you.

14          All right. So that's the evidence. I've gone

15   over the charge with you and I've briefly gone over what I

16   believe is the important evidence in the case. Clearly, you've

17   already convicted David of the capital murder. And you're fully

18   aware of the circumstances of that murder. But now the

19   punishment evidence is that which I played out for you.

20          What I would suggest to you is that there are two

21   ways for you to look at this case. You can look at it in an Old

22   Testament way, an eye for an eye, which is revenge, and that's

23   not what our system of laws is for. Our system of laws is not

24   for the sake of revenge. It's for punishment. Or you can look

25   at it as a New Testament, in a New Testament way and say, I'm

1  just going to lock him up in prison and let God do with him what

2  he will in his own sweet time.

3  So I would ask you to give David Rentería a

4  sentence of life.  Thank you.

5  THE COURT:  Mr. Segall.

6  MR. SEGALL:  May it please the Court.

7  THE COURT:  Yes.

8  ### DEFENSE'S CLOSING ARGUMENT

9  MR. SEGALL:  Counsel, Ladies and Gentlemen of the

10  Jury.  I'd like to start with an apology.  I met with the

11  officers, the detectives in this case out in the hallway during

12  one of our breaks and they expressed to me their personal opinion

13  of what I've done in the courtroom.  And I had to agree with

14  them.  If I have stepped across the line, if I have agitated you,

15  tell my boss, Clara Hernández.  David did not choose me.

16  Certainly doesn't control what I say.  And if I'm going to be

17  damned, I'd rather be damned for trying too hard than not trying

18  hard enough.

19  I'd like to talk to you a little bit about the

20  process and your rights.  Perhaps -- I'm sure I talked to most

21  all of you about this during voir dire.  You have the right to

22  truth, you have the right to your own vote, you have the right to

23  have your conscience free and clear of any pressure.  You know,

24  you vote in this case because you feel pressured, or you feel

25  that you've been ridiculed or something else, you cannot come

1   back into court tomorrow and tell the Judge, that vote that I

2   signed was not my free choice. I've changed my mind. I don't

3   like it. What you vote, it is reality. If you vote to put David

4   to death, he will be executed.

5              Let's look at the evidence. Murder is evil.

6   There's no two ways about it. I hate murder. I hate pictures of

7   the victims both before and after. It doesn't matter whether

8   we're talking about a child of five or a man of 50. Murder is

9   evil. Murder deserves strong punishment. And that's what our

10  Legislature says. Life in prison. Because it's evil and bad.

11  And that's the punishment. And they can talk all they want to

12  about how bad this murder is. And I submit to you there is no

13  good murder. There is no murder that does not deserve strong

14  punishment. It's evil and so the punishment should fit -- the

15  punishment is no less than life in prison. You've seen what that

16  life looks like.

17             But our law goes on and says, you know, there's a

18  small, small class of people who being locked up in prison will

19  not protect us. And for them and them alone should we use the

20  death penalty. We don't use the death penalty because the crime

21  is evil. Look at that charge. Where does it say the crime is

22  evil and therefore he should be killed? It does not. And all of

23  you told me during voir dire that you would not do that. That

24  you would not just look at the crime and say it is evil. You

25  would vote for death but you would follow the law. We expect you

1  to do so.  The State must prove beyond a reasonable doubt --

2  Ms. Swopes indicated that it was our job, somehow, to prove that

3  he wasn't a future danger.  It's their job to prove that beyond a

4  reasonable doubt he will do acts of violence that the prison

5  system will not be able to control him.  That's what they must

6  prove.

7          So what's the evidence?  Well, he molested a child

8  some 10 years ago for which he will have to do 20 years in

9  prison.  We know that he drove drunk repeatedly, for which he

10 will have to do 10 years in prison after he does the 20 years for

11 molesting a child.  That's exhibits, I believe, 19 and 20, or 20

12 and 21.  Then he will have a life sentence.  And it will be

13 illegal to give him parole in less than 40 years.  It ain't going

14 to happen.  We know that the district attorney did not think the

15 indecency and DWIs warranted revoking his probation when they

16 occurred because the Probation Department asked for revocation

17 and the district attorney's office said no.  I'm sure they're

18 embarrassed by that decision.

