ORIGINAL

74829

1          REPORTER'S RECORD

2      VOLUME 28 OF 84 VOLUMES

3      TRIAL COURT CAUSE NO. 20020D00230
       COURT OF APPEALS CAUSE NO. AP-74,829

4

5

6  THE STATE OF TEXAS,          )      IN THE DISTRICT COURT OF
                                )
7          Plaintiff,           )
                                )
8  vs.                          )      EL PASO COUNTY, TEXAS
                                )
9  DAVID S. RENTERIA,           )      41st JUDICIAL DISTRICT
                                )
10         Defendant.           )

11                                         FILED IN
                                   COURT OF CRIMINAL APPEALS
12

13  -----------------------------------  JUN 0 4 2009  -------

14          INDIVIDUAL VOIR DIRE       Louise Pearson, Clerk

15  -------------------------------------------------------

16

17

18      On the 11th day of December, 2007, the following

19  proceedings came on to be heard in the above-entitled and

20  numbered cause before the Honorable Dick Alcala, Judge

21  Presiding, held in El Paso County, Texas:

22          Proceedings reported by machine shorthand.

23

24

25

1                    A P P E A R A N C E S

2    Ms. Lori C. Hughes          SBOT:   00786275
     Ms. Diana E. Meraz          SBOT:   13942600
3    Assistant District Attorneys
     500 E. San Antonio, Room 201
4    El Paso, Texas 79901
     Phone: (915) 546-2059
5    Fax:  (915) 533-5520
     ATTORNEYS FOR: The State of Texas
6

7    Mr. Jaime E. Gandara         SBOT:   07611900
     Ms. Edythe M. Payan          SBOT:   00791415
8    Public Defender
     500 E. San Antonio, Room 501
9    El Paso, Texas 79901
     Phone: (915) 546-8185
10   Fax:  (915) 546-8186
     ATTORNEYS FOR: Defendant
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VOLUME 28
CHRONOLOGICAL INDEX
(INDIVIDUAL VOIR DIRE)

|  | Page | Vol. |
|---|---|---|
| Jurors sworn . . . . . . . . . . . . . . . . . | 6 | 28 |
| Introduction . . . . . . . . . . . . . . . . | 6 | |

| PROSPECTIVE JURORS | Voir Dire | Vol. |
|---|---|---|
| Robert Crosby . . . . . . . . . . | 11, 12, 40 | 28 |
| Defense Challenge for Cause . . . . . | 61 | |
| Court's ruling . . . . . . . . . . . | 63 | |

|  | Page | Vol. |
|---|---|---|
| Parole law discussed out of juror's presence . . . . | 44 | 28 |
| Motion for Mistrial . . . . . . . . . . . . . | 52 | |
| Court's ruling . . . . . . . . . . . . . . . | 52 | |

VENIREPERSONS EXCUSED BY AGREEMENT OF THE PARTIES

| Humberto Diaz . . . . . . . . . . . . . . . . . | 61 |
|---|---|
| Jose Aguirre . . . . . . . . . . . . . . . . . | 61 |
| Angelica Maria Acuna . . . . . . . . . . . . . | 64 |
| Belia Vasquez Martinez . . . . . . . . . . . . | 64 |
| Maria Wallace Cisneros . . . . . . . . . . . . | 64 |
| James Edward Sims, Jr. . . . . . . . . . . . . | 64 |
| Sergio Alfonso Manon . . . . . . . . . . . . . | 64 |
| Kaye Beth Zuloaga . . . . . . . . . . . . . . | 64 |
| Felipe Andres Hernandez . . . . . . . . . . . | 64 |
| Jorge Guillermo Torres . . . . . . . . . . . . | 64 |
| Kathy B. Tarango . . . . . . . . . . . . . . . | 64 |
| Donna M. Baker . . . . . . . . . . . . . . . . | 64 |
| Richard L. Linebaugh . . . . . . . . . . . . . | 64 |
| Virginia Lopez . . . . . . . . . . . . . . . . | 64 |
| Ana Lilia Sohle . . . . . . . . . . . . . . . | 64 |
| Maria Lourdes Campos . . . . . . . . . . . . . | 64 |
| Cecilia Salgado Salinas . . . . . . . . . . . | 64 |
| Maria T. Magallanes . . . . . . . . . . . . . | 64 |
| Leyra Ferrer Anton . . . . . . . . . . . . . . | 64 |
| Tammy Jane Strand . . . . . . . . . . . . . . | 64 |
| Mazin A Khateeb . . . . . . . . . . . . . . . | 64 |
| Olga M. Ramirez . . . . . . . . . . . . . . . | 64 |
| Rosa Maria Garcia-Shamma . . . . . . . . . . . | 64 |
| Alicia Jimenez . . . . . . . . . . . . . . . . | 64 |

VOLUME 28
CHRONOLOGICAL INDEX
(INDIVIDUAL VOIR DIRE CONT'D)

| PROSPECTIVE JURORS | Voir Dire | Vol. |
|---|---|---|
| Diana Herrera . . . . . . . . . . . . . | 65, 66 | 28 |
| Venireperson excused by agreement . . . | 74 | |
| | | |
| Robert Tomes . . . . . . . . . . . | 75, 77, 110 | |
| | 125, 127 | |
| Defense Challenge for Cause . . . . . | 129 | |
| Court's ruling . . . . . . . . . . . . | 129 | |

| | Page | Vol. |
|---|---|---|
| Jurors sworn . . . . . . . . . . . . . . . . | 131 | 28 |
| Introduction . . . . . . . . . . . . . . . | 131 | |

PROSPECTIVE JURORS

| | Page |
|---|---|
| William Ruiz, Jr. . . . . . . . . . . . . | 131 |
| Venireperson excused by agreement . . . . . . . . | 131 |
| Roberto Guevara, Jr. . . . . . . . . . | 131 |
| Venireperson excused by agreement . . . . . . . . | 131 |
| Court Reporter's certificate . . . . . . . . . . | 137 |

VOLUME 28
ALPHABETICAL INDEX

|  | Page | Vol. |
|---|---|---|
| **PROSPECTIVE JURORS** | | |
| Acuna, Angelica Maria | 64 | 28 |
| Aguirre, Jose | 61 | 28 |
| Anton, Leyra Ferrer | 64 | 28 |
| Baker, Donna M. | 64 | 28 |
| Campos, Maria Lourdes | 64 | 28 |
| Cisneros, Maria Wallace | 64 | 28 |
| Crosby, Robert | 11 | 28 |
| Diaz, Humberto | 61 | 28 |
| Garcia-Shamma, Rosa Maria | 64 | 28 |
| Guevarra, Jr., Roberto | 131 | 28 |
| Hernandez, Felipe Andres | 64 | 28 |
| Herrera, Diana | 65 | 28 |
| Jimenez, Alicia | 64 | 28 |
| Khateeb, Mazin A. | 64 | 28 |
| Linebaugh, Richard | 64 | 28 |
| Lopez, Virginia | 64 | 28 |
| Magallanes, Maria T. | 64 | 28 |
| Manon, Sergio Alfonso | 64 | 28 |
| Martinez, Belia Vasquez | 64 | 28 |
| Ramirez, Olga M. | 64 | 28 |
| Ruiz, Jr., William | 131 | 28 |
| Salinas, Cecilia Salgado | 64 | 28 |
| Sims, Jr., James Edward | 64 | 28 |
| Sohle, Ana Lilia | 64 | 28 |
| Strand, Tammy Jane | 64 | 28 |
| Tarango, Kathy B. | 64 | 28 |
| Tomes, Robert | 75 | 28 |
| Torres, Jorge Guillermo | 64 | 28 |
| Zuloaga, Kaye Beth | 64 | 28 |

1          THE COURT:   Good morning, folks.

2          VENIREPERSONS:   Good morning.

3          THE COURT:   We'll get on the record.   Welcome again to

4    El Paso County Courhouse.   Again, I'm Judge Alcala.   You

5    remember me from October 10th and these folks.   The Prosecutors

6    and the Defense attorneys will introduce themselves a little bit

7    later.   But for now, would you raise your right hands to be

8    sworn.   Do you solemnly swear or affirm that you will make true

9    answers to such questions as may be propounded to you by the

10   Court or under its direction touching your service and

11   qualifications as a juror so help you God?

12          VENIREPERSONS:   I do.

13          THE COURT:   All right.   Folks, today we're going to

14   talk to you individually.   That we told you we were going to

15   contact you to come for your individual interviews.   Right now

16   we're going through general matters and you're here together so

17   I won't have to do it, you know, four or five times today.   So

18   tend to try to do this to try to save time.

19          During this process, we're going to talk to you about

20   how you feel about some of the issues in this case.   As you

21   remember the defendant in this case has already been convicted

22   of capital murder.   Okay.   It's been done.   The jury that will

23   be impanelled, by this process, will be impanelled for the

24   purpose of determining the sentence only.

25          Now, under the law in a capital offense situation like

1   we are, there's only two options, either the death penalty or

2   life in prison.  Those are the two options that we're going to

3   talk to -- we'll be talking to you about.  And these are issues

4   that you normally don't sit around the table and discuss with

5   your spouses.  You might, you know, and in fact we had one

6   yesterday.  It was a teacher from the government and was just

7   familiar with a lot of stuff and she said she did talk about it.

8   So, you know, there's always the exception, but generally it's

9   not.

10          So we're going to ask you to really think about your

11  responses when you're sitting here.  You're going to be asked

12  some pointed questions.  Don't get nervous.  You know, this is

13  not a test or, you know, you don't need to know the law.  But --

14  but it is important that we know how you feel.

15          If -- if you don't understand the questions, you have

16  the right to ask that it be rephrased or put in a way that you

17  can understand.  Rephrase it, repeat it.  I'm sorry ,I don't

18  understand what you're asking me.  By all means, you have the

19  right to understand.  We will be -- take the time to do that

20  because your responses are very important.

21          Now, when you respond, responses like well, I don't

22  know or I think I can do it, or I believe I could do it or if I

23  were a juror, I would hope that I could do that.  Those

24  responses really don't help us to be frank with you jurors.  We

25  need to have direct answers to the questions so that is why I

1   ask you folks to take some thought.

2          You're going to have to search between your heart and

3   your mind to see how you really feel about these things.  And

4   today you're going to have to, you know, think about it, you

5   know.  You're going to be asked questions so we ask that you do

6   that.  We're going to take the time.  This process is very

7   important.

8          We don't know how long it's going to take.  Some

9   jurors take a couple of minutes, other jurors we take a couple

10  of hours because it's that important.  We're all unique

11  individuals.  We have our opinions and that reflects, you know,

12  how much time it takes depending on how you feel about the

13  issues.

14         This is sort of an educational process and also

15  finding out how you feel.  Education in the sense that we're

16  going to explain to you what the law is and what's required.

17  Because in a capital murder situation, the jury doesn't go back

18  and say all right.  Who is in favor of life?  Who's in favor of

19  death and you take a count.  That's not how it works at all.

20         The jury after hearing the evidence answers some

21  questions.  And they're up there, but we will go over them in

22  detail with you.  Answer some questions and depending on the

23  answers of the jury to those questions determines whether the

24  sentence is life or death.  Okay.  And we'll go through that in

25  a lot of detail.  So that's kind of how it all works.  Okay.

So you're going to be seated here, right here.  We'll put you here.  Make sure you speak loud.  And it's close to me so that you can speak loudly to everybody, an individual.  The court reporter is Becky Macias.  And as I speak, she's taking down what I say and that's her responsibility as a court reporter.  She's responsible for the preserving the record.  Make sure it's accurate.

So in doing her job, you know, if she has trouble hearing you and she's going to prompt you, I'm sorry, would you -- what did you say?  And she just didn't hear your last response and just wants you to repeat it.  That's all.  She doesn't want an explanation, she just wants you to repeat it, okay, because she didn't pick it up.  So please just keep that in mind.  We know this is kind of new.  Everyday you're not in front of a court reporter.  So we may prompt you from time to time to do that.

And if your responses are uh-huh and huh-uh, they're not very good because they don't come out good.  When you try to print it out, we don't know if it's a yes or no.  So please keep that in mind.  Nods of the head.  Try to keep away from that, nods of the head, when you respond.  Little things that we might prompt you on.

When you're here, you know, this is -- this is a formal court proceeding, but we're proceeding more or less informally in the sense that if you want to take a break, just

```
 1  tell me and we will take a break.  If you want water or coffee,
 2  we have here to make you comfortable, by all means do that.
 3  We're going to take the time to do it.  Now, this morning our
 4  first juror is -- has -- is not here.  Normally we have to
 5  proceed in numerical order.  But he's not here so we're going to
 6  break with that and start with Mr. Crosby.  He'll be the first
 7  one --
 8          VENIREPERSON CROSBY:  Me?
 9          THE COURT:  -- today.  And the other ones, you're
10  going to be up on the 10th floor and, you know, we don't know
11  how long we'll take.  I'm hoping that we can complete all of you
12  all today, but it may be impossible.  You may have to come back
13  this afternoon.  Maybe you have to come back tomorrow, but I'm
14  going to work hard today and hopefully we can complete this
15  process today.  Today you will know.  You will know whether
16  you're going to be a -- be on the jury or not.  So you'll know
17  when you live here whether you're going to be excused or whether
18  you've been accepted as a juror.  Okay?
19          VENIREPERSONS:  Okay.
20          THE COURT:  All right, folks.  I think that's my
21  little spiel.  Mr. Crosby.
22          VENIREPERSON CROSBY:  Yes.
23          THE COURT:  Have a seat.  Did you all need to talk to
24  me before or?
25          MR. GANDARA:  No.
```

1    MS. HUGHES:  No.  No, we're fine.  Did you identify

2 who was here?

3         THE COURT:  I did, yes.  I did earlier.  So okay.

4              ROBERT W. CROSBY,

5 having first been duly sworn, testified as follows:

6                   VOIR DIRE

7 BY THE COURT:

8    Q    All right, Mr. Crosby.  We have Robert Wynn Crosby,

9 Juror 307, who was taken out of numerical order.  Mr. Crosby,

10 this is your questionnaire and I thank you very much for filling

11 it out.  It was a long day and you all were tired and without

12 food, and yet you perservered and gave us this information that

13 we -- we are going to make decision on today.

14         On page 3, you indicated that you had heard about the

15 case and the defendant by virtue of the newspaper, the radio --

16 radio, television, but you have not reached an opinion about

17 what the punishment should be --

18    A    That's correct.

19    Q    -- is that correct?  Still the way you feel today?

20    A    That's correct.

21         THE COURT:  All right.  I'll turn it over to the

22 State.

23         MS. MERAZ:  Thank you, Your Honor.

24

25

VOIR DIRE

BY MS. MERAZ:

Q    Good morning, Mr. Crosby.

A    Good morning.

Q    My name is Diana Meraz.  Beside me is Lori Hughes.

MS. HUGHES:  Good morning.

A    Good morning.

Q    (By Ms. Meraz) We're Assistant District Attorneys. Our client is the State of Texas.  What we do is we prosecute criminal cases.  Our job is to seek justice.  Sometimes that means prosecuting a case to seek a conviction and sometimes dismissing.  It all depends on the facts.  And beside me are the -- one of the Defense attorneys, Mr. Jaime Gandara.

MR. GANDARA:  Good morning.

A    Good morning.

Q    (By Ms. Meraz) And Ms. Edythe Payan who just stepped out for moment and their client, David Renteria.  Do you know any of us, Mr. Crosby?

A    Not personally, no.  I've seen your picture or seen you on television.

Q    Oh, okay.  Must be famous.  Just kidding.  During this process, we're going to be asking you questions about what you filled out on your questionnaire and --

A    Okay.

Q    -- about how you feel about certain matters related to

1  this case which involve asking you a little bit about how you

2  feel about the death penalty.  And during this process also if

3  you have any questions, you can let me know.  If I'm not clear

4  about something, please let me know.  And if I ask you a

5  question you don't understand, I'll try to rephrase it.

6      A    I will.

7      Q    Now, during this process, we're trying to talk to

8  potential jurors and see if they qualify to be one of the 12

9  jurors on this case.  Now, people have different viewpoints,

10  different ways of seeing things because of the way they're

11  raised.  And sometimes because of those viewpoints, they may not

12  be the most ideal juror for this type of case.  Maybe in another

13  case they'd be a perfect juror, but not in this one.  So those

14  are the kind of issues we're trying to work, you know, finding

15  out about any possible biases and prejudices you may have.  And

16  I don't mean that in a negative way.  Just, you know, to see if

17  you qualify as a juror in the case.

18      A    I understand.

19      Q    Now, Mr. Crosby, you said you've served on a jury

20  before?

21      A    Yes, ma'am.

22      Q    This was back in the 80's or?

23      A    Yes.

24      Q    Okay.  Do you remember what kind of case it was?

25      A    It was a drug related kiss -- case.

1    Q    Okay. And you actually reached a verdict in that

2    case, didn't you?

3    A    Yes, we did.

4    Q    Okay. And what did you think about your experience?

5    A    I -- it was a learning experience. I learned a lot.

6    Q    You did. Okay. Because of that experience, it was so

7    hard to leave a positive one, would you have any problems

8    sitting on this case?

9    A    No, I wouldn't.

10   Q    Now, I want to go ahead and ask you a little bit about

11   the death penalty. On page number -- let me see -- page 9 you

12   were asked some -- let me skip a little bit. Page 8, you were

13   asked a little bit about the death penalty and kind of a very

14   vague question. The first -- that first one that I'm referring

15   to is questions 37 had asked you do you believe that there

16   should be a death penalty and you said yes.

17   A    Yeah.

18   Q    Why do you believe that?

19   A    I think there's a sudden certain justification for

20   behavior. And when it's an extreme case, I believe that the

21   death penalty is a good alternative.

22   Q    Okay. Now, do you think it should be something that

23   should be an automatic sentence or do you think it's something

24   that the jury should consider as just an option?

25   A    It definitely should not be an automatic thing.

1    Q    Okay.

2    A    Definitely should be considered on a case by case

3 basis.

4    Q    Okay.  So when you wrote -- let me see if I can find

5 the question.  Okay.  Page -- it was page 10, number 57.  You

6 were asked, you know, please rank in order of importance the

7 following three types of, you know, punishments or reasons for

8 punishment.  And you put punishment versus -- you checked off

9 punishment and then the other two were left blank, but on the

10 explanation you went ahead and said if you do the crime, you

11 should do the time.

12    A    That's correct.

13    Q    And what do you mean by that?

14    A    I mean, if you committed the crime, then you should

15 stand accountable for it.

16    Q    Okay.  And I guess the type of punishment or the

17 amount of time that a person is punished would be --

18    A    Depends --

19    Q    -- left up to the jury or?

20    A    Yes, depending on the crime.

21    Q    Okay.

22    A    And what the jury decides that the punishment should

23 be for that particular case.

24    Q    Okay.  Okay.  And I guess to you it all depends on

25 what happened and the type of crime to you to be able to

1    properly assess the --

2    A    Exactly.

3    Q    -- sentence?  Okay.  Now, uhm -- and I'm bouncing

4    around a little bit.  On page 32, question number 165, you were

5    asked a little bit about your religious viewpoints.  And on

6    question 165, you were asked how important are the teachings of

7    your church to you in making decisions?  And you said very

8    important.

