1    **REPORTER'S RECORD**

2    **VOLUME 50 OF 84 VOLUMES**

3    **TRIAL COURT CAUSE NO. 20020D00230**

4    **COURT OF CRIMINAL APPEALS NO. AP-74,829**

5

6    THE STATE OF TEXAS          )     IN THE DISTRICT COURT
                                 )
7    v.                          )     OF EL PASO COUNTY, TEXAS
                                 )
8    DAVID RENTERÍA              )     41ST JUDICIAL DISTRICT

9

10

11   **TRIAL ON THE MERITS - MORNING SESSION**    FILED IN

12                                              COURT OF CRIMINAL APPEALS

13                                                 JUN 0 4 2009

14                                              Louise Pearson, Clerk

15          On Tuesday, the 22nd day of April 2008, the

16   following proceedings came on to be heard in the above-entitled

17   and numbered cause before the **Honorable Mary Anne Bramblett**,

18   Judge of the 41st Judicial District Court in El Paso County,

19   Texas.

20          Proceedings reported by computer-aided machine

21   shorthand.

22

23

24

25                                              ORIGINAL

MARIA C. CHAVEZ, CSR
OFFICIAL COURT REPORTER

1              A P P E A R A N C E S

2

3

4

5    JAIME ESPARZA, ESQ.              JAIME GÁNDARA, ESQ.
     SBOT NO. 06666450               SBOT NO. 07611900
6    LORI HUGHES, ESQ.               EDYTHE PAYÁN, ESQ.
     SBOT NO. 00786275               SBOT NO. 00791415
7    DIANE MERAZ, ESQ.               GREG VELÁSQUEZ, ESQ.
     SBOT NO. 13942600               SBOT NO. 20540300
8    500 E. San Antonio Rm. 201      500 E. San Antonio Rm. 401
     El Paso, Texas  79901           El Paso, Texas  79901
9    (915) 546-2059                  (915) 546-8185
     ATTORNEYS FOR THE STATE         ATTORNEYS FOR DEFENDANT
10

11

12   **HEARING ON 11.07 WRIT**

13   TOM DARNOLD, ESQ.               LOUIS LÓPEZ, ESQ.
     SBOT NO. 00787327               SBOT NO. 00787923
14   500 E. San Antonio Rm. 201      300 E. Main Drive Suite 700
     El Paso, Texas  79901           El Paso, Texas  79901
15   (915) 546-2059                  (915) 543-9800
     ATTORNEYS FOR THE STATE         ATTORNEYS FOR DEFENDANT
16

17

18

19

20

21

22

23

24

25

**VOLUME 50**

CHRONOLOGICAL INDEX

TRIAL ON THE MERITS- MORNING SESSION

| Tuesday, April 22, 2008 | | PAGE | VOL. |
|---|---|---|---|
| Hearing on 11.07 Writ | | 4 | 50 |
| Discussions on Motions in Limine | | 6 | 50 |
| Roll Call of Jury | | 11 | 50 |
| Jury Sworn by the Court | | 13 | 50 |
| Jury Instructed by the Court | | 13 | 50 |
| Opening Statement by Mr. Esparza | | 20 | 50 |
| Opening Statement by Mr. Gándara | | 25 | 50 |

| STATE'S WITNESSES | DIRECT | CROSS | VOIR DIRE | VOL. |
|---|---|---|---|---|
| Douglass Lloyd | 30 | -- | | 50 |
| Tom Monday | 36 | 74 | | 50 |
| Bruce Orndorf | 77 | -- | | 50 |
| Court Reporter's Certificate | | | 93 | 50 |

ALPHABETICAL WITNESS INDEX

| | DIRECT | CROSS | VOIR DIRE | VOL. |
|---|---|---|---|---|
| Lloyd, Douglass | 30 | -- | | 50 |
| Monday, Tom | 36 | 74 | | 50 |
| Orndorf, Bruce | 77 | -- | | 50 |

EXHIBIT INDEX

| STATE'S NO. DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|
| 1A  Waiver | 34 | 34 | 50 |
| 2A  Plastic Bag | 63 | 64 | 50 |
| 2B  Photo | 68 | 68 | 50 |
| 5 Photo | 66 | 66 | 50 |

1  **Tuesday, April 22, 2008**.

2                    (Defendant present, no Jury.)

3                    THE COURT:  This is cause number 20020D00230, the

4  State of Texas v. David Rentería.  We are scheduled for a jury

5  trial on the resentencing of this case today.

6                    Mr. Louis López has an 11.07 writ that had been

7  pending on behalf of the Defendant, and I have you and

8  Mr. Darnold here from the district attorney's office.  If you

9  wish to address anything this morning before we start trial.

10                   MR. LÓPEZ:  Yes, Your Honor.  Since -- this is

11  Louis López on behalf of Mr. Rentería.  I'm his 11.071 writ of

12  habeas corpus attorney.  Since they are my motions, I will go

13  first.  However, I think this Court will be able to make --

14  decide what it needs to do without Mr. Darnold having to add

15  anything, but I do encourage Mr. Darnold to add if he wishes.

16                   As Mr. Gándara pointed out to me, St. James once

17  said, if you have no faith, proceed like you do have faith.  And

18  I think that's the situation where we're in now.  I am his writ

19  attorney, appointed to represent him on his original writ of

20  habeas after he received his first death sentence.  When the case

21  was taken up on appeal, the Texas Court of Criminal Appeals

22  reversed the sentencing and sent it back and here we are.

23                   However, Mr. Darnold called up to the Court and

24  had asked, well, what happens to the writ?  Is it still pending

25  or is the writ moot?  The Court said, well, it's still pending,

1   and so when -- if he gets sentenced to death again, then we'll

2   see what we do next.  Unfortunately, this procedure in which the

3   Texas Court of Criminal Appeals is proceeding under the writs is

4   not under the 11.071.  There's no guideline for where we stand

5   right now.

6           I'm in a situation where I am in existence, but

7   I'm not in existence.  Because Mr. Rentería has not been

8   sentenced to death, technically, I have no standing to be in

9   front of the Court asking you to do anything on his writ because

10  he has not been given the death penalty.  And only when you're

11  given the death penalty does your 11.071 rights come into play.

12  If, after the close of all the evidence, if the Jury gives him

13  life, I will not -- there will be no need for me in this case.

14  And so we're stuck in a situation as to, well, can you

15  procedurally hear my motions if I don't technically exist, or can

16  you hear my motions because technically I do exist because the

17  writ is still pending?

18          So Mr. Darnold and I believe that the proper --

19  well, I'm not going to agree that this is the proper way, but I

20  think the Court's only ruling is to deny me standing because

21  technically, he does not have 11.071 rights.  Of course, I'm

22  alleging that I do have standing because his writ is still

23  pending, but that's a decision you're going to have to make.

24          THE COURT:  Mr. Darnold, is there anything you

25  wish to place on the record?

1          MR. DARNOLD:  Not too much, Your Honor.  Just, I

2   think any filings under 11.071 are premature since there is no

3   death sentence in this case as of yet.

4          THE COURT:  All right.  I will deny your motions

5   that you do have pending, that I have seen that have been filed

6   regarding your writ because it is probably a premature request

7   for rulings by me in this case.

8          MR. LOPEZ:  Your Honor, just for record purposes,

9   we do object to your ruling.

10          THE COURT:  It's in the record.

11          MR. LÓPEZ:  Thank you, Your Honor.  May I be

12   excused?

13          THE COURT:  Yes, you may.  Thank you.

14          MR. DARNOLD:  Thank you, Your Honor.

15          THE COURT:  Mr. Darnold, thank you.

16          Before we bring the Jury in there were some items

17   that the Court was going to rule on regarding the motion in

18   limine.  On number 5 the Court is going to grant the motion in

19   limine as to fact witnesses without personal knowledge, but the

20   Court is going to deny that motion in limine regarding experts or

21   lay witnesses with personal knowledge.

22          I've even written on here to refresh my memory if

23   the issue comes up.

24          Anything else before we bring the Jury in?

25          MR. GANDARA:  Ms. Hughes has an issue she wishes

1　to present to the Court in limine.

2　　　　　　　MS. HUGHES: There was one more issue, Judge. In

3　regards to the evidence in this case, as we've discussed

4　repeatedly, the evidence admitted during the guilt phase is

5　admitted and is still part of the record and we anticipate that

6　we will have additional exhibits and the Defense would have

7　additional exhibits, as well. We would like to ask for a motion

8　in limine regarding discussion along these lines: Well, the

9　first jury didn't hear this evidence and so we're asking you to

10　consider this. They didn't hear this in considering whether he

11　was guilty or not, but you can consider it now as to his

12　sentence, or -- I don't think that that is relevant and we would

13　ask that there be a motion in limine granted as to going into any

14　of that type of discussion or argument on opening or questioning

15　or closing.

16　　　　　　　THE COURT: Any response?

17　　　　　　　MR. GANDARA: Your Honor, as the Court is acutely

18　aware, we filed a series of motions for new trial which we allege

19　that there was *Brady* material that was not disclosed to the

20　Defendant at the first trial -- before the first trial in time to

21　use it, and that's evidence that the first jury did not hear.

22　There is information that was presented to the first jury in a

23　different light than it's going to be presented this time around,

24　and that's information that the first jury did not hear. And it

25　all goes to circumstances of the offense, and it's evidence that

1   is relevant and admissible.  And so in terms of whether this Jury

2   considers it or not, as a factor that the first jury did not hear

3   I think could be critical to their assessment of that in terms of

4   their determination of the punishment in this case.

5              THE COURT:  The Court will grant the motion in

6   limine regarding discussing it as not having been heard by the

7   first jury.  I'm not saying that that evidence is not admissible.

8   I'm just saying that you're not allowed to comment on it in that

9   vein.

10             Anything further?

11             MS. HUGHES:  No, ma'am.  Thank you.

12             THE COURT:  All right.  Let's bring the Jury in.

13             MR. GANDARA:  Your Honor, before the Jury comes

14  in, before the Jury is seated, we filed various objections to the

15  manner of conduct of the voir dire.  And we filed a motion for

16  mistrial and made oral motions for mistrial based on what we

17  perceive to be impermissible and incorrect restrictions on our

18  right to voir dire the panelists in this case.  And at this time

19  before the Court seats the Jury, we object to seating this Jury.

20  We ask for a mistrial on the grounds that we were not permitted

21  to do a full and fair voir dire in jury selection in this case.

22             THE COURT:  Did you present these -- the motion

23  for mistrial to Judge Alcalá, who was the judge appointed to do

24  the jury selection?

25             MR. GANDARA:  Yes, Your Honor.  We did present it

1  during the course of the jury selection, but not at the point

2  when we had completed the jury, the selection of the 14.

3           THE COURT:  Motion for mistrial is denied.

4           MR. GANDARA:  Your Honor, I'm reminded as a

5  procedural requisite I'll have to renew this motion after the

6  jurors are sworn, and I would like to do it out of the presence

7  of the Jury.

8           THE COURT:  All right.  Well, then you will be

9  able to come up here afterwards and just put it in the

10  microphone.

11          MR. ESPARZA:  Your Honor, I wanted to make the

12  Court aware that Mrs. Flores is in the courtroom for opening.

13  She won't be here during the presentation of the evidence.  But I

14  thought -- just to make sure that the Court is aware of that.  I

15  don't think that's in violation of any rule of evidence.

16          MR. GÁNDARA:  I have no objection.

17          THE COURT:  All right.

18          MR. ESPARZA:  Just to the three witnesses --

19  actually, the first four witnesses.  Three of them are police

20  officers, one is Dr. Contín.  How do we want to proceed?  Do you

21  want to voir dire them now?  How do you want to proceed after

22  opening?  What do you want to do?

23          MR. GANDARA:  We don't have any voir dire of the

24  police officers or of Dr. Contín.

25          MR. ESPARZA:  One of them is the fingerprint guy,

10

1   Monday, Orndorff, and -- Lloyd, Monday, Orndorff, and Contín.

2                MR. GANDARA:  We don't have any voir dire for

3   them.

4                THE COURT:  Are you going to need the podium?

5                MR. GANDARA:  For opening I can go with or without

6   it.

7                MR. ESPARZA:  Your Honor, I prefer to use the

8   podium.  Or would you like me to move it?

9                THE COURT:  I have a young Bailiff for it.

10               Ready?

11               MR. ESPARZA:  I'm ready, Your Honor.

12               THE COURT:  Bring them in.

13               (Jury in, Defendant present, 9:20 a.m.)

14               THE COURT:  Good morning, Ladies and Gentlemen.

15               MEMBERS OF JURY:  Good morning.

16               THE COURT:  You can say good morning to me.

17               MEMBERS OF JURY:  Good morning.

18               THE COURT:  Good.  Good.  That's probably about

19  all you can say to any of us as you'll find out from the

20  instructions you're going to get.  But the first thing that we do

21  need to do, since it's been a while since we've seen you, I need

22  to have the Clerk do a roll call to make sure we have the correct

23  person sitting in the correct seat.

24               Proceed.

25               THE CLERK:  I'll now call roll.  Please answer

"here."  Donnie Malpass.

THE JUROR:  Here.

THE CLERK:  Joaquin Rivera.

THE JUROR:  Here.

THE CLERK:  John Harton.

THE JUROR:  Here.

THE CLERK:  Norman Thomas.

THE JUROR:  Here.

THE CLERK:  Brett Williams.

THE JUROR:  Here.

THE CLERK:  Roxanne Castricone.

THE JUROR:  Here.

THE CLERK:  Robert Micaletti.

THE JUROR:  Here.

