′14824

# REPORTER'S RECORD
## VOLUME 51 of 84 VOLUMES
### TRIAL COURT CAUSE NO. 20020D00230

ORIGINAL

| | | |
|---|---|---|
| THE STATE OF TEXAS, | ) | IN THE DISTRICT COURT OF |
| Plaintiff, | ) | |
| vs. | ) | EL PASO COUNTY, TEXAS |
| | ) | |
| DAVID RENTERIA, | ) | |
| Defendant. | ) | 41st JUDICIAL DISTRICT |

---------------------------------------

JURY TRIAL
PUNISHMENT PHASE

---------------------------------------

**FILED IN**
**COURT OF CRIMINAL APPEALS**

JUN 0 4 2009

Louise Pearson, Clerk

On the 22nd day of April, 2008, the
following proceedings came on to be heard in the
above-entitled and numbered cause before the Honorable
Mary Anne Bramblett, Judge presiding, held in El Paso,
El Paso County, Texas:

Proceedings reported by machine shorthand
utilizing computer-assisted realtime transcription.

```
1                    A P P E A R A N C E S

2

3    Jaime Esparza                  Lori Hughes
     DISTRICT ATTORNEY              ASSISTANT DISTRICT ATTORNEY
4    SBOT NO. 06666450              SBOT NO. 00786275
     500 East San Antonio, # 201    500 East San Antonio, # 201
5    El Paso, Texas  79901          El Paso, Texas  79901
     Phone:  (915) 546-2059         Phone:  (915) 546-2059
6    Fax:  (915) 533-5520           Fax:  (915) 533-5520
     ATTORNEY FOR THE STATE         ATTORNEY FOR THE STATE
7
         - AND -                        - AND -
8
     Diana Meraz                    Jaime Gandara
9    ASSISTANT DISTRICT ATTORNEY    ASSISTANT PUBLIC DEFENDER
     SBOT NO. 13942600              SBOT NO. 07611900
10   500 East San Antonio, # 201    500 East San Antonio, # 501
     El Paso, Texas  79901          El Paso, Texas  79901
11   Phone:  (915) 546-2059         Phone:  (915) 546-8185
     Fax:  (915) 533-5520           Fax:  (915) 546-8186
12   ATTORNEY FOR THE STATE         ATTORNEY FOR THE DEFENDANT

13       - AND -                        - AND -

14   Edythe M. Payan                Gregorio S. Velasquez
     ASSISTANT PUBLIC DEFENDER      ASSISTANT PUBLIC DEFENDER
15   SBOT NO. 00791415              SBOT NO. 20540300
     500 East San Antonio, # 501    500 East San Antonio, # 501
16   El Paso, Texas  79901          El Paso, Texas  79901
     Phone:  (915) 546-8185         Phone:  (915) 546-8185
17   Fax:  (915) 546-8186           Fax:  (915) 546-8186
     ATTORNEY FOR THE DEFENDANT      ATTORNEY FOR THE DEFENDANT
18

19

20

21

22

23

24

25
```

CHRONOLOGICAL INDEX
VOLUME 51 OF 84 VOLUMES

APRIL 22, 2008                                    PAGE      VOL

| STATE'S WITNESSES: | DIRECT | CROSS | VOIR DIRE | | |
|---|---|---|---|---|---|
| Bruce Orndorf (Cont.) | 5,21,23 | 15,22 | -- | | 51 |
| Juan Contin | 24,60 | 55 | -- | | 51 |
| Court Reporter's certificate.................. 64 | | | | | 51 |

EXHIBIT INDEX

APRIL 22, 2008                                          VOL

** Exhibits have been previously admitted

STATE'S EXHIBITS:
NO.   DESCRIPTION

| NO. | DESCRIPTION | VOL |
|-----|-------------|-----|
| 1 | Latent palm print | 51 |
| 2-B | Latent palm print | 51 |
| 3 | Photograph | 51 |
| 4 | Photograph | 51 |
| 6 | Latent palm print (enlarged) | 51 |
| 7 | Latent palm print (magnified) | 51 |
| 8 | Autopsy report | 51 |
| 9 | Photograph | 51 |
| 10 | Photograph | 51 |
| 11 | Photograph | 51 |
| 12 | Photograph | 51 |
| 13 | Photograph | 51 |
| 14 | Photograph | 51 |
| 15 | Photograph | 51 |
| 16 | Photograph | 51 |
| 17 | Photograph | 51 |
| 18 | Photograph | 51 |
| 19 | FTA card | 51 |
| 43 | Cardboard demo of Alexandra Flores | 51 |
| 104 | Photograph | 51 |

1          (Jury present.)

2          THE COURT:  Good afternoon, ladies and

3  gentlemen.

4          THE JURY:  Good afternoon.

5          THE COURT:  Okay.  Just as long as you're

6  still saying good afternoon and good morning to me, I'll

7  be all right.  Thank you.

8          You may continue with your witness.

9          MR. ESPARZA:  Thank you, Your Honor.

10          BRUCE ORNDORF,

11  having been previously sworn, testified as follows:

12          DIRECT EXAMINATION CONTINUED

13  BY MR. ESPARZA:

14      Q.  Did you have a good lunch, Mr. Orndorf?

15      A.  Yes, sir.

16      Q.  Let me show you what's been marked as State's

17  Exhibit 2-B and State's Exhibit 1.  Okay?

18      A.  Yes, sir.

19      Q.  I'm going to put them up here and I know you

20  already gave us an opinion as to the comparison between

21  the print -- the known print, right?  Is it the known

22  prints?  I'm sorry, I should show you the number.  The

23  right palm of David Renteria, right?

24      A.  Yes, sir.

25      Q.  Okay.  Now you see this circle right -- there's

1 a little pointer right there, you see it?  There you go.

2    Do you see where you made the -- well, who

3 made that circle?

4  A. I did.

5  Q. And why did you do that?

6  A. Well, I did that -- that's the particular piece

7 of palm that I was working with against the latent that

8 was developed on 2-A or -- on 2-B, the photograph.

9  Q. So this is the area that left the impression on

10 the plastic bag?

11  A. Yes, sir, the plastic bag didn't have the

12 impression of the whole hand, you know; you're not going

13 to get all that from a latent.  People don't do that.  We

14 normally just get a partial print.  And this one here on

15 the plastic bag was this area right here.

16  Q. Okay.  It's not on the plastic bag.  This circle

17 is pretty large all the way around here, right?

18  A. Yes, sir.

19  Q. Is that -- specifically is that the area you're

20 looking at the plastic bag or is it greater or smaller?

21  A. Well, the plastic bag there's -- you have --

22 this part here has the ridge detail, the characteristics

23 on the plastic bag.  It also has an area around there

24 that we never developed any ridge detail there.  But

25 we're not -- it's not like we was trying to make the

1  circle as small as we could.  We wanted to have it in the

2  middle, and it's the same way here.  That's why the

3  circle encompasses a lot more of the ridge detail and the

4  characteristics that's actually on the plastic, but

5  that's the area that I technically wanted photographed.

6      Q.   I'm going to show you what's marked as State's

7  Exhibit 6 and State's Exhibit 7 which have been

8  previously admitted.

9           I should show them to them.  I'm sorry.

10          MR. ESPARZA:  I apologize.  This is the

11  smaller one and this is the larger one.  All right?

12          MR. GANDARA:  All right.

13     Q.   (BY MR. ESPARZA)  Take a look at State's 6, and

14  can you identify it?

15     A.   Yes, State's 6 is a charted enlargement of the

16  photographic image of the print.  I think you had it as

17  State's Exhibit 2-B, and also of State's Exhibit 1.

18  Basically they're charted enlargements of those two

19  prints.

20     Q.   And State's Exhibit 7, can you identify State's

21  7?

22     A.   Yes, State's Exhibit 7 is the same thing except

23  more magnification.

24     Q.   Do you know what the difference in magnification

25  is between 2 and 4 -- I'm sorry, between 6 and 7?

1    A.    I think 6 -- the photo lab -- it was around

2  two-and-a-half or three times.   And 7 was four or

3  four-and-a-half, something like that.   Just one or two

4  more magnifications more.

5    Q.    Did the magnification change the print in any

6  way?

7    A.    No, all it does is just, basically, makes it

8  more visible, the same way as you did a photographic

9  enlargement of a photograph.

