74829

# REPORTER'S RECORD
## VOLUME 69 of 84

### TRIAL COURT CAUSE NO. 20020D00230

| | |
|---|---|
| THE STATE OF TEXAS, | ) IN THE DISTRICT COURT OF |
| Plaintiff | ) |
| VS. | ) EL PASO COUNTY, TEXAS |
| | ) |
| DAVID RENTERIA, | ) |
| Defendant | ) 41st JUDICIAL DISTRICT |

---------------------------------------

Jury Trial Continued (Punishment Phase)

May 2, 2008 (Morning Session)

FILED IN
COURT OF CRIMINAL APPEALS

JUN 0 4 2009

Louise Pearson, Clerk

------------------------------------

On the 22nd day of APRIL 2008 the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Mary Anne Bramblett, Judge Presiding, held in El Paso, El Paso County, Texas:

Proceedings reported by machine shorthand.

ORIGINAL

APPEARANCES

Lori Hughes          SBOT NO. 00786275
Diana Meraz          SBOT NO. 13942600
Jaime Esparza        SBOT NO. 06666450
Office of the District Attorney
500 East San Antonio, Room 201
El Paso, Texas  79901
Phone:  (915) 546-2059
Fax:  (915) 533-5520
ATTORNEYS FOR THE STATE OF TEXAS


Jaime Gandara        SBOT NO. 07611900
Edythe Payan         SBOT NO. 00791415
Greg Velasquez       SBOT NO. 20540300
Office of the Public Defender
500 East San Antonio, # 501
El Paso, Texas  79901
Phone:  (915) 546-8185
Fax:  (915) 546-8186
ATTORNEYS FOR THE DEFENDANT

CHRONOLOGICAL INDEX
VOLUME 69 OF 84
Punishment Phase Continued

PAGE VOL.

MONDAY, APRIL 28, 2008

| DEFENDANT'S WITNESSES | Direct | Cross | V/D | Vol. |
|---|---|---|---|---|
| Frank AuBishon | 16,37 | 6,28 | | 69 |
| Mark Douglas Cunningham | 66 | | 40 | 69 |

Court Reporter's Certificate..................... 097   69

EXHIBIT INDEX

DEFENDANT'S

| NO. | DESCRIPTION | OFF'RD | ADMT'D | VOL. |
|---|---|---|---|---|
| 162-A | Redacted Exhibit | 27 | 27 | 69 |

1          (Friday, May 2, 2008)

2          (Open Court, defendant present, jury is

3 present)

4          THE COURT:  Good morning, ladies and

09:05AM  5 gentlemen.

6          JURORS:  Good morning.

7          MS. HUGHES:  Your Honor, could we approach the

8 Bench for a moment, please.

9          THE COURT:  Come on up.

09:05AM 10          (At the Bench, on the record)

11          MS. PAYAN:  We're missing somebody.  Our

12 client was not brought out.

13          THE COURT:  That could be a problem.

14          Martin, get the defendant in here.

09:06AM 15          MS. PAYAN:  Well, we don't want him coming in

16 and out like that.

17          THE COURT:  Well, we've had the transfer

18 officers here in uniform the entire time.  They've seen it.

19          MS. PAYAN:  Okay.

09:06AM 20          THE COURT:  Sorry.  We'll pay attention next

21 time.

22          MS. HUGHES:  The other thing, there was a

23 question yesterday wherein defense defined probability and

24 then asked do you think there is a probability that the

09:06AM 25 defendant would be a continuing threat to society.  I

1 objected to the definition of probability.  But I would not

2 object to them asking the question as it's phrased in the

3 two special issues, that is, is there a probability that

4 David Renteria would commit criminal acts of of violence so

09:06AM 5 that he constitutes a continuing threat to society.  I

6 would not object to that question as I do believe that's a

7 proper question even for a lay person to answer.

8 So that the record is clear, if the defense

9 wants to ask that question before passing the witness or

09:07AM 10 has other questions that they want to ask, I want to make

11 sure it's clear, I will not object to that as long as

12 there's no defining of probability.

13 MR. GANDARA:  If I ask him the question, I

14 would ask him to distinguish between the word possibility

09:07AM 15 and the word probability.

16 MS. HUGHES:  Which I think is a -- there's

17 some definition there, Judge.  I -- the question as it is

18 phrased I think is the appropriate way to ask the question

19 as it's phrased in the Court's charge and in the Code.

09:07AM 20 THE COURT:  Well, I'm not going to tell anyone

21 how to ask a question at this point in time.  Ask your

22 questions, raise your objections, if you have any.

23 MS. HUGHES:  I'm just saying we withdraw our

24 objection as to asking the question as it is in the Code.

09:07AM 25 THE COURT:  Well, that wasn't the objection

1 yesterday.  The objection was to the definition that the

2 attorney had placed on the word probability.

3          MS. HUGHES:  Yes, ma'am.

4          THE COURT:  So let's proceed.

09:08AM 5          MS. HUGHES:  Yes, ma'am.

6          (Bench conference concluded)

7          THE COURT:  Ms. Hughes, are you ready?

8          MS. HUGHES:  Yes, ma'am.

9                    RECROSS-EXAMINATION

09:08AM 10 BY MS. HUGHES:

11     Q.    Good morning, Mr. Aubishon.

12     A.    Good morning.

13     Q.    When we broke yesterday, we talked about various

14 things within the system.  And some of the things that I

09:09AM 15 want to make sure are clear is you reviewed the records in

16 this case.  Is that right?

17     A.    I reviewed his TDCJ classification and records

18 files.

19     Q.    The files?

09:09AM 20     A.    Yes, ma'am.

21     Q.    And that --

22     A.    Paper and computerized files.

23     Q.    Right.  You actually -- you're close -- you live

24 close to the area, and you went down to TDC and got on the

09:09AM 25 computer and looked at what is in the computer on David

1 Renteria as well as looking at the paper documents. Is

2 that right?

3    A.    Yes, ma'am.

4    Q.    And have you spoken to anyone else about David

09:09AM 5 Renteria other than -- and I don't want to know what you've

6 spoken to his attorneys about or this group -- but outside

7 of that have you spoken to anyone else?

8    A.    The witness that testified yesterday, Mr. Hayburn,

9 he and I have had discussions about certain aspects.

09:10AM 10    Q.    Have you spoken to any witnesses?

11    A.    No.

12    Q.    Or anyone involved in the case?

13    A.    No, ma'am.

14    Q.    You wouldn't normally do that. Right?

09:10AM 15    A.    Right.

16    Q.    Okay. And you didn't talk to Mr. Renteria?

17    A.    No, I have not.

18    Q.    Okay. Now, when we -- yesterday when we were

19 talking you mentioned -- and so that it's clear -- that

09:10AM 20 based on your experience David Renteria would be classified

21 as a G-3 inmate, if he were to receive a life sentence on

22 this capital murder charge. Is that right?

23    A.    Yes, ma'am.

24    Q.    And you believe based on all the information that

09:10AM 25 you have that he would go into general population?

1     A.    More likely than not, yes, ma'am.

2     Q.    Okay.  And as we discussed the G-3 -- I just want

3 to briefly go through this because I think we've talked a

4 little bit about it. If someone receives a 50 year or more

09:11AM 5 sentence they are automatically a G-3?

6     A.    Pretty much, yes, ma'am.

7     Q.    There's not much of variance in that?

8     A.    That's correct.

9     Q.    Okay.  Someone like that, once they serve ten

09:11AM 10 years in prison for that offense then -- then they are

11 subject to receiving more privileges assuming they haven't

12 had any disciplinary history.  Right?

13     A.    It is possible.

14     Q.    Sure.  And let's say hypothetically you have

09:11AM 15 someone who is a G-3, they have served ten years whether in

16 general population or administrative segregation which are

17 the two essential ways to classify.  Is that fair to say?

18     A.    Would you repeat that, please?

19     Q.    I know it was too confusing.  I'm sorry.

09:11AM 20     A.    Okay.

21     Q.    Serve their ten years in prison.  Okay?

22     A.    Okay.

23     Q.    Have not had any disciplinary history whatsoever.

24 Okay?

09:12AM 25     A.    Okay.

1    Q.    After that ten years is up, they then become a

2  G-2.  Right?

3    A.    They can.

4    Q.    And if there's no disciplinary history and no

09:12AM  5  reason to stop them, no threats, no violence, no -- then

6  they would go to G-2?  Is that right.

7    A.    It is possible.

8    Q.    It's likely?

9    A.    It's possible.

09:12AM 10    Q.    Oh, it's not likely?

11    A.    It could be likely.

12          THE COURT:  Excuse me.  Just a minute.

13          (At the Bench, on the record).

14          THE COURT:  I didn't know if you wanted to

09:12AM 15  talk with her or just have somebody on your staff talk with

16  her.

17          MR. GANDARA:  Yeah.  Yeah.

18          THE COURT:  Okay.

19          (Bench conference concluded)

09:13AM 20    Q.    (By Ms. Hughes)  You said it -- it could be likely

21  that someone under that hypothetical that I gave you would

22  then become a G-2?

23    A.    Yes.  But I'm trying not to leave the impression

24  with, you know, anybody here that any classification

09:13AM 25  decisions are just ought.

1    Q.   Okay.

2    A.   Because they're not.  There's always a review

3 process.  There are very, very few things that are just

4 presto, automatic.

09:13AM 5    Q.   Right.  And if an inmate who understands the rules

6 and is capable of making requests and filing grievances and

7 going through the processes that are available to an inmate

8 has done their ten years in -- as a G-3 and is ready to be

9 classified as a G-2 because of the additional privileges

09:14AM 10 that that comes with -- that come with that classification,

11 then certainly classification is going to make sure that

12 they look into that.  Right?

13    A.   Yes.

14    Q.   And the ten years involves time that someone has

09:14AM 15 served in prison.  Is that correct?

16    A.   In prison on that incarceration.

17    Q.   Now, in -- in your discussion yesterday you talked

18 about the mental health assessment.  Do you recall that?

19    A.   Yes, ma'am.

09:15AM 20    Q.   There was a defense exhibit that had that

21 information in it.  And it talked about the current status

22 of an inmate.  Is that correct?

23    A.   Yes.

24    Q.   Today, that day, whatever day the assessment is

09:15AM 25 done, is the inmate a risk of him harm to himself or

1 others.  Right?

2     A.  Yes.

3     Q.  And it deals with whether or not they are -- well,

4 let me backtrack.  The way that assessment is done, Mr.

09:15AM 5 Aubishon, it's done cell side.  Right?

6     A.  Possibly.

7     Q.  Okay.  And it's done in a way where the staff

8 member from the mental health unit goes to the cell -- and

9 in administrative segregation the door is not even open --

09:16AM 10 goes to the cell and kind of talks to the inmate for a

11 little bit.  Right?

12     A.  I have not actually personally ever seen one of

13 these, so I don't know if that's correct or not.

14     Q.  It wouldn't surprise you if that's the way it is,

09:16AM 15 would it?

16     A.  Very little surprises me.

17          MR. GANDARA:  Objection, Your Honor, relevance

18 as to whether it would be surprising.

19          THE COURT:  Overruled.

09:16AM 20     Q.  (By Ms. Hughes)  And that contact with the inmate

21 can take as little as 30 seconds?

22     A.  I don't know that.

23     Q.  You don't know.  And it -- in that --

24          MS. HUGHES:  May I approach, Your Honor?

09:16AM 25          THE COURT:  Yes, you may.

1    Q.   (By Ms. Hughes)   I'm going to show you State's

2 Exhibit 245 and within that document would you agree that

3 it says patient is at a low imminent danger to harm self or

4 others.   Is that what that says?

09:17AM 5    A.   Yes.

6    Q.   And imminent means their current status.  Right?

7    A.   I'm really not sure what imminent means in that

8 context.

9    Q.   And are you aware that those evaluations are

09:17AM 10 required to be done every 90 days for any inmate on death

11 row?

12    A.   That was my understanding.

13    Q.   And in -- you're not familiar with those records

14 because you don't use those records in determining

09:17AM 15 classifications, do you?

16    A.   They can be used during the classification

17 committee process.

18    Q.   They're not HIPA protected?

19    A.   There's medical staff that are members, typically

09:18AM 20 members of classification committees when there is an issue

21 of either physical or mental health, and those folks have

22 access to those records, and can advise the other members

23 of the classification committee.

24    Q.   That record is not used in classification, is it?

09:18AM 25    A.   I think I just answered that.

1 Q. Is that a yes or a no?

2 A. It would be a yes.

3 Q. That record is used in classification?

4 A. As I just explained, yes.

09:18AM 5 Q. That physical document is present in the meeting

6 and available for review in classification?

7 A. It could be.

8 Q. All right.

9 A. Under -- under certain circumstances it could be.

09:19AM 10 Q. All right.  In looking at whether someone is a

11 risk or a threat it's important to know any fighting

12 history they have.  Is that correct?

13 A. That is an element.

14 Q. Assaultive history?

09:19AM 15 A. Yes.

16 Q. Threats that have been made?

17 A. Yes.

18 Q. Whether they've possessed contraband or weapons?

19 A. Yes.

09:19AM 20 Q. As well as the escapes and the murders and the

21 other more obvious things that one would look at.  Right?

22 A. Yes, ma'am.

23 Q. Now, do you place a high importance on -- on the

24 history of an inmate as far as their employment outside of

09:19AM 25 of TDC?

