*74829*

## REPORTER'S RECORD
## VOLUME 71 of 84 VOLUMES

### TRIAL COURT CAUSE NO. 20020D00230

| | |
|---|---|
| THE STATE OF TEXAS, | ) IN THE DISTRICT COURT OF |
| Plaintiff | ) |
| VS. | ) EL PASO COUNTY, TEXAS |
| | ) |
| DAVID RENTERIA, | ) |
| Defendant | ) 41st JUDICIAL DISTRICT |

FILED IN
COURT OF CRIMINAL APPEALS

JUN 0 4 2009

Louise Pearson, Clerk

------------------------------------

Jury Trial Continued (Punishment Phase)

May 3, 2008 (Morning Session)

------------------------------------

On the 22nd day of APRIL 2008 the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Mary Anne Bramblett, Judge Presiding, held in El Paso, El Paso County, Texas:

Proceedings reported by machine shorthand.

ORIGINAL

Lisa Marie De Mello, CSR

Official Court Reporter - Council of Judges Administration

## APPEARANCES

Lori Hughes          SBOT NO. 00786275
Diana Meraz          SBOT NO. 13942600
Jaime Esparza        SBOT NO. 06666450
Office of the District Attorney
500 East San Antonio, Room 201
El Paso, Texas  79901
Phone:  (915) 546-2059
Fax:  (915) 533-5520
ATTORNEYS FOR THE STATE OF TEXAS


Jaime Gandara        SBOT NO. 07611900
Edythe Payan         SBOT NO. 00791415
Greg Velasquez       SBOT NO. 20540300
Office of the Public Defender
500 East San Antonio, # 501
El Paso, Texas  79901
Phone:  (915) 546-8185
Fax:  (915) 546-8186
ATTORNEYS FOR THE DEFENDANT

CHRONOLOGICAL INDEX
VOLUME 71 OF 84 VOLUMES
Punishment Phase

PAGE  VOL.

SATURDAY MAY 3, 2008

| DEFENDANT'S WITNESSES | Direct | Cross | V/D | Vol. |
|---|---|---|---|---|
| Mark Douglas Cunningham | 79 | 3 | | 71 |

Defense Rests................................... 091   71
State Closes................................... 100   71
Defense Closes................................. 100   71

Court Reporter's Certificate................... 101   71

EXHIBIT INDEX

DEFENDANT'S

| NO. | DESCRIPTION | OFF'RD | ADMT'D | VOL. |
|---|---|---|---|---|
| 158 | Judgment | 96 | 96 | 71 |
| 159 | Judgment | 96 | 86 | 71 |

1                    (Saturday, May 3, 2008)

2                    (Open Court, defendant present, jury is

3 present)

4                    THE COURT:  Good morning, ladies and

08:50AM 5 gentlemen.

6                    JURORS:  Good morning.

7                    THE COURT:  You may proceed.

8                    MR. ESPARZA:  Thank you, Your Honor.

9                         CROSS-EXAMINATION (Continued)

08:50AM 10 BY MR. ESPARZA:

11      Q.   Doctor, yesterday before we stopped I was

12 questioning you about the domestic abuse that you had

13 testified on direct, and, as your slide says, that the

14 family was pathological?

08:51AM 15      A.   Yes, sir.

16      Q.   All right.  Now, in regards to your investigation

17 in regards to the family, who exactly did you interview?

18      A.   If I could have my interview binder back, I have

19 those persons and dates and time periods I logged there,

08:51AM 20 but I'll need that file.

21                    (Documents handed to witness)

22      Q.   (By Mr. Esparza)  Well, while you're looking --

23      A.   I have that here.

24      Q.   Okay.  Tell me who did you interview?

08:51AM 25      A.   I interviewed David Renteria for 203 minutes,

three and a half hours, on July 16th, 2007. I interviewed

Eva Renteria, his mother, for 162 minutes on July 15th,

2007. I interviewed Cecelia, who goes by Ceci, Esparza,

his sister for 140 minutes on July 15th, 2007. I

08:52AM  interviewed Oscar Santaella. A teacher from the high

school, Cathedral High School, for 71 minutes on February

the 2nd, 2008.

I interviewed Maria Jimenez his girlfriend and

common law partner for 42 minutes on February the 2nd,

08:52AM  2008. I should say for over 42 minutes. I had one

interview that was 42 minutes, subsequently picked the

interview back up but didn't log off my ending time, so it

was over 42 minutes.

Q.   All right.  You didn't interview, Mr. Renteria,

08:53AM  the defendant's dad?

A.   I'm sorry?

Q.   You did not interview Mr. Renteria, the

defendant's dad?

A.   That's correct.  I met him, spoke to him, but did

08:53AM  not interview him.

Q.   And you never checked with Child Protective

Services to determine whether or not there were any records

regarding abuse in the home?

A.   I engaged in no independent attempt to retrieve

08:53AM  records of any sort.  I relied on the records that were

1 provided to me by the investigators.

2 　　Q.　　All right.　Okay.　But the answer to the question

3 if you just -- I -- I understand your answer.　But the

4 answer to my question is you did not review records from

08:53AM 5 Child Protective Services in regards to abuse in that

6 Renteria household?

7 　　A.　　I have no knowledge of any such records.

8 　　Q.　　I asked --

9 　　A.　　And so I can't review them.　I don't know whether

08:53AM 10 they exist or not.　I was not provided with any to review.

11 　　Q.　　I think it's a simple question, Doctor.　You did

12 not review records of Child Protective Services regarding

13 abuse in the Renteria home?

14 　　A.　　That's correct.

08:54AM 15 　　Q.　　And you did not review any police reports, if

16 there are any made, in regard to abuse at that Renteria

17 home?

18 　　A.　　That's correct.

19 　　Q.　　And you never checked with the shelter, the

08:54AM 20 battered women's shelter in the area to determine whether

21 or not they had any contact in regards to the Renteria --

22 in regards to abuse in the home?

23 　　A.　　That's correct.　I engaged no independent

24 investigation.

08:54AM 25 　　Q.　　And I think from your direct you reviewed the

1  transcripts of prior hearings in this case?

2      A.    Yes, sir.  Not all of the hearings but a portion

3  of the hearings.

4      Q.    Well.  I would assume you reviewed the transcripts

08:54AM 5  when Ceci, his sister, the defendant's sister, testified,

6  you reviewed those transcripts, didn't you?

7      A.    Yes, sir.

8      Q.    And you reviewed the transcripts of his mother,

9  the defendant's mother when she testified?

08:55AM 10     A.    Yes, sir, I did.

11     Q.    And in your review of those records you never

12  found any indication of any abuse in the home?

13     A.    I don't recall there being references there.  I'd

14  have to look back specifically, but I don't recall there

08:55AM 15  being references to abuse from those transcripts.

16     Q.    Certainly from the review of those transcripts you

17  never got any indication that that family was pathological?

18     A.    That was not in those transcripts.  Those -- that

19  sort of inquiry didn't seem to have been made in the course

08:55AM 20  of their testimony, but there was not evidence in those

21  transcripts that would have led me to that conclusion.

22     Q.    Certainly, in those transcripts and the purpose of

23  those hearings that kind of inquiry could have been made,

24  but, as you say, you didn't find any evidence of that and

08:55AM 25  possibly the inquiry was never made.  Right?

1    A.    In the -- in the time they were on the stand the

2 inquiry was not made to my recollection.  I don't recall a

3 question was there any abuse in the household from that

4 prior transcript.

08:56AM 5    Q.    And you talked a little bit about the defendant's

6 history in regards to alcohol?

7    A.    Yes, sir.  That's correct.

8    Q.    Now, are -- are you aware from review of police

9 reports -- you did review offense reports in this case, did

08:56AM 10 you not?

11    A.    Yes, sir.

12    Q.    You're aware that -- from police reports that at

13 the time of the killing of Alexandra Flores that the

14 defendant was not intoxicated?

08:56AM 15    A.    I don't recall specifically.  He was not

16 apprehended at the time.  And so I don't know what

17 definitive evidence there would be one way or the other

18 that he was intoxicated and don't recall his self-report

19 about that.  My recollection about interviews that were

08:56AM 20 done of both his sister and the mother is they described

21 him as drinking that day.  But I don't recall whether that

22 was in the police reports or not.

23    Q.    You don't remember when you reviewed the

24 transcripts of prior hearings that the defendant's mother

08:57AM 25 said she saw him right before he left to the Wal-Mart and

1 he was sober?

2     A.   I don't recall specifically that one way or the

3 other.  That may be the case.

4     Q.   Now, you have years of practice as a psychologist?

08:57AM 5     A.   Yes, sir.

6     Q.   That would be fair.  Right?

7     A.   Yes, sir.

8     Q.   And you did practice -- I mean at this point now

9 in your career you do a lot of these risk assessments and

08:57AM 10 you travel the country making these risk assessments.

11 Right?

12     A.   That's a portion of my professional role.  My

13 practice is now entirely Court related in nature.  The risk

14 assessments are not as time consuming as some of the other

08:57AM 15 evaluation components that I might engage in.

16     Q.   Okay.  What I'm getting at, though, is you're not

17 a clinician where you see clients, people coming in

18 regarding some sort of emotional issue or a mental

19 disorder.  You don't do that, do you?

08:58AM 20     A.   I no longer provide treatment, haven't provided

21 treatment for about six years.

22     Q.   But you did provide treatment at one point in your

23 career regarding people's disorders, their emotional

24 issues, and they would come to talk to you about that.

08:58AM 25 Right?

1    A.    Yes, sir.  That's primarily what I did for over 15

2 years.

3    Q.    And so is -- this is fair to say, isn't it, that

4 if you're trying to assess somebody's alcoholism or the

08:58AM 5 level of the seriousness of their problem with alcohol,

6 there are a variety of inquiries that you can make?

7    A.    Yes, sir, that's correct.

8    Q.    And I'm sure you've heard of the instrument -- and

9 I actually only know the acronym, SASI -- I'm sure you

08:58AM 10 probably know what that stands for.  That instrument is

11 given to the individuals to determine at least some

12 indication of their problem with alcohol?

13    A.    Yes, sir, to the extent that they're candid in

14 their self-report, but that's an instrument that can be

08:59AM 15 used to identify the nature of the problems with substance

16 abuse.

17    Q.    And when you spoke with the defendant you never

18 gave him any type of instrument that he could process and

19 take to determine whether or not there was some indication

08:59AM 20 of a problem with alcohol?

21    A.    That's correct.  The instrument is primarily

22 intended to assess current alcohol abuse.  He's been in

23 custody at the point that I had seen him for many, many

24 years.  And so that instrument is really not deigned to be

08:59AM 25 used retrospectively from what someone's level of alcohol

1 use was seven years before.  So I -- I did not give it to

2 him.  I don't know that it was appropriate to even utilize

3 seven years after the fact.

4     Q.   And it's fair to say that you didn't given him any

09:00AM 5 psychological testing or have him take any psychological

6 instrument in any area to inquire in any area when you

7 interviewed him?

8     A.   That's correct.  It simply would not have informed

9 any issue it was performing.

09:00AM 10     Q.   And it would -- it would be fair to say that in

11 regards to alcohol that is no excuse for what the defendant

12 did, is it?

13     A.   There's nothing that I have said that's in the

14 arena of an excuse.  It's not something I've addressed in

09:00AM 15 any way in my testimony.

16     Q.   Now, as you said -- and with some precision, I

17 think -- that you keep track of minutes you said that you

18 interviewed the defendant for three hours and 23 minutes?

19     A.   Yes, sir.  That's correct.

09:00AM 20     Q.   And you interviewed him regarding pretrial

21 confinement?

22     A.   Yes, sir.

23     Q.   That would be in the county jail.  Right?

24     A.   Yes, sir.

09:00AM 25     Q.   And you interviewed him -- I'm sorry -- you

1    interviewed him regarding prior confinement in jail and in

2    prison?

3        A.    Yes, sir.

4        Q.    And you interviewed him regarding his educational

09:01AM  5    history?

6        A.    Yes, sir.

7        Q.    And you interviewed him regarding his -- his

8    history of extracurricular activities?

9        A.    Yes, sir.

09:01AM 10        Q.    And you interviewed him regarding his occupational

11   history?

12        A.    Yes, sir.

13        Q.    And you interviewed him regarding his parental

14   marital history?

09:01AM 15        A.    Yes, sir.

16        Q.    And you interviewed him regarding his dating and

17   marital history?

18        A.    Yes, sir.

19        Q.    You did not question the defendant regarding the

09:01AM 20   capital offense?

21              MR. GANDARA:  Objection, Your Honor.  It

22   invades the defendant's right to invoke his Fifth

23   Amendment.

24              THE COURT:  Overruled.  You may answer.

09:01AM 25              THE WITNESS:  I did not.

|   |   |
|---|---|
| 1 | MS. HUGHES: Your Honor, may we approach? |
| 2 | THE COURT: Yes, you may. |
| 3 | (At the Bench, on the record) |
| 4 | MR. ESPARZA: My next question, Your Honor, is |
| 09:01AM 5 | the defendant refused to answer any questions regarding the |
| 6 | capital murder offense. I believe I'm entitled to go into |
| 7 | it. I've approached the Bench so that we don't have a big |
| 8 | issue in front of this jury. |
| 9 | THE COURT: Under what theory or what law do |
| 09:02AM 10 | you believe you're entitled to go into that? |
| 11 | MS. HUGHES: Can I just step back to the |
| 12 | table? I have my cases. |
| 13 | THE COURT: Yes. |
| 14 | (Brief pause) |
| 09:02AM 15 | MR. ESPARZA: I don't have a copy of it, I was |
| 16 | working on somehting else. But in Soria it does have that, |
| 17 | Judge. |
| 18 | (Brief pause) |
| 19 | THE COURT: What did you say your next |
| 09:03AM 20 | question was going to be? |
| 21 | MR. ESPARZA: That the defendant refused to |
| 22 | answer any questions regarding the capital murder offense. |
| 23 | MR. GANDARA: Your Honor, Soria says that you |
| 24 | waive your Fifth Amendment right when you talk to your own |
| 09:03AM 25 | mental health expert, that you've effectively waived it for |

1 the purposes of having a State's expert interview him and

2 so forth. Well, he did not. And that's the point. He

3 says I'm not going to answer any questions about the

4 offense. He invoked his Fifth Amendment right. Bottom

09:04AM 5 line.