19          We know that he did not appear to be a threat to

20 those who know him.  The Probation Department lady, she knows

21 dangerous people.  She sees them.  He wasn't one of them.  She

22 knows -- we know the sex therapist was proven wrong.  Does the

23 fact that one person was proven wrong prove that he is a future

24 danger?  I submit to you it does not.  We know what type of man

25 he is in that -- remember, they brought in the clerk who talked

about how he bought two beers instead of the usual one on the night of this crime? But he also said a little bit about what sort of man David is. You'll remember his testimony.

Well, the State brought in their $350-per-hour doctor to say by a preponderance of the evidence that he was a future danger. And you'll remember that very long, very detailed, very complete hypothetical example which totally left out, totally ignored the most important facts. What were those most important facts? That David will be locked up in a prison for the next 40 or 50 or 60 or 70 years, until he's a hundred years old. That fact was not in the hypothetical. And the doctor said, well, when he gets backed into a corner he might lash out. And of course, the best predictor is what he has done.

Well, what has he done in prison? When locked up, what has he done? And he's been locked up for more than three years over his life. What have they brought you in the way of what he has done when he has been locked up? And the answer is he yelled at a guard. If the past is any predictor of the future, we know how he's going to behave in the prison system. Just like he has.

They speculate that perhaps those parole laws could change. Now, the evidence is that parole laws are becoming harder, harsher. I guess they could change. Martians could come down, free David Rentería. No. We must decide this case on what the law is now, what the facts are now, not on fears that are not

1   real.  I mean, Dr. Gripon, you know, said, well, of course this

2   man should not be allowed, he's a danger, he should not be

3   allowed on the streets.  Well, hello.  He's going to go to prison

4   for the rest of his life.  No.  Dr. Gripon does not prove to us

5   that he's a danger.

6           But let's talk about the real danger.  Let's talk

7   about TDC.  Let's talk about whether they have proven that TDC is

8   incompetent, cannot protect the people in it, cannot protect the

9   inmates, cannot protect the staff, cannot stop someone from being

10  a future danger.  Well, we've seen that administrative

11  segregation, we've seen how ugly it is.  And we've seen some

12  debate and discussion as to whether he would go to administrative

13  segregation or to general population.

14          But you know, that debate does not really impress

15  me.  Because TDC knows how to control the uncontrollable.  If he

16  is, in fact, a danger, they will put him into a cell with

17  nothing, feed him a loaf of food, and his only weapon is to pee

18  on the floor and listen to that noise.  And have they proven that

19  this is a failure?  Well, they make a big deal over the Texas

20  Seven, and as their expert, their witness said, we have made

21  changes.  We have learned.  And yet, they would have you believe

22  that they are incompetent, that they're a pack of fools, they

23  don't know what they're doing.  You know, there are 150,000 of

24  the worst people in our society locked up in the Texas Department

25  of Corrections, and out of that, they managed to commit 3,000

assaults. 150 of the worst people. We're not talking about 150

people here. We're talking about criminals and TDC is good

enough to control them.

Let's look at the real numbers. You know, if our

actuarial expert -- which, by the way, he reminded me of all the

good reasons why I don't want to go to school any more -- but if

what he had to say was immaterial or had nothing to do with it or

shouldn't be relied on, it's just nothing of interest, I really

don't think Mr. Esparza would have gotten up, ripped it off,

wadded it up into a ball and thrown it into a corner if he wasn't

angered by it.

The reality of it is that there are certain things

that indicate whether a person is likely to be a danger, and this

man doesn't fit it. He has one aggravator and one subtractor.

The aggravator is the prior prison term, which he got the same

point whether he went down there for 90 days or 10 years. And

the overriding consideration is, as you get older, you get tired,

you don't go forth and cause trouble.

He said that sex offenders don't fit this category

as well as others. That they take a little longer, they push an

envelope a little further, but the bottom line was as they got

older -- as they get older, they became less violent. Where is

somebody, even Dr. Gripon or anyone else, to say that that's

wrong, that that's not true, that that's inaccurate? Where is

that expert who said we don't use this method to determine where

1  to put somebody?  The prison system itself, the people who have

2  to live with the decision, the people whose very lives depend on

3  whether to evaluate these people and determine whether they are a

4  risk or not, uses this method.  And they didn't come in here and

5  say, no, that's not true.  We don't do that.  We rely on

6  Dr. Gripon to tell us who to put where.  They use the actuarial

7  method, and the actuarial method says he's not a future danger

8  beyond a reasonable doubt for multiple acts, which is what the

9  law requires.