9    A    That's correct.

10   Q    Okay.  Now, what religion do you practice?

11   A    Lutheran.

12   Q    Okay.  Because you said -- you said on question 162

13   that you changed religions when you got married?

14   A    Yes, I'm -- my wife was a Catholic and for years we

15   served in the Catholic Church.  Okay.  But we -- about seven

16   years ago we switched over to Lutheran.

17   Q    Okay.  But you were raised Lutheran?

18   A    I was raised Southern Baptist --

19   Q    Oh, okay.

20   A    -- as a child.

21   Q    Okay.  Now, would those religious viewpoints affect

22   the way you decide this case?  Would they have an impact?

23   A    I don't think they would, no.

24   Q    Okay.  Now, I'm just asking because if, you know, some

25   religions, they -- they hold the viewpoint that they could not

1 be part of a jury that could possibly assess the death penalty.

2     A    That wouldn't be correct in my case.

3     Q    Okay. And that's why I was asking. Mr. Crosby, you

4 were in the Army, right?

5     A    20 years and six months.

6     Q    20 years, oh, it's a long time. And right now, what

7 do you do?

8     A    I teach Micro Computer Electronics at Western

9 Technical College.

10     Q    Okay. And how long have you been doing that?

11     A    13 years.

12     Q    Okay. Now, during this process like I said we're

13 going to talk to, you know, potential juros and see if they

14 qualify to be on the jury. There's no right or wrong answers.

15 You took an oath right now to answer the questions truthfully.

16 If you're actually sitting on the jury, you'd be given an

17 additional oath which would require you to follow the law.

18     At this point because of -- we were discussing

19 earlier, you know, because your viewpoints are -- there's no --

20 first off, they are not able to follow the law because of those

21 viewpoints they have. And so those are the things we're trying

22 to figure it out to see if you'd be able to follow the law

23 inspite of whatever views you may hold. And so this process,

24 like I say, feel free just, you know answer what you're

25 thinking. There's no right or wrong answers.

1  A  Okay.

2  Q  In this case, the defendant has been convicted of

3 capital murder.  Typically as you probably know, a jury

4 considers the evidence and then they decide whether a person is

5 guilty or not guilty.  And then after that, then they decide the

6 proper punishment.  In this case, that is no longer an issue.

7 Okay?  The only thing the jury would decide is the proper

8 punishment.  Mr. Crosby, would you have a problem sitting on a

9 jury where the determination of guilt has already been made?

10  A  No, I don't.

11  Q  Okay.  And like I said, in this situation, you would

12 only be deciding the punishment.  And in a capital murder case

13 where there's been a conviction, the only options are life in

14 prison or the death penalty.  Okay?

15  A  Okay.

16  Q  Now, that doesn't mean that the death penalty is an

17 automatic.  It's something for you to consider as an option.

18 Now, what the jury does is they consider all the evidence, but

19 when they go back and deliberate, they don't exactly decide life

20 in prison or the death penalty.  What they do instead is they

21 answer two questions.  But based on the answers to those

22 questions, they decide for whether it's life in prison or the

23 death penalty.  Okay.

24    Now, the first question basically asks a juror to

25 consider all the evidence and decide whether or not the

1   defendant is probably going to be a future danger.

2       A    Okay.

3       Q    So that's the first question.  Based on the evidence

4   you believe the defendant is not probably going to be a future

5   danger, your answer to that question would be no.  But if you

6   are convinced the defendant is probably going to be a future

7   danger, your answer to that question would be yes.  Okay?

8       A    I understand.

9       Q    Now, if you answer no, that results in life in prison.

10      A    Okay.

11      Q    But if you answer yes to that first question, then

12  you're on your way to the death penalty.  And if that's the

13  case, then you would proceed to question number two.  And in

14  question number two, you're asked to consider all the evidence

15  again and look to see if there's anything mitigating, any

16  factor, any piece of evidence that you think makes the defendant

17  deserve life in prison rather than the death penalty.

18           Now, if that's the case, if you found that piece of

19  evidence that you think makes him deserve life, then you're

20  answer to question number two would be yes, which results in a

21  life sentence.  But if you look at the evidence and you thought

22  no, there is no piece of evidence, no factor that makes me think

23  he deserves life, I think he deserves the death penalty, your

24  answer to that question would be no, which results in the death

25  penalty.

1    And it's only that combination of an answer of yes to

2 question number one and an answer of no to question number two

3 that results in the death penalty.  Any other combination

4 results in life in prison.  Does that make sense?

5    A    Okay.  Can I ask a question?

6    Q    Sure.

7    A    I'm pretty sure I understand what the death penalty

8 is.

9    Q    Yes, sir.

10   A    But I have a lot of doubt on that if I understand what

11 life in prison is.  Does life in prison mean life in prison

12 without any chance of parole or does life in prison mean at some

13 point in the future, parole would be considered?

14   Q    Okay.

15        THE COURT:  Yeah, in this case, those are matters that

16 the jury cannot consider.

17   A    Okay.

18        THE COURT:  It cannot, cannot be considered.  And I

19 guess the question would be -- would be -- that'd be something

20 Mr. Crosby that would so be in your mind that would influence

21 the way you decide the issues in the case?

22   A    No, I can answer the question as presented, but I --

23 it's just a -- something in my mind if that was part of my

24 process --

25        THE COURT:  Yeah, no, it's not.

1     A    Okay.

2        THE COURT:  That's for -- that's for people in the

3 other place --

4     A    Okay.

5        THE COURT:  -- other places of authority.

6     A    Okay.

7     Q    (By Ms. Meraz) Okay.  Well, we'll talk about the two

8 questions in a little bit more detail, but I just wanted to talk

9 a little bit more about capital murder in general.

10     A    Okay.

11     Q    Okay.  Now, capital murder is -- is murder plus some

12 other factor.  Capital murder is a grade up from plain old

13 murder.  And I don't mean that to minimize it, but murder by

14 itself is intentionally and knowingly causing the death of an

15 individual.

16     A    Uh-huh.

17     Q    That means that the person intended to cause the death

18 of a person or knew what they were doing would cause the death

19 of a person.  Okay.  In that situation like that, there's no

20 self-defense.  There is no defense of a third person.  That's

21 what the person intended to do, to cause the death of the person

22 or you know, that what they were doing would cause their death.

23 That's a murder.

24        A capital murder is one step up from that because you

25 have an additional factor.  For example, you can have a person

1   who if they intentionally and knowingly cause the death of a

2   police officer or a firefighter in the line of duty, okay, that

3   would make that case a capital murder.  Or if you have a

4   situation where you intentionally or knowingly killed two people

5   during the same criminal episode, well, that's a capital murder.

6           Or you can have a capital murder if you intentionally

7   cause the death of a person while you're trying to rob them or

8   while you're trying to commit a sexual assault, a burglary, you

9   know, some other felony in addition to murder.  Or you can have

10  a capital murder if you intentionally and knowingly cause the

11  death of a child under the age of six.  Okay.  That's considered

12  a capital murder.

13          Now, the death penalty is only an option for capital

14  murder cases.  It's not an option for just plain murder let's

15  say.  Now, it's never an automatic.  It's just something that

16  the jury can consider as an option in sentencing along with life

17  in prison.  Okay.  Now, what I want to ask you is right now the

18  death penalty is not an option for just plain murder.  The range

19  of punishment for plain murder is five to 99 years or life.

20  Now, do you believe if you could change the law, okay, that the

21  death penalty should also be an option for plain murder?  Not an

22  automatic, just an option.

23      A    No, I think they have it correct the way it is.

24      Q    Okay.  Okay.  Now, as a juror, your role would be

25  obviously to look at all the evidence and make your decision on

1 the evidence. Another thing that a juror does is that they

2 weigh the credibility of the witnesses. In other words, you get

3 to decide if a witness is telling the truth or lying, okay.

4 That would be part of your job as a juror. And you know, you

5 can believe everything a witness says. You can believe nothing

6 what they say or bits and pieces. It's all up to you. Okay.

7 You get to weigh their credibility the way you want. And use

8 whatever criteria you want in doing that.

9      Now, we may have different types of witnesses coming

10 to testify. And we might have forensic scientists, doctors and

11 -- and police officers. And what the law requires is for a

12 juror to not prejudge any witness. In other words, hold

13 judgment on the credibility of the witness until they actually

14 testify.

15      You know, we may have certain tendencies, for

16 instance, like with law enforcement. Some people have the

17 tendency to believe police officers because of, you know, they

18 -- they have a badge. They're up -- they've taken an oath to

19 uphold justice. They think now as they come in, they're going

20 to be telling the truth. Well, I mean, that may be the case,

21 but then to be fair I mean --

22     A    Human beings are human beings. I understand that.

23     Q    Exactly, right. Everybody is fallible. They -- it's

24 conceivable they can come up here and lie or just be mistaken.

25 And so that's what the law requires for you not to automatically

1  believe any one witness.  Does that make sense?

2      A    Makes sense perfectly.

3      Q    Okay.  And I'm just following up on something you had

4  said, page 37, question 206.  You were asked would you favor the

5  side that had law enforcement officers and witnesses.  You said

6  yes, they have the facts and --

7      A    Well, they do have the facts.  They -- and you know,

8  if you still have to understand that people are people, right?

9      Q    Right.

10     A    But you have to look at the facts and what's proven

11 and not proven and decide for yourself what to believe.

12     Q    Okay.  Exactly.  Like you said, you know, you can't

13 automatically believe them.  And even though you may have a

14 tendency, you or maybe some other juror to want to believe them,

15 you know, that's fine.  But what the law requires is that if you

16 have a tendency like that just put that aside when you -- when

17 you come in as a juror and then just decide based on what's

18 presented to you and based on their testimony whether they're

19 telling the truth or not.

20     A    I agree with that.

21     Q    Okay.  Now, along the same lines, a defendant can also

22 be a possible witness.  He can take the stand and testify.  And

23 same thing applies to the defendant.  Obviously, you have a way

24 to listen and decide whether he's telling the truth or not

25 because it's conceivable he could be telling the truth.  It's

1  conceivable he could be lying, right?

2     A     That's correct.

3     Q     So you won't know until he testifies.  Now, a

4  defendant also has what is known as the Fifth Amendment right

5  and I don't know if you're familiar with that term?

6     A     Yes.  He can testify if or decide not to testify.

7     Q     And that's it in a nutshell.  He can testify if he

8  wants to, but he doesn't have to.  He's the one person that the

9  State cannot subpoena as a witness because it's his absolute

10  right not to testify if he doesn't want to.

11     A     That's correct.

12     Q     Okay.  That's a decision that's his and his Defense

13  attorneys.  And what the law requires is that as a juror, you

14  not hold it against him if he doesn't testify.

15     A     That's correct.

16     Q     In other words, don't go back in and say, well, he

17  didn't testify.  Obviously, he's hiding something.  Does that

18  make sense?

19     A     I understand it and it does make sense.

20     Q     Okay.  And kind of along the same lines, the Defense

21  attorneys don't have any burden whatsoever.  In other words,

22  they don't have to testify -- oh, excuse me.  I mean they don't

23  have to put on any witnesses if they don't want.

24     A     That's correct.  That's the prosecution to prove the

25  case.

Q   There you go.  See.  And again, you know, we're going through -- I'm going through these things to make sure you understand.  If you understand, let me know and I'll move on.

A   Okay.

Q   But just like you were saying, it's our burden to prove the case to them, to the jury.  We bring the action forward.  We bring the indictment forward so it's up to us.  They don't have to disprove anything.

A   That's correct.  I understand.

Q   Okay.  Now, I wanted to go back and refer to those two questions again.  We talked about them briefly, but I want to talk about them in a little bit more detail.

A   Okay.

Q   Okay.  Now, like we said before as a juror, you would be looking at those two questions in the punishment phase of the trial.  And the first question that you would be looking at is whether -- and it's up on the board.

A   Uh-huh.

Q   Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.  Well, that's the first question that the jury would have to answer.  If you would look at the question and think about it a little bit, it's kind of a futuristic question.  In other words, asking you to kind of make a prediction --

```
1       A    Yes.

2       Q    -- of some event.  Now, that word probability is used

3   at -- toward the beginning of the sentence.  And if you look at

4   it, obviously, probability is -- is more than a possibility,

5   right?  Does that make sense?

6       A    I would think so, yes.

7       Q    Anything is possible, right?

8       A    Yes.

9       Q    But not everything is probable.  Does that make sense?

10      A    I think so, yes.

11      Q    Okay.  Probable -- probably means more likely than

12  not, does that make sense?

13      A    Yes.

14      Q    Okay.  And also the question is not asking you for 100

15  percent certainty.  It's only asking you for --

16      A    Can't be 100 percent.

17      Q    Exactly, right.  We can't make that sort of prediction

18  for the future.  So it's only asking you if there's a

19  probability that the defendant would commit criminal acts of

20  violence, okay, however you define that.  Some of these terms

21  are not defined for you.  At the end of the trial, the Judge

22  gives you what is called a Charge.  You may have -- you may

23  remember that from the trial you were in.

24      A    Yes.

25      Q    At the end, you're given some instructions with, you
```

know, to do and it will have these questions again and some
definitions are defined, but not everything. And what those
things that are not defined, you have to go ahead and use your
own judgment and common sense. Okay?

Now, going back to that question like I said, some of
these terms will not be defined for you, whatever every day
meaning you give to them. And on that last word in the first
question, society, okay, is the defendant going to be a
continuing threat to society? Well, that's kind of like an all
encompassing term. Okay. It's whatever society the defendant
is in. Whether it be outside society or it can even include a
prison society?

A    Yes.

Q    Does that make sense?

A    Yes.

Q    Okay. So then you would look at the first question
and then decide if there is that probability of the defendant
being a future danger. And -- and if you look at all the
evidence and you're not convinced that he is going to be a
future danger or probably is going to be a future danger, your
answer would be no. Okay. Now, only 10 of you have to agree to
a no answer. Okay? Because that results in life in prison.

A    Yes.

Q    Okay. And in that first question, it's the State that
has that burden of proof. Okay? In other words, we have to

convince you beyond a reasonable doubt that he probably is going to be a future danger. Now, the -- the burden of proof or beyond a reasonable doubt is the highest there is. Okay. It's used in a criminal context. When you were in that -- on the other jury trial, you said it was a drug case?

A    Yes.

Q    That was a criminal case too.

A    Yes.

Q    And that was the same standard of proof that was used for you to decide the case. It's the same standard of proof that is used in deciding the guilt or nonguilt of the defendant. Okay?

A    Okay.

Q    We have other standards of proof that are used in other types of cases. For example, in civil cases, the standard of proof is called preponderance of the evidence.

A    Yes.

Q    Which is lower. And then in CPS cases, there's another one called clear and convincing which is higher than preponderance, but not as high as this one.

A    I understand.

Q    Okay. And basically, what that one is, we have to remove any -- any reasonable doubt out of your mind because we have to convince you of that first question. Does that make sense?

1     A    I understand and yes, it does.

2     Q    Okay. And if we don't convince you to that level of

3  beyond a reasonable doubt, then we haven't convinced you.

4     A    That's correct.

5     Q    Okay. So in that first question, let's assume that we

6  went ahead and presented all the evidence to you, okay. We

7  presented evidence to you. We put on witnesses. And like I

8  said before, the Defense doesn't have to put on any witness.

9  They can if they want to, but they never have to. It's not

10  required of them. Let's assume they don't put on any witnesses.

11  Okay? And you know, we put witnesses on, but it came time to

12  answer that first question and you still were convinced beyond a

13  reasonable doubt, not to that level that he probably is going to

14  be a future danger. What would your answer have to be to

15  question number one?

16     A    No.

17     Q    Okay. Exactly, right. We have to convince you beyond

18  a reasonable doubt.

19     A    Yes.

20     Q    That's -- it would be no. Now, let's go ahead and

21  look at question number one. You looked at all the evidence and

22  we have convinced you beyond a reasonable doubt that the answer

23  is yes. Okay. Now, question number one, all of you -- the 12

24  jurors would have to agree that the answer is yes. Okay.

25  Because if you all answer yes to that first quesiton, you're on

1    your way to the death penalty and the death penalty has to be

2    unanimous.

3        A    Okay.  I understand.  That does make sense.

4        Q    Now, let's go ahead and assume that you all answered

5    yes to question number one and so at this point you proceed to

6    question number two.

7        A    Okay.

8        Q    Okay.  And question number two is -- I'll let you read

9    it to yourself.  Go ahead and read it and we'll talk about it in

10   a minute.

11       A    Okay.

12       Q    Okay.  Question number two is asking you okay, juror,

13   this is the last question.  Look at all the evidence again and

14   taking into account the circumstances that the offense, what

15   happened in the case, and also take into consideration the

16   defendant's character and background, and his personal moral

17   culpability and anything else that's presented, and look to see

18   if there's any mitigating circumstance.  Okay?

19           And mitigating circumstances have been defined by some

20   jurors to be just the opposite of aggravating.  Okay?

21   Aggravating makes the situation worse.

22       A    Okay.

23       Q    Mitigating makes it less bad.  Does that make sense?

24       A    Yes.

25       Q    Okay.  So you're looking at all the evidence to see if

1    there's any piece of mitigating evidence, okay, that you think

2    makes the defendant deserve a life sentence instead of the death

3    penalty.  Okay?

4        A    Okay.

5        Q    Because at this point, you've already decided he's

6    probably going to be a future danger, but the second question is

7    asking you there might be something else that may make you

8    decide to go with life instead of the death penalty.

9        A    Yes.

10       Q    Okay.  So you look to see if there's any factor that

11   you think is mitigating and ask yourself is it still sufficient

12   for you to tell you he should get life instead of the death

13   penalty?  Because if it is, then your answer to second question

14   would be yes, I found a mitigating factor and it's enough for

15   me.  And if at least 10 of you answer yes to that second

16   question, that results in life in prison.

17       A    Okay.

18       Q    Okay.  But let's say you all look at the second

19   question and you believe there's nothing mitigating or if there

20   is, it's still not enough for us to tell you he should get life.

21   We still think he should get the death penalty.  And if that's

22   your decision based on the evidence, your answer would be no.

23       A    No.

24       Q    And that results in the death penalty.  And again, it

25   would have to be unanimous.  All 12 would have to answer no for

1   the death penalty to be imposed.  Okay?

2       A   Okay.

3       Q   Now, on this second question, neither the State nor

4   the Defense has the burden of proof.  In other words, we don't

5   have to convince you that there are no mitigating circumstances

6   and they don't have to convince you that there are mitigating

7   circumstances.  It's just whatever you believe based o the

8   evidence.  Okay.  This is kind of a unique question.  And one of

9   the reasons for that is that when you look at that word

10  mitigating, okay, it's going to be unique to the juror.

11          In other words, you may find a piece of evidence like

12  let's say you look at factor A and you think it's mitigating.