THE CLERK:  Ellen Bradley.

THE JUROR:  Here.

THE CLERK:  Chester Dowling.

THE JUROR:  Here.

THE CLERK:  Robert Martínez.

THE JUROR:  Here.

THE CLERK:  Washington Watley.

THE JUROR:  Here.

THE CLERK:  Jeanette Sánchez.

THE JUROR:  Here.

THE CLERK:  Sandra Heimer.

1          THE WITNESS:  Here.

2          THE CLERK:  Fernando Soliz.

3          THE JUROR:  Here.

4          THE CLERK:  The Jury has been properly seated,

5    Your Honor.

6          THE COURT:  Thank you very much.  Again, good

7    morning, Ladies and Gentlemen of the Jury.  The first thing I

8    would like to do is I would like to thank you very much for your

9    time that you have already given to us, the time that you are

10   going to be giving to us these next couple of weeks, and I do

11   want to thank you very much for your patience.  You all have made

12   this a much easier process for all of us that are involved in it,

13   so I'm appreciative.  I know the attorneys are, as well.

14          You are called upon to decide the punishment of

15   the Defendant in this case.  As you have already been informed

16   during the voir dire process, the Defendant has previously been

17   found guilty of capital murder, and the matter of punishment is

18   now referred to you.  Your duty as jurors will be to decide the

19   disputed facts.  It is the duty of the Judge to see that the case

20   is tried in accordance with the rules of law.  In this case, as

21   in all cases, the actions of the Judge, parties, witnesses,

22   attorneys, and jurors must be according to law.  Texas law

23   permits proof of any violation of the rules of proper jury

24   conduct.  By this I mean that jurors and others may be called

25   upon to testify in open court about any acts of jury misconduct.

1    I instruct you therefore, to carefully follow all

2 of the instructions which I'm now going to give to you, as well

3 as all others that you may receive while this case is on trial.

4    Please raise your right hands.

5    (Jury duly sworn by Court.)

6    THE COURT:  Counsel, for the record.

7    (At the bench, on the record.)

8    MR. GÁNDARA:  Your Honor, I would respectfully

9 object to the seating of the Jury on the grounds that we were not

10 given a full and fair opportunity to voir dire the members of the

11 jury panel in this case, and on the additional grounds that were

12 stated during the voir dire as the case went on.  We object to

13 the seating of this Jury.

14    THE COURT:  Denied.

15    (Open court, Jury hearing.)

16    THE COURT:  By the oath which you take as jurors

17 you have now become officials of this Court and active

18 participants in the public administration of justice.

19    I'm now required to give you further instructions

20 which you must obey throughout this trial.  It is your duty to

21 listen to and to consider the evidence and to determine fact

22 issues later submitted to you, but I, as a judge, must decide

23 matters of law.

24    I have given you a handout of your instructions

25 that I'm going to read to you.  You may follow along.  You are

1   also allowed to keep those instructions.  If you have any

2   questions about your responsibilities as a juror, it should be

3   answered there.  If not, you may ask the Bailiff about it.  Do

4   not ask the Bailiff anything about the case; only about your

5   responsibility regarding your conduct as a juror.

6           Do not mingle with nor talk to the lawyers,

7   witnesses, parties, or any other person who might be connected

8   with or interested in this case, except for casual greetings.

9   They have to follow these same instructions and you will

10  understand it when they do.

11          Do not accept from nor give to any of those

12  persons any favors, however slight, such as rides, food, or

13  refreshments.

14          Do not discuss anything about this case or even

15  mention it to anyone whomsoever, including your spouse, nor

16  permit anyone to mention it in your hearing until you are

17  discharged as jurors or excused from this case.  If anyone

18  attempts to discuss this case with you, please report it to me at

19  once.  Do not even discuss this case among yourselves until after

20  you have heard all of the evidence, the Court's charge, the

21  attorneys' arguments, and until I have sent you to the jury room

22  to consider your verdict.

23          Do not make any investigation about the facts of

24  this case.  Occasionally we have a juror who privately seeks out

25  information about a case on trial.  This is improper.  All

1   evidence must be presented in open court so that each side may

2   question the witnesses and make proper objections.  This avoids a

3   trial based upon secret evidence.  These rulings apply to jurors

4   the same as they apply to the parties and to me.  If you know of

5   or learn anything about this case except from the evidence

6   admitted during the course of this trial, you should tell me

7   about it at once.

8              You have just taken an oath that you will render a

9   verdict based upon the evidence submitted to you under my

10  rulings.

11             Do not make personal inspections, observations,

12  investigations, or experiments, nor personally view premises,

13  things, or articles not produced in court.  Do not let anyone

14  else do any of these things for you.  Do not tell other jurors

15  your own personal experiences nor those of other persons nor

16  relate any special information.  A juror may have special

17  knowledge of matters such as business, technical, or professional

18  matters, or may have expert knowledge or opinions, or may know

19  what happened in this or some other lawsuit.  To tell the other

20  jurors any of this information is a violation of these

21  instructions.

22             Do not seek information contained in law books,

23  dictionaries, public or private records or elsewhere which is not

24  admitted into evidence.

25             At the conclusion of all the evidence I will

1    submit to you a written charge. Since you will need to consider

2    all of the evidence presented by me -- all of the evidence

3    admitted by me, it's important that you pay close attention to

4    the evidence as it is presented. Any violation of these rules

5    should be reported to me at once.

6             I'll tell you how this case will proceed. The

7    State will make an opening statement outlining its case. The

8    Defendant's attorney may also make an opening statement at that

9    time. After the opening statement, the State will introduce

10   evidence. At the conclusion of the State's evidence, the

11   Defendant has the right to introduce evidence; however, he

12   need not do so. At the conclusion of all the evidence, I will

13   read to you the charge which contains the law that applies to

14   this case, and then the attorneys will make their closing

15   arguments to you.

16             Opening statements and closing arguments of the

17   attorneys are intended to help you in understanding the evidence

18   and applying the law, but they are not evidence. In other words,

19   anything the attorneys say in this courtroom is not evidence.

20   The evidence which you are to consider consists of the testimony

21   of the witnesses and the exhibits admitted into evidence.

22             The admission of evidence in court is governed by

23   rules of law. From time to time it may be the duty of the

24   attorneys to make objections, and my duty as judge is to rule on

25   those objections and determine whether or not you can consider

1   certain evidence.  You must not concern yourself with the

2   objections or my reasons for these rulings.  You must not

3   consider testimony or exhibits to which an objection has been

4.  sustained or which has been ordered stricken.  It is your duty to

5   determine the facts and to determine them from the evidence and

6   the reasonable inferences arising from such evidence, but you

7   must not indulge in guesswork or speculation.

8            No statement or ruling or remark that I may make

9   during the presentation of testimony is intended to indicate my

10  opinion as to the facts.  You are to determine the facts.  In

11  this determination you alone must decide upon the believability

12  of the evidence and its weight and its value.  In considering the

13  weight and value of the testimony of the witness, you may take

14  into consideration the appearance, attitude, and behavior of the

15  witness, the interest of the witness in the outcome of the case,

16  the inclination of a witness to speak truthfully or not, and all

17  other facts and circumstances in evidence.  Thus, you may give

18  the testimony of any witness just such weight and value as you

19  may believe that testimony is entitled to receive.

20           You must not be influenced in any degree by any

21  personal feeling of sympathy for or prejudice against either the

22  State or the Defendant, for each is entitled to the same fair and

23  impartial consideration.  Until this case is submitted to you for

24  your deliberation, you must not discuss this case with anyone or

25  remain within the hearing of anyone discussing it.  You are not

1  allowed to read any newspaper article, listen to any radio

2  broadcast, nor view any television program that will discuss this

3  case.

4      After this case has been submitted to you, you

5  must discuss this case only in the jury room and when all members

6  of the Jury are present. You are to keep an open mind and you

7  must not decide any issue in this case until it is submitted to

8  you for your deliberation under my instructions. Faithful

9  performance by you of your duties is vital to the administration

10  of justice.

11      One of the things that we are going to have

12  someone discuss with you later on, if you wish to work on

13  Saturdays, if you wish to work a half day on Saturdays, all day,

14  none on Saturday, it's up to you. I understand that there is

15  something coming up for one of you Saturday after next and we're

16  going to make sure that you get to that and you're not stuck in

17  the hotel room during the -- well, should I say, the event that

18  you are required to go to.

19      For recess, well, I've got you here. You're at my

20  beck and call, so I'm not going to bore you with that. I do want

21  to let you know, though, that if you need a break and I don't

22  give you one, please raise your hand. Let me know. I'll be

23  happy to accommodate you. It's not a problem at all. Don't be

24  embarrassed to wave at me.

25      Also, if you cannot hear a witness or an attorney,

1    or if you cannot see an exhibit that's being shown to you, raise

2    your hand, let me know.  I need to make sure that you can see and

3    hear everything that is presented here in the courtroom for you

4    to help you decide on this case.

5                    Who's going to do the opening statement for the

6    State?

7                    MR. ESPARZA:  I am, Your Honor.

8                    THE COURT:  I forgot, since this is kind of an

9    unusual procedure, I forgot to have the attorneys stand up and

10   reintroduce themselves to you.

11                   Please do that.  We'll start with the State.

12                   MR. ESPARZA:  I'm Jaime Esparza.  I'm the district

13   attorney.  I'm representing the State of Texas.

14                   MS. HUGHES:  I'm Lori Hughes, also with the

15   district attorney's office.

16                   MS. MERAZ:  Good morning.  My name is Diana Meraz.

17                   THE COURT:  I would like the attorneys for the

18   Defendant to please stand up and introduce yourself and your

19   client.

20                   MR. GANDARA:  Good morning, Members of the Jury.

21   My name is Jaime Gándara.  I'm here to speak for David Rentería.

22                   MS. PAYÁN:  My name is Edy Payán, also co-counsel

23   for David Rentería.

24                   MR. VELÁSQUEZ:  My name is Greg Velásquez.  I also

25   represent David Rentería.

MARIA C. CHAVEZ, CSR
OFFICIAL COURT REPORTER

1          THE COURT:  Have your client stand up, reintroduce

2     him, as well.

3          MR. GÁNDARA:  This is my client, David Santiago

4     Rentería.

5          THE COURT:  Thank you.

6          All right.  Proceed.

7          MR. ESPARZA:  May it please the Court.

8          THE COURT:  Yes.  You may proceed.

9          MR. ESPARZA:  Counsel, Counsel for the Defense,

10    Ladies and Gentlemen of the Jury.  Good morning.

11         MEMBERS OF JURY:  Good morning.

12                    **STATE'S OPENING STATEMENT**

13         MR. ESPARZA:  I first want to thank you for your

14    service.  I know that you know how serious the charge is, what

15    kind of case we're talking about, and the decisions that you're

16    going to have to make.  And so I want you to know that on behalf

17    of the State of Texas I truly appreciate that you would accept

18    your responsibility and sit on this Jury.

19         This is the punishment phase of the trial.  You

20    will later learn, or you know by now that the Defendant has been

21    found guilty and I'm talking to you a little bit about that.  But

22    at this stage of the trial I get to talk to you about what the

23    evidence will show.  So I'm not going to go into great detail,

24    just kind of give you an idea of where we're headed and kind of

25    where we're going so you'll know.

1      Punishment.  That's your job, to decide what is

2  the appropriate punishment.  I think the evidence will show that

3  the best predictor of the future is the past.  So during this

4  part of the·trial you'll see the State of Texas bring you

5  evidence regarding the Defendant, about his past, so that you'll

6  know a little more about him because, as you know, you must

7  answer these questions, and that will be your charge.  When the

8  evidence is concluded, the Judge will give you the charge and you

9  will have to answer these questions.

10      So just to give you a little bit of an idea of the

11  kind of evidence you'll hear is you'll hear that the Defendant

12  graduated from Cathedral High School in 1988.  That he attended

13  UTEP, he attended the Community College.  And then you'll hear

14  about some of his criminal history.  That he has two DWIs, that

15  he had a third DWI, and you're going to hear that in 1992 he

16  committed the act of indecency with a child by contact.  And

17  you're going to hear that in 1994 he pled guilty to that charge

18  and received 10 years' deferred adjudication, which is a type of

19  probation.

20      After that probation, in '94, '95, he was twice

21  convicted of DWI.  In the year 2000 he picked up a third DWI.  On

22  that DWI his status changed from deferred adjudication, which the

23  evidence will show is a type of probation, and that he·went into

24  what you'll hear that we call a shock probation.  And what that

25  means is he's still on probation, but for lack of a better

1    term -- it's just a common vocabulary for us -- he was sent to

2    the penitentiary for 90 days. That's the shock part of the

3    probation. He was sent in 2000 and then he was released in 2001,

4    in January of 2001. You'll hear that when he came back he was

5    placed on probation. You see, the shock part, if you do it

6    again, you're going to go to the penitentiary, then you're on

7    probation. He came back in 2001.

8                On November 18, 2001, is when he murdered and

9    killed Alexandra Flores. That's the crime. It's that crime for

10   which he's been convicted of. That's capital murder. It's

11   capital murder because in this state when you kill someone under

12   the age of six, that's a capital murder and the possibility of

13   the death penalty. That's why the whole process of selecting you

14   was so elaborate, because you will have to answer these

15   questions.

16               Now, you might be wondering -- because of the

17   uniqueness of this hearing that will last probably several days,

18   the uniqueness of this hearing is that someone before you has

19   found the Defendant guilty. And you might be wondering, well,

20   will the evidence show the act that was committed? And the

21   evidence will show that. We will present that to you.