10              MR. ESPARZA:   Your Honor, can I have the

11  witness step towards the jury?

12              THE COURT:   Yes.

13    Q.    (BY MR. ESPARZA)   First, I want to show the jury

14  State's Exhibit 6, and can you tell them what State's 6

15  is?

16    A.    Basically on State's Exhibit 6 --

17    Q.    You don't have this problem, but just in case,

18  you have to speak up loudly so she can hear you.   You

19  don't have that problem.

20    A.    On State's Exhibit 6 --

21              THE COURT:   If I can't hear, I assure you

22  she can't hear.   My ears are older then hers.   So if I

23  can hear you, you're good.   Keep going.

24              THE WITNESS:   State's Exhibit 6, on your

25  left, is an inked palm impression, basically, of that

1  area of the palm that we was looking at.  You'll notice

2  that it has like a loop area, like I was saying before,

3  the ridges are entering from outside of the palm,

4  recurving and exiting back out.  This is referred to as

5  the loop.

6      Q.   This is referred to as a loop?

7      A.   This is referred to as a loop-type pattern

8  basically.  You find it in the palm -- not that often.

9  You will find one in every fingerprint, but you won't

10  find it that often in the palm.  Not in this area.  This

11  one here does have this big loop-type pattern and that's

12  what we're looking at.

13      Q.   We'll step this way.  Okay.  All right.

14      A.   On the other side is a latent print, this is a

15  blow-up of Exhibit 2-B.  Basically, this whole thing is

16  prepared just, you know, to show you how I compare prints

17  and effect an identification of a print.

18      Q.   Okay.  Hang onto this.

19            Okay.  And now I have State's Exhibit 7?

20      A.   State's Exhibit 7 is identical to State's

21  Exhibit 6 except we've basically enhanced it or made it

22  bigger.

23      Q.   Okay.  So let's talk about 7 now and forget 6.

24  It's larger.  All right.  We're going to talk about

25  State's 7 instead of 6.  Now on State's 7 you have --

1  it's exactly like State's 6, right, except enlarged?

2      A.    That's correct.

3      Q.    Now, could you tell the ladies and gentlemen of

4  the jury the reason you have these one through nine?

5      A.    One through nine -- basically, what I've done

6  here is we have -- we have the loop, but one through nine

7  is the characteristics.  Number one -- what I've done on

8  number one is, basically, I started with -- you can say

9  that's a reference point.  I've taken number one and

10  there's a ridge that is flowing in an upward angle and

11  all of a sudden it abruptly comes to a stop just like,

12  you know, a road with a dead end.

13             Over here on the eighth fingerprint

14  impression, I'm showing the same ridge flowing up and it

15  abruptly stops.  I've marked where it stops, where the

16  dead end is.  That's a characteristic.  That's one of

17  those 1500 characteristics you will find from that palm

18  print.

19             Now, what I've done is, basically, when I'm

20  comparing prints, I need to establish that the

21  characteristics from one print to another print are the

22  same characteristics they occupy on the same relevant

23  position.

24      Q.    Move this away because they can't see.

25      A.    All right.

1    Q.    Same relevant position is what you said?

2    A.    All we're doing is just making sure that the

3    characteristics occupy the same relevant position.  In a

4    fingerprint identification if anything is not the same,

5    then it's not the same print.  It can't be.  So with one

6    being the ridge flow and then abruptly ends at a dead

7    end -- and I've matched it over here -- now, I've got a

8    ridge ending.  There's more than one ridge ending within

9    a print, but I'm using that as a reference point.

10            Now what I've done is, going to our left,

11   there is one intervening ridge that flows up.  It doesn't

12   do anything, it just -- the ridge just keeps going.  But

13   number two, what I found in number two -- the next ridge

14   over -- it's flowing downward and abruptly stops.  So

15   I've got another ridge in just the opposite of this one,

16   and I've got a ridge that runs through the middle of it.

17   So I've got this with a ridge in it.  That right there is

18   the start of basically me establishing identification.

19            Three -- what I've done with three is from

20   two -- I've counted over one, two, three ridges and on

21   the third ridge I had what appears to be a bifurcation.

22   If you come back to the latent print and come from two,

23   it's one, two, three ridges and there you have that same

24   bifurcation.

25    Q.    Move this way.  Sorry.

1     A.   Okay.  This continues on and what I've done now

2 is from three, where that bifurcation is like that on

3 both prints, I've now established -- came up one, two,

4 three, four, five, six, seven, eight, nine, ten and what

5 I've found now is I found another ridge ending that comes

6 around the loop and stopping just like that.  And if we

7 come back over here, they're harder to see because it's a

8 latent print.  If you count up to one, two, three, four,

9 five, six, seven, eight, nine, ten, when you get to ten

10 you have to find -- that has to be there, and there it

11 is.

12     Q.   Okay.  We're just going to step right here.

13 Okay.  You were down to three?

14     A.   Well, I was up at four.

15     Q.   Okay.

16     A.   Now from four -- all I've done on four is

17 looking at, if you follow the bifurcation from four and

18 you follow the left ridge it goes up a little bit and it

19 stops, the other one continues on, but this one here

20 stops, and I've marked where it stops as number five.

21          If you come back over to the latent, and if

22 you follow where the bifurcation is, follow it up a

23 little bit on the left ridge, and it stops again.  So now

24 I'm up to five characteristics, and that's what I've done

25 the whole way up through here.  When I get up -- well, I

1    continue on here.  Six -- six, basically, is from that

2    ridge ending where we had the bifurcation, then we have

3    the ridge ending, and then what I've done is I went back

4    two ridge -- two intervening ridges, and I've got another

5    ridge ending right there, and it's the same way on the

6    latent print.  I come back two ridges and there's my

7    ridge ending.

8        Q.   That's it.  We're done.

9        A.   Okay.

10       Q.   Okay.  And we could have gone all the way up

11   through nine, but basically what's on the left side

12   matches what's on the right side?

13       A.   Yes, sir, it's the same print.

14       Q.   So the known print of the defendant David

15   Renteria is a perfect match to the latent print?

16            MS. PAYAN:  Asked and answered, Your Honor.

17            THE COURT:  Overruled.

18       Q.   (BY MR. ESPARZA)  You highlight in State's 6 and

19   7 nine characteristics; is there a minimum or maximum

20   number in order to obtain an identification?

21       A.   No, sir.  They -- a lot of years ago, there was

22   some agencies around the world that would have a minimum

23   number of characteristics.  Basically, that's more of

24   it's policy with a department or a bureau.  And nowadays

25   we find out nobody really has a set number.  It's

1  basically if an examiner looks at a print and establishes

2  a positive ID, if you have any other examiner with the

3  same amount of expertise look at that print, they're

4  going to come to the same conclusion.  So I've never

5  testified in a court and I've never brought into a

6  court any --

7  　　　　　MS. PAYAN:  Your Honor, I'm going to object

8  to relevance and hearsay as to other testimony.  And it's

9  outside the scope of his question.  Nonresponsive.

10  　　　　　THE COURT:  Sustained.

11  　　Q.　(BY MR. ESPARZA)  So the question was, is there

12  a minimum number of characteristics in order to make an

13  identification?

14  　　A.　No.

15  　　Q.　Were there more -- these have -- State's 6 and 7

16  have nine characteristics that you have highlighted.

17  Were those all the characteristics that you saw that were

18  common?

19  　　A.　No, sir, there's more characteristics on those

20  two exhibits.

21  　　Q.　And why is it that all you showed was nine?

22  　　A.　All the exhibits are for -- to demonstrate to

23  the jury how I'm making an identification.  Go put a

24  bunch of them on there, and this is a minute area, and I

25  don't want to clutter it all up, I just want to show them

1  how I made the identification.

2          MR. ESPARZA:  I pass the witness,

3  Your Honor.

4          THE COURT:  Ms. Payan?

5          MS. PAYAN:  Thank you, Your Honor.

6          CROSS-EXAMINATION

7  BY MS. PAYAN:

8      Q.  Good afternoon, Mr. Orndorf.

9      A.  Afternoon.

10      Q.  I just have a few questions.  You had stated, I

11  guess, there were up to how many characteristics on a

12  print?

13      A.  On that one there I located around 15.

14      Q.  What's the -- is there a maximum number of

15  characteristics on any --

16      A.  Well, the only maximum number would be when you

17  find there's no more characteristics.