1    A.    In what context?

2    Q.    In classification.

3    A.    Do we look at their prior employment in making

4    classification decisions?  Is that the question?

09:20AM 5    Q.    Sure.

6    A.    It can be looked at, yes.

7    Q.    Is it of high importance to you?

8    A.    It very well can be.  But one of the functions of

9    the unit classification committee is also to assign

09:20AM 10    offenders to a -- to a job.  And so if we see if an

11    offender was welder in the free world or that has some

12    skills that would be useful in the penitentiary we

13    absolutely want to know that and we will try and use that

14    offender in that type of job.

09:20AM 15    Q.    Okay.  That makes sense.  Because you want to know

16    how can I put this person to work.  Right?

17    A.    Yes.

18    Q.    It's not you need to need to know that to

19    determine are they a threat.  Do you see the difference?

09:20AM 20    A.    I think so.

21    Q.    Will you agree with that?

22    A.    I guess so.

23    Q.    And does it matter to you in looking at

24    classifications if someone has been involved in childhood

09:21AM 25    activities, positive activities as a child.  That's

1 something that you -- information you even have in

2 classifying someone?

3     A.    Probably not.

4     Q.    Okay.  And does it matter to you that there is --

09:21AM 5 there are letters going back and forth from the inmate and

6 his friends or family or there are visits between the

7 inmate and his friends or family?

8     A.    I'm sorry.  I don't understand that question at

9 all.

09:21AM 10     Q.    Okay.  If an inmate has letters coming from

11 friends or family or visits with friends or family, does

12 that matter to you in classifications?

13     A.    It can in some context.

14     Q.    Okay.  And it can matter because that is one of

09:22AM 15 the ways that some inmates perpetrate their crimes.  Right?

16     A.    I don't know about that.

17     Q.    Did you know that George Rivas, the mastermind of

18 the Texas Seven had his father provide a vehicle for him?

19         MR. GANDARA:  Objection, Your Honor, relevance

09:22AM 20 to any issue or material fact in this case.

21         THE COURT:  Sustained.

22     Q.    (By Ms. Hughes)  So to you whether or not someone

23 has visits or letters from friends and family it could

24 matter but it doesn't necessarily?

09:22AM 25     A.    It depends on the circumstances and what we're

1 looking at that offender to do with that offender. Okay?

2    Q.   It depends on each individual offender. Right?

3    A.   And the circumstances, yes.

4    Q.   And the circumstances.

09:22AM 5    A.   Of why we're -- the circumstances of why we're

6 reviewing that offender at that time.

7    Q.   Right. And if you're reviewing an offender, you

8 want to know as much of the specifics to each offender as

9 you can. Right?

09:23AM 10    A.   Yes.

11        MS. HUGHES: Thank you, Your Honor. I'll pass

12 the witness.

13               REDIRECT EXAMINATION

14 BY MR. GANDARA:

09:23AM 15    Q.   Mr. Aubishon, please take a look at what was

16 marked as Exhibit 162. Tell me if you recognize that

17 document.

18    A.   Yes, sir.

19    Q.   Is this document an official publication of an

09:23AM 20 agency of the State of Texas?

21    A.   Yes, it is.

22    Q.   And what -- what is it, the nature of it in

23 general? What is it?

24    A.   It's a summary of certain activities that happen

09:24AM 25 within the Texas Department of Criminal Justice.

1          MR. GANDARA:  Your Honor, I'm going to offer

2    portions of 162.  It's an official publication self-

3    authenticating and not hearsay under the rules of evidence.

4          THE COURT:  Have you shown it to opposing

09:24AM 5    counsel?

6          MR. GANDARA:  Yes, Your Honor.

7          MS. HUGHES:  Your Honor, we received this this

8    morning.  I haven't looked through every bit of it.  I

9    don't mind if he wants to question on it.  If I could have

09:24AM 10   time while he's questioning if I could look at it before I

11   make objections, if any, to its admission.

12         MR. GANDARA:  I'm not going to offer it in its

13   entirety, Your Honor.

14         THE COURT:  Well, then at least can you

09:24AM 15   explain to Ms. Hughes which portions you are wanting to

16   show to the jury?

17         MR. GANDARA:  Yes.  Primarily the -- page

18   three.

19         MS. HUGHES:  Is that the only page?

09:25AM 20        MR. GANDARA:  At this point that's the only

21   one I'm going to work with.

22      Q.   (By Mr. Gandara)  Mr. Aubishon, would you take --

23   I know you've got a copy of it, but let's take the one

24   that's been marked --

09:25AM 25      A.   Yes, sir.

1     Q.    -- and refer to page three.  We have up on the --
2   up on the screen --
3             THE COURT:  Wait a minute.  Is that page three
4   that you're showing?
09:25AM 5             MR. GANDARA:  Yes, Your Honor.
6             THE COURT:  All right.  Well, at least let the
7   attorney have an opportunity to object or -- I mean she was
8   over there reading the page while you were putting it up on
9   the screen.
09:26AM 10             MS. HUGHES:  Could I have one minute, Your
11   Honor, just to review this?
12             THE COURT:  All right.  Give her a minute just
13   to look at it.
14             Want to take a stretch break?  We'll start off
09:26AM 15   doing stretch breaks early.
16             (Brief pause)
17             MS. HUGHES:  To page three we have no
18   objection, Your Honor.
19             THE COURT:  All right.  And go ahead and put
09:27AM 20   page three up on the screen.
21     Q.    (By Mr. Gandara)  Mr. Aubishon, up on the screen
22   are we looking at the cover sheet of this document?
23     A.    Yes, sir.
24     Q.    And that has the title of the document.  Correct?
09:27AM 25   Select Statistics From the Emergency Action Center?

1    A.   Yes, sir.

2    Q.   And it's prepared by Executive Services.  Tell us

3 who they are?

4    A.   They are a statistical group within the Texas

09:27AM 5 Department of Criminal Justice.

6    Q.   And the work they do?

7    A.   They do statistics.  They do reports for the

8 agency and the Board of Criminal Justice.  They handle all

9 of the records requests for the agency and a wide variety

09:27AM 10 of administrative functions.

11   Q.   All right.  Let's take a look at page three.  Let

12 me see if I can get it to focus a little here.

13        All right.  Mr. Aubishon, what -- tell us what

14 in general page three depicts.

09:28AM 15   A.   It's yearly totals of the numbers of certain

16 incidents that occur within TDCJ.

17   Q.   And different types of problem incidents.

18 Correct?

19   A.   That is correct, yes, sir.

09:28AM 20   Q.   Okay.  Now I'm pointing here to -- to this line,

21 offender death by homicide?

22   A.   Okay.

23   Q.   Now, what do those numbers tell us?

24   A.   It's by year how many offenders were essentially

09:29AM 25 murdered while in TDCJ.  It shows, I guess, the highest

1  number I see here is 8, and that would have been in the

2  year 2000, and in the year 2003 there was only one

3  homicide.

4      Q.    All right.  The natural deaths happening in the

09:29AM 5  prison are just -- are the line just above that.  Correct?

6      A.    Yes, sir.

7      Q.    And what are the totals, for instance, you

8  compared 2000, the year 2000, how many people died of

9  natural causes in the prison in 2000?

09:29AM 10     A.    2000 looks like 414.

11     Q.    And in the year when there was only one murder how

12  many people died of natural causes?

13     A.    Looks like 363.  About one a day.

14     Q.    Okay.  Now, look over here to the years 2005, 2006

09:30AM 15  and 2007.

16     A.    Okay.

17     Q.    David Renteria was housed in the prison during

18  those three years.  Correct?

19     A.    Yes, sir.

09:30AM 20     Q.    Okay.  In fact, 2004 also.  Correct?

21     A.    Off the top of my head.  I'm not sure.

22     Q.    Okay.  But you're sure about 2005, 2006 and 2007?

23     A.    Yes, sir.

24     Q.    Okay.  Now, describe for us this phrase here on

09:30AM 25  this line that says major use of force?

1      A.    Okay.

2      Q.    What is -- what does that mean?

3      A.    Those are incidents where staff has to basically

4  lay their lands on an offender during an occurrence.  You

09:31AM 5  know, the offender is acting out, fighting, not obeying

6  orders.  And typically any time a staff member has to touch

7  or restrain an offender under those circumstances that's a

8  major use of force.  As opposed to like just ask the

9  offender put your hands behind your back so I can apply

09:31AM 10  restraints.  That is not a use of force.  But if I have to

11  force -- use force to restrain an offender, then that would

12  be a major use of force.

13      Q.    All right.  And down in this subparagraph down

14  here you have serious staff assaults?

09:31AM 15      A.    Yes, sir.

16      Q.    Serious offender assaults.  Correct?

17      A.    Yes, sir.

18      Q.    And also the ones that are non serious.  Correct?

19      A.    Yes, sir.

09:31AM 20      Q.    And up here you have escapes, attempted escapes

21  and escapes by -- by the incident, by the number of escapes

22  and the number persons involved in the escape.  Correct.

23      A.    Yes, sir.

24      Q.    In these lines.  And tell us what employee arrest

09:32AM 25  is?

1      A.    Exactly what it says.  It's employees of the
2  agency that have been arrested for some type of criminal
3  activity.

4      Q.    Within the prison?

09:32AM 5      A.    No.

6      Q.    Not necessarily?

7      A.    No.

8      Q.    Okay.

9      A.    No.  Employees are required to report all arrests
09:32AM 10  whenever they occur.

11      Q.    All right.  So for the year 2005 you had your
12  staff, your corrections officers had to use major force
13  6,071 times.  Correct?

14      A.    Yes, sir.

09:32AM 15      Q.    And there were two attempted -- four attempted
16  escapes, two escapes --

17      A.    Yes, sir.

18      Q.    -- and two personal.  Right?

19      A.    Yes, sir.

09:33AM 20      Q.    And there were 117 disturbances?

21      A.    Yes, sir.

22      Q.    And there were 54 serious staff assaults?

23      A.    Yes, sir.

24      Q.    And 1,025 serious offender assaults?

09:33AM 25      A.    That's correct.

1    Q.   And 5,000 disciplinary convictions for staff

2  assaults.  Correct?

3    A.   Yes, sir.

4    Q.   And 14,000 disciplinary convictions for offender

09:33AM 5  assaults?

6    A.   Yes, sir.

7    Q.   And this is out of a population in 2005, a prison

8  population -- an inmate population of 166,620?

9    A.   That is correct.

09:34AM 10   Q.   What was roughly the number of staff, the number

11  of employees, in the prison over and above -- who would be

12  part of the prison population over and above the inmates?

13   A.   On any given day there's usually in the range of

14  36- to 37,000 employees employed by TDCJ, plus there's

09:34AM 15  women staff and medical staff that's not in that -- not in

16  that code number.

17   Q.   So there are roughly 200,000 people in that prison

18  system on a day to day basis?

19   A.   Fairly close to that, yes, sir.

09:34AM 20   Q.   And in 2005 David Renteria did not participate in

21  an attempted escape.  Right?

22   A.   Not to my knowledge.

23   Q.   Or an escape?

24   A.   That's correct.

09:34AM 25   Q.   Or an attempted suicide?

1    A.   Not to my knowledge.

2    Q.   Or he didn't participate in a death by homicide?

3    A.   No, he certainly did not.

4    Q.   And he did not participate -- he was not a

5 participant in any of those major use of force incidents?

6    A.   Not to my knowledge.

7    Q.   And he was not involved in any of those

8 disturbances?

9    A.   Not to my knowledge.

10    Q.   And he was not involved in any of those alleged

11 sexual assaults on that line there?

12    A.   Not to my knowledge.

13    Q.   In fact, he was not involved in any of the -- not

14 a single one of the 14,309 reported incidents in that

15 subparagraph?

16    A.   Not to my knowledge.

17    Q.   He did not participate in a serious staff assault.

18 Correct?

19    A.   That's correct.

20    Q.   Nor in a non serious staff assault?

21    A.   That's correct.

22    Q.   He did not participate in a serious offender

23 assault or in a non serious one.   Correct?

24    A.   That's correct.

25    Q.   And out of 5,024 disciplinary convictions for

1  staff assaults in 2005 how many were -- were David

2  Renteria?

3      A.   None to my knowledge.

4      Q.   Zero?

09:36AM 5      A.   Zero.

6      Q.   And of 14,611 convictions for offender assaults

7  how many were David Renteria's?

8      A.   None.

9      Q.   I'll ask you the same questions in sum for the

09:36AM 10  years 2006 and 2007.  Did David Renteria have any

11  participation in any of those types of incidents or

12  assaults or disturbances?

13      A.   No, sir.  There's no record of his participation

14  in any of these activities.

09:36AM 15      Q.   Now, these -- these yearly totals are from 1999

16  to -- up to February 2008.  Correct?

17      A.   Yes, sir.

18      Q.   And I'm going to go down to the line -- a couple

19  of lines here.  We've got offender death by homicide on one

09:37AM 20  line.  Right?

21      A.   Yes, sir.

22      Q.   Is that the line --

23      A.   Yes, sir.

24      Q.   -- the first one after what I've covered?

09:37AM 25      A.   Yes, it is.

1    Q.    And executions is the line below it.  Right?

2    A.    That's correct.

3    Q.    So in '99 there were seven murders in the prison

4  and 35 executions.  Right?

09:37AM 5    A.    Yes, sir.

6    Q.    And each year thereafter up until the year 2007

7  there's a small number of homicides and they're relatively

8  relatively much larger number of executions.  Right?