6      Now, _Soria_, neither _Soria_ nor _Chamberlain_, nor

7 any of the other cases that's construct _Soria_ say that it's

8 proper to let the jury know that a man's invoked his Fifth

9 Amendment right. And in all cases, in every case,

09:04AM 10 traditionally historically you don't tell the jury, well,

11 he took the Fifth. It's improper.

12      THE COURT: I'm going to sustain the objection

13 to that question. However, I believe based on the law he's

14 entitled to ask your expert witness why he did not ask

09:04AM 15 about the capital murder offense.

16      MR. GANDARA: We object to that too because

17 it's an invocation of the Fifth Amendment right.

18      THE COURT: I understand. It's overruled.

19      MR. ESPARZA: Your Honor, could I propose a

09:04AM 20 compromise situation? Instead of leaving it open ended --

21 I actually think the ruling is correct, Your Honor. I

22 don't have any objection to the ruling.

23      But so that he doesn't say -- but because the

24 Fifth Amendment riht goes to the defendant, not to his

09:05AM 25 lawyers. The answers go into that my lawyers told me -- on

1  my lawyer's advice I'm not answering any questions

2  regarding -- regarding the offense.

3          The problem with that is then I have to

4  further inquire that the Fifth Amendment is his right and

09:05AM  5  belongs to no one but him, and he asserts his right.  And

6  so we're going to have to go on a -- and he's a forensic

7  psychologist, and so he meshes the law with his mental

8  health issues.

9          I prefer just to tell him that the defendant

09:05AM 10  refused to answer the questions period.  And then I think

11  Soria and Lagrone clearly say that I can go into that

12  without ever having him say he has to assert his Fifth, so

13  that the jury never hears that.  Although I think that's

14  fair game, but as a compromise we don't talk about the

09:06AM 15  Fifth.  I just lead him into it, he says no, and we move

16  on.

17          MR. GANDARA:  First off the defendant's Fifth

18  Amendment right can be invoked through counsel.  And -- and

19  then if the Court will remember from the voir dire

09:06AM 20  testimony Dr. Cunningham never asked him any questions

21  about the offense based on the advise from counsel.

22          THE COURT:  And I will overrule your objection

23  to the extent that Mr. Esparza talked about getting a brief

24  real quick and move on.

09:06AM 25          MR. GANDARA:  And -- okay.  Then I'm not clear

1 where we are.

2               THE COURT:  I've overruled your objection.

3               MR. GANDARA:  He can ask him that question.

4               THE COURT:  He can ask what he told me he was

09:06AM 5 going to ask, yes.

6               (Bench conference concluded)

7               MR.ESPARZA:  Could I have just a moment, Your

8 Honor?

9               THE COURT:  Yes.

09:07AM 10              (Off the record discussion)

11              MR. ESPARZA:  Your Honor, we have a -- can we

12 approach one more time, Your Honor?

13              THE COURT:  Yes.

14              (At the Bench, on the record)

09:08AM 15              MR. ESPARZA:  I do think that factually they

16 are correct, that he didn't ask him, but he didn't ask him

17 because they gave him a letter saying that he was going to

18 assert his Fifth.

19              And so the only right way to ask it -- my

09:08AM 20 question is not -- is not accurate.  That's not -- that's

21 not a factually correct question.  The factually correct

22 question is exactly the way you phrased it, Judge, why did

23 you not ask him, and he'd have to say because he asserted

24 his Fifth.

09:09AM 25              THE COURT:  Well, I don'tk now what it is he's

1 going to say.

2             MR. ESPARZA: That's what his affidavit says.

3             THE COURT: We have a mental health expert

4 here that's talking about everything except any kind of

09:09AM 5 information regarding the offense that we're here on. And

6 I think he's entitled to ask why he didn't ask about it.

7             MR. GANDARA: Well, that's what he's

8 suggesting that he wants to do now.

9             THE COURT: I think that's the proper way to

09:09AM 10 do it. Ask him that and move on. And your objection is

11 noted. Your objection to that is -- I know what you've

12 made one objection before, and I am overruling it again.

13             Ask him that question.

14             (Bench conference concluded)

09:09AM 15   Q. (By Mr. Esparza) Doctor --

16   A. Yes, sir.

17   Q. -- in the time that we were up here in the brief

18 break period here, I'd just previously asked you you did

19 not question the defendant regarding the capital offense?

09:10AM 20            MR. GANDARA: Objection, Your Honor, for

21 reasons previously stated. And we request a running

22 objection to questions regarding Fifth Amendment

23 invocation.

24            THE COURT: All right. Your objection is

09:10AM 25 overruled. And you may have your running objection.

1          THE WITNESS:  Yes, sir.  That's -- that's

2 correct.

3     Q.    (By Mr. Esparza)  And why did you not question the

4 defendant regarding the capital offense?

09:10AM  5     A.   Well, there were two reasons for that.  One of

6 them is that I was instructed by defense counsel not to

7 inquire of the defendant about the capital offense or about

8 any prior unadjudicated conduct which means offenses that

9 he might have committed and never been convicted of.

09:10AM 10          Additionally, there is nothing about that

11 inquiry that would inform either of the two issues before

12 me.  A report from him of his conduct or his thoughts or

13 feelings during the offense itself would not tell me what

14 had happened to him developmentally that had damaged him.

09:11AM 15 It would represent an expression of that damage, but it

16 wouldn't tell me how he came to be damaged.

17          Individuals whose bad life decisions and

18 criminal behavior is an expression of the bad things things

19 that have happened to them aren't thinking at the time that

09:11AM 20 occurs, gee, I think that I'll beat up this person because

21 I was beaten up.  It's more like you've been exposed to

22 radiation and then later on you grow tumors from that

23 without any conscious connection of the two events being

24 connected.

09:11AM 25          So it wasn't going to tell me how he became to

be damaged, and it also -- beyond defense reports and

beyond what he was convicted of, his own personal report

doesnt tell me anything about what kind of inmate he's

likely to be in the future.

09:11AM     Those are the two issues that were before me,

how did we get here and where do we go from here.  And his

self-report of his thoughts, feelings and actions during

the time period of events don't inform either one of those.

    Now, if there was an issue of what sort of

09:12AM  psychological disturbance he was having at that moment,

then that kind of inquiry would have been relevant, but

under the two issues that I was looking at it was not.

    Q.  Well, then it's fair to say that in determining

what he would do in the future the facts of this case do

09:12AM  not matter to you?

    A.  No, sir.  That mischaracterizes what I just

described.

    Q.  Okay.  Well -- okay.  Well, you didn't question

him about it.  And when you came to testify here yesterday,

09:12AM  you knew you had not questioned him about the offense.  Is

that correct?

    A.  That's correct.

    Q.  And you were prepared to render an opinion in

regards to the opinions you rendered yesterday knowing that

09:12AM  you had not questioned him.  Right?

1    A.    That's correct.

2    Q.    And it was not important for you to question him

3 about the offense.  Not for the purposes of the evaluation

4 questions that I had?

09:13AM 5    Q.    And why he committed the offense was not important

6 to you?

7    A.    By his self-report of it, no.

8    Q.    How he committed the offense was important to you?

9    A.    Not his self-report.  That -- that information was

09:13AM 10 in the police reports and the offense description.  His own

11 self-report doesn't any further inform that for either of

12 the two purposes I was involved.

13    Q.    How he tried to avoid getting caught was not

14 important to you?

09:13AM 15            MR. GANDARA:  Objection.  It's outside of the

16 record.  It's an incorrect interpretation of the facts in

17 the case.

18            THE COURT:  Overruled.  You may answer.

19            THE WITNESS:  Not beyond what was in the

09:13AM 20 records.

21    Q.    (By Mr. Esparza)  The extent in which the steps he

22 would take to avoid being caught was not important to you?

23    A.    Again, those are detailed or inferred from the

24 records.  His own self-report of that doesn't further

09:14AM 25 inform either of the issues that I was examining.

1    Q.    Well, is it similar to when you were telling this

2  jury about the pathological family that he lived in that

3  you didn't investigate CPS records, police records, records

4  of the shelter, talking to a neighbor, maybe a home visit,

09:14AM  5  those things weren't important to you either when you came

6  and told this jury that it was a pathological family.

7  Isn't that correct?

8    A.    No, sir.  It's not that they weren't important.  I

9  was advised that there had been no complaints that had been

09:14AM 10  made to the authorities.  And it -- so it was no -- no

11  reason to go forward to look for police reports or CPS

12  records.  Eva described that she never made an official

13  complaint about those during the course of time it was

14  occurring.

09:14AM 15    Q.    Okay.  Now, you just testified to that at this

16  very moment, but you didn't testify to that yesterday, did

17  you?

18    A.    Well, there are many things in my notes and in

19  this information and in the additional binders that I

09:15AM 20  didn't go over yesterday.  That was just a synopsis of the

21  information that I have looked at.

22    Q.    I know that, Doctor.  But you have come to give an

23  opinion to this jury -- and I assume the opinion is a level

24  of certainty and credibility that you must ask yourself as

09:15AM 25  a researcher and as a scientist whether or not when you

1 talked to the mother, for instance, the information they

2 are giving you is reliable. That must be important to you.

3 Right?

4     A. Yes, it is.

09:15AM 5     Q. Okay. And it must be important to you as a

6 scientist and as a researcher and as an expert who will

7 render an opinion to this jury that the sister, what she

8 told you was reliable and something you could rely on.

9 Isn't that correct?

09:15AM 10     A. The -- question that you've asked is lengthy and

11 complex. Certainly, I have talked to the sister, and I

12 weighed the the information that I got from her as I did

13 from other individuals.

14     Q. Well, Doctor, but you didn't test it against the

09:16AM 15 record, did you, the transcripts?

16     A. The transcripts did not speak to the presence of

17 abuse one way or the other as I recall.

18     Q. Well, wouldn't that have been some sort of red

19 flag that at prior hearings there has never been anything

09:16AM 20 about abuse in the home, yet in my interviews there's some

21 indication of that? That would have been a red flag that

22 something is going on here that's strange. Isn't that

23 correct?

24     A. Yes, sir. It's a red flag. It's a red flag that

09:16AM 25 may identify or point to several different things. It may

1  be a red flag regarding the adequacy of the prior

2  interviews that wered one prior to that hearing.  It may be

3  a red flag regarding the extent of which this family has

4  invested in keeping these secrets even at grave consequence

09:17AM  5  to David.

6          There are a number of things it may mean,

7  including the possible that they fabricated it to me and

8  their failure to describe it in other instances is a

9  reflection in the reality of that household.  There are a

09:17AM  10  number of different hypotheses that I'm going to be

11  examining in the course of that.

12      Q.  All right.  But the level of your examination, in

13  order to give a credible opinion to this jury, really

14  relied the interviews that you did period.  Isn't that

09:17AM  15  correct?

16      A.  Oh, no, sir.  If you look at the sex abuse

17  counseling record of Norma Reed from 1995, as I recall from

18  about December 11th of 1995, at that time six years before

19  any capital charges were brought against David Renteria and

09:18AM  20  a history of pathological family circumstances would be

21  relevant to a death penalty proceedings he reported to his

22  counselor that he had grown up in a battering household.

23  And his report of that battering household in the notes is

24  as that counselor is working with him and David is trying

09:18AM  25  to get an understanding of how he engaged in this

1 indecency.  And so it isn't as if this is the only report

2 that I got from mom or from Ceci or even from him.

3          Q.    On what day did he report that?

4          A.    He reported that on December 7th, 1995.  It's in

09:18AM  5 two places in the notes.  It is at Bates stamp 5115 where

6 there is the summary of contacts and things that were

7 discussed.  And then if you go to the specific progress

8 note of that same date of 12/7/95, it says issue of why he

9 offended, drinking a factor, DWI in past, verified fear of

09:19AM 10 reoffending and desire to understand why he offended.

11 Described having a battering home as a child.  Still lives

12 at home at -- it looks like there's some shorthand, it may

13 be at this time.

14          Q.    Now, Doctor, you think that that information is

09:19AM 15 extremely significant, don't you?

16          A.    Well, I think it is corroborative --

17          Q.    Okay.

18          A.    -- of the reports that I got from mom and from

19 Ceci to a lesser extent.

09:19AM 20          Q.    Okay.  So you are -- okay.  So you believe that

21 what he told the therapist verifies the information that

22 you received from other family members?

23          A.    It identifies that there was a battering home.  It

24 doesn't describe the specifics that Eva talked about.

09:20AM 25          Q.    That wasn't my question.  That wasn't my question.

1    A.    I'm sorry.

2    Q.    My question was what he told the therapist

3 verified what you discovered in your interview.

4    A.    No, sir, I didn't say that it verified it.  I said

09:20AM 5 it's corroborative.

6    Q.    Okay.

7    A.    It is consistent with.

8    Q.    Okay.

9    A.    It provides an additional source of evidence of

09:20AM 10 that same synopsis.

11    Q.    So you used what he reported to the therapist to

12 corroborate what the family said in the interviews?

13    A.    That's correct.

14    Q.    All right.  Now, Doctor, I don't know, maybe ten

09:20AM 15 questions ago you said that his self-reporting, like the

16 crime, was not going to be helpful because, well, it's just

17 his self-reporting.

18    A.    No, sir.  That --

19    Q.    So --

09:20AM 20    A.    No.  That mischaracterizes my --

21    Q.    Let me finish my question, and then you can

22 answer.  So when he self reports it's really in his own

23 interest to say what he wants to say.  That's what you

24 previously testified to because the question to you is

09:21AM 25 self-reporting there's a motivation not to tell the truth.

```
 1      A.    You've asked a compound question with about five
 2 different assertions therein.   Let me address each --
 3      Q.    Well, then --
 4      A.    I -- let me address each of --
 5      Q.    No.
 6      A.    -- those in --
 7      Q.    No.  I --
 8      A.    -- you said in --
 9            MR. ESPARZA:  Your Honor --
10      A.    -- the order that --
11            MR. ESPARZA:  Your Honor --
12            MR. GANDARA:  Objection, Your Honor.
13            MR. ESPARZA:  Your Honor --
14            THE COURT:  Just a minute.  Just a minute.
15            MR. ESPARZA:  If he can't understand the --
16 I'm sorry, Your Honor.
17            THE COURT:  Just a minute.
18            MR. GANDARA:  Objection, Your Honor.
19            THE COURT:  All right.  Everybody's talking
20 approximate on top of each other.  I'm going to warn
21 everybody to behave in this courtroom.
22            Ask a question, answer the question.
23            Proceed.
24      Q.    (By Mr. Esparza)  It's clear you me you didn't
25 understand my question and it may be that you're correct,
```

09:21AM  5
09:21AM 10
09:21AM 15
09:21AM 20
09:21AM 25

1 that it was a compound question.