10             Do we fear him when he turns 80?  You know, I

11  don't know why, but capital juries, like most juries, seem to

12  think, first time you're eligible for parole, you're out the

13  door.  Not true.

14             MR. ESPARZA:  Your Honor, I think he -- I object.

15  He's asking this jury to speculate.  The instructions are very

16  clear and the Court gave them to this jury, that they cannot

17  determine exactly how the parole law would apply in this case.

18             THE COURT:  Sustained.

19             MR. SEGALL:  But that instruction goes on to say

20  just because you're eligible, you will not necessarily

21  automatically get it.

22             So why find a future danger?  Well, Ms. Swopes's

23  reason is because we want to punish him for the crime.  Well, you

24  know, they haven't proven it.  You know that locked into that

25  little cell, handcuffed, watched every minute, he's not going to

1  be a danger.  And you know that if he starts to get himself into

2  one of those situations, he's going to be yanked out.  He's going

3  to be brought down.  You know he's not going to be a future

4  danger.

5           One of the things that they said was, well, he had

6  a reason to behave when he went down there for shock.  That's

7  true.  You know, he violated the terms and conditions.  He acted

8  up in prison, he wouldn't get the benefit of shock.  Same thing

9  is true now.  He's going to be spending the rest of his life in

10  that society, in that prison cell, in that little room for 23

11  hours a day, seven days a week, unless he flies right.  Unless he

12  is not a danger.  Because the moment he's a danger, into the box.

13           I submit to you they have failed to prove that

14  he's a future danger, that the Defense has shown that he is not.

15  So we don't need to go to that mitigation question.

16           However, if you do, I want you to think about

17  this.  I love my job.  I hate murder.  I'll be thrilled the day

18  they tell me you can't defend any more murderers because there

19  aren't any.  Best day of my life for sure.  But I love my job

20  because I'm here to try to save a life.

21           Now, is it a good life that I'm trying to save?

22  Is it meritorious?  No.  But do I have the right to choose who

23  lives and who dies?  Do any of us have the right?  The power?

24  You have the power.  Do we have the right?  You can bring the

25  lash of murder to another family.  You can kill.  You can say

1    it's an eye for an eye.  You can say he deserves it.  Or you can

2    say, I vote for life.

3            This is why I love my job.  I get to go home, say

4    to my child, I fought for someone to live.  I invite you to do

5    the same.

6            Thank you, Your Honor.

7            THE COURT:  Mr. Esparza has to set up some easels,

8    if you'd like to stand up and stretch a little.

9            Go ahead and get it started.

10           MR. ESPARZA:  May it please the Court.

11           THE COURT:  Yes.

12                    **STATE'S CLOSING ARGUMENT**

13           MR. ESPARZA:  Counsel, Ms. Swopes, Mr. Gibson,

14   Ladies and Gentlemen of the Jury.

15           First, I want to thank you for your service.  I

16   think this is your third Tuesday.  Certainly, it's more service

17   than anyone should have to do.  And the questions I'm going to

18   ask you to answer are as serious as they get in this courthouse.

19   So on behalf of the State of Texas, I thank you, for one, coming

20   to jury service, agreeing to do your part for this community,

21   showing extraordinary citizenship, wading through all this.  Give

22   us your patience and your tolerance because now we have some work

23   to do and you're going to carry most of the work now.

24           The other thing I'd like to tell you before I get

25   started is my client really expects the best of me.  The State of

1    Texas, they expect the best of me every time I'm in the

2    courthouse, especially when I'm in here. And you deserve that,

3    as well. So if at any time I offended you, or my behavior was

4    not called for, I sincerely apologize.

5                But you might imagine that in this struggle, in

6    this fight, and because the issues are so serious, that the fight

7    would be fought hard. And I would -- I would think that you

8    would expect no less.

9                At this stage of the trial, though, something they

10   didn't say is that, you know, when we do the first phase of the

11   trial, that jury -- you stand between the State of Texas and the

12   Defendant. You're in between. You ensure, with the help of the

13   Judge, you ensure that he gets a fair trial. That he's not

14   convicted on some rumor or hearsay, that the evidence is tested,

15   that you know that the evidence is true, and that he's guilty

16   beyond a reasonable doubt. You stand between us and him.