13  Okay.  And another juror might look at that same factor.  In

14  looking at factor A, they think I don't think that's mitigating.

15  That's aggravating.  But they may be looking at another factor,

16  factor B and they think, well, okay, that's -- that's

17  mitigating.  And as long as you all agree that there is

18  something mitigating and it's enough for you to tell you he

19  should get life, that's enough.  You don't have to agree on your

20  particular piece of evidence being mitigating.  Does that make

21  sense?

22      A   Yes, it does.

23      Q   Okay.

24      A   Confusing, but it makes sense.

25      Q   Okay.  I know it's a -- you know, we take what the law

1    is, but we can't always give you the rationale behind it and

2    so -- but you know, that's what it is.  And do you kind of

3    understand the process now a little bit?

4         A    Yes.

5         Q    Okay.  And I can say you don't have to agree what is

6    mitigating or a particular piece of evidence being mitigating as

7    long as you all agree that it's mitigating and it's enough to

8    warrant the life sentence.  Okay?

9         A    Okay.

10        Q    Now, Mr. Crosby, would you be able to answer that

11   second question based on the evidence regardless of whether it

12   resulted in life in prison or the death penalty?

13        A    Yes, I can answer the question.

14        Q    Okay.  Okay.  Now, I wanted to go ahead and refer to

15   page 9 a little bit.  If you'll turn to page 9.  You were given

16   three choices towards the middle of the page.

17        A    Okay.

18        Q    That's when we were talking about the death penalty

19   and you said -- and you were asked to check off one of those

20   statements and you checked off I am in favor of the death

21   penalty.

22        A    Yes, I did.

23        Q    Okay.  And why did you check that one?

24        A    Because I'm in favor of the death penalty.

25        Q    Okay.

1     A    And I think certain crimes are committed and people

2    are -- want to commit them again. I think the death penalty is

3    a good resolution to the problem.

4     Q    Okay. Because when you -- that same page on 46 you

5    were asked whether -- there's a statement there and then you

6    were asked to agree or disagree. And that statement was

7    executing a person for capital murder discourages others from

8    committing that crime in the future and you agreed.

9     A    I would hope so, yes.

10     Q    Okay. So you're -- I guess that statement means that

11    it's a deterrence for other people. And when you were speaking

12    earlier, you had said certain deterrence for that person?

13     A    Yes.

14     Q    Okay. Now, the reason I was referring you to that

15    question or those three statements and you said you were in

16    favor of the death penalty generally.

17     A    Yes.

18     Q    Some people had read those three statements and felt

19    that it referred them to this specific case because it's in the

20    paragraph above it's talking about this particular case and then

21    asks you for your views.

22     A    I didn't -- I didn't think it was about this

23    particular case.

24     Q    That's fine.

25     A    I thought it was in general.

1      Q    Okay.  And that's fine.  People have interpreted

2    differently so I just wanted to see where you fell as far as

3    that goes.  Let me go ahead and talk a little bit about this

4    particular case.  In this particular case like the Judge told

5    you that the defendant's already been convicted of capital

6    murder.

7      A    Okay.

8      Q    Okay?

9      A    Correct.

10      Q    And he's been found guilty of intentionally and

11    knowingly causing the death of a child under the age of six.

12      A    Yes.

13      Q    And so what I want to know is knowing that, okay,

14    there's no defenses to it.  There's -- any issues of

15    self-defense, defense of a third party or any issues of insanity

16    have already been resolved, okay?  So the defendant's been found

17    guilty of intentionally and knowningly causing the death of a

18    child under the age of six.

19      A    I understand.

20      Q    Okay.  Now, Mr. Crosby, in that situation, this

21    specific offense, are you still willing to keep an open mind and

22    consider both life in prison and the death penalty?

23      A    I can keep an open mind.  I believe so.

24      Q    Okay.

25      A    I can.

1     Q    I'm sorry?

2     A    I can.

3     Q    Okay.  One of the reasons we're asking, some jurors

4 just hear the charge and they -- well, I'm already going to

5 automatically assess the death penalty.  I don't have to hear

6 anything more.  And like I said, before you know, we're trying

7 to find jurors who are open minded and can consider the evidence

8 and keep an open mind up to the very end before you make a

9 determination of whether to go with life or the death penalty.

10 Does that make sense?

11    A    Makes sense.

12    Q    Okay.  So that one of the reasons we ask you at least

13 once if not two or three times can you keep an open mind.  Okay.

14 So in this situation, just knowing that he's been convicted of

15 capital murder, intentionally and knowingly causing the death of

16 a child under the age of six, you're views on the death penalty

17 are that both are still options, the death penalty and life in

18 prison?

19    A    Let's put it this way.  If it was open and shut case,

20 we wouldn't be doing this right now.  So obviously, there has to

21 be information presented so people can make the decision.  I

22 want listen to information before I make a decision.

23    Q    Exactly.  And you know and that's what we're asking of

24 the jurors.  You know at the point we're not allowed to give you

25 any facts and circumstances.  You wouldn't know all the facts

1  and circumstances to actually get there and --

2      A    Right.

3      Q    -- you know you're one of the 12 jurors, then you get

4  to see all the evidence and to -- to make a proper assessment.

5  Now, Mr. Crosby, let's go ahead and assume, okay, the defendant

6  has already been convicted of capital murder, okay,

7  intentionally and knowingly causing the death of child under the

8  age of six. Just knowing that, does that give you an automatic

9  answer to question number one?

10      A    No, I haven't heard the evidence yet.

11      Q    Exactly. Now, let's go ahead and look at question

12  number one. The defendant's been found guilty of capital

13  murder, intentionally and knowingly causing the death of a child

14  under the age of six. And you looked at the evidence and based

15  on the evidence, you were convinced beyond a reasonable doubt

16  that the defendant was probably going to be a future danger. So

17  you would answer that first question yes.

18      A    Yes.

19      Q    Okay. So at that point after having answered question

20  number one yes, are you still open to both life in prison and

21  the death penalty at that point?

22      A    Yes, I am because obviously I wouldn't have the second

23  question if there wasn't some information that you needed to

24  decide.

25      Q    Exactly. So at that point, you still need to look at

```
 1   question number two and answer it based on the evidence?

 2        A    That's correct.

 3        Q    Mr. Crosby, do you have any questions of me on the two

 4   questions so far?

 5        A    No, I don't think so, so far.

 6        Q    Okay.  Now, I wanted to ask you one thing you said

 7   that your wife knows Dr. Briones?

 8        A    Yes.

 9        Q    Okay.  She's -- is she still a patient of his or?

10        A    Yes.

11        Q    Okay.

12        A    She's been a patient of him for about 15 years.

13        Q    Okay.  He's listed as one of the potential witnesses,

14   not to say he's going to testify, but a potential witness.  If

15   he were to testify, would you be able to evaluate him like any

16   other witness?

17        A    I -- I've never talked -- spoken with him personally.

18        Q    Okay.

19        A    And I don't know him and yes, I could.

20        Q    Okay.  Just making sure.  And again, you know we're

21   asking you questions.  We don't mean to pry.  We just want to

22   make sure that whatever you went through won't -- won't have an

23   affect on you on this case if you're asked to serve as a juror.

24        A    I understand.

25        Q    Okay.  Now, your wife went through something
```

1 traumatic.

2     A    Yes.

3     Q    Okay.  And would that have any impact on you if you're

4 to sit on the case as a juror?

5     A    No.

6     Q    Okay.

7     MS. MERAZ:  May I have just a moment?

8     THE COURT:  Yes.

9     Q    (By Ms. Meraz) Okay, Mr. Crosby.  Thank you for your

10 time.

11     A    Okay.

12     MS. MERAZ:  And I pass you.

13     THE COURT:  Okay.  Mr. Crosby, do you need a break or

14 any coffee or water?

15     A    I'm good to go.

16     THE COURT:  Okay.  Mr. Gandara.

17     MR. GANDARA:  May I, Your Honor?

18                    VOIR DIRE

19 BY MR. GANDARA:

20     Q    Good morning, Mr. Crosby?

21     A    Good morning.

22     Q    As a perspective juror, Mr. Crosby, you've got a right

23 to your own honest opinion about any fact situation about the

24 law, about whether you agree with the law, about whether you

25 agree that it should be as it is.  There's a list essentially up

1     here if you'll take a look up here on your left.

2        A     Yes.

3        Q     You have the absolute right to state your own opinion

4     and to stand by it. And -- and you've got a right not to have

5     to say that you're going to change it in order to adapt yourself

6     to any sort of a requirement. In other words, once you sit on a

7     jury, there's an oath you take that you have to follow the law

8     and you have to essentially keep yourself within the confines of

9     it, but at this point, you're absolutely free to believe the way

10     you do, to feel the way you do and not to have to set your

11     opinion aside for any reason.

12        A     I understand.

13        Q     Now, it's a little different than when we practice our

14     religion from Catholic or Lutheran or Baptist or Jewish, Muslim,

15     you have to set aside your doubts and -- and misgivings and hue

16     to the line, to the dogmatic line, right?

17        A     Yes.

18        Q     Well, that's not where we are. We're in a -- in a

19     court of law where we're trying to talk to people to find out

20     how they feel about things and whether -- how they feel, what

21     essentially is affecting them in the way they might decide the

22     case. Nothing says that you have to be on a death penalty jury.

23        A     I understand.

24        Q     Okay. Now, you've told us that essentially and you

25     were pretty emphatic about it now, we're talking about a life

1    sentence here. Does that mean life sentence without the

2    possibility of parole?

3       A     Yes.

4       Q     And that's a -- that's a strong opinion to have about

5    the law.

6       A     Correct.

7       Q     Okay?

8       A     Correct.

9       Q     And I take it then that you're feeling about the law

10   in that regard is it's the only good alternative, the only

11   acceptable alternative to a death penalty in a capital case

12   would be a life in prison without any possibility of parole?

13         MS. MERAZ: Objection to contracting, Your Honor.

14       A     I think --

15         THE COURT: I'm going to sustain the objection.

16   Rephrase it.

17         MR. GANDARA: Your Honor --

18       Q     (By Mr. Gandara) Okay. Let me ask another question.

19   Well, I'm asking you if you agree, if you agree with a law that

20   might provide for parole --

21         MS. MERAZ: I'm going to object.

22         THE COURT: I'm going to sustain the objection.

23         MR. GANDARA: Okay. Your Honor, we reurge our right

24   to ask that this juror be instructed as the Code of Criminal

25   Procedure would require instructions to the jury at the end of

1  the case with regard to life sentence and the parole law.

2      THE COURT:  I think earlier I informed the juror --

3  potential juror that under the law, the juror is under the law

4  pertaining to this case that the jury is not allowed to consider

5  how the parole law would have any affect in the case.  It's not

6  within the province.  It's not an issue for them.  That is a

7  decision for other authorities to make.

8      MR. GANDARA:  I'm making specific reference, Your

9  Honor, to the Code of Criminal Procedure that provides that the

10  jury will be instructed exactly what the certain perameters of

11  the parole are with regard to life sentence in capital cases.

12  And we assert our right to ask a -- to inform the juror of that

13  and to question him about that with regard to whether he can

14  follow that law, whether he agrees with it and how it would --

15  would or might affect him in deciding the case.

16      THE COURT:  The Jury in a criminal case is informed

17  and same as in this -- this capital case informed that thee is a

18  parole law.  But they are not to be given any thought or

19  consideration nor talk about how that law would be calculated or

20  affect a particular defendant because that is a decision for

21  other authorities to make.  So they cannot consider it during

22  deliberation.  They can be informed of it that the fact there is

23  possibly parole -- probability of parole.  That eligibility does

24  not mean that they get it.  It's just they're informed of that

25  they can't take into consideration.

1          MR. GANDARA: Your Honor --

2          THE COURT: And in the issue for the juror in this

3  case is whether is that an issue of parole as you mentioned

4  earlier when you were commenting whether that would influence

5  you to such a degree that you would not follow the instructions

6  of the Court and that's the -- that's the issue in the case.

7  What would be your response to that, sir?

8     A    When I asked the question, I was trying to decide in

9  my own mind whether if I had listened to the evidence and

10  decided that life in prison was what I thought was best for the

11  defendant, would I also have to be the one to decide whether he

12  was going to be eligible for parole or whether it would be life

13  without parole. I didn't know that and you answered the

14  questions for me and now I understand it that somebody else

15  makes that decision. I only make the decision of whether I

16  think it's death or life in prison.

17          THE COURT: Okay. Let me have you step outside just a

18  minute. There's some matters I need to consule with the

19  attorneys on --

20     A    Certainly.

21          THE COURT: -- Mr. Crosby.

22          (Venireperson Crosby left the courtroom.)

23          THE COURT: On that issue since it was brought up --

24  you all can sit down. I just wanted to -- to -- I need to ask

25  look into the law certainly. I don't remember this trial

1   previously was tried with just life in prison as opposed to life

2   without parole.  Is that how the case is going to be tried in

3   this case?

4               MS. HUGHES:  Yes, sir.

5               MR. GANDARA:  With a -- under the old law with parole

6   at 40.

7               THE COURT:  Okay.  Okay.  And with the -- that's what

8   I've assumed and I looked at it and I said, hum, I wasn't sure

9   and I think that you all have already addressed that with Judge

10  Bramblett or somehow --

11              MS. HUGHES:  Your Honor, I don't know that we've

12  addressed it with Judge Bramblett, but the law took affect based

13  on the occurence of the offense.

14              THE COURT:  Uh-huh.

15              MS. HUGHES:  With life without parole to the occurence

16  of the offense was prior to that law taking effect.

17              THE COURT:  Are you sure about that?

18              MS. HUGHES:  So it would be life without parole.

19              MR. GANDARA:  This case, it -- when they first tried

20  it was -- we had the parole at 40 and that would remain the

21  same.  In other words, the law that makes the punishment worse

22  doesn't apply retroactively.

23              THE COURT:  Okay.  I just wanted to clear any because

24  I looked at it and it -- it -- it's 37 -- let me just take a

25  look at it.  Clear my mind in that regard.  37.071.  One is the

1  new -- the new -- I'm sorry, it's the old law I believe.  The

2  offense date in this case is November, is that right?

3          MS. HUGHES:  Yes --

4          MS. MERAZ:  Right.

5          MS. HUGHES:  2001.

6          THE COURT:  November 2001.  Now, on 37.01 which is the

7  new law, it says under little i this article applies the

8  sentencing procedure in a capital case for the offense committed

9  on or after September 1st, 2000 -- 1991.  That's -- is that in

10  regard to life without parole.

11          MS. HUGHES:  You're right, Judge.

12          THE COURT:  So I've been looking at that and I wonder

13  whether -- if that's the case -- that if that's the case, then

14  -- then these -- these jurors are supposed to -- it says are

15  supposed to have been told -- are supposed to have been told

16  that there's life in prison without parole.  It says

17  specifically there.  Now, that being said, I can, you know, in

18  this case I understand why you would want to go under the old

19  law, but under the old law, the same requirement regarding what

20  jurors are supposed to know about parole are in effect.

21          In other words, what I just explained to him.  So if

22  -- if somehow that's incorrect, then we've been going on along

23  all wrong which looks like we have --

24          MR. GANDARA:  Judge, that section -- subsection in the

25  Code that I've got that has the prior law subsection e below is

1   affective for offenses in which any element of the offense was

2   committed before September 1st, 2005. And that's the one that

3   requires the Court to instruct the jury, to charge in writing

4   shall be as follows. Under the law applicable in the case if

5   the defendant is sentenced to imprisonment in the Institutional

6   Division of the Texas Department of Criminal Justice for life,

7   the defendant will become elligible for release on parole, but

8   not until actual time served by the defendant equals 40 years --

9           THE COURT: Right.

10          MR. GANDARA: -- without consideration of good conduct

11  time. And goes on to say well, you don't -- we don't know

12  what's going to happen. Don't consider what the parole board

13  might do. And we've been operating under the assumption that

14  we're dealing with a life with a parole at 40.

15          THE COURT: Yeah. And that's what he was tried with,

16  right?

17          MS. HUGHES: Yes, right.

18          THE COURT: That's how he was tried?

19          MS. PAYAN: Yes, sir.

20          THE COURT: I don't know. It doesn't -- from your

21  viewpoint, you're talking about the possibility of parole which

22  is --is beneficial to your client if he got life.

23          MR. GANDARA: And --

24          THE COURT: It would be unfair to try him in a

25  situation where it's life, you know, without parole and now if

1  the perspective jurors knew that, it might have affect which

2  under the new law they're entitled to know.

3         MS. HUGHES:  Where are you getting they're entitled to

4  know, Judge?

5         THE COURT:  It says -- let me find it.

6         MR. GANDARA:  If I may, we have a copy of the actual

7  charge that was submitted in this case.

8         THE COURT:  Okay.  I'm going to have to start reading

9  from the start to find it.

10        MS. HUGHES:  Is it in that section --

11        THE COURT:  37.01, yes.  Because the actual issue has

12 it in there.  In other words, number two has in there warrant a

13 sentence of life imprisonment without parole rather than the

14 death sentence be imposed.  So, you know, we're talking about

15 that issue under the new law.  It actually has it in there.

16        MR. GANDARA:  Right.

17        THE COURT:  Life without parole.  You see, but this

18 specifically tells that you're supposed to tell the jurors under

19 the new law that it's a life sentence without parole.  I saw

20 that somewhere.

21        MR. GANDARA:  Under the current law for cases, the

22 question we have is whether -- whether David is subject to a

23 life without parole or life sentence with parole.  That was the

24 law when the offense was committed.  That's the question.  I'm

25 not saying it applies one way or the other.  I'm just bringing

1  it up.

2        MS. PAYAN:  Since they're going to get this charge --

3        MS. HUGHES:  We all believe that the old law applied,

4  but on it's face it looks like this law applies.

5        THE COURT:  Yeah.  If you read it, it says in the

6  article it applies to sentence proceedings in capital cases for

7  offenses committed on or after September 1st, 1991.  It doesn't

8  say anything about a case that is tried -- has already been

9  tried and then retrial.  It doesn't say anything about that.

10       MS. PAYAN:  On or after.

11       THE COURT:  On that provision can make an argument

12  that the old law applies.

13       MS. PAYAN:  There was still --

14       MR. GANDARA:  And also the argument that the new law

15  applies.

16       MS. PAYAN:  On or after 1991 that was still life with

17  parole.  That's still parole.

18       MS. MERAZ:  Right.

19       MS. PAYAN:  That the new law without parole wasn't

20  after.

21       MR. GANDARA:  2005.

22       THE COURT:  It doesn't take affect after.

23       MR. GANDARA:  Oh, this is something else.  This is

24  something else.  This is -- what we're reading after September

25  1st '01.

1          MR. GANDARA:  Had -- had --

2          MS. PAYAN:  Does not -- parole at 40.

3          MS. HUGHES:  But if you look at it, it applies to a

4  sentencing procedure for an offense that was committed after

5  September 1.  The sentencing procedure is what we're --

6          MS. PAYAN:  Right, but not the precise -- I guess this

7  applies.