22               We're going to present to you that on November 18,

23   2001, the Sunday before Thanksgiving of that year, at a Wal-Mart

24   which was very busy, the Defendant twice enters that store. He

25   enters that store once through one door then through another

1   door. During that time Alexandra Flores, the deceased, she and

2   her family are in that Wal-Mart.

3             The evidence is going to show that when he entered

4   that Wal-Mart the first time he bought some merchandise and he

5   went back to his van. And the evidence is going to show that

6   the -- that at the van there was a security guard. And that the

7   security guard remembers that it was that van because the van was

8   running. The van had been left on. The engine was going. And

9   the security guard was concerned. So the security guard took the

10   plate number of the van.

11             The Defendant went into his van, dropped off his

12   groceries, and went back into the store. When he went back to

13   the store, he also waves and acknowledges the security guard.

14   And the evidence will show that he said, "Don't tow my van, I've

15   got to go back in." It's still running. And then in the time of

16   about 129 seconds to 140 seconds, he enters that Wal-Mart. He

17   goes in, he steps back, he pulls a cart, he walks in with an

18   empty cart, 129 seconds to 140 seconds. In that period of time

19   he goes into that store and he exits with Alexandra Flores.

20   You'll see -- the evidence will show. You'll see that video.

21   And you'll see that when he exits, he exits a safe distance in

22   front of Alexandra, but Alexandra is following the Defendant.

23             The evidence is going to show that on the very

24   next day, on November 19th, a Monday, 2001, her body is

25   discovered. She's naked, she's cold, and she's alone, and the

1   evidence will show that we found her body.  And you'll find out

2   where we found it.  The evidence is going to show that among all

3   the things, the condition of the body, besides being naked, the

4   body had been burnt.

5            But the evidence will show that there is -- that

6   there was a plastic bag on her head and you'll hear that that

7   plastic bag had a palm print on it.  And you'll hear evidence

8   that that palm print belongs to the Defendant.  Palm print, plate

9   number to the van.  Defendant, you'll hear, was a sex --

10  registered sex offender.

11           There won't be any question in your mind at the

12  conclusion of this part of the trial that the Defendant is guilty

13  of capital murder.  You won't have to rely on someone else's

14  decision.  You'll know.  You will know that the Defendant is

15  guilty of capital murder.

16           The really hard part is you're going to have to

17  answer these questions.  It's not hard because there won't be

18  evidence and it won't be hard because you don't know.  It will be

19  hard because the charge is so serious and the crime is so serious

20  and the penalty is so serious, that will make it difficult.  That

21  will be your job.

22           When you get to answering the first question, the

23  evidence will show that the answer is "yes."  He is a future

24  threat.  And when you get to question 2, there will be no

25  mitigating circumstances, none, in order to spare his life.  I'm

1  not here to fool you or fancy talk you.  This is a serious

2  offense.  Your duty is serious.

3          All I ask is that this phase, that you listen to

4  the evidence, you observe the evidence, you watch how witnesses

5  testify, and you'll come to the proper conclusion.  You'll come

6  to the conclusion that the answer to number 1 is "yes," and that

7  the answer to number 2 is "no."  And that the only appropriate

8  sentence in this case, the only appropriate sentence, is the

9  death sentence.

10          The punishment phase of a trial is always

11  difficult because you have to decide what is appropriate.  Your

12  only guide is the evidence and the law.  And I ask you to follow

13  it.  Thank you.

14          THE COURT:  Mr. Gándara.

15          MR. GÁNDARA:  Good morning, Members of the Jury.

16          MEMBERS OF JURY:  Good morning.

17                  **DEFENSE'S OPENING STATEMENT**

18          MR. GÁNDARA:  You're going to hear, I anticipate

19  the evidence will show, that David Santiago Rentería has been

20  convicted by another jury, found guilty of committing a capital

21  murder.  He's been convicted of causing the death of a child

22  under the age of six years old.

23          You're also going to hear evidence that David

24  Santiago Rentería, at the age of five years old, began living at

25  the Tigua reservation here in this town with his parents who were

1  at least older than average parents.  You're going to hear that

2  David went to grade school at Mt. Carmel Elementary School, that

3  he was a very good student in grade school, that he practiced his

4  religion very closely and very seriously.  He was an acolyte, an

5  altar boy, for the Catholic Church.  You're going to hear that

6  he --

7                    (Cell phone ringing.)

8                    THE COURT:  All cell phones off in this courtroom.

9                    MR. GÁNDARA:  You'll hear that he won himself a

10  trip to Rome to an audience with the Pope when he was a young

11  man, about 11 years old.

12                    You'll hear that there was some turmoil in his

13  household as he grew up.  You'll hear some details about that.

14  You'll hear that he had to be protective of his younger sister as

15  a child.  David went to high school at Cathedral and was a very

16  good student there, a very well-behaved person, very --

17  throughout his life he's been a very mild-mannered person, not

18  aggressive, not violent.  He had a very good high school career.

19  And things were going well for him up to that point in his life

20  with the exception of some of the turmoil in his home.

21                    He held a job after high school for three years

22  with United States Customs Service.  And then after that, for

23  another three years, he held on to a job with the Life Management

24  Center here in El Paso.  And that brought him to about the age of

25  24 years old, around which time he began drinking heavily.

1          He had drank before socially.  He had enjoyed

2     dancing.  He was a dancer.  He did folkloric dancing along with

3     his sister and some other of his friends, and he liked to do line

4     dancing and was a dance instructor at a nightclub here in town

5     and would drink socially.  But around the time he turned 24, the

6     drinking got to be very, very heavy.  It changed radically.  His

7     sister will tell you that the man she had seen as a hero

8     throughout her life as a child and as a grown man all of a sudden

9     changed, something began to unravel.

10         Well, he began to drink heavily and he pleaded

11    guilty to this touching incident with a child and went on

12    probation.  And things continued to unravel.  His drinking got

13    worse, to the point where it got him in some more trouble with

14    the law and he went to the penitentiary for it.  He came out of

15    the penitentiary and a few months later he became involved in the

16    incident on the basis of which he's been found guilty of capital

17    murder.

18         The evidence will show you that Alexandra Flores

19    was found dead with a plastic bag over her head with -- her head

20    was burned and her midsection was burned.  And the evidence is

21    going to show you some video from Wal-Mart of somebody in a white

22    cap going in the store and somebody in a white cap going out of

23    the store.  And you're not going to be able to distinguish the

24    features, and nobody is going to be able to tell you that that

25    figure is David Rentería.  You'll hear evidence that somebody

1   other than David Rentería was in control of the van out in the

2   parking lot and had contact with the security guard out there.

3              And in short, David's been found guilty. That's

4   what you've got to work with. He's been declared guilty of

5   capital murder by another Jury. He went -- he was in jail for

6   two years before the trial in which he was found guilty, and he's

7   been in the penitentiary since then on death row. He's been no

8   disciplinary problem to anybody at the county jail, no

9   aggression, no violence, no behavior problems. He has been no

10  disciplinary problem to anybody at the Texas Department of

11  Criminal Justice. At TDC, at death row, no disciplinary

12  problems, no aggressive behavior, no violence of any kind.

13             He has been, even before, before his life started

14  to unwind and even during, he was kind of a caretaker for his

15  family. He was the head man. His parents were older and he had

16  to do for them. At one point in his life when things began to

17  unravel, he and the parents were kicked out of the Tigua

18  reservation. There were a lot of politics going on there, and in

19  addition, there he was, already on probation at that time, and in

20  addition having to attempt to meet his weekly payments he had to

21  pay on probation, to provide for himself, to help -- to try to

22  provide for his parents. His parents ended up without a home and

23  he ended up without a home. Still, he remained constant in

24  trying to help his parents and help them live their lives.

25             He was raising, in essence, as a father his niece.

His sister became pregnant when she was very young, had a baby. That baby stayed home with Santiago Rentería, David's father, and Eva Rentería, and David was a father to that child, and has continued to be.

Even in prison he's continued to provide advice to his family when they have problems, to counsel them, and to be as productive as he can be and as brotherly as he can be to his family while he's in prison. And so you're going to hear that and more about David Rentería so that you know who it is that the prosecutors are going to ask you to put to death. So that you can, before you decide to put him to death, if that's what you ultimately decide, you know who you're going to kill.

But the bottom line is this. What the law provides in Texas is that the punishment for capital murder is life in prison unless the Jury finds, by considering evidence about these two questions, that it's necessary to put him to death, that there's some need, something that says we've got to put him to death. And I submit to you that you're going to hear that David Santiago Rentería is a human being, like all the rest of us, has gone through life, made some horrible mistakes, real bad ones, but that he's not a dangerous, violent, aggressive person. And he's not going to be dangerous under circumstances where -- under the circumstances he's going to be in. There's no way he's going to be dangerous to society anywhere, and you're going to find that his character before the unraveling, and even

1   since then, is that of a human being with saving grace.

2              And so when you hear all the evidence in this

3   case, you're going to know that it's not necessary to kill David

4   Rentería.  Just doesn't need to be done.  You're going to hear

5   evidence that he's going to be locked up for most of the days of

6   the hours in his life in a six-by-ten cell.  You'll hear all of

7   those details about what life in prison is going to be about.

8   And bottom line, there's no need to kill.  Thank you.

9              THE COURT:  Call your first witness.

10             MR. ESPARZA:  Your Honor, the State calls Officer

11  Lloyd Douglas.  Douglas Lloyd, I'm sorry.

12             THE COURT:  Raise your right hand.

13             (The witness was duly sworn by the Court.)

14             THE COURT:  Please be seated.  Speak up loud and

15  clear.

16             Proceed.

17                          **DOUGLAS LLOYD**,

18  having been first duly sworn, testified as follows:

19                     **DIRECT EXAMINATION**

20  BY MR. ESPARZA:

21      Q.   Would you state your name for the record.

22      A.   My name is Douglas Lloyd.

23      Q.   And how are you employed?

24      A.   By the El Paso Police Department.

25      Q.   And what is your job title there with the El Paso

1    Police Department?

2          A.    I'm a latent print examiner.

3          Q.    And how long have you been a latent print examiner?

4          A.    10 years now.

5          Q.    And did you have other duties before that with the El

6    Paso Police Department?

7          A.    I was a police officer for 21 years up until 2006.  I

8    retired and then came back to work for the city.

9          Q.    And your duties as a latent print examiner, what are

10   they?

11         A.    Basically, my duties are to examine all the latent

12   print evidence that comes in from crime scenes.  I evaluate that

13   evidence to make sure that it's of value or no value.  I then

14   enter that information into our AFIS computer, our Automated

15   Fingerprint Identification System, then I look for any comparison

16   matches.  And then at that time I distribute those between Bruce

17   Orndorf and myself.

18         Q.    And what is your training and educational background

19   that allow you to be a latent print examiner for the City of El

20   Paso?

21         A.    I have over 320 hours of training in latent print exam

22   work.  I've been doing it for 10 years.

23         Q.    So on a daily basis you make comparisons of prints?

24         A.    Yes.

25         Q.    Let me show you what's been marked as State's Exhibit

1.   And can you identify it?

     A.   This is a palm print card.   This is what we take inked palm prints on for the department.

     Q.   And did you make these impressions or help assist in making those impressions?

     A.   I did.

     Q.   How do you know that?

     A.   It has my name and ID number and date on them.

     Q.   On what date were the impressions made?

     A.   11/20 of '01.

     Q.   November 20, '01?

     A.   Yes.

     Q.   And who was the person -- do you need the card to tell me who was the person whose prints these belong to?

     A.   No.

     Q.   Who was the person?

     A.   This gentleman right here.

     Q.   What is his name?

     A.   Mr. Rentería.

     Q.   Well, on the card you have his first name, too, do you not?   What is his name?

     A.   David Rentería.

     Q.   And you see him in the courtroom?

     A.   Yes, sir.

     Q.   Could you please just describe a piece of clothing for

1   me for the record?

2       A.    Wearing a blue suit with a white shirt, gray-black tie.

3           MR. ESPARZA:   Your Honor, may the record reflect

4   the witness has identified the Defendant?

5           THE COURT:   It will so reflect.

6       Q.    This is State's Exhibit Number 1, is it not?  This is

7   State's 1 that I just showed you?

8       A.    Yes.

9           THE COURT:   Is the monitor on to your left there?

10  It may be easier to see.  Whichever one is easiest for you.

11      Q.    Do you remember what time it was you took this print?

12      A.    Not specifically.  I know it was in late evening or

13  early afternoon.

14      Q.    Were you still at work when the print was made?

15      A.    I had been called in to work, yes.

16      Q.    They called you in?

17      A.    Yes.

18      Q.    Specifically to do this?

19      A.    To do some comparisons, yes.

20      Q.    And how is it that you came in contact with the

21  Defendant?

22      A.    I don't know if I can say it.  We have his prints on

23  file.

24      Q.    Uh-huh.

25      A.    And during my cursory look at the latent evidence that

1   had come in, I found that the one -- the palm print that we had

2   on file for him was not of very good quality, so I had asked that

3   he be brought in for additional prints.

4       Q.   You probably see it on the monitor, but do you see that

5   circle on the bottom part of what is the right palm?

6       A.   Yes.

7       Q.   Did you make that circle?

8       A.   No, sir.

9       Q.   Prior to taking his palm print, did you get permission

10  to do that?

11      A.   Yes.

12      Q.   Let me show you what's been marked as State's Exhibit

13  1A.  And can you identify it for me, please?

14      A.   This is a waiver that we usually give anybody that's

15  coming in for -- to be fingerprinted or palm printed, and they

16  sign it.