18      Q.  Obviously the more characteristics you can match

19  the more reliable?

20      A.  No.

21      Q.  No?

22      A.  That's not a true statement.

23      Q.  But you can match up to 20, 25 characteristics,

24  theoretically?

25      A.  Yeah, there's prints that I've matched with

1  less, there's prints that, you know, I may go more than

2  the nine that's on there.  It depends on the uniqueness

3  of the characteristics themselves.

4      Q.   Okay.  Now with regard to this specific case,

5  you -- in addition to making this comparison between the

6  known print and the latent, you received other latents

7  than what you were to compare, correct?

8      A.   Yes, ma'am.

9      Q.   And as far as your duties in respect to the

10  El Paso Police Department, you're not out at the crime

11  scenes investigating, are you?

12      A.   No, ma'am.

13      Q.   You're not out there yourself lifting palm

14  prints looking for latents, are you?

15      A.   No, ma'am.

16      Q.   And you don't go out there looking for people

17  from which to take a known print from, do you?

18      A.   No, ma'am.

19      Q.   And, in fact, when it comes to developing them

20  you don't do that either, Officer Tom Monday develops

21  them?

22      A.   That's correct, yes, ma'am.

23      Q.   And you don't direct the detectives or the case

24  agents in telling them whose prints or what to go look

25  for either, do you?

1    A.    Well, not -- for the most part, no.

2    Q.    For the most part, you depend and rely on what

3  they bring to you, into your lab, correct?

4    A.    That's correct.

5    Q.    Officer Monday, Officer Velez, they'll bring you

6  a pile of latents, photographs, whatever it is for you to

7  do your comparisons with, correct?

8    A.    Yes, ma'am.

9    Q.    And as part of this case, you received 15

10  latents from Officer Velez, correct?

11   A.    Yes, ma'am.

12   Q.    And those latents have been lifted from a van,

13  correct?

14   A.    Yes, ma'am.

15   Q.    And of those 15 latents four were of evidentiary

16  value, correct?

17   A.    That's correct, yes, ma'am.

18   Q.    And by evidentiary value that means something

19  you can actually work with, make some comparisons from?

20   A.    Yeah, make it of evidentiary value.  The print

21  has to have a sufficient number of characteristics where

22  I know that I can positively identify it to somebody

23  else.  If it doesn't have that, then we say it's not of

24  evidentiary value.  It's totally worthless.

25   Q.    And when you got those four that were of latent

1  evidentiary value, you then compared those four to the

2  latent palm print, correct?

3      A.    No, I compared those latents to the known --

4      Q.    To the known ink print?

5      A.    -- prints.

6      Q.    And one of them was a match?

7      A.    Yes, ma'am.

8      Q.    Of those four one of them was a match to State's

9  Exhibit 1, which is the known ink print?

10     A.    Yeah.  One of them was a match to Renteria.  I'm

11  not sure whether it's the right palm or one of the

12  fingers.

13     Q.    And there were three left that did not match the

14  known ink print, correct?

15     A.    I believe there was, yeah.

16     Q.    Of evidentiary value?  If we have 15, only four

17  were any good?

18     A.    I'm trying to recollect these numbers right

19  quick.  I know I received 15 from him and four -- four or

20  five of them were evaluated.  Did I say -- let me check

21  my report real quick.

22     Q.    Sure.  Do you need your report?  You made

23  records?

24     A.    I'm sorry.  On Velez I received 15 latent

25  prints.  Four of them were of value and I was able to

1  positively identify one of them as being made by

2  Mr. Renteria left's thumb.

3      Q.   Don't keep reading.

4      A.   Okay.

5      Q.   You had three latent lifts that did not

6  correspond to David Renteria, correct?

7      A.   Correct, yes, ma'am.

8      Q.   And of those three you ran them through the AFIS

9  system, correct?

10     A.   Yes, ma'am.

11     Q.   Could you please tell us a little bit about the

12  AFIS system?

13     A.   AFIS is the Automated Fingerprint Identification

14  System.  It's basically a computer that -- what it does

15  is it will take one print and it will search -- it will

16  minutiize [sic] the print.  In other words, it'll mark

17  these characteristics that we've talked about.  And then

18  what it'll do is it will scan against, in our case, the

19  three hundred thousand print cards we have electronically

20  in the AFIS system.  What it's trying to do is match up

21  those characteristics with one of the other prints.  And

22  then it gives out a candidate listing, basically, of any

23  people that may match the print and we have to look at

24  that.

25     Q.   And only certain people are in the system,

1  correct?  Not the whole world is in the AFIS system,

2  correct?

3      A.    That's true.

4      Q.    Okay.  So when you don't get a match against

5  AFIS it just means it's not a match against somebody who

6  is in that system, correct?

7      A.    That's all that means, yes, ma'am.

8      Q.    Theoretically you can get a match against

9  somebody else who lives in the city or county of El Paso,

10 correct?

11     A.    Yes, ma'am.

12     Q.    And once it doesn't match -- once the three

13 remaining latents of evidentiary value don't come up with

14 a match in AFIS, you personally do nothing further to try

15 to match those three latents, correct?

16     A.    No, in this case once I searched through our

17 local AFIS, I went ahead and filed them with the case.

18     Q.    You put them in an envelope and filed them away,

19 that was the end of those?

20     A.    Yes, ma'am.

21     Q.    And so you have no idea who made those other

22 three remaining latent prints?

23     A.    I don't have the faintest idea who made them.

24     Q.    And those are the same ones that came -- brought

25 to you from Officer Velez that he had gotten off the van,

1   correct?

2       A.   Yes, ma'am.

3       Q.   Now, as far as the comparison between the known

4   inked print and the latent, State's Exhibit 6 and 7 that

5   we've been looking at, and as far as your testimony that

6   it is a match to David Renteria, you cannot tell us when

7   that palm print was made on that plastic bag, can you?

8       A.   No, I cannot.

9       Q.   You can't tell us if it was made November 1st,

10  2001 or if it was made December 1st, 2001?

11      A.   I can't tell you the age of that print that was

12  located on that bag.

13      Q.   You can't tell us the age, nor can you tell us

14  when it was made in relation to the facts of the offense,

15  correct?  If it was made -- you can't tell us if that

16  print was made before or after the victim was actually

17  killed, correct?  You just don't know when?

18      A.   No.  All I know is Mr. Renteria made the print.

19  That's the only thing I can tell you for sure.

20           MS. PAYAN:  No further questions.  Pass the

21  witness.

22           THE COURT:  Anymore questions?

23           MR. ESPARZA:  I have a few, Your Honor.

24                  REDIRECT EXAMINATION

25  BY MR. ESPARZA:

1    Q.    Whose prints go into AFIS?

2    A.    Anybody that is arrested for a Class B

3 misdemeanor and above and -- by the City of El Paso

4 Police Department.  And we also have city employees and

5 some older prints of some older taxi cab drivers.  But

6 for the most part, 95 percent of it is -- it's criminals.

7 Whether they're adults or juveniles that's who's

8 basically in our system, and that's who's basically in

9 all the systems.

10    Q.    You get arrested for a Class A misdemeanor, you

11 get booked, you get a known print that goes into AFIS?

12    A.    You're going into AFIS, yes, sir.

13    Q.    You get arrested for a third-degree felony or a

14 state jail felony, you get arrested, booked, you give a

15 known print, does that go into AFIS?

16    A.    Yes, sir.

17    Q.    And as you said only criminals basically are in

18 AFIS?

19    A.    Yes, sir.

20          MR. ESPARZA:  I don't have any further

21 questions.

22          <u>RECROSS-EXAMINATION</u>

23 BY MS. PAYAN:

24    Q.    Just to clarify, that's obviously known

25 criminals, correct?  Actual criminals who have been

1  caught committing a crime, correct?

2      A.   Yes, ma'am.

3      Q.   I mean, there could be all kind of criminals out

4  there that haven't been caught?

5      A.   Yeah -- no, we've got criminals that ain't been

6  caught.

7      Q.   So they're not in AFIS?

8      A.   They ain't in AFIS.

9      Q.   Thank you.

10             MR. ESPARZA:  I have just one question.

11                    REDIRECT EXAMINATION

12 BY MR. ESPARZA:

13     Q.   But if you are in jail for a Class B or above

14 you are in AFIS?