9    A.    Yes, sir.

09:37AM 10   Q.    All right.  If David Renteria is sentenced to

11  capital murder or life over at TDC, this ten year period

12  that he has to put in as a G-3 inmate begins when?

13   A.    Upon his admission to TDCJ on the capital life

14  sentence.

09:38AM 15   Q.    Does he get any credit against that ten year time

16  for the time he was awaiting trial or any previous time he

17  served in prison?

18   A.    No, sir.

19   Q.    From -- from your review of David Renteria's

09:38AM 20  records and from your research in this case what are the

21  things that get David Renteria in a wreck?

22   A.    The biggest would be if he talks about what he did

23  to get to the -- to the penitentiary.

24   Q.    I'm talking basically about his behavior.

09:39AM 25   A.    Okay.  I'm sorry.

1    Q.    What are the things about David Renteria that get

2 him in behavioral problems from your research?

3    A.    Alcohol and access to young children.

4    Q.    Are there any young children at the penitentiary

09:39AM  5 that he's going to have any access to?

6    A.    No, sir.

7    Q.    Ever?

8    A.    Only in the visiting rooms but there's

9 protections, you know, in place.  There's -- he would not

09:39AM 10 be able to have a contact visit with any child.  By that I

11 mean be able to hold them on his lap set them on the table.

12 There could be other people's children in the area where

13 the visits are being conducted.  There's a security staff

14 there that's monitoring all these activities.

09:40AM 15    Q.    And that's as close as it would get?

16    A.    Yes, sir.

17    Q.    And is David Renteria a future danger in prison?

18 Is he -- is he going to commit -- knowing what you know of

19 him and knowing where he's going to be is he going to

09:40AM 20 commit criminal acts of violence that constitute a threat

21 to that society over there?

22    A.    Not that I'm aware of.

23        MR. GANDARA:  Pass the witness.  I offer

24 Exhibit 162-A as what we've designated as page three.

09:40AM 25        MS. HUGHES:  No objection.

1        THE COURT:  So admitted.

2        (Defendant's Exhibit No. 162-A was admitted

3 into evidence)

4        MR. GANDARA:  And we're not offering 162 which

5 is the entire document, Your Honor.

6        THE COURT:  Correct.

7        Ms. Hughes, any more questions?

8        MS. HUGHES:  Yes, ma'am.  May I proceed?

9        THE COURT:  Yes, you may.

10              FURTHER RECROSS-EXAMINATION

11 BY MS. HUGHES:

12    Q.   Mr. Aubishon, you've talked about the two issues

13 that you see in Mr. Renteria that would cause concerns is

14 alcohol and children.  Is that right?

15    A.   Yes, ma'am.

16    Q.   Alcohol because of the three DWIs.  Right?

17    A.   Yes, ma'am.

18    Q.   Children because of his indecency with a child?

19    A.   That's part of it.

20    Q.   Okay.  On the alcohol and the DWIs, do you know

21 that he was involved in two accidents on his first two

22 DWIs?

23    A.   No, I was not.

24    Q.   Do you know that he continued to drink and drive

25 obviously --

1    A.    Obviously.  Because he --

2    Q.    -- because he had a third DWI?

3    A.    Yes, because he -- right.  Felony DWI takes

4  priors.

09:41AM  5    Q.    Right.

6    A.    Yes.

7    Q.    And so he continues to engage in that conduct.

8  Would you agree with?

9    A.    Yes.

09:41AM 10    Q.    And he had been to shock on the DWI.  Right?

11    A.    Yes, he had.

12    Q.    And then he returned and he continued to drink and

13  drive?

14    A.    Yes, he did.

09:41AM 15    Q.    The indecency with a child, were you aware that

16  the victim in that case Erica McDonald testified here?

17    A.    No, I was not aware of that.

18    Q.    And that she explained the details of what

19  occurred in that incident?

09:42AM 20    A.    I was not aware of that.

21    Q.    And you didn't know that he gave that little girl,

22  when she was seven years old, he said my name is Bobby but

23  don't tell anybody.  Did you know that?

24    A.    I have not read -- seen or read the transcript of

09:42AM 25  that trial.  So I know nothing about what occurred during

1 that trial.

2     Q.   Okay.  That was actually a plea of guilty.  The

3 defendant admitted that he had done this.  Did you know

4 that?

09:42AM 5     A.   Well, I -- I don't have the judgment in front of

6 me.  So I don't know what the plea was in that.

7     Q.   Okay.  Then on the capital murder he takes a

8 little girl from a Wal-Mart but he does it in a way that it

9 doesn't look like he's taking her.  Did you know that?

09:42AM 10     A.   No, ma'am.

11     Q.   He's walking in front of her out of the store, not

12 got his hands on her and not touching her.  Did you know

13 that?

14             MR. GANDARA:  Objection, Your Honor.  That's

09:43AM 15 speculation and a matter for determination of the jury, and

16 it's outside the --

17             MS. HUGHES:  He's been convicted.

18             THE COURT:  Just a minute.

19             MS. HUGHES:  I'm sorry.

09:43AM 20             THE COURT:  Overruled.

21     Q.   (By Ms. Hughes)  He doesn't have a hand on her as

22 he's walking out of that store with her behind him.  That

23 he went into that store and was there for two minutes and

24 20 seconds.  And within that amount of time he's convinced

09:43AM 25 that five year old little girl in her cute little red dress

1 to leave the store with him.  Did you know that?

2     A.   NO.  NO.  I -- I guess that was a question.

3 Right?

4     Q.   Yes.

09:43AM 5     A.   The speech and then the question so -- but no, I

6 did not know that.

7     Q.   And did you know that he put her in his van?

8     A.   No, ma'am.

9     Q.   Did you know --

09:44AM 10     A.   I -- again, I have not read the transcript of that

11 trial either.  So I don't know -- I'm not aware of any of

12 the facts or anything that went on during that trial.

13     Q.   Okay.  And I'm going to talk about those facts

14 because I want to ask a question about what you've already

09:44AM 15 seen.  Did you know that he injures her somehow so that

16 she's bleeding and her blood ends up in that van?

17     A.   I did not know that.

18     Q.   Okay.  Well, let me tell you.  He then takes off

19 her clothes.  He then puts his hands --

09:44AM 20          MR. GANDARA:  Objection, Your Honor, that's

21 outside the record.  There's no evidence about how the

22 clothes were removed.

23          THE COURT:  Overruled.

24     Q.   (By Ms. Hughes)  -- or arm or some other object on

09:44AM 25 her neck compressing her little neck for one to three

1 minutes until she dies. Now, you know about his prior

2 indecency. Right?

3    A.   Yes, ma'am.

4    Q.   And we don't have any evidence of any sexual

09:45AM 5 penetration that left an injury. So that we're clear.

6 Okay? On the capital murder case. But does it make a

7 difference to you that he -- whatever he took her for he

8 does everything in his power to cover up?

9            MR. GANDARA: Objection, Your Honor. That's

09:45AM 10 entirely outside of the record.

11           THE COURT: Overruled.

12    Q.   (By Ms. Hughes) He takes her 15 miles away from

13 where he abducted her. He puts a bag over her head.

14           MR. GANDARA: Your Honor, we object to this

09:45AM 15 final argument. This is not -- there's not a question to

16 this witness. And the witness has told the Court

17 repeatedly that he's not aware of the facts of the case.

18           THE COURT: Sustained.

19    Q.   (By Ms. Hughes) Now, he killed her in a way --

09:46AM 20           MR. GANDARA: Objection. Same objection.

21           THE COURT: All right. Counsel approach.

22           (At the Bench, on the record).

23           THE COURT: All right. If you want to lay out

24 a hypothetical, do so in the correct manner. Otherwise I'm

09:46AM 25 going to continue to sustain the objection.

1        MS. HUGHES:  I will.

2        THE COURT:  He's already stated he does not

3 know.

4        MS. HUGHES:  I will.

09:46AM 5        (Bench conference concluded)

6   Q.   (By Ms. Hughes)  And so if we're looking at what

7 occurred -- and I'll talk to you about it in the terms of a

8 hypothetical.  Okay?  He puts her in his van.  He injures

9 hers in a way that leaves her blood in his van she is a

09:47AM 10 complete stranger to him and she's five years old.  He then

11 takes her 15 miles away --

12        MR. GANDARA:  Objection.  Same objection as

13 previously and repetitious.

14        THE COURT:  Overruled.

09:47AM 15   Q.   (By Ms. Hughes)  -- where he stages her naked body

16 to expose her genitals.  He has a bag over her head, a bag

17 that on the forehead of her head has his right palmprint, a

18 bag that is fused to her head from where he's doused her

19 with gasoline and lit her body?

09:47AM 20        MR. GANDARA:  Objection, Your Honor.  This --

21 this final argument that's being presented here does not

22 the form the basis of any reasonable hypothetical question

23 to be posed to Mr. Aubishon based on his expertise and the

24 testimony he's given today, yesterday and today, in this

09:48AM 25 case.  It's simply ininflammatory and intended to inflame

the minds of the jury rather than to get facts from this

expert witness.

THE COURT: It's overruled. However, I will

tell you, Ms. Hughes, you need to make it clear to the

09:48AM witness and everything that you are posing a hypothetical

question.

Q. (By Ms. Hughes) Those facts that I just

described, Mr. Aubishon, are a hypothetical that I'm giving

to you.

09:48AM My question is this. Would you agree that

that is someone who is sophisticated in avoiding detection?

A. Apparently not.

Q. Apparently not?

A. No because he was caught, and he was convicted.

09:48AM So you know, he didn't -- he didn't get away with it. He

didn't -- his deception was not successful.

Q. But he certainly tried. Would you agree?

MR. GANDARA: Objection, speculative and not

based on the hypothetical.

09:49AM THE COURT: Sustained.

Q. (By Ms. Hughes) So in the hypothetical moving the

body, burning the body are not avoiding detection?

MR. GANDARA: Objection. The same question

phrased differently. Same objection as previously, and

09:49AM it's argumentative.

1    THE COURT:  Overruled you may answer.

2    THE WITNESS:  Okay.  Please repeat it for me

3  please.

4    Q.   (By Ms. Hughes)  is it your testimony that by him

09:49AM 5  removing the body and attempting to burn the head,

6  including the mouth and the genitals of the body is not an

7  attempt to avoid detection?

8    MR. GANDARA:  Objection, relevance to any

9  issue of material fact and relevance to any issue that this

09:49AM 10  expert can testify about.

11    THE COURT:  Sustained.

12    Q.   (By Ms. Hughes)  So Mr. Aubishon, would that

13  information be important to you in knowing how

14  sophisticated an individual is to determine their threat of

09:50AM 15  future violence?

16    MR. GANDARA:  Objection to the

17  characterization of the fact in the hypothetical as

18  sophistication as outside the record.

19    THE COURT:  Overruled.  You may answer.

09:50AM 20    Q.   (By Ms. Hughes)  Would that information be

21  important to you in determining whether or not someone is a

22  threat of future violence?

23    A.   Not really, not in the prison classification

24  setting, no.

09:50AM 25    Q.   It wouldn't matter at all?

1    A.    It wouldn't be that important no, ma'am.

2    Q.    Let me give you another hypothetical.  Someone

3 goes into a store and impersonates an officer or a security

4 guard, has guns, has radios, has a plan, holds hostage

09:51AM 5 individuals within that store?

6                MR. GANDARA:  Objection, Your Honor, relevance

7 to any issue of material fact in this case.  This is David

8 Renteria's case and not some other robbery or whatever

9 event.

09:51AM 10                MS. HUGHES:  It's a hypothetical, Your Honor.

11                THE COURT:  Regarding what issue?

12                MS. HUGHES:  Regarding whether or not it

13 matters that someone would consider the instant offense and

14 that the individual in determining whether or not they are

09:51AM 15 a future danger.

16                THE COURT:  Overruled.  He's already answered.

17    Q.    (By Ms. Hughes)  So to you the individual facts of

18 a case make no difference at all?

19    A.    That's not what I said.

09:52AM 20    Q.    So it would matter if you know the individual

21 facts of the case?

22    A.    If you can in certain circumstances and certain

23 classification decisions it can.  But it's not -- it's not

24 the primary thing.  Most classifications decisions are not

09:52AM 25 based on what the offender did to get to the penitentiary.

1    Q.   Exactly.

2    A.   I mean I don't mean to sound callous in that, and

3 particularly in this -- this case.  This is a horrible

4 crime.

09:52AM 5    Q.   But you're not suggesting to this jury that they

6 should ignore those facts, are you?

7         MR. GANDARA:  Objection, Your Honor, that's

8 speculation on this man's part and not relevant to an issue

9 of material fact.  To suggest that Mr. Aubishon is telling

09:52AM 10 the jury to ignore facts is not a proper question.

11         THE COURT:  Overruled.

12         THE WITNESS:  Okay.  I'm sorry.  So that means

13 that I --

14         THE COURT:  You may answer, yes, sir.

09:53AM 15         THE WITNESS:  Okay.  I'm sorry, Your Honor.

16         I'm not trying at all to tell this jury how to

17 think.  They will make up their own minds.

18         MS. HUGHES:  Thank you.  Pass the witness.

19         THE COURT:  Any more questions?

09:53AM 20              FURTHER REDIRECT EXAMINATION

21 BY MR. GANDARA:

22    Q.   After all, after all, do you consider that David

23 Renteria is going to be a threat of violence, of criminal

24 acts of violence in the future that he will be a continuing

09:53AM 25 threat to society in -- where he's going to be in prison?