2      A.    No, sir.  I did understand the question.  It was a

3 compound question.

4            MR. ESPARZA:  Your Honor, I haven't asked my

09:21AM 5 question yet.

6            THE COURT:  Sir, wait for the question.  Do

7 not argue -- please.

8            THE WITNESS:  Yes, ma'am.

9            THE COURT:  -- please.

09:21AM 10   Q.    (By Ms. Hughes)  Self-reporting has the inherent

11 danger of not being reliable.  Is that true or not true?

12     A.    That is a risk.

13     Q.    Now, you would agree that the defendant is -- that

14 there is a probability that the defendant would commit

09:22AM 15 criminal acts of violence that would constitute a

16 continuing threat in our free society excluding prison.

17 You would agree with that, wouldn't you?

18     A.    Yes, sir, at large in the community today I

19 believe that he would be at elevated risk.

09:22AM 20   Q.    Well, the probability that he would be a

21 continuing threat in our community.  That's a fact?

22     A.    I believe that to be the case.

23     Q.    And you'd agree that --

24            MR. GANDARA:  Objection, Your Honor,

09:22AM 25 relevance.  The alternative to a death penalty is a life

1 sentence in prison, and the community of the defendant is

2 going to be in prison and not -- not the free world.  I

3 object to the relevance of it, and I ask that the response

4 be stricken from the record.

09:23AM 5            THE COURT:  Overruled.

6     Q.   And you would agree that prison is a dangerous

7 place?

8     A.   No, sir.  I would not -- I would not characterize

9 it as either dangerous or not dangerous.

09:23AM 10     Q.   Well, the obvious fact is that you -- and I'm not

11 talkinging about as an inmate -- but if you walked the

12 halls of a prison you would be in somewhat fear of

13 something might happen to you.  That's a fair statement.

14 Right?

09:23AM 15     A.   I don't know that I would agree with that.

16     Q.   Now, without going into all these facts -- and I

17 know you that you testimony regarding, for instance,

18 incidents, episodes, like the Texas Seven?

19     A.   Yes, sir.

09:24AM 20     Q.   And the wide range of age of those Seven from 39

21 to 23?

22     A.   I'm not familiar with their ages.

23     Q.   Well, you wouldn't have disputed the witness that

24 testified before you as to their age of 39, 38, 37, 30 and

09:24AM 25 23, would you?

1      A.   I don't know that the prior witness affirmed those

2  specific ages or -- or said that he had knowledge of the

3  specific ages.  I -- if you have evidence of those ages,

4  then I'd be glad to look at that and then I could respond

09:24AM  5  to the question.  I don't have independent knowledge of

6  their ages.

7      Q.   And you're aware that there was an escape on death

8  row?

9      A.   Yes, sir, from the Ellis Unit in about 1997, '98.

09:24AM  10     Q.   And you're aware that there are other escapes at

11  prison?

12     A.   Yes, sir.  That does occur on rare occasions from

13  secure perimeter facilities.

14     Q.   Even -- even after we tightened it up after the

09:25AM  15  Texas Seven there are still escapes in the Texas prison

16  system.  That's that's a fair statement. Right

17     A.   I'm unfamiliar with successful escapes from level

18  five facilities in TDCJ since the Texas Seven.

19     Q.   And from emergency action reports -- that's what

09:25AM  20  they're called.  Right?

21     A.   Are yes, sir.

22     Q.   -- you're aware of the episodes of violence in the

23  prison system?

24     A.   Yes, sir.

09:25AM  25     Q.   And it would be fair to say that in the Texas

1 prison system -- the Texas prison system in -- with the

2 resources they have, those inmates, whatever level, are

3 guarded 24 hours, seven days a week, 365 days a year?

4     A.   With varying degrees of supervision depending on

09:26AM 5 the security level.

6     Q.   Right.  So some -- some are in general population,

7 and the security level is less, and some are in

8 administrative segregation and then that security is more

9 severe.  Right?

09:26AM 10     A.   No, sir.  Some are in facilities that don't have a

11 perimeter fence around them and others are in facilities

12 that have double perimeter fences, concertina wire, fence

13 detection devices, concentric layers of security, many

14 other things.

09:26AM 15     Q.   Well, you have to say that the security on death

16 row is much more stringent than the security in general

17 population?

18     A.   Yes, sir, I'd agree with that.

19     Q.   How they move an inmate correct?

09:26AM 20     A.   Yes, sir.  It's essentially an administrative

21 segregation  status.  So it's similar to the other 10,000

22 beds.  Administrative segregation is more secure in its

23 supervision and confinement and general population of level

24 five.

09:27AM 25     Q.   Every time they move an inmate on death row he's

1 escorted by a guard?

2      A.    That's correct.

3      Q.    And when they feed them, they feed them through

4 the door?

09:27AM 5      A.    Yes, sir.

6      Q.    Now, in the work that you do, you are studying

7 human behavior.  Is that correct?

8      A.    Yes, sir.  That's correct.

9      Q.    And you try to -- you are trying to predict what

09:27AM 10 future behavior will be through your studies?

11      A.    That's an application of it.  We are studying it

12 for the sake of studying it in terms of rates and

13 correlates.  It has an obvious application to prediction,

14 but as a scientist it's interesting to me for its own sake.

09:28AM 15      Q.    In order to make those types of analysis you have

16 to be able to somehow quantify the behavior?

17      A.    That's correct.

18      Q.    You've got to be able to count it in some way?

19      A.    Yes, sir.

09:28AM 20      Q.    It has to be -- you have to be able to detect that

21 behavior.  Right?

22      A.    Yes, sir.

23      Q.    And probably, in language that you use, you have

24 to be able to code that behavior?

09:28AM 25      A.    Yes, sir.

1    Q.    And coding it is somehow putting a name to the

2 data and being able to count the data?

3    A.    Yes, sir.  That's fair.

4    Q.    Now, first as a psychologist you know that

09:28AM 5 quantifying and counting human behavior is a difficult job?

6    A.    Depending on what you're counting, it may be more

7 or less difficult.

8    Q.    Well, when we're counting into the future and

9 trying to decide what one person will do versus what

09:29AM 10 another person will do, it would be important to try to

11 quantify as much data as possible so that you could at

12 least have that available in helping you analyze what might

13 happen in the future?

14    A.    No, sir.  That's not necessarily the case.  Once

09:29AM 15 you go beyond the most powerful four or five predictive

16 factors, the information you add after that typically is

17 almost of no assistance in further improving predictive

18 accuracy.

19    Q.    Well, that's not entirely accurate, though, is it,

09:29AM 20 Doctor?  Because you know that -- I mean to be quite honest

21 with this jury -- that there have been instruments that

22 have attempted to do what you are testifying to and those

23 instruments are evolving as we speak.  Isn't that true?

24    A.    There are instruments including those that my

09:29AM 25 colleagues and I are working on that are continuing to

evolve, yes, sir.

Q. And the reason that they continue to evolve is
that human behavior is so complex and complicated is that
it's always hard to figure out which data is important and
which data is not. Right?

A. No, sir. It's -- it's not hard to figure out.
It's trying to be sure that there is not an additional
factor that might prove to be helpful or that you're
looking at what effect does one -- how powerful is one
factor as compared to another as you study a different
population. The larger the groups you study, the more
different groups that you study, the better you -- you will
become at being able to identify how much weight to give to
a particular factor.

Q. Now, you use what we would call the actuarial
model in trying to make in your analysis. Right?

A. I described two models. I described a past
pattern approach -- well, actually three -- a group
statistical approach and then an actuarial approach.
That's where we would identify factors that would raise and
lower and actually give that some weighting, which is what
we did with the models at the end of that testimony
yesterday.

Q. Well, let's first talk about pattern. Pattern is
behavior in the past. Right?

1      A.     Yes, sir, in a similar context.

2      Q.     Okay.   Behavior in the past is a predictor of

3 behavior in the future?

4      A.     As long as as it's apples it apples, the same

09:31AM 5 context to same context.

6      Q.     In that -- in that limited way that you've

7 answered that, it would be fair to say the best predictor

8 of the future is past behavior?

9      A.     Same context, yes, sir.

09:31AM 10     Q.     And the challenge is to determine which group that

11 the person belongs to?

12     A.     Yes, sir, or typically groups.  But yes, you

13 obviously have to identify what group they belong to then

14 track the experience with that group to see how that group

09:32AM 15 ends up performing.  You know, for example, inmates in

16 prison, inmates in high security prisons, convicted

17 murderers, convicted capital murderers, life sentence

18 inmates.   There are different groups you might assign

19 someone to to then look at what does that tell us about

09:32AM 20 their outcomes.

21     Q.     So in many ways you are identical to what

22 insurance companies do.  Right?

23     A.     Yes, sir.  It's a similar model also based on your

24 paste driving record, for example.   That as you have more

09:32AM 25 tickets that moves you into a different group that has a

1  different outcome.  It's a similar model.

2      Q.  But like you the insurance company will say the

3  age of the driver is 16, and 16 year olds have this kind of

4  exposure, and so the rate of insurance will go -- it's

09:33AM 5  higher because 16 years old have that kind of experience.

6  Right?

7      A.  Yes, sir, broadly.  Typically, it's more like 16

8  to 25.  They find all the young males to be at greater risk

9  in most instances.

09:33AM 10      Q.  Okay.  Now, when a person buys insurance it -- the

11  insurance company isn't looking at the individual.  They're

12  just looking at the group.  Right?

13      A.  No, sir.  They are looking at this individual in

14  terms of which groups does he belong to, by age, by driving

09:33AM 15  history, by driving location.  They're taking the

16  individual characteristics that they have found to be

17  meaningful, and then they're examining their data of what

18  happens to the people defined in that way over their

19  driving history for the next typically year or two.

09:33AM 20      Q.  Now, in your answer you said the insurance

21  companies look to see what is meaningful.  That's what you

22  just said.  Right?

23      A.  Sir, what they have identified to be meaningful in

24  their research.

09:34AM 25      Q.  And what is meaningful to an insurance company is

1 something that can be counted and quantified and is

2 statistically significant. Right?

3     A. Yes, sir, that's fair.

4     Q. And by being statistically significant there has

09:34AM 5 to be a high number of that trait in order to determine,

6 one, if it can be quantified and, two, whether or not it

7 actually has an effect on behavior. Right?

8     A. No, sir. An infrequently observed trait could be

9 extraordinarily powerful as a predicted factor. In fact --

09:34AM 10 so it's not that it has to be common in order to be

11 identified as predicted.

12     There has not -- I'm going to amend that.

13 There has to be a large enough cell as you're studying it

14 to -- to be meaningful, but that cell may constitute a

09:35AM 15 minority of a given population that you've studied.

16     Q. In your studies how many of those inmates that you

17 studied are similar, other than by offense, to the

18 defendant?

19     A. Well, most of them -- and it depends on the

09:35AM 20 study -- all of them are prison inmates, as he will be.

21 The study on inmates at high security, in that there are

22 14,000 inmates in high security, he belongs to that group

23 of 14,000. If we're talking about him being a male, then

24 he belongs to 90 percent of the prison inmates and an even

09:35AM 25 greater percentage of capital offenders. If we identify

1 him by age range, that also has a specific percentage of

2 individuals who were at this age as they were assessed.

3          We could -- we could break this down by

4 whether it was a single victim or multiple victims.  We

09:36AM  5 could break it down by whether it involved a robbery or

6 pecuniary gain or not.  There are a number of different

7 ways that we could break this down where there would be a

8 substantial number of similarly situated individuals as we

9 were applying that group and their outcomes to Mr.

09:36AM 10 Renteria.

11     Q.    How many defendants did you study that strangled a

12 five year old girl?

13     A.    I don't know the answer to that.

14     Q.    And you don't know the answer to that because you

09:36AM 15 didn't count it.  Right?

16     A.    That's correct.  We did not have information that

17 would let us count that in an effective way.

18     Q.    Right.  You didn't have the information.  And did

19 you have that information --, well, even if I told you that

09:36AM 20 today go count, it's not statistically significant because

21 you don't have enough of that information.  Right?

22     A.    I would expect that there is a very small minority

23 of those individuals who strangled a five year old girl.

24 What percentage would involve a homicide, the murder of a

09:37AM 25 child is something that I would need a greater degree of

1 conviction information about than we were provided in the

2 large scale studies that we did.

3     Q.   But when we first started talking I asked you did

4 you interview the defendant about the offense.  Do you

09:37AM 5 remember that question?

6     A.   Yes, sir, I do.

7     Q.   Okay.  And your answer was -- it was a two part

8 answer -- but I believe the second part of your answer was

9 it wasn't important to interview him in regards to how and

09:37AM 10 why and whatever else about the offense.  That's not

11 important to you?

12     A.   Not important for purposes of risk assessment and

13 not important in terms of illuminating what damaged him,

14 how did he get here to this offense.

09:38AM 15     Q.   Well, you actually don't know that do you, Doctor,

16 because you haven't had enough data to make some sort of

17 comparison so that you could determine if it's not

18 significant or not.  Isn't that correct?

19     A.   No, sir, I would not agree with that.

09:38AM 20     Q.   Okay.  Well, you'ven ever had -- I thought your

21 question -- your answer to your -- the question was you

22 didn't have the information regarding this defendant, and

23 you don't have that kind of information regarding any other

24 defendant, do you?

09:38AM 25     A.   No, sir, that's not correct.  I had information

1  about this defendant.  It was many amply described in the

2  police reports and the information about this offense and

3  the prior trial.  I had all kinds of information about this

4  conduct.  I did not have information about his self-report

09:38AM  5  of his thoughts, feelings and actions during the time, but

6  I had a great deal of information about this offense.

7      Q.   You don't have information like that about many of

8  the other defendants who are on death row?

9      A.   I don't have the self reports of most of those

09:39AM  10  individuals.

11      Q.   You don't have -- you're not going to tell the

12  ladies and gentlemen of the jury that you have that you

13  have examined the way defendants on death row have

14  committed their crimes?  You haven't examined that, have

09:39AM  15  you, Doctor?