17               That talk about a police state was all for naught

18   because this is a living example of how we protect our rights in

19   this community. Because even though the State of Texas, in all

20   its mighty power, we cannot get over the fence that you create

21   between us and the Defendant to ensure that his rights are

22   protected.

23               But it's a little bit different now. Because now

24   the fence moves. You are now between him and the community. And

25   with your verdict, you can send a message and you can protect us.

1    And that's what is so important at this stage, is that you send a

2    message and that you protect us.  And the reason I set all this

3    up was not to upset you.  But it's so easy to forget all of this.

4    It's so easy to forget her and all the opportunities that the

5    Defendant had not to commit the crime.  And that's why we're

6    here.  That's why you're called here.  So now remember your role,

7    your role as you protect this community, as you send a message.

8    Do not forget that.  It is so important.

9            And when you try to determine whether or not the

10   State of Texas has proved beyond a reasonable doubt that there is

11   a probability that the Defendant will commit future acts of

12   violence, remember what they're trying to argue.  One, he is a

13   future danger.  They want you to believe that he's not, but then

14   they -- they want to put him in that setting.  They want you to

15   know that there is that potential threat there, so he will go to

16   administrative segregation.  Why does he have to go to

17   administrative segregation?  Because they want you to believe

18   that when he's in administrative segregation, he won't be a

19   danger to everyone because he's got to get handcuffed, there's

20   got to be someone with him at all times.

21           But they were unable to show that to you.  Because

22   we don't know where he's going to go if you give him life.  We

23   have no idea.  He will go to general population.  You heard from

24   their own expert that people are not prisoners -- are not

25   classified by the offense.  In other words, a murderer is going

1  to room with an auto thief or a robber or somebody less violent.

2  There's no classification that way.  That's general population.

3  Does it sound mean?  Does it sound hard?  It's prison.  But they

4  want you to believe that he's going to go to administrative

5  segregation and he'll never commit any more future acts of

6  violence.

7       Well, if we have to put him in administrative

8  segregation in order to protect other prisoners, what does that

9  tell you?  In and of itself on its face he's a danger.  So that

10  argument doesn't fly.

11       And don't buy this little hamburger theory, that

12  he bought this guy or offered to buy some guy a hamburger.  My

13  God, he is a monster, this Defendant.  He is a monster and he is

14  a monster manipulator.  He knows how to work the system.  He says

15  what he needs to.

16       Let's just take a look at what Dr. Gripon said.

17  That hypothetical was complete.  If there had been something

18  wrong with the hypothetical, they would have attacked it.  But

19  there was nothing wrong.

20       MR. SEGALL:  Your Honor, we did object at the

21  bench, as the Court well knows.  For him to indicate we did not

22  is to mislead this Jury.

23       THE COURT:  Let me instruct the Jury what the

24  attorneys say, especially during argument, is not evidence.  The

25  evidence that you are to consider that is valid evidence comes

1  from the witness stand and the testimony from the witness and the

2  exhibits.

3           MR. SEGALL:  Your Honor, we thank you for the

4  instruction, but we respectfully move for a mistrial.

5           THE COURT:  Denied.

6           MR. SEGALL:  Thank you, Your Honor.

7           MR. ESPARZA:  There wasn't anything wrong with it.

8  It was fine.  It said the good things about him.  46 out of 101,

9  that when he was younger he was a catechist, belonged to the

10 Knights of the Altar, that he was chief commander of some

11 Explorer post, and something else.  It was complete.  It was a

12 full and complete picture.

13          And what does Dr. Gripon tell you?  He says in the

14 end he is a future danger because what do we know?  We know this

15 about him.  We know that he will kill a five-year-old.  That

16 should just shock your conscience.  A five-year-old which is

17 within his target range to avoid consequences.  Now, he could

18 have taken her from here, that little 47-inch, 56-pound

19 Alexandra, and done whatever deed he wanted to do, whatever he

20 wanted to do to her.  Touch her, look at her, whatever.  But did

21 he have to kill her?  Were there other ways?  No, not in his

22 eyes.  Do whatever it takes to avoid the consequences.  That's

23 what we know about him.  And what did he do?  He knew he could

24 avoid the consequence because he had somebody who was vulnerable,

25 someone who was weaker than him, and he could get away with his

1   evil deed.