8          MR. GANDARA:  Does it apply as it -- 1991 or as it was

9  amended in 19 -- in 2005.  That's -- that's the issue.

10         THE COURT:  That's the issue.  See --

11         MS. HUGHES:  We've been operating under the idea that

12 we would go with the parole law because we didn't think it would

13 apply to --

14         MS. PAYAN:  Right, but I don't think this section

15 addresses that issue.  This issue is talking about something

16 else.  Because even in 1991 --

17         MS. HUGHES:  Okay.

18         MS. PAYAN:  -- there was still parole.

19         MS. MERAZ:  Right.

20         MS. PAYAN:  So this is referencing another procedure.

21 I guess --

22         MR. GANDARA:  I mean, the procedure in this

23 subsection, but -- and the question is how does the amendment of

24 the subsection affect us in --

25         MS. PAYAN:  If we read every single code, I mean,

1   that's going to be in this from the old Code, whatever the

2   procedure all the way --

3           THE COURT:  Okay.  Let me -- let's get off the record.

4           (Off the record discussion, then the following

5   occurred.)

6           THE COURT:  Okay.  Anything to take up, objections

7   to peremptories of Mr. Crosby before we bring him back in?

8           MR. GANDARA:  Your Honor, we submit that we're

9   entitled to a inquiry of this juror whether he has a bias or

10  prejudice against any of the law applicable to this case at set

11  out in Article 3516 of the Code of Criminal Procedure at

12  subsection C2.  And under circumstances in which the Court is

13  required to instruct the jury that a defendant sentenced to life

14  in prison under the law applicable to this case would become

15  eligible for release on parole, but not until actual time served

16  by the defendant equals 40 years and also requires further

17  instruction to the jury not to consider how that parole law

18  might be applied to the defendant.

19          That we're entitled to inquire of each juror and

20  instruct them what the law is and ask them if they have any bias

21  against the law.  And if they disagree with the law, would

22  affect them in -- in deliberating in coming to a verdict in this

23  case.  And the statutory requirement is in Article 37071,

24  subsection 2, subsections A and B.  Actually it's in Section 2,

25  subsection e2 A and B.  That subsection requires the instruction

1 of jurors.

2      And we rely on the rights provided by the Code of

3 Criminal Procedure and by the Constitutional provisions of the

4 Texas Constitution, and Sixth Amendment United States

5 Constitution, and as specifically set out in Irwin v. Dowde, 366

6 U.S. 717, Morgan v. Illinois, 504 U.S. 719 and Lee v. State,

7 Texas Case 35 S.W. 3rd, 296.

8      THE COURT: Okay. I'm going to overrule the

9 objection. The juror shall -- again, I informed him about what

10 a jury would be entitled to know and then that's about as far as

11 you can go. And with that -- with his question regarding parole

12 whether he could -- it would so influence him that he couldn't

13 be fair and impartial and he said that no. Okay.

14      MR. GANDARA: One more matter, Your Honor. Inspired

15 by the new discusion that we've had about this point,

16 respectfully move for a mistrial under circusmtances where we

17 were either prevented from asking the question that we wanted to

18 ask to inform the jurors what the law is and how they would be

19 instructed at the end of the case to discover any possible

20 prejudice or bias against the law. And the Court denied us the

21 permission to ask that question to each and every juror and we

22 have not been able based on the Court's ruling to ask that to

23 each and every potential juror and we move for mistrial on those

24 maters.

25      THE COURT: Okay. I'm going to overrule -- denying

1  your motion for mistrial.

2      MR. GANDARA:  Okay.

3      THE COURT:  Bring in Mr. Crosby.

4          (Venireperson Crosby present.)

5      THE COURT:  Have a seat, Mr. Crosby.  Sorry for the

6  delay, sir.  You may proceed.  Proceed, Mr. Gandara.

7      MR. GANDARA:  Okay.

8  Q    (By Mr. Gandara) Hello again.

9  A    Hi.

10 Q    In your questionnaire and I don't know if he -- I

11 guess I can get to it, but at question 206 back there at page

12 37.  Although you've told Ms. Meraz that -- that as you listen

13 to the witnesses and you decide their credibility based on what

14 you hear and so forth.  That does not say that you've changed

15 your mind that you would favor the side that has law enforcement

16 officers as witnesses, does it?

17 A    I will listen to the evidence and I will lay it in my

18 own mind to what I think is true or not true no matter who

19 presents it.

20 Q    I appreciate your answer, but it doesn't quite get to

21 the question.

22 A    Okay.

23 Q    Because your remark was an explaination of what your

24 answer was to the question.  They have the facts.  That is law

25 enforcement side has the facts.

1     A    They gather the facts, yes.

2     Q    And that tells you -- tells me, correct me if I'm

3 wrong, that -- that's your leaning, your bent, your opinion that

4 you believe that the law enforcement side is the side with the

5 facts in the case?

6     A    I would tend to lean that way, yes.

7     Q    Okay.  And nothing -- nothing about, you know, the

8 proposition that you're going to listen to the evidence and

9 consider the testimony of these witnesses changes that meaning.

10    A    Now, that's not true.  I told you I would listen to

11 the facts presented and I would weigh it in my own mind as to

12 whether I think it's true or not true.

13    Q    So -- so you still haven't told me one way or another

14 whether you would -- whether you can get around the fact that

15 you side with the law enforcement witnesses because they have

16 the facts.  You haven't told me that.

17    A    Well, I don't think I can answer your question,

18 counselor, because they gather the facts.  I listen to facts.

19 You have people that gather the facts.  I'll listen to their

20 facts.

21    Q    Okay.  Now, the answer to question number one up there

22 would depend on you being convinced beyond a reasonable doubt

23 that a person would probably commit criminal acts of violence in

24 the future that would constitute a threat to society.

25    A    Yes.

Q    Beyond a reasonable doubt.  Now, that we're talking about, well, nothing is 100 percent certain and all that.  But is it your feeling that in considering the evidence and looking at the burden of proof, that you would have to be 100 percent certain that the proof -- that it's been proved to you beyond a reasonable doubt?

A    Nobody can be 100 percent certain.

Q    So you couldn't be 100 percent that you -- that they had come beyond a reasonable doubt, the threshhold of beyond a reasonable doubt yourself?

A    No, I think I can reach the decision on whether it's reasonable doubt.  There's a lot of difference between reasonable doubt and 100 percent certainty.

Q    Well, but would you be 100 percent certain yourself that they had reached a reasonable doubt which would require of yourself to be 100 percent certain that this came beyond a reasonable doubt?

A    It would have to be beyond a reasonable doubt in my mind, yes.

Q    100 percent.

A    I can't say 100 percent.

Q    Well, 100 percent beyond a reasonable doubt is what I'm asking you.

MS. MERAZ:  Your Honor.

Q    (By Mr. Gandara) Now, assuming that that -- that you

1 hear a case where the defendant doesn't present any evidence one

2 way or the other on question one, future probability that that

3 person will commit criminal acts in the future. How does that

4 affect you in determining the burden of proof?

5     A   I'd have to listen to what the Prosecution had to say

6 and base it on my decision on the evidence presented by them.

7     Q   Okay. And you would not hold it against the defendant

8 that there were no persentations of testimony?

9     A   No, I would not.

10     Q   Okay. Now, you -- if a man is doing a life sentence,

11 okay, this question up here --

12     MR. GANDARA: If I may, Judge?

13     Q   -- asks you to determine whether something is going to

14 be a -- constitute a continuing threat to society. If a man's

15 doing a life sentence, what society is it in your mind that he

16 would be a threat?

17     MS. MERAZ: Objection, contracting, Your Honor.

18     THE COURT: Sustained.

19     Q   (By Mr. Gandara) Okay. Now, you told us that you

20 believed in the death penalty because depending on the crime, a

21 person is apt to commit the crime again, the death penalty is a

22 good resolution to the problem. Is that what you told us?

23     A   I believe so.

24     Q   Okay. So under those circumstances if you're at that

25 point -- well, you know you've got a conviction. David Renteria

1  has been found guilty of knowingly and intentionally causing the

2  death of a child under six.

3      A    Yes.

4      Q    And you're on a jury and you reached your own personal

5  conclusions, your honest conviction about the evidence.  Is it

6  --

7      A    Uh-huh.

8      Q    -- is -- he's going to commit criminal acts of

9  violence in the future that constitutes a continuing threat to

10  society.  At that point, based on what you've told us, the death

11  penalty is a good resolution to the problem, correct?

12      A    Based on the decision that I have to make, yes.

13      Q    Okay.  And so at that point if based on your -- your

14  feelings about the death penalty that you've told us about this

15  morning --

16      A    Uh-huh.

17      Q    -- that future danger.  If he's a future danger,

18  there's nothing that you -- that you would consider as a

19  mitigating circumstance.

20      A    I have to listen to the evidence.

21      Q    So then your opinion about the death penalty then is

22  not the one you've told us about.  It's not solid.  There you're

23  telling us that -- you've told us that if somebody is liable to

24  commit the crime again, death penalty is the resolution.  So far

25  that's what I -- what I get from Juror Crosby.  Now, that's

1 telling me that -- that that's the end of the line.

2     A    Okay.  Ask me a question to answer this.

3     Q    Well, is it the end of the end of the line?

4     MS. MERAZ:  That's a vague question.  I'm going to

5 object.

6     THE COURT:  Sustained.

7     Q    (By Mr. Gandara) Somebody has been convicted of

8 knowingly, intentionally causing the death of a child under six.

9     A    Okay.

10     Q    You've decided that he's going to do that again in the

11 future or some other criminal act of violence.

12     A    Based on the evidence presented --

13     Q    Based on the evidence that you've heard, and they met

14 the burden of proof and you're convinced.  Right?

15     A    Yes.

16     Q    Are we good so far?

17     A    We're good.

18     Q    Okay.  That's the end of the line for you.  That's the

19 death penalty.  Right?

20     A    No, because I still have to answer the second

21 question.

22     Q    All right.  And so if you heard evidence, having found

23 that somebody is a future danger, you heard evidence that you

24 consider mitigating --

25     A    I haven't heard the mitigating evidence yet.

1     Q    Okay.  All right.  Now, do you know that an answer to

2  question number one about future danger requires a unanimous

3  verdict, all 12 jurors?

4     A    Yes.

5     Q    Do you know that one no is a -- one no to future

6  danger, one vote for life, it means a life sentence.

7     A    Is it one or two?  I forget.  You have to explain that

8  one to me again.

9     Q    If you -- if you have to have a unanimous answer to

10  that question --

11     A    Yes.

12     Q    -- all 12 and you only get 11, that means you don't

13  have 10, right?

14     A    Okay.

15     Q    Okay.  Question two requires all 12 to say no

16  mitigation.  But if one juror that says there's mitigation

17  that's a sufficient mitigating circumstance, there's no death

18  penalty.

19     A    That's got to be unanimous, that's correct.

20     Q    You understand that?  All right.  Now, you do expect

21  respect for your personal views and your moral decision and your

22  honest conviction about the evidence?

23     A    Yes, I do.

24     Q    Do you agree that you would accord the same respect to

25  another juror if he might differ with your view?

```
1        A     Certainly.

2        Q     Okay.

3              MR. GANDARA:  Conditionally pass the juror.

4              MS. MERAZ:  Nothing.

5              THE COURT:  Okay.  If you can step out just a minute,

6   sir.  I'll be right back with you.

7                    (Venireperson Crosby left the courtroom.)

8              THE COURT:  To -- as far as Juror 307, Robert Crosby,

9   to the State for any challenges for cause.

10             MS. MERAZ:  No challenges for cause.

11             THE COURT:  Okay.

12             MR. GANDARA:  Your Honor, before we determine our

13  challenge, we reurge our right to ask all the questions that

14  have been prohibited by the Court, the ones that have been

15  propounded orally on the record and as set out in the documents

16  we've filed, motion for the right to conduct a full, fair and

17  constitutional voir dire and motion entitled propounded specific

18  questions to each member of the venire.  We need answers to each

19  and every one of those questions from each and every prospective

20  juror in order to intelligently exercise peremtory challenges

21  and for lodging challenges for cause and thereby providing

22  effective assistance of counsel to the defendant.

23             We rely on the Sixth, Eighth and Fourteenth Amendment

24  to the United State Constitution and Article 1, Section 10 and

25  19 of the Texas Constitution as well as the statutory laws.
```

1      THE COURT:  The Court will maintain it's previous

2  rulings in connection with those proposed questions.  To the

3  Defense for any challenges?

4      MR. GANDARA:  We challenge this juror for cause.  He

5  indicated that any case in which there is a finding of a person

6  might commit a criminal act again in the future, that the death

7  penalty is a good resolution.  When asked whether he -- after

8  having made a finding of future danger there were any mitigating

9  evidence that he would consider, he gestured toward the

10  Prosecution and said I have not heard any mitigating evidence.

11  And he indicated to me that -- that his view about the case is

12  that he sides with law enforcement and he's not going to listen

13  to any mitigating evidence unless he hears it from the State.

14  And that this juror is not impartial.  He's substantially

15  impaired in his ability to consider mitigating evidence and an

16  alternative life sentence.

17      THE COURT:  Im going to overrule -- overrule the

18  challenge for cause.  To the State for acceptance or agreement?

19      MS. MERAZ:  Well, I think we're going to agree to two,

20  302 and 311.  302 was scheduled for this morning, the one that

21  didn't show up.

22      MS. PAYAN:  That's right, Judge, we're out of order.

23  If we can have a minute before we.

24      THE COURT:  Oh, I'm sorry.  Proceed.

25      MS. PAYAN:  We're out of order.  If we could just have

1   a few minutes.

2           MR. GANDARA: Can we have a few minutes to talk?

3           THE COURT: Yes, sir.

4           (Off the record discussion, then back on record.)

5           MR. GANDARA: We can go in order and excuse Humberto

6   Diaz, Number 302.

7           MS. HUGHES: Your Honor, we have an agreement to

8   excuse 302 and Number 311.

9           THE COURT: Defense?

10          MR. GANDARA: That's correct, Judge.

11          THE COURT: Okay. Humberto Diaz, Juror Number 302 is

12   excused by agreement of the parties. Also Jose Aguirre, Juror

13   Number 311 is excused. Okay. Okay. Now, on the record we got

14   to the point where --

15          MR. GANDARA: -- the State had -- Stated had declined

16   the challenge for cause, Mr. Crosby, Juror Nubmer 307 and we

17   reiterate our challenge for cause is made on the record.

18          THE COURT: Yes, sir.

19          MR. GANDARA: At this point, the Court had passed to

20   the State for a peremtory and I believe the State declined.

21          MS. MERAZ: Well, we're going to decline in --

22          MR. GANDARA: Okay.

23          THE COURT: Okay. To the State for acceptance or

24   peremtory.

25          MS. MERAZ: We accept the juror.

1          THE COURT:  Okay.  And to the Defense for use of a
2    peremptory or acceptance?
3          MR. GANDARA:  Based on -- after having made our
4    objection and pointing out the questions that we wanted to ask
5    this juror and would like to ask, we exercise our peremptory
6    challenge.
7          THE COURT:  Okay.
8          MR. GANDARA:  And move for the Court for additional
9    strikes.
10         THE COURT:  Okay.  Would you bring Mr. Crosby in?
11              (Venireperson Crosby present.)
12         THE COURT:  Okay, Mr. Crosby.  I'm going to excuse
13   you, sir, but I want to thank you for your serivce.  Very glad
14   you were patient with us?
15         VENIREPERSON CROSBY:  Thank you.
16         THE COURT:  And back in October you put up with us
17   then and today answered our questions and we appreciate very
18   much your service.  You're excused?
19         VENIREPERSON CROSBY:  Thank you.
20         THE COURT:  Okay.  Have a good day.
21              (Venireperson Crosby left the courtroom.)
22         THE COURT:  We're finished for this morning.  Before
23   we leave let me state for the record that the Defense is
24   assigned two additional peremptories and it's to be used for the
25   12 -- the 12 regular jurors only.

```
 1              MS. HUGHES:  Okay.

 2              MS. MERAZ:  Okay.

 3                   (Break, then the following occurred.)

 4              THE COURT:  Who's going to announce the agreed

 5     excuses?

 6              MS. HUGHES:  I can, Judge.  We've agreed to excuse all

 7     the jurors from Number 325 through Number 346.

 8              MR. GANDARA:  That's correct.

 9              THE COURT:  All right.  All inclusive between those

10     numbers, right?

11              MS. HUGHES:  Yes, sir.

12              MR. GANDARA:  Yes, sir.

13              THE COURT:  All right.  All right.  By the agreement

14     of the parties, the jurors -- juror 325 through 346 all

15     inclusive --

16              MS. PAYAN:  Yes, sir.

17              THE COURT:  -- are excused by agreements of the

18     parties.

19              MS. HUGHES:  Yes, sir.

20              THE COURT:  That's the first bunch.

21                   (Off the record discussion, then back on record.)

22              THE COURT:  We're going to take off tomorrow and

23     Thursday and Friday.

24              MS. HUGHES:  We're going to finish these next four.

25              MR. GANDARA:  We may not till tomorrow morning.
```

1          THE COURT:  Okay.  Then that's the plan.

2                (Venireperson Herrera present.)

3          THE COURT:  Ms. Herrera, come on up.  Have a seat over

4    there Ms. Herrera.  And just for the record we have Diana

5    Herrera present.  You may be seated.

6          VENIREPERSON HERRERA:  Yes.

7          THE COURT:  Everybody else may be seated.  She's Juror

8    Number 316.  And earlier this morning you were given the oath,

9    you recall that?

10          VENIREPERSON HERRERA:  Right.

11          THE COURT:  Okay.  That's stated for the record.

12                      DIANA HERRERA,

13    having first been duly sworn, testified as follows:

14                        VOIR DIRE

15    BY THE COURT:

16       Q    All right.  Ms. Herrera, you have your questionnaire

17    before you and on page 3, if you look at page 3, it deals with

18    publicity.  It asks you a question whether you heard of the case

19    or the defendant and you said that you had.  That you put --

20       A    Yes.

21       Q    -- you know by television, newspaper and that you've

22    reached no opinion at this time about what -- what the

23    punishment should be.  Is that still the way you feel today?

24       A    Yes.

25          THE COURT:  Okay.  All right.  You may proceed.

VOIR DIRE

BY MS. HUGHES:

Q    Good afternoon, Ms. Herrera.  How are you?

A    Good.

Q    My name is Lori Hughes and I along with Diana Meraz represent the State in this case.  We're going to talk -- I'm going to talk to you a little bit about your questionnaire, and about the law in a capital murder case.  You can get comfortable if you want.

A    Okay.

Q    If you need water or coffee or want to take a break, if you'll just let us know.  We can take a break whenever you need to.

A    Okay.  Thank you.

Q    We've had the chance to look at your qeustionnaire and want to see what your views are in different areas of the law at it relates to a capital murder case and specifically as it relates to the death penalty.  From your questionnaire, it looks like you feel there should be a death penalty and so we're going to talk a little bit about that and see where you are.  The concept that we are going to talk about, we're just looking for your opinion.  There's not going to be a right or a wrong answer.  It's really just how you feel.