17      Q.   And is it a fair and accurate depiction?

18      A.   Yes.

19          MR. ESPARZA:  Your Honor, at this time I'd offer

20  State's 1A into evidence.

21          MR. GÁNDARA:  No objection.

22          THE COURT:  So admitted.

23      Q.   (BY MR. ESPARZA)  Before I put it on the screen, do you

24  have -- is your signature on State's Exhibit 1A?

25      A.   It is.

```
 1        Q.    Is the Defendant's signature on Exhibit 1A?

 2        A.    Yes.

 3        Q.    And this document is used why?  For what purpose?

 4        A.    Just to take the fingerprints, showing that the --

 5   we're going to use your fingerprints for evaluation and

 6   comparison.

 7        Q.    I'm now showing you the back side of the card.  And

 8   this, the back side of the card, shows what?

 9        A.    This is the left palm, and my name and initials -- or

10   my name and ID number, the date.

11        Q.    Did you take more prints than just the left palm and

12   the right palm?

13        A.    No.

14        Q.    Just those two?

15        A.    Yes.

16              MR. ESPARZA:  I have no further questions, Your

17   Honor.

18              MR. GÁNDARA:  No questions.

19              THE COURT:  You may step down.

20              (Witness leaves the stand.)

21              THE COURT:  Call your next witness.

22              MR. ESPARZA:  My next witness is Officer Tom

23   Monday.

24              THE COURT:  Raise your right hand.

25              (The witness was duly sworn by the Court.)
```

```
 1              THE COURT:  You may be seated.  Speak up loud and
 2   clear.
 3              THE WITNESS:  Yes, ma'am.
 4              THE COURT:  Proceed.
 5                        TOM MONDAY,
 6   having been first duly sworn, testified as follows:
 7                    DIRECT EXAMINATION
 8   BY MR. ESPARZA:
 9        Q.   Sir, would you state your name for the record.
10        A.   Officer Tom Monday.
11        Q.   And how are you employed?
12        A.   As a police officer for the City of El Paso.
13        Q.   And how long have you been with the City of El Paso?
14        A.   19 years.
15              THE COURT:  Excuse me just a minute.  Spell your
16   last name, please, for the record.
17              THE WITNESS:  M-o-n-d-a-y.
18              THE COURT:  Let me ask the lawyers, when you have
19   your witnesses up here, have them spell their last names.
20        Q.   (BY MR. ESPARZA)  What are your duties currently?
21        A.   Currently I'm assigned to the Crime Scene Unit and
22   latent print section.
23        Q.   And on November 19th, November 20th, that week, what
24   were your duties?
25        A.   The same, attached to the Crime Scene Unit, sir.
```

1    Q.   How long have you been with the El Paso Police

2 Department?

3    A.   19 years now.

4    Q.   And what is your training and background that allows

5 you now to work in the department you work in?

6    A.   For the last 15 years I've been assigned to the Crime

7 Scene Unit.  I've gained over 3,000 hours of specialized

8 training.  That training includes everything from forensic

9 photography, latent print development, latent print comparisons,

10 blood spatter analysis, shooting reconstructions, almost anything

11 involved in the forensic side of evidence collection.

12    Q.   I had you come in uniform.  At my request you came in

13 uniform, right?

14    A.   Correct.

15    Q.   That uniform looks different than what I see a patrol

16 officer wearing.

17    A.   Correct.

18    Q.   What does that uniform designate?

19         MR. GÁNDARA:  Objection, Your Honor.  Relevance.

20         MR. ESPARZA:  I'm just placing the witness, Your

21 Honor.  I won't be very long here.

22         THE COURT:  Overruled.

23         THE WITNESS:  As part of my duties it will -- I

24 use a variety of chemicals.  I'm having to do, basically, the

25 grunt work.  If I have to go up on a roof to process a scene,

1    that's where I have to go, so the uniform is a little different

2    because we have a little different scope in the investigation

3    part of it.

4         Q.   (BY MR. ESPARZA)   And on November 19, 2001, what was

5    your assignment?

6         A.   I was told to respond to an alley in the area of Oregon

7    and Mesa, approximately 1900 northward, in reference to a

8    recovered body.

9         Q.   And is that area that you went to, 1200 North Oregon,

10   is that in El Paso County, Texas?

11        A.   Yes, sir, it is.

12        Q.   And if you could, for the Ladies and Gentlemen of the

13   Jury, when you got to 1200 Oregon, could you tell the Ladies and

14   Gentlemen of the Jury what you saw?

15        A.   Well, the body itself was away from plain sight and it

16   was in an alley under a carport.  So I did not observe the body,

17   but I was briefed by the investigators that were already there

18   advising what we already had, what they already knew.  And I did

19   not go in and view that body until they took care of the things

20   that they had to take care of, so it was almost 11 o'clock before

21   I viewed the body for the first time.

22        Q.   How many officers make the criminalistics unit?

23        A.   In total or at the scene?

24        Q.   At the scene.

25        A.   At this scene there were at least five.

1    Q.    Why are there so many?

2    A.    When we go to a major scene, everyone is given a

3    different duty.  You have someone doing photography, someone

4    doing videotape, someone doing evidence collection, someone doing

5    a diagram, and each of them have different duties at a particular

6    scene to do.

7    Q.    At this scene your duties are to do what?

8    A.    I'd been requested to search for and recover any

9    possible latent prints on or about this body.

10   Q.    Why is it that you wait so long to view the body?

11    A.    Because the other team members had not effected their

12   part of the investigation.  Videotape and the photographs were

13   not complete yet.  That all had to be done before we did any

14   movement or did anything with the evidence or the body.

15   Q.    At the crime scene is the crime scene divided up?  Are

16   there divisions, different zones in the crime scene?

17   A.    Yes, sir.

18   Q.    Could you tell the Ladies and Gentlemen of the Jury

19   what are the different zones at a crime scene?

20   A.    Sure.  The interior, the most -- the closest to the

21   body would be the red zone, and the only persons allowed in the

22   red zone are the investigators who are actually doing their

23   function, doing their part of it.  We don't go into the red zone,

24   basically, until it's my turn to do my job.  That's when I enter

25   the red zone.

You have a yellow zone outside of that where the command post, for example, would be. The investigators would gather, share information.

Then, of course, the green zone.

Outside the green zone, the public and/or the media.

Q. Why is the area so restricted?

A. To protect the evidence.

Q. That's what you do, you collect evidence?

A. Yes, sir.

Q. In this case you were collecting fingerprint evidence?

A. That's what I was asked to look for, yes.

Q. I'm now going to show you State's 3 and 4. Can you see State's 3 and 4?

A. Yes, sir.

Q. Are they fair and accurate depictions of what they're supposed to represent?

A. Yes, sir, they are.

Q. About what time was it when you were able to step into the red zone?

A. Approximately 11 o'clock that morning.

Q. When you step into the red zone, how close -- well, what do you see? Why don't you tell us what you saw?

A. I got into the red zone. What I observed is the body, but it's covered with a sheet at this time. Obviously EMS had

1   covered the body with a sheet.  There were -- the reason for

2   that, there were apartments close by where people could have been

3   looking out their windows and viewing, not even going outside,

4   but just simply looking out their windows, so they had covered

5   the body with a sheet, and that's the first thing I saw.

6               There's no other cars in this particular carport.

7   There was a very strong odor of gasoline in the air.  And that

8   was my first observation, was the sheet.

9        Q.   Where was the body?

10       A.   Under the carport closer to the corner -- closer to

11  the -- would have been the northwest corner of the carport.

12       Q.   How long did you stay in the red zone?

13       A.   We stayed in that red zone probably hour, hour and a

14  half, approximately.

15       Q.   And you stayed in the red zone for that length of time

16  to do what?

17       A.   Basically they were -- the only evidence I really had

18  was the body itself.  She was -- once I viewed the body, I

19  noticed she was completely void of any clothing.  The only thing

20  on the body was a plastic bag over the head, which was melted or

21  charred to her face.  So since I'm the only one in the unit at

22  the time that had any specialized training in recovering prints

23  from skin, from human skin, that's why I was asked to do that --

24  this particular -- on this particular case.

25               There were things that needed to be considered to

1   protect any potential evidence on her skin, and those things we

2   went through one at a time.  I made requests -- I even asked for

3   an arson investigator to help us so we could collect potential

4   gasoline or arson evidence in the way it needed to be collected.

5   And I instructed the body transporters on how to move the body,

6   how to cover the body, if you will, so that not to create any

7   damage to any potential prints.

8       Q.   At one point you had -- did you remove the sheet

9   from -- that was covering the body?

10      A.   We -- yes, we did.  That original sheet that was on was

11  collected as arson evidence and tagged accordingly.

12      Q.   Let me show you State's Exhibit 4.  And tell me if this

13  is what her head and the upper part of her body looked like.

14      A.   Yes, sir, it is.

15      Q.   I'm not going to show you a picture of the lower half

16  of her body at the moment, but when you viewed the body like

17  this, at any time did you touch the body?

18      A.   Eventually, yes, I did.

19      Q.   When was that?

20      A.   The first time I'm touching it was I placed paper bags

21  over her hands to protect any evidence that she may have under

22  her fingernails and in her hands.

23      Q.   All right.  And the next time you touched the body?

24      A.   The next time I touched the body was we rolled her over

25  slightly to collect samples of the asphalt and/or gasoline that's

1    underneath her back.

2        Q.    At any time, including the -- what you see here or the

3    lower half of her body, did you at any time at that point in the

4    red zone examine the body for prints?

5        A.    No.

6        Q.    And why?  If your job was to look for prints, why would

7    you not do it there at that time?

8        A.    To develop prints on skin, there's a particular process

9    that has to be done to give you the best possible result, and

10   that could not be accomplished in, one, in these weather

11   conditions.  It was windy.  It was very cold.

12                   And, two, there was a process that needed to be

13   done, that we needed to do indoors, and at proper temperatures.

14       Q.    Now, the print that you're looking for, what do you

15   call that print?

16       A.    Latent print.

17       Q.    Why is it called a latent print?

18       A.    Because it's unseen at this point.  No one knows where

19   it is.

20       Q.    How is it that somebody like you is able to see a print

21   that cannot be seen?

22       A.    I don't particularly see the print.  I have to go

23   through the process, every step of the process, for the entire

24   body and the bag that's on the head, and it's not seen until one

25   is developed, if it is developed.

1    Q.    After the arson investigators did their -- whatever

2  they had to do to collect their evidence, what did you do?

3    A.    Then I talked with the medical examiner and body

4  transporters that were there, gave them specific directions on

5  how I wanted the body transported.  The main reason being the

6  typical protocols, their standard operating procedure is to place

7  the body inside a homicide bag, which is a plastic bag.  I know

8  that that plastic bag, in conjunction with the temperatures out

9  there, could cause condensation, and that moisture and

10  condensation would be detrimental to any prints that may be on

11  the skin.  So I asked them to transport her in a particular way.

12    Q.    Okay.  And what way did you ask them to transfer her?

13    A.    As opposed to put her in a plastic bag, I asked that we

14  simply put a sheet on the gurney, place her on the sheet, and

15  place another sheet on top of her.  And when they got to the

16  morgue, I asked them not to put her in the cooler, to keep her

17  out in a viewing room so that her skin temperature could warm up

18  to where I needed it to be.

19    Q.    Did you eventually go to the morgue?

20    A.    Yes, sir, I did.

21    Q.    And what time did you get there?

22    A.    Approximately 1:00 p.m.

23    Q.    And are you working by yourself or with anyone else?

24    A.    No.  There's other people working on -- Officer Vico

25  Granillo is present, as is Officer Jiménez, who was the evidence

1    custodian for this particular case.

2        Q.    Prior to the time that the body is transferred, when

3    you touched the body, do you do anything for protection, to

4    protect yourself or the scene?

5        A.    Everyone there is wearing gloves.  I asked the body

6    transporters -- two of the biggest places to look for prints on

7    skin, of course, would be the wrist, if someone was dragging a

8    body, and/or the ankles, if someone was dragging by the ankles.

9    So I asked that they not pick up the body from those particular

10   points, but rather, underneath the shoulders and from underneath

11   the knees, but everybody who handled it was wearing gloves at all

12   times.

13       Q.    Just so we're clear, normally they would have picked up

14   the body from the ankles?

15       A.    I'm not saying they would have picked it up that way,

16   but I instructed them not, just in case they did.  I did not want

17   them to pick it up from the ankles or from the wrists.

18       Q.    And did you see them comply to your instructions?

19       A.    Yes.  Yes.

20       Q.    Did you, from -- after you left the red zone, did you

21   immediately go to the medical examiner's office?

22       A.    No, sir.

23       Q.    Where did you go?

24       A.    I went back to my office to gather some equipment that

25   I knew I would need for the process.

1    Q.   Is it -- could you tell the Ladies and Gentlemen of the

2    Jury how difficult it is to collect just the print in general,

3    not from skin, just in general?

4    A.   Well, the most difficulty is, like we said before, it's

5    a latent print.  It's one we can't see.  No one knows where it

6    is, so basically I'm having to do a blind search for any latent

7    prints.  Now, we always search smart.  For example, a burglary,

8    we're searching the point of entry, point of exit, things that

9    the subject obviously handled.  But there are multitude of places

10   that you can look for latent prints.  This is a matter of

11   searching that is rather meticulous, depending on the size or

12   circumstances involved in the case.

13   Q.   Well, what is the likelihood that if you touch

14   something, that you'll leave a print?