15     A.   Yes, sir.

16             MR. ESPARZA:  I don't have anything

17 further.

18             THE COURT:  Anything else?

19             MS. PAYAN:  No, nothing further,

20 Your Honor.

21             THE COURT:  All right.  You may be excused.

22             Call your next witness.

23             MR. ESPARZA:  Your Honor, actually it's

24 going to be Dr. Contin.

25             Could I have just a moment?

1          THE COURT:  The next witness may be

2  lengthy.  Do you want to take a break now before you have

3  to break in the middle?  All right.  Is that a yes or

4  just --

5          THE JURY:  No.

6          THE COURT:  -- or you just sit here and go

7  with the flow.

8          THE JURY:  We're good.  We're fine.

9          THE COURT:  Raise your right hand.

10          (Wherein the witness was sworn.)

11          THE COURT:  Please be seated.  You may

12  proceed.

13          MR. ESPARZA:  Thank you, Your Honor.

14                  JUAN CONTIN,

15  having been first duly sworn, testified as follows:

16                  DIRECT EXAMINATION

17  BY MR. ESPARZA:

18     Q.    Doctor, would you state your name for the

19  record?

20     A.    Dr. Juan Contin.

21          MR. ESPARZA:  And while I was busy working

22  over here, Your Honor, he spelled his name?

23          THE COURT:  No.

24     Q.    (BY MR. ESPARZA)  Okay.  Would you spell your

25  last name for me, Doctor.

1    A.    C-O-N-T-I-N.

2    Q.    And can you tell me what is your occupation?

3    A.    I'm a medical examiner.

4    Q.    And how long have you been a medical examiner?

5    A.    Since 1976.

6    Q.    Always here in El Paso?

7    A.    Yes.

8    Q.    And it would be fair to say that you've

9    testified many times?

10    A.    Over 300 times, yes.

11    Q.    And I know you've done this about 300 times but

12    could you tell the ladies and gentlemen of the jury what

13    your educational background is that entitles you to hold

14    the position that you hold?

15    A.    I received an MD degree from the University of

16    Santo Domingo in the Dominican Republic in 1960.  I came

17    to the United States in 1961, and then I did one year of

18    rotating internship at the --

19    Q.    You know, Doctor --

20    A.    Yes.

21    Q.    -- I can hardly hear you from over here.  I know

22    you've done this a million times.  Your background and

23    experience, but they can't hear you back here?

24         THE COURT:  We also have a problem in this

25    courtroom, and I've been on them for over a month to fix

1  whatever noise it is is above your head.  I apologize for

2  it.  They've come and looked, said there's nothing wrong;

3  they don't have to sit here.  So, please, loud and clear

4  for all of them.

5           THE WITNESS:  I said I received an MD

6  degree at the University of Santo Domingo in the

7  Dominican Republic in 1960.  I came to the United States

8  in 1961.  And went to the Bronx -- to the Mount Vernon

9  Hospital in Mount Vernon, New York where I completed one

10  year of rotating internship and one year of pathology.

11           In 1962, I went to the Bronx Municipal

12  Hospital Center in New York where I completed my

13  residency in pathology which I finished in 1966.  That

14  same year, I returned to the Mount Vernon Hospital as

15  assistant pathologist up to 1968.  In '68, I joined the

16  U.S. Army and I served one year in Fort Gordon, Georgia

17  and one year in Vietnam.

18           After returning from Vietnam, I became a

19  chief pathologist for a hospital in Spring Valley,

20  New York.  During that period between '70, '71 to 75, I

21  also was a pathologist with the Medical Examiner's Office

22  in Brooklyn County, New York.  In '75, I came to El Paso.

23  And in '76, I became deputy medical examiner.  And then

24  in '78, I became chief medical examiner.  A position I

25  held until the year 2000.  That year I continued working

1  for the medical examiners on contract, and I have been

2  there since then.

3       Q.   So now you're on a contract basis with the

4  County?

5       A.   Yes.

6       Q.   Could you tell the ladies and gentlemen of the

7  jury just exactly what is forensic pathology?

8       A.   The dictionary definition is the application of

9  medical facts for legal problems.  We do autopsies to

10  determine the cause of death and establish the nature of

11  the injuries or illnesses that may be present in the

12  body.

13       Q.   And what is an autopsy?

14       A.   The word "autopsy" means is seeing with your own

15  eyes.  It's an examination of the body after death for

16  the purpose of establishing the cause of death.

17       Q.   And how many autopsies do you believe you have

18  performed?

19       A.   Probably way over 7,000.

20       Q.   And have you testified before regarding forensic

21  pathology?

22       A.   Yes, here in El Paso at least 300 times.

23            MR. ESPARZA:  Your Honor, at this time I

24  tender Dr. Contin as an expert in forensic pathology.

25            MR. GANDARA:  We were well aware of

1    Dr. Contin's qualifications.  We have no objection.

2                     THE COURT:  Proceed.

3         Q.   (BY MR. ESPARZA)  On November 19th, 2001, did

4    you perform an autopsy on a person you knew as Alexandra

5    Flores?

6         A.   Yes, I did.

7         Q.   Let me show you State's Exhibit No. 8 which has

8    been previously admitted.

9         A.   This is a copy of the autopsy report I performed

10   on Alexandra Flores.

11                    THE COURT:  Louder please, Doctor.

12                    THE WITNESS:  Okay.  This is a copy of the

13   autopsy report I prepared for Alexandra Flores.

14        Q.   (BY MR. ESPARZA)  And I noticed while I was

15   looking over your shoulder, do you have a copy of the

16   report there with you?

17        A.   Yes, I do.

18        Q.   On November 19th, 2001 -- and you performed the

19   autopsy there at the Medical Examiner's Office?

20        A.   Yes.

21        Q.   Was that the first time that you saw the body of

22   Alexandra Flores?

23        A.   No, I went to the scene where she was found.

24        Q.   And why did you go to the scene, Doctor?

25        A.   You know on some occasions the police request

1  that the medical examiner go to the scene.  In this case,

2  they called me and I went.

3      Q.    And about what time did you go to the scene?

4      A.    It must have been a little after 8:00, around

5  there.

6      Q.    And could you tell us, did you enter what the

7  police department calls the "red zone" to look at the

8  body?

9      A.    Well, I just went to the vicinity of where she

10  was.  I didn't come in contact with the body, no.

11     Q.    And could you tell us on November 19th, 2001,

12  what did you see when you approached the body?

13     A.    Well, there was a young child there lying on the

14  porch.  Obviously, there was some evidence of fire around

15  the body, partly because the body was partially burned.

16     Q.    How long would you say you stayed there at the

17  scene?

18     A.    Maybe 30 minutes.  No more than one hour.

19     Q.    From your examination of -- eventually the body

20  was taken to the Medical Examiner's Office?

21     A.    Yes.

22     Q.    And did you ever speak to any officers there

23  at -- with the El Paso Police Department with the

24  criminalistic unit?

25     A.    Yeah, there was several police officers there.

1    I remember one of them because I -- he -- I mean, I know

2    him for many years.

3        Q.   And did they make a request of you?

4        A.   Yes.

5        Q.   What did they want you to do?

6        A.   I mean they wanted me to see the surroundings of

7    where she was found.

8        Q.   Okay.  And then when you went to the Medical

9    Examiner's Office were they there as well?

10       A.   Yes.

11       Q.   And did they make a request of you regarding

12   tests they wanted to perform?

13       A.   Yes, they wanted to look for fingerprints on the

14   body, which is a common practice.  And for that they have

15   to do a special technique that they use on chemicals to

16   see if they are able to detect the fingerprints on the

17   body.

18       Q.   And did you give them permission to do that?

19       A.   Yes.

20       Q.   When that was completed what happened then?

21       A.   Then we proceeded to do the autopsy.

22       Q.   What is the very first thing you do when you

23   begin the autopsy, Doctor?

24       A.   The first thing you do is an external

25   examination, which means examination of the surface of

1   the body.

2     Q.   There is a time, is there not, Doctor, when the

3   body -- you see the body as it is, and then is the body

4   cleaned up?

5     A.   Yes, we see the body as it is, we take

6   photographs, and then we clean the body to look for any

7   other evidence of injuries or markings on the body.