1     A.    In the prison I don't -- I don't see that. I

2 don't see any evidence or see anything in his -- in his

3 past institutional behavior that would make me think that.

4          MR. GANDARA:  Pass the witness.

09:53AM 5          THE COURT:  Any more questions?

6          MS. HUGHES:  No, Your Honor.  Thank you.  I'll

7 pass the witness.

8          THE COURT:  All right.  You may step down.

9          THE WITNESS:  Thank you, Your Honor.

09:54AM 10          MR. GANDARA:  Your Honor, I believe we have

11 a -- Mr. Esparza has a matter to take up with the Court

12 before we call the next witness.

13          THE COURT:  Okay.  Is it Dr. Cunningham is

14 your next witness?

09:54AM 15          MR. GANDARA:  Yes, Your Honor.

16          THE COURT:  All right.  We'll take a break --

17 well, you are.

18          (Jury not present)

19          THE COURT:  Be seated, please.  And if you

09:54AM 20 would call your witness.  Mr. Gandara, if you would call

21 your witness.

22          MR. GANDARA:  Excuse me, Your Honor.  Dr.

23 Cunningham.

24          (Brief pause)

09:55AM 25          THE COURT:  Sir, raise your right hand.

1                    MARK DOUGLAS CUNNINGHAM,

2   having been first duly sworn, testified as follows:

3                    THE COURT:  Mr. Esparza has made a request to

4   voir dire the witness prior to him being called in front of

09:55AM 5   the jury.

6                    MR. ESPARZA:  Your Honor, I'm not going to --

7   other than have him -- have this witness briefly tell us

8   his qualifications because they're quite lengthy.  I'm sure

9   we'll hear them once again before the jury.  I really

09:55AM 10  wanted to ask him about the underlying facts and data of

11  his conclusions.  So that would be the course of my

12  inquiries.

13                   THE COURT:  All right.  Proceed.

14                        VOIR DIRE EXAMINATION

09:56AM 15  BY MR. ESPARZA:

16       Q.   (By Mr. Esparza)  Sir, would you state your name

17  for the record?

18       A.   Mark Douglas Cunningham.

19       Q.   And would you spell your last name, please?

09:56AM 20       A.   C-U-N-N-I-N-G-H-A-M.

21       Q.   And would you just briefly tell us your

22  educational background, your professional experience that

23  entitles you to -- you to do the -- to hold the occupation

24  that you hold, which I assume you would say a forensic

09:56AM 25  psychologist?

A.   I'm a clinical and forensic psychologist and
independent research scientist.  I'm licensed here in Texas
and in 14 other states.  My Ph.D. is from Oklahoma State
University and a doctoral training program in clinicology
accredited by the American Psychological Association.

I did a one year clinical psychology
internship at the National Naval Medical Center at
Bethesda, Maryland, where I was an active duty Naval
officer and clinical psychology intern.

I was subsequently assigned to the staff
psychologist at the Naval Submarine Medical Center in
Groton, New London, Connecticut.  During my tenure there as
an active duty Naval Officer and clinical psychologist I
also did two years of part time post doctoral study at the
Yale University School of Medicine.

I subsequently had a two-year full time
academic position as an associate professor of psychology
at a small private university in west Texas.  Let me
correct that.  I was an assistant professor of psychology
at the small university.  And I also began a private
practice.

I have been in the practice of clinical and
forensic psychology full time for the last 25 years.  I've
participated extensively in continuing education,
particularly in the area of forensic psychology over the

1  last 15 years. I'm board certified in forensic psychology

2  by the American Board of Professional Psychology which is

3  the board certification organization that's recognized by

4  the American Psychological Association.

09:58AM  5  I'm extensively approximate published in the

6  area of forensic psychology particularly regarding

7  scientific studies of rates and correlates of inmate

8  misconduct and violence as well as studies of capital

9  offenders, murderers, destined as inmates and their

09:58AM 10  behavior in prison. I also was nationally recognized --

11  MR. GANDARA: Your Honor -- and Dr.

12  Cunningham, I apologize for -- for interrupting. It has

13  nothing to do with Dr. Cunningham's situation. But Mr.

14  Aubishon I'd like to ask him to be excused from the rule at

09:58AM 15  this point. We'd like him to sit and listen to some of the

16  testimony. We do not anticipate recalling him.

17  MR. ESPARZA: If they're not recalling him, I

18  don't have any objection.

19  THE COURT: Okay.

09:58AM 20  MR. GANDARA: Thank you.

21  THE WITNESS: I'm a nationally recognized

22  scholar regarding captital sentencing and issues in terms

23  of forensic psychology evaluations of capital sentencing

24  and standards for thosea s well as capital violence risk

09:59AM 25  assessments.

1    Q.    (By Mr. Esparza)   You have testified frequently on

2 the issue of future dangerousness?

3    A.    I've testified routinely about violence risk

4 assessment in capital case which is the assessment of the

09:59AM 5 probability that a defendant would commit acts of various

6 severity of violence.   Dangerousness is a dispositionsl

7 quality that is not what is specified under the special

8 issue.   I -- I look at probability of acts.

9         MR. GANDARA:   Excuse me, Your Honor.   I

09:59AM 10 apologize for interrupting again.

11        Counsel has reminded me that we might need Mr.

12 Aubishon for surrebuttal.   And he is an expert witness and

13 the State's prison expert is also in the courtroom.

14        MR. ESPARZA:   I have no objection if he stays,

10:00AM 15 Your Honor.

16        THE COURT:   All right.

17        MR. ESPARZA:   I assume they don't have any

18 objection to ours.

19        THE COURT:   They haven't lodged one . Let's

10:00AM 20 go.

21        THE WITNESS:   As I said, the issue is not, as

22 I would assess it, is not is he dangerous.

23        Dangerousness is a dispositional quality.

24 It's not what's specified in the special issue under Jurik

10:00AM 25 V. Texas.   It's not subject to scientific measurement.   And

1  it does nothing to narrow or particularize the application

2  of the death penalty as a probability of acts of a

3  particular severity would have.

4            THE COURT:  All right.  Hold on just a minute.

10:00AM  5  We have another person standing at the hallway there that's

6  probably somebody's expert witness.  Just so that you-all

7  know.

8            MR. GANDARA:  Gripon.

9            THE COURT:  All right.  And there's already

10:00AM 10  been discussion that he will be allowed in during this as

11  well.

12            THE WITNESS:  If I might continue --

13            THE COURT:  Just --

14            THE WITNESS:  -- dangerousness is a common.

10:01AM 15            THE COURT:  Just a minute, sir.  Why don't we

16  go question and answer.  Go.

17            MR. ESPARZA:  Okay.

18       Q.  (By Mr. Esparza)  My question was you have

19  testified on -- in the punishment phase of capital murder

10:01AM 20  trials?

21       A.  Yes, sir.

22       Q.  In both federal and state courts?

23       A.  Yes, sir.

24       Q.  And you have done that numerous times?

10:01AM 25       A.  Yes, sir.

1    Q.    And you have done that for the defense

2 exclusively?

3    A.    Sir, I never testify for anyone.  In all of those

4 cases I --

10:01AM 5    Q.    We don't have a lot of time, and they'll get to

6 cross, redirect or whatever.

7    A.    That's why I'm trying to answer your question. I

8 never --

9    Q.    I'm just doing --

10:01AM 10    A.    -- testify for anybody.

11    Q.    -- this front of the Judge so we can get to the

12 heart of the matter.  All right?

13    A.    Yes, sir.

14    Q.    So you have been called by the defense

10:01AM 15 exclusively?

16    A.    In capital cases, yes, sir.

17    Q.    Now --

18          MR. ESPARZA:  May I approach him, Your Honor?

19          THE COURT:  Yes, you may.

10:02AM 20          MR. ESPARZA:  I assume -- what are we on

21 State's Exhibit --

22          MS. HUGHES:  122.

23          THE COURT:  122 is open.  Unless you want

24 another number.  I've got lots of other nubmers in here.

10:02AM 25          MR. ESPARZA:  122 is just fine, Judge.  I'm

1 showing you what I've marked for identification purposes as

2 State's Exhibit 122.  I believe this is a printout of a

3 Power Point presentation you intend to present through

4 direct examination to the jury.

10:02AM 5      A.   Sir, this is one of two power point presentations

6 that I prepared.  This one has additional markings on it

7 that I did not make, but it's been apparently added by

8 someone in your office.

9      Q.   Okay.

10:03AM 10      A.   But otherwise this is the printout.

11      Q.   Actually, those are my markings, and I'll -- I'm

12 doing this for identification purposes.

13      A.   Yes, sir.

14      Q.   When we get down to admitting it, I'll -- I

10:03AM 15 promise I'll tender a clean copy.  Okay?

16           But this one is entitled Developmental

17 Factors?

18      A.   Yes, sir, that's correct.

19      Q.   Okay.  And then your other one it's entitled

10:03AM 20 Violence Risk Assessment Capital Sentencing?

21      A.   Yes, sir, that's correct.

22      Q.   Do you have a copy of this developmental factor

23 power point, don't you --

24      A.   Yes, I do.

10:03AM 25      Q.   -- on paper so we can kind of do this together?

1  A.   Yes, sir.

2  Q.   All right.  Right before I go into that, could you

3 tell the Court exactly what -- what kind of reports did you

4 examine prior to making both Power Points and prepare for

10:03AM 5 the testimony you're about to give today?

6  A.   You would like for me to describe the procedures

7 that I engaged in?

8  Q.   If that's the best way for you to answer the

9 question, that would be fine with me, Doctor.

10:04AM 10  A.   Yes, sir.  I interviewed David Renteria, the

11 defendant for 203 minutes on July 16th.  I interviewed Eva

12 Vacuera Renteria, his mother, for 162 minutes on July 15th

13 of 2007.  I interviewed Cecelia, who goes by Ceci, Esparza,

14 Mr. Renteria's sister for 140 on July 15th, 2007.

10:04AM 15          I interviewed Oscar --

16          THE COURT:  Just a minute.  Just a minute.

17 This is a preliminary hearing.  I would like for this to be

18 question and answer, not just dialogue by the doctor.  I am

19 not the trier of fact regarding the sentence of this

10:04AM 20 defendant.  Please, question and answer.

21  Q.   (By Mr. Esparza)  All right.  You're -- you're --

22 right now on the interview phase.  Did you interview

23 besides Ceci Esparza?

24  A.   Yes, sir, I did.

10:05AM 25  Q.   And who was that?

1    A.    I also interviewed Oscar Jose Santeria who was a
2  teacher at the high school attended by Mr. Renteria.  And I
3  interviewed him for 71 minutes on February the 2nd, 2008.
4              I also interviewed Maria Christina Jimenez,
10:05AM  5  Mr. Renteria's girlfriend or common law partner.  I
6  interviewed her for over 42 minutes on February the 2nd,
7  2008.  I also reviewed a number of records.
8    Q.    Okay.  What report -- did you ever review any
9  police reports?
10:05AM 10    A.    Yes, sir.  I reviewed supplemental case
11  narratives.
12    Q.    Okay.  And what police reports did you review?
13    A.    I don't have those specifically detailed.  I would
14  have to go through the binders and look through those.
10:06AM 15    Q.    Okay.  Well, did you review the report of the
16  capital murder case?
17    A.    Yes, sir that's my recollection.
18    Q.    Did you review the report of the DWIs?
19    A.    I do not recall reviewing the offense reports.  I
10:06AM 20  reviewed summaries of those in terms of arrest records.
21    Q.    Is that -- would that include all three DWIs?
22    A.    Yes, sir.
23    Q.    Did you review the probation file?
24    A.    A portion of those.  I reviewed the sex offender
10:06AM 25  counseling records and at least some of the probation files

1 I don't know if those were in their entirety.

2 　　Q.　Did you review any police reports regarding

3 domestic violence between Eva Renteria and Santiago

4 Renteria?

10:07AM 5 　　A.　No, sir, not that I recall.

6 　　Q.　Did you not review those because they were not

7 available or you just didn't look?

8 　　A.　I don't know of the existence of those.

9 　　Q.　Well, you do know that the police were never

10:07AM 10 called in any of those those instances that you're about to

11 testify to?

12 　　A.　I have no record of the police being called nor

13 did Eva describe that she called the police.

14 　　Q.　And just to be clear, Mr. Santiago never called

10:07AM 15 the police either -- I'm sorry -- Santiago Renteria never

16 called the police either, did he?

17 　　A.　I have no record that he did nor a report from

18 anyone that he did.

19 　　Q.　Did you ever look at any Child Protective Services

10:07AM 20 records regarding the family?

21 　　A.　I'm unaware of the existence of any Child

22 Protective Service records.

23 　　Q.　So the answer would be no?

24 　　A.　A simple answer, no.　Potentially misleading in

10:08AM 25 conveying that said records did exist but I didn't see

them. I am unaware of the existence of those records and certainly could not have reviewed what I don't know existed.

Q. So the answer is no you did not review Child Protective Services records?

A. Given the additional information that I provided that's correct.

Q. Did you ever review any records regarding the shelter who house victims of domestic violence?

A. Not specific to this case, no.

Q. Did you review any records, any psychological records regarding the defendant?

A. Yes, sir. I reviewed, as I described, the treatment records of Norma Reed who was the counselor who was providing the sex offender treatment. I also reviewed mental health records from his medical file in TDCJ.

Q. I know from your affidavit that we were given that you did not interview the defendant regarding the instant offense, the capital murder?