16      A.   Yes, sir.  We have looked at what -- whether they

17  used a gun or a knife or bludgeoned somebody or strangled

18  them and found that the method of killing was not

19  predictive of their behavior in prison.  We have looked at

09:39AM  20  different types of capital offenses and identified that a

21  robbery or burglary in the course of a capital offense does

22  raise the risk somewhat of prison violence, but other

23  aspects of a capital offense are not predicted.

24           We've looked at people in prison who have been

09:39AM  25  convicted of different crimes and identified that

1 murderers, as you saw, are no more likely than other

2 inmates to be involved in assaultive misconduct, and sex

3 offenders are somewhat less likely to be.  So I -- in fact,

4 we have done research that would inform a number of

09:40AM 5 parameters that may be relevant to the defendant.

6      Q.   How many sex offenders are on death row?

7      A.   I may have that data, but I can't tell you off the

8 top of my head.

9      Q.   It's not important, is it, in your assessment?

09:40AM 10      A.   As I said, that's an issue that we have looked at

11 and did not find it to be a significant predictor.

12      Q.   You don't -- it's not significant because you

13 really don't count it and it's not statistically

14 significant?

09:40AM 15      A.   No, sir, that's not correct.  In the

16 Sorensen-Pilgrim study in 2000 my recollection is that, in

17 fact, whether the murder was associated with a sex offense,

18 which this is not specifically.  I recall they also looked

19 at murder of a child, although I would have to go back and

09:40AM 20 exam that study.  But those various offense parameters,

21 exempt for robbery or burglary in the capital offense were

22 not predictive of violence in prison.  They simply didn't

23 inform the issue.

24      Q.   You testified yesterday that the current

09:41AM 25 conviction -- the current conviction does not have any --

1  is not helpful in determining what they'll do in the

2  future?

3      A.   No, sir.   I described summaries of the U.S.

4  Department of Justice where they described the severity of

09:41AM  5  the offense or a history of violence in the community was

6  not a reliable predictor.  We identified that murder

7  broadly was not a predictor of who was going to be violent

8  in prison.  I did describe characteristics of the offense

9  in one of the actuarial models that I presented at the end,

09:41AM 10  the Sorensen and Pilgrims model, where if the capital

11  offense involved a robbery or burglary it did raise the

12  person's risk of violence in prison to a modest degree.

13      Q.   Doctor, I'm going to show you what I'll mark as

14  State's Exhibit --

09:42AM 15              MR. ESPARZA:  Just for demonstrate purposes,

16  Your Honor.

17      Q.   (By Mr. Esparza)  State's Exhibit 123 which I

18  believe you're very familiar with.  Is that true?

19      A.   Yes, sir, I am.  This is a paper that I

09:42AM 20  co-authored with Dr. John Sorensen that was published in

21  the Journal of Criminal Justice in 2007, and it's entitled

22  *Operationalizing Risk, the Influence of Measurement Choice*

23  *on the Prevalence and Correlates of Prison Violence Among*

24  *Incarcerated Murderers*.

09:42AM 25              THE COURT:  All right.  Let me interrupt here.

1   The jury says they want a stretch break.  Right?  Take a

2   real break quick, a very quick one though.

3                    (Recess taken)

4                    (Open Court, defendant present, jury is

09:57AM  5   present)

6                    THE COURT:  You may continue.

7                    CROSS-EXAMINATION

8   BY MR. ESPARZA:

9       Q.    Before the break, Doctor, you were talking about

09:57AM 10  an article that you wrote.  And without going over the

11  title again as you stated in the previous answer I only

12  have a few questions about your article.

13      A.    Yes, sir.

14      Q.    This article is published?

09:58AM 15      A.    Yes, sir, it is.

16      Q.    Peer reviewed?

17      A.    Yes, sir.

18      Q.    And it would be fair to say that it is a recent

19  study?

09:58AM 20      A.    Yes, sir, it is.

21      Q.    One of your most recent, if not the recent,

22  publications that you have out at the moment?

23      A.    It's not the most recent, but it is from this last

24  year.

09:58AM 25      Q.    And in that study reported that those convicted of

1 higher degrees of homicides and sentenced to longer terms

2 of incarceration were more often involved in violent prison

3 misconduct?

4     A.    Yes, sir.  Among this study of homicide offenders,

09:58AM 5 that's correct.

6     Q.    And in that study there were 76 inmates that were

7 sentenced to death

8     A.    That's correct.

9     Q.    And I'm not talking about inmates that had a death

09:59AM 10 sentence and commuted and were doing a capital murder life,

11 those 76 were on death row?

12     A.    That's correct.

13     Q.    And it's fair to say that 21 percent of those 76

14 had potentially violent acts?

09:59AM 15     A.    Yes, sir.  During the time period of the study.

16 That's correct.

17     Q.    The other 79 percent of these 76 did not have

18 potentially violent acts?

19     A.    That's correct.

09:59AM 20     Q.    They did not have assaultive violations?

21     A.    That's correct.

22     Q.    And they did not have assaults resulting in

23 serious injury?

24     A.    That's correct.  Well, as you move up, fewer and

09:59AM 25 fewer have those.  But those were all grouped under

1 potentially violent.  So certainly those 78.9 percent did

2 not exhibit that during the study period.

3      Q.    So those 78 percent, .9, you're not better at math

4 than I.  But just let me round it down there.   78 percent

10:00AM  5 were -- that -- their conduct on death row is consistent

6 with the defendant's conduct?

7      A.    If that they had no potentially violent

8 infractions, this doesn't report whether they had no

9 infractions at all, which is what Mr. Renteria's conduct

10:00AM 10 is, but 78 percent did not have any of the more serious

11 misconduct.

12      Q.    78 percent of death row inmates did not have

13 possession of a weapon?

14      A.    That's correct.

10:01AM 15      Q.    Did not have any escape conduct?

16      A.    That's correct.

17      Q.    Not have any riot conduct?

18      A.    That's correct.

19      Q.    Did not have any threatening to inflict harm on an

10:01AM 20 offender?

21      A.    That's correct.

22      Q.    Did not have any threatening to inflict harm on an

23 officer?

24      A.    That's correct.

10:01AM 25      Q.    Did not have any fighting?

1        A.    That's correct.

2        Q.    Did not have any extortion?

3        A.    That's correct.

4        Q.    And no assault on an offender or an officer?

10:01AM  5        A.    That's correct.

6        Q.    All right.   That conduct is consistent with the

7   defendant's conduct on death row?

8        A.    Yes, sir.   That's correct.

9        Q.    And part of the reason that the 78 percent of the

10:01AM 10   76 that were researched is -- has a lot to do with the way

11   they are guarded?

12       A.    The absence of serious assaults has to do with the

13   way they are guarded.   The absence of fights with other

14   inmates or assaults of other inmates associated with the

10:02AM 15   way that they're guarded.   Whether or not they make threats

16   or possess a weapon or engage in minor assaults does not

17   seem to be subject to the way that they're guarded because

18   their rates of those are higher than what we observe among

19   the capital inmates who are sentenced to life in terms of

10:02AM 20   both potentially violent acts and also assaultive

21   violations.   So the guarding only prevents injuries that

22   would result in more than first aid treatment, which were

23   infrequent in all the groups, it did not prevent the

24   others.

10:02AM 25       Q.    Well, in those -- in that specific conduct that I

1  listed, that which was detected, 78 percent did not have

2  that type of conduct.  Right?

3      A.   That's correct.

4      Q.   And it's fair to say that you have said that those

10:03AM  5  sentenced to life in prison committed assaults resulting in

6  serious injuries 11 times as often as those sentenced to

7  less than 20 years?

8      A.   I'm sorry.  Could you repeat that?

9      Q.   Sure.  Those sentenced to life -- I don't mean

10:03AM 10  to --

11      A.   If you could direct me a page.

12      Q.   I will do that.  Page 551, on the upper left hand

13  corner.

14      A.   Yes, I have that right there.

10:03AM 15      Q.   That those sentenced to life are eleven times more

16  likely to commit assaults resulting in serious injury -- or

17  I'm sorry.  I should -- let me just do it as you say it so

18  I don't misstate your words -- those sentenced to life in

19  prison committed assaults resulting in serious injury

10:03AM 20  eleven times as often as those sentenced to less than 20

21  years?

22      A.   Yes, sir.  That's correct.  It represented only

23  4.4 percent of them.  But that 4.4 percent was eleven times

24  greater than the .4 percent that the inmates committed who

10:04AM 25  were sentenced to ten to 19 years.

1    Q.   Okay.  Your research shows in that study that the

2 seriousness of the homicide, the length of sentence and age

3 matter in the prevalence of prison misconduct?

4    A.   That's correct.

10:04AM 5    Q.   Now, let's talk a little bit about age because --

6 can I have the exhibit, please -- about age.  Because,

7 well, right before I ask you about age, certainly the

8 seriousness of a homicide the defendant has qualified in.

9 Right?  This is a capital murder?

10:05AM 10   A.   Yes, sir.  That's correct.

11   Q.   As the length of his sentence is certainly an

12 indicator based on this study?

13   A.   Sir, these results only looked at homicide

14 offenders.  It did not compare them to inmates at large.

10:05AM 15 In other studies the life sentence inmates were

16 substantially less likely to be violent in prison than the

17 other inmates that they're serving time with.  This study

18 only compared greater and lesser degrees of homicide that

19 also did not control the security level they're held at.

10:05AM 20 So the -- those result needs to be taken in total with

21 other research and not simply extracted out all by

22 themselves.

23   Q.   Doctor, your study -- you have testified on direct

24 that the offense of conviction was not predictive of the

10:05AM 25 prevalence of misconduct in prison.  You testified to that

1 on direct.  Right.

2    A.   No, sir.  Again, that mischaracterizes my

3 testimony.

4    Q.   All right.  And your answer just now -- not this

10:06AM 5 one, but the one right before that -- clearly says that

6 there are depending on how you look at it, depending on the

7 numbers that you look at, a life sentence -- a person doing

8 life is not going to be -- is not going to show prison

9 misconduct versus someone in the later study shows that

10:06AM 10 they are going to have prison misconduct?

11    A.   No, sir.  In one study -- and this -- for example

12 even in this study -- 96 percent of the life sentence

13 inmates did not engage in a serious assault during the time

14 period of this study, 96 percent.

10:06AM 15          Now, the people that were convicted of a

16 homicide serving less than 20 years, then 99.5 of them did

17 not or in the case of the individuals that were serving

18 sentences of less than ten years, none of them committed a

19 assault during the study period.

10:07AM 20          So none of these homicide offenders were

21 likely to commit serious assaults.  All of them were

22 extremely unlikely to.  There were simply differences in

23 the degree of unlikeliness that that represented.

24          And again, this is only a comparison with

10:07AM 25 different degrees of homicide.  It doesn't then compare

 1 them with property offenders, robbers, other folks that are

 2 in prison and also doesn't control for the security level

 3 that they're held at.

 4     Q.    In regards to the security level of prison, prison

10:07AM 5 attempts to limit the number of opportunities that an

 6 inmate might have in order to have prison misconduct?

 7     A.    Broadly, that's the case, yes, sir.

 8     Q.    That's why they have guards in prison?

 9     A.    Both to provide security to keep the people within

10:07AM 10 the facility as well as to control the facility on the

11 inside as well.

12     Q.    The guards and -- that are provided at the Texas

13 prison system are there for safety purposes?

14     A.    Safety and security.

10:08AM 15     Q.    Now, I don't think you have this flagged, but I do

16 think you testified to it, that it is well known that as

17 you get older your -- the chances of you becoming violent

18 or doing a violent act are less?

19     A.    Yes, sir.  That's correct.  If you have a history

10:08AM 20 of serious violence, then that may override that aging out

21 factor of serious violence in the institution.  But apart

22 from that the older you get the less likely you are to be

23 involved.

24     Q.    But that even exists in the free world too.

10:08AM 25 Right?  The older you get the less likely you are to commit

1 a violent act?

2      A.      Yes, sir.  Again, unless there is recent violence

3 or a pattern of recent violence then that personal pattern

4 would override it in that context.

10:09AM 5      Q.      Okay.  Now, what you just testified to is what you

6 say is a statistical norm.  Right?

7      A.      Well, it's not a statistical norm.  It is an

8 observation of the different degrees of risk that different

9 people have based on that characteristic.  It's not a norm.

10:09AM 10 It is what's observed in the population.

11      Q.      The defendant doesn't fit that model in the free

12 world, does he?

13      A.      I don't know that I would say that.  He -- he

14 committed this offense when he is 31 years old.  That is

10:09AM 15 still well within the mid range of risk for violent

16 misconduct and violent offending, homicide in the

17 community.  It's not as high as the guys that are 20.  And

18 it is certainly higher than guys that are 40.  At age 30

19 that's going to be someplace, as I recall from looking at

10:09AM 20 those graphs, at about a mid level basis.

21      Q.      So you're saying that at 31 he was still

22 potentially violent.  That's -- that's your testimony

23 today?

24      A.      Everyone is potentially violent at any age.  The

10:10AM 25 likelihood of that is going to vary depending on the age of

the individual.  Now, he was not as at greater risk as he

would have been at age 21 or 22, but age 31 is still on the

younger side of that curve and is -- and is very likely in

the mid range of individuals that commit homicides.

10:10AM   Q.   Now, those people that are on death row, as you

said, 78 percent of them did not have misconduct?

A.   No, sir.  78 of percent of them did not engage in

more serious misconduct.  That would be ones that have the

potential for misconduct, that had potential for violence.

10:10AM   Q.   Well, that was the -- that was the violence that

you were concerned about.  Right?

A.   Yes, sir.  That was our concern.  It was not in

this study with misconduct in general but misconduct that

had violent potential or even moreso assaults or assaults

10:11AM   with injuries.

Q.   Now, I'm sure you're aware from your background as

a psychologist that a defendant can work the system.

Right?

A.   No, sir.  Substantially the system works the

10:11AM   offender.  He doesn't control -- he's beyond trying to have

good conduct to maybe make his confinement a little less

onerous over a long period of time.  Largely his life is

under the direction of the system, and his own attempts

only have the most modest and -- or minimal effects on that

10:11AM   except to make it worse.

1   Q.   Well, his good -- a person on death row his good

2   conduct offers him some benefits, doesn't it?