2           Don't kill him.  Don't give him a death sentence

3   because he's a pedophile.  Don't give him a death sentence

4   because of that.  He deserves a sentence of death because he will

5   do anything and everything to avoid the consequences, and little

6   Alexandra is a clear example.  If past behavior is the best

7   predictor, then clearly, we know what he'll do.  When there is

8   someone weaker, someone more vulnerable, then he will kill.  Or

9   if he can't kill, he will hurt them.  He will commit criminal

10  acts of violence in order to what?  Protect himself.  No one else

11  in this world matters to him.

12          And if we're to believe anything that Dr. Sorenson

13  says, anything, we should take him on his word that 80 percent of

14  the killers are antisocial psychopaths.  And he has no

15  conscience.  None.  There are two things that I know about this

16  case now.  One is he'll do anything, anything, to avoid the

17  consequences.  And I know that he'll avoid -- and I know that the

18  best predictor of the past -- of the future is the past.  Let's

19  just take a look at Dr. Sorenson's statement for just a little

20  bit.

21          Put it in a computer, punch it out.  We don't even

22  need you.  Because that guy is 95 percent certain.  It didn't

23  matter that the Defendant was a planner, it didn't matter that he

24  was organized, it didn't matter that he had premeditation, it

25  didn't matter if there was no remorse.  It didn't matter if he

1   was deceitful.  It didn't matter if he concealed evidence.  It

2   didn't matter if he destroyed evidence.  None of that mattered to

3   him.  The only thing that mattered to Dr. Sorenson was he had a

4   prior prison record.  That's the only thing that made the

5   Defendant a plus in his deal.  That he would be a little more of

6   a risk because of that, the prior prison record.  That's the only

7   thing that mattered.  And he got points, he gave this monster

8   points because of his age.

9           But guess what?  Eventually, Dr. Sorenson had to

10  admit, well, he didn't tell you this on direct, did he?  Well,

11  no.  I asked him, well, you know the Defendant is outside the

12  range.  He's 31 at the time he commits the crime.  But shouldn't

13  he be going down in his violence instead of going up?  And what

14  did Dr. Sorenson say?  Dr. Sorenson, who said he did not study

15  human behavior.  He looked at numbers, but for that moment he

16  decided to tell you he was a psychiatrist or psychologist because

17  he was going to tell you about human behavior, because he said,

18  oh, no, oh, no, it's a little bit different when it comes to sex

19  offenders because sex offenders take a little longer to taper

20  off.  Well, he didn't tell you that when he showed you his

21  formula.

22          And it wasn't one of his aggravating factors

23  whether the murder was part of a robbery or a burglary, whether

24  there were multiple victims, whether or not there was an

25  attempted murder or attempted assault, whether there was gang

1   membership.  He never told you any of that about being a sex

2   offender, did he?  All of a sudden he had to turn it just a

3   little bit because he wanted to make it fit so he could protect

4   the monster because he didn't want his theory to be proven wrong.

5          The very first question I asked him, or near

6   the first one -- I can still see myself standing here -- and

7   I asked him, well, you know, sometimes the insurance companies

8   tell you this and this and this.  But obviously, if the color

9   of the car is not going to make a difference -- and I said,

10  so if the car is red, it doesn't make any difference, what

11  did he say?  Oh, no.  Oh, no.  Studies have shown that because

12  you drive a red car you might be more prone, something might

13  happen.

14         Now, if the insurance companies believe the color

15  of a car can make a difference in a prediction, I am mortified

16  that Dr. Sorenson doesn't believe that any of this cunningness,

17  planning, organization, premeditation, the fact that it was a

18  cold-blooded killing, the fact that it never should have

19  happened, that he was deceitful, that he destroyed evidence, none

20  of that, not one of those things seem to matter to him.

21         And the Defense says, well, every murder is bad.

22  No, no, no, no.  Every murder is bad, but some murders are just

23  plain evil.  Evil.  Should never, ever happen; that shock your

24  conscience, the kind that make you scared, the kind that take

25  your security away; the reason you don't go to 7-Eleven or some

1   convenience store at night.  The kind that just rob us, that take

2   from our community, that shock your conscience.  This is one of

3   those.  It shocks your conscience.  If you'll kill a

4   five-year-old, you will do anything to protect yourself.