In these types of cases, there's some jurors who feel very strongly about the death sentence, as you might imagine,

1   and they're feelings are strong enough that it prevents them

2   from being what the law would require of them. Does that make

3   sense?

4      A.   Yes.

5      Q   And so if that were the case, then that doesn't make

6   them a bad person. It just means that they're not able to be a

7   juror on a case where the death penalty is an option. Does that

8   make sense?

9      A   Uh-huh.

10      Q   And I have to ask you to answer yes or no because she

11   has to write everything down.

12      A   I'm sorry. I forgot.

13      Q   I'll try to remind you, but --

14      A   Yes.

15      Q   Okay. In your questionnaire, you told us you felt

16   like we should have a death penalty. What purpose do you think

17   the death penalty serves?

18      A   Uhm, well, for me the reason why I think it should be

19   a death penalty is because we as taxpayers, we're also paying

20   for them --

21      Q   Uh-huh.

22      A   -- being in jail and also I mean they committed a

23   crime. I believe they should get the death penalty.

24      Q   Okay. Do you think that the death penalty should be

25   something that's a factor in any murder case, that should be an

1   option not an automatic, but an option in any murder case?

2       A    Not in any murder case. To me the death penalty

3   should be like on some cases I could go for it.

4       Q    Okay. And that's what the law says. The law says

5   that there's a difference between murder and capital murder.

6   Okay. And murder is intentionally causing the death of another

7   person. Capital murder is murder with some other felony. Like

8   this case where it's the murder of a child under six years of

9   age and that would be a capital murder. And in a capital

10   murder, the sentencing options are life in prison or the death

11   penalty. Okay. Does that make sense?

12       A    Yes.

13       Q    There's other ways that a capital murder can be

14   committed. It could be the murder of a policeman or a fireman

15   in the line of duty. It could be murder in the course of

16   committing a robbery or a burglary, a sexual assault,

17   kidnapping, murder of more than one person in the same event.

18   All of those would be ways that a capital murder could be

19   committed and in many of those circumstances, the death penalty

20   would be an option. Does that make sense?

21       A    Yes.

22       Q    So you see there's a difference between murder and

23   capital murder. There's no death penalty option on plain

24   murder. It's never an option.

25       A    What do you mean by plain murder?

1     Q    Murder which is intentionally causing the death of

2    another person as opposed capital murder which is a different

3    offense.  Capital murder is murder plus some other factor like

4    killing a child or killing a policeman or killing more than one

5    person.  Those are capital murders.  So do you see -- did I

6    confuse you?

7    A    Yes, when you said plain murder, but now I understand

8    the capital murder.

9    Q    Capital murder and murder are different.

10    A    Okay.

11    Q    So do you think that we should have the death penalty

12    as an option in a murder case or just for capital murder like

13    this -- like it is?

14    A    On capital murder.

15    Q    Okay.  In -- in a capital murder case, the two

16    sentencing options are life in prison or the death penalty.

17    Neither one of them are automatic sentences.  So what you -- if

18    there's been a conviction, someone has been found guilty of

19    capital murder, then the two options that are available for a

20    jury are life in prison and the death penalty.  Does that make

21    sense?

22    A    Yes.

23    Q    Okay.  So it's not an automatic.  Once someone is

24    convicted, they receive the death penalty, no.  Okay so far?

25    A    Yes, that's why we have this jury going on, right?

1    Q    That's right.  Exactly.  So a lot of the questions I'm

2  going to be asking you deal with if you're ability or inability

3  to keep an open mind to those two sentencing options throughout

4  the process.

5    A    Okay.

6    Q    Does that make sense?

7    A    Yes.

8    Q    Now, in your questionnaire you told us that you had a

9  cousin who was shot at Sonic.  Tell me a little bit about that?

10   A    There was -- this is a far relative of mine.  I met

11 him back -- I met him twice.

12   Q    Uh-huh.

13   A    And before he died and he was at Sonic with his

14 brother and some guys passed by that didn't like the brother and

15 started shooting.  And they shot him and he died.

16   Q    Okay.

17   A    And the other one was just injured.

18   Q    Was this within the last couple of years?

19   A    Yes, he was still in high school.  Maybe like seven,

20 eight years ago.

21   Q    Okay.  And do you know if anyone was prosecuted for

22 that or if anything happened to anyone as a result of that?

23   A    Honestly, no.  I'm not -- it was a relative, but I

24 wasn't very close to him.

25   Q    Okay.  All right.  Is there anything about that that

1  you think would affect you in a case where a capital murder

2  conviction and you're dealing with the life or death sentence?

3      A    No.  No.

4      Q    Have you served on a jury before?

5      A    No, I haven't.

6      Q    Okay.  Have you been called for jury duty before?

7      A    No.

8      Q    So this is the first time?

9      A    My first time.

10     Q    It's only in a capital murder case where we talk to

11  you like this, one on one.

12     A    Yes.

13     Q    Every other case we talk to the jurors as a whole, you

14  know -- you know, whether it's 40 jurors or 200 jurors.  We talk

15  to them all as a group.

16     A    Okay.

17     Q    And the reason for that is because of the death

18  penalty.  Okay.  Now, in looking at a death penalty case when

19  you're deciding the punishment, the jury doesn't go back and

20  just vote how many think he should get life or how many think he

21  should get death.  They don't do that.

22     A    Oh, okay.

23     Q    What happens is the jury has to answer to questions.

24  And the answers to those questions determine whether it's life

25  in prison or the death penalty will result.  Does that

1    distinction make sense to you?

2        A    Yes.

3        Q    Okay.  And in answering those questions, there's some

4    very specific things that we're going to talk about that have to

5    occur.  Okay?

6        A    Okay.

7        Q    The first question deals with whether or not the jury

8    is convinced that this person who's already guilty of capital

9    murder is likely to commit criminal acts of violence in the

10   future.

11       A    Okay.

12       Q    Okay.  And if the jury believes beyond a reasonable

13   doubt that the person is likely to commit criminal acts of

14   violence in the future, if they believe beyond a reasonable

15   doubt that they're likely to be a future danger, then you go to

16   the second question.

17       A    Okay.

18       Q    The second question asks the jurors to look at all of

19   the evidence again and decide if you think there's some

20   circumstance that is sufficient enough for you to think that

21   life should be given instead of death.

22       A    Okay.

23       Q    Okay.  We're going to talk in detail about those , but

24   that's the overall.  If the jury answers yes to number one,

25   which says this person is a future danger , you believe beyond a

1    reasonable doubt they're likely to commit criminal acts of

2    violence in the future, then you go to number two.  And if you

3    answer no to number two, then the death penalty will result.

4         A    Okay.

5         Q    That's how that works.  Yes and no results in the

6    death penalty.  Any other answers will result in life in prison.

7         A    Okay.

8         Q    Okay so far?

9         A    Yes.

10        Q    Now, in order to answer for the death penalty, in

11   order to answer yes and no, all 12 jurors have to agree.  It has

12   to be a unanimous decision.

13        A    Oh, okay.

14        Q    Do you think you can keep an open mind regarding the

15   death penalty throughout that entire process?

16        A    Yes.

17        Q    Okay.  In looking at question number one, it's actual

18   over here on that board and I'll ask you just read it to

19   yourself.  Okay.  Do -- would you agree that it's asking you

20   about the future?

21        A    Yes.

22        Q    I'm --

23        A    This one or that one?

24        Q    I'm sorry.  It's the far right one?

25        A    Okay.  I'm looking at this one.

1     Q    Let's look at whether there's a probability.

2     A    Okay.  Yes.

3     Q    Okay.  And because it's asking you about the future,

4 it's asking you about --

5     MS. HUGHES:  Excuse me just a minute.  I think we have

6 something to take up with you, Judge.

7     THE COURT:  Okay.  I need to consult with the

8 attorneys.  Would you step outside, Ms. Herrera, just a minute.

9 I'll be right back with you.

10     (Venireperson Herrera left the courtroom.)

11     THE COURT:  Okay.  We're outside the presence of the

12 juror.  Is there an announcement?

13     MS. HUGHES:  Your Honor, we'll agree to Juror Number

14 -- to excuse Juror Number 316.

15     MS. PAYAN:  Your Honor, we're in agreement to excuse

16 her, 316.

17     THE COURT:  Diana Herrera, Juror Number 316 is excused

18 by the parties.

19     (Venireperon Herrera present.)

20     THE COURT:  Ms. Herrera, I'm going to excuse you,

21 ma'am.  I want to thank you for your service and back in October

22 for filling out the questionnaire and -- and talking to us today

23 here, but I'm going to excuse you.  Thank you very much?

24     VENIREPERSON HERRERA:  Thank you.

25     THE COURT:  You may go back.

1          (Venireperson Herrera left the courtroom and

2    Venireperson Tomes present.)

3          THE COURT:  We have Juror Number 320, Robert Paul

4    Tomes --

5          VENIREPERSON TOMES:  Yes.

6          THE COURT:  -- is present.  Mr. Tomes, this morning

7    you remember I gave you an oath, correct?

8          VENIREPERSON TOMES:  Yes.  Yes, you did.

9          THE COURT:  I want to get that down for the record.

10          VENIREPERSON TOMES:  Uh-huh.

11          THE COURT:  I had -- I had, but I didn't -- I didn't

12    identify --

13          VENIREPERSON TOMES:  Yes, sir.

14          THE COURT:  -- actually having done so.

15                    ROBERT P. TOMES,

16    having first been dulty sworn, testified as follows:

17                        VOIR DIRE

18    BY THE COURT:

19      Q    But nevertheless, you have your questionnaire in front

20    of you, sir.  If you'd turn to page 3.  The questionnaire asked

21    you about publicity and whether you've heard about the case or

22    the defendant and you -- you told us that you had.

23      A    Right.

24      Q    And as a result of that and that you had reached an

25    opinion about what the punishment should be.

1    A    Uh-huh.

2    Q    Would that opinion about what the punishment should

3    be, would that influence your verdict if you were to serve as a

4    juror?  Would that influence you?

5    A    No, I don't think so because I don't -- I -- the only

6    facts I know about the case are what I heard on -- is what I

7    heard on the news.  I don't really know anything other than

8    that.

9    Q    Okay.

10    A    I don't -- you know, I never even realized.  I heard

11    about the case and I knew that a gentleman had been arrested,

12    but after that I didn't really follow the case very much.

13    Q    Okay.  All right.  So apparently what you read and

14    heard, you come to a conclusion.  Are you telling me that you

15    could set aside that opinion about what the punishment should be

16    and return a verdict, if you were a juror, based on the evidence

17    that you hear in court and nothing else?

18    A    Yes, sir, I believe I could.

19    Q    Okay.  They might ask you a little bit more of the

20    sources of what you heard and things of that nature?

21    A    Okay.

22         THE COURT:  I'll pass it to the State.

23         MS. MERAZ:  Thank you, Your Honor.

24

25

VOIR DIRE

BY MS. MERAZ:

    Q    Good afternoon, Mr. Tomes.

    A    Good afternoon.

    Q    My name is Diana Meraz and beside me is Lori Hughes.

    MS. HUGHES:  Hi.

    A    Hi.

    Q    (By Ms. Meraz) We're Assistant District Attorneys and our job is to seek justice and represent the State of Texas.  To the right of me are the Defense attorneys, Mr. Jaime Gandara --

    MR. GANDARA:  Good afternoon.

    A    Good afternoon.

    Q    (By Ms. Meraz) And Ms. Edythe Payan.

    MS. PAYAN:  Hi.

    A    Good afternoon.

    Q    (By Ms. Meraz) And their client David Renteria.  Do you know any of us?

    A    No.

    Q    Okay.  During this process we're going to be asking you questions about your questionnaire and how you feel about certain things related to this case.  During this process if I'm not clear about any of my questions, just let me know and I'll try to rephrase them.

    A    Okay.

    Q    You had said that you had heard something about this

1   case from the newspaper, radio and television?

2       A    Yes, ma'am.

3       Q    Do you remember exactly what it was that you heard?

4       A    Well, it was just from the T.V. I remember seeing the

5   video clips --

6       Q    Okay.

7       A    -- they showed on the T.V. and the reporting of it at

8   that time. And then later on, again, from the T.V. that they

9   had made an arrest and everything, but that's -- that's about

10  all I've heard. So --

11      Q    Okay. What was your reaction when you heard all that?

12      A    I was -- it was pretty -- it was pretty -- I was

13  disgusted I guess basically you can say. I mean, I didn't -- I

14  felt like it was -- it was just a horrible crime. It happened

15  and -- and that I was glad they caught the person.

16      Q    And so based on what you had heard, you -- you thought

17  of what you would think would be a proper punishment based on

18  what you had heard?

19      A    Right. Yes.

20      Q    Okay. Now, I just need to ask you then, I just want

21  to make sure. You know, if you're chosen as one of the jurors,

22  you will have to decide the case just based on the facts

23  presented during the case.

24      A    Yes, ma'am.

25      Q    In other words, you have to listen to the evdience and

1    base your entire decision on the evidence?

2        A    Right.

3        Q    And I just want to make sure.  Could you honestly set

4    aside what you had heard on the news or any of the media and

5    base it just on what you hear in the courtroom?

6        A    Yes.

7        Q    Okay.  Now, you know what you hear in the courtroom

8    may be different than what you've heard --

9        A    Sure.

10       Q    -- in the media of it.  What you heard in the media,

11   it's hearsay, you know?

12       A    Right.

13       Q    People talk to people about it and obviously that --

14   it's not reliable like it is what you hear in the courtroom.

15       A    Right.

16       Q    You know, when you hear something in the courtroom,

17   obviously, it's tested, you know.  We -- the evidence is

18   presented and it's subject to scrutiny from both sides.  Okay.

19   So if it's -- what you heard outside through the media conflicts

20   with something you hear in the courtroom, can you be able to go

21   ahead and just base your decision on what you heard in the

22   courtroom.

23       A    Oh, definitely.

24       Q    Okay.

25       A    I've -- you know, like I was telling the Judge, I -- I

know what you hear is sometimes on the news or the radio or T.V.

or whatever is totally different from what, you know, the actual

facts might be. I just heard the basic -- the basic -- the

basics about it. I don't know any of the details. I don't know

-- I don't know anything else other than what I heard on that.

So definitely I could put aside what I've -- that based on the

actual facts of the case. Sure.

Q    Okay. Just making sure. Now, Mr. Tomes, you have a

baby boy?

A    Yes, I do.

Q    It's a baby boy.

A    Yes.

Q    Okay.

A    Actually he's 10 months old today.

Q    How's he doing?

A    He's doing great.

Q    Because you had mentioned he had some respiratory

problems?

A    Yeah, he was -- he had been in the hospital two

different times because of respiratory problems. He was have a

real hard time breathing and his lungs were real full of phlem.

And he was just having a real hard time so we --- we had him in

the hospital two different times. But the last time, thank God,

it's really good now.

Q    Okay.

1     A    And he's doing -- he's doing great.

2     Q    Good.  Good.  And your wife is a stay at home mommy?

3     A    Yes, she is now.

4     Q    Okay.

5     A    She is now yes.  She just resigned her position a

6 little while back so she is now.  Yes.

7     Q    Okay.  Just wanted to make sure, you know, if you're

8 actually chosen to be one of the 12 jurors, we're scheduled to

9 begin the trial January 29th --

10    A    Yes, ma'am.

11    Q    -- 2008.  And the jury is going to be sequestered for

12 two weeks.  That means, you know, you'll come and listen to the

13 evidence and then afterwards go to a hotel room --

14    A    Right.

15    Q    -- and then come back in the morning and we'll do it

16 all over again.  It will be about two weeks, you know, give or

17 take a few days.  And you will have a -- you know, obviously, be

18 able to have contact with your family through the phone.  It

19 will be limited --

20    A    Okay.

21    Q    -- and monitored, you know.  The bailiff just wants to

22 make sure that there's no improper contact with the jurors.

23    A    I understand.

24    Q    So I'm just letting you know and I wanted to ask you,

25 would that cause any problems for you?

1    A    No, ma'am.

2    Q    Okay.

3    A    No.  No, none at all.

4    Q    Now, on -- do you have your questionnaire in front of

5 you?

6    A    Uh-huh.

7    Q    On page 6, you're asked certain questions.  I gave you

8 the wrong page, I'm sorry.  It's page -- page 8.  You were asked

9 about certain things about the death penalty.

10    A    Yes.

11    Q    On page 37, you were asked do you believe that there

12 should be a death penalty and you said yes.

13    A    Yes.

14    Q    And why do you believe that?

15    A    Because I believe that there are some crimes that --

16 that warrant the death penalty.

17    Q    Okay.  And then you said you and your wife feel the

18 same way --

19    A    Yes.

20    Q    -- about the death penalty?

21    A    Yes.

22    Q    Have you all actually discussed the death penalty?

23    A    Well, yes.  Yes in a sense that when we were both

24 going to school, the subject came up and that was one of the

25 things that we talked about and it just happens that she -- she

1  agreed with -- we kind of have the same opinions on it.

2      Q    Uh-huh.

3      A    And we both believe that yeah, there are definitely

4  crimes that warrant the death penalty.

5      Q    Okay.  And on question 41, you were asked -- it's on

6  the same page.  Do you think the death penalty is imposed and

7  you said about right?

8      A    About right.

9      Q    Okay.  And when you -- when you say that, you know,

10  some cases warrant it, are you saying that you think the death

11  penalty should be an option kid of have to look at all the facts

12  and circumstances of each case or is it something that you think

13  should be an automatic sentence?

14     A    No.  No, I don't think it should be an automatic

15  sentence.  I think it's something that has to be looked at, all

16  the facts of the case have to be looked at.  And everything --

17  everything involved with the case has to be looked at before you

18  make that decision. I don't think it should just be an automatic

19  --

20     Q    Okay.

21     A    -- an automatic decision.  Yes.

22     Q    Okay.  On page 32 you were asked about questions

23  pertaining to your religion and your religous views.

24     A    Uh-huh.

25     Q    Currently are you a member of any church or --

1     A    Yes.

2     Q    Okay.

3     A    Well, I'm a member of Abundant Living Faith Center.

4     Q    Okay.  Because you did put on question 165 you

5 answered -- okay.  How important are the teachings of your

6 church to you making decisions and you said very important.

7     A    Uh-huh.

8     Q    Are there any teachings in your church that would

9 prevent you from sitting on this type of case for -- where the

10 death penalty is an option?

11    A    No, ma'am.  No -- I mean, I believe that when we go to

12 church, you know, our Pastor, I -- I take everything he says and

13 I take everything he says, but I also feel like the final

14 decision is mine.  And --

15    Q    Okay.

16    A    -- and I feel like it's very important to listen to

17 what he has to say, but the final decision is always mine.  So I

18 follow -- I follow a lot of the Christian beliefs and I believe

19 in that.  I still think that my -- my decision is the final

20 decisions.

21    Q    Okay.  Now, on question -- I'm sorry that I'm bouncing

22 around.