15   A.   The likelihood is very good.  However, you have to

16   have -- just touching something doesn't necessarily leave a

17   print.  You have to have some type of fingerprint residue on your

18   fingers in order to leave that impression.

19   Q.   What is that, that print residue?

20   A.   Fingerprint residue is -- well, it's 98.5 percent

21   water, which is sweat that comes through your pores, and the

22   other parts of it are amino acids, lipid salts, and fatty oils.

23   All of those things make up fingerprint residue.  And I have

24   specific powders and/or chemicals that will target not -- each

25   individual part of that residue.

1    Q.    And can you tell the Ladies and Gentlemen of the Jury

2  how fragile a fingerprint is as it sits in an area?

3    A.    It's fragile in the sense that if you wipe over it,

4  it's gone.  If -- any movement across it, any contamination of it

5  could destroy it.  If it's left alone and untouched, it could

6  stay for years, literally, but if it's damaged in any way,

7  handled over or smeared through, then it would be gone.

8    Q.    Will any surface hold a print?

9    A.    Not necessarily, no, sir.

10    Q.    What are the dynamics?  What type of surface do you

11  need in order to hold a print?

12    A.    Well, the best surface is always a nonporous surface;

13  talking about glass, metals, most plastics, things like that.

14  Clean, nonporous surfaces are the best surfaces for a print.

15  Now, we can get prints off porous surfaces such as paper, wood,

16  things like that, where the fingerprint residue actually leaches

17  into that surface, and we use chemicals to bring the residue back

18  out and stain, so those things could stay for years.  But the

19  best surface, the surface we use black powders on that you see

20  everyone using black powder is non- -- clean, nonporous surfaces.

21    Q.    State's Exhibit 3.  What is that a photograph of?

22    A.    This is the little girl's face, but you can see a

23  little more clearly the plastic bag that's over her head and

24  around her face.  You can see that it's melted, actually, around

25  her cheeks and her chin.

1     Q.   And what are these bag things on both corners?

2     A.   Those are the paper bags that I placed at the scene

3 over her hands to protect any evidence that may be there.

4     Q.   When this photograph is taken, do you know where the

5 body is located?  Can you tell?

6     A.   Oh, where this photograph was taken?

7     Q.   Uh-huh.

8     A.   It's at the morgue, sir.

9     Q.   At the medical examiner's office?

10     A.   Yes.

11     Q.   When you got to the medical examiner's office, did you

12 speak with the medical examiner?

13     A.   Yes, sir.

14     Q.   And who is the medical examiner?

15     A.   For this particular case it was Dr. Contín.

16     Q.   And what was the purpose of speaking with the medical

17 examiner?

18     A.   The purpose of it, there were things that I needed to

19 do to try to get prints, try to get evidence off of it.  In the

20 State of Texas the body basically belongs to the medical examiner

21 so I have to get his permission to do anything that I want to do

22 to that body.

23     Q.   And did you make the request of the medical examiner?

24     A.   Yes, sir, I did.  I told him exactly what I wanted to

25 do and he agreed.

1    Q.   Okay.  Would you tell us, please, what request did you

2  make of the medical examiner?

3    A.   I explained to the medical examiner that I would be

4  doing a chemical process to try to help recover latent prints

5  from the skin parts of her body.  I told him what chemicals I

6  would be using, what those chemicals would do, and he had no

7  problem with me doing those.

8    Q.   As a result of your request, where was the body of --

9  where was this body placed?

10    A.   In the viewing area.  In the back room of the medical

11  examiner's office, but it was not in the cooler.

12    Q.   Why did you -- why was she back there and not in the

13  cooler?

14    A.   Again, I needed the skin to get up to a particular

15  temperature.  It was very cold that morning.  I needed her skin

16  to be between 70 and 72 degrees to make the process of the

17  skin -- for skin prints -- to give me the best optimal situation

18  for getting prints off her skin.

19    Q.   How long did you wait for the temperature -- for her

20  body temperature to rise?

21    A.   Well, I had not gotten there till almost 1 o'clock, and

22  it was probably another hour before we began doing anything

23  chemically to the body.

24    Q.   About how long did the body sit there at the medical

25  examiner's office warming up?

1    A.    Four or five hours.

2    Q.    And how is it that you determined that the body

3    temperature has reached an appropriate temperature?

4    A.    I use an adhesive thermostat to place on her skin and

5    to take a gauge of how the temperature of her skin is.

6    Q.    It's not a thermometer?

7    A.    No.

8    Q.    Could you tell the Ladies and Gentlemen of the Jury how

9    that works?

10   A.    Basically, a thermometer would be telling the inner --

11   her inside temperature.  I'm looking for the surface temperature.

12   So it basically -- what I'm using is simply the same type of

13   thermostat you would use on an aquarium.  It's adhesive.  You

14   stick it to the glass to get the temperature of the water.  It's

15   just a gauge to give me a good idea of when the skin is at

16   optimal temperature.

17   Q.    About what time did the body reach the temperature

18   required?

19   A.    It was closer to 2:00, 2:30.

20   Q.    This -- at what point, when you are working with the

21   body -- at one point -- I mean, you can naturally assume that at

22   one point that person was living and had a surface temperature of

23   something, whatever that is, right?

24   A.    Yes.

25   Q.    Then the body was out where you found it?

1    A.    Yes, sir.

2    Q.    For however long it was out there, so the body

3  temperature has dropped, right?

4    A.    Considerably, yes.

5    Q.    Then you move the body to the medical examiner's office

6  and you allow the body to now increase in temperature?

7    A.    Correct.

8    Q.    Well, just those fluctuations in temperature, is that

9  enough to have a piece of evidence like a fingerprint, because

10  they're so fragile, isn't that enough to destroy a print?

11              MR. GÁNDARA:   Objection.   Leading.

12              THE COURT:   Sustained.

13    Q.    (BY MR. ESPARZA)   With the circumstances that I

14  described to you, could you tell me what could happen to a

15  fingerprint?

16    A.    Under those circumstances and the conditions we had,

17  those things did not cause any condensation to the skin.   The

18  room we had -- we kept her out of the cooler.   We put her in a

19  room that was not hot by any means.   But it was normal

20  temperature, about like this room here.   But it wasn't causing

21  any condensation that would destroy the prints.   So those

22  conditions that we set forth were not -- the least detrimental of

23  any conditions possible.

24    Q.    At what point did you remove the brown bags from her

25  hands?

1    A.   That would have been removed during the process to --

2  when we started the process of trying to develop latent prints,

3  we removed those bags.  They're collected as evidence.  If

4  anything fell off inside the bags, the bags themselves are

5  collected as evidence.  So that would have been 2:00, 2:30.

6    Q.   How difficult is it to retrieve a print from skin from

7  a human person?

8    A.   It is possible to do, not real probable.  And I say

9  possible because even the courses I take, they take us several

10  steps for the process.  But it's also known by the time we leave

11  there, that class, that instruction, that -- at that time -- I

12  took the course in 1998 -- it had only been done successfully 20

13  times in the world.

14    Q.   A print from skin?

15    A.   A print from skin.

16    Q.   So what you tell us now, what procedure did you use to

17  attempt to locate any prints on the body?

18    A.   The procedure I used was to expose her skin to

19  cyanoacrylate; cyanoacrylate being the chemical name for

20  superglue.  So basically we built a -- erected a plastic tent

21  over the -- right on the gurney where she was, over the gurney,

22  put the superglue on a heater, and heated the superglue so --

23  until it began to fume.  Those fumes are made -- designed to

24  adhere to any sweats or fatty oils that may be present on the

25  surface that we're processing.

1    Q.   So you have her body on a gurney?

2    A.   Yes, sir.

3    Q.   And then you put plastic over her?

4    A.   Yes, sir.

5    Q.   What kind of plastic?  Can you see through it?

6    A.   Yeah, it's a see-through plastic.  It's very loose.

7 It's not draped to her body.  It's built up.  We have things to

8 hold the -- the plastic does not touch the skin at all.  It's

9 just something to contain the fumes.

10   Q.   And then you have -- is it more than one burner to

11 create the fumes?

12   A.   No.  For this particular we only used one burner.

13   Q.   Where did you place the burner inside the tent?

14   A.   Inside the tent, best I recall, it was in between her

15 legs, so that it was not touching her skin in any way.

16   Q.   And how do you -- could you tell us the procedure you

17 used in order to get the cyanoacrylate to fume?

18   A.   Yes.  The burner is turned up about four, five hundred

19 degrees, and a small amount of superglue was placed inside a tin

20 weight boat, and that weight boat is put on the burner at those

21 temperatures.  It only takes a few seconds for the glue to begin

22 to fume, and we let it fume for anywhere from two to three

23 minutes.

24   Q.   How do you know how long to let it fume?

25   A.   In most nonporous surfaces like glass or plastic -- I'm

1   sorry -- glass or metals, and sometimes plastic, you can see the

2   glue beginning to take form on a print as you're watching it.  On

3   skin you really -- you can't see that.  You can't see that, so I

4   let it go two and a half, three minutes, just to be on the safe

5   side.  And that was -- for this particular process, that was a

6   little long.

7       Q.   Is it possible through using the cyanoacrylate fuming

8   process that somehow you've altered or damaged or even make it

9   not possible to view a print?

10      A.   You could leave it on too long and overdo it, and

11  eventually the superglue is going to -- it's starting to adhere

12  to everything inside, inside the tent or inside the chamber,

13  okay.  If you leave it excessively, too long, it could go too

14  far.

15      Q.   Why do you use the cyanoacrylate versus some other

16  chemical?

17      A.   The cyanoacrylate gives us the basis.  It will

18  polymerize the prints to the surface that we're doing, and it

19  allows us a multitude of methods after that's done.  If we don't

20  use the superglue first, we're limited to one thing or the other,

21  and that's it.  For example, a latent print, if I go and use

22  black powder on a latent print off of a piece of glass, black

23  powder, that's fine, I lift it.  Well, now that print is gone

24  because it's on my tape.  Where if I superglue it first and then

25  put the black powder on, the superglue, I can lift it and lift it

1    and lift it as many times as I want to.  Or, if I'm not

2    satisfied, I can still go on to other chemical means to try to

3    develop it as long as I superglued it first.

4         Q.   After the body had undergone the cyanoacrylate fuming

5    process, what did you do?

6         A.   Then we took down the tent, we removed the heater, and

7    I began searching the body from head to toe with a specialized

8    powder that is specifically designed for skin prints.

9         Q.   Would the body be discolored if you do that?

10        A.   Not on the skin, no.

11        Q.   And did you know where you started on this person?

12        A.   Best I recall, I started at the shoulders area.

13   Obviously, the face was too badly damaged to see anything like

14   that, plus it's covered with a bag.  I started at the shoulders

15   and worked my way down both sides.

16        Q.   Could you just tell -- I'm sure most of us have not

17   done that.  What is the procedure?  How much powder?  What do you

18   do?

19        A.   The particular powder I was using was magnetic powder,

20   so I'm using a magnetic wand.  It's just a small amount of powder

21   that sticks to the wand and as I go over it, I'm watching very

22   carefully to see if it's developing any -- any prints on the

23   skin.

24        Q.   So you dust the body first?

25        A.   Yes, after the superglue, then it's dusted first.

1    Q.   With that magnetic powder?

2    A.   Yes.

3    Q.   What kind of tools are you using to illuminate the area

4  that you're examining?

5    A.   The only thing we had was normal room lighting plus

6  flashlights.  I'm using a flashlight in the other hand as I go.

7    Q.   Is there any magnification?

8    A.   No, sir.

9    Q.   No magnifying glass, nothing like that?

10   A.   No, sir.  The only reason I would have used a magnifier

11  is if I had actually come across something that I needed to see a

12  little closer, but in this case, no.

13   Q.   So you're going to be able to see the print with the

14  naked eye?

15   A.   Yes, sir.

16   Q.   Did you examine the entire body?

17   A.   Yes, sir, I did.

18   Q.   And were you able to see any prints on her skin?

19   A.   On her skin, no, sir.

20   Q.   Were you -- at any time were you able to find a print

21  or prints?

22   A.   Yes, sir, I was.

23   Q.   And where did you find the print?

24   A.   During this process I observed a potential print being

25  developed on the plastic bag that was on her head.  That bag was

1   on her head when we did the superglue process.  It was within the

2   tank when we fumed the body.  And that's where the print was

3   being developed, was on the bag itself.

4        Q.    I guess you found that print after you examined the

5   skin?

6        A.    During that time, yes, sir.

7        Q.    Are you being assisted by anyone as you examine the

8   body?

9        A.    Officers Granillo and Jiménez are right there with me,

10  yes, sir.

11       Q.    Who's actually searching for the print?

12       A.    I am.

13       Q.    Only you?

14       A.    Yes.

15       Q.    How long does it take you to go over the body, head to

16  toe?

17       A.    Another 30 minutes.

18       Q.    Once you find the print, do you look for others, or was

19  that the only one you found?

20       A.    The one on the bag was barely visible.  The condition

21  of the bag was very poor.  It was wrinkled, it was melted in some

22  parts, so we didn't move the bag.  I just knew I'd seen areas

23  where I thought a potential print was being developed and I just

24  kept my eye on it, but I didn't move the bag at that time because

25  we're not in the autopsy room yet.  We're still in the viewing

1  room, and Dr. Contín is not even present yet.

2      Q.   What do you do after the fuming process has been

3  completed and you have -- and you believe you have a print?  What

4  do you do then?