8           THE COURT: All right. We have a juror

9   who's having a hard time hearing you, Doctor. Repeat

10   your answer please. Do you need to have the --

11     Q.   (BY MR. ESPARZA) Doctor, could you repeat your

12   answer? I'm sorry, could you repeat your answer in

13   regards to the external examination and when she's

14   cleaned?

15     A.   Well, when the body gets there we take

16   photographs of the way the body looks like, then we wash

17   the body to look for any evidence of injury or illness or

18   markings on the body.

19     Q.   I'm going to show you what's marked as State's

20   Exhibit 3 and 4, and is this how she looked prior to you

21   cleaning the body up?

22     A.   Yes.

23     Q.   I'm going to put State's Exhibit No. 3 on the --

24   up on the screen. Doctor, you can look to your left and

25   see the photograph.

1    A.    This is a photograph of the face before she was

2 cleaned.

3    Q.    And can you describe what's on the upper part of

4 the head --

5    A.    There was --

6    Q.    -- of Alexandra Flores?

7    A.    There was a partial-burned transparent --

8 transparent plastic bag on her head.  It was fairly well

9 preserved from the level of the mouth and nose to the top

10 of the head.

11    Q.    And I'm going to show you State's Exhibit No. 9

12 which has been previously admitted.

13    A.    This is --

14    Q.    What is State's 9?

15    A.    This is the way the face looked after the

16 plastic bag was removed.

17    Q.    And was the bag removed in your presence?

18    A.    Yes.

19    Q.    In your autopsy report you indicate the length

20 of the hair; what was the length of her hair?

21    A.    The length of the hair is about ten inches in

22 length.

23    Q.    And how tall was she?

24    A.    She was 47 inches, just one inch short of four

25 feet.

1    Q.   And how much did she weigh?

2    A.   56 pounds.

3    Q.   And did you know how old she was?

4    A.   Yeah, she was five according to the information

5  that was given to me.

6    Q.   I'm going to show you what's been marked as

7  State's Exhibit 43 that has been previously admitted.

8              THE COURT:  You said 40 or 23?

9              MR. ESPARZA:  43.  I'm sorry, Your Honor,

10  43.

11   Q.   (BY MR. ESPARZA)  And can you measure from the

12  toe to the head, tell me the distance?

13   A.   It's about 47.

14   Q.   47 inches?

15   A.   Yes.

16   Q.   So she was according -- this is the height of

17  Alexandra Flores?

18   A.   Yes.

19   Q.   And I think the first thing that you looked at

20  as you started your external examination were her eyes?

21   A.   Yes.

22   Q.   Tell me, when you examined her left eye, what

23  did you see?

24   A.   She had the -- it was -- it's called a petechial

25  hemorrhage of the -- what is called palpebral

1 conjunctiva. The palpebral are the lining of the

2 eyelids. She had a pinpoint hemorrhage there. And there

3 was another hemorrhage that was noted on the -- what is

4 called the bulbar conjunctiva of the right eye which is

5 the lining of the eye itself on the right side adjacent

6 to the side of the eye.

7     Q. The hemorrhage on the left eye, a petechial

8 hemorrhage, what would that be the result of?

9     A. That's usually associated with strangulation.

10     Q. I'm going to show you what's been marked as

11 State's Exhibit 17 and has been previously admitted.

12 What eye are we looking at, Doctor? Can you see that?

13     A. Yes, that's the --

14     Q. Do you need me to back it out?

15     A. That's the right eye.

16     Q. On 17 and 18 -- should I show them to you

17 together? Let me show them to you together. This is 17

18 and this is 18.

19     A. Okay. 17 shows the hemorrhage in the eyeball

20 itself and the -- 18 shows the hemorrhage in the eyelid,

21 inside the eyelid.

22     Q. I'm going to ask you to point using this. Push

23 there.

24            17 -- again what eye are we looking at,

25 Doctor?

1      A.     That's the right eye.  The hemorrhage would be

2  here and this is the hemorrhage.

3      Q.     And where's the hemorrhage?

4      A.     All the red area you can see here.

5      Q.     And State's Exhibit 18?

6      A.     Yeah, this is the left eye with the eyelid --

7  the eyelid is pulled down, and you can see the

8  hemorrhage.  This is the pupil here and this is the

9  hemorrhage on the eyelid of the inside.

10     Q.     And then you had an opportunity to -- you made

11 your observations regarding the appearance, or what her

12 tongue looked like:  Could you tell us what that looked

13 like?

14     A.     Yeah, the tongue was protruding.  It was

15 sticking out a little bit and was burned.

16     Q.     I'm now showing you State's Exhibit No. 9, and

17 like I said it's previously admitted.  Could you show

18 that with the pointer?

19     A.     This is the nose here and you can see this is

20 the mouth and the tongue was protruding and it was

21 burned.

22     Q.     And what was the condition of her nose?

23     A.     Her nose was burned.

24     Q.     Fractured, not fractured?

25     A.     There was no evidence of fracture, and she --

1   there was blood -- a bloody fluid oozing from the

2   openings of the nose.

3       Q.   And why would that be?

4       A.   This could be different things.  It could be

5   postmortem what is called purge.  The body after a while

6   will start oozing blood from her nose.  It's possible

7   that she had a previous injury that I couldn't see.  If

8   she had another injury it would be inside, and you cannot

9   see that during the autopsy.

10      Q.   And what were the conditions of her ears and her

11  neck?

12      A.   Her ears were almost completely charred.  In

13  other words burned, and so was the neck.  The skin of the

14  neck couldn't be recognized as skin, it was charcoal.

15      Q.   Were you able to -- in regards to the neck were

16  you able to see whether or not there was any bruising?

17      A.   Well, if there was any there it was obscured by

18  the burning.  I couldn't see.

19      Q.   And her umbilicus area, what did you see there?

20      A.   She had a third degree burn of the skin and the

21  area of the belly button was more burned then the

22  surrounding skin.

23      Q.   And did you have an opinion as to why that

24  occurred?

25      A.   Yeah, I think they put some sediment or gasoline

1   or some kind of a sediment, and since liquid has a

2   tendency to pool in the belly button when you are lying

3   down, probably generate -- the burning of the fluid

4   generated more heat and it is surrounding the skin and

5   this takes longer for the fluid to burn because it was --

6   there was a little pool of fluid there.

7      Q.   Let me show you what's been marked as State's

8   Exhibit 104 and previously admitted.  Does that look

9   familiar, Doctor?

10     A.   Yes.

11     Q.   And what is State's Exhibit 104?

12     A.   That's the way -- the position that she was when

13  I went to see her at the scene.

14     Q.   The umbilicus area that you were referring to,

15  could you point that out with your pointer?

16     A.   Yes.  You see the skin in the belly button was

17  burned more than the -- well, the skin of the abdomen was

18  barely burned, but this was a third degree burn, the skin

19  of the belly button.

20     Q.   So the accelerant probably sat there for a

21  little while?

22     A.   Yes.

23     Q.   If you look around the outlining of her body

24  there seems to be an area, a shadow of some sort; what is

25  that?

1    A.    You're talking about this?

2    Q.    Uh-huh.

3    A.    It's a body -- that oozes when a person is

4 burned.

5    Q.    Okay.  But how about like right here and up in

6 her vaginal area, this here, what is that?

7    A.    This is all burned there, you know, it looks

8 like charcoal.

9    Q.    I'm going to show you what's been marked as

10 State's Exhibit 14 and it's been previously admitted.

11 Does that look familiar, Doctor?

12    A.    Yeah, that's her right hand.

13    Q.    And what were you able to observe of her right

14 hand?

15    A.    She had superficial abrasions, which are

16 scratches on the back of the right second and third

17 finger; and the left second finger and right knuckles.

18 In addition, she had a ring on one of the fingers of the

19 right hand.

20    Q.    Did you also -- in the process of doing your

21 examination, did you examine her hymen and vagina area?

22    A.    Yes, we checked her --

23              MR. GANDARA:  Objection, relevance,

24 Your Honor.

25              THE COURT:  Overruled.

1          THE WITNESS:  No, we checked her for any

2 evidence of injury to the genital area and the anus,

3 there was none.

4     Q.    No injury to the hymen?

5     A.    No.

6     Q.    No injury to the vagina?

7     A.    No.

8     Q.    And the anus?

9     A.    No, there was no injury.

10     Q.    When you began -- -- after you do your external

11 examination, then what do you do?

12     A.    We proceed to do an internal examination by

13 opening the head, the chest, the abdomen, and the neck.