A. That's correct.

Q. Asked him questions, he refused to answer?

A. No, sir, I did not inquire.

Q. And just so the Court knows, would you tell the Court why you did not inquire?

A. Yes, sir. Two primary reasons. One, defense

1 counsel had instructed that the defendant was not to be

2 questioned about the instant offense or prior unadjudicated

3 conduct.  Second, an inquiry --

4          THE COURT:  About prior what conduct?

10:09AM  5          THE WITNESS:  Prior unadjudicated conduct.  The

6 second reason is that that information would not inform

7 either of the two issues that I was looking at.  It would

8 not tell me how he came to be damaged.  It would not inform

9 what kind of inmate he would be confined on a capital life

10:10AM 10 term in the Texas Department of Criminal Justice.  Beyond

11 the facts of the offense that I'm accepting from his

12 conviction and from the trial my inquiry of him beyond that

13 doesn't inform any issue that's before me.

14     Q.   So the Court knows, that as you were developing

10:10AM 15 and doing your research your underlying facts and data you

16 do not have anything regarding his character from a

17 personal interview with him?

18     A.   No, sir.  That's not correct.

19     Q.   Okay.  Tell me what you have in regards to his

10:10AM 20 character.

21     A.   I -- as I described, I took -- I interviewed him

22 regarding his experiences in prison and in confinement and

23 his reaction to those.  I took a relatively brief social

24 history from him regarding his family and background.  I

10:11AM 25 then developed significant additional information regarding

1 him and his character from my interviews with third

2 parties. And I also talked to him about extracurricular

3 activities that he'd been involved in in childhood and a

4 brief employment history and that sort of thing.

10:11AM 5   Q.   Okay. But the underlying facts and data of the

6 opinion that you will espress today does not include any

7 type of character assessment of the instant offense?

8   A.   My assessment is based on an understanding of the

9 instant offense and what transpired here.

10:11AM 10         The focus of my evaluation was on his

11 development in terms of arriving at that offense and on his

12 character as it was reflected in his conduct in that

13 offense.

14   Q.   And my question to you is that in -- in forming

10:12AM 15 your opinion the underlying facts and data that you use to

16 formulate that opinion you excluded whatever facts and

17 circumstances that you could have revealed in regards to

18 his character to form your opinion today?

19   A.   No, sir. That's not correct.

10:12AM 20   Q.   Well, tell the Court you didn't talk to him about

21 his frame of mind when he committed this crime?

22   A.   That's correct.

23   Q.   Is that correct?

24   A.   That's correct.

10:12AM 25   Q.   You didn't talk to him what his thought process

1 was when he committed this crime?

2     A.    That's correct.

3     Q.    You didn't talk to him about what he thought about

4 when he abducted that young girl when he committed this

10:12AM 5 crime?

6     A.    That's correct.

7     Q.    You never talked to him about the avoidance

8 techniques that he was going to use when he committed this

9 crime?

10:12AM 10     A.    That's correct.

11     Q.    You never talked about what he felt, how he felt

12 as he burned that little girl's body?

13     A.    That's correct.

14     Q.    Now, you've been a psychologist for many years.

10:12AM 15 Right?

16     A.    Yes, sir, about 30 years.

17     Q.    Okay.  And I -- and I am -- I am sure that you

18 were much more versed in this area than I am.  But I would

19 imagine that knowing that -- those bits and pieces would

10:13AM 20 assist you in at least learning more of his character?

21     A.    No, sir.  That's not the issue that's before me.

22 This was not a --

23     Q.    No, no, no.  I don't mean to interrupt you.  I

24 just don't want to go long in front of the Court.  We can

10:13AM 25 do this in front of the jury.  All right?  I'm not fighting

1  with you.  I'm just trying to get to this point.

2      A.   The answer is no.

3      Q.   Okay.

4      A.   If in terms of I'm not answering that I don't

10:13AM 5  agree with the proposition that you're offering.

6      Q.   I understand.  I understand.

7           Now, you didn't number your pages, but in

8  regards to -- disturbed sexually?  Disturbed sexuality, I

9  believe, actually is what it's titled.

10:13AM 10      A.   Yes, sir.  That's correct.

11      Q.   You actually start on the page before that and you

12  say -- you talk about disturbed sexuality.  But then on the

13  following page you get more specific.  You talk about his

14  pathological family, Mount Carmel.  You see the square I'm

10:14AM 15  in?

16      A.   Yes, sir, I do.

17      Q.   Okay.  All right.  Now you've never spoke with

18  Father Pete, did you.

19      A.   No, sir.  It's my understanding he's now deceased.

10:14AM 20      Q.   And the defendant never told you about this

21  incident that -- and I'll just quote it for the Court.  You

22  write that Father Pete observed having sex with a young

23  boy, Father Pete transferred the next day?

24      A.   That's correct.

10:14AM 25      Q.   Okay.  Now the slide indicates -- well, the slide

1 indicates that that event occurred at Mount Carmel. Right?

2 The school?

3     A.   I don't have information that it occurred on the

4 school grounds.  It was described as having occurred

10:15AM 5 involving Father Pete and a male student at the school.

6     Q.   Now, the defendant didn't tell that you that that

7 had occurred.  Right?

8     A.   That's correct.

9     Q.   Okay.  And none of those people you interviewed

10:15AM 10 told you that had occurred.  Isn't that correct?

11     A.   None of the individuals that I described --

12 interviewing described that to me.  That's correct.

13     Q.   And you --

14     A.   Well, let me -- let me back up.

10:15AM 15     Q.   Okay.

16     A.   No.  Oscar Santiella told me about the Cathedral

17 High School incidence.  He did not tell me of the Mount

18 Carmel incidence.

19     Q.   So there is no connection, and there is no

10:15AM 20 evidence, in your underlying facts or data that the

21 defendant was aware of is this offense or in any way.

22 Right?

23     A.   I have not inquired whether he was aware of those

24 events.

10:15AM 25     Q.   Okay.  So the evidence as it stands now is that

1  the defendant was not aware of this event, Father Pete

2  observed having sex with a young boy, Father Pete

3  transferred the next day?

4      A.   So the evidence at this point is that it is

10:16AM 5  unknown whether or not David Renteria had knowledge of that

6  event.

7      Q.   Nothing prevented you from asking him that

8  question.  Right?

9      A.   That's correct.

10:16AM 10      Q.   Not Brother Sam, not the --

11           MR. ESPARZA:  You know, I just realized that

12  the Court has a disadvantage, and I apologize.  I guess I

13  just put this on the screen.  I might have -- do you have a

14  copy?  You have a copy, Judge.

10:16AM 15           THE COURT:  The defense provided me a copy.

16           MR. ESPARZA:  Okay.  Well, I thank them for

17  being so gracious, Your Honor.

18      Q.   (By Mr. Esparza)  Okay.  Now when I go to the

19  following square, disturbed sexuality, none -- I guess

10:16AM 20  excluding Mr. Santaria -- is that how you say his name?

21           MR. GANDARA:  Santaella.

22           MR. ESPARZA:  Santaella.  I guess somebody

23  should spell that for the record because I don't know how

24  to spell it.

10:17AM 25           THE COURT:  He was already a witness here.

1 Santaella, S-A-N-T-A-E-L-L-A.

2     Q.  (By Mr. Esparza)  Now, except for him, when you

3 interviewed him, he was the one that told you about these

4 incidents?  No one else told you about them?

10:17AM 5     A.  No, sir.  That's not correct.  I also have

6 affidavits that describe the student being molested by

7 Brother Sam, a student at Cathedral high school being

8 molested by Brother Sam.  So I have those affidavits.  I

9 have treatment records regarding this other individual who

10:17AM 10 made that allegation against Brother Sam.

11     Q.  Okay.

12     A.  It's consistent with what I -- with the interview

13 that I had with Oscar Santaella.

14     Q.  All right.  And who do you have the affidavits

10:17AM 15 from?

16     A.  Those are identified as John Does in the suit that

17 was filed.

18     Q.  So we don't have a name, someone we can call as a

19 witness?

10:18AM 20     A.  I have the cause numbers and the petitions that

21 were filed and the affidavits in the District Court of El

22 Paso County, Texas, 346th Judicial District.  I assume upon

23 order from the Court that that identity could be retrieved.

24     Q.  I -- I'm assuming -- you can assume all you like.

10:18AM 25 My question was do you know the identity of the person who

1 made the allegations?

2    A.   Only as John Doe 1.

3    Q.   And did -- so you never I didn't inquired as to

4 the truth or falsity of that -- of that particular

5 allegation?

6    A.   Only to review the sworn affidavits of this

7 individual and treatment providers to whom he had also

8 complained in the course of his attempts to recover from

9 the trauma of that experience.

10   Q.   And the extent of the evidence as it exists at

11 this moment is that you are not aware of any evidence that

12 the defendant is aware that these things occurred?

13   A.   That's correct.

14   Q.   And in regards Brother Steven F-U-R-C-H-E-S, I

15 believe it's E-S.  I've got to get better glasses.  You

16 retrieved this information from whom?

17   A.   This was from the interview of Oscar Santaella.

18   Q.   And anyone else?

19   A.   I don't recall whether the affidavit of John

20 Doe 1 -- I don't recall it speaking specifically of Steven

21 Furches.  I -- it's my recollection is it did describe that

22 Brother Sam was not the only individual involved.  But I

23 don't recall Steven Furches by name in that affidavit.

24   Q.   So the standing evidence is you only received it

25 from one source?

1    A.    I received it by interview from Oscar Santaella --

2    Q.    Right.

3    A.    -- in terms of a specific name --

4    Q.    Okay.

10:20AM 5    A.    -- that was from a single source.

6    Q.    All right.  And also the state of the evidence at

7 this moment you -- no evidence that the defendant is aware

8 of that conduct either?

9    A.    I have no knowledge of whether he's aware of it or

10:20AM 10 not.

11    Q.    Would it be a fair statement to say that this

12 disturbed sexuality, as you titled it, is based on these

13 three events?

14    A.    No, sir.  The disturbed sexuality is an indication

10:20AM 15 that David Renteria's sexuality is disturbed.  These events

16 are describing pathological context that are part of his

17 background that may have contributed to the formation of.

18 that disturbed sexuality and were part of his background in

19 any case.

10:20AM 20    Q.    Now, you'd agree that that's highly speculative

21 because you personally not aware as to whether or not the

22 defendant is aware of those three events?

23    A.    No, sir.  The fact that these are a part of his

24 background is not highly speculative.  That comes from

10:21AM 25 sworn affidavit and from interview of Oscar Santaella as

1 well as investigation interviews of two other individuals
2 who describe their observation or their -- the reports of
3 Brother Sam of being involved in a sexually abusive
4 situation with a young boy.

10:21AM 5        The fact that -- that David Renteria was
6 attending schools where apparently pedophile teachers or
7 administrators were present is part of his background.

8        Now, if he was additionally victimized by
9 those individuals, then that is an even more substantial
10:21AM 10 part of his background that is a pathological context to go
11 to school in in any case, much as it would be for you or I
12 with our children if we said you have a problem with your
13 kids going to school where the teachers or administrators
14 may be pedophiles as long as they don't victimize them or
10:22AM 15 as long as this child doesn't become formally aware of that
16 during their childhood is that a problem.  Most of us would
17 find that to be a profoundly pathological context to have
18 our children in on a day in, day out basis.

19    Q.    Okay.  I don't think you understood my question,
10:22AM 20 Doctor, but let me try again.

21        You don't have any evidence that the defendant
22 knows about these three events?

23    A.    I have no knowledge of that.

24    Q.    And you don't have any evidence that those three
10:22AM 25 events have somehow affected the defendant?

1    A.    A specific nexus.  I have his disturbed sexuality

2  in adulthood.  There are a number of possible contributors

3  for that.

4    Q.    Well, is it --

10:23AM 5    A.    Among those certainly a pathological school

6  situation and pedophile.  I don't have a specific nexus for

7  that element as part of his disturbed sexuality.

8    Q.    That's my point.  That it might just be -- but

9  that's my point.  You don't have any connection between

10:23AM 10  these three events and the defendant's conduct?  You don't

11  have that connection, do you?

12    A.    There's no formal nexus that can be made about any

13  background factor in terms of looking at outcome.  What we

14  can do is identify factors in someone's background that are

10:23AM 15  adverse that may have varying degrees of contribution or

16  have that potential in terms of the -- of the tragic and

17  violent outcomes that characterize a capital case.

18    Q.    I guess if I -- if I swim in the ocean and it has

19  sharks, I could get bit by a shark even though it's a

10:23AM 20  hundred miles away from me.  I mean that's your analogy

21  here.  Right?

22    A.    No, sir, it's not.

23    Q.    He went to the school.  He went to the school.

24  These events may have occurred and they may have affected

10:24AM 25  him some way?

1    A.   No, sir.  My -- my testimony is that he is in the

2  swimming pool with the sharks.  The sharks are in close

3  proximity to him.  His childhood experience is in a

4  shark-filled pool.  That has an effect on someone.  Now, if

10:24AM 5  the shark bit him too, then that effect is magnified.  But

6  it's not a benign event to attend a school throughout your

7  childhood that is staffed by certainly multiple pedophiles,

8  not to implicate or indict all of the teachers many of whom

9  may have been oddly dedicated individuals.  But there are

10:24AM 10  sharks in the pool that he's in, and that is a significant

11  factor in his background.