3   A.   Very minor benefits in terms of a little bit more

4   personal property, a little bit more commissary.  You're

10:12AM  5   still 23 and one in a cell by yourself all day, but that

6   good conduct does allow you to have a few more incentives,

7   which is why they structure it that way so that there are

8   incentives to reward someone for good conduct.

9   Q.   Well, he gets basic things, like with good conduct

10:12AM 10  he gets a radio?

11   A.   Yes.

12   Q.   And he'll get a fan.  Right?

13   A.   Yes, sir.

14   Q.   But he also -- a person on death row gets more

10:12AM 15  than just those personal items.  Because a person on death

16   row their case is always under review.  Their -- the case

17   in which they are sitting on death row is always under

18   review?

19   A.   Yes, sir.  That's broadly the case.  The time

10:12AM 20  comes when they have exhausted their review and they're

21   in -- essentially in a holding pattern waiting an execution

22   date.  But -- but short of that their case is one phase or

23   another reviewed.

24   Q.   So there is a strong -- and I believe you said

10:12AM 25  this in the past.  There is a strong motivation for an

1 inmate to be careful about their conduct because they have

2 a lot to lose because their case is still under review?

3     A.   No, sir.   That's not correct.   Most of the -- the

4 behavior of the inmate has no -- on death row has no effect

10:13AM 5 on their review.   Their review is what happened at the

6 trial and whether or not that trial was within

7 Constitutional parameters.   And their behavior on death row

8 doesn't affect that review at all.

9          Now should they get a new trial and should

10:13AM 10 they be in a jurisdiction like Texas where there is going

11 to be some assessment made of their risk of future violence

12 in prison, then that behavior will be meaningful to that

13 new trial but otherwise doesn't affect that review process

14 at all.

10:13AM 15     Q.   Well, I would assume that you can make this

16 assumption that if you were on death row your hope is that

17 you would get a new trial.   Right?

18     A.   Yes, sir.   Most of those defendants would like to

19 get off of death row or to have a new trial.

10:14AM 20     Q.   So they do have a strong motivation because

21 they're still pursuing their appeals, and they still have

22 this post conviction review.   Isn't that true?

23     A.   Their good conduct has nothing to do with their

24 direct appeal or post conviction review.   It would only

10:14AM 25 come into play should they get a new sentencing phase.   And

1 then their conduct in confinement would come under review.

2 Otherwise it has absolutely nothing to do with their

3 appellate review.

4     Q.   That wasn't my question, Doctor.

10:14AM 5     A.   That was my understanding of your question.  I

6 apologize.

7     Q.   I think it's pretty clear, but I'll give it

8 another run.  They are hopeful for a new trial.  That would

9 be a fair assessment?

10:14AM 10     A.   In most instances.  There are volunteers.  But in

11 most instances they are hopeful of release.

12     Q.   And good conduct, good behavior would be important

13 in that instance?

14     A.   No, sir.

10:15AM 15     Q.   Clearly, with your three hour and 23 minute

16 interview with the defendant you were able to determine

17 that he was -- that he is intelligent?

18     A.   Of broadly average intelligence.  I wouldn't -- I

19 wouldn't make a definitive assessment of intelligence just

10:15AM 20 based on chatting with somebody.  His TDCJ records reflect

21 an IQ score of 100 which is just smack in the middle of the

22 population.

23     Q.   Doctor, you reviewed those records regarding

24 regarding his IQ, didn't you?

10:15AM 25     A.   The TDCJ records that I reviewed, yes, sir.

1   Q.   And -- I mean let's be honest with this jury.   On

2  that record it says 100.   And on top of that it says not

3  tested.

4   A.   No, sir.   That's not my recall -- my recollection.

5  My recollection is that there was another -- there are two

6  different things they're looking at.   There's an IQ score

7  and there was, as I recall, a personality testing.   That's

8  my recollection of the form.

9           MR. ESPARZA:   Could I have just a moment, Your

10 Honor?   I'm looking for the form.

11           THE COURT:   Yes.   While they're looking, you

12 want to take a stretch break?

13           (Brief pause)

14           MR. ESPARZA:   I found them.   May I proceed

15 Your Honor?

16           THE COURT:   Yes.

17   Q.   (By Mr. Esparza)  Doctor, let me show you what I

18 have marked as -- what has been marked as State's Exhibit

19 248.   And you'll see that State's 248 is the defendant's

20 records.   And without unclipping it.   And it will show here

21 that it is -- that his IQ shows 100, not tested?

22   A.   Yes, sir.   I recall another form.   My recollection

23 is that there's another form that has a not tested one

24 block over on top of another assessment aspect of -- but I

25 reviewed a large volume of records.   I could be mistaken.

1  Q.   Okay.  But we're clear that this record shows that

2 the IQ is not tested?

3  A.   That's correct.

4  Q.   All right.  He did succeed in college?

10:19AM 5  A.   No, sir.  His -- he completed about 50 semester

6 hours in college.  His performance as I recall was pretty

7 variable.  The last semester that he was there I think he

8 got credit for none of the courses he took.

9  Q.   Well, he has his last -- his last record that we

10:19AM 10 show where he got grades he had a B average?

11  A.   That may be the case.  I don't recall that grade

12 sheet for sure.

13  Q.   He was certainly aware and understood his

14 surroundings?

10:19AM 15  A.   Yes, sir.

16  Q.   He understood the concept of choices, chances and

17 consequences, didn't he?

18  A.   Yes, sir, as every convicted capital offender

19 would.

10:20AM 20  Q.   And he certainly was smart enough to learn from

21 his mistakes?

22  A.   That I would not agree with.

23  Q.   As a psychologist, you would agree with me that

24 people evolve as they gain experience?

10:20AM 25  A.   Broadly, that's the case.  That's a difficult

1  question to answer yes or no to.  Many aspects of behavior

2  remain constant or deteriorate, but someone's behavior may

3  show some evolution over time.

4      Q.   And common sense says that criminals evolve as

10:20AM  5  they gain experience in the perpetration of their crime?

6      A.   That happens on some occasions.  Many continue in

7  the same foolish and ill conceived plans and offenses that

8  caused them to be apprehends the first time.  But it's

9  pretty rampant that these are folks that are displaying

10:21AM  10  very poor judgment and often very poor planning, which is

11  helpful in being able to apprehend them.

12      Q.   But some, some, if you have an opportunity to look

13  at their offense, show more criminal sophistication than

14  others?

10:21AM  15      A.   That's correct.

16      Q.   And based on your review of the records, it would

17  be fair to say that the defendant did not take advantage of

18  his opportunity that he received when he was given

19  probation?

10:21AM  20      A.   I would say that's a fair characterization.  He

21  didn't maximally utilize the treatment services that were

22  provided and did not maintain his sobriety, either one.

23      Q.   And he never -- and he was -- and he did not take

24  advantage of the therapy he was provided regarding his sex

10:22AM  25  offender treatment?

1    A.    I'd say that he took incomplete and inconsistent

2 advantage of it.  There is evidence that he participated

3 but not as faithfully or as intensively as he might have.

4    Q.    Without going through all of the details of the

10:22AM  5 crime, you know, the abduction, the murder, strangling, I'm

6 not going to go through that with you, Doctor.  But it

7 would be fair to say that none of those details are

8 important to you in making -- in rendering the opinions

9 that you rendered today?

10:22AM 10    A.    His self-report of those is not important.  The

11 record about those does inform me regarding this is a very

12 disturbed offense that -- that raises the index of concern

13 about what happened to this person growing up that was

14 formative or that would contribute to their participating

10:23AM 15 in this kind of offense.

16          And so it is -- it is relevant in raising that

17 index of concern about background.  It -- it does not tell

18 me exactly how that happened, and it doesn't -- it doesn't

19 tell me what kind of inmate he's going to be in prison

10:23AM 20 beyond the fact that this pattern of offense, or a

21 strangulation or that kind of thing is not predictive.  So

22 I certain took it into account, but it -- but his

23 self-report of that doesn't move the ball forward.

24    Q.    The defendant telling you how he's committed the

10:23AM 25 offense is not important to you?

1    A.   No, sir.  Because that's in the records.  The

2 abduction is in the records.  The nature and manner of

3 death is in the records.  All of that information is in the

4 records.

10:23AM  5    Q.   Well, Doctor, if that was true, we could make an

6 analysis based on the records, then why is it important for

7 a psychologist who has a clinical practice to talk to

8 people about their issues?  Aren't those -- aren't those

9 issues important when you speak to somebody to determine

10:24AM 10 their conditions, what they'll do and how they'll live in

11 the world?

12    A.   It is certainly important to some types of

13 evaluation.  If I were involved in treating him, then I

14 would want to know a great deal about his feelings and

10:24AM 15 thoughts.  It is simply not relevant to an analysis of how

16 he came to be damaged, and his self-report is not relevant

17 to an analysis of what kind of inmate he will be in prison.

18         So there's some types of psychological

19 evaluations or -- or purposes that you might well want to

10:24AM 20 interview at length about that.  If this was an insanity

21 evaluation, was he insane at the time of the offense,

22 certainly, I would want to talk to him about this in

23 detail.  It's simply not relevant for the purposes that I

24 was focused on.

10:24AM 25    Q.   If you talk to him about the crime, wouldn't you

1 know something about his character and his personality

2 which would be significant to determine whether or not he's

3 going to be a statistical average or a statistical

4 abnormality?

10:25AM 5    A.    Not for prison.  If we were talking about in the

6 community at large, then it would be, but not for purposes

7 of a risk assessment for prison.  It is simply not

8 informative.

9    Q.    The conversation that you could have had with the

10:25AM 10 defendant regarding how and why and the details of avoiding

11 detection --

12          MR. GANDARA:  Objection, Your Honor.

13    Q.    -- that would not have been important?

14          MR. GANDARA:  Objection, Your Honor.  The

10:25AM 15 question asks Dr. Cunningham something that's totally

16 outside of the record.  The doctor never could have had

17 such a conversation with the defendant because, as he's

18 testified, he was instructed not to go there by defense

19 counsel.  They're asking him to answer a question that he

10:25AM 20 cannot answer.

21          THE COURT:  The objection is overruled.  You

22 may answer.  However, Mr. Esparza you can get on with

23 another subject after you get your answer.

24          MR. ESPARZA:  Yes, Your Honor.

10:26AM 25          THE WITNESS:  The records in this case reflect

1 a very bungled attempt to avoid detection including

2 multiple behaviors that specifically brought attention on

3 himself and left incriminating evidence both at the crime

4 scene as well as in his van.

10:26AM 5       So his -- his -- his attempts to avoid

6 detection were extremely poorly conceived as demonstrated

7 in the records.  His personal rationale about why he

8 engaged in that unless he was intending that he be caught

9 would otherwise not be informative.

10:26AM 10     Q.   Moving the body 15 miles is a poor attempt?

11     A.   Well, yes, sir, when it would be so easy just to

12 drive out into the desert, to -- to leave this body in a

13 downtown area and then create a fire that attracts

14 attention to it and then leave a handprint on something

10:27AM 15 that you touched with your bare hands that is now on this

16 victim.  And then you leave blood splatters in your van

17 when it would be so easy to drive this child tragically 15

18 miles out in the desert, dispose of the body, take your van

19 to a high pressure car wash, spray out the inside of it,

10:27AM 20 throw away any clothing that you might have been wearing

21 that were associated with this.

22       There are a number of things that could have

23 been done.  Of course, he screwed up when he left his van

24 running at the time of the abduction so that he has a

10:27AM 25 personal contact with security personnel at the Wal-Mart.

1 That was the point to abort this, if you were a cold

2 blooded predatory - offender because you'd been made at the

3 point you have a conversation.  So there are -- if you

4 would track this offense and how it was conceived and what

10:27AM 5 he did to avoid detection it is extraordinarily poorly

6 conceived unless it was his intent to be apprehended.

7    Q.   Well, that -- that is certainly one possibility.

8 But it is also -- if we take it step by step, the fact that

9 he continues and persisted in pursuing his crime even after

10:28AM 10 having spoken to someone really indicates a boldness and a

11 risk taking part of his character.  Right?

12    A.   No, sir.  I would -- I would characterize it as --

13 as demonstrating bad judgment.  I would identify it as

14 reflecting a compulsive component, but not boldness.  I

10:28AM 15 wouldn't characterize it in that way.

16    Q.   The fact that he only took two minutes and 20

17 seconds to complete his task certainly indicates that he

18 was set on doing what he intended to do?

19         MR. GANDARA:  Objection, Your Honor, the

10:28AM 20 question is vague.  Two minutes and 20 seconds.  There's

21 been some testimony about a time span in the store, and I

22 think it's suggested to the doctor that somehow or another

23 this whole crime was committed in two minutes and 20

24 seconds.

10:29AM 25         THE COURT:  Overruled.

1          THE WITNESS:  I'm unfamiliar with the specific

2    duration of this offense and whether it was conceived at

3    the point that he went into the store or was conceived at

4    the point that he was already there.  I simply don't have

10:29AM   5    definitive evidence about length of crime or when in that

6    process he made a determination of what he was going to do.

7          Q.   And you don't see a level of cunning and

8    manipulation and lying when two days after the murder he

9    allows police officers to search his van?

10:29AM  10          A.   That is extraordinarily poorly conceived, the

11   consent to search and then waive any rights that he might

12   have had about whether there was probable cause.  It was

13   extremely poorly conceived for a cunning offender not to

14   have thoroughly cleaned his van so that there would have

10:30AM  15   been nothing to discover.  So it fails on both of those

16   points in terms of being calculated and cunning in nature.

17          Q.   That would assume that he is not cunning and

18   calculating and manipulative and a liar because when he

19   commits the offense he burns the body assuming that all

10:30AM  20   evidence will be destroyed.

21               MR. GANDARA:  Objection to speculation.

22               THE COURT:  Overruled.  You may answer, if you

23   can.

24               THE WITNESS:  My understanding is that the

10:30AM  25   body was only very partially and incompletely burned.

1 Certainly it was not sufficient to avoid recognition of the
2 child or to destroy the evidence that implicated him there
3 at the scene.  And so it would appear to be an attempt to
4 do that, again, very poorly conceived and executed.

10:31AM 5      Q.   If he thought he had gotten away with the murder
6 after burning the body, he certainly, certainly, hasn't --
7 it follows that he would let him search his van two days
8 later, doesn't it?