5           And in a prison environment he will do anything to

6   protect himself.  And we know they want to take credit.  Well,

7   there's only 3,000 assaults out of 150 -- my God.  Do you know

8   how much we spend, how much we spend to try to prevent little

9   things from happening?  And is there any way when this monster

10  gets into general population that he won't take advantage of some

11  administrative staff, he wouldn't take advantage of a nurse, he

12  wouldn't take advantage of a more vulnerable, weaker inmate to

13  get what he wants?  No.  Give him credit because he's been in

14  jail for some-odd time and hasn't violated anything?  No.

15  Because he's a monster manipulator.  Because he knows he had to

16  come over here and do his song and dance for you.  And shame on

17  Dr. Sorenson for saying --

18          MR. SEGALL:  Your Honor, we object to the comment

19  on the Defense silence.  Move for a mistrial.

20          THE COURT:  Denied.  Your objection is overruled.

21          MR. SEGALL:  Thank you.

22          MR. ESPARZA:  Shame on Dr. Sorenson that he was

23  going to say, because he had put it in the formula, shame on him

24  that 90 days is a prison stay.  90 days is not a prison stay.

25  I'm a golfer.  That's a little chip shot.  90 days is nothing.

1   90 days, he knew he could come home.   That wasn't anything.   I

2   don't think Dr. Sorenson's opinion was worth the 150 bucks we

3   paid him an hour.   It didn't mean anything.   It wasn't helpful.

4   It didn't assist you.   It was nothing.   Because it's not reality.

5          Because you know what?   Next time you see

6   Dr. Sorenson, you tell him life is complicated.   Life isn't

7   simple.   You can't just punch this into a computer and punch us

8   out.   Some things are just bad.   Some parts of life are

9   consistent, and some parts of life are not.   And you cannot make

10  the type of prediction that he's making based on that

11  information.   And you cannot tell the Jury to make such an

12  important decision regarding future dangerousness based on five

13  aggravating factors, as he lists them.   It's not possible.   It's

14  just not possible.

15          And sure, I wish Dr. Gripon had told you, I'm a

16  hundred percent certain.   It would be great.   It would be

17  powerful evidence to tell you that.   I wish I could stand here to

18  tell you that.   But it's not.   It wouldn't be true.   Because

19  we're judging human behavior.   And we can only look at the past.

20  We can only look at the trail that the monster left behind.

21  That's the only thing we can look at.

22          So what did he leave behind?   He left behind in

23  the indecency, Erica McDonald.   He left behind Adriana [sic]

24  Flores.   Alexandra Flores, he left her behind.   He had all those

25  DWIs.   And what does he keep telling us?   I don't care about your

1   rules.  That's what that says.  That's what that conduct says.

2   That's the trail he left behind.

3          So when I look at where I'm going, I have to look

4   at where I've been.  And when I look at where the Defendant's

5   been and I look to where he's going, all I see is bad and vicious

6   and ugly and horrible.  And when I look over there I see the same

7   thing.  Even Dr. Quijano said, we do not change them when we send

8   them to prison.  We just limit their opportunities.  He's not

9   going to change because we send him to prison.  He's just going

10  to get into a society where he now understands, well, I've got a

11  few more rules.  I've got a few more things.  Let's see how I can

12  manipulate them.  Let's see how I can work the system.  That's

13  what he's going to do.  And you need to send a message and

14  protect us.

15         And when I look at the whole picture and I think

16  about the needlessness of taking her -- and this really cute

17  picture of her, I think she's playing in the mud there.  When I

18  look at this little baby and think of the senselessness of this

19  killing, if he had any conscience, there would be even the

20  slightest bit of remorse, the slightest bit of remorse, but we

21  know from his actions and the testimony that he had none.  I

22  mean, what Dr. Sorenson didn't need, we need.  We need to know.

23         And what did he do?  That night he bought a couple

24  of beers.  Now, that sounds to me like he's troubled.  I'm so

25  sarcastic.  It seems to me like for him it's just like Miller

1  time. He could care less. Could care less. And then the next

2  day, just by chance, his probation officer comes by and it's as

3  if it's nothing. And you can look in the chronos. You can read

4  her notes. It's like page 3 in here. 11/19. It's in blue.