23    A    That's okay.

24    Q    But on question 46, it's page 9, you were asked --

25 given certain statements and on question 46, you were given a

1   statement and this is the statement.  Executing a person for

2   capital murder discourages others from committing that crime in

3   the future.  You put agree.  And not -- why did you agree with

4   that?

5        A    Well, because I believe that -- that hopefully it

6   would -- if somebody is put to -- put to death for a crime that

7   they committed and hopefully others will learn from that -- from

8   that judgment and that punishment and not do the same thing.

9        Q    Okay.  Okay.  So not only do you believe it's going to

10  deter that person, the person who's executed, but maybe others

11  who --

12       A    From others who are doing the same thing.

13       Q    Okay.  Okay.  Now, you've actually sat on a jury,

14  right, back in 1998?

15       A    Right.

16       Q    And what kind of case was it?

17       A    One -- it was actually two.  One was a criminal case.

18  It was drugs.  They were smuggling drugs across the Border.

19       Q    Okay.

20       A    And then the other one was a civil case.  It was -- a

21  gentleman was suing the company he was working at for wrongful

22  termination.

23       Q    Okay.

24       A    So those were the two cases that I sat on.

25       Q    Okay.  And did you arrive at a verdict on both of

1  them?

2      A    Yes, we did.

3      Q    And I think from your following questions, question

4  66, it seems like you had a not too bad experience.  I think you

5  said it was interesting?

6      A    It was very interesting.  It was the first time I ever

7  had sat on a jury.  I had come before, but I had never been

8  selected.  And it was -- it was interesting to see the way the

9  process works because --

10     Q    Okay.

11     A    -- it's not like what you see on Law & Order or

12  anything like that.  So it was very interesting.

13     Q    Oh, okay.  So there's nothing from that experience

14  that would create a problem for you, if you sat on this jury?

15     A    No, not at all.

16     Q    Okay.  Now, on -- and you know, I can just tell you

17  what you wrote here you said that you and your wife are involved

18  in or were in the neighborhood watch.

19     A    Yes.

20     Q    Are you still involved with that?

21     A    Yes, we are.

22     Q    What made you decide to be -- to be a part of that?

23     A    Because it's important to us about our neighborhood

24  and our -- our neighbors are really good people.  We've gotten

25  to know our neighbors really well and to us, it's just

important.  It's important for us to make sure that our -- that

we watch our for our -- for our neighbors and our kids and their

possessions.  And so we -- that's why we decided to get involved

with it.

Q     Okay.  Do you all have periodic meetings?

A     Yes, we do.  We have a periodic -- maybe once every

couple of months we kind of get together in one of the houses

and we discuss things.  And one of the -- one of our -- one of

our neighbors was -- is a police officer.

Q     Okay.

A     So he kind of gives us like little updates on it.

Q     Uh-huh.

A     You know, the robberies in the area, stolen cars and

that type of stuff.  So --

Q     Okay.  Now, you probably know a little bit about how

the jury stystem works given that you've been a jury (sic) on a

jury twice.

A     Yes, ma'am.

Q     As you know, the role of the jury is obviously to look

at all the evidence and base your verdict on -- on the evidence.

And one of the more important roles is to look at the testimony

of the witnesses and evaluate their credibility, right?  It's

one of the things you do.  You decide whether a witness is

telling the truth or not telling the truth.

A     Right.

1     Q    That's up to you as a juror to, you know, waive that.

2    And we have different types of witnesses coming to testify.  You

3    know, doctors, forensic scientists, police officers.  And the

4    law requires that you not prejudge anybody.  In other words,

5    that you wait and listen to the testimony and then decide

6    whether you believe or disbelieve a witness.

7          Some people, you know, maybe feel like, for instance,

8    police officers, they carry a badge.  If they're going to come

9    in and testify, I know they're going to be telling the truth and

10    I know they would never lie.  And, you know, that's one extreme.

11    You know, other people might be just the exact opposite.  They

12    always lie.  I'm not going to believe anything they say.  Well,

13    that's kind of not fair to prejude somebody.  Does that make

14    sense?

15    A    Yes.

16    Q    So what the law requires is for you not to

17    automatically believe or disbelieve any one witness and for you

18    to wait and listen to what they say before you decide to believe

19    them or not.  Can you do that?

20    A    Yes.

21    Q    Okay.  And it just makes sense, right?

22    A    Sure.

23    Q    Now, the defendant, just like any of the witnesses can

24    testify if he wants.  He can come in and testify and the same

25    thing with the defendant.  Obviously, he can lie or he can tell

1   the truth.  Right?

2       A    Uh-huh.

3       Q    Just like any other witness and same thing with them.

4   Can you wait and see and hear the testimony and decide if he's

5   telling the truth or not?

6       A    Yes.

7       Q    Okay.  Now, you're probably familiar with this since

8   you were on a criminal jury trial probably.  It's the Fifth

9   Amendment right.  Does that sound familiar?

10      A    Yes.

11      Q    And basically what that says, the defendant has an

12  absolute right not to testify.  Well, he can take the stand if

13  he wants.  He has the absolute right not to.  That's the

14  decision that's his alone and his Defense attorneys.  And if he

15  doesn't want to testify, it's something that a juror cannot hold

16  against him.

17           In other words, you cannot go back there and say,

18  well, you know, what?  He didn't testify.  Obviously he's hiding

19  something.  So, you know, or you can't go back there and make up

20  a story for him or speculate.  What the law says is if he

21  doesn't tetify, you cannot hold it against him.  And would you

22  be able to do that?

23      A    Yes.  Yes, I believe so.

24      Q    Okay.  So then just decide the case as what's

25  presented to you and that's all we can ask.

1    A    Right.

2    Q    Now, the Defense has no burden whatsoever in a case.

3  It's the burden of the State.  We are the State of Texas.  So

4  convince the jury.  They don't have to present any witnesses if

5  they don't want.  Okay.  They don't even had to cross-examine

6  the witnesses that we present.  Of course, the defendant is

7  entitled to effective assistance of counsel, but for whatever

8  reason maybe they see that -- that strategy wise, it's best for

9  them not to put any witnesses.  And so what they -- the jurors

10  cannot do is require them to put on witnesses.

11        You know, it's natural for a juror to want to hear

12  both sides, you know.  And that's --that's instinct that, you

13  know, that's human instinct.  You want to hear both sides when

14  you're basing your decision.  So I mean, that's fine, but what

15  the law says is, you know, if you have that tendency or that

16  desire, you know, put it aside and decide the case just based on

17  what's presented to you.  Can you do that?

18    A    Yes.

19    Q    Okay.  Now, this case, as the Judge told you earlier,

20  is one where you decide only the punishment.  Okay.  Typically,

21  you have -- as you're aware, the jury decides the guilt or non

22  guilt of the defendant.  And then after that, then they decide

23  the proper punishment.  But in this case, the defendant has

24  already been found guilty of capital murder by a previous jury

25  so that no longer is an issue for you.  The only thing you would

1   decide is the proper punishment.

2       A    Okay.

3       Q    Would you have a problem sitting on a jury where the

4   -- the guilt has already been determined?

5       A    No.

6       Q    Okay.  Now, as the Judge was telling you this -- this

7   defendant has already been convicted of capital murder.  So I

8   just want to briefly go over what capital murder means.  Capital

9   murder basically is murder plus some other factor.  Murder by

10  itself is intentionally and knowingly causing the death of an

11  individual.  That means that you intended to kill this person or

12  you knew that your actions would cause the death of the person.

13  Okay.  Now, it wasn't an accident or it wasn't some wreckless

14  act.  That was your intent, okay, to kill that person.  Okay.

15       Now, capital murder is one degree higher than murder.

16  Okay.  It's murder plus some aggravating factor and I'll give

17  you some examples.  For instance, you have a capital murder when

18  you intentionally and knowingly cause the death of two or more

19  people during the same criminal episode.  That's a capital

20  murder.  Or you can have a capital murder when you intentionally

21  causing the death of a person while you're attempting to rob

22  them or sexually assault them or, you know, some other felony.

23       Or you can also have a capital murder if you

24  intentionally and knowingly cause the death of a child under the

25  age of six.  That's capital murder.  There's some -- there's

1    some more examples.  I'm just giving you a few so you kind of

2    know what it is.  But you have murder on one level and then

3    capital murder is a grade higher.

4        A    Okay.

5        Q    Okay.  Now, the death penalty is only an option for

6    someone convicted of capital murder.  And even then, it's not an

7    automatic.  It's just one option that the jury can consider.

8    The other option is life in prison.  So really you only have two

9    options where a person convicted of capital murder.  It's life

10   in prison or the death penalty.

11       A    Is that life in prison without possibility of parole.

12       Q    Well, we can't get into --

13       A    Oh.

14       Q    -- that right now.  So that's basically all I can tell

15   you.  The only options are life in prison or the death penalty.

16       A    Okay.

17       Q    Okay.  Now, for a conviction of murder, the punishment

18   range is five to 99 years or life.  Okay.  Because that's the

19   way it's been put out by the Legislature.  Now, what I want to

20   ask you is do you think if you were able to change the law,

21   okay, do you think you make -- you would make capital -- I mean

22   -- excuse me -- you would make the death penalty an option for

23   just plain murder or do you think it's appropriate the way it is

24   now, just an option for capital murder conviction.

25       A    No, I think I would make it an option for regular

1   murder convictions also.

2       Q    You would, okay.  Okay.  Okay.  Of course, the way it

3   stands now, it's obviously not, but it's just an option for

4   capital murder convictions.

5       A    Right.

6       Q    Now, what the jury does when -- they the person has

7   been convicted of capital murder, they listen to more evidence

8   in the punishment phase and then they decide whether it's lfe in

9   prison or the death penalty.  But the jury doesn't go back there

10   and vote for either life in prison or the death penalty

11   directly.  What they do instead is they answer two questions.

12       A    Okay.

13       Q    Okay.  But based on your answers to those questions,

14   they decide whether it's life in prison or the death penalty.

15   Okay.  And the first question basically is asking whether the

16   defendant probably would be a future danger.  Okay.  And so

17   you're to decide that.  If you think that he probably is not

18   going to be a future danger, then the answer to that first

19   question is no.  But if you think that based on the evidence

20   that yes, he probably is going to be a future danger, your

21   answer that first question yes.  Okay.

22       Now, if you had answered no, that first question, that

23   would have resulted in life in prison.  But if you answered yes

24   to that first question, you're on your way to the death penalty.

25   Then you would proceed to the second question.  And that second

1    question requires you to look at all the evidence and see if

2    there's anything mitigating, any factor that you find in the

3    evidence that makes you think he deserves life instead of the

4    death penalty.  Because if you do find that factor, that piece

5    of evidence that makes you think he deserves life, then your

6    answer to that second question would be yes, which would result

7    in a life sentence.

8         A    Okay.

9         Q    But if you look at the evidence and you thought, no, I

10   don't find any mitigating factor, I still think he should get

11   the death penalty, your answer to that second question would be

12   no, which would result in the death penalty.  So it's only that

13   combination of an answer to -- of yes to that first question and

14   an answer of no to the second question that results in the death

15   penalty.  Any other combination results in life in prison.

16        A    Okay.

17        Q    Okay.  Now, on page 9 of the questionnaire on the

18   middle of the page you were given three statements.  And the

19   first statment says I am against the death penalty.  You can

20   refer to it if you want.

21        A    Okay.

22        Q    The second statement says I am neither in favor of or

23   against the death penalty.  The last one says I'm in factor of

24   the death penalty and that's the one you checked off.  Why did

25   you check off that one?

1    A    Because I -- I believe there are cirmes that -- that

2    dictate that the death penalty should be enforced.

3    Q    Okay.

4    A    I believe -- I think there are certain things that

5    people do that need to be punished that way.

6    Q    Okay.

7    A    They need to be punished very severely.

8    Q    Okay.  When you answered that, it was in a generic

9    sense --

10   A    Right.

11   Q    -- your general views on the death penalty?

12   A    On the death penalty, yes.

13   Q    Okay.  Okay.  Not referring to any specific case?

14   A    No.

15   Q    Okay.  Now, what I want to ask you is in this specific

16   case, okay, in a case involving a defendant who's been convicted

17   of capital murder, of intentionally and knowingly causing the

18   death of a child under the age under the age of six, okay, are

19   you still willing to keep an open mind and consider both life in

20   prison and the death penalty

21   A    Yes.

22   Q    Okay.  Now, just to follow up on that because, you

23   know, sometimes jurors come in with maybe the mindset that

24   because of that particular offense, they've already made up

25   their mind --

1     A    Uh-huh.

2     Q    -- that they would automatically give the death

3 penalty or just the opposite.  They would automatically give

4 life in prison.

5     A    Right.

6     Q    Now, obviously, right now it's  kind of like what

7 you're saying, you don't know all the facts and circumstances --

8     A    Yeah.

9     Q    -- of a case.  And you won't unless you're sitting in

10 the jury as one of the 12 people.  So what we're asking each

11 juror is at this point, not to -- to have been committed to one

12 or -- one side or the other, you know.  To keep an open mind and

13 be willing to listen to -- to all the facts and circumstances

14 before you make up your mind.

15     A    Right.

16     Q    You're willing to do that?

17     A    Yes.

18     Q    Okay.  Now, going back to those two questions.

19 They're up on the board actually in front of you and I wanted to

20 go over them in some detail just to make sure you understand

21 them.

22     A    Okay.

23     Q    That first question is asking you -- that's the first

24 question that the jury would consider, okay, in deciding the

25 punishment.  First question asks you whether there is a

1   probability that the defendant would commit criminal acts of

2   violence that would constitute a continuing threat to society.

3   Okay.  So after the defendant has been convicted of capital

4   murder and then we're on this phase of the trial where you

5   decide the proper punishment.  And those are the two questions

6   you would be posed with.

7       A    Okay.

8       Q    So that's the first question and basically what it's

9   asking you, you know, he's probably going to be a future danger.

10  And so when we -- when we look at that question, it's kind of

11  asking you to look into the future, right?

12      A    Right.

13      Q    So you would have to look at all the evidence to be

14  able to answer that first question.  And notice that it asks you

15  for a probability.  Is there a probability, more likely than

16  not.  And the reason that's there instead of, for instance,

17  possibility, you know, if we asked you, okay, is there a

18  possibility that he's probably a future danger?  Well, I mean

19  anything is possible.  Right?

20      A    Uh-huh.

21      Q    It's possible we could be future dangers.  And so

22  probability is a higher standard than possibility.  Would you

23  agree with that?

24      A    Yes, I understand.

25      Q    Because not everything is probable.  So it's asking

you is there a probability that he will be a future danger.
Now, the other thing it's not asking you is for 100 percent
certainy. Okay. Because obviuosly, we can't do that because
it's a prediction of the future, right?

A     Right.

Q     So it's also not asking you for 100 percent certainty,
just for for a probability. Does that make sense?

A     Yes.

Q     Okay. So it's asking you if you think probability
that the defendant would commit criminal acts of violence.
Okay, whatever that means to you. Criminal acts of violence
that would constitute a continuing threat to society. And that
word society is kind of all encompassing. It means, you know,
whatever society the defendant is in, which could also include a
prison environment, right?

A     Uh-huh.

Q     For instance, they have inmates. They have jailers.
They have nurses. So that's also a part of the definition of
society. Does that make sense?

A     Okay. Yes, it does.

Q     Okay. So when you're looking at that questions,
you're asked to consider all the evidence and then base your
answers on the evidence and decide either yes or no. Okay.
Now, in that first question, the State has the burden of proof
of convincing you that yes, he probably is going to be a future

1    danger.  Okay?

2         A     Uh-huh.

3         Q     Okay.  Now, the standard of proof there is beyond a

4    reasonable doubt.  And it's probably the same phrase you heard

5    when you were in that criminal case, that drug case you were in.

6    It's the same standard you used there.  It's -- it's the same

7    level that you have to be convinced that when you're deciding

8    the guilt or non guilt.  Okay.  So we have to convince you to

9    that level of beyond a reasonable doubt.

10        A     Okay.

11        Q     Okay.  So we have to remove all doubt out of your mind

12   before we can convince you.  And it's a higher standard than

13   when you were in that civil case.  When you were in that civil

14   case, the standard of proof was preponderance of the evidence.

15        A     Right.

16        Q     You kind of were asked, you know, to weigh one side

17   against the other.  And so it's higher than that.  And there's

18   another standard of proof called clear and convincing which is

19   used for CPS cases.  You know, when --

20        A     Child abuse cases, right.

21        Q     -- the State comes and takes the kids away from the

22   parents.  It's -- it's higher than that.  Beyond a reasonable

23   doubt is the highest one there is.  And again there's a -- you

24   were probably told there's no definition.  It's just, you know,

25   the level that you're convinced at.  But one thing it's not,

1  it's not beyond all doubt, because we could never convince you

2  something beyond all doubt, you'd almost have to be a witness to

3  be convinced to that level.  So it's something below that.

4  Okay?  So that's the level of which we have to convince you of

5  in order for you to answer that first question yes.  Does that

6  makes sense?

7      A    Yes.

8      Q    Okay.  And so if we don't convince you to that level

9  beyond a reasonable doubt, you know, we convince you to anything

10  lesser than that, you know, like probably it's not enough.

11  Okay.  So if we haven't to convinced you to that level of beyond

12  a reasonable doubt, you know, then we haven't convinced you.

13  Does that make sense?

14      A    Yes.

15      Q    Now, the Defense has no burden whatsoever.  Okay.

16  Like I told you before, they don't have to put on any witnesses.

17  They don't even had to cross-examine the witnesses we put on.

18  Okay.  So, for instance, you know, even if they don't put on any

19  witnesses, if we haven't convinced you beyond a reasonable doubt

20  that he probably is going to be a future danger, you'd have to

21  answer that first question no.  Right?

22      A    Right.

23      Q    Does that make sense?

24      A    Yes, it does.

25      Q    So in that first question let's say you looked at all

the evidence, right, and you still weren't convinced.  Okay.

Even though they didn't put on any witnesses, you weren't

convinced beyond a reasonable doubt that he probably is going to

be a future danger, you'd have to answer that first question no.

Q    Does that make sense?

A    Yes.

Q    And only 10 of you would have to agree to answer that

first question no.

A    Okay.

Q    Okay.  Because at least 10 of you agree that the

answer is no to question number one, that results in life in

prison?

A    Oh, okay.

Q    Okay.  And then you don't even have to go on to

question number two if you answered that first question no,

because that's --

A    Okay.

Q    -- life in prison.

A    Uh-huh.

Q    Okay.  And let's go ahead and assume that you looked

at all the evidence and you were convinced beyond a reasonable

doubt that he probably is going to be a future danger.  Your

answer to that first question would be --

A    Yes.

Q    Yes.  And for a yes answer, all 12 of you would have

1    to agree because if all 12 of you answer yes, you're on your way

2    to the death penalty.  You're a step closer.

3         A    Uh-huh.

4         Q    Okay.  And the death penalty has to be unanimous.

5    Okay.  So let's go ahead and assume it's a hypothetical and you

6    looked at question number one and you all believed that yes, he

7    is going to be a future danger and you think beyond a reasonable

8    doubt so now we would proceed to question number two.