5      A.   Once we're done, we advise Dr. Contín.  He moves the

6  body into the autopsy room at that point.  We point out to him

7  the potential latent print on the plastic bag, and myself and

8  Officer Granillo carefully remove that bag from her head.

9      Q.   I'm going to show you State's Exhibit 3 again.

10          MR. ESPARZA:  Could I have just a moment, Your

11  Honor?  I just misplaced something.

12          THE COURT:  Yes.

13          MR. ESPARZA:  I found it.

14      Q.   I know you can see State's 3 -- I'm sorry -- State's 4

15  from the monitor, but could you indicate to the Jury the plastic

16  bag that we're talking about?

17      A.   Yes, sir.  The plastic bag, you can see it well in this

18  area, but also, it continues down the side of her face on both

19  sides.  On these sides it's actually melted to her skin, around

20  her hair here.  But this part up here is, if you will, untouched

21  by the fire.

22      Q.   When State's 4 -- when that photograph is taken, could

23  you tell us, was that before or after the fuming process?

24      A.   Best of my recollection this is before the fuming

25  process because we had not removed the bags yet.

1      Q.   And where was it that you saw what you believe could be

2   a print?

3      A.   In this area of the bag right at the top, at the crown

4   of her head.

5      Q.   And from the time that you see it, are you able to

6   determine whether or not you believe it is a fingerprint or a

7   palm print or do you know?

8      A.   My first and gut reaction was that it was a palm print

9   based on my experience in the overall size of the print I was

10  seeing, and the ridge detail.

11           THE COURT:  For the record, Counsel, you have

12  State's Exhibit 3 up on the monitor?

13           MR. ESPARZA:  That is correct, Your Honor.

14           THE COURT:  Does the Jury need a short break?

15  It's dark in here.  Raise your hand if you need one.

16           MR. ESPARZA:  Could they turn the lights back on,

17  Your Honor, please.

18      Q.   Let me show you what's been marked as State's Exhibit

19  2A.  Are you familiar with 2A?

20      A.   Yes, sir, I am.

21      Q.   And how are you familiar with 2A?

22      A.   It bears my initials, my ID number, the case number,

23  and it even states what's inside this particular box.

24      Q.   And what is inside State's 2A?

25      A.   The plastic bag that we removed from the girl's head.

1    Q.   Would you take the contents of 2A out.

2    A.   (Witness complies.)

3    Q.   2A.   The contents of 2A is the plastic bag that we see

4   on State's Exhibit 3?

5    A.   That's correct.

6              MR. ESPARZA:   Your Honor, just for the record, I'm

7   not offering these items into evidence because they had been

8   previously admitted, all the items that I'm not offering.

9              THE COURT:   Counsel, approach.

10             (At the bench, on the record.)

11             THE COURT:   I don't know how you all want to

12  work it's already been admitted or not.   I don't know how you all

13  want to do this.   I mean, they have been admitted before.   I'm

14  looking at my notes from the last one.   I don't know if you want

15  to admit them or just show them or just say it's admitted into

16  evidence.

17             MR. GÁNDARA:   My view of it is that the Jury --

18  this Jury should not be given evidence that was admitted in the

19  first trial without readmitting it this time because they don't

20  have any frame of reference for it.   They haven't heard the

21  foundation, they haven't heard the relevance, and so whatever you

22  consider has got to be admitted, and only what they got to see in

23  this trial is what's admitted.   That's my opinion.

24             MS. PAYÁN:   For example, if there's something that

25  we don't want this time that got them there the first time, an

1  official request for the evidence, they'll end up with stuff that

2  we didn't go through this time.  Just a simple motion, Your

3  Honor, to keep track.

4              MR. GÁNDARA:  It's a new trial on punishment.

5  It's not on guilt-innocence.

6              MS. MERAZ:  It's admitted.

7              THE COURT:  Everything that was admitted in the

8  last trial is admitted in this one because that conviction has

9  not been vacated.  However, I think that it is wisest for the

10  Defense, as well as for the State, to offer it in this one.  And

11  I understand that there were objections made on both sides of

12  evidence prior to, and you know, the evidence that was in the

13  first trial is coming in in this one one way or the other.  And I

14  just don't know how you all want to handle it.

15              (Open court, Jury hearing.)

16              THE COURT:  Let's let the Jury take a break

17  because we're having trouble with the microphone here.

18              (Jury exits courtroom at 10:45 a.m.)

19              MR. GÁNDARA:  For purposes of this situation, it's

20  all right for him to go back to the back for the moment.  We can

21  do this without him.  He needs a break.

22              THE COURT:  You all may be seated.

23              All right.  Well, we all need a break, too.  He

24  can wait till we finish this up.

25              All right.  Now, we're talking about the admission

1   of the evidence.  I have a list from the last trial of everything

2   that was admitted into evidence, some over objections, some

3   without objection.  And this case has been tried and the

4   conviction has been upheld.  It has not been reversed.  So all of

5   the evidence that was admitted in that first trial in the

6   guilt-innocence phase, whether it's for the State or for the

7   Defense, is coming in in this case.

8           MS. HUGHES:  Your Honor, in order to accommodate

9   what I think the Court is requesting, which I think is a very

10  good idea, if we could itemize with the Court to make sure that

11  our list is correct of what was admitted during the guilt phase

12  of trial in the first trial, and then reoffer that in front of

13  the Jury, itemizing all of those so that it's clear that all of

14  those exhibits are in evidence and up for consideration for this

15  Jury.  Would that be an acceptable way to approach?

16          MS. PAYÁN:  I think we can save time.  I have the

17  list from Lisa from the clerk's office.

18          THE COURT:  Okay.  Well, I have the original list

19  that I made.  I think it's probably best if we do that.  We do

20  State, we do Defense.  If you want to stand up and say, "Whatever

21  objections we had before, we'd like to lodge again," and I'll

22  say, "Fine, whatever rulings I made before stand now," and that

23  way there's something in the record if you think that you're

24  trying to keep an objection on the first trial alive on this

25  second trial.

1        MR. GÁNDARA:  Your Honor, additionally, I would
2  object to giving this Jury any piece of evidence that hasn't been
3  proved up and been the basis of a laying of a foundation at this
4  trial because they're going to go back there with a box of
5  evidence that they don't hook up to a witness or to any point or
6  to any relevant matter.
7        THE COURT:  Then whoever does that will have their
8  case weakened by doing that, whether it be you or whether it be
9  the State.
10        MS. HUGHES:  Yes, ma'am.
11        THE COURT:  However, I think that this Jury needs
12  to understand what evidence they possibly may have to take back
13  with them to the jury room in their deliberations.
14        MS. HUGHES:  Yes, ma'am.  May I review my list
15  with the Court to make sure that our list is accurate?
16        THE COURT:  All right.  Let's take a break.  We'll
17  come back in.
18             You can take him for his break.
19             (Recess from 10:46 a.m. to 11:00 a.m.)
20             (After recess, Defendant and Jury present.)
21        THE COURT:  You may continue.
22        MR. ESPARZA:  Your Honor, at this time I'd offer
23  State's Exhibit 2A and its contents into evidence.  I believe
24  they've seen them.
25        MR. GÁNDARA:  No objection.

1          THE COURT:  So admitted.

2      Q.   (BY MR. ESPARZA)  I'm now handing you what I just

3   removed from exhibit -- from State's Exhibit 2A.  Can you tell

4   me, what are you holding?

5      A.   This is the plastic bag that was over the girl's head.

6      Q.   Without showing you the photo, State's Exhibits 3 or 4,

7   the bag that -- the item you're holding there looks somewhat

8   different than what we see in the photographs.

9      A.   Yes, sir.

10     Q.   Why is that?

11     A.   The difference is the chemical processing that I put

12  this particular bag through.

13     Q.   What was the condition of the contents of State's

14  Exhibit 2A before you started treating it?

15     A.   The outside edges are as they were then, burned and

16  charred.  These are the parts that were melted to her face.  The

17  part here inside the hoop was the clear part that you saw when it

18  was still on her face.  This is darker now because of the

19  chemicals that I applied in order to enhance that print, or bring

20  out that print.

21     Q.   When you look at -- well, it's also on some sort of

22  embroidery hoop?

23     A.   Correct.

24     Q.   Who did that and when was that done?

25     A.   I did.  Closer to the ending stages, once I knew

1    exactly the part of the bag that that print was going to be on, I

2    wanted to isolate it for direct processing, plus I wanted to keep

3    the wrinkles out of it because the wrinkles would obviously be

4    detrimental to my examiner's process of looking at the print, so

5    I placed it on this embroidery hoop in November of 2001 and it's

6    still on that hoop today.

7        Q.   And when you look at the contents of State's Exhibit

8    2A, can you, with your -- with the naked eye, can you see the

9    print?

10        A.   Yes, sir.  It's still there, approximately in this area

11    right here.

12            MR. ESPARZA:  Your Honor, could I have the witness

13    step down so he could publish it to the Jury?

14            THE COURT:  Yes.  You may step down.

15            MR. ESPARZA:  Just stand here.

16            I'm sorry, I didn't mean to talk so low.

17        Q.   If you would stand here.  We're going to go from right

18    to left, but if you would, without touching the bag, would you

19    point so that they could see where you believe the print is

20    located?

21        A.   Yes, sir.  The print that is seen is in the approximate

22    center of the hoop right here.  If you look closely, or put a

23    white background behind it, you can see it better, or with

24    magnification.

25        Q.   Would that help?

1    A.    Yes, sir.  But the ridges themselves are on the bag in

2    the approximate center of that hoop.  It's there.  Right there.

3              THE COURT:  Show it to the Defense attorney,

4    please.

5              MR. ESPARZA:  Certainly.

6              THE WITNESS:  (Witness complies.)

7    Q.    I'm now going to show you State's Exhibit Number 5.

8    And can you identify State's Exhibit Number 5?

9    A.    Yes, sir, I can.

10   .Q.    Does it fairly and accurately depict what it's supposed

11   to represent?

12   A.    Yes, sir.

13             MR. ESPARZA:  Your Honor, after showing to Defense

14   Counsel, I offer State's 5 into evidence.

15             MR. GÁNDARA:  No objection.

16             THE COURT:  So admitted.

17   Q.    (BY MR. ESPARZA)  What is State's 5, Officer?

18   A.    State's 5 is a photograph in the beginning stages, one

19   of the first photographs I did of the bag after we realized there

20   was a print present on it.

21   Q.    Did I leave you with the little laser?

22   A.    Yes, sir.

23   Q.    Can you show me where the print is located?

24   A.    Yes, sir.  You can see the ridges of the print

25   beginning to form in this area here.  At this stage, only thing

1  that's been done to the bag now is superglue, so the ridges are

2  white.

3       Q.   Now, I assume we're talking this area here where my

4  left hand is?

5       A.   Yes, sir.

6       Q.   And there are little rows, lines, it looks like?  I

7  guess you call them ridges?

8       A.   Yes, sir.

9       Q.   When you go -- when you do the fuming process, will the

10 fuming process change the print?  In other words, will it move a

11 line?  Will it look different to me?

12      A.   No, it does not alter the print.

13      Q.   How can the fuming process hurt the print?

14      A.   If you go too far, the -- and again, it's important to

15 understand that here all we've done is superglue, so the ridges

16 are white.  The superglue has adhered to the fatty oils or sweat

17 that's present on the bag, and they're white.  The furrows, or in

18 between each ridge, you'll notice it's still black.  If you

19 continue to go too far with the superglue process, you'll begin

20 to fill in these furrows and before you know it, the whole thing

21 is white.  And you won't be able to distinguish ridges from

22 furrows.

23      Q.   Now, State's Exhibit 5, what is the difference between

24 State's 5 and the contents of State's Exhibit 2A that I showed

25 you?

1    A.   One thing in this process, I have not put the

2  embroidery hoop on it, so that's why it's all -- it's still

3  wrinkled, like it is.  And this is the very first process that I

4  put it through, the superglue.  Nothing else has been done to it

5  at this point.  In the other -- on the bag itself several

6  processes have already been done to it.

7    Q.   Now I'm going to show you what's been marked as State's

8  Exhibit 2B.  And can you identify it?

9    A.   Yes, sir, I can.

10   Q.   And is it a fair and accurate depiction of what it's

11 supposed to represent?

12   A.   Yes, sir.

13            MR. ESPARZA:  Your Honor, at this time I'd offer

14 Exhibit 2B into evidence after showing to Defense Counsel.

15            MR. GÁNDARA:  No objection.

16            THE COURT:  So admitted.

17   Q.   (BY MR. ESPARZA)  Let me show you what I've marked as

18 State's Exhibit 2B.  Do you see it?

19   A.   Yes, sir, I do.

20   Q.   And what is 2B?

21   A.   2B is the same bag.  It's now been through the

22 superglue and other processes and it's also attached to the

23 embroidery hoop at this time.

24   Q.   The contents of 2A that you just showed the Jury, is

25 that what we're looking at here?

1     A.    Yes, sir, it is.

2     Q.    Exactly like it is?

3     A.    Exactly like it is.

4     Q.    Why do we have this FBI marking right there?

5     A.    We had taken this particular piece of evidence to the

6  FBI for additional examination.

7     Q.    And when was that done?

8     A.    In December of 2001.

9     Q.    And just so I'm clear, if you fume -- if the fuming

10 process, if you overdo it, then that superglue is going to fill

11 in the areas between the lines, right?

12    A.    Correct.

13    Q.    So then you just get a smooth surface?

14    A.    Basically, yes, sir.

15    Q.    When you got -- when you looked at State's Exhibit 2,

16 the contents of 2A, this bag here, when you had State's 5 --

17 well, first, let me ask you, where was this photograph?