14     Q.    And did you observe injuries?

15     A.    Yes, she had injuries confined mainly to the

16 neck.

17     Q.    Could you describe for the ladies and gentlemen

18 of the jury the extent of those injuries?

19     A.    In the neck she had what is called interstitial

20 hemorrhage -- which means a bruise -- along the carotid

21 sheath -- the carotid sheath is a very strong tissue that

22 envelops the carotid arteries, and she had hemorrhage

23 there commonly associated with strangulation.  This was

24 more prominent on the right.  She had hemorrhage of what

25 is called the strap muscles of the larynx.  We've got

1  muscles on top of the larynx.

2          She had also hemorrhaged on the posterior

3  aspect of the larynx -- which is the back of the larynx

4  which is next to the esophagus.  She had hemorrhage of

5  the right lobe of the thyroid gland.  That's the thyroid

6  gland that is on top of the Adam's apple.  And she also

7  had a hemorrhage of the thyroid cartilage itself.  And

8  there was -- the injuries you can see -- you can see at

9  this time in the neck.

10     Q.   I'm going to show you State's Exhibit 43 and I'm

11  going to hold State's 43, and can you tell us where the

12  injuries were in what area?

13     A.   The injuries were -- the carotid arteries run

14  from here, the thorax to the neck, she had a hemorrhage

15  there.  And then the thyroid gland and the thyroid

16  cartilage right here, and she had hemorrhage there -- and

17  then the hemorrhage was located to the front by the neck.

18     Q.   And were you able to determine what caused those

19  injuries?

20     A.   This is caused by compression of the neck.

21     Q.   And are you able to determine how or what

22  instrument, if any, were used to make those injuries?

23     A.   I concluded this was probably manual

24  strangulation because she had many injuries compared to

25  other cases I have done.

1    Q.   I'm sorry, manual strangulation?

2    A.   Yes.

3    Q.   What is that?  Does that mean with your hands?

4    A.   With your hands.  Naturally other methods will

5  give you the same result if somebody's strangled with an

6  arm around the neck -- a chokehold they call it, but I

7  rule out like ligature strangulation caused by a belt or

8  a cord because in those cases the hemorrhage is very

9  limited to the area where the compression is.  When you

10 use a larger, so-to-say, weapon you have more extensive

11 hemorrhage like in this case.

12   Q.   So it could have been somebody's hands?

13   A.   Yes.

14   Q.   Or it could have been maybe an arm?

15   A.   Yes, it's possible.

16   Q.   You are able to see the extent of the injuries

17 in that area, in her neck area?

18   A.   Yes.

19   Q.   And taking into account the injuries that you

20 saw to her eyes, can you tell the ladies and gentlemen of

21 the jury what degree of force was applied in order to

22 cause those injuries, if the scale is from zero, not very

23 much force; and four, being an extreme amount of force?

24   A.   Well, I 'd say four because she had more

25 hemorrhage then many cases I've done on strangulations.

1    Q.    You checked out areas like her cardiovascular

2  area?

3    A.    Yes, we did the complete examination of

4  different organs and the only significant findings --

5              THE COURT:    Okay.  We have a juror that

6  can't hear you.  Louder.

7              THE WITNESS:    The only significant finding

8  that were connected to the strangulation she had

9  hemorrhage of the thyroid gland, I mean, of the thymus

10 gland which is not -- this is not the result of direct

11 pressure to the gland due to the -- elevated pressure of

12 the capillaries and rupture -- the same mechanisms that

13 rupture the capillaries of the eyes.

14   Q.    So the injury to the thymus was the result of

15 the strangulation?

16   A.    Yes.  And so were a few hemorrhages in the

17 inside of the larynx.  Not outside, inside.

18   Q.    You examined her -- the respiratory system?

19   A.    Yes.

20   Q.    And I note that you -- in your autopsy you state

21 that there was no soot?

22   A.    No, there was no indication that she was alive

23 when she was burned.  When you are burned you take a

24 couple of breaths, soot will get into the -- into the

25 trachea and it will stain the trachea and the larynx.  In

1  addition, with the -- I'm sorry, level and it was zero, I

2  mean, she was dead when she was burned.

3      Q.   I showed you the front side, her whole frontal

4  view.  I'm going to show you her back side now, it's

5  State's Exhibit No. 10 and it's been previously admitted.

6  If you'd look on your screen, is that the back side of

7  Alexandra Flores?

8      A.   Yes, you can see that she has third-degree burns

9  in many areas.  The spared areas are those areas that

10  were touched with the ground at the time of the fire and

11  I didn't have a chance to get that.  But this is all

12  charcoal here.

13      Q.   The charcoal areas are the third-degree burns?

14      A.   Yes.

15      Q.   And the area -- is this burned or was it --

16      A.   It's cooked a little bit, I call it second

17  degree burns.

18      Q.   Okay.  And that occurred after she died?

19      A.   Yes.

20      Q.   You examined her stomach.  Did you examine her

21  stomach?

22      A.   Yes, we always check the contents of the

23  stomach, yes.

24      Q.   And in this case was there any contents in her

25  stomach?

1    A.    She had about 70 grams of food.  So many pieces

2 were identifiable.

3    Q.    First, let's talk about 70 grams.  70 grams --

4 can you translate that to ounces?

5    A.    Well an ounce is about 27 -- 27 grams, then

6 there's 50 -- 70 grams is just a little bit over two

7 ounces.

8    Q.    And you were able to identify some items that

9 was in that fluid?

10    A.    Yeah, there was shredded orange.  The orange

11 wedges were identifiable.

12    Q.    Orange wedges as in the wedge of an orange

13 fruit?

14    A.    Yes.

15    Q.    Not an orange-slice candy?

16    A.    Yes.

17    Q.    Her muscular -- musculoskeletal system, could

18 you tell us what you determined after your examination?

19    A.    Well, she had no born injuries.  The muscles

20 looked healthy.

21    Q.    And did you examine her -- she was -- I'm sorry,

22 she was healthy?

23    A.    Yes.

24    Q.    Well developed?

25    A.    Well developed, well nourished.  No evidence of

1  any illness.

2     Q.    No reason to die versus some extenuating force?

3             MR. GANDARA:  Objection, leading.

4             MR. ESPARZA:  That's okay.

5             THE COURT:  Overruled.

6     Q.    (BY MR. ESPARZA)  No reason to die?

7     A.    No.

8             MR. GANDARA:  Objection, leading.

9     Q.    (BY MR. ESPARZA)  The central nervous system,

10 did you examine that area?

11    A.    Yes, the only significant findings when I did

12 the head was that she had two separate bruises in the

13 skull.  What you do is you cut the skin from ear to ear,

14 then you pull half of the skull forward and the other one

15 backwards.  By doing that we expose the inside of the

16 skull and there was an area of hemorrhage in the right

17 occipital area -- which is the back of the right ear, in

18 the back, and there was another hemorrhage in the left

19 frontal area -- which is the left forehead, each of the

20 contusions was about two inches by two inches.

21    Q.    I'm going to show you these two squares that

22 I've cut out already.  Can you tell me what is the size

23 of these two squares?

24    A.    We've got two inches by two inches.

25    Q.    And this one?

1    A.   The same.

2    Q.   And that was -- two-by-two is the size of the

3 bruising that you found when you examined her brain?

4    A.   No, no.  In the skull.

5    Q.   In the skull?

6    A.   In the scalp.

7    Q.   I see, in the scalp?

8    A.   Yes.

9    Q.   Okay.

10        MR. ESPARZA:  Could I have the witness

11 approach the jury, Your Honor?

12        THE COURT:  Yes.

13    Q.   (BY MR. ESPARZA)  If this represents the size of

14 the bruised area, could you point that on me, generally

15 where it was located in the front there?

16    A.   That's the left forehead.

17    Q.   And if you put this one -- so about right here?

18    A.   Yes.

19    Q.   I'm going to turn around here.

20    A.   This is the occipital area.

21    Q.   And you can have a seat.  And were you able to

22 determine whether or not they -- those two injuries came

23 from independent blows?

24    A.   They were two separate injuries, yes.

25    Q.   Not together, not one from another?

1     A.    They were not connected.  They were on the

2 opposite sides of the head.

3     Q.    And did you form -- after your autopsy, did you

4 form an opinion as to the cause of death?