12    Q.   And that -- that is the -- the nexus you're

13  talking about is that he was breathing the same air and

14  maybe it affected him?

10:25AM 15    A.   No, sir.  That's not been my testimony.

16    Q.   I understand from your affidavit that you were

17  engaged to give testimony regarding whether there is a

18  probability that the defendant would commit criminal acts

19  of violence that would constitute a continuing threat to

10:25AM 20  society?

21    A.   That was one of the two issues that I was asked to

22  look at.

23    Q.   And the other issue?

24    A.   The other issue are factors in his background that

10:25AM 25  are adverse in nature.

1    Q.    And what is the basis of that opinion?

2    A.    The basis of that opinion are the interviews that

3 I conducted, the records that I reviewed and the

4 investigation summaries and reports that I reviewed.

10:26AM 5    Q.    Now, let me -- let's go to the -- just quickly.

6 I'm almost done.

7         In regards to the capital sentencing Power

8 Point.  What is -- what information or underlying facts and

9 data that you used to try to express the opinions that

10:26AM 10 you're using today here to express?

11    A.    I just described that.  The interviews that I

12 conducted.  The records that I reviewed, the investigation

13 summaries and reports that I reviewed, the totality of the

14 information and the interviews that I conducted --

10:26AM 15    Q.    Okay.  What --

16    A.    -- were integrated to form those opinions and

17 findings.

18    Q.    If I --

19         MR. ESPARZA:  Could I have just a moment, Your

10:27AM 20 Honor?

21         THE COURT:  Yes.

22         (Brief pause)

23    Q.    (By Mr. Esparza)  As I understand your research

24 and the body of work that you've done as a scholar, your

10:27AM 25 opinions are expressed based on -- and you believe that an

1 actuarial approach to determining dangerousness -- without

2 going into the definition of dangerousness -- is the proper

3 approach in trying to predict what may occur.  Is that a

4 fair statement?

10:27AM 5     A.    In part.  It is an essential element in doing a

6 scientifically sound violence risk assessment.  That risk

7 assessment would also rely on the conduct of this

8 individual in a similar situation in context.  The

9 individualized factors that are considered are ones that

10:28AM 10 can be empirically demonstrated or have a clear

11 relationship to factors that can be empirically

12 demonstrated.

13          MR. ESPARZA:  Your Honor, I -- I don't object

14 to him from a -- that he's qualified.  He certainly has a

10:28AM 15 huge body of work.  I to object to the -- the frames --

16          THE COURT:  Are you going to ask him any more

17 questions?

18          MR. ESPARZA:  I am not.

19          THE COURT:  All right.  Let me see counsel in

10:28AM 20 Chambers.

21          (Recess taken)

22          (Open Court, defendant present, jury not

23 present)

24          THE COURT:  Do you need to put any objections

25 on the record?  Do you want to ask any questions --

1           MR. ESPARZA:  No, Your Honor.

2           THE COURT:  -- of your witness on the record?

3           MR. GANDARA:  I don't have any questions on

4 the voir dire portion.  And we need to hook up the Elmo so

5 that we can --

6           THE COURT:  All right.  Let's hurry up and do

7 it.  We're wasting time.

8           Are you going to put any objections on the

9 record?

10          MR. ESPARZA:  Let's go.

11          THE COURT:  Let's go.

12          MR. GANDARA:  The magician went that way.

13          (Open Court, defendant present, jury is

14 present)

10:53AM 15          THE COURT:  Call your next witness.

16          MR. GANDARA:  Mark Cunningham.

17          MR. ESPARZA:  Your Honor, can we approach the

18 Bench?

19          THE COURT:  Yes, you may.

10:53AM 20          (At the Bench, on the record)

21          MR. ESPARZA:  This issue about inquiring into

22 specific facts of the case, and I don't think he has the

23 right to take the Fifth at that point.  I just -- is there

24 a way you want to get into this area?

10:53AM 25          MR. GANDARA:  Well, the defendant has a right

1 to invoke the Fifth Amendment protection, and it was done

2 through counsel, and it's improper to comment on it in any

3 fashion, to comment on his invocation of his Fifth

4 Amendment right.

10:53AM 5        MR. ESPARZA:  Well, except that he's going to

6 say that he interviewed him and then he didn't interview

7 him in certain areas.

8        MR. GANDARA:  That he what?

9        MR. ESPARZA:  That he interviewed him, but he

10:54AM 10 didn't interview him in the area of the instant offense.

11        MR. GANDARA:  That's a comment on the Fifth

12 Amendment right.  I mean it's that simple.

13        THE COURT:  So what is your objection or --

14        MR. ESPARZA:  Well, I believe that I --

15        THE COURT:  -- what you're wanting me to rule

16 on?

17        MR. ESPARZA:  -- I believe I'm entitled to

18 inquire that he did not answer, that it was not a complete

19 interview, and he asserted his Fifth whether there was

10:54AM 20 counsel or not, that he asserted his Fifth, that he was not

21 able to get those facts from him.

22        MR. GANDARA:  That's improper evidence for the

23 jury.

24        THE COURT:  All right.  Well, we're not --

10:54AM 25 we're not even at your portion of the questioning anyway.

1       MR. ESPARZA:  Okay.

2       THE COURT:  So let's get the testimony from

3  him on direct.  And then when it's time to begin your

4  cross-examination we can approach the subject again.

10:54AM  5       MR. ESPARZA:  Okay.

6       (Bench conference concluded)

7       THE COURT:  Proceed.  For the benefit of the

8  jury this witness has previously been sworn in.

9       Proceed.

10:55AM  10            MARK DOUGLAS CUNNINGHAM,

11  having been previously duly sworn, testified as follows:

12            DIRECT EXAMINATION

13  BY MR. GANDARA:

14      Q.   Please state your full name?

10:55AM  15      A.   Dr. Mark Douglas Cunningham.

16      Q.   Spell your last name for the record, please?

17      A.   C-U-N-N-I-N-G-H-A-M.

18      Q.   What kind of work do you do, Doctor?

19      A.   Clinical and forensic psychologist and private

10:55AM  20  practice and also an independent research scientist.

21      Q.   What academic degree do you have?

22      A.   I have a bachelors degree that was from Abilene

23  Christian College with a double major in psychology and

24  mass communications and a minor in Bible.  I graduated with

10:55AM  25  high honors and then attended graduate school at Oklahoma

1 State University.

2         THE COURT: All right. The jury is already

3 telling me they cannot hear you. Please speak up louder.

4         THE WITNESS: Yes, ma'am. I've attended

10:55AM 5 Oklahoma State University in a doctoral program that was

6 accredited by the American Psychological Association as a

7 doctoral training site in clinical psychology and obtained

8 both my masters and doctorate degrees, Ph.D., in clinical

9 psychology at Oklahoma State.

10:56AM 10         I did a one year clinical psychology

11 internship at the National Naval Medical Center in

12 Bethesda, Maryland where I was an active duty Navy officer

13 and also clinical psychology intern. And that lasted a

14 year.

10:56AM 15         I was then assigned as a staff psychologist at

16 the Naval Submarine Medical Center in Groten, New London,

17 Connecticut, which at that time was the primary Navy

18 submarine base on the Atlantic coast. And I was an active

19 duty Naval Officer and also staff clinical psychologist at

10:56AM 20 the medical center there at the submarine base.

21    Q. And this was all in connection with acquiring your

22 academic degree?

23    A. Yes, sir. It -- what I was going to expand on was

24 that while there I did two years part time post doctoral

10:56AM 25 study at the Yale University School of Medicine.

1          When I left the Navy in 1981 I took a full
2 time academic position as an assistant professor of
3 psychology at a small private university and did that full
4 time for two years and also began a practice at the same
10:57AM 5 time.
6          For the last 25 years I have exclusively been
7 in practice initially with a primary focus in clinical
8 psychology which is the evaluation and treatment of
9 psychological disorders with an increasing amount of my
10:57AM 10 practice devoted toward forensic psychology, which is the
11 application of psychological research and techniques to
12 legal issues any way that psychology as a science can be
13 helpful to some issue that's before the Court.
14     Q.    Describe some of the issues that you apply the
10:57AM 15 forensic psychology to?
16     A.    Well, that's all the way from things like
17 evaluation of parenting capabilities in child custody cases
18 or evaluation of psychological injuries in civil cases or
19 in criminal cases things like competency to stand trial or
10:58AM 20 a mental state at the time of offense or sentencing
21 considerations such as are being considered today.
22     Q.    All right.  And, Doctor, where are you licensed to
23 practice as a psychologist?
24     A.    I'm licensed as a psychologist here in Texas, as
10:58AM 25 well as Oklahoma, Arkansas, Louisiana, South Carolina, New

York, Connecticut, Illinois, Indiana, Colorado, Idaho,
Oregon, Arizona, New Mexico, Tennessee -- I may have left
some out, 15 states in total.

    Q.   Okay.  Doctor, you used some initials after your
name, the first one says Ph.D.  Is that -- tell the jury
what that is.

    A.   Ph.D. stands for Doctor of Philosophy which is the
highest level of degree that a university gives in whatever
the field is.  So someone may have a Ph.D. in chemistry.

    Q.   Yours is in psychology?

    A.   Mine is in psychology.

    Q.   You did post doctoral educational work to further
your education after you got your Ph.D.?

    A.   Yes, sir.  That's correct.

    Q.   The other side of the initials is ABPP.  What does
that mean?

    A.   The American Board of Professional Psychology
which is a board certification organization that's
recognized by the American Psychological Association.  I'm
board certified in forensic psychology by the American
Board of Professional Psychology.

    Q.   Would you -- where do you essentially -- it seems
that your practice is national in scope.  Is that correct?

    A.   Yes, sir.  That's correct.

    Q.   Okay.  Now have you published some publication of

1  work in your -- in your specialty?

2      A.   Yes, sir.  In peer review or scientific journals

3  as well as in edited textbooks.

4      Q.   What publications do you have in clinical

11:00AM 5  psychology?

6      A.   There's a single publication in clinical

7  psychology that's entitled the effects of bilateral EEG --

8  well, that was the dissertation title.  The actual title of

9  the journal article -- let me turn to that -- is *The*

11:00AM 10 *Effects of Bilateral EEG Biofeedback on Verbal, Visual,*

11 *Spatial and Creative Skills in Learning Disabled Male*

12 *Adolescents*.  That was published in *The Journal of Learning*

13 *Disabilities* 27 years ago.

14     Q.   In the forensic psychology what have you

11:00AM 15 published?

16     A.   I've published a large number of scholarly papers,

17 over 30, most of those addressing rates of violence in

18 prison, factors that are a predictive of violence in

19 prison, the behavior of murderers or capital murderers or

11:00AM 20 high security inmates in prison, death row populations,

21 standards of evaluations in capital cases for forensic

22 psychology evaluations.

23              Let me turn that off.

24              (Brief pause)

11:01AM 25     Q.   (By Mr. Gandara)  You indicate that in addition to

your academic education and your post doctoral work that
you do -- you're an independent research scientist?

     A.   Yes, sir.

     Q.   Tell us a little bit about what -- what that
involves?

     A.   That involves conducting these studies that I have
described, sometimes involving smaller numbers of
individuals, like we did a study that looked at the prison
behavior of 145 federal capital inmates sentenced to life
instead of death.  We looked at the behavior of 136 capital
inmates in Texas who were sentenced to life instead of
death after being capitally charged.

          Another study we did looked at 50,000 inmates
in the Florida Department of Corrections.  Another study
looked at about 3,000 inmates over an eleven year period of
time in a high security prison in Missouri.

          My colleagues and I do research on our own
initiative, not as part of an academic position, but simply
because we're interested in it and find it interesting to
do.  And I'm involved in that so heavily that even though
I'm not compensated for it, even though I'm not paid to do
it I consider that to be part of my occupational identity.

     Q.   Doctor --

          MR. ESPARZA:  Your Honor, I'll object to --
may we approach the Bench?  We have Defendant's 152, I

1 believe the Doctor has testified.

2     (At the Bench, on the record)

3     MR. GANDARA:  Judge, we're -- we're --

4     THE COURT:  Defense 152.

11:03AM 5     MR. GANDARA:  It hasn't been admitted yet.

6 I'm offering it.

7     MR. ESPARZA:  That's the purpose of the --

8 this has all sorts of extraneous stuff, Judge.  They can go

9 page by page.  I don't -- they can bolster the witness with

11:03AM 10 State's 152 -- with Defendant's 152.

11     (Bench conference concluded)

12     THE COURT:  Overruled.  152 is admitted.

13     (Defendant's Exhibit No. 152 was admitted into

14 evidence)

11:03AM 15     Q.  (By Mr. Gandara)  Dr. Cunningham, please take a

16 look at Defendant's Exhibit 152.  Do you recognize that

17 document?

18     A.  Yes, I do.  This is my curriculum vitae which is a

19 fancy word for a resume that summarizes my educational

11:04AM 20 background and awards and scholarly publications and

21 professional groups that I belong to, that kind of thing.

22     Q.  Thank you.  Have those studies you're talking

23 about regarding prison inmates and violence and statistical

24 studies, have have they been published?

11:04AM 25     A.  Yes, sir, they have.  They have been published in

peer review which is what we call scientific journals.

This work has already been summarized in chapters that I

have written that are -- that are in edited textbooks.

Q.   You've been -- you've been quoted in -- those

11:04AM   studies have been quoted in other -- in other words?

A.   Yes, sir.   Those studies are quoted in other

scientific papers.   And then I summarize that research in

the book chapters that I have written.