9           MR. GANDARA:  Objection.  Calls for
10:31AM 10 speculation.

11           THE COURT: Overruled.

12           THE WITNESS:  No, sir.  People agree to
13 searches and provide statements to the police who have
14 actually committed.  They agree to those things pretty
10:31AM 15 routinely.  It is routinely an exercise in judgment for
16 them to do so.  It may -- it's inconsistent with criminal
17 sophistication.

18           A sophisticated criminal would not agree to a
19 search that was not supported by -- they would make them
10:32AM 20 produce a warrant.  They're going to preserve that
21 Constitutional right to be free from search or seizure.
22 They would systematically destroy any evidence, clean the
23 inside of the van with, you know, a high pressure hose or
24 follow that up with bleach or whatever you need to be sure
10:32AM 25 that there is nothing that would tie you to this capital

1 murder.

2     Q.    So it is not criminally sophisticated to burn the

3 body?

4     A.    No, sir.  The criminally sophisticated thing to do

10:32AM 5 would be to drive that body out into the desert. This is

6 a -- it's ill conceived.  A sophisticated criminal

7 recognizes how difficult it is to consume a body.

8     Q.    I -- I have no intent -- well, let me first ask

9 you this.  Have you seen the photographs of the damage to

10:32AM 10 this this young girl?

11     A.    Yes.  My recollection is I observed those photos

12 when I met with the public defenders here in El paso.  I

13 don't have a specific recollection of those that I remember

14 a photo book that I flipped through.

10:33AM 15     Q.    I am not going to show you.  But it is your

16 recollection that that young girl did not appear to you to

17 be burned to a great extent?

18     A.    No, sir. That is not what I said.  The fire was

19 not sufficient to consume the implicating evidence.  I

10:33AM 20 don't recall that the fire was not sufficient to disfigure

21 her beyond recognition or destroy, you know, handprints

22 fingerprints, all facial characteristics.  I don't recall

23 that that was the case.

24     Q.    It could be that the location of the body when it

10:33AM 25 was discovered -- you cannot rule this out, can you --

1 that, one, it was done to distract and redirect an

2 investigation?  You cannot rule that out, can you?

3          MR. GANDARA:  Objection to speculation.

4          THE COURT:  Overruled.  You may answer, if you

10:34AM 5 can.

6          THE WITNESS:  I don't know how that would have

7 had a distracting effect.  It would result in an almost

8 immediate discovery of the body, how that would very

9 quickly tie it to the disappearance of a child that

10:34AM 10 occurred within the previous 48 hours.  And so very quickly

11 all the pieces began to come together including interviews

12 there at the scene of -- of anyone that was seen coming or

13 going at that time period.

14          And so the method of of disposal is one that

10:34AM 15 sets a capital murder investigation in progress immediately

16 when other methods of disposing of the body would have

17 resulted and then simply remained an abduction without

18 bringing the pieces together.

19    Q.   It also could indicate a meanness and a

10:35AM 20 viciousness in the character of the perpetrator because

21 they could have left it in the desert, instead they left it

22 for all to see?

23          MR. GANDARA:  Objection, Your Honor.  This is

24 a jury argument and not a question that's relevant to any

10:35AM 25 issues of material fact, and it calls for speculation.

1          THE COURT:  Overruled.

2          THE WITNESS:  It is conceivable that the body

3  was placed for some symbolic effect.  It's conceivable that

4  its placement was random and ill conceived.  If the primary

10:35AM  5  issue were meanness, then I would expect greater evidence

6  of torture to have been done to the child, if that's the

7  primary purpose, is an exercise of sadism.

8      Q.   It's not mean to strangle her to the degree that

9  the medical examiner had said it is from a degree from one

10:36AM 10  to four, four being the most severe, that that wasn't used

11  to strangle that little girl for a period of at least three

12  minutes, from one to three minutes?

13          MR. GANDARA:  Objection -- withdraw.

14      A.   To kill a child is a profoundly tragic and mean

10:36AM 15  act.

16      Q.   And violent?

17      A.   Obviously violent.  That overwhelmingly lethal

18  force was brought to bear so that life would be

19  extinguished as quickly as possible.  That doesn't reflect

10:36AM 20  an increased degree of meanness that overwhelming force is

21  brought to bear.  It is a -- it is a method of inflicting

22  death.  The offense is the tragedy.  I don't read an

23  additional element of meanness into the degree of force

24  that can even be conceived as attempting to do this quickly

10:37AM 25  and with certainty.

1    Q.   As a kindness?

2    A.   No, sir, not as a kindness, but not to prolong

3 that suffering any longer than it had to be.

4          If you don't shoot someone with a gun, then

10:37AM  5 inflicting death on them is not an easy thing to achieve.

6 And it requires either great damage being done to them by

7 bludgeoning or quickly stabbing them many times or by

8 strangulation and cutting off an airway and blood flow.

9 The greater degree of force that's applied the more quickly

10:37AM 10 the person will lose consciousness, the more certain the

11 outcome will be.  So it -- the offense itself is -- is

12 tragic.  The method of its infliction doesn't add a

13 character element as I would feel it.

14    Q.   Okay.  Let me ask you about him working the

10:38AM 15 system.  When he was in his sex offender treatment

16 program -- you have reviewed those records. Right?

17    A.   Yes, sir, I have.

18    Q.   And what -- it took him an extraordinarily long

19 time to proceed through that treatment program?

10:38AM 20    A.   Yes, sir.  That's correct.

21    Q.   Yet he was bright enough to convince the therapist

22 that he had met the goals of his treatment.  Isn't that

23 true from the record review?

24    A.   It's inconsistent with the records that he was

10:38AM 25 bright enough.  The bright thing to do to work the system

1 is to matriculate through that program as rapid and

2 compliantly as possible so you can get out from under the

3 supervision of the Court and go on about your business.  To

4 drag this out and miss sessions brings greater attention on

10:39AM 5 him and increases the likelihood that his probation will be

6 revoked.  Now, ultimately he does complete that in spite of

7 doing so inconsistently.  It is not an effective way to

8 work the system.

9     Q.   Well, let me just step back for just a moment.

10:39AM 10 You do remember that the defendant was in the National

11 Honor Society in high school.  Right?

12     A.   Yes, sir, I recall that.

13     Q.   And he was able to convince the sex therapist that

14 he had accepted the responsibility for his crime of

10:39AM 15 indecency with a child.  Do you remember that?

16     A.   Yes, sir.

17     Q.   And he was able to convince the sex therapist that

18 he had increased victim awareness.  Do you remember that?

19     A.   That was her conclusion.  Her conclusion was that

10:39AM 20 his victim awareness increased and he had taken

21 responsibility for it.  How much of that is a result of him

22 convincing her as opposed to did he perceive that himself

23 at the time is uncertain.

24     Q.   Okay.  Well, he also was able to get the sex

10:40AM 25 offender [sic] to believe that he could identify the

factors that led to his indecency with a child and had a
relapse plan?

    A.   That was her report.

    Q.   And all of that was reported was based on over 28
sessions individually and -- and I lose track of the number
of group sessions.

    A.   I didn't do a count of the sessions.  I would
accept that there was about 28 individual sessions and
group sessions as well.

    Q.   And even after having committed the murder he's
still able to go and see the sex offender therapist and
thank her for the work she's done.  Do you remember that?

    A.   I recall him going back to see a probation
officer.  I didn't recall if that was Norma Reed who he
returned to or not.

    Q.   And from her records she was a -- she was unable
to predict this violent outburst of the defendant?

    A.   At the point of her releasing him from treatment
I -- it's my recollection that she regarded him as a low
risk to reoffend.

    Q.   Just as today you regard him to be a low risk
reoffend in prison?

    A.   No, sir.  That's not the case.  The adequacy of
her assessment and the predicted variables associated with
that and the -- the quality of research that would support

1   it is entirely different than the nature of the research

2   that we are brinking to bear.  Are both of them risk

3   assessments?  Yes, sir.  There --

4        Q.   You're better at it -- I mean will you you're

10:41AM 5   going to tell me that you're better at it.  Right?

6                    MR. GANDARA:  Objection, Your Honor.  Can we

7   allow the witness to answer counsel's question?

8                    THE COURT:  Sustained.

9                    THE WITNESS:  There is fundamentally better

10:41AM 10  science and data about recidivism and violence in prison

11  than there is in predicting reoffending of sex offenders in

12  the open community.

13       Q.   And that generally means you're better at it than

14  she is?

10:42AM 15                   MR. GANDARA:  Objection.  That's

16  argumentative.

17                   THE COURT:  Overruled.

18                   THE WITNESS:  No, sir.  It's the quality of

19  the science is substantially better in one context than the

10:42AM 20  other.  And the control over the important variables is

21  much better in terms of access to victim or controlling

22  substance abuse or that kind of thing.

23       Q.   (By Mr. Esparza)  Now, I do believe you have your

24  charts with you.  And I'm sure you're familiar with this

10:42AM 25  chart.  We saw it yesterday.

1    A.    Yes, sir.

2    Q.    And according to you and your colleague Dr.

3 Sorensen, what counts in trying to determine there is --

4 when you're trying to do overall risk you count whether or

5 not the capital murder involved robbery or burglary.

6 Right?

7    A.    That was a factor in this study.  These are not

8 exhaustive of all the factors we look at or all of them

9 that are brought to bear by Mr. Renteria.  In this study

10 that was a factor that had predicted significance.

11    Q.    Whether there were multiple murder victims?

12    A.    And that finding was restricted to this study.

13    Q.    Meaning that it may not be -- there's not a

14 corelation between now with future studies?

15    A.    Our subsequent studies did not find that to be a

16 predictive factor.

17    Q.    So this study is incorrect now since as the

18 research evolved you learned that that's not a predictive

19 factor?

20    A.    It's not that it is incorrect in terms of this

21 study.  It was a predictor of these offenders at that time.

22 It's a finding that doesn't replicate as we study it with

23 other groups of offenders, and so I no longer regard it as

24 a reliable risk factor.

25    Q.    So you are learning as the research develops?

1     A.    Oh, absolutely.  That's the nature of science and
2  we keep doing it is to improve our understanding.
3     Q.    And you showed this to the -- excuse me -- to the
4  jury yesterday.
10:44AM  5     A.    Yes, sir.  That's correct.
6     Q.    It would be fair to say that you have some data
7  and research that age is a predictor?
8     A.    It an important and -- and changing risk factor,
9  yes, sir.
10:44AM 10     Q.    And past behavior in prison you also believe is
11  some predictor?
12     A.    Yes, sir.  Again, that's a significant predictive
13  factor.
14     Q.    And the high school diploma is some predictor?
10:45AM 15     A.    Yes, sir.
16     Q.    And you have at least one study that says the
17  history of community employment is some predictor?
18     A.    There is a -- there is research regarding that and
19  high school diploma and likely the prosocial childhood
10:45AM 20  activities as being part of a community stability factor.
21  Yes, sir.  There is -- there is evidence that a history of
22  community employment is associated with reduced violence in
23  prison.
24     Q.    You have no data that prosocial childhood
10:45AM 25  activities is a predictor, do you, Doctor?

1    A.    That's what I described in my testimony.  I find
2 that to be an expression of this stability factor, but I
3 don't have data specifically regarding it.
4    Q.    So now you step out of your role as an actuarial,
10:45AM 5 as the insurance company, and you added this prosocial
6 childhood activity in helping you assess his future
7 conduct?
8    A.    No, sir.  I described that I don't have
9 statistical data that examines that specifically.  It is a
10:46AM 10 very infrequent history of somebody who is a capital
11 offender.  As I described, I've never seen this before.  I
12 found that to be of some significance within this community
13 stability factor although it may be redundant with the
14 others and not add a lot to the prediction.
10:46AM 15    Q.    But you did tell the ladies and gentlemen that
16 his -- his performance on probation that somehow that was
17 an indicator of what he'll do in the future?
18    A.    That's correct.
19    Q.    That is not helpful evidently?
10:46AM 20    A.    That's correct.
21    Q.    But it is at least in your mind, not studies and
22 not analyzed as a scientist, his prosocial childhood
23 activity?
24    A.    That doesn't -- that doesn't characterize this
10:46AM 25 accurately.  I didn't say that it had been unstudied or was

1 somehow pulled out of the air.  Because 75 percent of the

2 folks in prison can be characterized as antisocial

3 personality disorders which requires a conduct history in

4 childhood of committing significant misconduct and

10:47AM 5 disregard for other people.

6 　　　　　When somebody's childhood is different from

7 that, when their employment history and family

8 relationships are different than that that makes them very

9 discrepant from the typical person who is there in prison.

10:47AM 10 That discrepancy is part of what Quay talked about as far

11 as industrious inmates for what he looked at was

12 historical data about the individual that -- that would

13 inform that kind of perspective.

14 　　　　　So it's not that there's no science attached

10:47AM 15 to this.  I simply don't have a study that pulls this out

16 specifically and demonstrates it an actuarial model.  But

17 it is at least conceptually consistent with what we do

18 know.

19 　　Q.　And his continued correspondence and visitation

10:48AM 20 with family, friends, you don't have any data -- you don't

21 have anything that -- any data that supports that -- or

22 research -- I'm sorry -- you don't have any research that

23 supports that fact is somehow predictive of the future

24 conduct?

10:48AM 25 　　A.　No, sir.  That's not correct.  This is a factor

1 that has been described in research literature.  And I

2 may -- I think I cite a specific study that speaks of that

3 in one of my papers.  As I recall, in the other research

4 when it described the effect of that factor, it did not

10:48AM 5 quantify it in terms of a number but did describe it.

6     Q.   The fact -- you take -- he gets points or at least

7 some credit regarding his prosocial childhood activities,

8 but there are no -- he doesn't -- there's no indication

9 that you factor in that this is an unprovoked murder.  Isn't

10:49AM 10 that true?

11     A.   Oh, no, sir.  That's -- that's not the case.

12 Virtually every capital murder is unprovoked.  The victim

13 hasn't -- hasn't done something that has required this to

14 happen in virtually any of those cases, or else it ends up

10:49AM 15 being a lesser homicide in those instances.  So we studied

16 that.  We've studied capital offenders.  We've studied

17 first degree murderers.  These are individuals whose

18 murders are not provoked in terms of providing any

19 justification for it.

10:49AM 20     Q.   Oh, Doctor, that's not true.  If you cite the

21 capital murder statute, then you must tell the ladies and

22 gentlemen of the jury that, for instance, a murder for hire

23 is a capital offense?