5  Now, she doesn't know anything different. Her testimony is that

6  she didn't see anything different, but she doesn't note anything

7  different.

8         And then lets those officers in. Now, that's one

9  vicious evil human being without a care in the world. You can

10  come through my van after he knows that that body was there.

11  Come on, come on. I'll work the system. Come on through.

12  That's okay. Just like a good liar he admits to seeing the

13  guard, he admits to having seen the guard twice, he admits to

14  having the van running because that's what good liars do. They

15  admit to some facts, but the most important, crucial fact, of

16  course they lie. Because he has to avoid the consequences.

17  Nothing is beyond him. Nothing. He didn't even act nervous.

18         In the end they tell him, hey, don't worry. Would

19  you please take care of those tickets. Oh, yeah, yeah. What a

20  swell guy. The day earlier we had just found the body. Didn't

21  faze him one bit.

22         And then if this doesn't beat all. You read

23  Dr. Reed's entry for 11/29, 11 days afterwards. You read it.

24  And what did she testify to? Nothing different. It's all the

25  same. And the gall, the gall -- I mean, why doesn't he just

1  shove it in our face?  The gall.  And Dr. Reed, thank you so much

2  for what you've done to me.  I mean, thank you so much for

3  helping me.  Why doesn't he say, and Dr. Reed, thank you for

4  teaching me to admit totally and accept responsibility.  Thank

5  you for telling me to do that.  And thank you for teaching me

6  victim empathy.  Thank you, because it's helped me so much.  Why

7  didn't he say, and thank you for teaching me what the red flag's

8  for when I get into trouble to avoid committing the offense.

9  Thank you so much, Doctor, for doing that for me.  Oh, yes.  And

10  Doctor, please, please, must thank you, Doctor, because I also

11  learned how to prevent reoffending.  Thank you, Doctor.  Thank

12  you.  And he never broke a sweat.  He went out of his way to do

13  that.  That's a monster.  That's a monster.

14         They said every murder's evil.  No.  No.  This is

15  an exceptional murder.  That's why it's capital murder, because

16  the victim is under six.  Because we, as a community, know that

17  some things you just don't ever do.  And little baby, six years

18  old and five years old and four-year-olds, you leave them alone.

19  We need to protect and nurture our young.  Leave them alone.

20         THE COURT:  Excuse me.  Five minutes.

21         MR. ESPARZA:  Thank you, Your Honor.

22         Not him.  So I tell you, has the State beyond a

23  reasonable doubt, proved that there is a probability that he will

24  commit future acts of criminal violence?  There is.

25         On mitigation, I'd saved it for the last because I

1    think the instruction reads -- it's so hard, I know, to do this.

2    "Circumstances to warrant the sentence of life rather than the

3    sentence of death be imposed." What a heavy burden we place on

4    you, huh? But this is the easier problem of the two. There is

5    none. When you have had every opportunity, when you've had a

6    loving family, when you can even have friends who don't know much

7    about you come and testify for you, private school, you name it.

8    All the opportunities the Probation Department gave him, all the

9    opportunities Norma gave him, Norma Reed gave him, all of that,

10   and guidelines to live your life and fly right, all of that, and

11   you just turn your back on them. There is no mitigation.

12   There's no excuse to let him go. There's no reason to let him

13   go.

14            A sentence of death is all that's necessary. It's

15   the only thing.

16            They made some reference to the Bible. I'm not

17   nearly qualified to do that. What I am qualified to do is

18   interpret this evidence and to show you what a monster leaves

19   behind in his trail is what exactly he's going to do as he walks

20   further on his journey of life. This journey is not going to

21   automatically just turn this way and no longer will he follow the

22   trail that he's left behind. No. You look at his trail, you

23   know where he's going. He took a beautiful, beautiful, beautiful

24   little flower from our garden. He took it and he stomped on it

25   and he didn't care.

He didn't care that he would leave Adriana, Jaime, Juan, Lizette, Monique, and all the other brothers and sisters, and Mr. and Mrs. Flores without a loved one. He didn't care that Mrs. Flores would have to suffer the loss, or the family a loss. And when she cuddled that little jacket, she touched it like it was a newborn, like the first time she ever held Alexandra. And he didn't care. He didn't care for her loss. He didn't care that she'd have to grieve. All he cared about was him.