9         A    Okay.

10        Q    Okay.  And I'll let you read question number two to

11   yourself and we'll talk about it.

12        A    All right.

13        Q    Long question?

14        A    Yeah.

15        Q    Okay.  What this second question is asking you is

16   basically, okay, juror, you need to consider all the evidence.

17   Look at everything again which would include look at the

18   circumstances of the offense, okay, what happened in the case

19   and also look at the defendant's character and background.

20   Okay.  And also look at his personal moral culpability and

21   anything else presented.  And look at it all and see if there's

22   anything mitigating.

23             Now, some jurors have described mitigating to be just

24   the opposite of aggravating.  Aggravating makes it less bad.

25   Okay?  So you look to see if there's anything that you think is

1    mitigating, something that makes you think he deserves life

2    instead of the death penalty.  And then you look to see if you

3    find some piece of evidence, some factor that you think is

4    mitigating and you ask yourself is it still enough for me?  Is

5    it sufficient to tell me he deserves life instead of the death

6    penalty.

7            And so if you think, yes, there is some mitigating

8    piece of evidence and it's sufficient for me to tell me he

9    deserves life, your answer to that second question would be yes.

10   Okay.  And if at least 10 of you agree that the answer to number

11   two is yes, that results in life in prison.  Okay?

12       A    Uh-huh.

13       Q    So let's say you looked at all the evidence and you

14   didn't think there was anything mitigating or if you did find

15   something mitigating, it's still wasn't sufficient for you to

16   tell you he should get life, you still think he should get the

17   death penalty, then your answer to that second question would be

18   no --

19       A    Uh-huh.

20       Q    -- which would result in the death penalty.  Okay.

21   Now, all 12 of you would have to agree on question number two

22   that the answer is not.  Because like I said before, the death

23   penalty has to be unanimous.

24       A    Okay.

25       Q    Okay.  So that's the only combination of an answer by

1   all of you to question number one of yes and an answer to

2   question number two to no. That results in the death penalty.

3   Okay?

4      A    Okay.

5      Q    Now, in that second question, this is kind of a unique

6   question. None of the -- we -- we don't have the burden of

7   proof, the State doesn't have the burden of proof. The Defense

8   doesn't have the burden of proof. Neither side does. So it's

9   whatever you believe based on the evidence. Okay?

10     A    Yeah.

11     Q    In other words, we don't have to convince you that

12   there are no mitigating cirucmstances. Okay. And they don't

13   have to convince you there are mitigating circumstances. It's

14   whatever you believe based on the evidence. Okay. And you know

15   one of the reasons for that is, you know, what you may find to

16   be mitigating, some other juror might not. You don't have to

17   agree on -- on any particular piece of evidence as being

18   mitigating.

19        In other words, let's say you look at factor A and to

20   you it's mitigating, Okay. Some other juror might think factor

21   A is not mitigating, but they think factor B is mitigating. So

22   you all -- you don't have to agree to a particular piece of

23   evidence as long as you agree that you found something·

24   mitigating and it's enough for you to tell you he should get

25   life. Okay.

1      A     Okay.

2      Q     So like I said before, if at least 10 of you agree,

3   yes, there is some piece of mitigating evdience and it's

4   sufficient for you, your answer would be yes --

5      A     Yes.

6      Q     -- which would result in life.  But if you don't find

7   that piece of mitigating evidence or it's still not sufficient

8   for you, then your answer would be no.  And again, like I said,

9   12 of you would have to agree on the no answer --

10     A     Okay.

11     Q     -- and -- which would result in the death penalty.

12  Does that make sense?

13     A     Yes.

14     Q     Okay.  Any questions on the two questions?

15     A     No.  No.

16     Q     Okay.  Okay.  Now, let me kind of backtrack a little

17  bit.  Now, let's assume that if a person's been convicted of

18  capital murder, okay, he's been convicted of intentionally and

19  knowingly causing the death of a child under the age of six.

20  Okay.  Now, at this point, there's -- the issue of any possible

21  self-defense, insanity, defense of third person have already

22  been resolved.  Okay?

23     A     Uh-huh.

24     Q     Okay.  That is no longer an issue.  So now you know

25  he's been convicted of a capital murder of intentionally and

1   knowingly causing the death of a child under the age of six.

2       A    Okay.

3       Q    Does that give you an automatic answer to question

4   number one?

5       A    No.

6       Q    Okay.  Because obviously, you still have to look at

7   the evidence and decide --

8       A    Right.

9       Q    -- the answer based on the evidence.

10      A    Sure.

11      Q    Which is posible that no, maybe we don't convince you

12  beyond a reasonable doubt that he probably is a future danger.

13  Does that make sense?

14      A    Yes.

15      Q    Okay.  Now, let me backtrack a little bit once more.

16      A    Okay.

17      Q    Now, let's go back to the conviction.  A person has

18  been convicted of capital murder of intentionally --

19      A    Uh-huh.

20      Q    -- and knowingly causing the death of a child under

21  the age of six.  Are your views on the death penalty at that

22  point still that both life in prison and the death penalty are

23  options?

24      A    Yes.

25      Q    Okay.

1     A    Yeah.

2     Q    Okay.

3     A    I still believe that you have to listen to everything

4 and you have to know the facts of the case before you can make a

5 decision --

6     Q    Okay.

7     A    -- one way or the other.

8     Q    Okay.  Now, let's go back to that first question.

9 Okay.  Let's assume you -- you looked at all the evidence and

10 you're on that first qeustion and we had convinced you beyond a

11 reasonable doubt that he probably is going to be a future

12 danger.

13     A    Okay.

14     Q    Okay.  So all -- and all 12 of you agree that yes, he

15 probably is going to be a future danger.  You believe it beyond

16 a reasonable doubt so all of you answer yes.  Now, at that

17 point, what are your views on the death penalty?  In other

18 words, are both still -- life in prison and the death penalty

19 still options before you get to question number two?

20     A    Yes.  I believe -- I believe so.  I mean it's -- I

21 think you still have to -- you have to -- once you're in that --

22 once you're in the courtroom and once you hear all the -- the

23 circumstances of his background, I guess everything he's done

24 even since -- since that time that he was convicted and

25 everything.  I think all those factors have to be -- have to be

1    looked at and determined before you can make your final decision

2    on question number two.

3        Q    Okay.  Okay.  And that makes sense.  This would be

4    something outside of question number one, right --

5        A    Right.

6        Q    -- that you consider in question number two?

7        A    Uh-huh.

8        Q    Okay.  And so after question number one, you still

9    haven't made up your mind even if you answered yes --

10       A    Right

11       Q    -- one way or another?

12       A    Right.

13       Q    Okay.  So when you get to question nubmer two, you're

14   still open to see if you find anything mitigating?

15       A    Right.

16       Q    Okay.  And then let's say -- okay.  You get to

17   question number two, would you be able to answer question number

18   two based on the evidence regardless of whether it's life in

19   prison or the death penalty?

20       A    Yes.

21       Q    Okay.

22            MS. MERAZ:  May I have just a moment?

23       Q    Just maybe a couple of other things.

24       A    Okay.

25       Q    Let's talk about going back to the evidence presented.

I think I mentioned it earlier. You know, you may only hear

evidence from one side.

A    Okay.

Q    From the State's side. Like I said, they don't have a

burden of proof. They don't have to put on any evidence if they

don't want. It's up to them.

A    Uh-huh.

Q    Okay. They might feel they don't have to, that

there's no need.

A    Okay.

Q    So you may be asked just to render a verdict based on

what's presented to you by the State.

A    Okay.

Q    Okay. And -- and not hold it against them. Would you

be able to do that?

A    Yes, I believe I would.

Q    You would?

A    Yes.

Q    Okay. Now, just one more question. Your wife works

for Ray Velarde, does she?

A    Yeah, it was a long time ago. She was a secretary for

him at one point. We were still dating at the time. We weren't

married.

Q    Oh, okay. Okay.

A    But she worked for him for I don't know, maybe six

```
 1   months or something along those lines.

 2        Q    Okay.  Not very long?

 3        A    No, not that long.

 4        Q    Okay.  Okay.  Thank you very much.

 5        A    All right.  Thank you.

 6             THE COURT:  Do you need a break, Mr. Tomes or need

 7   some water or coffee?

 8        A    No, no.  I'm okay.  Well, you know what?  I could use

 9   some water.

10             THE COURT:  Okay.  Okay, Mr. Gandara.

11             MR. GANDARA:  May I, Your Honor?

12             THE COURT:  You may proceed.

13             MR. GANDARA:  Thank you, Your Honor.

14                             VOIR DIRE

15   BY MR. GANDARA:

16        Q    Good afternnon.

17        A    Good afternoon.

18        Q    Mr. Tomes, you -- you've been working for I guess the

19   Federal Government delivering mail?

20        A    Yes, sir.

21        Q    Mail carrier?

22        A    Yes.

23        Q    It's probably interesting you get away from that --

24   that's rural?

25        A    Yeah, I just --
```

```
1        Q     From the paved roads, huh?

2        A     Yeah, that's part of it anyway.  Most -- alot of it is

3   -- would be considered a city route.  It's all paved and stuff,

4   but there are some areas of my route where yeah, it's a little

5   off track, yes.

6        Q     And I take it from -- from reading -- I didn't read

7   anything specific, but I take it from reading your questionnaire

8   that you were in the military service?

9        A     No, no.  No, I was one of the lucky ones that got

10  hired into the post office without any military experience.

11       Q     Okay.  So your -- your travels to Europe were related

12  to what?  Where --

13       A     My dad was in the military.

14       Q     Okay.  So --

15       A     My dad was in the military.

16       Q     Okay.  So when you were a younger --

17       A     My dad -- yes, exactly.  So we moved around a lot.  We

18  spent six years in Germany and three years in Italy.

19       Q     All right.  Before you started working for the -- for

20  the government, what did you do?

21       A     I worked at a place called West Tele Services,

22  telemarketer and then I was -- after that I was a trainer for

23  them as well.

24       Q     For about how long all together?

25       A     I would say about two years, maybe two and a half
```

1  years I worked there.

2      Q    All right.  And as you -- as you worked through

3  college or what sort of employment did you have?

4      A    I used to work at a store downtown here called

5  Commercial Sales.

6      Q    Commercial Sales?

7      A    Yes.

8      Q    I remember.

9      A    Off of Paisano.  Yeah, I worked there for -- I was a

10  little -- well, I was there maybe about six years I think.

11     Q    For a while.

12     A    And the owners decided to close it down.  So then

13  after that I -- I started working a bunch of telemarketing

14  places.  I started at West and then I moved over to Providian

15  and places like that.  And I was doing that and going to school,

16  and then I had taken the post office test a little earlier, but

17  my dad was a -- was a mailman.  He was a city carrier.

18     Q    Right.

19     A    And so I took the test and about maybe seven months

20  later they called me and I started.

21     Q    Good.  Thank you.  You've talked about -- I don't know

22  if we've asked you this way.  What -- what does the death

23  penalty serve?

24     A    I believe -- I believe it's a deterrent to -- to other

25  people who might be thinking of doing something along those

1    lines or even if it's -- even if it affects just one person, I

2    think then it's done it's job.  So I just think it's a deterrent

3    to people who want to do that or who have thoughts of doing

4    stuff like that.  If they see that this is a possibility that

5    could happen to them, hopefully it might deter even if it's just

6    one person from doing it.

7        Q    Okay.  And you've told us that some crimes warrant the

8    death penalty?

9        A    Yes.

10       Q    Some capital murders, right?  Because I think you've

11   told us you would not extend it to murders that are not capital

12   murders?

13       A    No, I think I told her I would -- I would.  She asked

14   me if --

15       Q    You would?

16       A    -- if I was a law maker, if I would -- if I had the

17   option of changing it to just regular murder.  I believe I said

18   yes.

19       Q    Yes, that you would?

20       A    That I would.  But based on the circumstances, again,

21   and all the evidence based on that.

22       Q    And I think you told us even further that certain

23   crimes dictate that the death penalty should be enforced?

24       A    Uh-huh.

25       Q    Is that --

1     A    Yes.

2     Q    -- correct?  Okay.and that is the crime itself.  The

3 -- the?

4     A    Nature.

5     Q    Of it's own nature would dictate death penalty?

6     A    Yes, sir.

7     Q    Okay.  Now, in your view, I take it that a life

8 sentence without possibility of parole is the only reasonable

9 range of punishment with -- with the death penalty?

10     MS. MERAZ:  Objection, Your Honor.  Improper --

11 improper question.

12     THE COURT:  Sustained.

13     Q    (By Mr. Gandara) You started asking about parole, is

14 that correct?

15     A    Right.  Yes, I asked her the possibility of life -- is

16 there life without parole.

17     Q    All right.  And if you're not told that as a juror --

18     A    Uh-huh.

19     Q    -- then you won't know, it's going to affect you in

20 your verdict in deciding whether to go with a life sentence or

21 not?

22     A    Yes.  Yeah, I guess it probably would just based on

23 what I hear and, you know, what I would find out in the court.

24     Q    Now, in the -- in the law, there are definitions for

25 these concepts of knowingly and intentionally having committed a

crime.  In Texas law, you can't convict somebody of committing a

crime unless you prove that it had a certain culpable mental

state.  In other words, that whenever he did the act, that his

mind was in a certain condition.

A    Okay.

Q    That's not real clear at this point, but you

understand more or less where I'm going?

A    Okay.

Q    Okay.  Some crimes it's enough to be negligent like

running a red light.  You're supposed to be keeping a look out

ahead of you and you run through a red light and maybe going a

little over the speed limit, that's negligent, right?

A    Okay.

Q    And you kill somebody.  All right.  It's not a -- it's

not intentional.  You didn't say well, I'm going to time myself

so that I know when Juan Sanchez is coming through this

intersection and I'm going to run into his car and kill him.

It's not that.  Right?  And it's not -- wrecklessness is another

level of culpability, a state above negligence.  Right?

recklessness is when you know or should know that something is

dangerous to the other people and you do it in spite of the

risk.

A    Okay.

Q    Like perhaps it's a 35 mile an hour zone and you

pegging it at 55, 60, 65 miles an hour, that's maybe taking a

1    bit of a risk.  Right?  Is that --

2        A    Yes, sir.

3        Q    You follow that?

4        A    Uh-huh.

5        Q    Okay.  If your -- if your limit is 35 and you drift up

6    to 40, 45 and, you know, just -- you didn't notice, then maybe

7    that's negligent, right?

8        A    Okay.

9        Q    So wrecklessness, you get up to that speed, and

10   somebody crosses the street and you nail him, you took the risk

11   and so you committed a different sort of a homicide or wreckless

12   killing.  Right?

13       A    Okay.

14       Q    Now, a murder, in order to commit a murder, the State,

15   the Prosecutor has to convince a jury that the accused person

16   knowingly and intentionally caused the death of another person.

17   And knowingly means that a person acts with respect to the

18   nature of his conduct or to circumstances surrounding his

19   conduct when he's aware of the nature of his conduct or the

20   circumstances exist.  Did you follow all the way through?

21       A    Okay.

22       Q    Okay.  A person acts knowingly or with knowledge --

23   excuse me -- with respect to a result of his conduct when he is

24   aware that his conduct is reasonably certain to cause the

25   result.  Was that clear?  Did you follow me?

1    A    When he knows what he's doing.

2    Q    Knows what he's doing.  Knows what he's doing is going

3   to produce a certain result.

4    A    Okay.

5    Q    Okay.  Intentionally is -- a person acts intentionally

6   or with intent with respect to the nature of his conduct or to a

7   result of his conduct when it is his conscious objective or

8   desire to engage in a conduct or cause the result.

9    A    Okay.

10    Q    Okay.  Now, you have a situation where David Renteria

11   has been convicted of knowingly and intentionally causing the

12   death of a child under the age of six.

13    A    Uh-huh.

14    Q    Right?  On those bear facts, what are your views about

15   the death penalty?

16    A    My views are the same.  I don't know -- I really don't

17   know all the facts of the case.  I just know that he has been

18   convicted, but I don't know any of the background.  I don't know

19   any -- I really don't know any facts of the case.  I don't

20   really know, you know, why he was found guilty or any reason

21   like that.  So I think my views of --my views of the death

22   penalty would stay the same.

23         I believe that certain crimes dictate that there's --

24   that the death penalty needs to be enforced, but I don't know --

25   but I couldn't make my decision at that point based on -- just

1    knowing the fact that he's been convicted of a capital murder, I

2    couldn't make the decision of death penalty or life in prison

3    without knowing the facts of the case.

4        Q    So that's not a situation where you would say as you

5    said before that that dictates a death penalty.  That crime --

6        A    Right.

7        Q    -- dictates a death penalty?

8        A    Well, I mean based on the outside facts like if I were

9    just to -- if I were just to be sitting in front of the T.V. or

10   something and say -- and say, well, this gentleman's been

11   convicted of -- of killing a child, you know, six years old or

12   whatever the age is, then yeah, I might sit there and go that --

13   that -- that deserves the death penalty, right.  But being

14   actually sitting on a jury, or being considered of selecting --

15   of being selected for a jury, I think I could set my views aside

16   on that to listen to what the facts of the case are before I

17   made my final decision based on it.

18       Q    Okay.  Now, you have the phases to this proposition

19   that we've been talking to you about now.  So you -- you know

20   you've got a -- you're a juror and you -- who's making the

21   decision for you when you're in the jury room?

22       A    Me.

23       Q    Right.  Do you know that -- that in order to impose a

24   death penalty, that all 12 jurors have to say yes, there's a

25   probability of future violence and no, there's no -- there's no

```
 1    mitigating --

 2        A    Right.

 3        Q    -- circumstance sufficient to warrant a death penalty

 4    -- life sentence.

 5        A    Can I ask you a question on that?

 6        Q    Yes.

 7        A    Uhm, is there any discussion that goes on?  Like it's

 8    -- for example, let's say you -- you get in there and the first

 9    question is -- is done and everybody puts yes or no.  And it

10    comes back I don't know say seven/five or something like that.

11    Is there a discussion based upon that or is that just a final,

12    final talley?

13        Q    That all depends on the jurors and what they do in

14    there is -- is not subject to regulation.  What they do is they

15    get a set of instructions from the Court, a Jury Charge which

16    you've probably see.

17        A    Uh-huh.

18        Q    Right?

19        A    Yes, sir.

20        Q    And they do the same thing you did in those juries you

21    served on.

22        A    Okay.

23        Q    Right?

24        A    Okay.

25        Q    Okay.  Now, you now that a yes answer to question one
```

```
 1    requires 12 yes votes, 12 individual yes votes.  Right?

 2         A    Uh-huh.

 3         Q    Correct?

 4         A    Yes, sir.

 5         Q    All right.  Now, if you listen to the evidence and

 6    you're unconvinced, in other words, you don't believe beyond a

 7    reasonable doubt that this person is probably going to commit

 8    criminal acts of violence in the future that poses a continuing

 9    threat to society.  And you say well --

10         A    No.

11         Q    It's not passed enough that -- so you're -- you've

12    decided you answer to question one is what?

13         A    Would be no.

14         Q    Would be no.  Okay.  And 11 other jurors say no, well,

15    each one of us thinks it's yes.  Would you surrender your honest

16    conviction on the evidecne just to get a verdict?

17         A    No.  No, I mean -- I mean, I'm sure you get a lot of

18    pressure and I'm sure there would be a lot of people to --

19    pushing you in that direction since you're the lone person who

20    would -- who would say -- who would say no, but I don't think I

21    would.  I think I would stick to -- to what I believe.

22         Q    You think you would or you know?

23         A    I know I would.  I know -- I know I would -- I would

24    stick to what I believe because -- because at the end of the

25    day, I'm going to be the one who has to life with that decision.
```

So --

Q    All right.  If you -- if you've come to the conclusion

that the State did convince you, that there's going to be

continuing acts of violence in the future that pose a threat to

society and you believe that way, and several or maybe a good

number of your fellow jurors agree with you, and there's on

juror who says no, I'm not convinced, would you respect that

juror's personal views and his or her honest conviction about

the evidence?