18    A.    In my office in the photo lab.

19    Q.    And why did you photograph it?  Why do we have State's

20 Exhibit 5?

21    A.    Because I want to photograph it in between each stage.

22 I knew I was going to continue to another stage processing.  But

23 in case we did go too far or in case that bag deteriorated to the

24 point where it began to tear or destroy itself, I wanted each

25 stage photographed.

1     Q.   Well, let me show you what comes from State's Exhibit

2   2A, the contents of 2A.  And why can't a comparison be made with

3   prints just off of that embroidery hoop?  Why can't you just do

4   that?  I mean, why photograph it?

5     A.   Because you want to record those stages of the print,

6   okay.  One photograph may be better than the next.  One set of

7   photographs, one process, may improve the quality of this print a

8   little more.  And it may be there's a possibility that it's

9   detrimental to it, so you've got to record each stage of it.  The

10  other stage is this bag is so fragile I didn't want anyone

11  putting magnifiers or any undue handling to this particular bag.

12    Q.   And is it acceptable to make comparisons using a

13  photograph?

14    A.   Absolutely.

15    Q.   You take State's Exhibit 5, you put it in that

16  embroidery hoop.  Did you -- was it automatically tagged with

17  that FBI tag?

18    A.   No, that was done much later.

19    Q.   So it doesn't have the FBI tag?

20    A.   No, sir.

21    Q.   All right.  The first thing -- tell the Ladies and

22  Gentlemen of the Jury what did you do once you put it in the

23  embroidery hoop?

24    A.   Once we did it in the embroidery hoop, I had shown it

25  to my latent examiner.  He asked if we could continue the

1  processing more and I did.  The first thing I did was put it in

2  another superglue tank, a controlled tank in the lab, and

3  superglued it an additional time, for about 20 seconds.  Then we

4  went back and I tried fluorescent dye stains so that I could

5  fluoresce the superglue and the dye stains and photograph it that

6  way.  That did not help.  I went back and I tried black powders.

7      Q.  What does that mean, try black powders?

8      A.  Much like I did the surface of her skin, I went over

9  the superglue areas with black powder and tried to make a lift of

10  it so I could give him a lift of the print.  And that was not

11  successful.  And that's why the photography was so critical,

12  because it was the only way we were recording a quality image

13  that he could use for comparison.

14      Q.  So every step of the way you try something, then you

15  photograph it?

16      A.  Yes, sir.

17      Q.  All of those different processes, can you tell us

18  whether or not all those different processes altered the print in

19  any way?

20      A.  Alter it, no, sir.

21      Q.  Why not?  I mean, I thought you just testified earlier

22  that a print is fragile?

23      A.  It is fragile.

24      Q.  Now, you put all sorts of things, without repeating

25  them, you've done all sorts of things to this print.  Why isn't

1    it altered?

2        A.    We stopped at -- we kept it from being fragile by the

3    superglue process.  The superglue polymerizes that fingerprint

4    residue to the surface.  And as you can see, the print is still

5    there to this day, some eight years later, because it's fixed on

6    it.  That's the purpose for doing the superglue in the first

7    place.  If I had not done the superglue up front, then we would

8    never have gotten to two and three processes down the road.

9        Q.    Who was your fingerprint examiner?

10       A.    Bruce Orndorf.

11       Q.    And how often do you believe you're going back and

12   forth as to whether or not the print is in a condition that a

13   comparison can be made?

14       A.    Most every day over the next nine days.  Nine, 10 days.

15       Q.    And why does it take so long?

16       A.    Some of the process -- for example, the fluorescent dye

17   stain is a wet process.  Once I did that, I had to put the bag

18   away for the rest of the day and allow it to dry before I could

19   continue to anything else.  The final process I did to it, which

20   is Sudan black, is also a wet process.  It's rinsing -- I'm

21   sorry -- applying the chemical and rinsing it off.  It's a wet

22   process.  It has to completely dry before you go and do another

23   set of photographs.  It's also slowed down because I'm using my

24   photo lab.  There's only two photo lab techs in there that I have

25   to have their permission, move them out of the way so I can do

1    the work in there.  And plus we were being very careful taking

2    our time in doing this print.  We were not rushing it in any way.

3        Q.    When was the print -- when was the embroidery hoop and

4    the print, when did that go to the FBI?

5        A.    First week of December.

6        Q.    And who took it to the FBI?

7        A.    I did.

8        Q.    Was that done here locally at the FBI office?

9        A.    No, sir.  I took it to Washington, D.C.

10       Q.    And was the print -- or the contents of 2A or 2A ever

11   out of your possession?

12       A.    No, sir, it was not.

13       Q.    And why not?

14       A.    I kept it in my possession to maintain care, control of

15   it, and custody of that particular item.

16       Q.    What was the purpose of taking it to the FBI?

17       A.    We wanted to have them look at our findings.  We wanted

18   their opinion on our findings, and I also wanted -- I was curious

19   to see if we could do some more photographs, which we did.  The

20   other exhibit that you showed me is their final photograph that

21   we did using their camera, but again, I was present with the

22   evidence during that time, as well.

23       Q.    That was Exhibit 2B?

24       A.    Yes, sir.

25       Q.    And did they use a different camera than the camera you

1   used here in El Paso?

2       A.   Same type camera.  The only difference being was the

3   lighting.  They had better lighting.  And the lighting actually

4   made a big difference.  Just like putting a white paper behind

5   it, now you could see it better with the little bit of contrast.

6   The lighting aids in the contrast of seeing that print.

7       Q.   What I'm showing you here in State's Exhibit 2B, was

8   that what was used to make a comparison?

9       A.   The photograph of this, yes, sir.

10          MR. ESPARZA:  I don't have any further questions,

11  Your Honor.

12          THE COURT:  Any cross-examination?

13          MR. GÁNDARA:  Just briefly, Your Honor.

14                    **CROSS-EXAMINATION**

15  BY MR. GÁNDARA:

16      Q.   Officer Monday, you did not locate any fingerprints on

17  Alexandra Flores's body?

18      A.   No, sir, I didn't.

19      Q.   The business of the processes is complicated, as you

20  said, and it's rare to locate prints on bodies?

21      A.   Correct.

22      Q.   Not because the process doesn't find them, just because

23  they're not often there?

24      A.   Right.

25      Q.   So the fact that there's only 20 of them been found

1  doesn't mean that the process has failed every other time.

2  They've looked.  It's simply there have been no prints on the

3  body that they use the process on?

4      A.   None that they could recover.

5      Q.   I may be repeating myself.  No print from her skin, no

6  fingerprints from her skin did you recover?

7      A.   No, sir.

8          MR. GÁNDARA:  Pass the witness.

9          THE COURT:  Any more questions?

10         MR. ESPARZA:  I don't have any further questions

11 for this witness at this time, Your Honor.

12         THE COURT:  You may be excused.

13         (Witness leaves the stand.)

14         THE COURT:  Call your next witness.

15         So the attorneys know, even though I'm excusing

16 witnesses from the courtroom, any time you need to recall them,

17 we will find a way to get ahold of them and bring them back in

18 for either of you.

19         MS. HUGHES:  Thank you, Your Honor.

20         MR. ESPARZA:  Prior to calling the next witness we

21 were going to go through the list of exhibits that have been

22 admitted.

23         THE COURT:  All right.  Go ahead.

24         MS. HUGHES:  Your Honor, at this time the State

25 would offer into evidence those exhibits that were previously

1  admitted during the guilt phase of the trial to include exhibits

2  numbered 1, 2A, 2B, 3 through 31, 31A, 32, 32A --

3                THE COURT:  Just a minute.  Continue.

4                MS. HUGHES:  38, 39, 40 through 52, 54 through 72,

5  75, 78, 80 through 86, 92, 93, 95, 101, 102, 104, 106.

6                MR. GÁNDARA:  Your Honor, we renew the objections

7  made to the introduction of that evidence previously.

8                THE COURT:  Whatever ruling the Court made on the

9  prior evidence at the guilt-innocence phase of the trial stands

10  today.  Those admitted -- those exhibits that she's enumerated

11  here today are admitted.

12                Let me ask the State a question.  There was an

13  Exhibit 1A?

14                MR. ESPARZA:  That's new, Your Honor.

15                THE COURT:  Was there an offer made on that?

16                MR. ESPARZA:  There was, Your Honor.

17                MS. HUGHES:  It was admitted.

18                MR. GÁNDARA:  I don't recall.  1A is what?

19                MR. ESPARZA:  The consent.

20                MR. GÁNDARA:  That's correct.

21                THE COURT:  There's no objection?

22                MR. GÁNDARA:  We did not object.  No objection.

23                THE COURT:  That also is admitted.

24                Call your next witness.

25                MR. ESPARZA:  Your Honor, the State calls Bruce

1    Orndorf at this time.

2                    THE COURT:  Raise your right hand.

3                    (The witness was duly sworn by the Court.)

4                    THE COURT:  Please be seated.  Use the microphone.

5    Speak up loud and clear.

6                    Proceed.

7                         **BRUCE ORNDORF**,

8    having been first duly sworn, testified as follows:

9                      **DIRECT EXAMINATION**

10   BY MR. ESPARZA:

11       Q.   Sir, would you please state your name for the record.

12       A.   Bruce Orndorf.

13       Q.   And how are you employed?

14       A.   With the City of El Paso Police Department.

15       Q.   And --

16                   THE COURT:  Spell your last name for the record.

17                   MR. ESPARZA:  I'm sorry, Your Honor.

18                   THE WITNESS:  O-r-n-d-o-r-f.

19                   THE COURT:  Proceed.

20       Q.   And how long have you been working for the City of El

21   Paso?

22       A.   37 years.

23       Q.   What's your official title at the moment?

24       A.   I'm the senior latent examiner in charge of the latent

25   fingerprint section in the AFIS unit.

1    Q.    And how -- and you work there at the El Paso Police

2    Department?

3    A.    Yes, sir.

4    Q.    In all the time that you -- the 30-plus years with the

5    City of El Paso, have at any time you worked with the El Paso

6    Police Department as an officer?

7    A.    Yeah.  I was an officer for 10 years, and then a

8    detective for 20 years, and now I've been a civilian for seven

9    years.

10   Q.    On November 19th of -- or that week of November 19th,

11   2001, about the next two or three weeks -- were you working with

12   the El Paso Police Department back in 2001?

13   A.    Yes, sir.

14   Q.    And at that time you were a detective?

15   A.    No.  At that time I was a civilian.

16   Q.    And what is your area of specialty?

17   A.    Fingerprints.

18   Q.    And how long have you been involved in fingerprint

19   work?

20   A.    27 years.

21   Q.    And could you tell us what your training and -- well,

22   let's first go over your training in order -- that qualifies you

23   to be a fingerprint examiner.

24   A.    Well, I've attended and completed both the basic

25   fingerprint school and the advanced latent fingerprint school

1    conducted by the Department of Public Safety in Austin, Texas.

2    Along with those I've attended and completed three advanced

3    courses in fingerprint ridgeology studies.  These were all

4    conducted by the Federal Bureau of Investigation in Washington,

5    D.C.  I've tested and been certified by the international of

6    identification -- International Association of Identification as

7    a latent fingerprint examiner, qualified by the State of Texas as

8    an official instructor in the field of ridgeology and fingerprint

9    identification.  Along with that I run the unit, compare prints.

10        Q.    How many fingerprints comparisons do you think you've

11   made in your career?

12        A.    A whole bunch of hundreds of thousands.  I mean, it

13   could be a million prints as far as just fingerprint comparisons.

14        Q.    Is the examination and comparison of a fingerprint

15   similar to or different from the examination and identification

16   comparison of a palm print?

17        A.    They're both the same.  The fingerprint and the -- the

18   palm area of the hand is basically -- all of it's made up by the

19   same, you know, ridgeology.  It's just raised portions of skin.

20        Q.    All right.  Well, just so that we have an

21   understanding, if I ask you a question regarding fingerprints,

22   would that also apply to palm prints, or is there something

23   different to a palm print that the Jury needs to know in regards

24   to the examination, comparison, and identification of a palm

25   print?

1   A. Everything is identical, except you've got the palm

2 area of the hand. You've got the fingerprints, but everything is

3 the same as far as the technical aspect, as far as comparing a

4 fingerprint or a palm print. I mean, I intertwine them. I could

5 say fingerprint, but I mean fingerprint or palm print.

6   Q. They're the same?

7   A. They're the same, yes.

8   Q. Ridgeology. Is that what you said you're --

9   A. Yes, sir. It's just a study of --

10   Q. What is ridgeology?

11   A. It's just a study of ridges in the human body.

12   Q. And have you been qualified as an expert in state

13 courts to testify as a fingerprint expert?

14   A. Yes, sir. I've been qualified in all the El Paso

15 courts, the county courts, the district courts, along with the

16 federal courts here in the western district, southern New Mexico,

17 and in central Texas.

18   Q. And how many times have you testified as a fingerprint

19 expert?

20   A. It would be in excess of 500, more, but I wouldn't know

21 how many. But it's in excess of 500.

22   Q. So when you say you've been qualified as an expert in

23 the area of fingerprints, would it be fair to say that you have

24 been qualified as an expert in the area of palm prints?

25   A. Yes, sir.

1    Q.   Have you ever found two people to have the same

2  fingerprint?

3    A.   No two fingerprints are the same.

4    Q.   Have you ever found two people ever have the same palm

5  prints?

6    A.   No, sir.

7    Q.   Have you ever heard, ever heard -- different than of

8  you finding it -- two people having the same fingerprint?

9    A.   No.  Two people don't have the same fingerprints.

10   Q.   Have you ever heard of two people having the same

11 print?