5     A.    The opinion was that the child -- this child

6 died from asphyxia due to manual strangulation, and that

7 the manner of death was homicide.

8     Q.    Were you able to determine -- so she died

9 because somebody strangled her?

10    A.    Yes.

11    Q.    Were you able to determine whether or not there

12 had been any type of sexual assault?

13            MR. GANDARA:  Objection, Your Honor,

14 relevance.

15            THE COURT:  Overruled.  You may answer.

16            THE WITNESS:  There was no indication that

17 I could determine that she was sexually assaulted, no.

18    Q.    Well, from your examination you were not able to

19 determine whether or not she had been sexually

20 penetrated?

21            MR. GANDARA:  Objection, Your Honor,

22 relevance, and it calls for -- he's already answered that

23 there was no sexual assault.  And it's -- calling for

24 speculation.

25            THE COURT:  Overruled.

1    Q.   (BY MR. ESPARZA)  You may answer.

2    A.   Well, sexual assault is a legal conclusion.  Not

3 a medical conclusion.  She had no injuries that indicated

4 that she was sexually injured somehow.

5    Q.   Well, I know, but listen to my question, Doctor.

6 I asked in regards to penetration?

7    A.   Yes.

8    Q.   Was there any -- from your findings, was there

9 any indication that there was penetration?

10           MR. GANDARA:  Objection, Your Honor,

11 relevance.

12           THE COURT:  Overruled.

13           THE WITNESS:  There was no damage to the

14 hymen, no, but that doesn't mean that she wasn't touched.

15           MR. GANDARA:  Objection, responsiveness.

16           THE COURT:  Overruled.

17    Q.   (BY MR. ESPARZA)  Were you able to determine

18 whether or not she was touched, like in her vaginal area,

19 or not?

20           MR. GANDARA:  Objection, speculation,

21 Your Honor.

22           THE COURT:  Overruled.

23           THE WITNESS:  There was -- I couldn't say

24 that she was because I couldn't see any physical evidence

25 that she was touched, but that doesn't mean that she was

1  not touched.

2          MR. GANDARA:  Objection, responsiveness and

3  speculation.

4          THE COURT:  Overruled.

5     Q.   (BY MR. ESPARZA)  Okay.  I asked you about her

6  vagina area, how about her anus?

7     A.   The anus there was no injuries.  There was no

8  evidence of it.  Anything that could tell me that she had

9  penetration, no.

10     Q.   And -- but you could not rule out she was

11  touched?

12          MR. GANDARA:  Objection; leading,

13  speculation, relevance.

14          THE COURT:  Sustained as to leading.

15  Overruled as to relevance.

16     Q.   (BY MR. ESPARZA)  Can you tell the ladies and

17  gentlemen of the jury whether or not you were able to

18  rule out she was touched in any of those areas?

19     A.   No.

20     Q.   Whether there was contact in any of those areas?

21     A.   No.

22     Q.   In order -- can you -- did you form an opinion

23  or can you tell us from your experience, in order to have

24  the bruises of the two-by-two in the front and in the

25  back area, the amount of force it would take to cause

1  that size injury?

2      A.    It doesn't require a tremendous force because

3  you can even do this with your knuckles.  When you bump

4  your head walking into a car.

5      Q.    All right.  There was some injury, I mean, there

6  was some force?

7      A.    There was an impact, yes.

8      Q.    Okay.  And did you --

9            MR. ESPARZA:  I need one moment,

10 Your Honor.

11           I need to approach the evidence,

12 Your Honor.

13           THE COURT:  All right.

14           MR. ESPARZA:  May I proceed, Your Honor?

15           THE COURT:  Yes.

16     Q.    (BY MR. ESPARZA)  Let me show you what I've

17 marked as State's Exhibit No. 19 that's been previously

18 admitted.  Can you identify that?

19     A.    Yeah, this is called an FTA card.  It's used to

20 collect the blood sample.

21     Q.    Did you mark it?

22     A.    Yes.

23     Q.    Okay.  I had just opened State's Exhibit No. 19

24 and we unfolded the tinfoil.  What is inside that?

25     A.    What's inside that is blood.  It's marked with a

1  case number of the autopsy and name, and the date, and my

2  initials, and there are some other initials there.

3     Q.   Not yours?

4     A.   No.

5     Q.   And what's the purpose of the FTA card?

6     A.   It's to preserve the blood sample to be used in

7  the future.

8     Q.   And whose blood is preserved on State's Exhibit

9  No. 19?

10     A.   Alexandra Flores.

11     Q.   And you did this?

12     A.   Yes, that's my initial here.

13     Q.   Doctor, now I'm going to show you a series of

14  photographs, 11 -- State's 11, State's 12, State's 13,

15  State's 15, and State's 16; are you familiar with those

16  photographs?

17     A.   Yes, uh-huh.

18     Q.   And they have been previously admitted.  What is

19  State's -- let me -- this is State's Exhibit No. 11; as I

20  said it was previously admitted; can you tell me what we

21  see here?

22     A.   You can see here the -- that's the genital area,

23  that's the right foot, and this is the knee, and this is

24  the right thigh.

25     Q.   And State's 12?

1    A.   This is the right hand, this is the right

2 forearm, the right elbow, the right arm.

3    Q.   What's this, Doctor?

4    A.   That's a blood smear.

5    Q.   Did you test that?

6    A.   No.

7    Q.   Or attempt to identify the blood?

8    A.   No.  We don't -- normally we don't do that

9 ourselves, no.

10    Q.   I'm now showing you State's Exhibit 13?

11    A.   That's the right hand.

12    Q.   And this area in here?

13    A.   There is a little blood, a smear on the palm of

14 the right hand.

15    Q.   And did you test that blood?

16    A.   No, I did not.

17    Q.   To determine whether it was hers or from someone

18 else?

19    A.   Normally we don't do that kind of work.

20    Q.   You're not saying it wasn't done, you just

21 didn't do it?

22    A.   Yes.

23    Q.   State's Exhibit 15?

24    A.   That's the left hand.

25    Q.   And this area right here?

```
 1      A.    You can see some blood, a bloody smear on the

 2  hand.

 3      Q.    And did you test that blood?

 4      A.    No, I did not.

 5      Q.    And let me show you State's 16; what do you see

 6  on 16?

 7      A.    I can see some scratches in the hand on this

 8  finger.

 9      Q.    Were they fresh, the scratches?

10      A.    They look like fresh, yes.

11      Q.    By "fresh" do you mean just prior to death or --

12      A.    Well, it's possibly saying that scratch -- one

13  hour, two hours, three hours they look the same.  Maybe

14  after a day they would look different, but these look

15  fresh.

16      Q.    When you examined the stomach -- Doctor, you

17  examined the stomach?

18      A.    Yes.

19      Q.    And you observed those orange wedges?

20      A.    Yes.

21      Q.    Can you tell the ladies and gentlemen of the

22  jury how long had it been -- I should put it this way,

23  I'm sorry.  When did she eat those oranges?

24      A.    The only thing I can say that probably three --

25  within three hours before she died.
```

1  Q. Within three hours?

2  A. Yes, before she dies.

3  Q. Everything stopped, I guess, at the point of

4 death, right?

5  A. Yes.

6  Q. Was there more that you could identify in the

7 digestive fluids?

8  A. There was mushy unidentifiable fluid.

9  Q. Would you happen to be able to determine at what

10 point that mushy fluid was eaten?

11  A. No, you can't tell.

12  Q. Just within three hours?

13  A. Probably three hours -- within three hours

14 before death.

15  Q. On the cause of death were you able to, with

16 certainty, determine the manner and means of the death?

17     MR. GANDARA:  Objection, asked and

18 answered.

19     THE COURT:  Overruled.

20  Q. (BY MR. ESPARZA)  How?

21  A. Well, she was strangled.

22  Q. With what?

23  A. With pressure of the neck, most likely by the

24 hands.

25  Q. Most likely by the hands?

1    A.   Yes.

2    Q.   Could it have been another instrument?

3    A.   As I said, it's possible that they used the arm,

4  yes.

5    Q.   So in some ways it may not be able to be

6  determined?

7    A.   Well, not with a hundred percent sure, no.

8    Q.   So it could be the hands, could be something

9  else?