Q.   Have you -- have you made a contribution though

11:05AM   other than publishing personally directly yourself to any

recently published books?

A.   Yes, sir.   A chapter that I co-authored regarding

capital sentencing evaluations was published in the

handbook of psychology which is a 12 volume series that's

11:05AM   intended to represent the state of the art of psychology at

this time.   One of those volumes is on forensic psychology.

I was asked to write the chapter on capital sentencing

evaluations, and I asked Dr. Allen Goldstein to co-author

that with me.

11:05AM   There are two additional chapters that were

published late in 2007 or earlier this year.   One of them

summarizes and integrates the -- all of the research that's

been done regarding what we know about the conduct of

capital offenders in prison.

11:06AM   Another one is a textbook chapter that

1 describes how you go about doing evaluations at capital

2 sentencing, how psychological evaluations, the -- the

3 issues that -- that psychologists would examine, the

4 research that informs those as well as considerations about

11:06AM 5 what we call informed consent, matters that need to be

6 talked about to the attorneys before one begins.

7     Q.    Doctor, are there other psychologists or

8 psychiatrists or scholars that have published work relevant

9 to capital sentencing and death row?

11:06AM 10     A.    Yes, sir, there are.

11     Q.    Have any of them published as extensively as you

12 have?

13     A.    Not to my knowledge.

14     Q.    All right.  Have you testified in Court

11:07AM 15 proceedings, military, criminal, family or civil?

16     A.    Yes, sir, I have on many occasions.

17     Q.    Let me go back to something.  To what professional

18 organizations do you belong?

19     A.    I'm a fellow of the American Psychological

11:07AM 20 Association which is a distinction that reflects having had

21 national impact on the practice or science of psychology.

22 That's a peer reviewed elected distinction.

23           I'm a fellow of the American Academy of

24 Forensic Psychology which is the board -- scholarly

11:07AM 25 association of board certified forensic psychologists.  I'm

1 member of the Texas Psychological Association.  I'm listed

2 in the National Register of Health Service Providers, which

3 means that my training was in an organized medical setting,

4 particularly my post doctoral training and supervision so

11:08AM 5 that I'm better equipped to treat more serious disorders.

6          I hold what's called a CPQ, which is a

7 credential that's intended to facilitate by serving the

8 clearinghouse that your credentials have passed muster to

9 facilitate licensing in additional states.  It hasn't

11:08AM 10 worked that way yet, but that's the idea.  And then I'm

11 also a member of other various professional or correctional

12 associations.

13     Q.   When did you become board certified in forensic

14 psychology?

11:08AM 15     A.   In 1995.

16     Q.   How long did it take you to do the work that

17 required you to get that?

18     A.   Well, I suppose that began even when I was in the

19 Navy back in the late 1970s and early '80s.  More

11:08AM 20 specifically I spent about three years in a very focused,

21 dedicated self-study program, reading, workshop attendance

22 in preparation for that credential including the last nine

23 months before the oral exam spending 30 to 40 hours a week

24 studying for that oral examination.

11:09AM 25     Q.   How many board certified forensic psychologists

1  are there in the United States?

2      A.   About 250.

3      Q.   All right.  Did you -- after acquiring your board

4  certificate, did you participate in -- to any degree with

11:09AM 5  board certification?

6      A.   Yes, sir.  After I became board certified, I then

7  was involved as -- as a work sample reviewer, in other

8  words, the person that reviews what the candidates for

9  board certification have submitted to illustrate their

11:09AM 10  sophistication in the field, reports that they've done that

11  are heavily supplemented by research and ethical

12  considerations and legal analysis.  And I also served as an

13  oral examiner.  The final step in being board certified is

14  at that time is a three hour examination that's given by

11:09AM 15  three board certified forensic psychologists who can ask

16  anything in the field of forensic psychology to test your

17  knowledge of.  That's the exam that I spent those nine

18  months studying for.  The failure rate at oral exam at the

19  time I took it was about 40 percent.  And I have

11:10AM 20  subsequently served as an oral examiner of other people who

21  are involved in a similar attempt to become board

22  certified.

23      Q.   Doctor, do licensed psychologists do continuing

24  education?

11:10AM 25      A.   Yes, sir, they do.

1   Q.   Would you describe the continuing education that
2 you engage in as -- on a routine basis over the course of a
3 year?

4   A.   Yes, sir.  In any given year I will typically have
5 anywhere from 40 or 50 to 70 or 80 hours of continuing
6 education that I'm attending as a student.  Most of that
7 continuing education in the last ten years has focused on
8 forensic psychology and particularly on workshops that
9 would inform capital sentencing considerations.

10   Q.   Now, we're talking about a -- is there a teaching
11 faculty for -- for the continuing education that you have?
12 In other words, is it all done under one particular
13 association or do you just pick it up in general in
14 seminars that are given by various medical schools?  How
15 does that work?

16   A.   The continuing education that I participate in,
17 some of that is sponsored by the board certification
18 organization that I'm a part of, but I also widely attend
19 continuing education and also complete correspondence
20 continuing education that is outside of that.

21          I am one of the instructors who teach on
22 behalf of the American Academy of Forensic Psychology.  I'm
23 part of their faculty, about 30 of us that serve as
24 individuals that present full day workshops to help raise
25 the practice of psychology as it comes into the courtroom.

1 That doesn't mean that we're trying to make psychologists
2 or teach them how to be more persuasive, but instead, to
3 give psychologists that are coming into the courtroom the
4 best understanding of the issues that are in front of them
11:12AM 5 and the best available research and techniques that will
6 inform that evaluation and be most helpful to the Court.
7     Q.    How many of the board certified psychologists that
8 are currently active in the United States are on that
9 teaching faculty of the American Academy of Forensic
11:12AM 10 Psychologists?
11     A.    At any point in time about 30.
12     Q.    Have you ever provided continuing education to
13 lawyers?
14     A.    Oh, yes, sir.  On many occasions, attorneys,
11:12AM 15 defense attorneys, prosecutors, have attended seminars that
16 I have instructed.  I've have also participated in seminars
17 that are jointly sponsored by the American Psychological
18 Association and the American Bar Association.  And judges,
19 defense attorneys and prosecutors have been present at
11:13AM 20 those as well.
21     Q.    Okay.  Getting pack to testifying in Court.
22 You -- you said that you have testified in Court how many
23 times would you say?
24     A.    Over 200.
11:13AM 25     Q.    And what courts have you appeared to testify?

1       A.   I've appeared in state or federal courts in Texas,

2   Oklahoma, Arkansas, Louisiana, Alabama, Georgia, Florida,

3   South Carolina, North Carolina, Virginia, Maryland, New

4   York, Massachusetts, Pennsylvania, Ohio, Illinois, Indiana,

11:13AM   5   Missouri, Kansas, Colorado, Idaho, Oregon, Washington,

6   California, Arizona, New Mexico, in -- in over 30

7   jurisdictions, Puerto Rico as well.

8       Q.   And in those courts where you've testified were

9   you recognized as an expert witness in your field?

11:14AM   10       A.   Yes, sir, in clinical and/or forensic psychology

11   on all occasions.

12       Q.   Has any Court where your testimony was proffered,

13   was offered, denied you?  Has a Court ever denied you the

14   right to testify as an expert in forensic or clinical

11:14AM   15   psychology?

16       A.   I've never been denied status as an expert in

17   clinical or forensic psychology.  The Court might or might

18   or might not decide whether the testimony I was about to

19   give was admissible under the legal framework that that

11:14AM   20   hearing was occurring.

21           MR. GANDARA:  Your Honor, we move to have Dr.

22   Cunningham accepted an expert in clinical and forensic

23   psychology for David Renteria's case.

24           MR. ESPARZA:  Your Honor, I have no objection

11:14AM   25   to his qualifications.

1   THE COURT:  Proceed.

2   Q.   (By Mr. Gandara)  Dr. Cunningham, what is the

3   primary area that you were asked to focus on in David

4   Renteria's case?

11:15AM  5   A.   Stated most simply, it was where do we go from

6   here, what kind of of inmate is he likely to be in prison,

7   and even more specifically, what's the likelihood that he

8   would commit acts of serious violence confined for life in

9   the Texas Department of Criminal Justice.

11:15AM  10   Q.   What information did you review or gather to

11   prepare for your testimony today?

12   A.   I reviewed his correctional records from the Texas

13   Department of Criminal Justice.  I reviewed records

14   regarding his confinement in the El Paso jail.  I reviewed

11:15AM  15   offense related records.  I reviewed criminal records and

16   not just of this offense but his past criminal record.

17         I also have reviewed transcripts of the -- of

18   Court proceedings that have occurred in the past.  I

19   reviewed various affidavits and investigation summaries.

11:16AM  20   Then I engaged in a number of direct interviews as well.

21   Q.   All right.  Did you look at any government

22   documents, research or statistics or other sources of

23   information?

24   A.   Yes, sir, I did.

11:16AM  25   Q.   Briefly, can you give us an outline of what -- or

1 at least the exemplary ones?

2     A.   Yes, sir.  I reviewed information that's produced

3 by the Texas Department of Criminal Justice such as the

4 Emergency Action Center Report that there was an excerpt of

11:16AM 5 that was shown here in the Court not long ago.

6         I also reviewed information that my colleagues

7 and I have collected about rates of violence in other

8 correctional settings.  I reviewed research that my

9 colleagues and I have done looking at factors, rates and

11:17AM 10 predicted factors associated with prison violence among

11 general offenders, murderers and capital offenders here in

12 Texas, Missouri, Florida, federal prisons nationwide.

13         I also reviewed research and studies published

14 by other individuals who I have not collaborateed with in

11:17AM 15 my own investigations.

16         I -- i think that probably captures the broad

17 nature of -- of this research.  And some of it I summarized

18 before that my colleagues and I have done, very large scale

19 studies looking at how often does violence happen in prison

11:17AM 20 and who is more likely to be involved in committing that

21 violence.

22         Essentially, it's fancy counting.  You

23 identify a group of individuals and you count how often

24 different severities of violence happen with that group.

11:18AM 25 And then even count, if we break those guys down by age or

1 education, how do their counts compare to people who have

2 different characteristics.

3     Q.    Are your methods and your sources information

4 that -- that you have relied on, that you have looked at

11:18AM 5 for this case, are they -- are those things reasonably

6 relied on by forensic psychologists in coming to their

7 professional opinions?

8     A.    Yes, sir, they are.

9     Q.    Now, you've prepared some demonstrative exhibits

11:18AM 10 to -- to help us work through your testimony.  Is that

11 correct?

12     A.    Yes, sir, that's correct.

13          MR. GANDARA:  Your Honor, we'd ask for

14 permission for Dr. Cunningham to coordinate the exhibits

11:18AM 15 during the direct examination.

16          MR. ESPARZA:  Do you need a response from me,

17 Your Honor?

18          THE COURT:  Yes.

19          MS. HUGHES:  I don't have any objection to the

11:18AM 20 use for demonstrative purposes.  If we get to the issue of

21 admission, I have objections in that regard.  For

22 demonstrative purposes the State has no objection.

23          THE COURT:  All right.  You may proceed.

24          MR. GANDARA:  Thank you, Your Honor.

11:19AM 25     Q.    (By Mr. Gandara)  Doctor, how many times have you

1 testified at capital sentencing trials?

2    A.   Approximately 130 times, about 80 times in state

3 capital cases and approximately 50 times in federal capital

4 cases.  And those are in jurisdictions throughout the

11:19AM 5 United States.

6    Q.   Have you ever been called to testify by the

7 prosecution in a criminal case, whether it's a capital case

8 or not?

9    A.   I've been called in a criminal case.  I have not

11:19AM 10 been called to testify by the State in a capital case.

11    Q.   All right.  And how many times have you been

12 called by the State in a criminal case other than capital?

13    A.   I don't have a count of those.  It's on many

14 occasions.

11:19AM 15    Q.   Are you opposed to the death penalty, Doctor?

16    A.   No, sir, I'm not.

17    Q.   Now, if the State would want to call you to

18 provide information in a capital murder case, a death

19 penalty case, would you be willing to testify?

11:20AM 20    A.   Yes, sir, I would.  I would present the same

21 information that I'm going to present today regardless of

22 who called me to testify.

23    Q.   Has the prosecution ever called on you to provide

24 consultation or testimony in a capital case?

11:20AM 25    A.   No, sir.

1    Q.   Now, it seems like that -- that if you've been

2   called only by one side that that would show that you're

3   biased, that your point of view is biased.  Would you

4   respond to that?

11:20AM  5    A.   Yes, sir.  It -- it could appear that way on first

6   glance.  The research that I'll be talking about very

7   clearly demonstrates that the majority of capital offenders

8   will not commit serious violence in prison, that the

9   seriousness of the offense that sent you to prison is not a

11:20AM 10  good predictor of violence once you get to prison.  That is

11   simply the state of the research.

12                 And so I'm not unlike the scientist that has

13   studied the --t he connection between cigarette smoking and

14   lung cancer, and my science demonstrates that there is a

11:21AM 15  very strong connection.  That guy is never going to be

16   called by the tobacco companies in one of the civil cases,

17   not because he's biased, but because that's just what the

18   research says.

19                 And so I'm -- I'm a scientist.  This is what

11:21AM 20  my studies show.  These studies the defense finds to be

21   more helpful to them than the State does.  But I'm glad to

22   present them whoever would call.