24     A.   Yes, sir, it is.

10:49AM 25     Q.   And you would tell these ladies and gentlemen of

1 the jury that a murder for hire is a provoked murder?

2    A.   No, sir, I would not.  There's nothing the victim

3 has done to provoke that.  There is a reward that has been

4 offered to them.  Very often in capital murders there is

10:50AM 5 some return the person has gotten for doing it,

6 economically or something else that's going on, but that

7 doesn't mean the victim has provoked it.  It is -- it is

8 motivated by some economic return or some personal force

9 within this individual, but it's not like the victim has

10:50AM 10 provoked any of this.

11    Q.   Doctor, well, that narrow view maybe.  But

12 certainly you can imagine the person that hired or even the

13 person that does it, the person who hires does it because

14 they are killing that person for a reason and that

10:50AM 15 reasoning could be the provocation.

16             MR. GANDARA:  Your Honor, this is a broad

17 speculation, totally outside any relevance to any issue in

18 the case, and it's argumentative.

19             THE COURT:  Overruled.

10:51AM 20             THE WITNESS:  I would not regard capital

21 murders as being provoked by the victim.  They are all

22 motivated by something in every case.  But provocation I

23 think is not a -- it is a very imprecise concept at best to

24 try to differentiate one capital murder from another.

10:51AM 25    Q.   Okay.  Whether it was provoked or not provoked is

1 not something you take into account in your analysis?

2     A.   Well, yes, sir, it is.  As I described, we have

3 looked at first degree murders and at capital murders which

4 by definition don't have the same provocation that a

10:51AM 5 manslaughter case would have for example.  We've looked at

6 them too.

7     Q.   But --

8     A.   So we have taken this into account.

9     Q.   But you said the facts -- the facts don't matter

10:51AM 10 because talking to the defendant wasn't going to be helpful

11 to you.

12     A.   No, sir.  Again, that mischaracterizes my

13 testimony.  I've described reviewing the facts of this

14 offense, and we've described what in our research we've

10:52AM 15 examined, what facts are predictive of violence in prison

16 and which facts are not.  Talking to the defendants can't

17 inform that.  The information that's available from the

18 type of offense does inform that.  In some instances it's

19 predictive and some instances it's not.

10:52AM 20     Q.   So why the murder occurred is not important to

21 you?

22     A.   Not the person's self-reporting of that.

23     Q.   What the defendant -- what an inmate would tell

24 you, I killed because of this reason, is not important to

10:52AM 25 you?

1    A.    Their self-report is not important.

2 Characteristics of the offense may be if they're

3 demonstrated, but not their self-report.

4            MS. HUGHES:  I pass the witness, Your Honor.

10:53AM 5          THE COURT:  Mr. Gandara.

6            MR. GANDARA:  May I approach, Your Honor?

7            THE COURT:  Yes.

8                    REDIRECT EXAMINATION

9 BY MR. GANDARA:

10:53AM 10   Q.    Mr. Cunningham, I'm going to hand you Defendant's

11 Exhibit 160 and ask you if you are familiar with this

12 document.

13           THE COURT:  Mr. Gandara, you need to speak up.

14 The jury can't hear you.

10:53AM 15   Q.    (By Mr. Gandara) I'm handing you Defendant's

16 Exhibit 160.  Are you familiar with this document?

17   A.    Yes, sir, I am.

18   Q.    Is that a true and correct cope of a page out of

19 one of the State's Exhibits constituting the prison records

10:54AM 20 of David Renteria?

21   A.    Yes, sir.  That's correct.  The date of this

22 review is April the 30th of 2007.  This is a unit

23 classification review that summarizes or depicts the

24 absence of any assaultive misconduct.

10:54AM 25   Q.    Now, Defendant's Exhibit 161, do you recognize

1  that?

2       A.   Yes, sir, I do.  This is the same type of document

3  dated October the 31st, 2006 again reflecting complete

4  absence of any disciplinary incidents including any staff

10:54AM 5 assaults.

6                 MR. GANDARA:  I offer Defendant's Exhibits 160

7  and 161.

8                 MR. ESPARZA:  Your Honor, I believe they're

9  already part of the record, and I have no objection.

10:54AM 10             THE COURT:  All right.  Did you take them out

11 of the State's record --

12                MR. GANDARA:  No, Your Honor.  I --

13                THE COURT:  -- to make them yours?

14                MR. GANDARA:  No, Your Honor.  I asked him if

10:54AM 15 they were copies, if they were true and correct copy of --

16                THE COURT:  Copies.  All right.  Just so that

17 I understand what's going on here.

18                160, 161 is admitted into evidence.

19                (Defendant's Exhibits Nos. 160 and 161 were

10:55AM 20 admitted into evidence)

21      Q.   (By Mr. Gandara)  All right.  Doctor, would you

22 take a look at the Exhibit 160?

23      A.   Yes, sir.

24      Q.   Tell us what this shows.

10:55AM 25      A.   This is the date of review, April the 30th of

1  2007. And this is disciplinary history three months, six

2  months, one year, two year, three year. These are the

3  different levels of assault that are being described or

4  misconduct, staff assaults, inmate assaults, assaults with

10:55AM  5  weapon, and then incidents of varying severity, escape and

6  a -- how long he has been at level three -- or whether he's

7  gone to level three, I anticipate, since level three is the

8  more punitive end of death row. And so those show a

9  complete absence of any of this misconduct during this --

10:56AM 10  this period of time going back three years dating it back

11  from April the 30th, 2007.

12      Q.   Is this any sort of indicator about David

13  Renteria's behavior in prison?

14      A.   It demonstrates that he's got no disciplinary

10:56AM 15  writeups whatsoever going back three years prior to April

16  30th, 2007.

17      Q.   Is it at all informative in the manner of your

18  risk assessment? Does it say anything that -- that helps

19  you do a risk assessment?

10:56AM 20      A.   Yes, sir, it does. It tells me that there was no

21  misconduct. That pattern or adjustment to confinement is a

22  significant factor in predicting positive adjustment in the

23  future.

24      Q.   Well, if -- if there were an incidence of

10:56AM 25  misbehavior of assaults or inmate assaults or staff

1 assaults, it would be an indicator to you that he's a --

2 that he's a bad person and a higher risk.  Correct?

3        A.   I wouldn't characterize it as meaning he was a bad

4 person.  It would mean that he was having adjustment

10:57AM 5 problems to prison and was displaying misconduct there.  As

6 those were violent in nature, then it would raise the index

7 of concern.  It would be a risk factor for future violence

8 in prison.

9        Q.   So the fact that he's behaving then is

10:57AM 10 manipulative.  If he misbehaves, he's a higher risk, and if

11 he behaves, he's manipulating you and Mr. Esparza and me

12 and the jury?

13        A.   That's not my interpretation of the meaning of

14 this.

10:57AM 15        Q.   Explain why.

16        A.   First, as a scientist I want to be really careful

17 about having a conclusion in mind and then using whatever

18 data is there to demonstrate that conclusion.  And at the

19 point I say no misconduct means your dangerous and lots of

10:58AM 20 misconduct means that you're going to hurt people in the

21 future, at the point that I do that then it appears from a

22 scientific standpoint to be disingenuous, that there's

23 nothing that a person can exhibit in their pattern that

24 won't lead me to a particular conclusion.

10:58AM 25             In -- in terms of prison -- prison is not

concerned with why the inmate complies.  Prison is only

concerned that the inmate does comply.

Now, if an inmate complies in order to come

out of their cell and order commissary and go to

visitation, is that a manipulation?  Are they still, in

fact, callous and self absorbed or are they just acting

this way in order to have greater privileges?  The prison

virtually assumes that that's the case.  That's why they're

providing these incentives.  They aren't expecting that

these inmates are going to behave because they got

rehabilitated as they came through the doors.  They provide

these as incentives to encourage and reward positive

conduct.

Why the inmate complies is irrelevant.  It's

only important that the immate does comply.

Q.   So exhibiting good behavior so he can get a chance

to buy a candy bar is -- is -- again, has been

characterized as manipulative?  Do you agree with that or

not?

A.   No, sir.  That is -- is a practical response to

the reward and punishment situation that this person is in

in prison.  If you go along with the program and you don't

cause problems, then you get a few more things.  You get to

order a little more commissary.  You get a fan in the cell.

Some things like that.  If you act up, then had you end up

1 with nothing in your cell.   Given those two options, most

2 of us would probably elect to comply and make things just a

3 little less horrific.

4     Q.    Doctor, I'm going to ask you to take a look at

10:59AM 5 Exhibit 161 and just tell us briefly if there's any

6 measurable difference between this document and Exhibit 160

7 with -- except for the date for the review.

8     A.    The date of the review is October 31st, 2006.   So

9 the three years goes back six months further than the April

11:00AM 10 2007.   Otherwise the forms are identical in what they -- -

11 what it depicts.

12     Q.    So what has David Renteria's behavior been all

13 along out at the TDC?

14     A.    Completely compliant in terms of no disciplinary

11:00AM 15 infractions of any sort.

16     Q.    Now, in your risk assessment of David Renteria

17 you've done an individualized assessment.   Correct?

18     A.    That's correct.

19     Q.    When you were talking about the study that you and

11:00AM 20 Mr. Sorensen did about the severity of the offense or -- or

21 the type of offense and incidents of violence in prison,

22 did you do an individualized assessment on any of those

23 inmates that you studied?

24     A.    No, sir, not beyond identifying predicted factors

11:01AM 25 associated with those inmates that raised or lowered their

1  risk or that we could identify as -- as correlates for that

2  misconduct, but there was no personal interview of them or

3  review of their individual history.

4      Q.   Now, cats and dogs learn from their mistakes,

11:01AM  5  don't they?

6      A.   To a very limited degree.  They may repeat the

7  same mistakes over and over again, but they do learn some

8  from experience to the extent of their capabilities.

9      Q.   Do human beings repeat the same mistakes over and

11:01AM 10  over again?

11      A.   Sometimes they do.  It depends on whether they

12  remain in the same context with the same forces operating

13  on them or whether they are in a different context than

14  they were as well as what information they gained that may

11:02AM 15  lead them to behave differently.

16      Q.   If you change the circumstances of their

17  existence, do they change their behavior?

18      A.   Yes, sir.  That is the definition of prison, that

19  you fundamentally change the circumstances of these

11:02AM 20  offenders.  And as you can see from the statistics that

21  we've looked at in the last couple of days that

22  fundamentally changes the behavior of concern, which is the

23  incidents of serious violence or injuring society, the

24  community during their tenure there in prison.

11:02AM 25      Q.   I don't know if it makes any sense to ask, I hope

1   it does.  But how would they put down 100 IQ in the prison

2   records without having tested him?

3        A.   A score of 100 the average IQ score.  They may not

4   have the same interest in testing a death row inmate as

11:03AM 5   compared to a general population inmate because it's

6   irrelevant to their classification.  They're going to death

7   row.  And so there may not be the same interest studying or

8   giving them that assessment.

9        Q.   All right.  Assume with me that there's testimony

11:03AM 10   that National Honor Society takes a B average plus service

11   to the community and other factors and that David's high

12   school grades were a B average and that he did a semester

13   at community college after he flubbed at UTEP with a B

14   average, and then his cumulative grade point average at

11:03AM 15   UTEP was 1.75, have you got a brilliant individual there

16   intellectually just based on that -- those factors?

17        A.   If they are brilliant, they are substantially

18   underachieving given that information.  So they either, in

19   fact, do not have great intellectual capability or are

11:04AM 20   completely undershooting themselves in the application of

21   it.

22        Q.   I have -- Doctor, tell me if you agree with me or

23   not.  It seems that just common sense would tell you that

24   anybody that you -- that's been convicted of an intentional

11:04AM 25   murder, okay, capital or otherwise, just as a basis of

common sense or a common reaction if you just walk him out
the door into the world that he's going to be dangerous.
And I think that's what you told Mr. Esparza about David
Renteria?

11:04AM    A.   Yes, sir.  That any capital offender if
released -- if convicted but then released to the open
community at the time of trial that -- that matter
virtually anybody who's been convicted of a violent felony
who was then after that conviction, a serious violent
11:05AM felong, just released out the door, they are at an
increased risk of violence in the community.  And so if
that's what this means, this -- this -- whether there's a
probability that the defendant would commit criminal acts
of violence that would constitute a continuing threat to
11:05AM society, if that issue means if released today at the
points of conviction, then the answer would be yes for
every capital offender who comes to trial, and this issue
would serve no purpose in the application of the death
penalty because it would not in any way help us understand
11:05AM who then gets the death penalty, which is the purpose of
the special issue in the sentencing statute, to
particularize and narrow the application of the death
penalty.  That doesn't work if the answer is always
question.

11:05AM    Q.   Well -- and let me ask you something additionally.

1 Isn't it a little disingenuous to ask you to assume that a

2 person convicted of a capital murder is going to walk out

3 into the community?

4    A.   That's a hypothetical that is impossible.

11:06AM 5    Q.   He's -- I think that's what prisons are for, isn't

6 it?

7    A.   Yes, sir.  Prisons are to confine and quarantine

8 individuals who would otherwise be at increased risk in the

9 community as well as punishment and deterrence, but

11:06AM 10 significant aspect of prison is containment of risk.

11    Q.   I believe Mr. Esparza asked you if David Renteria

12 would be a continuing threat in our community today

13 excluding prison, if he were at large in our community.

14 That was the question.

11:06AM 15              Now, based on your expertise and your research

16 of prison life and prison sentencing, when is he ever going

17 to be at large in the community?

18    A.   I believe that he will die in prison, that he will

19 never be at large in the community.

11:07AM 20    Q.   Is David Renteria -- is there a probability that

21 he's going to commit continuing acts of violence that

22 constitute a continuing threat -- that he will commit acts

23 of violence that would constitute a continuing threat to

24 society in the future?

11:07AM 25    A.   That likelihood is very low.  It becomes even less

1 likely as the severity of the criminal act increases.

2 He -- as we compare him to other capital offenders, his

3 likelihood is well below that of the typical capital

4 offender and well below that of the typical prison inmate.

11:07AM 5 So he is neither disproportionately likely to commit

6 violence in prison, nor is he probable in terms of that

7 having a meaningful definition of more likely than not or a

8 substantial or disproportionate.

9          There is always -- if possibility -- if

11:08AM 10 probability means possibility, then the answer is always

11 yes, for every capital defendant, for everybody in this

12 room the answer would be yes, there's always some

13 possibility.