He cared about monster me. That's all he cares about. And he was vicious. And how bad was that strangulation? It was vicious. And he got up close to her, he could hear her scream. He could hear her breathe. He could hear her as he snuffed her life away. He knew all of that and it never mattered to him.

There's only one verdict you can hand him and that's a death sentence. I told you when I opened I'm not so bold and so callous to believe that it's easy to do. But you must send a message and you must protect us and you must do what's right based on the evidence. And what's right based on the evidence is a death sentence. You answer the first issue "yes." And you answer the second issue "no." And don't feel bad about it because he put you there.

MR. SEGALL: Your Honor, we object that is an improper argument, improper to imply that these jurors are not morally responsible for their choice.

1              THE COURT:  Overruled.

2              MR. ESPARZA:  So don't feel bad about it.  You do

3    your job, you do it on the evidence, and you'll be okay.

4              And my final words, I just ask you to do what's

5    just.  I know, based on the evidence, what's just is "yes" to the

6    first question and "no" to the second one.  And I wish you

7    Godspeed.

8              THE COURT:  I'm going to send you to the jury room

9    to begin your deliberations.  If you must communicate with the

10   Court, you must do so in writing.

11             (The Jury was then sent out to deliberate at

12             10:55 a.m.)

13             (After deliberations, Jury and Defendant present,

14             12:09 p.m.)

15             THE COURT:  Has the Jury reached a verdict?

16             THE PRESIDING JUROR:  Yes, we have, Your Honor.

17             THE COURT:  Would you hand the charge to the

18   Bailiff.

19             Will the Defendant please rise.

20             THE COURT:  "We, the Jury, unanimously find and

21   determine beyond a reasonable doubt that the answer to this

22   special issue is 'yes.'

23             "We, the Jury, unanimously find that the answer to

24   this special issue is 'no.'"

25             They have answered "yes" to special issue number 1

1   and "no" to special issue number 2.  You may be seated.

2            I'm going to poll the Jury, and I'm going to ask

3   whether each and every one of you -- if what I have read into the

4   Court record is, in fact, your verdict.

5            Number 1, is this your verdict?

6            JUROR NUMBER 1:  Yes, ma'am.

7            THE COURT:  Number 2, is this your verdict?

8            JUROR NUMBER 2:  Yes, sir.  I mean, yes, ma'am.

9            THE COURT:  Number 3, is this your verdict?

10           JUROR NUMBER 3:  Yes, Your Honor.

11           THE COURT:  Number 4?

12           JUROR NUMBER 4:  Yes, ma'am.

13           THE COURT:  Number 5?

14           JUROR NUMBER 5:  Yes, ma'am.

15           THE COURT:  Number 6?

16           JUROR NUMBER 6:  Yes, ma'am.

17           THE COURT:  Number 7?

18           JUROR NUMBER 7:  Yes.

19           THE COURT:  Number 8?

20           JUROR NUMBER 8:  Yes, ma'am.

21           THE COURT:  Number 9?

22           JUROR NUMBER 9:  Yes, ma'am.

23           THE COURT:  Number 10?

24           JUROR NUMBER 10:  Yes, ma'am.

25           THE COURT:  Number 11?

1          JUROR NUMBER 11:  Yes, ma'am.

2          THE COURT:  Number 12?

3          JUROR NUMBER 12:  Yes, Your Honor.

4          THE COURT:  Your verdict is accepted and will be

5    filed with the other papers in this case.  You are now released

6    from your secrecy.  You are now free to discuss this case with

7    whoever you choose to discuss it with.  You do not have to

8    discuss the case with anyone.  Thank you very much.

9          (The trial was then concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE

THE STATE OF TEXAS )
)
COUNTY OF EL PASO )

     I, MARIA C. CHAVEZ, Official Court Reporter in and for the 168th District Court of El Paso County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open Court or in chambers and were reported by me.

     I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

     WITNESS MY OFFICIAL HAND this the _15th_ day of ____July____, 2004.

MARIA C. CHAVEZ
Official Court Reporter
Certificate No. 2090
Date of Expiration: 12/31/04
602 El Paso County Courthouse
El Paso, Texas 79901
(915) 546-2141
E-mail: machavez@co.el-paso.tx.us