A    Yes.

Q    The same as you would expect yours to be respected?

A    Yes.

Q    Okay.  Now, let's say you're there and you get to

knowingly and intentionally killing a child under six.  That's

guilty.  All right?  And yes, I believe beyond a reasonable

doubt that he's probably going to commit criminal acts of

violence in the future that constitute a threat to society.  Is

that one of your cases that dictate a death penalty?

A    I believe so.

Q    Okay.

MS. MERAZ:  Objection contracting.

THE COURT:  I'm going to sustain it as the way the

question was put.  You can rephrase the question I think.

Q    (By Mr. Gandara) How are your feelings about the death

penalty in a case in which you've got a conviction of knowingly

1    and intentionally killing a chid under six and you've

2    established -- you've determined in your mind that that person's

3    going to be a future danger?

4         A    I've already sat through --

5         Q    You've sat through all the evidence.

6         A    And I determine?  Then I would --

7         Q    Future danger.

8         A    Then in -- then in that case I would say yes.

9         Q    Death penalty?

10        A    Death penalty.

11        Q    Okay.  All right.

12             MR. GANDARA:  Excuse me a moment, would you, Your

13   Honor?

14        Q    All right.  So at this point that's a death penalty

15   case for you?

16        A    (Moving head up and down.)

17        Q    And -- and there's no amount of mitigating evidence

18   that you might hear that would bring you to say there's a

19   sufficient mitigating ·evdience -- sufficient mitigating

20   circumstance for a life sentence?

21        A    Well, I think that would be based in -- the -- the

22   lady said that you don't have to present any evidence or that

23   you don't have to cross-examine witnesses or anything like that.

24   I think if there was something maybe in his background or maybe

25   something in his character or something like that that I would

know about after having listened through the trial, then that
could maybe be considered a mitigating cirucmstance, but I --
but that would have to be based on something that I would hear
in the court to determine.

Q    Okay.  At that point where you got to beyond a
reasonable doubt question one --

A    Uh-huh.

Q    -- he's guilty of killing a child under six.  He's
going to commit criminal acts of violence in the future that
pose a continuing threat to society.  At that point you have to
be convinced by somebody out of the death penalty?

A    I'd have to be -- I'd have to be convinced by a
mitigating circumstance in question number two because I know
this -- the lady asked me if you had said yes to number one,
would you still be considered -- consider life without prison
(sic) or the death penalty based on question number two?  And I
-- my answer was yes.  I could still consider the life without
parole life sentence because then you would -- maybe you hear
something in the court that would dictate something that was --
maybe caused him to do it or caused something along those lines.
Maybe something happened in his background -- who knows -- that
would cause -- there would be a mitigating circumstance that
maybe would change your opinion of -- of -- of the death
penalty.

Q    And might bring you to consider life without parole,

```
 1   is that what you said?

 2        A     Correct.

 3        Q     Okay.

 4             THE COURT:  Let me -- let me inform you as far as life

 5   or life without parole, the jury would be instructed as to a

 6   parole law.  They can be informed of it, but they are not

 7   permitted to calculate, analyze or anything to try to apply that

 8   parole law in their decision.

 9        A     Okay.

10             THE COURT:  Cannot consider it for -- for that purpose

11   at all.

12        A     Right.  So it's just death penalty or life -- life

13   sentence.

14             THE COURT:  Life.  That's it.

15        A     Okay.

16             THE COURT:  And my question is since you're talking

17   about life without parole, life in prison, that's really not in

18   consideration for the jury.

19        A     Right.

20             THE COURT:  And my question is would that influence

21   you?  Would that issue -- is that issue so important to you, so

22   pervasive in its finding, it is, that it would influence your

23   verdict?  In other words you would be --

24        A     No.

25             THE COURT:  -- tempted to try to calculate, then
```

1   figure out things.

2      Q    No.  No, I wouldn't.  I -- I -- no, I wouldn't.  It

3   would -- with those two choices, then those are the only two

4   choices we have, those two choices that you have to go with?

5          THE COURT:  Those would be the instructions.

6      A    Correct.  Yes.

7          THE COURT:  You would be informed of the parole law,

8   but you could not apply it.

9      A    We couldn't apply it.  Yeah, that would be fine.

10         MR. GANDARA:  All right.  Conditionally pass the

11   juror, Your Honor?

12      A    Okay.

13         THE COURT:  Okay.  State.

14         MS. MERAZ:  Yes.

15                  VOIR DIRE

16   BY MS. MERAZ:

17      Q    On -- just kind of going back to what Mr. Gandara was

18   talking about.

19      A    Uh-huh.

20      Q    So let's go ahead and assume you answered question

21   number one yes.

22      A    Yes.  Okay.

23      Q    And like I said before, you're on your way to the

24   death penalty.

25      A    Uh-huh.

Q    So kind of clearing up what he said.  So are you telling me then that even after having answered question number one yes, you're still willing to consider both life in prison and the death penalty an option?

A    Yes.  Yes, because I think, you know, looking at question number two, it says defendant's character and background, personal moral culpability.  If there's a sufficient mitigating circumstance, maybe something would come out in the court or in the testimony that would dictate a mitigating circumstance.

Q    Okay.  Something that maybe didn't come up when you discussed the first question?

A    Uh-huh.

Q    Okay.  So that after -- after answering question number one, you're still not having been committed to either life in prison or the death penalty?

A    No.

Q    Okay.

A    Oh, well, yeah, no.  Not -- not at that time.  I would have to look at it again, the second qeustion and determine whether there was something that it might have heard in the courtroom or the testimony or something that may be --

Q    Okay.  And you can -- can you base your answer to question number two on the evidence regardless of whether it results in life in prison or the death penalty?

1    A    Definitely.

2    Q    Okay.

3         MS. MERAZ:  Nothing further, Your Honor.

4         MR. GANDARA:  Just one question.

5                         VOIR DIRE

6    BY MR. GANDARA:

7    Q    Mr. Tomes, you work for West from September '99 to --

8    excuse me, tell me again.

9    A    I worked at West Services -- I started at the post

10   office in '99.  February of '99 I believe in the post office.  I

11   worked at West Tele Services for about two and a half years.  So

12   I don't think I worked at West till -- I want to say like July

13   or August of '98.  So I was there from maybe '96 to '98.

14   Q    Okay.  That clears something up for me.  Thank you.

15        MR. GANDARA:  Conditionally pass the juror.

16        MS. MERAZ:  Nothing further.

17        THE COURT:  Okay.  You may step outside just a minute,

18   Mr. Tomes.

19        VENIREPERSON TOMES:  Okay.

20        THE COURT:  I'll be right back with you, sir.

21        VENIREPERSON TOMES:  All right.

22        MR. GANDARA:  Thank you.

23        VENIREPERSON TOMES:  Thank you.

24        MS. MERAZ:  Thank you.

25            (Venireperson Tomes left the courtroom.)

1    THE COURT:  Okay.  Mr. Robert Tomes, Juror Number 320.

2  To the State for any challenges?

3    MS. MERAZ:  No challenge for cause.

4    THE COURT:  To the Defense if you have anything before

5  you make your challenges?

6    MR. GANDARA:  We reurge the defendant's right to ask

7  all the questions that have been prohibited by the Court which

8  questions were propounded both orally and on the record and set

9  out in the defendant's motion for right to conduct a cull, fair

10  and constitutional voir dire and in the file documents entitled

11  -- entitled propounded specific voir dire questions to each

12  member of the venire.

13    Additionally, Your Honor, we reurge without scheduling

14  the rest of it, the defendant's right to enquire of each juror

15  specifically about his views on the parole law.  And that the

16  right to inform these jurors exactly how the Court would

17  instruct the jury at the end of the case and before submitting

18  the case for punishment, and to ask for each of these jurors

19  views on that aspect of the law to determine whether they agree

20  with the law, disagree with it or would be biased agianst that

21  application of that -- of that law in the case.  We need answers

22  to each and every one of those questions from each and every

23  prospective juror in order to intelligently exercise our

24  peremptory challenge in order to lodge proper challenges for

25  cause in so provide effective assistance of counsel to the

1  defendant at jury selection.

2       We rely on the Sixth, Eighth and Fourteenth Amendments

3  of the U.S. Constitution and Articles -- Article 1, Section 10

4  and 10 of the Texas Constitution.

5       THE COURT:  The Court will maintain its previous

6  rulings in connection to the proposed questions.  To the State

7  for acceptance or use of a peremptory?

8       MR. GANDARA:  I didn't make my challenge for cause.

9       THE COURT:  I'm sorry, go ahead and make it.

10      MS. MERAZ:  We challenge this juror for cause.  He

11 can't be fair and cannot be fair and impartial because his views

12 regarding parole and life in prison without possibility of

13 parole would affect his verdict.  He cannot answer special

14 issues one and two impartially because as he stated, the crime

15 itself of it's on nature would dictate the death penalty and

16 certain crimes dictate the death penalty.  And his views are

17 biased toward the death penalty.  His opinion would have to be

18 changed by evidence regarding the death penalty.  We challenge

19 for cause.

20      THE COURT:  I'm going to overrule the challenge for

21 cause.  To the State for use of a peremptory or acceptance?

22      MS. MERAZ:  We accept this juror.

23      THE COURT:  To the Defense for use of a peremtory or

24 acceptance?

25      MR. GANDARA:  We strike, Your Honor.

```
1              THE COURT:  Okay.

2              MR. GANDARA:  And we request additional strikes.

3              THE COURT:  I will take that under advisement.  Would

4    you bring in Mr. Tomes.

5                   (Venireperson Tomes present.)

6              THE COURT:  Mr. Tomes, I'm going to excuse you.  I

7    want to thank you very much for your service and appreciate it

8    very much.

9              VENIREPERSON TOMES:  Thank you.

10             MS. MERAZ:  Okay.  Thank you.

11             MS. HUGHES:  Thank you.

12                  (Venireperson Tomes left the courtroom and

13   Venireperson Ruiz present.)

14             THE COURT:  Mr. Ruiz, how are you?

15             VENIREPERSON RUIZ:  Fine.  How are you, Judge?

16             THE COURT:  You never thought we'd see you again?  We

17   need to bring down Mr. Guevara who's up there with so.  We're

18   going to wait for him --

19             VENIREPERSON RUIZ:  All right.

20             THE COURT:  -- and do this all at time.

21             VENIREPERSON RUIZ:  Okay.

22             THE COURT:  That way we won't don't have to do it

23   twice.  Mr. Ruiz, you may be seated, relax for a minute, at ease

24   as they say.  Okay.

25                  (Break, then the following occurred.)
```

1       THE COURT:  Actually, we'll get on the record at this

2  time.  We have two jurors.  One is Mr. William Ruiz, Jr., Juror

3  Number 321 and also Mr. Roberto Guevarra, Jr., Juror Number 324.

4  Okay.  Gentlemen, would you please raise your right hand so I

5  can swear you in.  Do you solemnly swear or affirm that you will

6  make true answers to such questions as may be propounded to you

7  by the Court or under its direction touching your service and

8  qualifications as jurors so help you God?

9       VENIREPERSON RUIZ:  I do.

10       VENIREPERSON GUEVARA:  I do.

11       THE COURT:  Okay.  Gentlemen, you remember in October

12  10th you were with that large group and it was a long day, and

13  you were out -- without food and you were kind enough to fill

14  out this questionnaire for us which has provided us with a lot

15  of good information and we're going to go over it today.  You

16  will remember that and I told you then that we would have you --

17  call you for individual interviews and that's what we're doing

18  here today.

19       Each of you will be seated here at this seat and

20  answer questions of the Court.  I'll have a few, but most of the

21  questions will come from the attorneys, the State and the

22  Defense.  And they'll introduce themselves a little bit later.

23       If you remember, we told you in your questionnaire

24  that the defendant in the case has been convicted of capital

25  murder already by another jury.  And the jury in this case will

1  be impanelled for the sole purposes of determing the punishment.

2  Now, in a capital murder situation, there's two options, life or

3  death.  And the jury in this case will be solely for that

4  purpose, okay, since guilt has already been determined.

5        Now, the jury doesn't -- after hearing the evidence in

6  this portion of the -- of the trial doesn't go back and just

7  vote for life or death.  They have to answer certain questions.

8  That's the process that the law provides.  They are there on the

9  board and the attorneys will be talking to you.  This process is

10  an educational process and it also is a process to understand

11  how you feel about these issues.

12        Now, these are issues that you may or may not have

13  taked about.  You know, normally we don't talk, sit around the

14  kitchen table and talk about it, talk about how you feel about

15  the death penalty.  Some people do, but normally we don't.

16  Okay?  But today we are going to talk to you about that.  So

17  it's real important that we know how you feel about these

18  issues.  You've given us an idea by the quesitonnaire, but we

19  need to delve a little bit more into these matters.  It's very

20  important what your opinion is to us.

21        So in that vein, it's important that you come -- that

22  you respond directly.  That's one -- responses like well, I

23  think I can or I don't know until I'm a juror, or I would hope

24  that I could do that if I were a juror, but I don't know.  That

25  doesn't help us.  Because based on your responses, we have to

1  make decisions, okay, about whether you would be a juror.  In

2  fact, today you'll know whether you'll be a juror or not.

3  You'll know one way or the other whether you've been excused or

4  selected as a juror.

5          So when you are asked those questions, please

6  contemplate them.  In that vein, understand those questions.

7  You know, sometimes those questions they ask can be darn right

8  confusing.  Sometimes they don't make any sense at all.  So if

9  that happens, you have the absolute right to demmand that that

10 question be clear before you answer it because it is that

11 important.  So think about it and if it's confusing or you don't

12 understand why it's asked ror you want it asked another way, by

13 all means you have the right to demand that it be asked, you

14 know, the way you can understand it.

15         Also by contemplating the question, it gives time for

16 the court reporter to make sure that she takes down the

17 proceedings and what you respond, because it's difficult to take

18 people talking over each other.  And so there has to be a

19 question and answer and it has to be clear cut, and that's her

20 responsibility.  Becky Macias is taking down the proceedings and

21 as I speak, she's taking down what I'm saying.

22         So she has to hear what we say.  And so from time to

23 time, we have to prompt you.  You're not in front of a court

24 reporter every day.  We do, but we know what she goes through,

25 but you probably don't.  So just keep that in mind as we go

1   through this.

2           I don't know how long this process is going to take,

3   Mr. Ruiz, Mr. Guevara.  Some jurors have been over here a couple

4   of mintues, other jurors we've been with a couple of hours.

5           VENIREPERSONS:  Okay.

6           THE COURT:  So I don't know how long it's going to

7   take.  As unique as that time period is, we as individuals in

8   our opinions if we need to delve into different things.  So

9   please be patient.  We're going to take Mr. Ruiz first.  We take

10  them in numberical order.  Mr. Guevara, I don't know how long it

11  will take.  Hopefully we can finish this afternoon.  If not, it

12  possibly be -- might have to come back in the morning.  I

13  apologize for that, but we just need to get this done and that's

14  just the way it is.  It's really tough to tell exactly how long

15  it's going to take.

16          We have been doing it for quite a bit of time now.

17  We've talked to a lot of jurors so we kind of get a pattern, but

18  you know, we can't get into a pattern when it comes to important

19  things like this.  We can't to a certain extent, but then we

20  have deviate as you dictate with we deviate.  In other words, we

21  have to go into other things.  It's that important of a process.

22  So anyways, does that sound fair?  Fair warning, let me put it

23  that way.

24          VENIREPERSON RUIZ:  Fair warning.

25          VENIREPERSON GUEVARA:  Fair warning.

```
1          THE COURT:  Okay.  All right.  Mr. Ruiz, if you would

2    have a seat here.  Mr. Guevara, we'll let you know.  I'll have

3    -- I have an idea how it's going and you'll be up there.  Okay.

4               (Venireperson Guevara left the courtroom.)

5          THE COURT:  Let's see.  Mr. Ruiz, I have your

6    questionnaire here that you were gracious --

7          VENIREPERSON RUIZ:  Yes, sir.

8          THE COURT:  -- enough to fill out for us.  You all may

9    be seated.

10         MR. GANDARA:  Your Honor, before we talk to Mr. Ruiz,

11   can we have a couple of minutes to talk with counsel.

12         THE COURT:  Okay.  Mr. Ruiz, step outside.  Mr. Ruiz,

13   they want to talk to me and we'll be with you.

14              (Venireperson Ruiz left the courtroom, off the

15   record discussion, then the following occured.)

16         THE COURT:  Okay.

17         MS. PAYAN:  We have an agreement.

18         MS. HUGHES:  Okay.

19         THE COURT:  As to Mr. Ruiz?

20         MS. PAYAN:  Your Honor, we would.

21         MS. HUGHES:  As to both.

22         MS. PAYAN:  We would agree to excuse Mr. Ruiz and Mr.

23   Guevara, Jurors, 321 and 324.

24         THE COURT:  Okay.  All right.

25         MS. HUGHES:  Yes, sir.
```

1         THE COURT:  Would you bring in Mr. Ruiz?

2         BAILIFF:  Yes, sir.

3           (Venireperson Ruiz present.)

4         THE COURT:  Mr. Ruiz, after consulting with the

5  attorneys, they agreed to excuse you and Mr. Guevara.  So okay.

6         VENIREPERSON RUIZ:  Thank you very much, Judge.

7         THE COURT:  It was a pleasure talking to you and

8  enjoy.  Maybe we'll see you some other time.  Okay.

9           (Individual Voir Dire concluded for the day.)

THE STATE OF TEXAS)

COUNTY OF EL PASO )

I, Rebecca Macias, Official Court Reporter in and for the Council of Judges of El Paso County, Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, to the best of my ability, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $_____ and {is to be paid} OR {was paid} by El Paso County_____.


Witness my hand the 8th day of May_____, 2009.




Rebecca Macias
Rebecca Macias, CSR
Certificate No. 6096
Expiration 12/31/09
500 E. San Antonio
Council of Judges Room 101
El Paso, Texas 79901
(915)546-2143