12   A.   No.

13   Q.   Could you tell the Ladies and Gentlemen of the Jury

14 what is a latent print?

15   A.   A latent print?

16   Q.   Yes, sir.

17   A.   To explain a latent print, I've also got to explain an

18 inked print.

19   Q.   Okay.  You want to do that one first?

20   A.   I'd rather.  It makes more sense.

21   Q.   Okay.  Tell the Ladies and Gentlemen of the Jury, what

22 is an inked print?

23   A.   Well, located on the palmar surfaces of the hands,

24 which is the palm area, and also the fingers and the plantar

25 surfaces of the feet, the human body has skin which is unlike

1   skin on other portions of the body.  Instead of being smooth,

2   this skin is rough and corrugated, consisting of raised portions

3   of skin, or what we refer to as ridges.

4           Now, these ridges do not like enter on one side of

5   the hand or one side of the finger and exit out the other side in

6   straight lines.  That's not what they'll do.  What will happen is

7   the ridges will enter different parts of the palm and the

8   fingers.  They'll -- the pattern types will be formed.

9           Basically we've got three pattern types; those

10   being arches, loops, and whorls.  You'll find one of those

11   pattern types on the first joint of each finger.  You'll also

12   find those types of patterns in the interdigital area of the palm

13   and the hyperthenia area.  So along with these pattern types, the

14   ridge flows, like I say, are not straight.  Now, along with not

15   being continuous, these ridges are not being straight.  These

16   ridges are not continuous.

17           What happens is you have these ridges, and what

18   they'll be doing is they'll be flowing along, and all of a sudden

19   they'll form a characteristic.  By that I mean you may have a

20   ridge that's flowing along and all of a sudden it will abruptly

21   come to a stop, like you would at a dead end road.  The ridge may

22   flow along and then bifurcate into two ridges, which would

23   basically be, you know, a fork in the road.  Other

24   characteristics will be we have all different lengths of ridges.

25   A lot of them are considered to be dots or a small ridge.  It

1   just may start and immediately stop. It's just a real short

2   ridge. We have characteristics where a ridge may bifurcate, and

3   then enclose and form what appears to be an island. You'll find

4   these characteristics throughout the fingerprints.

5           On one joint of each finger you'll find anywhere

6   from 90 to 150 of the characteristics. In the palm area of the

7   hand, upwards -- close to around 1500 of these characteristics.

8           What we do to obtain a set of inked prints, I'll

9   apply a thin layer of printer's ink, like you see on TV when we

10  roll the prints, and then transfer that ink on to a susceptible

11  surface, such as a fingerprint card. What that gives me now is a

12  complete set of a person's known finger and palm prints to

13  include, you know, the characteristics, the ridge flow, and the

14  pattern types themselves. That is the basis behind a known or an

15  inked print.

16          Now, when we talk about latent prints, what

17  happens on a latent print is on the tops or the summits of these

18  ridges, the human body has tiny minute sweat pores that are

19  constantly secreting body fluids or sweat, amino acids, things of

20  that nature. What happens is that body fluid will sort of lay on

21  the tops of those ridges. Then when you touch a surface, that

22  body fluid or sweat is transferred onto that surface. Basically

23  if there's an ending ridge, what you would be transferring would

24  be that ending ridge, because you're only going to have the

25  moisture on the raised portions of skin, which is the ridges.

1   You wouldn't have them in the furrows between the ridges.  That

2   right there, when that is laid on a surface that you would find,

3   you know, any place that you're processing, that would be a

4   latent print.

5            And then you also have a patent print, which is

6   basically you have other substances that will adhere to the

7   top or the summit of the ridges.  Some could be oil from your

8   forehead, it could be a foreign substance such as grease or

9   blood.  And what happens is that substance also gets on and stays

10  on the tops or the summits of the ridges.  And then when you

11  touch a surface, that is transferred onto that surface.  Then

12  what we do is by the use of different powders, chemicals,

13  alternate light sources, we develop these latent prints, bring

14  them visible so we can see them, and then go ahead and either

15  lift the print through -- by the use of lifting tape, or we'll

16  photograph the print, and that way what we have is we have a

17  lasting impression of somebody's fingerprint from that particular

18  surface, fingerprint or palm print.

19       Q.   An inked print, do we know who makes the inked print?

20       A.   Yeah, the inked print or a known print is basically

21  made by a person.  You take their prints so you know that I've

22  taken your prints, I know they're your prints.

23       Q.   That would be in a controlled environment?

24       A.   Yes, sir.

25       Q.   Where like we see on TV, let's say somebody gets

1 arrested in jail or something, they just roll their prints,

2 right?

3     A.    That's what we do.

4     Q.    All right.. So you just make the print?

5     A.    You just make a set of prints.

6     Q.    A latent print, you do not know who left that print?

7     A.    No, sir.

8     Q.    And would it be fair to say that the criminalistic

9 guys, the crime scene guys, they're the ones who capture that

10 latent print?

11     A.    It's the crime scene unit's responsibility to locate

12 and develop and bring those latent prints into our unit.

13     Q.    And they do that based on the science and the variety

14 of ways in order to make a latent print visible?

15     A.    Yes, sir.

16     Q.    Is it possible to take a latent print from a crime

17 scene and match it with a known print to make a positive

18 identification?

19     A.    Yes, sir.  That's what I do.

20     Q.    State's Exhibit 1.  It's already been admitted into

21 evidence.  What is State's Exhibit 1?

22     A.    State's Exhibit 1 is a set of known or inked

23 fingerprint and palm print impressions.

24     Q.    And who made -- whose prints are on State's Exhibit 1?

25     A.    Mr. Rentería's.

1      Q.   And the print that you're looking at on that card, what

2  type of prints are we seeing?  What do you call that?

3      A.   A palm print.

4      Q.   Okay.  A palm print?

5      A.   Yes, sir.  Right now I'm looking at the right palm

6  print.

7      Q.   Okay.  If you turn it around, on the other side what

8  would you see?

9      A.   The left palm print.

10     Q.   Of who?

11     A.   David Rentería.

12     Q.   Did you ever have an opportunity to see the contents of

13  State's Exhibit 2A, which I'll now show you?  The embroidery hoop

14  would be the contents.  Have you ever seen that before?

15     A.   Yes, sir.

16     Q.   And can I show you what's been marked as State's

17  Exhibit 2B?

18     A.   State's Exhibit 2B is a photographic image of State's

19  Exhibit -- of what that is.

20     Q.   I'm sorry.  I didn't hear you at the end.

21     A.   State's Exhibit 2B is a photographic image of that

22  State's Exhibit.

23     Q.   Okay.  2A?

24     A.   2A.

25     Q.   Okay.  So it is possible to take a latent print and

1    identify it with a known print?

2        A.    Yes, sir.

3        Q.    Is there a preferred method of making that comparison

4    in your experience and background, off a photograph or off the

5    original item?

6        A.    Mostly I don't work off the original item.  Normally I

7    would work off of either a fingerprint card or a photograph.

8        Q.    Back in 2001, do you remember working on the latent

9    print that I showed you in 2A?

10       A.    Yes, sir.

11       Q.    And do you remember who you worked with in regards to

12   the print that's contained in 2A?

13       A.    Yes, sir.

14       Q.    And who was that?

15       A.    Well, it was basically myself and Officer Monday.

16       Q.    And what were you all doing?

17       A.    Well, Officer Monday was developing the print.  I was

18   comparing what he developed.

19       Q.    Well, if you have the print, why does he need to

20   develop it?

21       A.    Had what print?

22       Q.    You have the print.  You have the print that's on

23   State's Exhibit 2A, right?

24       A.    Yes, sir.

25       Q.    Why do you have to develop it if you have it?

1    A.    Well, we have to develop it to bring out the

2  characteristics and ridge detail located in the latent print.

3    Q.    And is that development process -- are you altering the

4  print in any way?

5               MS. PAYÁN:  Your Honor, I'm going to object to

6  relevance.  This is not the witness who developed the print.

7               THE COURT:  Overruled.

8    Q.    (BY MR. ESPARZA)  Are you altering the print in any

9  way?

10   A.    No.  All you're doing is just developing the print.  A

11  lot of times when you have this moisture or contamination or

12  whatever that is transferred from the fingers, a lot of it is

13  real light.  Some of it may be heavy, so the heavy part you may

14  be able to develop right away.  But then as you go from that

15  point out, you may have to use different means or more processing

16  to bring that ridge and those characteristics to develop them off

17  the surface.  I don't know whether I'm asking --

18   Q.    Yeah.  No, you're right.  You're answering my question.

19  So you're improving the quality of the print?

20   A.    Yeah.  The print's there.  It's just a matter of

21  bringing it so I can see it.

22   Q.    So you're making it more clear?

23   A.    You're making it more clearer and you're also expanding

24  the -- basically the size of the print that you're developing.

25   Q.    Did you make a comparison between what I showed you in

1  State's 1 and the latent print that is on 2B?

2      A.   Yes, sir.

3      Q.   Do you remember when you made that comparison and

4  identification?

5      A.   Not specific dates or times.  It was the latter part of

6  November and the first couple of days of December is when I was

7  doing all this comparison work on this particular piece of

8  evidence.

9      Q.   And when you're doing your examination and comparisons,

10 are you aware that at some point in the future you may be called

11 to render an opinion?

12     A.   Yes, sir.

13     Q.   How many times have you been in court to render an

14 opinion as to whether or not a latent print and a known print are

15 either one and the same person or not the same person?  How many

16 times have you testified to those items?

17     A.   Like I said, I've testified as an expert, you know,

18 over 500 times.  I mean -- and I've also testified for the

19 defense that a print doesn't belong to a person.

20          MR. ESPARZA:  Your Honor, at this time I'd offer

21 the witness as an expert in fingerprint and palm comparison

22 identification.

23          MS. PAYÁN:  Your Honor, no objection.

24          THE COURT:  Proceed.

25     Q.   (BY MR. ESPARZA)  When you make the comparisons that

1   you make -- now I'm just going to ask you specifically about this

2   case -- do you do it with the naked eye or do you have some

3   instrument in order to aid you in the comparison?

4       A.   The only instruments that I use for the comparing of

5   prints is a four-power -- basically a magnifying glass and a

6   pointer.

7       Q.   And is that what you used in this case?

8       A.   Yes, sir.

9       Q.   When you made the comparison from the known print

10  that's in State's Exhibit 1 to the latent print that -- when you

11  made those comparisons, did you do that before or after you went

12  to the FBI?

13      A.   Before.

14      Q.   And when you made that comparison, were you able to

15  render an opinion as to whether or not the latent print, the

16  print that was found on the -- what's inside State's 2A, the

17  plastic bag on 2A, whether or not that print belongs to the

18  person on the known print, State's 1?

19      A.   Yes, sir.  I've already, you know, I'd already

20  identified the print.

21      Q.   And could you tell the Ladies and Gentlemen of the Jury

22  whether or not the print that's on the plastic bag contained in

23  2A is the one and the same person on State's 1?

24      A.   Yes, sir, it is.

25      Q.   How sure are you?

1      A.    One hundred percent.

2      Q.    So if State's 1 is the Defendant, David Rentería, did

3  he make the print on the plastic bag, on 2A?

4      A.    David Rentería made the print on that plastic bag with

5  his right palm print.

6      Q.    If you had made the decision and were of the opinion

7  that the print on 2A was of David Rentería, why did you go to the

8  FBI?

9      A.    I was following protocol.

10     Q.    Would you tell the Ladies and Gentlemen what that

11 means?

12     A.    Well, protocol, basically most everybody in the

13 fingerprint community follows it.  It's basically comparison,

14 evaluating prints, and the final stage is verification of your

15 ID.

16     Q.    And were they able to verify the ID?

17            MS. PAYÁN:  I'm going to object to hearsay.

18            THE COURT:  Sustained.

19     Q.    Was the print verified?

20     A.    Yes, sir.

21            MS. PAYÁN:  Objection.  Hearsay.

22            THE COURT:  Sustained.

23            MS. PAYÁN:  Your Honor, I'd ask that the Jury be

24 instructed.

25            THE COURT:  It's sustained.  You know what I told

1   you before, you don't get to consider it.

2              Attorneys, I'd like to break a little early for

3   lunch so that the Jury is not jammed up in line.  It looks like

4   you're going to continue to go and there's possible

5   cross-examination, so we're going to take a lunch recess at this

6   time.

7              It's very important.  You are not allowed to

8   discuss the case among yourselves or with anyone else.  We'll see

9   you back here, everyone to be absolutely for sure, ready to go by

10  1 o'clock.

11             (Recess at 11:45 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE**

THE STATE OF TEXAS                  )
                                    )
COUNTY OF EL PASO                   )

          I, MARIA C. CHÁVEZ, Official Court Reporter in and

for the 168th District Court of El Paso County, State of Texas,

do hereby certify that the above and foregoing contains a true

and correct transcription of all portions of evidence and other

proceedings requested in writing by counsel for the parties to be

included in this volume of the Reporter's Record in the

above-styled and numbered cause, all of which occurred in open

Court or in chambers and were reported by me.

          I further certify that this Reporter's Record of

the proceedings truly and correctly reflects the exhibits, if

any, offered by the respective parties.

          WITNESS MY OFFICIAL HAND this the   8th   day

of _____May_____, 2009.


                              _____
                              MARIA C. CHÁVEZ
                              Official Court Reporter
                              Certificate No. 2090
                              Date of Expiration: 12/31/2010
                              602 El Paso County Courthouse
                              El Paso, Texas 79901
                              (915) 546-2141
                              E-mail: machavez@epcounty.com