10    A.   Yes.

11            MR. ESPARZA:  I pass the witness

12  Your Honor.

13            THE COURT:  Mr. Gandara?

14                CROSS-EXAMINATION

15  BY MR. GANDARA:

16    Q.   Good afternoon, Doctor.

17    A.   Hi.

18    Q.   You went out to the scene on November 19th,

19  where the child was -- the child's body was found?

20    A.   Yes.

21    Q.   At 7:00 or 8:00 in the morning?

22    A.   It must have been about 8:00.

23    Q.   About 8:00 in the morning?

24    A.   Yes.

25    Q.   And you have no idea how long the child had laid

1  there?

2     A.    No.

3     Q.    And you have no accurate idea of the hour of her

4  death?

5     A.    No.

6     Q.    You can't tell whether it was within 24 hours,

7  48, what?

8     A.    Well, I mean, if I'm going to make an estimate I

9  would say within 24 hours, but you don't know the

10  circumstances after the death.  Where she was for awhile

11  or if she was taken there immediately, you know, the

12  issue --

13           THE COURT:  Excuse me.  The jury cannot

14  hear you.

15           THE WITNESS:  Apparently all through the

16  changes that helps you to determine the time of death --

17  actually the burning was cooking the body and the body

18  becomes stiff.

19     Q.    (BY MR. GANDARA)  You noticed a lividity that

20  you mentioned in your autopsy report; tell the members of

21  the jury what that is?

22     A.    Lividity is settling of the blood after death.

23  After you die, the blood stops flowing, and if you are

24  face up the blood goes to like gravity to the lowest

25  point, and then if you are facing up the blood will go to

1 the back. If the body is resting face down, then you

2 will have the lividity of the front. And if you are

3 hanging, then it will go to your legs.

4     Q. So that's one sign that you were able to observe

5 despite the burning?

6     A. Yes.

7     Q. And at the time a person dies all the bodily

8 process is stopped?

9     A. Yes.

10     Q. So the scratches that you observed on her hand

11 will not change significantly, of course, depending on

12 how long she's exposed to the elements?

13     A. Eventually everything gets dry. If you had been

14 dead after many hours or days, it becomes dried out.

15     Q. But you can't tell the members of the jury with

16 any accuracy what time she got those scratches on her

17 hand or how?

18     A. No.

19     Q. Now, the bruises on her scalp, you have no

20 opinion to offer the jury on how they were caused, how

21 they got there?

22     A. Can't tell, no.

23     Q. Nor when?

24     A. No, they were fresh, but they could be fresh 24

25 hours, 12 hours, six hours, they look the same.

1    Q.   Okay.  And when you talked about the

2  strangulation that you attribute as the cause of her

3  death, you ruled out ligature strangulation, which I

4  think you told the members of the jury is with a cord or

5  a belt or something like that?

6    A.   That's correct.

7    Q.   Because of the extension [sic] of the injuries?

8    A.   The injury is too extensive.  A ligature

9  separation leaves less markings of blood in the neck.

10    Q.   And so your first reaction, your first response,

11  about that was that it was a larger weapon?

12    A.   Yes.

13    Q.   But you're not absolutely sure specifically what

14  it was?

15    A.   That's correct.

16    Q.   And when a person dies the bodily systems cease,

17  including neurosensory responses, messages to the brain,

18  sensory messages, all that stops?

19    A.   Yes, no electricity.

20    Q.   No electricity and no pain.  No transmission of

21  sensation of pain?

22    A.   None whatsoever.

23    Q.   None whatsoever.  Now, the burns to young

24  Alexandra were post mortem you said?

25    A.   Yeah, they happened after death.

1    Q.   At a time where there's no way that she could

2 have felt them?

3    A.   That's correct.

4    Q.   And the -- would you tell us what the hyoid bone

5 is?

6    A.   The hyoid bone in children it's almost

7 impossible to break because it's made with very

8 elastic -- it's like rubber.

9    Q.   I see you're reading my mind about the question.

10 I wanted to let the members of the jury -- tell them what

11 it is.  What the hyoid bone is?  They may not know.  I

12 know what it is.

13    A.   The hyoid bone is the bone where the muscle of

14 the tongue attach -- other muscle goes to the hyoid and

15 to the larynx.  It serves as a point when you talk or

16 eat.

17    Q.   And, of course, you're anticipating my question

18 which was going to be that usually strangulation involves

19 fracture or injury to the hyoid bone?

20    A.   You can only see that in an adult because after

21 you get old it becomes calcified, it's hard.  In children

22 it's very rubbery.

23    Q.   It's cartilage?

24    A.   Yeah, cartilage.

25    Q.   That answers my question.  May I have a moment,

1   Your Honor?

2                 THE COURT: Yes.

3                 MR. GANDARA: Pass the witness. Thank you.

4                 MR. ESPARZA: I have two questions,

5   Your Honor.

6                 THE COURT: Proceed.

7               <u>REDIRECT EXAMINATION</u>

8   BY MR. ESPARZA:

9     Q. How long would it take a person to strangle

10   Alexandra Flores? How much time would it take for her to

11   die?

12                 MR. GANDARA: Object to repetition. The

13   doctor's already told the jury.

14                 THE COURT: Overruled.

15                 THE WITNESS: A person can live without

16   oxygen for three minutes.

17     Q. (BY MR. ESPARZA) I can't hear you, Doctor.

18     A. A person can live without oxygen for about three

19   minutes. In the strangulation it may take that long for

20   you to die. It is believed, based on experiments on

21   animals, that you may die before that due to atrial

22   fibrillation. In essence, the heart stops, but it takes

23   at least one minute of pressure before you die.

24     Q. So about at a minimum of three minutes to die?

25     A. Yes.

1          MR. GANDARA:  Objection, leading, and

2    outside the record.  Maximum of three minutes to die.

3          THE COURT:  Clarify.

4     Q.    (BY MR. ESPARZA)  You said it takes three

5    minutes, I assume, of constant pressure --

6     A.    Yes.

7     Q.    -- in order for the strangulation to be

8    complete?

9     A.    Yes.

10    Q.    Was that your response?

11    A.    Yes.

12    Q.    If the pressure is not constant it could take

13   longer?

14    A.    Yes, if the pressure is not constant, if the

15   person might take a few breaths and then, so to say,

16   revive temporarily, then it may take longer, yes.

17    Q.    And generally you're at least conscious for the

18   first minute?

19    A.    Yes.

20    Q.    Right?

21    A.    Yes.

22    Q.    And can you tell us the degree of pain involved

23   at least in the first minute of constant pressure to her

24   neck?

25          MR. GANDARA:  Objection, question calls for

1  speculation on the part of this witness.

2            MR. ESPARZA:  I asked him if he knows.

3            THE COURT:  Well, you'll have to ask him

4  that, otherwise I'm sustaining the objection.

5            MR. ESPARZA:  Thank you, Your Honor.

6       Q.    (BY MR. ESPARZA)  Do you know how much pain

7  would be involved in at least, I mean, just -- in at

8  least the first minute, assuming how much pain would be

9  involved in that manual strangulation?

10      A.    It's like someone is squeezing you across the

11 neck and what causes more pain is the air hunger.

12      Q.    The air hunger?

13      A.    Yeah, people feel like they want to breathe and

14 they cannot do it because the air cannot go through.

15      Q.    Very painful?

16      A.    Yes.

17            MR. GANDARA:  Objection, leading.

18            MR. ESPARZA:  I'll rephrase it.

19            THE COURT:  Overruled.

20            THE WITNESS:  Yeah, painful, physically and

21 mentally, too.

22            MR. ESPARZA:  I have no further questions.

23            MR. GANDARA:  Pass the witness.  No

24 questions.

25            THE COURT:  All right.  You may be excused.

1        Break?  Yes?  All right.  Very quickly.

2        Don't discuss the case.

3        (Recess taken.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF TEXAS                    )

COUNTY OF EL PASO                 )

    I, Evangelina Morales, Official Court Reporter in and for Criminal District Court No. 1 of El Paso County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

    I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

    I further certify that the total cost for the preparation of this Reporter's Record is $ 240.00  and was paid/will be paid by  County of El Paso.

    WITNESS MY OFFICIAL HAND this the   27th   day of  April   , 2009.


*Evangelina Morales*

EVANGELINA MORALES, Texas CSR #7523
Official Court Reporter
500 E. San Antonio, Rm. 1003
El Paso, Texas 79901
(915) 546-8192
Expires December 31, 2010