23    Q.   All right.  And has the prosecution in federal

24   cases or the State in a criminal case ever brought to

11:21AM 25  testify in a case that you participated in an expert that

1 has said that your methodology or your statistical data was

2 wrong?

3     A.   No, sir.

4     Q.   Has the prosecution --

11:21AM 5     A.   To my knowledge.  I'm not always present

6 throughout the entirety of the case, but to my knowledge,

7 no.

8     Q.   All right.  Has the prosecution ever confronted

9 you with a peer review article while you were testifying

11:22AM 10 from the stand that demonstrated that your methods or data

11 were wrong?

12     A.   No, sir.

13     Q.   Now, when you get up to testify the prosecution

14 generally asks you about money.  What -- and about what

11:22AM 15 your fees were in capital cases routinely.  Right?

16     A.   Yes, sir.

17     Q.   Now, I'd like to ask you -- are you asked

18 sometimes what your total annual income is?

19     A.   On occasion I've been asked that.

11:22AM 20     Q.   And are you asked what proportion of your income

21 comes from working on capital cases?

22     A.   Yes, sir.

23     Q.   All right.  Let's get that out -- out of the way.

24 You've been asked to work David Renteria's case as an

11:22AM 25 expert in forensic psychology.  Correct?

1    A.    Yes, sir.  That's correct.

2    Q.    And have you been paid to do that?

3    A.    I have been paid in part.  There is still some

4    outstanding balance, but I've been paid incremently.  And

11:23AM  5    of course I expect that those invoices will be paid.

6    Q.    What are you being paid for?

7    A.    I'm being paid for my time and for the hours that

8    I spent in preparation and evaluation and consulting with

9    the attorneys and preparing my testimony.

11:23AM 10    Q.    Have you ever been asked to consult in a case

11    but -- but not called as a witness at trial?

12    A.    Yes, sir.  That's happens pretty routinely.

13    Q.    And what generally is the circumstance of that,

14    where you would consult in the case and then a party the

11:23AM 15    attorney would decide not to put your testimony on at

16    trial?

17    A.    Well, a couple of things can happen.  Some cases

18    end up pleading out along the way so they don't come to

19    trial.  Sometimes I'm not called to testify, and I really

11:23AM 20    don't know all the reasons why they ultimately didn't call

21    me.

22         Something that happens pretty regularly though

23    is that I will be called by an attorney who is interested

24    in my violence risk assessment in a capital case.  And in

11:24AM 25    that initial telephone call before I even open a file I

1 will ask him some questions about factors about a defendant

2 that served to raise or lower his risk of violence in

3 prison.  And I will run through a quick series of questions

4 about that.  And then use one of the risk assessment scales

11:24AM 5 that -- that are based on likelihood of violence in prison

6 to give them a ballpark idea of this defendant's relative

7 risk.

8 Sometimes that's a bigger number than the

9 defense wants to put on before the jury.  I -- and so

11:24AM 10 they'll tell me that, gee, that number is bigger than I

11 would like to have put forth, and I say I understand that.

12 And they say I think maybe we don't need to talk any

13 further, and that's the end of it.

14 Q.   Has that ever happened in a capital case, in a

11:25AM 15 death penalty case?

16 A.   Yes, sir.  That's what I was describing.  That

17 would be the application of that and that happen with some

18 regularity.

19 Q.   What is the hourly rate you're charging and for

11:25AM 20 working with this case?

21 A.   My fee is $300 per hour.

22 Q.   How would that be compared with what other

23 forensic psychologists charge, people that do the same or

24 similar work that you do?

11:25AM 25 A.   Those that are practicing on a national level that

1 fee is at lower end of the scale.

2     Q.   What's the -- give us a range in -- in your

3 working of death penalty cases, capital cases, of how many

4 hours you put into a given case.  I understand they're not

11:25AM 5 all the same.  But can you give us an idea of how many

6 hours you possibly could put into a case?

7     A.   Yes, sir.  When I'm involved in doing a number of

8 interviews in a pretty broad evaluation as I have in this

9 case.  It's not unusual for me to put in 80 or 100 hours in

11:26AM 10 a case prior to testimony.

11     Q.   So you can run up $20- or $30,000 in one case?

12     A.   Yes, sir.  That's correct.

13     Q.   Now, what percentage of -- of the money you've

14 made testifying comes from capital cases?

11:26AM 15     A.   Most of my income doesn't come from testifying

16 because I'm only on the stand for a few hours.  Most of it

17 comes from the preparation work.

18           Depending on the year, what I -- what I've

19 historically thought is that about 80 to 90 percent of my

11:26AM 20 income comes from consulting on capital cases -- capital

21 sentencing cases at one phase or another.  We -- we did a

22 check of that two or three years ago, a couple of years

23 ago, and I think it was only 60 percent.  But it is a very

24 substantial part of what I do.

11:26AM 25           So it's not unlike a heart surgeon who mostly

does hearts. My focus and specialization is capital

sentencing, and that's mostly what I do.

Q. Well, I suppose that trial lawyers are focused on

trial testimony. And so when we ask questions, we ask

11:27AM about testifying and sometimes we forget the work that it

took to get the information for your testimony. Right?

A. Yes, sir.

Q. You are a nationally recognized expert in capital

sentencing determinations. Correct?

11:27AM A. Yes, sir. That's correct.

Q. Now, when did you begin to travel extensively and

become involved in doing these capital cases?

A. The first capital case I did was in 1995 after I

became board certified. I think the first case that I did

11:27AM out of the state of Texas was probably in 1996. By 1998 I

was traveling world widely in terms of doing these cases.

Q. Did you -- did you foresee doing this kind of work

and this kind of traveling when you first started your

career?

11:28AM A. No, sir. When I began to focus on becoming board

certified in 1992 I simply thought that I would -- would be

better at the custody and incompetency and insanity and

civil evaluations that I did. They were locally in Abilene

where we lived at that time and where we'd been for about

11:28AM ten years at that point. I did not foresee that I would

1  become involved in capital cases or that I would be

2  traveling beyond the immediate west Texas region.

3      Q.   All right.  Doctor, where do we begin with talking

4  about this violence risk assessment that you've got up on

11:28AM 5  the screen?

6      A.   The -- the first set of factors are ones that I

7  would look at specific to David Renteria that -- that I

8  believe and my findings support that are associated with

9  his being likely make a positive prison adjustment.  In

11:29AM 10  other words, an adjustment to prison without serious

11  violence.  And those factors are his age, his past behavior

12  in prison or in jail, pretrial.

13          The fact that he holds a high school diploma

14  in his case and he's also completed about 50 semester

11:29AM 15  semester hours of college.  His history of gainful

16  employment in the community, even though that has some

17  instability to it, that he has recurrently sought gainful

18  employment.  A history -- an unusual history of prosocial

19  or positive childhood activities that may -- that those may

11:29AM 20  capture the same thing that the high school education,

21  college and employment do.  But because they're so

22  distinctive in his case, I identified those as a factor

23  that's part of the same set of what we would describe in

24  the community stability factor.

11:30AM 25          Also, that he is in a continued relationship

and correspondence and visitation with family members and

other community members. And finally, because he is

serving a -- or would be serving, if sentenced to it, a

capital life sentence. All of those are factors that point

11:30AM to him and factors about him and his circumstances that

point to his having a positive adjustment to prison.

Q. So it -- you're not just going to spit numbers.

You've done some individualization. In fact, you've

individualized the statistics and compared it with David,

11:30AM and you're going to tell the jury about David Renteria?

A. Yes, sir. That -- that's exactly correct. There

are really two essential elements in to doing this a

scientific way. One is to describe the factors that you've

identified about this person. And the second is to

11:30AM identify what science tells you about whether that's

predictive or not. In other words, if I identify factors

about him like he has black hair or he's heavy set, only

that has nothing do with his risk of violence in prison.

That factor is not helpful.

11:31AM But to the extent that I identify factors and

also identify the science that relates to that to being a

positive predictor. That's the most reliable scientific

foundation for this kind of evaluation.

Q. Let's go to the end of -- of this assessment and

11:31AM then come back to the beginning, Doctor. What's your

1 bottom line conclusions in regard to David Renteria?

2    A.    The bottom line is that he is unlikely to commit

3 acts of serious violence confined within the Texas

4 Department of Criminal Justice.  The more severe the act is

11:31AM 5 that we're talking about the less likely that is to occur.

6    Q.    Now, what -- what characteristics or what features

7 of the defendant or his background do you base this on?

8    A.    I presented those here.  This is an outline of

9 factors specific to him.  Now, there are others that have

11:32AM 10 to do with the context that he'll be in and -- and

11 preventive interventions that can be brought to bear.

12 They're going to look at characteristics simply about him

13 that inform that these are some of those.

14    Q.    All right.  So what -- what do you do?  You look

11:32AM 15 at -- you look at the individual characteristics, and by

16 doing some investigation you -- and so forth.  But what is

17 in the methodology or the science?  How do you go about

18 making your determination about the likelihood of violence

19 in prison?

11:32AM 20    A.    Well, let me describe that.  When we're talking

21 about doing a risk assessment, there -- there is an

22 overarcing question.  The overall question is will there be

23 violence.  Now, actually, that's made up of four

24 subcomponents, four individual questions.

11:33AM 25              What's the probability.  This is not a, yes,

1  he will, no, he won't kind of determination.  That can't be

2  made about anybody.  For anybody that I would look at there

3  is some probability, some possibility, however small, that

4  they would engage in violence in the future.  So that's

11:33AM 5  what we're talking about.  We're talking about what's the

6  likelihood, and how does that likelihood compare, for

7  example, to other inmates.

8          The next question is of what form of violence.

9  The question is what's the likelihood that he would shove

11:33AM 10  another inmate across a capital term in prison.  The

11  likelihood may be 100 percent, that he's going to have to

12  show a willingness to stand up for himself to prevent

13  greater victimization.

14          On the other hand, if the question is what's

11:33AM 15  the likelihood that he would kill a corrections officer.

16  Well, that's an event that happens about one time in State

17  prisons in the whole United States each year.  That

18  likelihood is about one chance in a million per year.  So

19  that -- that's an extraordinary unlikely event.

11:34AM 20          So -- as you're looking at this issue of

21  likelihood you want to identify the severity of violence,

22  at what time period.  Are we talking about his current age

23  of 38.  Are we talking about when he's 48, 58, 68.  Because

24  that risk will decline as he ages in prison.  And in what

11:34AM 25  context are we talking about him being in the general

population of a level 5 institution as a G-3, or are we talking about him being locked down in administrative segregation under super maximum conditions. And so those are the questions that we need to tease out as we come to

11:34AM  conclusions about what's the liklihood of violence.

Q.   Do you have a short title, a name for this process or this methodology?

A.   Well, yes, sir. This is -- is a group statistical method or an insurance company method. It's the same

11:35AM  question the automobile insurance industry has, what's the probability of what type of accident, at what age of driver and what driving locale.

And essentially we're bringing the same kind of methodology to bear looking at a different type of risk.

11:35AM  Instead of risk of a car accident, we're going to look at risk of violence in prison.

Now, as we would look at different methods of evaluating that, those range from more scientific to less scientific. The most objective, the most scientific

11:35AM  approach, is a group statistical approach. It's the insurance company method. You know, it's what happened to me when my son turned 16 and my insurance rates went up $1,000 a year. That was based on on the insurance company's experience with 16 year old male unmarried

11:35AM  drivers.

So that method means you define the group,
capital murderers, capital murderers in Texas, murderers in
Texas, life sentence inmates and you track your experience
with them. And on the basis of that you identify what --
11:36AM  what the experience rate is with that group, what the
likelihood is based on that group experience.

That -- that group number, what's the
likelihood of this in the group, or how often did this
happen in the group the defendant belongs to. That's the
11:36AM 10  most important single piece of information that you can
have to do an accurate and scientific risk assessment.

That one in a million number I gave you a
minute ago, that's the most number or piece of information
to have as you determine what the likelihood is of a
11:36AM 15  particular defendant carrying out an act like that.

Now, the next most reliable approach is an
anamnestic, or a past pattern, approach. This is the idea
that the best predictor of future behaviori s past
behavior. Now, that's true as long as you have two
11:37AM 20  critically important elements. Number one, you have enough
behavior to form a pattern. And number two, your context
of prediction is sufficiently similar.

Q.   What's context of prediction?

A.   Well, let's for example. The way that my 16 year
11:37AM 25  old might drive on Friday night when he's out with his

friends might have no correspondence with the way he drives on Sunday morning with me sitting next to him in the front seat.  Same kid, same car, but a fundamentally different context.  The way the class acts with the substitute teacher seems to have no relationship to the way they act with the regular teacher.

11:37AM

    THE COURT:  Let me interrupt here.  I think it's time to call a recess.  It will be very crowded on Friday afternoon at the restaurants.

11:37AM

    Don't discuss the case.

    (Lunch recess taken)

## COURT REPORTER'S CERTIFICATE

THE STATE OF TEXAS)
COUNTY OF EL PASO )

I, LISA MARIE DE MELLO, CSR, RPR, Official Court Reporter in and for the Council of Judges Administration, El Paso County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record, 5/2/08, is $____and was paid/will be paid by_____.

WITNESS MY OFFICIAL HAND this the 14th day of May 2009.

LISA MARIE DE MELLO, Texas CSR 3313
Expiration Date: 12-31-2009
El Paso County Council of Judges
500 East San Antonio Street, Suite 101
El Paso, Texas 79901
(915) 546-2000 ext. 4352