14          So that's what this means.  Again, it serves

11:08AM 15 no purpose in the application of the death penalty.  It

16 doesn't help us understand should he get the death penalty

17 in light of this special issue.  So there is a possibility.

18 There is -- there is statistically a very low probability.

19          Now, it's not my job to decide what level of

11:08AM 20 likelihood is there that makes the application of the death

21 penalty a reasonable deterrence in this particular case.

22 That's for the jury to decide.  My job is to describe what

23 that level of likelihood is as an absolute matter in

24 comparison to other murders and in comparison to other

11:09AM 25 folks in prison.

1    Q.   In terms of -- in other business where they deal

2  with odds to a degree, is he favored to commit violence and

3  will be a threat to people in prison or is he a long shot?

4    A.   I would characterize him as a long shot.

11:09AM  5         MR. GANDARA:  Pass the witness.

6         THE COURT:  Do you want that question

7  repeated?

8         JURORS:  Yes.

9         THE COURT:  Mr. Gandara, what was your

11:09AM 10  question.

11    Q.   (By Mr. Gandara)  In the parlance of another

12  business in which they deal with odds is David a favored to

13  commit violence in prison in the future or is he a long

14  shot?

11:09AM 15    A.   I would characterize him as a long shot, that if

16  he is unlikely, the odds are well against him committing

17  serious violence in prison.

18         MR. GANDARA:  Pass the witness.

19         THE COURT:  Mr. Esparza?

11:10AM 20         MS. HUGHES:  Your Honor, I have no further

21  questions for this witness.

22         THE COURT:  All right.  You may step down.

23         THE WITNESS:  Thank you, Your Honor.

24         THE COURT:  All right.  You may step down.

11:10AM 25         THE WITNESS:  Thank you, ma'am.

1          THE COURT:  Call your next witness.  Mr.
2  Gandara, that's you.

3          MR. GANDARA:  Oh.

4          THE COURT:  Call your next witness.

11:10AM  5          MR. GANDARA:  Oh.  We rest.  We maybe have one
6  more.  Before we rest we have a matter to take up, but it's
7  a legal question.

8          THE COURT:  All right.  I'll let you step out.

9          (Open Court, defendant present, jury not
11:11AM 10  present)

11          MR. GANDARA:  May I proceed, Your Honor?

12          THE COURT:  What do you have?

13          MR. GANDARA:  I'm going to offer State's
14  Exhibit 158 and 159.  They're certified copies of the
11:11AM 15  judgment and the sentencing judgments in David Renteria's
16  indecency case and then in his felony DWI case.

17          THE COURT:  All right.  Wait a minute.  You
18  already had them marked.  Here are matters that were marked
19  that have not been admitted.  And I believe the two you're
11:12AM 20  asking to admit now have already been marked and discussed
21  under other exhibit numbers 156 and 157.

22          MS. PAYAN:  Can I approach, Your Honor?

23          THE COURT:  If you're going to help him go
24  through them, please do.

11:12AM 25          (Brief pause)

1      MR. GANDARA:  Your Honor, these are -- these

2  were -- 156 and 157 were offered in connection with the

3  testimony of Mr. Habern that ended up as a Bill of

4  Exception.

11:12AM   5      And I'm offering the same documents again

6  under circumstances in which Mr. Esparza asked Dr.

7  Cunningham questions about whether or not Mr. Renteria

8  would be a danger to the community if he were out in the

9  community.  And we -- there's been testimony admitted

11:12AM  10  without objection that he's not going to be out in the

11  community.  Mr. Habern's testimony deals directly with

12  that.

13      Specifically, these judgments show that he got

14  a 20 year sentence and ten year sentence that's ordered to

11:13AM  15  begin when the 20 year sentence ceases to operate.  Now,

16  the 20 year judgment is already in evidence in Defendant's

17  Exhibit 124.  It's already there.

18      And the other judgment for some reason was not

19  in that pen packet.  And so there's already evidence before

11:13AM  20  the jury in Defendant's Exhibit 124 that says he's doing 20

21  cumulative with another sentence with a case number on it,

22  which is the DWI.

23      Now, the rules of evidence -- and I apologize,

24  Your Honor, I left my specs at the table.  Texas Rules of

11:14AM  25  Evidence, Rule 107 tells us that part of an act,

1  declaration, conversation writing or recorded statement is

2  given in evidence by one party, the whole on the same

3  subject may be inquired into by the other.  And any other

4  act, declaration, writing or recorded statement which is

11:14AM 5  necessary to make it fully understood or to explain the

6  same may also be given in evidence as when a letter is read

7  mall letters on the same subject between the same parties

8  may be given.  Writing or recorded statement includes

9  depositions.  And so since the judgment -- we have a

11:14AM 10  situation in which regarding the indecency case --

11              THE COURT:  Well -- okay.  I apologize for

12  interrupting but can you give me 124 and show me what

13  you're talking about inside 124.  Which one is in 124?

14              MR. GANDARA:  Okay, Your Honor.

11:15AM 15              MS. PAYAN:  Judge, if I may, can we -- can we

16  back up, please.

17              THE COURT:  All right.  You need to speak up

18  because the prosecutors can't hear you.

19              MS. PAYAN:  I'm just trying --

11:15AM 20              THE COURT:  If you'll step back a little bit.

21              MS. PAYAN:  I'm just trying to get it straight

22  because what we had offered before through Mr. Habern,

23  they -- I believe they weren't certified at the time, and

24  these are.  So that's why I --

11:15AM 25              THE COURT:  Now that I don't know.

1          MS. PAYAN:  Right.  And I didn't realize they
2 were admitted for the purposes of the hearing.

3          THE COURT:  Of the hearing, the voir dire
4 examination.

11:15AM 5          MS. PAYAN:  That's -- right.  And that's the
6 difference.  And we need --

7          MR. GANDARA:  Okay.  This is -- I will proffer
8 to the Court that Exhibit 158 is the document that is in
9 Exhibit 124 which is a pen packet -- well, essentially, Mr.
11:15AM 10 LeFleur from TDC responded.  Now, he's from classification.
11 He didn't send us an entire classification file, but he did
12 send us what is commonly known as a pen packet.  And the
13 pen packet had this judgment in it but not the judgment in
14 the DWI case that is numbered and mentioned in that
11:16AM 15 judgment, the 20 year judgment.

16          THE COURT:  All right.  So what is marked 158
17 is basically a certified copy of what was 156.

18          MR. GANDARA:  Correct, Your Honor.

19          THE COURT:  All right.  Do you have a response
11:16AM 20 to his offer on 158 and 159?

21          MR. ESPARZA:  I do, Your Honor.  The part that
22 they're including has to do with the issue regarding
23 parole.  And I think it is an attempt to confuse the jury
24 in regards to exactly how the sentences will -- how the
11:16AM 25 defendant will serve his sentences into the future.  It was

1 clear from the Bill -- from the Bill regarding parole that

2 the phrase -- and it's on the other exhibit, 159.

3           THE COURT:  You-all have 159.  It was not

4 given to me.

11:17AM  5           MR. ESPARZA:  The phrase this sentence will

6 begin when the sentence of 20 years, i.e., TDCJ on the

7 conviction of the offense of indecency with a child count

8 one in Cause Number 26723 in the 243rd Judicial District

9 Court on June 10th, 2002 shall cease to operate.  An

11:17AM 10 indication that he would have to do all these 20 years

11 without -- well, do his 20 years before he does his ten

12 year sentence.  And we know based on Mr. Habern's testimony

13 that that is not true, that he would be eligible for parole

14 as early as five years.  And then as -- as he becomes

11:18AM 15 parole eligible, then that ceases the operation of that

16 sentence and then the other sentence kicks in.  And he said

17 you're probably looking at seven years.

18           And this is an attempt to confuse the jury on

19 the language that's in the judgment.  And I don't think the

11:18AM 20 language in the judgment was made for a jury to understand.

21 This is language that we use in order to make sure that the

22 sentence and the -- and the wishes of the Court are

23 properly executed into the future.

24           MR. GANDARA:  Your Honor, I --

11:18AM 25           THE COURT:  Just a minute.  The objection is

1 overruled. 158, 159 will be admitted into evidence.

2        (Defendant's Exhibits Nos. 158 and 159 were

3 admitted into evidence)

4        THE COURT: And so that it is clear,

11:19AM 5 Defendant's Exhibit -- let's see. I thought it was marked

6 144, but it appears that it was marked 145, Motion to

7 Stack, 156, 157 and 151. Those were admitted for the Bill

8 of Exceptions only and they remain the same.

9        MS. PAYAN: 156, 157 and 151, Your Honor?

11:20AM 10        THE COURT: Yes.

11        MS. PAYAN: And 145?

12        THE COURT: And 145 which is the motion to

13 stack. That's in the record only.

14        Now, what else, Mr. Gandara?

11:20AM 15        MR. GANDARA: Your Honor, since my object is

16 to inform the jury rather than to confuse them, we have now

17 evidence about whether or not David Renteria is ever going

18 to be out of prison before the jury, and we have those two

19 judgments.

11:21AM 20        Before I get to the reprop of Mr. Habern's

21 testimony, I'd like to point out to the Court that the

22 instruction we already talked about regarding parole and

23 minimum of 40 on a capital death sentence informs as to a

24 capital death sentence if it is the only defense that the

11:21AM 25 defendant is going to do.

1            Now, that's not the case for David Renteria.

2  He has those two priors.  And that evidence is before the

3  jury.  And it is essentially outside of the operation of

4  37.071 that informs us about instructing the jury about the

11:22AM 5  40 year parole.

6            And I submit that in order to give the jury

7  accurate information and correct information on which to

8  base themselves in coming to a sentence they're entitled to

9  know what the practical operations of those two prior

11:22AM 10  sentences are.  And the way it goes essentially is that

11  those are stacked sentences, and he doesn't start doing

12  capital death until he's done doing those sentences.

13            And Mr. Habern is the one witness -- although

14  Mr. Aubishon could have given the same information -- Mr.

11:22AM 15  Habern is a recognized expert in the field.  And he can

16  tell this jury exactly how it's going to function so

17  they're not playing a blind man's bluff with those

18  decisions.

19            Under those circumstances, Your Honor, I

11:22AM 20  reproffer Mr. Habern's testimony and we'd like to bring him

21  in on Monday to testify to the brief testimony that he'd

22  have for this jury so that they can be informed when they

23  make this decision.

24            THE COURT:  Response.

11:23AM 25            MR. ESPARZA:  Your Honor, I once again renew

1 my objection to the Court's ruling of allowing that.  It

2 should be redacted for exactly that purpose.

3            Your instruction to the jury is they are not

4 to consider how the prison authorities or the Board of

11:23AM   5 Pardons and Parole will apply the parole statute. They're

6 not even to speculate -- this jury would not have even had

7 the opportunity to speculate on whether or not this Court

8 would stack the sentence or not.  And to include that -- to

9 include that language of the judgment confuses the jury.

11:23AM  10            And I would argue that if the Court -- if the

11 Court keeps that -- those -- that phrase in State's

12 Exhibit -- I believe it's -- Defendant's Exhibit 159, that

13 the jury is being confused.  And they should be instructed,

14 and the defense should be instructed not to be able to

11:24AM  15 argue and permit this jury to speculate on the enforcement

16 of any consecutive order, any stacking order.

17            And that's exactly why at the prior hearing

18 the Court did not allow Mr. Habern's testimony because of

19 the way the Court will instruct this jury regarding parole.

11:24AM  20            THE COURT:  This is the first time you've

21 brought up the issue of redacting that sentence in there.

22 I will agree with that, and I will sustain the objection,

23 and that portion of that judgment will be redacted.

24            And your request to bring Mr. -- let me get

11:24AM  25 his name right.

1          MR. GANDARA:  Habern.

2          THE COURT:  -- Mr. Habern.

3          MR. GANDARA:  Yes.

4          THE COURT:  Mr. Habern, your request to bring

11:24AM  5 him back is denied.

6          So which is the judgment, 159?  Is it the DWI

7 judgment?

8          MS. HUGHES:  I believe it is.

9          THE COURT:  Take a look.  Get it ready.  It

11:25AM 10 will be redacted.

11          MR. ESPARZA:  We can do that in a minute.  Do

12 you want to take care of other business, Judge.

13          THE COURT:  Let's see.  Let's see what else

14 there is.

11:25AM 15          Mr. Gandara?

16          MR. GANDARA:  I'm sorry.  I was distracted.

17 What was the last --

18          THE COURT:  That's all right.  Whatever -- now

19 that I've handled those issues, what other issue can I

11:25AM 20 handle for you?

21          MR. GANDARA:  Well, I'm trying to think if

22 there's another witness I can bring, but I guess we rest.

23          THE COURT:  All right.  Does the State have

24 any witnesses?  We still have another 35 minutes we can go

11:25AM 25 today.

1              MR. ESPARZA:  Your Honor, we're going to

2 close.

3              THE COURT:  All right.  So then is the defense

4 going to -- wait a minute.  Very confusing here.  He's

11:25AM  5 closing.  He's not any more witnesses.  So we're through

6 with witnesses.

7              MR. GANDARA:  We close.

8              THE COURT:  All right.  Now, the one issue

9 that I did speak with the lawyers about that was not on the

11:26AM 10 record, it was about all their exhibits, to make sure

11 you-all have the exhibits that you believe are in.

12              There was only one issue about Defendant's

13 Exhibit No. 4.  I don't know if you do want it in or not.

14 It was discussed during the trial.  It was used during the

11:26AM 15 trial.

16              MS. PAYAN:  Judge, if I can --

17              THE COURT:  We can go off the record here.

18              (Evening recess)

19

20

21

22

23

24

25

## COURT REPORTER'S CERTIFICATE

THE STATE OF TEXAS)
COUNTY OF EL PASO )


I, LISA MARIE DE MELLO, CSR, RPR, Official Court Reporter in and for the Council of Judges Administration, El Paso County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record, 5/3/08, is $____ and was paid/will be paid by _____.

WITNESS MY OFFICIAL HAND this the 14th day of May 2009.

LISA MARIE DE MELLO, Texas CSR 3313
Expiration Date: 12-31-2009
El Paso County Council of Judges
500 East San Antonio Street, Suite 101
El Paso, Texas  79901
(915) 546-2000 ext. 4352

*Lisa Marie De Mello, CSR*

*Official Court Reporter - Council of Judges Administration*