74829

REPORTER'S RECORD
VOLUME 72 of 84 VOLUMES

TRIAL COURT CAUSE NO. 20020D00230

| | | |
|---|---|---|
| THE STATE OF TEXAS, | ) | IN THE DISTRICT COURT OF |
| Plaintiff | ) | |
| VS. | ) | EL PASO COUNTY, TEXAS |
| | ) | |
| DAVID RENTERIA, | ) | |
| Defendant | ) | 41st JUDICIAL DISTRICT |

FILED IN
COURT OF CRIMINAL APPEALS

JUN 0 4 2009

Louise Pearson, Clerk

---------------------------------------

Jury Trial
May 5, 2008
Objections To Court's Charge
Court's Charge to the Jury
Closing Argument

---------------------------------------

On the 22nd day of APRIL 2008 the following
proceedings came on to be heard in the above-entitled and
numbered cause before the Honorable Mary Anne Bramblett,
Judge Presiding, held in El Paso, El Paso County, Texas:

Proceedings reported by machine shorthand.

ORIGINAL

APPEARANCES

Lori Hughes          SBOT NO. 00786275
Diana Meraz          SBOT NO. 13942600
Jaime Esparza          SBOT NO. 06666450
Office of the District Attorney
500 East San Antonio, Room 201
El Paso, Texas  79901
Phone:  (915) 546-2059
Fax:  (915) 533-5520
ATTORNEYS FOR THE STATE OF TEXAS


Jaime Gandara          SBOT NO. 07611900
Edythe Payan          SBOT NO. 00791415
Greg Velasquez          SBOT NO. 20540300
Office of the Public Defender
500 East San Antonio, # 501
El Paso, Texas  79901
Phone:  (915) 546-8185
Fax:  (915) 546-8186
ATTORNEYS FOR THE DEFENDANT

CHRONOLOGICAL INDEX
VOLUME 72 OF 84 VOLUMES
Objections To Court's Charge
Court's Charge to the Jury
Closing Argument

                                                    PAGE  VOL.

MONDAY, MAY 5, 2008

Objections to Court's Charge..................... 004    72

State and Defense Rest and Close................ 040    72

Court's Charge to the Jury on Punishment........ 040    72

Closing Argument by Ms. Hughes.................. 049    72
Closing Argument by Ms. Payan................... 074    72
Closing Argument by Mr. Gandara................. 095    72
Closing Argument By Mr. Esparza................. 115    72

Adjourned....................................... 140    72
Court Reporter's Certificate.................... 141    72

1                    (Monday, May 5, 2008)

2                    (Open Court, defendant present)

3                    THE COURT:  All right.  We are here this

4  morning without the jury being present for the purpose of

08:52AM 5  looking at the charge and to determine whether there are

6  any objections to the charge or any requests for the

7  charge.

8                    Has the State had an opportunity to examine

9  the charge of the Court?

08:52AM 10                    MS. MERAZ:  Yes, We have, Your Honor.

11                    THE COURT:  Do you have any objections to the

12  charge.

13                    MS. MERAZ:  We just have one objection, and

14  it's on page three of the charge.  And it's the third

08:52AM 15  paragraph.  There is instruction on extraneous crimes, that

16  they need to proven beyond a reasonable doubt.

17                    Our objection to that is based on <u>Adamanda V</u>

18  <u>State</u>, <u>856 SW 2nd 210</u> which states that an instruction on

19  extraneous offenses, for the jury to disregard them, is not

08:53AM 20  necessary.  There's some requirements too.  So they have to

21  find that first issue beyond a reasonable doubt.

22                    And so we would object to that instruction

23  being in there.  And that -- that is our only objection to

24  the charge, Your Honor.  In the punishment phase of the

08:53AM 25  trial it's not required.

1          THE COURT:  All right.  The Court is going to

2  deny that, and it will remain in the charge.

3          MS. MERAZ:  Thank you, Your Honor.

4          THE COURT:  Mr. Velasquez, have you had an

08:54AM  5  opportunity to examine the charge of the Court?

6          MR. VELASQUEZ:  Yes, Your Honor.  But before

7  getting to that, Your Honor, Jaime is bringing a motion

8  to --

9          THE COURT:  Jaime meaning Mr. Gandara?

08:54AM 10          MR. VELASQUEZ:  Mr. Gandara.  I'm sorry.  I

11  apologize, Your Honor.  He made an oral motion last week

12  regarding Powell, and the State brought up the issue that

13  it was late in filing.

14          I have located the two motions that we filed

08:54AM 15  for the -- before the Court, that the Court issued a order

16  on both orders, Your Honor -- both motions.  And I have

17  amended both motions, Your Honor, added the language of

18  Powell.  And we would ask the Court to address those

19  motions.  I filed them this morning.  I gave them to the

08:54AM 20  District Clerk's office Your Honor.

21          THE COURT:  I don't have them.

22          MR. VELASQUEZ:  I filed them this morning, and

23  I told them they needed to be in the Court.

24          THE COURT:  Can you give me your copy to look

08:54AM 25  at, please?

1        MR. VELASQUEZ:  Yes, Your Honor.

2        THE COURT:  As you know, it takes some time

3   for the clerks to get them into the file.

4        MR. VELASQUEZ:  Yes, Your Honor.  And I told

08:55AM 5   them that they needed to bring them up here before they

6   even stand up.

7        THE COURT:  Has State been given copies of

8   these?

9        MR. VELASQUEZ:  Yes, Your Honor.  I gave them

08:55AM 10  to them this morning, Your Honor.

11       MS. MERAZ:  Is that what you gave me on --

12       MR. VELASQUEZ:  Yes, uh-huh.  Your Honor,

13  specifically the language that I added on one motion, First

14  Amended Motion to Declare Statute Unonstitutional on its

08:55AM 15  Face, starting page eight and we go all the way to page 24.

16       And on the second motion, Your Honor, would be

17  on future danger issues.  I added the language in -- on

18  page nine -- I mean five, Your Honor, all the way to page

19  27, Your Honor.

08:57AM 20       Basically, we had -- in both motions, Your

21  Honor, we had addressed Apprendi.  And basically, we have

22  within both motions, Your Honor, we have addressed Ring,

23  Apprendi and Blakely.  I've just added some other cases

24  which the Court are -- are -- the words escape me, Your

08:57AM 25  Honor -- our basis for the motions, Your Honor, in that

1 there's some Supreme Court cases that deal with the issue

2 as to elements of the offense, Your Honor.

3         And we're asking that the Court look at those

4 issues as to the elements, Your Honor, since the Court of

08:57AM 5 Criminal Appeals overturned the conviction only as to

6 punishment, Your Honor.  And the Supreme Court has

7 addressed cases regarding the issue of elements, Your

8 Honor.

9         And there is a presumption that this element

08:57AM 10 should be presented in the first phase of the trial, Your

11 Honor.  And in failing to present the elements in the first

12 phase of the trial, Your Honor, the State has failed to

13 show that the case was a death penalty case.  It was just a

14 plain vanilla murder, Your Honor, because the issues were

08:58AM 15 not presented to the jury during the guilt or innocence of·

16 the case, Your Honor.  And by failing to present those

17 elements to the case, Your Honor, the State has failed its

18 burden of proof as to allowing this case to proceed as a

19 capital punishment case, Your Honor.

08:58AM 20         Within that section, Your Honor, I'm asking

21 that the double jeopardy clause prevents the State from

22 pursuing the case any further in this case, Your Honor,

23 since they failed to present the issues, the elements,

24 beyond a reasonable doubt, and they failed to prove those

08:58AM 25 elements beyond a reasonable doubt during the first phase,

1 Your Honor.  And thus the defendant has -- was actually

2 tried for the lesser offense of murder during the first

3 trial, Your Honor.

4          Does the Court wish me to be quiet while the

08:59AM 5 Court reads, Your Honor?

6          THE COURT:  No.  I'm listening to you and

7 looking through this.

8          MR. VELASQUEZ:  Okay.  I'm also requesting,

9 Your Honor, that with these cases that due process requires

08:59AM 10 that proof of all elements in a capital murder case

11 including at least one statutory circumstances, that

12 defendant receives the protections of the rules of evidence

13 and the presumption of innocence, Your Honor, regarding

14 those issues, Your Honor, since those elements are now part

09:00AM 15 of the case in chief, Your Honor.  The burden of proof has

16 now been raised higher by due process, Your Honor.

17          And then the last argument that I make, Your

18 Honor, is that since the case has been reversed by the

19 Court of Criminal Appeals, in effect the Court of Criminal

09:00AM 20 Appeals has failed to follow the law in that we are now

21 required to have a full trial before the jury and where the

22 elements of the case are presented to the jury during the

23 guilt or innocence case, Your Honor.  And since the Court

24 only granted a trial on just the punishment, Your Honor,

09:01AM 25 this trial should not go forward until we are actually

1   afforded a full trial on all -- on the whole case in chief,

2   Your Honor.  Since the State has failed in its burden of

3   proof are as to proving up elements during their case in

4   chief of the guilt or innocence of a capital murder case.

09:01AM  5          In effect, Your Honor, what we're stating is

6   that the first trial was actually a trial for a murder.  It

7   wasn't a trial for capital murder.  The elements that are

8   presented in the guilt -- in the penalty phase, mainly two,

9   the first two, Your Honor, are part of the elements of the

09:01AM 10  capital murder case Your Honor, and it should have been

11  presented during the first phase of the trial.

12          The first element usually is whether there's

13  going to be a danger.  And second element is whether he's a

14  party to the offense.  And the third element -- the third

09:01AM 15  issue, Your Honor, is what the jury should render a

16  decision and to whether there's mitigating evidence

17  regarding the defendant's life, Your Honor.

18          So in effect, Your Honor, by -- also we're

19  arguing that under both motions, Your Honor, the State

09:02AM 20  has -- during the first trial has failed to prove its case

21  beyond a reasonable doubt.  The statute in itself is

22  unconstitutional in that it didn't require the State to

23  prove its burden beyond a reasonable doubt as to the

24  elements that make this specifically a capital murder case

09:02AM 25  which is future dangerousness, Your Honor.

1          THE COURT:  Response?

2          MS. MERAZ:  Briefly, Your Honor.  Case law has

3 upheld all the Constitutional challenges he's making now.

4 The case was proven previously before on all the elements

09:02AM 5 that are required to be proven on a capital murder case.

6          And the case law is pretty clear that the two

7 questions that he's referring to the, future dangerousness

8 question and the mitigation issue, statutorily are

9 punishment issues.  They are not elements of the offense.

09:03AM 10 So there was no need for them to be presented nor proven in

11 the capital murder guilt phase of the trial.

12          The Court is correct in the way it has them

13 outlined in the charge.  The charge is following 37.071.

14 And those issues -- the first special issue and the second

09:03AM 15 special issue -- are issues that need only be proven during

16 the punishment phase of the trial.  So there is nothing

17 wrong with the way the charge is outlined.  The Court is

18 merely following 37.071 as it dictates.

19          Thank you, Your Honor.

09:03AM 20          THE COURT:  All right.  Your First Amended to

21 Declare 37.071, etcetera, Unconstitutional, and your First

22 Amended Motion to Find 37.071, what you have in there also

23 unconstitutional, those motions will be denied.

24          MR. VELASQUEZ:  These are your copies, Mr.

09:04AM 25 Velasquez.  I'll pick them up in a little while, Your

1 Honor.

2           THE COURT:  That's fine.

3           MR. VELASQUEZ:  Do you want me to address the

4 objections or do you want me to present our request for

09:04AM  5 jury charge, Your Honor?

6           THE COURT:  Well, first tell me what your

7 objections are.  Let's go with that first.

8           MR. VELASQUEZ:  I filed a -- I guess you don't

9 have a copy, Your Honor, also.

09:04AM 10           THE COURT:  I don't even -- haven't even seen

11 my clerk this morning, who knows better, who knows he or

12 she should be here.

13           MR. VELASQUEZ:  I saw saw them this morning,

14 Your Honor, and I told them this stuff needed to be in your

09:04AM 15 desk this morning, Your Honor.  I apologize.

16           THE COURT:  That's all right.  That's -- you

17 don't have any control over the clerk.  If I don't, then

18 you certainly don't either.

19           MR. VELASQUEZ:  Well, I was trying to let them

09:04AM 20 know that it was urgent that they present this to the Court

21 this morning, Your Honor.

22           I filed this this morning, Your Honor, but I

23 had given a copy to the State Saturday, Your Honor.  And

24 the body of the objections started on page three, Your

09:05AM 25 Honor.

Case 3:15-cv-00062-FM   Document 82-4   Filed 01/31/17   Page 12 of 142

1           THE COURT:  All right.  I'm there.  All right.

2  They are objecting to the language in order for the Court

3  to assess proper punishment.

4           Do you have a response to that?

09:05AM  5           MS. MERAZ:  Your Honor, I believe that's --

6  that's in the statute under 37.071.

7           (Brief pause)

8           MR. VELASQUEZ:  Your Honor, may I approach?  I

9  have two orders for the first two motions that the Court

09:06AM  10  heard this morning, Your Honor.

11           THE COURT:  Well, this Court did the best it

12  could to track the statute.  I cannot find it in 37.071.

13  The applicable code that applied at the time that the

14  offense was committed.

09:07AM  15           MR. VELASQUEZ:  Your Honor, if --

16           THE COURT:  So it looks like -- unless you can

17  find it somewhere in the statute -- that I'll just take it

18  out, and it will say -- I'll start with "it is necessary."

19           MS. MERAZ:  That's fine, Your Honor.

09:07AM  20           THE COURT:  So that will be granted.

21           MR. VELASQUEZ:  In effect, Your Honor, we'll

22  object to that, Your Honor.  We're actually asking for the

23  Court to say in order for the jury to assess proper

24  punishment, Your Honor, Cavo Versus Mississippi requires

09:07AM  25  that it be an individual decision of the jury in making a

1  decison as to the proper punishment, Your Honor.  And so we

2  would ask that the Court just remove -- in order for the

3  Court just add the jury or the jurors.  Actually.  The

4  jurors, Your Honor, because it's the jurors who have to

09:08AM 5  decide for themselves, Your Honor.

6              THE COURT:  That will be denied.  It is going

7  to start "it is necessary now you for you to determine."

8              MR. VELASQUEZ:  And we object to that

9  modification.

09:08AM 10              THE COURT:  That objection is overruled.

11              MR. VELASQUEZ:  Thank you, Your Honor.

12              THE COURT:  All right.  Now, you're also

13  object to a line or a few words somewhere in that sentence

14  as well.  You're objecting to determining, answering,

09:08AM 15  answers to certain questions.

16              MS. MERAZ:  If I may, I found that language on

17  37.071 Section 2(F).

18              THE COURT:  Okay.

19              MS. MERAZ:  It says the Court shall charge the

09:08AM 20  jury that in answering the issue -- that's the wording of

21  the statute.

22              THE COURT:  Well, that -- I don't know if

23  they're asking for it.  It says that I shall give it if

24  there is a written request from the attorney representing

09:09AM 25  the defendant.  Oh.  No.  You're saying 2(F).

1          MS. MERAZ:  Right.  On the following page,

2   Your Honor.  It says Section 2 and then there's A, B, C, D,

3   and there should be -- it's after the parole instruction.

4          THE COURT:  Oh, okay.  I thought you were -- I

09:09AM  5   thought you were going back to the other thing.

6          MS. MERAZ:  No.  I'm sorry.  I thought we were

7   on that question, question three.

8          THE COURT:  So you're saying that because I'm

9   telling them that they have to -- it is necessary for them

09:10AM 10   to determine the answers, that that is wrong,

11   unconstitutional?

12          MR. VELASQUEZ:  Yes, Your Honor.  Basically,

13   the -- the statute is requiring the jurors make a decision.

14   And like in everything else, Your Honor, they don't have to

09:10AM 15   make a decision.  The statute is clear that if the jurors

16   fail to render a decision, then the Court will

17   automatically set a life sentence, Your Honor.  And by

18   instructing them to answer the questions it's forcing them

19   to make an answer that they don't really have to answer.

09:10AM 20          THE COURT:  All right.  That objection is also

21   overruled.

22          MR. VELASQUEZ:  We need a -- we still haven't

23   addressed number two, Your Honor, but we're asking number

24   two is basically number for we're saying that --

09:10AM 25          THE COURT:  What?  I'm sorry.  You've totally

1 lost me.  Two is one and one is two?

2          MR. VELASQUEZ:  We never addressed number two,

3 Your Honor.  We immediately jumped to number three.

4          THE COURT:  That's also overruled.

09:11AM 5          MR. VELASQUEZ:  Okay.  Thank you, Your Honor.

6          THE COURT:  All right.  Your number four says

7 just because death is listed first that that means that

8 they have the find the death sentence?

9          MR. VELASQUEZ:  That's basically --

09:11AM 10          THE COURT:  Which I disagree with.  However, I

11 may consider just taking out the word mandatory and just

12 ahve it say "the punishment for the offense of capital

13 murder is."  Which is standard language in all other

14 criminal case in the State of Texas.

09:12AM 15          Any response from the State regarding that?

16          MS. MERAZ:  No.  If the Court wants to do

17 that, that's fine.  I believe that the way it's phrased

18 about death being listed first is the way it's in the

19 statute.  But if -- if the Court wants to take that word

09:12AM 20 out, mandatory, that -- that's fine.

21          THE COURT:  All right.  Well, I will remove

22 mandatory, and the remainder of the objection that you've

23 made is overruled as to number four.

24          Number five.  You don't want them to consider

09:12AM 25 all the evidence in the case?  You only want them to

1 consider certain portions of the evidence in the case in

2 five?

3           MR. VELASQUEZ:  It's not that, Your Honor.  By

4 saying all evidence, you're actually asking them to do a

09:13AM 5 general verdict, Your Honor, and this is not a general

6 verdict issue, Your Honor.  It's an individual verdict of

7 each individual juror, Your Honor.  And so the jurors can

8 decide whether they want to consider all the evidence, each

9 individual juror can decide whether they consider all the

09:13AM 10 evidence or not, Your Honor.  By saying you will consider

11 all the evidence as a group, you're telling them they have

12 to consider everything.

13           THE COURT:  So are you saying I should list

14 their names, each of you individually and list their names?

09:13AM 15           MR. VELASQUEZ:  No, Your Honor.  I'm --

16           THE COURT:  I mean -- just a minute.  Just a

17 minute.

18           MR. VELASQUEZ:  Yes, Your Honor.

19           THE COURT:  You're objecting to me telling

09:13AM 20 them to consider all of the evidence, but yet do you have

21 any request in here as to how it should be fixed or are you

22 just standing up to object to that part of it?

23           MR. VELASQUEZ:  Your Honor, if six follows

24 after that, we're still objecting.  We're asking that the

09:13AM 25 Court is doing that it's not setting forth a definition

1 regarding mitigation, Your Honor.  And so, you know, by,

2 you know, the Court saying that to consider all the

3 evidence and making it as a group decision instead of an

4 individual decision, Your Honor, you're asking -- basically

09:14AM 5 asking the jury to render a general verdict on special

6 issues that the -- that the statute is calling them to

7 answer, Your Honor.  And we're saying that this is not a

8 group of individuals sitting in judgment.  This is a group

9 of judges.

09:14AM 10          THE COURT:  Give me a minute.

11          (Recess taken)

12          (Open Court, defendant present)

13          THE COURT:  All right.  For the record, the

14 Court has added a set of instructions that the Court has

09:35AM 15 given on hundreds -- and as the lawyers tell me -- if not

16 thousands of other criminal cases, and that is my standard

17 concerning manner of deliberations which -- and I don't

18 have a copy of it -- have her print another one of what

19 I've just worked on.  Which I think will also assist you in

09:36AM 20 some of the gist of what I think you're asking for as far

21 as jurors determining the case for themselves, not giving

22 up their convictions and not going it by chance or lot or

23 any other method than by a full, fair and free expression

24 of their opinion.

09:36AM 25          MR. VELASQUEZ:  Yes, Your Honor.

1          THE COURT:  And so I think that's going to

2 assist you on that.

3          Now, we were on number -- four was granted in

4 that I took out mandatory, but the remainder stays on

09:36AM 5 there.

6          Number five, that is denied.  They're still

7 going to be ordered to consider all the evidence in the

8 case.

9          Number six is denied.  They are being told to

09:37AM 10 consider all the evidence in the case.  And as you will see

11 in that -- those new paragraphs that I added it tells them

12 that they are the ultimate triers of fact, and they weigh

13 the evidence and determine its value, no one else.  So that

14 six is denied.

09:37AM 15          Seven is in the Statute, 37.071.  And that is

16 under Section 2(D)1 where the statute dictates to me that I

17 shall instruct the jury about background, character,

18 etcetera that militates for or against the imposition of

19 the death penalty.  That's at the bottom of page one.  It

09:39AM 20 tracks the language of the statute.  So seven is denied.

21          MR. VELASQUEZ:  Your Honor, may I --

22          THE COURT:  All right.  You have also

23 complained that I have not defined in number eight the word

24 militates.  If you'll speak to that briefly please, why you

09:39AM 25 believe the statute needs to be changed and add a

1 definition of militate.

2          MR. VELASQUEZ: Well, Your Honor, actually,

3 the statute doesn't even allow for any definitions as to

4 any of the terms that are within the charge Your Honor.  It

09:39AM 5 doesn't allow for a definition for militate or mitigate.

6          And so we're just asking for definitions to

7 help the jury make their decision, Your Honor, by not

8 making a -- giving a definition as to militate it

9 doesn't -- won't allow the jury to decide issues that were

09:40AM 10 presented during the trial regarding the defendant's age,

11 sex, religion and other issues that, you know, we presented

12 during the case that would militate towards the decision of

13 the death penalty, Your Honor.

14          THE COURT: All right.  That would be a

09:40AM 15 comment by me on your evidence, and the Court is going to

16 deny that.

17          MR. VELASQUEZ: And so by not giving us a

18 definition I don't think the Court would be making comment

19 to just define what the -- what the word means, Your Honor.

09:40AM 20          THE COURT: I understand.  But that is denied.

21 I disagree with you on that.

22          MR. VELASQUEZ: Thank you, Your Honor.

23          THE COURT: All right.  On number nine, you're

24 also objecting to other mandatory language in 37.071.  This

09:41AM 25 one regarding the defendant's background or character or

1 the circumstances of the offense.  That you have set it out

2 very well in your objections to the charge that have been

3 filed.  So nine will be denied.

4          Okay.  Ten, you are objecting to me wording

09:41AM 5 the instructions the death option is always listed first.

6 I think I've heard this objection before, Mr. Gandara, in

7 one of your trials.

8          Go ahead.  Put something on the record real

9 quick about it, please.

09:41AM 10          MR. VELASQUEZ:  No, Your Honor.  Your Honor,

11 our motion speaks for itself, Your Honor.  If the Court

12 wants us to address it we'd be glad to address it.

13          THE COURT:  Okay.

14          MR. VELASQUEZ:  The Court has made its

09:41AM 15 decision.  I think our objections are well -- are

16 delineated in the motion, Your Honor, if the Court wants us

17 to argue them, we'll be glad to argue them.

18          THE COURT:  All right.  Number ten is also

19 denied.  Okay.

09:42AM 20          Eleven also deals with statutory language in

21 37.071.  That is denied.

22          And on number 12 I believe that is also in the

23 statute.  Is that correct?  From the State.

24          MS. MERAZ:  Yes, ma'am.  It's on Section

09:42AM 25 37.071 Section 2(D)3 that's mandatory.

1          THE COURT:  Okay.  There it is.  So that's

2 denied.

3          You are objecting to me not defining

4 reasonable doubt.  I'm going to deny that.  That's number

09:42AM 5 13.  Then your page skips to 15.  Looks like it missed a

6 14.  So the next one is 15.

7          MR. VELASQUEZ:  I'm sorry, Your Honor.

8          THE COURT:  15 is denied.  16 also deals with

9 statutory language, I believe.

09:43AM 10          MS. MERAZ:  I believe, Your Honor, that's in

11 Section 37.071 Section 2, Section F(4).

12          THE COURT:  That's correct.  So number 16 is

13 denied.  17, so you do not want the mere sentiment,

14 conjecture, sympathy, passion, prejudice, whatever, that

09:43AM 15 was in the last one?

16          MR. VELASQUEZ:  Your Honor, basically --

17          THE COURT:  And the reason -- let me explain

18 for the record.  The reason why it's in is that it was put

19 in at the behest of the attorney for the defendant at the

09:44AM 20 last trial.  So if you'd like it out, that's fine, I'll

21 take it out.  You want it out?

22          MS. MERAZ:  Your Honor, we're going to object

23 to it being taken out.  Under Prible V State, 175 SW 3rd

24 724, the anti sympathy charge is Constitutional, and it's

09:44AM 25 also appropriate, and it doesn't deny the jury considering

1 any mitigating fact, and so it is proper under the cases.

2          THE COURT:  Okay.  What say the defense after

3 consultation with each other?

4          MR. VELASQUEZ:  Can I have a minute, Your

09:44AM 5 Honor.

6          THE COURT:  You can have more consultation.

7          (Brief pause)

8          MR. VELASQUEZ:  Your Honor, on 17, on just the

9 list for the Court, to limit the admission is unlawful and

09:45AM 10 within the scope of mitigating evidence and circumstances

11 that jurors may consider in returning a life sentence.  So

12 the reason why we're objecting to that is to limit the

13 scope of the evidence that was presented on behalf of the

14 defendant, Your Honor.

09:45AM 15          THE COURT:  Okay.  So you want them to

16 consider that, sentiment, conjecture, sympathy, passion,

17 prejudice, public opinion, public feelings?

18          MR. VELASQUEZ:  No, we want it out, Your

19 Honor.

09:46AM 20          THE COURT:  But you want them to consider

21 that?

22          MR. VELASQUEZ:  Yes, Your Honor.

23          MS. MERAZ:  And if I may respond, the Court

24 held that anti sympathy charges are appropriate in that

09:46AM 25 they properly focus the jurors' attention on those factors

1  relating to the moral culpability of the defendant.  And

2  that's why they hold that the anti sympathy charge is

3  proper, Constitutional.

4            THE COURT:  And that case that you're citing

09:46AM  5  me to does it also have the language of their instruction

6  in there?

7            MR. VELASQUEZ:  Your Honor, I was just

8  corrected by -- by counsel in that in that we basically

9  want out of the instruction public opinion and public

09:46AM 10  feeling, Your Honor.

11            MS. MERAZ:  We have another case where it is

12  listed, Your Honor.

13            THE COURT:  You only want public opinion and

14  public feeling taken out?

09:47AM 15            MS. MERAZ:  There's two cases, and this one

16  has it listed out, Your Honor.

17            MR. GANDARA:  We'd like to modify number 17,

18  Your Honor, for the record.  Our objection to the charge

19  regarding the language where the Court instructs that the

09:47AM 20  jurors are not to be swayed by mere sentiment, conjecture,

21  sympathy, passion, prejudice public opinion and public

22  feeling.

23            We modify our objection to be limited to the

24  words sympathy is one of the one -- you know, Your Honor.

09:47AM 25  Excuse me.  I'm allowing myself to be confused by this

1 discussion. We withdraw objection number 17, for the

2 record. We withdraw.

3 THE COURT: Okay. Got it. 17 is withdrawn.

4 Okay. And you are also objecting in number 18 to the

09:48AM 5 parole instruction which is also required by 37.071. That

6 will be denied.

7 19 also deals with the parole instruction

8 which I have tracked the language in the statute. 19 is

9 denied.

09:48AM 10 MR. VELASQUEZ: Well, Your Honor, if we could

11 add something to it. Basically, we want other language

12 that appears in the -- usually on the regular criminal

13 cases, Your Honor. But eligibility for parole does not

14 guarantee parole will be granted. You are not to consider

09:49AM 15 the manner in which the parole law may apply to this

16 particular defendant, Your Honor.

17 MS. MERAZ: We have no objection to adding

18 that language, Your Honor.

19 THE COURT: Okay. I know I have it on the

09:49AM 20 computer. When we get in here remind me, we'll pull it

21 off -- those paragraphs off the computer and add it in

22 there for you.

23 MR. VELASQUEZ: Thank you, Your Honor.

24 THE COURT: All right. 20 you are objecting

09:49AM 25 that I'm not giving them the option of life without parole.

1    MR. VELASQUEZ:  Yes, Your Honor.

2    THE COURT:  That will also be denied.

3    MR. VELASQUEZ:  Your Honor --

4    THE COURT:  The Court's already heard evidence

09:49AM 5 by your parole expert regarding the fact that the

6 defendant -- and under the law as it stood at the time --

7 was eligible for parole within 40 years.  And he your

8 expert witness.  And there has also been some other

9 discussion by the defense about the 40 years.  So that

09:50AM 10 is -- 20 is denied.

11    MR. VELASQUEZ:  21, the Court has already

12 granted that, Your Honor.

13    THE COURT:  Okay.  All right.  All right.  And

14 I don't -- under 37.071 2(A) it says that I must charge the

09:50AM 15 jury if you-all have requested in writing, and -- and I

16 don't know if you-all have requested it.  2(A), 37.071

17 2(A).  Are you requesting that?  And even if you don't have

18 it in writing, the Court will consider it requested here on

19 the record if you tell me you want it.

09:51AM 20    MR. VELASQUEZ:  Your Honor, I apologize.  We

21 don't have the Code that was in existence at the time, Your

22 Honor.

23    THE COURT:  Right here.

24    MR. VELASQUEZ:  We do?

09:51AM 25    MS. PAYAN:  Yes.

1          MR. VELASQUEZ:  I'm sorry.  I've got it here,
2    Your Honor.
3          (Brief pause)
4          THE COURT:  I'm going to go work on the two
09:52AM  5    paragraphs you want while you're looking at that.
6          (Recess taken)
7          THE COURT:  Okay.  So that -- we're not on the
8    record.
9          (Off the record discussion)
10:01AM  10         THE COURT:  Number 19 is moot because it's
11   already in there.
12         MR. GANDARA:  And the only thing with regard
13   to number 19, Your Honor, is that we reserve our objection
14   to it essentially because it doesn't have the language that
10:01AM  15   we would ask for about stacked sentences.
16         THE COURT:  Right.  I understand.  Okay.  So
17   we've gone through basically the first part of your 20-page
18   objections to the charge.  Basically the remainder of your
19   objections is that you want me to define probability, a lot
10:02AM  20   of other things that you're asking for.
21         MR. VELASQUEZ:  Those are in the alternative,
22   Your Honor, one after the other.
23         THE COURT:  Okay.  Well, I'm -- I'm going to
24   deny the remainder of your objections to the charge that
10:02AM  25   are stated in this written objections to the charge.

1           Now, I understand that there are certain

2 things that you are going to ask the Court to put in here.

3           MR. VELASQUEZ:  Yes, Your Honor.

4           THE COURT:  If we can go to that, please.

10:02AM 5           MR. VELASQUEZ:  If I might direct the Court's

6 be attention to -- on page 20.  21 we did not address, Your

7 Honor.  And basically, we're asking for an instruction

8 that -- I don't know whether we have it in -- after we

9 added it, that the opinion of each juror should be

10:03AM 10 respected, no juror shall bully or harass or intimidate

11 another juror.

12           THE COURT:  That's in there in my manner of

13 deliberations that I told you-all I had added.

14           MR. GANDARA:  Yes.  And that's what I'm

10:03AM 15 saying.  I don't know whether it had --

16           THE COURT:  Well, I put it on the record that

17 I put it in there.

18           MR. VELASQUEZ:  Yes, Your Honor.  Thank you,

19 Your Honor.

10:03AM 20           THE COURT:  Not in your language, but in my

21 language.

22           MR. VELASQUEZ:  Yes, Your Honor.

23           THE COURT:  Okay.  Now, what are you asking

24 for to put in here that I have not put in?

10:03AM 25           MR. VELASQUEZ:  We're asking that the Court to

1 instruct the jury regarding the decision as an individual

2 decision, it's not a group decision, Your Honor.  And we

3 gave specific requests instructions regarding that, Your

4 Honor.

10:03AM 5                THE COURT:  Denied.

6                MR. VELASQUEZ:  Thank you.  We're also asking

7 for individual signature lines for each juror in returning

8 the verdict, Your Honor.

9                THE COURT:  Does the State have a response to

10:04AM 10 that?

11                MS. MERAZ:  I don't think they're entitled to

12 that, Your Honor.  I don't think it's a proper verdict

13 form.  I think you just need the -- the presiding juror's

14 signature, and that's it.

10:04AM 15                THE COURT:  That will be denied.

16                MR. VELASQUEZ:  We'd just like to be cite the

17 Court again to Caldwell Versus Mississippi and Williams

18 Versus Smith, Your Honor, which state that it's an

19 individual decision for each juror, Your Honor.

10:04AM 20                THE COURT:  Okay.

21                MR. VELASQUEZ:  Thank you, Your Honor.  We're

22 asking for an instruction regarding the Texas Department of

23 Criminal Justice, Your Honor.

24                THE COURT:  Stating what?

10:04AM 25                MR. VELASQUEZ:  That the Texas Department of

1 Criminal Justice is going do their duty regarding the

2 enforcement of the statutes that they're going to -- that

3 the prison system was properly designed, Your Honor.

4          THE COURT:  Wow, that's a big, broad statement

10:05AM 5 there that you're asking the Court to make.  That will be

6 denied.

7          MR. VELASQUEZ:  Okay.  It's in writing, Your

8 Honor.

9          THE COURT:  I understand.  I know you've got

10:05AM 10 them written and you've got them filed.

11          MR. VELASQUEZ:  I'm just trying to summarize

12 it, Your Honor.

13          THE COURT:  I -- I agree.

14          MR. VELASQUEZ:  Okay.  Again, Your Honor, the

10:05AM 15 Court has already addressed this, but just for protection

16 of the record, Your Honor, we're asking for an instruction

17 regarding the presumption that death is favored by the

18 statute, Your Honor.

19          THE COURT:  Denied.

10:05AM 20          MR. VELASQUEZ:  We're also asking for an

21 instruction to the jury regarding mitigating facts or

22 circumstances that must be considered in the jurors'

23 sentencing decision, instead of putting all the evidence.

24 We're asking that the Court replace all the evidence in

10:05AM 25 that all evidence -- all mitigating facts or circumstances

1 might be considered, Your Honor.

2   THE COURT:  Let me see that one, please.

3   As in this requested instruction, that will be

4 deny.

10:06AM 5   MR. VELASQUEZ:  Thank you, Your Honor.  We're

6 asking for a definition of probability, Your Honor, in the

7 alternative starting from 95 percent to 50 percent and

8 defining what probability means Your Honor.

9   THE COURT:  Denied.

10:07AM 10   MR. VELASQUEZ:  We're submitting a charge

11 regarding the stacking charge -- requesting a stacking

12 charge, Your Honor, in that the State has filed a motion to

13 stack the sentences from the prior two convictions, Your

14 Honor.  And we're asking the Court to advise the jury

10:07AM 15 regarding the effect of those two cases if the Court does

16 stack the sentence, Your Honor.

17   THE COURT:  Denied.

18   MR. VELASQUEZ:  Thank you, Your Honor.

19   We're asking -- well, the Court already denied

10:07AM 20 this, but we're asking the Court to instruct the jury on

21 life without parole, Your Honor.

22   THE COURT:  Denied.

23   MR. VELASQUEZ:  We're asking for an

24 instruction regarding parties, Your Honor.  That there is

10:07AM 25 other individuals were involved, Your Honor that was

Case 3:15-cv-00062-FM Document 82-4 Filed 01/31/17 Page 31 of 142

1 presented to the jury.

2           THE COURT:  Denied,

3           MR. VELASQUEZ:  Thank you, Your Honor.  We're

4 asking that the Court modify the instruction regarding the

10:08AM 5 right not to testify.  And I think it's more in a positive

6 terms, Your Honor, that the defendant has a Constitutional

7 right not to testify, Your Honor.

8           THE COURT:  Let me see what you have.

9           MS. MERAZ:  I think that's in the charge

10:08AM 10 already, Your Honor.

11           THE COURT:  Yes, it is but I think they're

12 asking me to reword it.  That's why I'm looking at their

13 motion.

14           (Brief pause)

10:08AM 15           THE COURT:  That is denied.

16           MR. VELASQUEZ:  Thank you, Your Honor.  We're

17 also asking for an instruction regarding residual doubt,

18 Your Honor, as a mitigating factor Your Honor.

19           THE COURT:  Let me see that one.  I don't know

10:09AM 20 what you mean by residual doubt.

21           MS. MERAZ:  I have some case law on that.

22           THE COURT:  Well, I need the motion first.

23           MS. MERAZ:  Yes, ma'am.

24           THE COURT:  Denied.

10:10AM 25           MR. VELASQUEZ:  Your Honor, we're asking the

1  Court to define continuing threat to society in that what

2  it means and doesn't mean, Your Honor, by adding

3  definitions to it, Your Honor.

4            THE COURT:  Denied.

10:10AM  5            MR. VELASQUEZ:  Thank you, Your Honor.  We're

6  asking for an application charge regarding reasonable in

7  the charge of the Court.  Although the Court of Criminal

8  Appeals has said that you're not entitled to an application

9  charge in the -- in the punishment phase, Your Honor.

10:10AM 10            But since this jury never heard the case

11  originally, Your Honor, it never received an application

12  charge that beyond a reasonable doubt should be applied.

13  And we're asking for the Court to provide an application

14  charge of how reasonable doubt ought to be applied in this

10:10AM 15  case, Your Honor.

16            THE COURT:  Denied.

17            MR. VELASQUEZ:  Thank you, Your Honor.  And

18  the Court has granted the manner of deliberations.  So

19  we're done, Your Honor.

10:10AM 20            THE COURT:  Okay.  We're going to make copies.

21  And let me see the lawyers in Chambers real quick, please.

22            MS. MERAZ:  Your Honor, if I could just put

23  something on the record.

24            THE COURT:  Yes.

10:11AM 25            MS. MERAZ:  The last time we were here,

1  Saturday, the defense offered an Exhibit, a judgment

2  revoking probation 159, Defendant's Exhibit 159, and the

3  Court had conditionally admitted it.  You told us to redact

4  it, and we did.  And so we're offering -- and we would like

10:11AM 5  to admit Defendant's Exhibit 159-A in place of Defendant's

6  Exhibit 159.

7            THE COURT:  Which is the redacted copy?

8            MS. MERAZ:  159-A is the redacted copy.

9            MS. PAYAN:  And, Your Honor, I have no

10:11AM 10  objection to that.  My concern is -- may I approach?

11            THE COURT:  Yes.  Come up.

12            MS. PAYAN:  My concern is 159-A with the

13  original language was a certified copy from the District

14  Clerk's office.  The way the -- the way the redactions have

10:12AM 15  been done, I guess it's just been whited out copied, the

16  page still reflect the seal of the District Clerk, and that

17  is not -- that document itself was not under seal.  It was

18  the original that was under seal.  And on the last page as

19  well language was redacted which has the seal of the

10:12AM 20  Court -- I mean the seal of the clerk's office.

21            MS. MERAZ:  I think the seal is on there.

22  We're not going to object to it being a copy obviously.

23            MS. PAYAN:  I have 159.

24            THE COURT:  Let's go in and talk about it

10:12AM 25  while we're making copies.

1                    (Recess taken)

2                    THE COURT:  All right.  So have you fixed the

3    exhibits?

4                    MS. MERAZ:  We have, Your Honor and the court

10:34AM 5    reporter now has it, 159-A, which we're substituting for

6    159.

7                    THE COURT:  All right.  Do you have another

8    motion to make, Mr. Gandara?

9                    MR. GANDARA:  Your Honor, with respect to the

10:35AM 10   exhibit, very briefly, that we would remind the Court that

11   we proffered and offered Exhibit 159 without redaction.  We

12   would like that one to go into evidence.  And I understand

13   the Court ruled -- sustained the State's objection and it

14   was going in as 159-A.  Is that the status?

10:35AM 15                   MR. ESPARZA:  It's my understanding that the

16   defense has reviewed 159-A.  They find it acceptable,

17   excluding the Judge's ruling of course.

18                   MR. GANDARA:  Except for the fact of the

19   redaction that we have --

10:36AM 20                   THE COURT:  Right.  All you are agreeing to is

21   it does comport with my order.  I know you object to my

22   order.

23                   MR. GANDARA:  Yes, Your Honor.

24                   THE COURT:  Anything else before we bring the

10:36AM 25   jury in?

1          MR. GANDARA:  Your Honor, I respectfully move

2 the Court to instruct the jury to answer no to the first

3 question regarding whether there's a probability that the

4 defendant will commit criminal acts of violence in the

10:36AM 5 future that would constitute a continuing threat to society

6 on the grounds that there is no evidence that has been

7 presented by the State to sustain that conclusion and to

8 offer any evidence on which the jury could possibly base a

9 verdict beyond a reasonable doubt for a yes answer to that

10:36AM 10 question.

11          Alternatively, we submit that there is

12 insufficient evidence as a matter of law on that first

13 issue, and the Court should instruct the jury to answer no

14 to that issue.  That's my motion.

10:36AM 15          THE COURT:  That will be denied.  All right.

16          When we bring the jury in, I'm going to ask

17 both sides whether or not they rest and close so that you

18 can do it in front of the jury.

19          I will explain to them that there have been a

10:37AM 20 few documents that have been admitted in evidence on

21 Saturday, correct, after they had recessed?  Is that right?

22          MR. GANDARA:  Correct, Your Honor.

23          MS. PAYAN:  Right.

24          THE COURT:  I will tell them that, and you

10:37AM 25 will rest and close in front of them.

1            MR. ESPARZA:  Your Honor, it's my

2 understanding that defense's in argument is going to

3 exhibit some of some of Dr. Cunningham's charts and graphs.

4 I have no objection to that.  But it's my understanding

10:37AM  5 just so the record is clear those were only entered for

6 demonstrative purposes and that they are not part of the

7 record in the sense of a piece of evidence.

8            MR. GANDARA:  We had offered them, Your Honor,

9 as a group, and we reoffer them now.  I don't recall

10:37AM 10 whether the Court made a ruling on that issue.  We reoffer

11 a hard copy of the doctor's Power Point presentation as

12 evidence in the summary of the expert witness's testimony.

13            THE COURT:  I do not recall you making the

14 offer.  And I do not have that as any numbered exhibit.

10:38AM 15 Wait a minute.  Wait a minute.

16            I -- yes.  I think you-all marked it as 122

17 Dr. Cunningham's Power Point.  No.  That was -- I sustained

18 the objection on that and I continue to sustain the

19 objection on that.  And as I recall, not -- the entire

10:39AM 20 Power Point was not shown to the jury.  Am I correct in

21 that, Mr. Gandara?

22            MR. GANDARA:  Well, Your Honor, the entire --

23 entire Power Point on the doctor's --

24            THE COURT:  Approach the Bench.

10:39AM 25            (At the Bench, on the record)

1    THE COURT:  My understanding is that he didn't
2  show any of the disturbed sexuality stuff because he didn't
3  testify to it.  Correct?

4    MR. GANDARA:  Exactly.  But I don't remember
10:39AM 5  if 122 consisted of both the risk assessment.  And the
6  developmental factors and the testimony that you're talking
7  about was in the developmental factors.  And he did indeed
8  change that.  In other words we -- we took that out.

9    THE COURT:  Right.  I understand.

10:39AM 10    MR. GANDARA:  Right.

11    THE COURT:  And I don't know what was in the
12  offer.  However, I'm going to sustain the objection as to
13  his Power Point.  He testified at length four and a half
14  hours about his findings, his studies, his Power Point, so
10:40AM 15  I'm going to sustain that objection.

16    MS. PAYAN:  And just to clarify, it's
17  irrelevant, but 122 is the motion for accumulation of
18  sentences.

19    THE COURT:  No.  122 -- let's see motion for
10:40AM 20  the accumulation was marked as -- I just saw it.  That was
21  144, and that is in your Bill of Exceptions.

22    MR. GANDARA:  It's as a Bill.

23    THE COURT:  In your bill of exceptions.

24    Now, I had it as 122 as his -- the State's 122
10:41AM 25  marked for identification when they were asking him.

1          MR. ESPARZA:  That's right.

2          MS. PAYAN:  Oh, State's 122.

3          THE COURT:  Not as Defendant's 122.

4          MR. GANDARA:  That's right.  That's why

10:41AM  5  we're --

6          THE COURT:  Okay.  In any event, that and his

7  study that you have marked as 123 to use for the -- his

8  testimony that is not admitted into evidence either.

9          MR. ESPARZA:  And I never offered it.

10:41AM  10          THE COURT:  Correct.  So are we good to go?

11          Bring the jury in.

12          MR. ESPARZA:  So we decided the charts, you

13  were using them, you're allowed to use them during

14  arguments?

10:41AM  15          THE COURT:  Yes he can use them during

16  argument.

17          MR. ESPARZA:  Okay.

18          THE COURT:  Now, I don't know if it was me or

19  someone else that walked off with -- probably me -- the

10:42AM  20  judgment adjudicating guilt on the DWI.  I don't have it in

21  your Bill of Exceptions.  I'm going to check my office to

22  make sure I have it.  But if I don't have it, we'll get

23  another copy, and I'll make sure it's in the Bill of

24  Exceptions.

10:42AM  25          MR. GANDARA:  Yes, Your Honor.

1          THE COURT:  Do you want me to keep anyone's

2 time or are you going to keep it for each other?

3          (Off the record discussion)

4          MR. ESPARZA:  Your Honor, would you give me a

10:42AM 5 warning at 25 minutes.

6          MS. PAYAN:  Judge, would you let me know when

7 I've used 30 minutes of the 45 minute one.

8          MR. ESPARZA:  Judge, we're breaking our time.

9 She'll have 40 minutes.  And then I'll take the remainder,

10:43AM 10 which is I believe 50.

11          THE COURT:  All right.

12          MR. ESPARZA:  If you'll give me a warning at

13 five as well.

14          THE COURT:  Yes.  Mr. Gandara, do you want

10:43AM 15 any?  Warning on your time.

16          MR. GANDARA:  Would you warn me, Your Honor,

17 ten minutes before you -- before you pull out the hook and

18 drag me off the stage.

19          (Recess taken)

10:50AM 20          (Open Court, defendant present, Jury is

21 present)

22          THE COURT:  Good morning, ladies and

23 gentlemen.

24          JURORS:  Good morning, Your Honor.

10:50AM 25          THE COURT:  All right.  There were some

1 Exhibits that were admitted into evidence Saturday after we

2 recessed.

3          Does the defense close?

4          MR. GANDARA:  We close, Your Honor.

10:50AM  5          THE COURT:  And does the State close?

6          MR. ESPARZA:  Yes, Your Honor, the State of

7 Texas closes.

8          THE COURT:  I guess I should have asked you if

9 you rested.

10:50AM 10          MR. GANDARA:  We rest and close, Your Honor.

11          MR. ESPARZA:  We close, Your Honor.

12          THE COURT:  All right.

13          So you have heard all of the evidence that is

14 to be presented in this case.  We have the charge ready for

10:50AM 15 you.

16          You have copies of the charge there.  I give

17 them to you so you may follow along and you may use those

18 to assist you in your deliberations when you go to the jury

19 room.  However the original has my signature on it, and it

10:50AM 20 is upon the original that you should place your verdict.

21 Does everyone have their reading glasses that needs them?

22          JUROR:  No.

23          THE COURT:  Okay.  Who needs their reading

24 glasses?  Okay.  Did you -- you don't have them?

10:51AM 25          JUROR:  I have them in the -- in the jury

room.

                THE COURT:  Okay.  The ones who need their
reading glasses, go ahead.  We'll let them go.  It's all
right.  You don't have to stand.  It's all right.  Juror
10:51AM  number four, do we need to find something --

                JUROR FOUR:  Longer arms.

                THE COURT:  Okay.  We can probably find some
if you need some.

                (Brief pause)

10:52AM                THE COURT:  Ladies and gentlemen of the jury,
after the attorneys have presented their summations, you
will go to the jury room, then you will -- then you will
select one of your members as your presiding juror.

                It shall be your Presiding Juror's duty to
10:52AM  preside over your discussions of and deliberations upon the
case and vote with you.

                In this case David Renteria has previously
been found guilty of capital murder as follows.  The jury
has found from the evidence beyond a reasonable doubt that
10:52AM  on or about the 18th day of November 2001 in El Paso
County, Texas, the defendant, David Renteria did then and
there intentionally or knowingly cause the death of an
individual namely, Alexandra Flores, by choking Alexandra
Flores about the neck by unknown means or by choking
10:52AM  Alexandra Flores about the neck with the defendant's hand,

Case 3:15-cv-00062-FM Document 82-4 Filed 01/31/17 Page 42 of 142

1 and the said Alexandra Flores was then and there an

2 individual younger than six years of age.

3      This case is now referred to you to determine

4 from all the evidence in the case the answers to certain

10:53AM 5 questions called special issues in this charge.

6      The Court instructs you in answering these

7 special issue as follows.

8      The punishment for the offense of capital

9 murder of which the defendant has been found guilty is

10:53AM 10 death or confinement in the Institutional Division of the

11 Texas Department of Criminal Justice for life.

12      You shall return a special verdict of yes or

13 no on special issue number one.

14      The State must prove special issue number one

10:53AM 15 beyond a reasonable doubt in order for you to return a

16 special verdict of yes to special issue number one.

17      In deliberating on special issue number one

18 you shall consider all the evidence presented in this case,

19 including evidence of the defendant's background or

10:54AM 20 character or the circumstances of the offense that

21 militates for or mitigates against the imposition of the

22 death penalty.

23      You may not answer special issue number one

24 yes unless you agree unanimously, and may not answer

10:54AM 25 special issue number one no unless ten or more jurors

agree.  Members of the jury need not agree particular --

excuse me -- on what particular evidence supports a a no

answer to special issue number one.

You are further instructed that you are not to

be swayed by mere sentiment, conjecture, sympathy, passion,

prejudice, public opinion or public feeling, in considering

all of the evidence before you and in answering the special

issue number one.

You are instructed that if you return a yes

answer to special issue number one, then, and only then,

are you to answer special issue number two.

You are instructed that in answering special

issue number two you shall answer the issue yes or no.  You

may not answer special issue number two no unless you agree

unanimously.  And you may not answer special issue number

two yes unless ten or more of you agree to do so.

You need not agree on what particular evidence

supports a yes on special issue number two.  In answering

special issue number two you shall consider mitigating

evidence to be evidence that a juror might regard as

reducing the defendant's moral blameworthiness.

You shall also consider all of the evidence,

including the circumstances of the offense, the defendant's

character and background and the personal moral culpability

of the defendant.

1          You are again instructed that you are not to

2    be swayed by mere sentiment, conjecture, sympathy, passion,

3    prejudice, public opinion or public feeling in considering

4    all of the evidence before you in answering special issue

10:56AM   5    number two.

6          You are instructed that if the jury answers

7    that a circumstance or circumstances warrant that a

8    sentence of life imprisonment rather than a death sentence

9    be imposed the Court will sentence the defendant to

10:56AM  10   imprisonment in the Institutional Division of the Texas

11   Department of Criminal Justice for life.

12         Under the law applicable in this case if the

13   defendant is sentenced to imprisonment in the Institutional

14   Division of the Texas Department of Criminal Justice for

10:56AM  15   life, the defendant will become eligible for release on

16   parole but not until the actual timed served by the

17   defendant equals 40 years without consideration of any

18   good-conduct time.

19         It cannot accurately be predicted how the

10:56AM  20   parole laws might be applied to this defendant if the

21   defendant is sentenced to a term of imprisonment for life

22   because the application of those laws will depend on

23   decisions made by prison and parole authorities.  But

24   eligibility for parole does not guarantee that parole will

10:57AM  25   be granted.

1          In arriving at the answers to the special
2   issues submitted it will not be proper for you to fix the
3   same by lot chance or any other method than by a full fair
4   and free exchange of the opinion of each individual juror.

10:57AM  5          The State as introduced evidence of extraneous
6   crimes or bad acts other than the one charged in the
7   indictment in this case.  This evidence was admitted only
8   for the purpose of assisting you, if it does, in
9   determining the proper punishment for the offense for which
10:57AM 10  you have found the defendant guilty.  You cannot consider
11  the testimony for any purpose unless you find and believe
12  beyond a reasonable doubt that the defendant committed such
13  other acts in, if any, were committed .

14          You are instructed the defendant may testify
10:58AM 15  in his own behalf, if he chooses to do so.  But if he
16  elects not to do so, that fact that cannot be taken by you
17  as a circumstance against him nor prejudice him in any way.

18          The defendant has elected not to testify in
19  the punishment stage of this trial.  And you are instructed
10:58AM 20  that you cannot and must not refer to or allude to that
21  fact throughout your deliberations or take it into
22  consideration for any purpose whatsoever.

23          After argument of counsel, you will retire and
24  consider your answers to the special issues submitted to
10:58AM 25  you.  It is the duty of your presiding juror to preside in

the jury room and vote with you on the answers to the
special issues submitted.

You are the exclusive judges of the facts
proved and the credibility of the witnesses and of the
weight to be given to their testimony, but you are bound to
receive the law from the Court as it is given to you, and
you are bound to be governed thereby.

You shall consider only the evidence and
exhibits presented here in the courtroom through the
witnesses who have testified. If you want to have the
exhibits with you in the jury room for your deliberations,
advise the Bailiff.

In deliberating on this case you shall not
talk to anyone except the members of the jury about it
until you have been finally discharged from service on this
jury.

Manner of deliberations. Jurors have a duty
to consult with one another to deliberate with a view of
reaching an agreement if it can be done without abrogating
individual judgment.

Each juror must decide the case for themselves
but only after an impartial consideration of the evidence
with their fellow jurors.

In the Court of deliberations a juror should
is not hesitate to reexamine their own views and change

1 their opinion if convinced it is erroneous.

2          No juror should surrender their honest
3 conviction as to the weight or effect of the evidence only
4 because of the opinion of fellow jurors or for the mere
11:00AM 5 purpose of returning a verdict.

6          The presiding juror or any other juror who
7 observes a violation of the Court's instructions shall
8 immediately warn the one who is violating the same and
9 caution the juror not to do so again.

11:00AM 10          In arriving at your verdict it will not be
11 proper to fix the same by lot, chance or any other method
12 than by a full fair and free exercise of the opinion of the
13 individual jurors under the evidence admitted before you.

14          If you want to communicate with the Court,
11:00AM 15 explain what you want in writing and deliver your message
16 signed by your presiding juror to the Bailiff who will
17 deliver it to the Court.  Do not orally explain to the
18 Bailiff what you want.

19          After you arrive at your verdict, you will
11:00AM 20 notified the Bailiff that you have reached your verdict.

21          The last pages are the special issue pages.

22          Special issue number one.

23          Do you find from the evidence beyond a
24 reasonable doubt that there is a probability that the
11:01AM 25 defendant David Renteria would commit criminal acts of

1 violence that would constitute a continuing threat to

2 society.  We, the jury, unanimously find and determine

3 beyond a reasonable doubt that the answer to this special

4 issue is yes.  Or we, the jury, because at least ten jurors

11:01AM 5 have a reasonable doubt as to the probability that the

6 defendant David Renteria would commit criminal acts of

7 violence that would constitute a continuing threat to

8 society determine that the answer to this special issue is

9 no.

11:01AM 10         In the event that the jury has answered

11 special issue number one yes, and only then, shall the jur

12 answer special issue number two to be found on the

13 following page.

14         Special issue number two.

11:01AM 15         Taking into consideration all of the evidence,

16 including the circumstances of the offense, the defendant's

17 character and background and the personal moral culpability

18 of the defendant, do you find that there is a sufficient

19 mitigating circumstance or circumstances to warrant that a

11:02AM 20 sentence of life imprisonment rather than a death sentence

21 be imposed.  We, the jury, unanimously find that the answer

22 to this special issue is no.  Or we, the jury, because at

23 least ten jurors find that there is a sufficient mitigating

24 circumstance or circumstances to warrant a sentence of life

11:02AM 25 imprisonment rather than a death sentence be imposed, find

1 that the answer to this special issue is yes.

2          After the jury has answered each of the

3 special issues under the conditions and instructions

4 outlined above the presiding juror should sign the verdict

11:02AM 5 form to be found below,.

6          We, the jury, return in open Court the above

7 answers to the special issues submitted to us and the same

8 is our verdict in this case.

9          Ms. Hughes, you may proceed.

10          MS. HUGHES:  Thank you, Your Honor.

11          Good morning.

12          JURORS:  Good morning.

13          MS. HUGHES:  We're at the point now where the

14 attorneys will have the opportunity to talk to you about

15 what they believe the evidence has shown.

16          The State, because we carry the burden of

17 proof, we'll begin that with me.  The defense will have the

18 opportunity to speak, and then Mr. Esparza will close the

19 closing arguments.

20          In this case we talked in voir dire with each

21 one of you individually how there's already been a finding,

22 there's already been a determination of guilt.  But if

23 you'll recall in opening statement you said you won't

24 necessarily have to rely on that because you will know from

25 the evidence that the defendant in this case is guilty.

1            The evidence that you heard during that first

2   week of trial showed you without any doubt of his guilt.

3            We started with the palmprint, a unique

4   identifier for each one of us.  My palmprint on my right

5   hand does not match my palmprint on my left hand.  It does

6   not match anybody else's palmprint.  It is unique to me.

7            Whose palmprint was on the bag burned on to

8   her head?  The defendant's.

9            You heard evidence of blood, blood that was

10  found inside the van.  Little tiny specks, tiny specks of

11  blood on the window, smears of blood on the seat in the

12  back of the defendant's van, the van that he left running,

13  keys inside of it at Wal-Mart, the van he opened with keys

14  when J. D. Trujillo saw him.

15           Inside that van is a one in 580 billion chance

16  that the victim's blood would be found, and that was the

17  lowest.  You remember hearing from the DNA expert at the

18  FBI, one in 580 billion.  And what does she say the world

19  population is?  Eight billion.

20           And if you take the higher threshold that they

21  now use it was one in a quadrillion or a quintillion chance

22  that Alexandra Flores' blood would be in that vehicle.

23           And what else do you have that helps you to

24  know that he is guilty?  We've got videos.  You've got

25  Wal-Mart, Sam's and 7-Eleven, three different videos that

1  show you he is guilty.

2           And why do you have a say on the video?  Why

3  does that matter?  Well, you heard from the defendant's

4  mother, yeah, I gave the Detective that receipt.  We did go

5  to Sam's that day.  And you saw in the Sam's video exactly

6  what David Renteria looks like, strikingly similar to

7  exactly what he looked like when he walked out of the

8  Wal-Mart store with Alexandra trailing behind him.

9           And then if that's not enough, we have the

10 7-Eleven video.  And the 7-Eleven video, why does that

11 matter?  Because he's identified.  He's identified by Nick

12 Coffman, that's David Renteria, and that's his statement.

13 The nine o'clock 7-Eleven video, that's him there.

14           So those are just high points in the evidence

15 that help you to know David Renteria is guilty of capital

16 murder.  That is not a decision that you have to make, but

17 you can rest assured it is the correct decision.

18           Now the issue for you is what the Court has

19 given you in these instructions and what we have discussed

20 in voir dire with each one of you individually, two

21 questions, two special issues.

22           And those two issues are what we discussed,

23 using this -- this very board in voir dire, with the

24 different considerations for you.

25           First of all, whether there's a probability

1 the defendant would commit criminal acts of violence that
2 constitute a continuing threat to society.  And if you
3 determine that the the answer to this is yes, and if all of
4 you determine that the answer is yes, and you're convinced
5 beyond a reasonable doubt, then you go to number two.
6           The heart of question number two is right
7 here.  Is there a sufficient mitigating circumstance or
8 circumstances to warrant that a sentence of life sentence
9 in prison rather than a death sentence should be imposed.
10 Is there a reason.  Is there an excuse.  Is there something
11 that makes me think this person deserves life instead of
12 death.  And the Court instructs you what to consider in
13 answering these issues.
14           If you look on the first page at that very
15 bottom paragraph, the Court tells you:  In deliberating on
16 special issue number one you shall consider all the
17 evidence presented in this case, and it outlines what it
18 projects, the defendant's background, character, the
19 circumstances of the offense.
20           Now, what is the evidence?  What is the
21 evidence in the case?   Well, if you look on page three, it
22 talks about in the second to the last paragraph you are the
23 exclusive judges of the facts proved, of the credibility of
24 the witnesses.  The witnesses and the exhibits are the
25 evidence.  The witnesses and the exhibits are the evidence.

1          So what you need to do, what I would suggest,

2 select your foreperson when you go back there, ask for all

3 of the exhibits, everything that was admitted

4 demonstratively you are allowed to have.

5          Witnesses.  You decide whether you believe a

6 witness or not, and you decide how much of each witness's

7 testimony you believe.  You can believe all, part or none

8 because you are the exclusive judges of the facts proved

9 and the credibility of the witnesses.  That is your

10 determination.  The next paragraph, the second sentence

11 says if you want to have the exhibits with you in the jury

12 room for your deliberations advise the Bailiff.  Ask for

13 them, and you will -- you will be given those exhibits.

14          Now, in looking at special issue number two

15 you consider all of the evidence.  And on page number two

16 in the middle of the page there's a discussion about what

17 mitigating means.

18          Mitigating evidence.  In answering special

19 issue number two you shall consider mitigating evidence to

20 be evidence that a juror might regard as reducing the

21 defendant's moral blameworthiness.  That's the definition

22 that you get.  Anything that is not defined in here you use

23 your reason and your common sense to determine the meaning

24 that it has.

25          Then on page three, the second full paragraph,

1 the second sentence, discusses the extraneous offenses.

2 Extraneous offenses or other bad acts, other things that he

3 has done, that you've heard testimony about.  It would

4 include witnesses like Erica McDonald, Sonia Hayes, Hayes

5 Security, the probation officers about all the times he

6 violated his probation.

7                This paragraph tells you you can consider

8 those things, and you should consider those things, in

9 determining what the answer to these two questions are.

10 You can consider them if you believe that they have been

11 proven beyond a reasonable doubt.

12                Now, in looking at these two special issues

13 the Court instructs you in these instructions -- and we're

14 just going to talk about it for a minute -- in order to

15 answer special issue number one yes, this person is likely

16 to be a future danger, all 12 jurors must agree.  The

17 alternates will not be in the jury room at that time.  All

18 12 jurors must agree.

19                In order to answer special issue number one

20 no, it only takes ten jurors to agree.  If the jury answers

21 number one yes -- and this is all in the instructions; this

22 is just an over view -- if you answer number one yes, then

23 you would go to number two.

24                In order for the jury to answer number two no,

25 there's no reason this person deserves to live, all 12 must

1  agree.  In order to answer it yes, there is a mitigating

2  circumstance, there is something that makes me think this

3  person deserves life instead of death, in order to say yes,

4  only ten must agree.

5          That's what the Court has outlined in the

6  instructions that you have before you and that you will

7  have in the jury room.  So let's look at that.

8          The first issue is there a probability that

9  the defendant would commit criminal acts of violence that

10 would constitute a continuing threat to society.  Is he

11 likely to be a future danger.  That's the first issue.

12          Well, society in this question is not defined

13 in your charge.  And so what that means is you decide what

14 that means to you.  What does society mean to you.  You'll

15 recall in voir dire there were suggestions that it can

16 include a prison environment, but it also includes and can

17 include the free world, inside and outside.

18          Well, let's start with outside.  Do you know

19 beyond a reasonable doubt that he is a future danger if he

20 is outside of a prison setting?  You know from the

21 evidence.  You know from his character.  You know from the

22 defense's own witnesses.  Absolutely.  This is a horrible

23 crime.  He is absolutely a future danger if he is on the

24 outside.

25          So do you know beyond a reasonable doubt that

1  he is a future danger?  Yes.  But let's look at it.  Let's

2  go one step further.  His character doesn't change.  Look

3  at all of the evidence.  Look at the 15 years that you have

4  of witnesses who can talk about him who are not his friends

5  and who are not his family, slightly more objective

6  witnesses.  And what do they tell you about him?  They tell

7  you his character.

8              And what else tells you his character?  His

9  own actions.

10              And so let's look at that.  If he's a danger

11 in the free world, if that is his character -- and his own

12 expert said that -- does that change when he goes into

13 prison?  No.  And we're going to explore it.  But no.  He

14 is still a danger.  He is still a danger.  All prison does

15 is limit the opportunity, limit the victim pool.  It

16 doesn't change his character.

17              So let's look at his actions and let's look at

18 his words, and let's see what has happened since 1992.

19 Because that's the first time time we come in contact with

20 David Renteria through the criminal justice system.

21              1992, he's out partying.  He goes by an

22 acquaintence's home, finds a seven year old little girl

23 there, takes advantage of that opportunity, has her

24 sexually touch him, he sexually touches her.  He unclothes

25 her.  He tries to penetrate her.  He then decides he'll

just enjoy himself in front of her and ejaculates.  What
did he tell her?  Don't tell anybody.  What else does he
tell her?  His name is Bobby.

Now, a year and a half or so later, after that
incident in 1992, what happened?  In 1994 he pleads guilty
to indecency with a child.  He pleads guilty to what
occurred in that bathroom in 1992.  And why did he plead
guilty?  Well, you heard from his sister.  You heard from
his sister.  What did she say as to why he pled guilty?
Because he was told if you don't take the probation you're
going to prison.  He doesn't want to go to prison.  He will
avoid prison.  So what does he do?  I did it.  Because he
knows he's guilty.  And if he forces it, he's looking at
prison.  So he pleads guilty.

And then what happens?  Then he's on
probation.  And on probation, not even eight months later,
he's in with Norma Reed.  We're in September of '94.  And
what does he do?  No, I really wasn't.  I was there, and I
was even in the bathroom, and I asked for some toilet
paper, but I didn't do it.  Okay.

So Ms. Reed continues with him for several
months.  And at what point does he again acknowledge that
he committed indecency with a child?  Well, let's look at
that.  He acknowledges that he committed that indecency
when Norma Reed puts it in his face and says, look, I will

1 no longer continue therapy with you if you continue to deny

2 it.

3          Now, sex offender therapy treatment is a

4 condition of his probation.  It is a term that the Court

5 has said you will do this.  If he doesn't do it, he's

6 violating his terms and conditions of probation and is

7 subject to going to prison.  He's subject to a consequence.

8          So what does he do?  In April of '95, what

9 does he do?  I did this.  I did this.  And that pattern,

10 that little window of his life continues for the next 15

11 years on probation.  He does whatever he wants, and he says

12 whatever he has to.  The lies, the tricks, the

13 manipulation, the conning and the deceit.  His actions tell

14 you one thing.  His words tell you something else.  He does

15 what he has to do to get by.  He says what he is supposed

16 to say.

17          On probation he's drinking, he's driving, he's

18 around children.  And what happens?  He's given chance

19 after chance after chance.  And what does he say?  Another

20 little snippet into his mindset.  What does he say?  In '98

21 when his family is being evicted and his father is losing

22 his job and all these things are happening.  I am

23 financially responsible for my family.  I had to work so I

24 couldn't do anything else.

25          Contrast that with what his very own mother

1 said on the stand.  Did you need his help when your husband

2 lost his job?  No, we were fine.  Did you need his help

3 when you got evicted?  He moved into the apartment and we

4 waited.  Because it sounds good to say my dad lost his job

5 and I had to help.  But that's not the truth.

6          Look to the actions.  Look at the truth

7 despite what he's doing.  Because is probation going to

8 help him?  They're giving him whatever treatment they can,

9 whatever he qualifies for.  Sex offenders therapy

10 treatment, substance abuse treatment, electronic monitor,

11 admonishments.  They're going through everything they can

12 to help him.  And what does he do?  He consistently makes

13 the wrong choice.  And he consistently gives excuses for

14 that.

15          Is he capable of doing what he's supposed to

16 do?  Yes.  You know that from the history you heard of his

17 upbringing.  He knows right from wrong.  And he's very

18 capable of doing exactly what he is supposed to do.

19          The question is do you trust him.  Do you

20 trust him.  Not his words.  You know you can't trust those.

21 Do you trust his actions?

22          And what does his family say about this

23 probation?  Their words were the indecency probation

24 wrecked his life.  Wrecked his life.

25          Well, let's look at his life because they tell

1 you about it.  And you heard from friends and family.  And
2 they all tell you about his life up to 1992 and 1994.  They
3 tell you what kind of person he was.  They tell you every
4 opportunity and chance that he's had to do the right thing.
5 He was smart.  He was bright.  He was articulate.  He was
6 intelligent.

7           His mother and father remain married to this
8 day.  He had both parents at home.  His mother stayed at
9 home.  Was at his school all the time.  His father worked
10 nights so he could take David and his sister to all their
11 extra curricular activities, to the Explorers, to the
12 various activities that they were engaged in.

13           He excelled in school.  He went to private
14 school.  He took a trip to Rome.  He had every advantage.
15 He probably had more advantages than you-all did growing
16 up, certainly more than some of us did.  Every advantage,
17 every opportunity to be a successful, contributing member
18 of our society.

19           And what does he do?  Throws it away.  Why
20 does he do that?  Well, look at it.  He had an
21 uncontrollable desire.  He had an uncontrollable urge.  And
22 he thought he'd get away with it in 1992, but he didn't.

23           Now, once he's on probation, does the system
24 just throw him away, does the system say, well, you
25 committed this horrible act, and so we're going to just

1  discard you?   No.

2          You heard the testimony of three different

3  probation officers, and you heard the testimony of Norma

4  Reed.  They did everything in their power, everything that

5  they could do to help him.

6          And what was the most important thing?  What

7  did -- Martha Cortez, the last probation officer, what did

8  she tell you was the most important thing for him to do?

9  To do the sex offender treatment program.  We'll even pay.

10 So you don't have to pay.  We will take care of it so that

11 you learn this.

12         And what are they teaching?  What is Norma

13 Reed trying to accomplish here?  Because this is crucial.

14 Is there anywhere in these goals that talks about changing

15 his desires or changing his urges?  No.

16         In fact, what it talks about is look at what

17 caused the behavior and figure out how to avoid those

18 situations.  And you heard Norma Reed say avoid people or

19 places or circumstances where you're likely to not be able

20 to control yourself.  And why did Norma Reed do that?  Why

21 isn't she trying to change his desire, change his urge?

22 Because you can't.  You don't change the character.  It

23 remains the same.

24         So what do they do?  They do the same thing

25 that Mr. Aubuchon from TDC talked about.  Okay?  Well,

1 let's see if we can try to to change his behavior and
2 modify that, by him taking control of that himself, and
3 when he doesn't, we'll put him in prison.

4             And what does TDC do?  What does prison do?
5 We will try to control his environment since he obviously
6 can't control it himself.  We will try to limit his
7 opportunity.

8             And look at everything that probation went
9 through.  The probation officer admonishes him.  The Judge
10 admonishes him.  He's placed on electronic monitor.  He's
11 given the cognitive skills class.  And remember what that
12 was.  The cognitive skills is the class that is supposed to
13 help him understand the choices that you make have
14 consequences.  There are consequences to your actions.

15            They go further.  They had him on the repeat
16 offender program.  Twice.  They put him in a lockdown
17 facility called ISF, the Intermediate Sanction Facility.
18 They had him subject to a curfew.  They had him reporting.
19 They had him going to the CADAT class, which is an
20 intensive substance abuse treatment.

21            They have done everything.  Everything.  They
22 even shocked him, sent him to prison for a little while.
23 And what does he do?  He makes excuses.  Well, you're not
24 doing this and I've got this and my family and my this and
25 my that.  He makes the excuses of life.  That's just life.

1  We all have our stressors.

2              Those are not excuses.  And you heard it from

3  their own expert.  None of that, none of that, excuses what

4  he did.  It cannot always be someone else's fault.  It

5  cannot always be someone else's responsibility.

6              Let's look at what he -- his actions and his

7  words.  In April of 1995 the defendant has been on

8  probation for about a year, a little over.  That's the

9  point in which, you remember, Norma Reed said he finally

10 admitted, because I brought it to the State, you're out of

11 here if you don't start working on it.  Fine.

12             It is also the time, oddly enough, that he

13 completes the cognitive skills class, the cognitive skills

14 class which helps him understand, okay, I need to watch

15 what I'm doing here.  I need to be careful about what I'm

16 doing because there are consequences to what I'm doing.

17             Okay.  What happens one month later?  May of

18 '95, first arrest for DWI.  Okay.  That's his actions.

19 Drinking and driving.  That's his choice.  What are his

20 words?  Huh.  And you can find it in the record.  I was

21 going to my friend's house to borrow money for my sex

22 offender treatment program, and I had a beer.

23             Well, what is that?  That's another excuse.

24 It's someone else's fault.  I have to have this money for

25 this counseling that I don't really need, and so that's why

1 he's there, and that's why he has a DWI.  No.  You're

2 smarter than that, tremendously smarter than that.

3               What does probation do?  They continue.  What

4 does he do?  Nine months later, February of '96, another

5 DWI.  At this point probation says okay, you're a problem,

6 and we're going to put you in a lockdown facility called

7 the Intermediate Sanction Facility.  And in that facility

8 he has intensive eight hour a day counseling and therapy

9 that he's going through.  It does not include the sex

10 offender counseling, but all the other issues that he's

11 got.

12               And then what does he do when he gets out of

13 ISF?  Drinks, drives, party, marries a girl named Anabuela,

14 picks up another DWI in 2000.  At that point probation has

15 said we've had enough, we can't do any more.  We have done

16 everything we can, everything we can.

17               So what happens?  He's given another chance.

18 Mr. Renteria, we're not going to revoke you and send you to

19 prison on the conviction itself.  But here's what I'm going

20 to do.  I'm going to send you to prison for a few months so

21 that you get a taste of what that's like.  He has another

22 chance to figure out this is not what I want to do.

23               Now, he's not there for a long time.  He's

24 there for a couple of months, probably in general

25 population, but nothing like serving a longer sentence.

1  His time there.  He gets out in early 2001 after his couple

2  of months there, early 2001.  Within a year Alexandra is

3  dead.

4              So what you see from all this are all the

5  chances and the opportunities that he had to make it work,

6  to do the right thing.  And you know from his background he

7  has intellectual ability, he has the network and the

8  support that he needs from his family and friends to get

9  through that.  He didn't do that.  He consistently chooses

10 the wrong thing.

11             And so when you look at that, when you look at

12 what his family -- probation wrecked his life.  No.  Who

13 wrecked his life?  He wrecked his life by the choices he

14 made, by the actions he took.  And his downward spiral that

15 I'm sure you'll hear about is because of his conduct, his

16 actions and his choices.  Don't be fooled or tricked into

17 thinking that someone else is responsible for what he has

18 done.  He consistently made the wrong choice.

19             So we've outlined -- hitting the high

20 points -- his character, who he is as of November 18, 2001.

21 You see all the opportunity.  You see all the potential.

22 You see all the choices.  You have all of that leading up

23 to November 18th of 2001.

24             So let's look at that.  And then we talked

25 about this.  Look and count in your mind all the

1 opportunities he had to do the right thing.  There's
2 hundreds, if not thousands, of chances for him to say I'm
3 stopping and I'm going to do the right thing.  He doesn't
4 take a single one of them.

5 What does he do November 18th, 2001?  Well, we
6 know he goes to the 7-Eleven about noon to buy some bread.
7 We know he goes to Sam's with some family members where he
8 buys some oranges.

9 We know that he goes to Wal-Mart.  We see him
10 coming in.  And when we see him coming in, you'll recall
11 from the testimony and from the evidence and the video he
12 comes in the west entrance.  That's where he comes in.
13 Because where does he park his van?

14 Well, let's look at that.  He parks his van
15 over here by the gas station.  So it makes sense that when
16 he goes in he goes in this door, the west entrance.  And
17 why does that make sense that that's where he's parking
18 because what's he there for?  Is he there for food or
19 general merchandise or he's there for chile.  That's what
20 everyone said, food.  Food comes in here.

21 Now when is the next time that we see him?
22 What does the video show you?  The videos shows you he's
23 exiting.  And it's on this exhibit, State's Exhibit 32.  He
24 exits the store the first time at about 5:07.  And he's
25 exiting way over here at the east entrance when his van is

1 way over here by the gas station.

2          And what does he have in his hands?  Look at

3 the video.  He's got a bag in his hand, like he's bought

4 something.  Where do you buy things?  Well, you buy things

5 here where the registers are.

6          And where is Alexandra?  She's here and she's

7 here playing in the store in her little red dress before he

8 walks past her.  And let's remember this.  The video.

9 Remember, the cameras are each different.  The times on

10 them are different.  From two to 12 minutes variance.

11          So what you have in that exhibit, State's

12 Exhibit 38, the video, you have them in order as David

13 Montes determines understanding the differences in the

14 time.  So one video might say 5:07, and the video before it

15 might say 5:11.  But based on his research at the time that

16 is chronologically in order.

17          And what else does David Montes tell you?  He

18 tells you that this camera, camera A, is consistent within

19 itself.  So if this says he left at 5:07 and he came back

20 in at 5:13, he was gone for seven minutes.  And it says --

21 because it's all this camera, camera A, if he goes out at

22 5:15, then he was in the store for two minutes and 20

23 seconds.  That's how you know that, because of this camera

24 right here.  Look at the video and you'll see, and these

25 times are on that video.

1          What does he do when he leaves?  First of all,
2  he's leaving out of an exit that's the furthest away from
3  his -- his van.  He goes up to the van, and there's someone
4  there, and that someone has written down his license plate
5  number.  He didn't count on that.  Wrote down his license
6  plate number.  Talked to her.  And how did he get into the
7  van?  She said with a key.  He used a key to get into the
8  van that was running, and there's a key inside.

9          And what does he do?  She says she sees him
10 getting in and standing on the little step there and she
11 leaves.  And where does she go?  Where does she go?  Well,
12 she says I come up over here, the east entrance, over here.

13         And where do we next see him?  Where do we
14 next see him on the video?  Coming in through the east
15 entrance.  What does he do when he -- before he comes in?
16 He goes over to her, shakes her hand and says thank you for
17 not towing my van.  I forgot something.  I'll be right
18 back.

19         Well, you know that he knows exactly what he's
20 going into that store for.  Because he's only there for 140
21 seconds.  You know he's already made up his mind.  He's
22 already made the choice, and he's taking the action.

23         Now, every step that he took in that walk to
24 get back inside that store was a chance for him to stop and
25 to make the right choice.  And you look at it, two minutes

1 and 30 seconds to make that walk.  Every step, every second

2 is another chance for Alexandra to live.  But he doesn't.

3 And he's so bold.  He goes up to the security guard and

4 shakes her hand.  That's how bold he is.

5       And what does he do inside the store?  Well,

6 you remember from the video he walked in, and then you see

7 him go back and, oh, I better get a cart.  He grabs a cart.

8 And look at the video.  Look at this video right here on F.

9 Look at the video at this podium.  There's never anything

10 in his cart.

11       And you'll see, it takes about 30 seconds to

12 go from the entrance to here.  We see him here, and he goes

13 off screen.  And what do we see?  We see her walk by.  Then

14 about five, ten seconds later you see him walk by pushing

15 an empty cart.

16       And the next thing we see he's leaving with

17 her.  He's not touching her.  He doesn't have a hand on

18 her.  He's not talking to her.  He's just walking out.

19       How many opportunities are there in that two

20 minutes and 20 seconds?  And then what does he have to do?

21 He has to get her all the way across that parking lot.  He

22 has to get to his van, open the van, get her inside and

23 shut the door.  And what did --

24       THE COURT:  Giving you a warning on the 35

25 minutes.

1          MS. HUGHES:  Thank you.  And what did he do
2  inside?  He moved her 15 miles away.  He gives her an
3  orange.  He takes off her clothes.  He strangles her.  He
4  puts a bag over her head.  He puts her out in the parking
5  lot, pours gasoline on her and lights it.  How many chances
6  does he have?  How many more chances?
7          Now, what does he do after that?  What does he
8  do after that?  Well, he needed a beer, so he goes to the
9  7-Eleven.
10          Fifteen years from -- from right now you have
11  to look at his life.  He has seven years of being on
12  probation, of people trying everything they can to help him
13  make the right choices.  He had a background that he
14  cognitively could make those decisions.  And does he?  No.
15          So let's look at him.  Because the crucial
16  analysis here, he doesn't have to kill her.  Take her for
17  whatever you're taking her for, but let her live.  But why
18  let her live?  Because the last time he did it wrecked his
19  life.  He had to go on probation.  He had to be held
20  accountable.  That won't happen again.  Because he will
21  destroy the evidence.
22          And what is the evidence?  Alexandra.  He's
23  done with her.  He doesn't need her anymore.  And he
24  destroyed her.  Not realizing the little teeny, tiny pieces
25  that were left behind.

1          So that is his character.  And that is what
2 makes him so dangerous.  If you're willing to kill an
3 innocent five year old little girl you're willing to do
4 just about anything whether you're in prison or you're in
5 the free world.
6          So if you look at it, where does he go to
7 receive a life sentence?  He goes to prison.  How is he
8 housed?  In general population.  What is his
9 classification?  G 3.  Does G 3 mean he never works?  No.
10 He works on G 3 even during those first ten years.  But
11 after those ten years he has more access to more areas, if
12 he -- if he maintains good discipline.  Has to maintain
13 good discipline?  Yes.  Have other escapees maintained good
14 discipline?  Yes.  Can you guarantee that he will be in
15 prison?  No.  Are you willing to risk another victim?  His
16 dangerousness has not changed simply because he is in
17 prison.
18          You know, you are in a position much like
19 Norma Reed was in in June of '01.  What does she say?  June
20 18th of '01 I didn't see this coming.  I would never have
21 predicted it.  What does she say on November 29th of '01?
22 Doesn't know he did it.  But we asked her did you think he
23 would?  No, I didn't.  Never saw it coming.
24          Even after he's arrested what did she say?  I
25 checked my records.  I had them verified.  Could not see it

1 coming.  And she does one more thing.  Remember what it's

2 called, a static 99.  She does it afterwards.  He's already

3 committed the offense.  He's already been arrested. I did

4 this actuarial study.  Very much like what Dr. Cunningham

5 talked about.  An actuarial study.  And there was a 10.2

6 chance that he would reoffend, that -- that he would be

7 violent.  10.2 percent chance.  But what does that

8 translate into?  A 100 percent reality.  There's your

9 probability.  10.2 chance that he would do this.  In

10 retrospect. She's looking backwards, and that's all she

11 gets.  And he did it.  You know he did it.

12           Now, defense wants to say there's mitigation.

13 So let's talk about the second issue.

14           MS. HUGHES:  What's my time, Judge?

15           THE COURT:  Well, you only asked for a warning

16 on the 35 minutes.  I've already given that.

17           MS. HUGHES:  Okay.  If you get to number two,

18 you find he's a future danger.  We've proven that beyond a

19 reasonable doubt.  All 12 of you should be able to answer

20 this yes.

21           You go to number two.  What's the mitigation?

22 What is the circumstance that makes you think he deserves

23 life instead of death.  Well, they say it's alcohol and

24 domestic violence.  It's his background.  That's what they

25 say.  And you'll have the charge.  A different charge about

1 probation, where the marital problems, the economic, the

2 financial, all of those things.

3          What did their own expert tell you?  Does

4 alcohol or domestic violence excuse this offense?  No.

5 Nothing excuses this offense.  Nothing.  There is no

6 mitigation.

7          And the fact that the defendant has friends

8 and family members who are good, decent people, who are

9 willing to come in here and testify on his behalf.  In the

10 representation of how good they are, it has nothing to do

11 with what he is.  Nothing.  They are good in spite of him.

12 He does not get points for that mitigation because that is

13 not mitigation.  It does not reduce his moral

14 blameworthiness.  Nothing does.

15          You heard it from their own experts.  So you

16 know beyond a reasonable doubt from the evidence, from his

17 actions.  Because see, the position you're in is different

18 than Norma Reed.  Norma had words, whatever he wanted to

19 say, whatever lie he wanted to tell.  I'm not around

20 children.  I'm not drinking.  I'm not driving.  Whatever he

21 said.  You have actions.

22          Don't be tricked.  Don't be conned.  Don't be

23 misled.  His actions tell you he has proven to me beyond a

24 reasonable doubt that there is a probability that he will

25 commit criminal acts of violence that constitute a

1  continuing threat to society.

2           And so in your charge you would answer that

3  question yes.  And here's how it works.  Yes, on number

4  one.

5           Then you go to number two.  There is no

6  mitigation.  None.  And you would answer that no.  And this

7  is how it works.  And then you sign the last one.  The

8  foreperson signs the last one.  The only just sentence in

9  this case is an answer of yes to number one and an answer

10  of no to number two.

11           Thank you.

12           THE COURT:  Ms. Payan.

13           MS. PAYAN:  May I proceed, Your Honor?

14           THE COURT:  Yes, you may.

11:50AM 15           MS. PAYAN:  May it please the Court?  Mr.

16  Gandara, Mr. Velasquez, Ms. Meraz, Ms. Hughes, Mr. Esparza.

17           Ms. Malpass, Mr. Rivera, Mr. Harton, Mr.

18  Thomas, Mr. Williams, Ms. Castricone,  Mr. Micaletti, Ms.

19  Bradley, Mr. Dowling, Mr. Martinez, Mr. Watley, Ms.

11:51AM 20  Sanchez, Ms. Heimer and Mr. Solis, good morning.  Good

21  morning.  Thank you for all your time and all your patience

22  throughout the past two weeks.  And thank you for the time

23  and patience you showed us months ago when we first began

24  this long process of the jury selection, the individual

11:51AM 25  voir dire.

1   You have now received the charge from the

2  Court.  And the State has gone over this.  And this is the

3  law.  This is the law that you were charged to follow.

4   And you are now instructed, as jurors, to go

11:52AM 5  back into that jury room to deliberate.  And you are to

6  deliberate as a jury, but each one of you -- each one of

7  you is an individual person, and each one of you is an

8  individual juror and each one of you is called upon to use

9  your own reason, your own common sense, everything you use

11:52AM 10  in your daily lives, your personal lives, your careers, to

11  make decisions.

12   You're called upon to use your values, your

13  beliefs and your own moral judgment.  And you're asked to

14  deliberate.  You're asked to give full consideration of the

11:53AM 15  evidence, of the exhibits, of the testimony.  But no where

16  in this charge does it say you are called upon to argue

17  debate or go into heated discussions.

18   Page four sets out the manner of

19  deliberations.  And it tells you you have a duty to consult

11:53AM 20  with one another.  You have the duty to deliberate with the

21  view of reaching an agreement, if it can be done without

22  abrogating individual judgment.

23   And the fourth paragraph, E, no juror should

24  surrender their honest conviction as to the weight or

11:53AM 25  effects of evidence only because of the opinion of fellow

1  jurors or for the mere purpose of returning a verdict.

2          You have a difficult task ahead of you, but

3  you are entitled to use your own judgment.  And some of you

4  may think you're entirely here completely random, but it's

11:54AM 5  not.  It may seem random in the beginning when you got

6  called in from the -- by the county and the voter

7  registration and the driver's license rolls.  But, if you

8  recall, depending on which day you came, there were two

9  different days.  And there were probably at least 250 other

11:54AM 10  people there.

11          So out of a total of 500 people, the 12 -- 14

12  of you remain.  And you are here because you were chosen to

13  be the most fair, the most impartial.  And there was a

14  question you were asked, a very important question, in

11:54AM 15  individual voir dire.  You were asked -- and at the time it

16  was a hypothetical -- but you were asked assume,

17  hypothetically, under the circumstances in which someone

18  had killed a child under six intentionally and knowingly --

19  and that meant that was an objective desire, a conscious

11:54AM 20  decision to cause that result -- caused the death of a

21  child under six, what are your views regarding the death

22  penalty.  And all of you, all of you sitting here today

23  said you could keep that open mind.  You had no

24  predisposition one way or another.  And you took an oath as

11:55AM 25  a juror to keep that open mind throughout the evidence.  I

1 call upon you to remember that oath and to analyze and

2 assess the evidence fairly.

3         And at the time you didn't know the facts.

4 You did it with a hypothetical. You didn't know any

11:55AM 5 details. Some of you had heard more than others, a little

6 bit in the media, but you didn't know exactly how that

7 child had been killed. Back then you didn't know she had

8 been strangled.

9         But yet the question itself that very question

11:55AM 10 implied and assumed something horrible and tragic had

11 happened. You already knew a child had been killed. And

12 yet in your own mind, whatever it was you fathomed at that

13 moment as to why or how, in your own mind, you said you

14 could be fair. And nothing, nothing, with regard to that

11:56AM 15 has changed. The fact that you now know how that child was

16 killed has not changed how you can be fair.

17         You were also asked knowing, hypothetically,

18 that a child under six had been killed, that you can hold

19 the State to its burden of proof. You can hold the State

11:56AM 20 to prove to you as a juror based on evidence beyond a

21 reasonable doubt, beyond a reasonable doubt, whether there

22 was a probability that the defendant would commit criminal

23 acts violence that would constitute a continuing threat to

24 society, and you-all said that you would. You need to hold

11:56AM 25 that -- the State to that burden. Not that they proved to

1 you that there's a possibility, not that they proved to you

2 the mere speculation, not whatever fear tactics they're

3 instilling, none of that answers yes.

4          Beyond a reasonable doubt.  And that is your

11:57AM 5 duty.  And that is in your charge, page one, second to the

6 last paragraph.  The State must prove special issue number

7 one beyond a reasonable doubt in order for you to return a

8 special verdict of yes to special issue number one.

9          But before the State gets yes, they have to

11:57AM 10 convince 12 of you, 12 of you, beyond a reasonable doubt.

11 Regardless of what the facts would be you, took the oath to

12 oath to hold the State to that burden.

13          Now, the facts of this case are horrible.

14 We've heard a lot about them.  On November 18th, 2001 a

11:58AM 15 horrible, horrible tragic offense happened.  A young girl

16 was kidnapped from a Wal-Mart.  She was taken from her

17 family.  She was killed.  She was suffocated.  And after,

18 after that, her body was burned.

19          And I am not here, nor Mr. Gandara nor Mr.

11:58AM 20 Velasquez, to minimize that.  That was a tragic offense.

21 But as tragic as it was, as horrible as it was, whatever

22 emotion that brings in all of us, anger, confusion, sorrow,

23 fear, indignation, all those emotions, that does not answer

24 question number one yes.  And I would ask that you put

11:58AM 25 those emotions aside.

1          All of us here have had to face that and have
2  had time and have been dealing with this a lot longer.  You
3  as a jury have only heard about this over approximately two
4  weeks.  But again, those emotions are not evidence.

11:59AM  5          And as horrible as the pictures are, as
6  horrible as the picture is of Alexandra's burned body, and
7  as horrible as that fact is, the emotions that that brings
8  upon you is not evidence.  I call upon you to separate that
9  and look at the evidence and look at the facts and listen
11:59AM 10  to the testimony.

11          With regards to the facts, with regard to what
12  facts are going to help you answer this question that the
13  defendant will continue to commit criminal acts of violence
14  that constitute a continuing threat to society, well, the
11:59AM 15  facts of a capital murder, those facts do not answer that
16  question.  You heard that from Dr. Mark Cunningham, the
17  forensic psychologist, and with regard to prison and what
18  we call a risk assessment.

19          And essentially, each one much you as a juror,
12:00PM 20  each one of you, must now make your own risk assessment.
21  Each one of you have to analyze the risk in order to answer
22  that question.  And as much as the State tries to ask Dr.
23  Cunningham about the facts of the offense and Dr. Aubishon
24  about the facts of the offense and how important those
12:00PM 25  matters in terms of risk and confrontation, the answer is

1  no.  Dr. Cunningham said the seriousness of the offense

2  that gets you sent to prison is not a connection.  It is

3  not a connection with how you're going to behave in

4  society, in a prison society.

12:00PM 5         It is not undisputed that David Renteria will

6  live the rest of his life and will die in prison.  Mark

7  Cunningham also said the severity of the offense is not a

8  good predictor of prison adjustment.

9         And then you heard from Mr. Frank Aubishon.

12:01PM 10  He came down from the Texas Department of Criminal Justice

11  Institutional Division.  That's the prison system.  He just

12  retired about four months ago.  And he worked in that

13  system for 26 and a half years, six and a half years as a

14  guard and the other 20 in classification.  He works for

12:01PM 15  worked for the governmental entity that is charged, that is

16  charged, with incarcerating people and protecting society

17  and making sure that prisoners stay inside the prison.  And

18  they do that by the classification.  And it's a very

19  elaborate process.

12:01PM 20         But the bottom line was -- and Mr. Aubishon

21  told us -- the facts are not that important in

22  classification.  A classification determines what level

23  security you're going to be in.  You're classified as G-3,

24  G-4, a G-5 and are you going to live in level 5 housing.

12:02PM 25  And we heard that David Renteria will be G-3.  And he'll be

1 subjected to level 5.  Then again, as horrible as the

2 underlying crime is, those facts don't matter to this

3 extent -- I'm going to give you an example.

4          Mr. Aubishon told us classification is based

12:02PM 5 on how long your sentence is.  The underlying sentence.

6 So, for example, you can have somebody go to prison on a

7 non violent offense, say, a drug offense and get a sentence

8 of 60 years.  And then you could have somebody go to prison

9 on a violent offense, a murder, sentenced to 30 years.  And

12:02PM 10 who's going to be classified higher?  Who's going to be

11 classified G-3?  The drug offender, the non violent person.

12 That's how non relevant the facts are on that level.

13          And with the prison system, that's the system

14 they use and the factors they use in making their own risk

12:03PM 15 assessment.  I submit to you on this level the facts don't

16 support that answer here.

17          And with regards to Mr. Renteria, Mr. Aubishon

18 told you, he told you clearly, he's not dangerous in prison

19 and, in fact, his concerns were that Mr. Renteria's life is

12:03PM 20 at risk in prison.  He made it clear the prison system can

21 handle David Renteria.  So to state the mere possibility

22 the mere speculation that maybe one day David Renteria will

23 be G-3 out working and escape.  And they bring you examples

24 of other escapees.  The statistics don't bear that out.

12:03PM 25          And the mere possibility -- the mere

1 speculation based on fear is not evidence. That is not

2 evidence. That does not prove number one beyond a

3 reasonable doubt.

4        Mr. Aubishon told us the prison system will

12:04PM 5 have David Renteria because of two things, two things don't

6 exist in prison. Children and alcohol don't exist in

7 prison.

8        Well, let's talk about David Renteria's past

9 and his probation records. We've been through his

12:04PM 10 probation file extensively, and we've talked about Norma

11 Reed extensively. And the issue of whether or not he had

12 denied the original offense on which he was on probation,

13 the indecency with a child. We've been over extensively.

14        And this is where he told us clearly, denial

12:05PM 15 is irrelevant to whether or not somebody is going to

16 reoffend. Denial is irrelevant with regard recidivism.

17 And, in fact, if you look at her records and her records

18 were provided to you by the State and their exhibits we

19 went through how many times he denied. And I prepared a

12:05PM 20 summary in that defense ehibit, and you can look at the

21 summary.

22        But I want you look at the records. I want

23 you to look at Norma Reed's records and the probatin file

24 records for yourself. He admitted. He admitted

12:05PM 25 approximately at least 95 percent of those times. So over

1 the course of his probation he came to admit the offense.

2 And over the course of his probation he reached level four

3 of his treatment.  He reached maintenance.  And he

4 completed ROPE classes.  He did do some positive things.

12:06PM 5 But yet the State only wants to look at the negative.  Now

6 they want to look to what he didn't do, how he reoffended,

7 how he has curfew violations, how he wasn't paying money,

8 how he wasn't attending all his meetings.

9          Well, no, he wasn't a perfect probationer.

12:06PM 10 Essentially, ultimately he failed at probation.  That is

11 not the issue before us today.  Probation isn't an option.

12 We've gone beyond that now.  And Dr. Cunningham made that

13 very clear.  You cannot compare his behavior on probation

14 to how he's going to behave in prison.  And prison is the

12:06PM 15 society in which he is going to live for the rest of his

16 life.  You can only compare one's actions into the future

17 within the same environment.  It has to be apples to

18 apples, oranges to oranges.

19          Mark Cunningham said comparing his behavior on

12:07PM 20 probation to how he's going to adapt, how he's not going to

21 be a risk in prison, it doesn't cross over.  Look at the

22 problems he had on probation.  And again, we talked about

23 that a lot.  See for yourself.  Look for yourself in those

24 files.

12:07PM 25          Alcohol.  Alcohol is clearly a problem in this

1 person's life.  It's been a continuing problem in his life.

2 He had financial problems.  He had problems with his

3 family.  And yes, Ms. Renteria said they could manage.

4 She's a proud woman.  She's a humble woman.  But she did

12:07PM 5 also say David helped support that family.  They all helped

6 each other.  He was also having marital problems.

7        There exists in those probation files

8 essentially a biography somebody's life.  And even David

9 Renteria admitted -- and it's in the probation records --

12:08PM 10 July 28, 1998.  That for him be personally his red flags

11 were alcohol and financial hardship.  And that echoed --

12 that echoed what Mr. Aubishon said.  There is no alcohol in

13 prison.  He will not have a rep in prison.  He will not

14 continue to commit criminal acts of violence that

12:08PM 15 constitute a threat to prison society in prison.

16        Then Mr. Renteria was placed with Norma Reed.

17 Norma Reed made the mistake and did a 10.2 percent on the

18 Static-99, to become a hundred percent.  Again, that is in

19 the outside world.  We cannot compare the free world to a

12:09PM 20 prison society.  We have to compare apples to apples and

21 oranges to oranges.  And in prison there is no alcohol.

22 There are no children.  There is no financial hardship.

23        What Cunningham said, we make more decisions

24 by ten o'clock every morning than somebody in prison is

12:09PM 25 going to make within a given day.  You cannot compare his

1 behavior in the free world when assessing your risk

2 assessment, in special issue number one, and the evidence

3 points to no, he is not a continuing threat.

4            And then the State brings you what we refer to

12:10PM 5 as the extraneous offenses.  In addition to the probation

6 issue, they bring you three people.  They bring Erica

7 McDonald.  And she comes to testify live.  And she was the

8 complaining witness in the 1992 indecency.

9            Well, the judgments were already admitted.  We

12:10PM 10 already knew he was on probation for that offense.  We

11 already know he had pled guilty.  We've been hearing about

12 it.  Bringing her to testify before you did nothing,

13 nothing in a significant and relevant manner of whether or

14 not David Renteria can constitute a continuing threat to

12:10PM 15 society.  And she told her story about what happened, 15

16 years later she tells her story.  And she embellishes that

17 story.  Because what she told us in the courtroom today was

18 not what was in that police report.  And furthermore, her

19 memory is so clouded by time she couldn't even identify

12:11PM 20 David Renteria.  The testimony of Erica McDonald brought

21 nothing new and gave you no relevant or significant

22 information to answer these questions.  All it did was add

23 to cloud the issues and prejudice the client.

24            They also brought Kay Sotero.  She was the

12:11PM 25 mother of the three year old little boy at the Poki Roni.

1 She didn't tell us anything we didn't already know either.

2 That's in the probation files. And we covered that

3 extensively. So again, that evidence, and again, all in

4 behavior was in the outside world, not in the prison world.

12:11PM 5      And then they bring in Sonia Hayes. And I

6 would ask that you look at the charge on page three.

7 There's an instruction regarding evidence of extraneous

8 crimes. And you're asked to not consider the testimony for

9 any purpose unless you finally believe beyond a reasonable

12:12PM 10 doubt that the defendant committed such other acts, if any

11 were committed.

12      And I would ask that you completely disregard

13 the testimony of Sonia Hayes because she offered absolutely

14 nothing. She told us the story about she was a co-worker

12:12PM 15 and David Renteria had been calling her and she'd been

16 talking to him, and then they were at a work function and

17 she was talking to somebody else and and Mr. Renteria makes

18 a comment to her, if I can't have you nobody else can. She

19 said she was scared. She doesn't leave El Paso. She stuck

12:12PM 20 around. She stuck around for a while. And there was no

21 evidence, no evidence whatsoever that he threatened her,

22 that he threatened her with any violence, that he attempted

23 to harm her, that he push her, that he acted aggressively

24 towards her in any way. Her testimony in this matter is

12:13PM 25 completely relevant.

1    So again, with regard to Erica McDonald and

2  the probation files none of that provides the answers of

3  the evidence to be able to answer special issue number one

4  yes.

12:13PM 5    The evidence that was brought to you, the

6  evidence that was brought to you in all of these prison

7  records.  And there's a big stack admitted by the State,

8  State's Exhibits 240, 244, 245 and so on.  And I'm going to

9  ask you look through those prison records and the jail

12:13PM 10  records and those submitted excerpts.  All of these

11  exhibits, Exhibit 137-A, 160, 161 came out of those

12  records.  And Exhibit 138 is a summary of those records.

13  And everything in those records show he has had excellent.

14  Excellent behavior in prison.  He has had no disciplinary

12:14PM 15  behavior whatsoever.

16    Defendant's Exhibit 160 goes back three

17  months, six months, one year, two years, three years, zero,

18  zero, zero, zero, staff assaults, assault with weapon,

19  infinite.  Nothing.  The whole time he was on death row

12:14PM 20  nothing.  The whole time he was in El Paso County Detention

21  Facility, El Paso County jail as for back as 2001.

22  Nothing.  His behavior in the prison environment predicts

23  his future behavior.  His behavior while incarcerated

24  predicts if he's going to continue to commit criminal acts

12:14PM 25  of violence that would constitute a continuing threat to

1 society, to prison society.  Apples to apples, oranges to

2 oranges.  And the only factual evidence you have -- we have

3 the numbers right there.  Objective.  These are objective

4 records from TDC.  All of those, this whole pile shows that

12:15PM 5 the answer to this question -- the answer to this questions

6 is no.  There's nothing in there that even remotely

7 suggests he's going to have any kind of offenses in prison.

8               Well, the State doesn't like that evidence.

9 It's their own evidence.  They put red stickers on that.

12:15PM 10 They're going to say well, it was only because of his

11 environment, that he's not in that environment.  So what.

12 Again, speculation.  And speculation is not evidence.  And

13 speculation is not beyond a reasonable doubt.

14               And don't forget he was in that prison

12:16PM 15 environment before when he went to general population and

16 he did shock.  And he had no disciplinary history from them

17 either.  And then there was just a lot, well, he's just

18 manipulating the system.  He's smart.

19               One, I'd like to point out, I've never heard

12:16PM 20 of a situation in which having intelligence, in which

21 having a skill and having smarts and reasoning is a

22 liability.  But all of a sudden it is.  He's smart.  He

23 knows he has an appeal rating.  He thought he was being

24 good because of the appeal.  Well, again, that's all pure

12:17PM 25 speculation and speculation is not evidence.

1        But even Mr. Aubishon said about the prison

2  system, we don't care why they're behaving, we just want

3  them to behave.  And, in fact, the sentences are built into

4  the prison system so that they'll behave, basic positive

5  reinforcement.  That's how people treat small children.

6        If you go to church or to dinner with a small,

7  unruly, squiggly, squalling, squirming four or five year

8  old, and you tell that child, if you behave, if you sit

9  there and behave at dinner over the next two, two and a

10  half hours, when it's over, we'll go buy some ice cream, or

11  when it's over, you'll get to go home and watch your

12  favorite movie.  And that's how they behave.  What matters

13  is the child behaves.  And that's how the prison system is

14  set up.  They're given incentives so that they will behave.

15  They're given incentives such as commissaries, what they

16  can have in their cell, personal property, visitation, all

17  of those things that we will behave.

18        And again, his jail, all his records of

19  incarceration show that November of 2001, over six and a

20  half years he had nothing but exemplary behavior.  In fact,

21  frank Aubishon said he found surprising.  He found it

22  surprising that there was nothing in that disciplinary

23  record.

24        THE COURT:  Your 30 minute warning.

25        MS. PAYAN:  Now, with regard to this next

1  issue, special issue number two.  When we went through the

2  voir dire and you were asked another question.  You were

3  asked assume someone has been convicted of capital murder

4  of causing the death of a child under six.  And assume that

12:19PM  5  you, the jury, have found that he was going to continue to

6  commit criminal acts of violence, can you -- what are your

7  views then regarding the death penalty.  And you-all said

8  you could keep an open mind.  You could keep an open mind

9  to what we call mitigation and give it its full effect.

12:19PM 10  And you are held to that oath today.

11              And again, this question is differentwith you

12  don't have to each agree on the exact mitigating factor.

13  Mitigation can be anything, anything you feel answers this

14  question, that's mitigation for you.  The circumstances of

12:19PM 15  the offense, his character, his background.  It says

16  including.  It does not say not limited to.  And under the

17  law, even mercy is considered a mitigating factor.

18              And so again, you are called upon him to look

19  at this for yourself.

12:20PM 20              You heard the story of David Renteria's

21  background and his family and his history.  He did grow up

22  with two parents.  He grew up going to good schools.  He

23  made good grades.  He had opportunity.  But again, there

24  were two sides to that story.  He was fun on that outside

12:20PM 25  but underneath there were problems.  Underneath there was

1 domestic violence and things going on with the family.  And
2 didnt bring that to you.  And I want to make this clear, we
3 did not bring that to you as an excuse for what happened.
4 That is not an excuse for causing the death of a little
12:20PM 5 girl.  Mitigation does not mean excuse.

6          We bring that to you only so you understand a
7 little bit more about this person.  And no, Eva Renteria
8 did not come and tell this jury about all those years she
9 suffered.  She talked to Mark Cunningham about it.  And no,
12:21PM 10 there were no police reports or CPS reports and no records
11 at the shelter.  But I'd ask you consider who tat witness
12 is.  Look at who she is.

13          She was an older woman.  She was from Mexico.
14 Ninth grade education.  She comes to live here.  No family.
12:21PM 15 I think we're all familiar enough with the pattern of
16 family violence to know that's part of the problem.  People
17 don't report it.  And so at this stage in her life, she
18 wasn't going to come in front of 12, 14 people and talk
19 about the shame she's experienced her whole life.  And that
12:22PM 20 is consistent.  And within that, she did the best she could
21 for her son.

22          And the best person that talked about David's
23 life was his sister.  She talks about what he was like
24 before he was placed on probation.  And she talked about
12:22PM 25 probation changed his life.  I know, it is a downward

1  spiral.  She talked about how David changed his life.

2  Whether he should have or shouldn't have known what the

3  ultimate consequences were going to be of being put on

4  probation.  What's important is it changed everything.  The

12:22PM 5  alcohol and the drinking.  And he couldn't hold a job.

6          Again, all that falls into place, and all that

7  shows he's got these problems, he's under stresses, these

8  are his red flags these things do not exist in prison.

9          And then we brought you more witnesses,

12:23PM 10 character witnesses, former teachers, somebody he had gone

11 to school with, people who he volunteered with, and they

12 all told you he was respectful, he was never aggressive, he

13 never even showed any signs, any signs of aggression or

14 violence, he was respectful towards his teachers, toward

12:23PM 15 his family.

16          And all those people came before you to tell

17 you what they knew about David Renteria.  David comes to

18 testify in a co-worker's DWI trial or in a best friend's

19 possession trial.  They all knew that David Renteria had

12:23PM 20 been convicted of capital murder, of killing a child under

21 six years old.  That they came in this courtroom to speak

22 on his behalf.  Because they believed that that was the

23 right thing to do, because they believe in the value of

24 life.  They believe in the value of David's life.

12:24PM 25          Now, Dr. Cunningham also talked about low risk

traits, traits that are going to help him in prison, his

age, his education, his community involvement.  We've

talked about, the Police Explorers.  He volunteered.  He

helped give clothes and food drives at Thanksgiving.

12:24PM 5          All these things, all these things can be

taken into account when you're looking at mitigating

factors.  And all those are are taken into account when

you're looking at how well and how he's going to succeed in

the prison environment.

12:24PM 10          The law as it stands -- and what we called

before the Legislative scheme gives these two questions.

The law presumes life even in a case in which somebodyhas

killed somebody and which somebody has been found guilty of

capital murder.  The law presumes life.

12:25PM 15          MR. ESPARZA:  Your Honor, I'm going to object.

I don't believe that's what the law is.  The law is what it

is, and it's an improper and a misstatement of the law.

18          THE COURT:  Sustained.  The the laws that you

are to consider is in the charge.

12:25PM 20          MS. PAYAN:  Not every person who is convicted

of murders, not every person who is convicted of capital

murder receives the death penalty.  Only in those cases in

which these two questions are answered, only in those cases

in which question number one is answered beyond a

12:25PM 25 reasonable doubt.  And don't forget how high that standard

1  is.   That standard is just as high as the standard that is

2  required to prove somebody guilty in a Court of law.

3            Do not underestimate that that standard

4  because he's already been guilty because we're already

12:25PM 5  here.   Don't think that this is just a simple inquiry.

6  Beyond a reasonable doubt is the standard, the highest that

7  we have.

8            And even if -- even if that question is

9  answered yes, the laws put a second hurdle, a second hurdle

12:26PM 10 before the life of someone who is killed can be taken, and

11 that seconds hurdle is a mitigating circumstance.   That

12 second hurdle says, yes, even though we think this person

13 is going to continue to commit acts or violence in the

14 future for whatever reason, their background, their

12:26PM 15 character, mercy, whatever it is, that person will not get

16 the death penalty.

17            Finally, please, focus on the evidence.   Don't

18 be dissuaded or sent off in different directions by what

19 could happen, by the possibility maybe somebody is

12:26PM 20 innocent, maybe somebody's going to get out.   That's not

21 going to happen.   The evidence is clear on that and the

22 evidence has not been countered on that.

23            Fear and possibility are not beyond a

24 reasonable doubt.   Evidence is.   Those prison files, that

12:27PM 25 is all the evidence you need to answer that question no.

And failed opportunities.  Yes, David Renteria had many,
many opportunities on probation, and he did take advantage
of them.  They were failed.  They were missed.  They were
wasted.  Again, failed and missed opportunities do not
provide the answer to that question.  That is not what the
question is about.

The question is is there a probability that
the defendant would commit criminal acts of violence that
would constitute a continuing threat to society.  The
society he will live in for the rest of his life.  And the
answer based on the evidence that we brought before you has
to be no.

THE COURT:  Finished?

MS. PAYAN:  Yes.  Thank you, Your Honor.

THE COURT:  All right.  Let's take a very
short break.  Do not discuss the case.  Leave your charges
here on your seat.

(Recess taken)

(Open Court, defendant present, jury is
present)

THE COURT:  You may proceed.

MR. GANDARA:  May it please the Court?

THE COURT:  Yes, sir.

MR. GANDARA:  Members of the jury, co-counsel,
Mr. Renteria.

1          Why do we have a death penalty?  Well, we have

2 a death penalty because of retribution.  We have the notion

3 that killing a killer is somehow proportional or

4 symmetrical to something else.

12:43PM  5          We have a death penalty because we want to

6 prevent a murderer from murdering again.  We want to punish

7 him for something he hasn't done yet.  We have it because

8 we have a delusional belief that it serves as a deterrent

9 to other people that are going to commit capital murder.

12:43PM 10 So a guy is thinking while he kills a police officer in the

11 line of duty, well, I wonder if they're going to give me

12 the death penalty over this.

13          And we a death penalty because of plain old

14 tradition.  Death by stoning has been around forever.

12:43PM 15 Drowning people, making them walk the plank.  That's a

16 death penalty, hanging, cutting off their heads with a

17 sword.  Some of the Middle Age kings would stretch them out

18 and pull their joints, and then they'd stick a hook in

19 their abdomen and walk them down the block with their

12:44PM 20 intestines, and then after they die, then they cut them in

21 several pieces and spread them around the countryside.

22 That was one form of capital murder.

23          Then they begin to efficient with it.  The

24 French invented the guillotine, and that's a lot more

12:44PM 25 efficient.  And they used it quite extensively.

1       And we've hanged people, and we've put them in

2  front of firing squads.  And we've fried them in electric

3  chairs and gassed them in gas chambers.

4       Now in the modern civilized world we strap

12:44PM 5  them down, inject them with poisonous drugs until they

6  finally stop breathing.  And we do it in front of a live

7  audience.

8       So these reasons and -- and some others,

9  because of retribution, because of deterrence or because

12:45PM 10 prevention of committing acts of violence in the future and

11 because it's tradition because it's what we've done for so

12 long.  These are reasons asserted to suggest that the death

13 penalty is somehow necessary.  Okay?  Well, we have the

14 death penalty.  It's in the law.

12:45PM 15      My father did hesitate best to teach me how to

16 take care of my money.  And one of the principles that he

17 always told me about to use before I spent money was, look,

18 you got to know the difference between need to have and

19 want to have.  You say to yourself, well, I need a new car.

12:45PM 20 Well, you don't really need a new car, you want a new car,

21 but you don't need to of it.  So you make your decisions on

22 spending your money according to that.

23      Well, we're human beings.  As far as actions

24 inspire more reactions from it as human beings.  And so we

12:46PM 25 get to the point where we're still alive, and we're

following the rule of law.  We've got to think about it.

Need to kill.  Want to kill?  That's easy.  Somebody does

something horrible and the first thing we want to do is

let's kill him.  Let's kill him.  Do we need to kill him?

12:46PM  David is an inmate who has been consistently

well behaved in prison and he's no threat.

Dr. Cunningham showed you in his scientific

analysis of statistical matters as applied individually to

David Renteria that he's not a threat, not going to be a

12:47PM continuing threat to society.  He's not likely to commit

criminal acts of violence in the future.

Mr. Aubishon, Frank Aubishon, a man who's been

on the front line at the prison as a correctional officer,

cuffing them, uncuffing them, strip searching them, walking

12:47PM them back and forth, dealing with different offenses,

levels of offenses, violent offenses, dealing with them day

in and day out, and then coming up in sophistication and

dealing with it as time went on from the administrative

level at the prison.

12:47PM David's not a threat in prison.  From the man

based on theory, from the man on the line, based on

practice, David Renteria is not a continuing threat to

society in prison.

Now, why not kill him?  Why is it not

12:48PM necessary?  Well, he hadn't been a zero.  I think that up

1 until the point in his life he crashed and burned, up until

2 the point he self-destructed he displayed positive traits

3 and positive behaviors.  In fact, he made a positive

4 contribution to society.  He worked as a Police Explorer

12:48PM 5 and a Customs Explorer with a positive attitude towards

6 society.

7 And there is an array of good people who have

8 had the courage to come to Court and speak to David.

9 Policemen, teachers, former fellow students and his family.

12:48PM 10 Is it necessary to kill?

11 The execution, based on the facts you've heard

12 in this case is going to achieve nothing, no positive gain

13 for anybody except as an outright extermination.  If you

14 follow with the notion that we need to exterminate, well,

12:49PM 15 then these questions are irrelevant.  They don't make any

16 sense because if the reason to kill David is because we

17 loathe him and he's revolting and we hate him, what are we

18 asking questions about whether there's a reasonable

19 probability that he's going to commit criminal acts of

12:49PM 20 violence in the future?  Why do we even use the word

21 mitigation or anything like that?  Let's kill him.

22 You know, an execution is a knowing and

23 intentional killing, knowingly and intentionally causing

24 the death of a human being.  In -- in one aspect -- and I'm

12:50PM 25 not saying murder because it's obviously not against the

1   law.  But in one aspect it's the same as murder because

2   it -- it also hurts the -- the people who are innocent to

3   the proposition not guilty of the crime.

4            And really, there's no gain in an execution

12:50PM 5   except to feed our desire to kill a killer.  We have a -- a

6   practice of a -- of a culture of death.  You know, from the

7   times at the Roman Coliseum where there would be

8   entertainment and to looking at our nature as -- as tribal

9   creatures, you know, with the creatures, the savannah and

12:50PM 10  out on the plains in the mountains fighting one another,

11  killing one another for various reasons.

12           And then we've embedded death in the laws of

13  our country.  Death as a -- as a solution to killing,

14  killing as a solution to killing.  It's part of that

12:51PM 15  culture.  And we have to -- we have to recognize the fact

16  that it's based on, bottom line, you know, vengeance,

17  loathing and revulsion of people who offend other human

18  beings in society in a certain way, hatred and fear

19  inspired by fear.  The more you fear something the more

12:51PM 20  likely you are to kill it.

21           Well, to kill we've got to dehumanize.  We

22  have to make the object of our desire to kill, got to make

23  his life superfluous.  We have to detach him as a human

24  human being, as a member of our society as a member of the

12:52PM 25  human race.  Well, what are we doing here over the ten

1  weeks that we spoke to you and others picking a jury, over

2  the two and a half weeks that we've been sitting in trial

3  are we participating?  Are we participants?  Are we

4  involved with mankind?  Isn't that what it's about or do we

12:52PM 5  just not care?  I think we're here because we're involved.

6          You know, civilization and our laws mean due

7  process.  In this civilized world of ours the law requires

8  that before you kill that you're presented with evidence

9  that convinces you beyond a reasonable doubt, that there is

12:52PM 10  a probability that the convict will by continued acts of

11  criminal violence be a continuing threat to society.

12          If the evidence that's been presented, or the

13  lack of it, leaves you without the conviction, without the

14  decision that the convict is going to commit -- commit acts

12:53PM 15  of violence in the future and be a continuing threat, you

16  may not feel under the law even though we might not want

17  to.  And awful thing like that makes even gentle folk wants

18  to kill sometimes, but that's not the answer to the

19  question.

12:53PM 20          Even then, if you think that you've been

21  convinced about -- beyond a reasonable doubt about threat

22  to society -- although this case gives you no evidence of

23  that -- even then you have to find that nothing about the

24  offender, the case or the offender's background is an

12:54PM 25  argument against the death penalty, you have to say nothing

that I have heard is a substantial argument against the
death penalty.  Nothing about David, his life, his family
his background, the circumstances.  I submit to you that
that isn't the case either.

12:54PM 　　　　　Now, we have to follow the law, and that's
what we've been doing.  And as you can tell, it's not
simple, and it's not easy.  It's painstaking and time
consuming.

　　　　　But as you consider the questions and the
12:55PM evidence, if you say that the word probability over here
has the same meaning as possibility, then the question is
meaningless.  Because it -- if you interpret that word to
mean possibility, that means that everybody who has been
convicted of any murder of any crime -- in fact, anybody,
12:55PM even those who have not about convicted of anything -- it's
possible that we're going to commit criminal acts of
violence in the future that constitute a continuing threat
to society if you interpret it that way.  It doesn't make
any sense.  And it doesn't make any sense under
12:55PM circumstances where juries are supposed, you know, to
decide from case to case.  We only have one case here
today.  But in the rare cases the juries are supposed to
decide, well, this guy gets the death penalty and that one
doesn't and this one does and this one doesn't and that one
12:56PM does.  Well, if you're saying that word means possibility,

1 you're not -- it makes it automatic everybody gets it.

2 Now, it would be automatic because every capital murder is

3 a horrible case.   I don't care which one you show me.   It's

4 a horrible case.   Whether a man is convicted of killing a

12:56PM 5 policeman in the line of duty, a fireman in the line of

6 duty, killing two or more people, killing -- intentionally

7 killing somebody in the course of burglarizing a home.

8 That's horrible.

9         And so if you get carried away about the

12:56PM 10 manner of commission of the crime and what specifically

11 what kind of crime it is, your vision is clouded.   We

12 get -- we're hidden from the facts that we need to answer

13 the questions that we're charged with answering.   And it's

14 hidden from us by inspiring those things that make us want

12:57PM 15 to kill rather than need to kill.

16         The guilt or innocence case -- let me get back

17 to something for a moment.   Dr. Cunningham gave you a

18 thorough analysis.   He tells us that the reasons that David

19 Renteria is likely to make a positive prison adjustment are

12:57PM 20 his age, his past behavior in prison, the fact that he's

21 got at least a high school diploma, his history of

22 community employment, his prosocial childhood activities,

23 his continued correspondence and visitation with his family

24 and friends and the fact that he's serving a capital life

12:58PM 25 sentence.   Dr. Cunningham hold you that as far as age goes

1 as inmates age and they enter prison at a later time,

2 they're far less likely as time passes to commit violent

3 acts.

4          Community stability prospect -- and I'm going

12:58PM 5 to kinds of gloss through this -- there's an employment

6 through his youth up to age 23.  The things that he did

7 with the Catholic church, the kind of student he was in

8 school, his activities in the community which I've

9 already -- some of which I already mentioned -- the band,

12:59PM 10 Customs Explorers and so forth are elements that tell Dr.

11 Cunningham and have told us based on statistics, based on

12 studies, based on looking at what really happened meaning

13 that David is not going to be violent in prison.

14          In fact, so that it's -- so that it's not

12:59PM 15 confusing is that the real tough people in terms of

16 violence, if you remember, are the property offenders.

17 They were 48 percent likely to have violations higher than

18 anybody, higher than first degree murderers.  They were --

19 they were -- the first degree murderers were the lowest in

12:59PM 20 potentially violent activities.  That means not an actual

21 act of violence.  And when it came to assault, it went way,

22 everybody kind of evened it up.

23          So I mean that's the reality of things.

24 Capital inmates have low rates of violence in the general

01:00PM 25 population.  And Dr. Cunningham showed you that with

1 statistics.  And he told you as a matter of statistics the

2 seriousness of the offense did not predict prison violence.

3          And with regard to David, in all the factors

4 that make up the physical difference you have those which

01:00PM 5 we've gone through that show increased risk and one factor

6 that increases his risk by several points, and that was his

7 prior trip to prison.  This is evidence.  This is evidence.

8 And down to David's individual base rate analysis compared

9 with everybody, okay, his overall risk rate is 2 percent to

01:01PM 10 7.3 percent, not a very good bet to be violent, to be a

11 continuing threat.

12          The bottom line for Dr. Cunningham was that

13 based on compared to 136 life sentence Texas capital

14 offenders, the average was during 2.37 would stay in

01:01PM 15 prison.  He examined the rate.  David is in the lowest

16 group where there were no assaults of staff, no inmate

17 assaults, no serious assaults.  In the first 2.7 years

18 when -- when these offenders are most likely to act out and

19 to act up.

01:01PM 20          And there's the record of David's behavior in

21 prison.  And of course you know if he --- if he misbehaves

22 he's bad.  Right?  And if he behaves he's bad too because

23 he's manipulating.  So I don't know if that line of

24 argument is salable.

01:02PM 25          Okay.  So the guilt/innocence case is that

1  David's been convicted.  But there's no evidence of time of

2  death.  There's an unknown, the means of causing the death

3  is uncertain.

4          The security guard was denied -- they didn't

01:02PM  5  let her -- give her a chance to look for other -- for the

6  other person she had seen in the store video.  They said

7  no, you're not looking at any more videos.  You've seen

8  what we want to show you, and that's it.

9          And there's -- there's no evidence, absolutely

01:03PM  10  none, of sexual assault.  And the burns to Alexandra were

11  postmortem burns.  Okay?  That case is what it is.  And

12  it's what resulted in a guilty verdict against David

13  Renteria for having committed a capital murder.  That's

14  case is no better than what the State showed you and

01:03PM  15  perhaps not as good, but nonetheless, he's convicted of

16  capital murder.

17          Nw, rather than answering the question about

18  his punishment that conviction raises the question shall we

19  kill David.

01:03PM  20          Now, the prosecutors are going to tell you --

21  well, first, why should we kill him.  Because it's the easy

22  and popular thing to do.  People who haven't heard evidence

23  and who don't think you think would approve and cheer.  The

24  prosecutor's version is that you've got to kill him because

01:04PM  25  he's a brilliant and cunning criminal because he let

1 somebody take down the license plate number of the van out

2 in front of the store, if that's indeed when and where

3 Alejandra left the store.  She said she was talking to cop,

4 a security guard face to face.  Of course, she says it

01:04PM 5 wasn't him, but that's another question.

6            And his thumbprint on a plastic bag.  And he

7 didn't clean up the van, and he left the child's body,

8 Alexandra's body, out for the whole world to find.  I mean

9 if you don't want to get caught, even somebody that's not

01:05PM 10 too brilliant -- I mean the bodies has never been found

11 compared with some other folks that committed capital

12 murder.

13            In any event, this notion that the brilliant

14 and cunning doesn't -- doesn't wash.  Again, if he

01:05PM 15 misbehaves in prison he's bad, and if he behaves, he's a

16 manipulator.

17            Now, it's suggested to us that -- that past

18 behavior is an indicator of future behavior.  Dr.

19 Cunningham talked about it.  But the prosecutor is the one

01:05PM 20 to look at the past good conduct.  Instead they want you to

21 look at the past bad conduct.

22            So past good conduct certainly forms the basis

23 for saying he has the capacity to behave in the future and

24 especially if you take a look at his prison record.

01:06PM 25            We all -- fear is first and revulsion and

1 horror.  The shock effect of -- of the pictures of

2 Alejandra being shoved in your face as many times as they

3 dared are there to horrify you and repulse you and make you

4 hate him.  And the idea that indoctrinates you with fear so

01:06PM 5 that you don't think about answering the questions and that

6 so you don't think about evidence.  You think about thee

7 motion and emotional reaction and want to kill and you

8 ignore scientific evidence.  You ignore evidence from eye

9 witnesses about the prison that are on the line in the

01:07PM 10 prison.

11                 So you ignore all the evidence about the

12 prison that shows you how they control the inmates.  And

13 what they do is the ones that misbehave where the bad ones,

14 the really bad ones, end up, in a place that's -- that's

01:07PM 15 crazier than an insane asylum, locked up, blocked off the

16 doors, no property.  Remember the rolls of film, without

17 clothes, paper gowns.  And this is our institution that's

18 created and designed take people who have been punished for

19 crimes and keep them there and keep them under control and

01:07PM 20 keep society stable because that's what the place is for.

21                 So the prosecutors want you to consider him a

22 threat to prison society, and there's no evidence.  I mean

23 all the evidence is to the contrary.  And they want you to

24 consider him a threat to the free world under circumstances

01:08PM 25 where he's not going to be out in three months if he gets a

1 life sentence.

2            They keep going back to the facts of the

3 murder because they've presented no evidence of probability

4 that David Renteria is going to commit criminal acts of

01:08PM 5 violence in the future.  None.  Zero.  Just the crime

6 itself.  And you heard that that doesn't answer the

7 question.

8            So why should we not kill David?  Well, first

9 let's take a look at the mother and the sister that you

01:08PM 10 have seen that are in evidence.

11            Okay.  I'm going to point to them here.  You

12 have offender death by homicide, and they basically start

13 from 1999 and go through 2007.  Do you remember that?

14 Okay.  Seven out of 150,000 -- close to 150,000 inmates,

01:09PM 15 146,000 inmates -- eight out of 150,000 -- or out of

16 146,000, six out of 145,000.  One out of 152,000.  And so

17 forth.

18            In 2007 the figure was seven out of 156,000

19 inmates which represents half of the national average

01:10PM 20 because those were ten out of 100,000.  It's lower by half

21 than the number of murders in the state of Texas.  It's a

22 fourth -- or less than a fourth of the rapes and murders in

23 Houston, in Dallas.

24            And I don't -- ironically, I know what this

01:10PM 25 means, but it's just ironic to look at it.  If you look

1  then at executions, and in 1999 you have 35 out of a

2  population of 146,000, five times the number of murders.

3  And 35 for 150,000 makes it about 20 per 100,000.  That's

4  higher than the murder rate in most places except Houston

01:11PM  5  and Dallas and New Orleans.  It's ironic, but it's a fact

6  of life.

7              There was a man named John Donne.  He was a

8  poet and a philosopher who lived a long time ago.  And he

9  was meditating about humananity and individual human beings

01:11PM  10  and life.  And he wrote a -- it's a meditation.  The title

11  of it is *For Whom the Bell Tolls*.  He said:  No man is an

12  island, entire of itself; every man is a piece of the

13  continent, a part of the main. If a clod be washed away by

14  the sea, Europe is the less, as well as if a promontory

15  were washed away, as well as if a manor of thy friend's or

16  of thine own were.  Any man's death diminishes me, because

17  I am involved in mankind, and therefore never send to know

18  for whom the bell tolls; it tolls for thee.

19              Now, because other juries have handed down

01:12PM  20  death penalties doesn't mean that you have to or even if

21  you should.  Lives, each one is a human life.  And some

22  people make very deep crawls from very low places.  They

23  have forward resistances where the mother is addicted to

24  crack and prostituting, and -- and they have -- they just

01:13PM  25  grew up in total disaster of a life.  They have a very deep

1 call in that they started from a lower place.  Some lives

2 break and fall, break off the edge and fall very, very

3 deep, from higher places where things were not bad as a

4 that other man had it, and that's not also good either.

01:13PM 5            Some of us have short falls.  A lot of the

6 time we keep having to make up for it.  Falls short, go

7 back at it again.  Some of us don't fall at all, ever.  But

8 we're all human, and that's part of the human condition.

9            If you kill David for what he did -- what did

01:13PM 10 he do?  Well, let's string him up and ignore the

11 fundamental questions that the lay requires you to answer.

12 What are you doing, you're just being a culture of death.

13            Pancho Villa's attack on Columbus is known to

14 have faced the situation where his Colonel came up with --

01:14PM 15 with this man and said, General, General, this man they say

16 that he violated and he raped an eleven year old girl, what

17 should we do?  And Pancho says, Shoot him, then look into

18 the matter.

19            That's not what we're allowed here.  David

01:14PM 20 Renteria has shown his adaptation to prison life in terms

21 his behavior there.  He's not going to be a threat to

22 society.  There is unrebutted and unchallenged testimony

23 that David is going to be there for the rest of his life.

24 If he gets a life sentence, he's going to die in prison.

01:15PM 25 He's not getting out.  And it's bung and a crazy notion to

1 suggest to you that he ever will.

2          The Institutional Division of the Texas

3 Department of Criminal Justice is adequately prepared to

4 control David, to keep him from being violent and to

01:15PM 5 protect society.

6          And  we strap a man down in front of an

7 audience and put needles in his veins and flush poison into

8 his blood.  What good does it do?  Sacrifice on the altar

9 of that god of death that we've been talking about.  That's

01:15PM 10 what it ends up being.  Because it ain't necessary.

11          Three reasons -- okay.  Three reasons not to

12 kill David.  Well, one is the number of times he's going to

13 be there it of time he's going to be there, he's got

14 another two sentences to do.  This is copy of Exhibit 158

01:16PM 15 that has been admitted into evidence, and this is a 20

16 years sentence.  Okay.  And it's ordered to run consecutive

17 to another sentence.  There's another exhibit in there that

18 says there's a ten year sentence for a felony DWI,  that's

19 one reason.

01:16PM 20          This -- that's David's score in violence and

21 aggression.  None.  Zero.  While he's been in prison.  You

22 heard the score at the county jail.  You heard the

23 prospective score scientifically propounded to you with Dr.

24 Cunningham.  You heard that score prospectively, to the

01:17PM 25 future, that comes to you by a man on the line who knows

1 what he's doing, Mr. Frank Aubishon.  He's not a threat.

2 He's -- he's depressed rather than a threat.

3          Now, that -- that also represents the

4 prosecution's going -- presenting evidence that he's a

01:17PM 5 continuing threat and that he's going to be dangerous in

6 the future.  That's their story.  It's zero.  That's why

7 not to kill David on the one point.  Not one witness or one

8 piece of evidence that shows objectively or rationally that

9 David is going to be a continuing threat to society.  Not

01:17PM 10 one.  He did a horrible thing.  Beyond doubt and beyond

11 challenge he'll never be out.  And they're saying grant him

12 his life.  He was a positive element in society at one

13 time.

14          Now, a lawyer named Clarence Darrow has helped

01:18PM 15 me.  He's long gone, but he's helped me a little bit to

16 talk about things.  He said -- I was talking about a death

17 penalty, and he says why not kill, he says, but more and

18 more people are gaining an understanding of humanity and

19 hoping that the normal and thoughtful feelings of man will

01:18PM 20 resume their sweat.  They will ask it more and more as the

21 days go by, but what they ask may not count, we know the

22 easy way.  I am pleading for a time when hatred and cruelty

23 will not control the hearts of men, when we can learn by

24 reason and judgment and understanding and faith that all

01:19PM 25 life is worth saving and that mercy is the highest

1 attribute of man.

2           As far as needing to kill, protection of

3 society and punishment of David Renteria for committing

4 this capital murder and fulfillment of your sworn duty to

01:19PM 5 render a true verdict do not require a death penalty.  None

6 of those things require it on the state of the evidence in

7 this case.

8           This is our last chance to -- to talk to you.

9 I won't be able to respond to the arguments they make.  And

01:19PM 10 the evidence will be twisted around to continue to you

11 inflame you and to incite you to kill.  12 heads are better

12 than one.  All of you collectively will remember the

13 evidence better than any of us, and you will be able to

14 better come to a decision than any of us.  And I ask you as

01:20PM 15 you hear the distortion of the evidence that you will try

16 to think of what we might have to say about it as you

17 consider David's fate.

18           THE COURT:  Ten minute warning.

19           MR. GANDARA:  Yes, Your Honor.

01:20PM 20           I -- juries have my utmost respect.  I've been

21 trying cases for 27 years, and I sure don't win all my

22 cases.  But I alwayshave ultimate respect for jurors in

23 going through the decisions that they have had to make.

24           And to tell you one thing, I don't envy you in

01:20PM 25 this case.  I don't envy you.  To walk back out there with

1 the power of life and death in your hands.   Thank you.

2                    THE COURT:   Mr. Esparza.

3                    MR. ESPARZA:   If I could have just a moment,

4 Your Honor.

5                    THE COURT:   Yes.

6                    (Brief pause)

7                    MR. ESPARZA:   May it please the Court?

8                    THE COURT:   Yes.

9                    MR. ESPARZA:   Counsel for the defense,

10 co-counsel.

11                    Ladies and gentlemen of the jury, the very

12 first thing I need to do is to thank you.   Your service is

13 extremely important to us.   And I know that every lawyer

14 that was here said that to you, and I know that each one of

15 us means it.

16                    But on opening statement, besides thanking

17 you, I talked to you about how difficult this job would be.

18 Not because -- and I remember telling you -- not because of

19 the evidence or the law but because this is such a

20 difficult decision because we're talking about so serious a

21 decision.

22                    Now, when defense counsel was just up here,

23 I'm not exactly sure to tell you the motivation of the

24 argument.   But if at any point in the argument you felt

25 shame or that something was wrong with doing what we're

1  about to ask you, that is wrong.

2          The law is very clear that in cases of these

3  types, in those rare cases, every now and again someone

4  steps up, someone tell us that they don't belong here

5  anymore.

6          And it's not just the evidence.  And it is

7  true that I'll show you photographs.  But the reason I have

8  to do that is because this, the photographs, Alexandra

9  Flores.  It's not just the crime.  If it was just the

10 crime, why do it?  Why answer yes if it was just the crime?

11         But their expert said I don't need to know the

12 facts.  He said that doesn't help me.  The how and the why,

13 that doesn't help me.  But our best look at the defendant,

14 our very best look at the defendant is his handiwork.  We

15 can learn so much about the defendant from what he has

16 done.  Because it's his actions that mean something.

17         We know that his -- what he says means

18 nothing.  It's a strong thing to call a person a liar.

19 This individual is a liar.  He's a manipulator.  He's a con

20 artist.  That's what he does.  And that's how he has lived

21 his life.

22         And so when you have to answer these

23 questions -- and I know they're hard.  And I know I'm

24 asking you to do your job.  Just do your job.  Do what we

25 require.  Do what the law says.

1          I want to talk to you about the case, but I
2 want to first talk to you about what the defense has said.
3 Only let's just get that out of the -- let's just talk
4 about that.  They say he has a clean record while he's on
5 death row.  They say that let's talk about apples and
6 apples.  Let's not talk apples and oranges.  Well, let's do
7 that.  Let's not mess around.

8          He has been on death row for three and a half
9 years.  Every other time he's been incarcerated he has been
10 in a cell by himself.  You heard that jailer say when he
11 steps out of the cell we stop everything.

12          He has been on death row.  You saw that video.
13 He has been in a society of how many?  One.  He's been in a
14 society of one.  And we guard him 24 hours a day every day
15 of the week, 365 days of the year, and we've had done that
16 for three and a half years.  And he wants to get credit
17 because the Texas Department of Corrections has been doing
18 their job.

19          And they say well Cunningham says this and
20 Cunningham says that.  I don't think Cunningham is a
21 credible expert.  But in his own words -- and not that they
22 asked him.  I had to ask him.  He brought all these
23 studies.  He talked about all sorts of up and down and so
24 forth.

25          But from the record, Question:  One of your

1 most recent -- on of your most recent, if not the recent

2 publications, that you have out this moment.  It's not the

3 most recent but it's from the last year.  And in that study

4 reported that those convicted of higher degrees of homicide

5 and sentenced to longer terms of incarceration were more

6 often involved in violent prison misconduct.  You didn't

7 hear that from the defense.  All right?  And that was their

8 own expert.

9          And then he says, yes, sir, among this study

10 of homicide offenders, that's correct.  And who was he

11 studying?  The question was specific.  The 76 that are on

12 death row, not the other 1,000 or so that are doing life

13 somewhere in California or Florida or Missouri or in a

14 federal pen.  We're talking about death row sentenced

15 inmates in the state of Texas.

16          And he said -- and the question, and that's --

17 and in that study there were 76 inmates that were sentenced

18 to death?  Answer:  That's correct.  Question:  I'm not

19 talking about inmates that had a death sentence and

20 commuted and were doing a capital murder life, those 76

21 were on death row?  Answer:  That's correct.

22          And it's fair to say that 21 percent of those

23 76 had potentially violent acts?  Answer:  Yes, sir.

24 During the time period the study that's correct.  The other

25 79 percent of the 76 did not have potentially violent acts?

1 That's correct.

2            Question:  They did not have assaultive

3 violations?  That's correct.  They did not have assaults

4 resulting in serious injury?  That's correct.

5            79 percent -- actually I think if you remember

6 he corrected himself.  Do you remember that?  He said no,

7 78.9 percent are just like the defendant on death row.

8            So if we're going to talk about giving him

9 some credit for being such a good boy while he's on death

10 row let's talk apples and apples.  He's no different.

11            And then you remember -- you might not

12 remember this.  Because I know this has been long.  I know

13 this has been so long.  But there was that video that -- it

14 wasn't the Conley Unit -- the Michaels Unit.

15            And then that one major, they asked him, how

16 are inmates on ad seg.  And what did he say?  Oh, pretty

17 bad.  Right?  And on death row?  Oh, not the same amount of

18 trouble.  They seem to do their time.  Now, I might have it

19 a little wrong, but it was something like that.

20            So he doesn't get points for that.  He doesn't

21 get points for living in a society of one while he's under

22 guard 24 hours a day every day of the year.  It doesn't --

23 that doesn't count.  That doesn't.

24            And Cunningham says, well, no when get older,

25 you get safer, you do less things.

1      Well, we know that age 21 he committed the
2 indecency with a child.  At age 31 where are we headed?
3 We're headed up.  Every line Dr. Cunningham showed us was
4 headed down.

5      But the defendant doesn't do that.  The
6 defendant is unique.  The defendant is different.  The
7 defendant is violent.  The defendant has done some horrific
8 things.  He doesn't.  You cannot put him in a computer and
9 say this is what the calculation is.

10      You can't be like the insurance companies,
11 like Dr. Cunningham would have you do, and say, well, we'll
12 put him in here, and that's what the answer is.  The
13 insurance companies are spreading the risk.  I don't have
14 to tell you about your day to day interactions about what
15 happens to you in your vehicle.  They don't want to
16 individualize this.  They want to put it in general
17 categories.

18      The exhibit that was just up there about his
19 prosocial activities, his community involvement, his
20 correspondence while he's been to the penitentiary, there
21 was no data as to that.  I'll give him the other three
22 maybe.  I'll give him that.  But those other three?

23      Now, where was I?  The murder.  Oh, no, no,
24 no, no, no.  The murder doesn't count.  That capital
25 murder, that doesn't count towards his risk assessment.

1  But oh, he got a letter from mom, and he sent a letter back

2  to mom.   That counts.   That counts.

3        He had some prosocial activity.   I don't know

4  what that means, but whatever that means, well, but the

5  murder doesn't count.   That has nothing to do with it.   And

6  his community involvement that somehow what, overrides his

7  handiwork?

8        Let's look at this.   Let's look at what he's

9  done.   November 18, 2001.   As I tell you this story, you

10  think about two things.   First, think about all the

11  opportunities that the defendant has had through his life.

12  All right?   It's not like he didn't have a loving family.

13  It's not like he didn't have a sister who cared.   Had high

14  school, parochial school.   All right.   You think about

15  that.   And you think about all the times the defendant

16  could say no, I'm not going to do it.

17        Because the road we're going to go down here

18  is all about his pleasure.   All about him, nothing about

19  us, who cares about our rules.   Who cares that we have to

20  live with each other and respect each other's rights.   That

21  has nothing to do with him.   All right?

22        On November 18th he goes to that Wal-Mart.

23  Now, when he goes to that Wal-Mart he goes to buy

24  groceries.   And when he comes back, that van is running.

25        Now, look.   I don't think there's any of you

1  who I've spoken to who don't think, hm, you know, I'm

2  thinking about maybe I was going to steal that loaf of

3  bread, but the guard is at that van.  Maybe I better just

4  go home.  Because somebody has already identified me.

5             He's a cool customer.  He talks to that

6  security guard, and he puts his stuff in the van and goes

7  back into the store.  When he walks back into that store,

8  you know that the evidence says it's clear that he has only

9  one item he's going to take from that store.  He's not

10 shopping for anything else.

11            He knows exactly what he wants.  And knowing,

12 knowing, that he's going to abduct that little girl he

13 still has the gall, the gall, to talk to the security

14 guard.  Hey, I left the car running.  Okay?  Now, that's

15 one cool customer.  All right?  That's one cool customer.

16            He goes in.  You already know the time.  He's

17 in and out.  And when he's in, he takes care of business.

18 Oh, better -- he steps in.  Can you see it?  If you look at

19 the video you'll see.  He steps in and, oh, maybe I better

20 go in and get a cart so I can make it look like I'm

21 shopping.  You'll see it when you look at the video.  I

22 know it's been a little while.  And he's always a safe

23 distance away from that little girl.

24            Just look.  When you look at that video, he's

25 going to be maybe a little over an arm's length from poor

1 Alexandra.  Why would I do that?  If momma comes, I just

2 keep walking.  It's all well orchestrated.  It's all well

3 planned.  His blood pressure is not beating.  His heart's

4 not up.  He's just (indicating) taking care of business.

5            He gets her in that car and does whatever he

6 does, whatever happens in there.  But I have to tell you --

7 I mean I'm no detective, but I've been on this planet a few

8 years, and I got to say is it a coincidence that in 1992 he

9 has the indecency with a child, and that child is seven

10 years old, and at the Wal-Mart Alexandra is five years old.

11 He does whatever he does.  And even if it was really bad,

12 whatever you could do to a five year old little girl --

13            MR. GANDARA:  Objection, Your Honor.  The

14 question is asking the jury to speculate on matters that

15 are absolutely not in evidence.

16            THE COURT:  Overruled.

17            MR. GANDARA:  Move for a mistrial.

18            THE COURT:  Denied.

19            MR. ESPARZA:  He could have let her go.  She's

20 only five.  Just let her go.  Let her go.

21            But you know what?  He's evolved it.  His

22 criminal sophistication has gone up.  He's learned from his

23 mistakes.  He knows that if he tells that little girl,

24 well, my name is Bobby, well, that doesn't work anymore.

25            So he's going to take care of it.  That Bobby

1   trick didn't work.  And look what happened.  I had to be on

2   probation.  I had to go see a sex offender therapist.  I

3   had to see a probation officer.  You know, it's all their

4   fault my life went to hell.  I'm not doing that.  I'm not

5   doing that.

6           So exclusively, it's only him that counts.  No

7   one else matters.  No one else matters.  He is going to

8   take that child's life.  Now, we're not talking about some

9   little bitty thing.  47 -- 47 inches tall, 56 pounds.

10  Whatever happened happened, and then he strangled her.

11          Now, I don't know what Dr. Cunningham was

12  thinking; he was out to lunch on this issue.  And somehow

13  the extra force was kind -- I don't what Dr. Cunningham

14  meant about that.  I don't think that guy has got any

15  credibility.

16          But just think of what he has to do when he

17  strangles her to the degree that Dr. Contin says it was the

18  force of four, if four is the most extreme.  It would take

19  one to three minutes to kill her.  At least one before she

20  lost consciousness and the other three minutes for her to

21  die.

22          Can you imagine poor little Alexandra gasping

23  for air because of that air hunger that Dr. Contin talked

24  about.  The fact that she was probably kicking and

25  screaming.  The blood smears that were on her body

1 certainly indicated that there was some sort of a struggle.

2       But he persisted.  He could have stopped when

3 he was -- when she was screaming.  If he had any, any,

4 conscience, he would have said that's it.  But no, he

5 persisted.  He held on to her for three minutes.

6       You can go back there and time it, see if you

7 can even hold your breath for a minute.  She held on for

8 three minutes.  And why is that important?  That's

9 important because it tells us about him.

10       This is his signature.  And I do apologize for

11 showing you these photos.  But it is his work.  And in a

12 courtroom like this you have to show what the defendant has

13 done.  What is his handiwork.  What is his artistry.

14 What -- they say he's been productive.  This is his

15 production.  This is his handiwork.  This is his handiwork.

16 This is his handiwork.

17       After he strangles her -- and it must have

18 been something because we know there is blood in that back

19 seat back here.  We know that.  We know that.  Now, it's

20 tiny, tiny to see part of this if he thinks he got away.

21       See, Dr. Cunningham, when he testified from

22 that stand, Dr. Cunningham didn't get it.  Dr. Cunningham

23 doesn't understand that the level of criminal

24 sophistication of the defendant is very high.  And his

25 conduct after the killing is extremely consistent with

1 someone who thinks he got away with it, someone who thinks
2 nobody will ever know.  I didn't try that old little Bobby
3 trick.  I took care of business.  I'm not going to get
4 caught.  That's how he proceeded.

5          So when he -- see, when he already killed her,
6 then we're going, okay, aw, that's bad, and -- he still has
7 to go further.  He has to take her to a public place.  I
8 don't know why he took her to a public place.  To further
9 humiliate her, to maybe distract the authorities that maybe
10 something else happened?  Who knows.  But he leaves her --
11 he leaves her on that cold cement.

12          And the gasoline.  The gasoline is so
13 important.  It's important because this is his attempt.
14 This is his key to getting away with it.  He lights her.

15          Now, you've got to believe that when he lit
16 her, and she went on fire it -- when that happened, you
17 know he's thinking I didn't leave any evidence behind.
18 There's nothing in the van, and I burned up all the
19 evidence.

20          Now, you know what he didn't plan on?  He
21 didn't plan on little Alexandra's resilience.  She was
22 dead, but she didn't stop talking.

23          You heard that fingerprints are 90 percent
24 water.  What are the odds, what are the odds that this
25 little -- that this little plastic bag would have that

1 print.  He thought he got away with it.

2           And so now we get to learn a lot about him.

3 We know this, that when he has the opportunity to deal with

4 a victim that is vulnerable he will go to any cost to avoid

5 the consequences.  We know that about him.  Because of

6 this.  This is his job.  This is his work.  We know that.

7 Because nothing else matters to him.

8           And you know what else we know about him?  We

9 know that when it comes down to it it doesn't even bother

10 him.  It doesn't bother him.  He's cool.  I mean real cool.

11 Because he goes and gets that beer.  We saw the video.  He

12 gets those two beers.  I -- well, you'd think he had a

13 round of golf or something.  He had those two beers.  He

14 had already killed her.  That little girl.  That little

15 girl fought and struggled and screamed and gasped for air.

16 I'm just going to have a couple of beers.

17           And we also know this, that when he got home

18 guess what he did?  His wife needed a chart or something

19 for a project.  And what does he do?  He goes back to the

20 scene of the crime.  She testified to that.  We went to the

21 Wal-Mart.  I don't remember why they didn't let us in.

22 Now, come on.  When does Wal-Mart deny us entrance?  I

23 think they close Christmas Day.  He -- he went back to see

24 what's going on.  And then he goes to the -- and then he

25 goes to the Walgreen's, gets her her chart and they go

1 home.

2          And this idea that in prison while the

3 trigger -- his the triggers aren't there, that there aren't

4 little people there and there's no alcohol, his mom

5 testified that on November 18th, 2001 when he went to the

6 store initially, what was he?  Sober.  He wasn't

7 intoxicated.  He doesn't have the excuse that somehow some

8 mind altering substance made him do it.  He doesn't have

9 that excuse.  He was sober.  He knew exactly what he was

10 doing every single step of the way.  He knew it.

11          That tells you more about why Dr. Cunningham

12 doesn't think that's important, it doesn't make common

13 sense.  The 12 of you are much smarter than that, much

14 smarter than that.  It makes sense.  It's important to

15 know.  This is the defendant.  This is his signature.

16          And then what happened?  Three real important

17 days, the 19th of November, the 20th of November and the

18 29th of November.

19          On the 19th the probation officer.  She comes

20 by in the morning to check on him.  And why does he do

21 that?  You know what?  Because she cares about her job.

22 She was -- you heard her testify.  She was going to have

23 major surgery and wasn't going to see the defendant in a

24 while, so he wanted -- she wanted to make sure that he

25 continued his sex offender therapy.

1        They talked briefly at the home visit.  It
2   doesn't seem like anything is wrong.  He doesn't complain
3   about anything.  Everything is fine.
4        On November 20th those detectives go knocking
5   on his door.  He admits, oh, yeah, I was at the -- I was at
6   the Wal-Mart, yeah, I did speak to the security guard.  You
7   know, he's like -- he's like a really good liar.  He's got
8   to concede some things, but when it really counts he's not
9   going to tell you the truth.  Yeah, yeah, I was there, I
10  was there.  You know, can we take your palmprint, can we do
11  all that.  Yeah, you can do that.  And then they take him
12  back.  And can we search your van.
13        Now, Dr. Cunningham, I think said you need
14  some sort of power hose to wipe the place down or
15  something.  Why do you need that when you think you didn't
16  leave a single thing behind.  I mean he not only burned her
17  body but he took all of her clothing.
18        So we weren't even under some possibility,
19  under like those CSI's TV shows, that we were going to
20  match fibers or whatever else, that there was a body --
21  bodily fluid on there.  Take the clothing.  Nothing.  I
22  left nothing behind.  There's no clothing.  There's no
23  evidence.  I burned her.  So come on in, come on in, look
24  at my van.  Look at my van.
25        His pulse doesn't go up.  The detectives

1 aren't even alerted.  They look in there.  It's kind of a

2 mess and they leave.  Another very good look at the

3 defendant.  He lets those detectives into that van knowing,

4 knowing, he has killed her, knowing he strangled that

5 little girl in that very, very van, and it doesn't bother

6 him one little bit.  He's a cool customer.

7                And then on the 29th, if it doesn't beat all,

8 he talks to the sex offender therapist.  Poor Norma Reed.

9 I -- that's got to be like an impossible job.  Impossible

10 job.  I -- you know, she's -- she's just doing the best she

11 can.

12                Twenty-eight sessions, 35 to 42 group

13 sessions.  He comes in on the 29th to have a conversation.

14 She says he -- in her own words, which is probably a term

15 of art, but his -- his emotions and his demeanor were

16 concurrent to what he was telling her, and everything was

17 fine.  He was calm.

18                And what does he do?  He says thank you for

19 everything you have done.  Thank you.  He says that after

20 he's killed that five year old kindergartner, strangled

21 her, what, ten, nine, eleven days before.  It doesn't

22 bother him.  It doesn't bother him.  That's him.  That's

23 his signature.  That's what this guy is about.  That's what

24 he tells us.  That's why the crime is important.

25                I know the defense said, well, the prosecutor

1 is going to show you all these photographs and so forth,

2 and somehow I'm going to get you to answer that he is a

3 continuing threat by emotion. And one thing I know about

4 the 12 of you is that's not going to work. It is a brutal

5 crime. It -- it is. But when you look at blood, it's when

6 you search it, that's where the evidence is.

7                The photographs are shocking. They're

8 horrible. Nobody should ever have to see that their entire

9 lives. I apologize for showing them to you. But that is

10 your job today. Your job is you have to look to that and

'11 then look behind it. Look at his motivation. Look at the

12 type of person we're talking about. That's why the crime

13 is important.

14                And when you're -- when you're looking to

15 answer this, I don't shy away from the fact that the State

16 of Texas must prove this beyond a reasonable doubt. I

17 think the evidence is overwhelming, overwhelming that he is

18 a continuing threat.

19                When we watch him 365 days a year, he's a good

20 boy. We can't watch him 365 days a year every day of the

21 week, every hour of the year. We can't do that.

22                And he is a continuing threat. He does not

23 deserve the right to go to general population. We have no

24 idea what kind of circumstances, crisis, that he might find

25 possible, and then we'll see this. We'll see this.

1          And they want to equivocate that continuing

2 threat, the threat -- it doesn't have to be another

3 homicide.  It can be a variety of violent conduct and

4 threat.  Whether you want to give him credit for living in

5 that prison society or in the free world.  But obviously

6 even Dr. Cunningham -- and I don't agree with much of what

7 he says -- but Dr. Cunningham says that in the free world

8 he is a continuing --

9          MR. GANDARA:  Objection, Your Honor.  Outside

10 the record.  The unrebutted testimony is that Mr. Renteria,

11 if he gets a life sentence, he's going to be in prison his

12 whole life.

13          THE COURT:  Overruled.

14          MR. ESPARZA:  There's no evidence in there

15 that he'll be in there his whole life.  You can read that

16 record all you want.  There's no evidence of that.

17          You read the charge.  The charge tells you

18 what the rules are.  I won't go into that.  The charge will

19 tell you.  And if you look at the second one, I spend the

20 majority of my time here.  Because we get a really good

21 look with the evidence that we have that he is a continuing

22 threat.  And the reason I may not spend the majority of my

23 time down on question two and the answer ought to be no,

24 it's because there's not much evidence there.

25          I mean which way do you have it?  He's either

1  a really smart kid who had a lot of opportunities, a family

2  that cared, a mother that did volunteer work at that school

3  stayed in contact with them, maybe overprotective parents,

4  National Honor Society, seventh grade spelling bee

5  champion.  I don't know.  Whatever else.  He's either

6  really bright or, when they want to, they want to dummy him

7  down.  They want to dummy him down and say, oh, no, no, no,

8  he didn't really understand that.  Ah, he wasn't smart

9  enough.  He bungled this murder.

10              Please, it's one or the other.  You either get

11 credit or you don't.  You either have a record or you

12 don't.  He has a record.  And he had opportunity.  He had

13 potential.  I mean ask yourself, does -- is this who he is?

14 Is this what he is?  I think the answer is yes.

15              What will he be?  What will he become?  The

16 answer is here.  The answer is here.  It's right in front

17 of you.  They may not want to see it, and it's a shame that

18 this community has to know it, but this is what he will be.

19              He will use any, any force to protect himself.

20 No matter how extreme the violence, he will use it here.

21 No matter how horrible, how distasteful we find the act, if

22 it will protect him, then it's okay with him.  That are --

23 those are his values.  That is his character.  That is the

24 person that is here in front of you.  That is the

25 defendant.

1           And when we get to question two, and you're
2 looking, well, you know, I -- Mr. Gandara went on and on
3 about -- about how we should be merciful.  Read what the
4 charge requires.

5           I don't forget for a single moment that each
6 one of you feels compassion, has emotion and the wide range
7 of emotions that may go through you before you make this
8 decision.  But is there any reason, any reason, to spare
9 the defendant's life?  Any, any, little bitty reason.

10          MR. GANDARA:  Objection, Your Honor.  That
11 misconstrues the law.  The reasons have to be presented
12 through evidence to take his life, not reasons given to
13 spare it.

14          MR. ESPARZA:  Are there --

15          THE COURT:  The law is in the charge.

16          MR. ESPARZA:  Are there any circumstances to
17 warrant that a sentence of life imprisonment rather than
18 death, is there anything to that.

19          So what did we hear.  I mean you had to be
20 surprised.  Were you?  I mean, God, that's a long trial.
21 And we're going through it, going through you it in the
22 last couple of days, all of a sudden Dr. Cunningham says I
23 think there was domestic abuse, I interviewed these people.
24 I read the records.

25          Well, you know what, Dr. Cunningham?  If you

1 read the record, then you knew that the family had never

2 said anything about domestic abuse.  Didn't you think that

3 was just a little odd?  Didn't you think you ought to

4 investigate?  Did you ever think about home visits?  Were

5 there any records?  Did you go back to the school?  I mean

6 what did you do?  No.  I interviewed for -- what did he

7 say -- like one hour, 23 minutes.  Two hours and -- he had

8 it down to the minute.  But he didn't look into that.

9         And you had to be shocked at the testimony up

10 to that point there was nothing there, other than his

11 sister saying I might have seen it twice, but I never

12 really saw it.  Because what?  Because David protected me.

13         And then there was the issue of alcohol.

14 Okay.  Well, he has three DWIs, three DWIs.  He was on

15 probation.  Now, clearly, clearly, he was smart enough to

16 know that, okay, you made a really bad mistake with Erica

17 McDonald.  You can change your behavior.  Naw.  Picked up a

18 DWI, picked up two DWIs, picks up three DWIs.  And then

19 goes to -- Dr. Cunningham says, well, I think maybe there's

20 some alcohol involved here.  Really?  Well, the only

21 problem with all of that is that when he killed, when we

22 really saw that ugly, evil, dark soul of his, he didn't

23 need alcohol to get down to that ugly, dark soul of his.

24 He didn't need to do that.  He he could get to that ugly,

25 dark, horrible place of his all on his own in a rational,

1  cold, methodical, killing way.  He didn't need any help.

2  He didn't need some push.  He didn't need that.

3              Now, afterwards, to enjoy the pleasure of what

4  he did, he had a beer.  And that's why he did that.  That's

5  who we're talking about.

6              And what he did when he was -- I guess you

7  really have that -- you probably know it as well as I do --

8  whatever he did up into high school he did -- he did what

9  we expect every person in this community to do.  He had the

10  like -- the likely daily struggles, the daily struggles of

11  every one of us.  And he had opportunities that some don't

12  get.  But he had all of that, and he said no.  Every

13  opportunity he said no to.

14              When he went down this road, he said no.  When

15  he does the indecency he held out his hand, we held out our

16  hand, and we provided him with -- I might miss one -- sex

17  offender treatment, substance abuse treatment, cognitive

18  skills classes, that ROPE program twice, electronic

19  monitoring, CADAT -- that was that alcohol abuse class --

20  he got admonished by the probation officer, he got

21  admonished by the Court.  He had home visits.  He had

22  financial help.  We shocked him.  We sent him to the

23  penitentiary so he'd know what he was -- what's going to

24  happen to you if you keep doing this.

25              I count those are eleven, eleven times this

1 community gave him a chance to change his behavior and.

2 What did we get in return?   We got this.

3           I know that this is a really hard decision

4 you're about to make.  I told you on opening that -- and

5 even just listening through your -- through your lunch

6 hour, you have been extremely attentive.  And I -- I truly

7 appreciate that.  And in just a little bit my job is done,

8 and I get to hand all of this to you.

9           And you probably, when you came in that very

10 first time, didn't really think what you're thinking right

11 about now, how hard this decision would be, how the fact

12 that as a people and as a community we are compassionate

13 and how we never, ever, ever like it when we have to punish

14 someone.  And now the State of Texas says I don't just have

15 to punish him but I'm going to punish him severely.  So I

16 know that's not easy.

17           I believe based on the evidence that the

18 answer to number one is yes.  This is his character.  This

19 is who he is.  He gets no credit for living in a society of

20 one.  That doesn't count.  It's just like all those other

21 guys, just doing their time.  Maybe they'll get their

22 paper.  Maybe they're waiting on the review of their case.

23 He gets no credit for that.  He doesn't.

24           And the evidence is clear.  There's no

25 circumstance to warrant that a sentence of life

1 imprisonment rather than the death penalty be imposed.  It
2 isn't.

3           I wish you -- I was going to tell you that I
4 wished you luck.  But that's what we say when we just kind
5 of we see somebody go off to do something.  But this is
6 more than that.

7           Some of you might pray.  Some of you may look
8 back at what you've done.  Some of you will consider those
9 around you.  And it won't be easy.  Personally, it won't be
10 easy.  But when you get down to the business of looking at
11 the evidence and reading the law, you'll know that the
12 right decision is yes on one and no on two.  You'll know.

13           And I don't care what the other side says
14 about somehow, you know, the history of the death penalty.
15 The defendant doesn't care about our rules.  The defendant
16 doesn't care about how we interact with each other, and the
17 defendant has zero, zero, respect for life.

18           Don't be tricked.  Don't be fooled, don't let
19 him manipulate you.  Don't believe his lies.

20           It is clear.  The evidence is overwhelming.
21 The answer to one is yes.  The answer to two is no.

22           I wish you Godspeed.

23           THE COURT:  All right.  Ladies and gentlemen,
24 we are going to take you to lunch.  You are not allowed to
02:05PM 25 discuss the case until you're brought back and I tell you

1  that it is time to deliberate.

2                    (Lunch recess)

3                    (Open Court, defendant present, Jury is

4  present)

04:08PM  5                    THE COURT:  Good afternoon, ladies and

6  gentlemen.

7                    JURORS:  Good afternoon.

8                    THE COURT:  Okay.  Now, the law is that I am

9  to separate the two alternates.  We have number 13 and

04:08PM  10  number 14, you are alternates.  There is a new law.  And I

11  am not allowed to release you, but I do have to separate

12  you.  So for the deliberation on this case there will be

13  the first 12 of you, and it will be you 12 only that will

14  be deliberating.

04:08PM  15                    Now, we're going to keep you separated during

16  the deliberation, but however in the evenings or at meals

17  or anything like that you will be allowed to be together

18  because, as you remember my instructions, you are not

19  allowed to discuss this case unless all of you -- which

04:08PM  20  means 12 now -- are present in the jury room.

21                    There are to be no discussions of this case

22  among yourselves or with anyone else outside of being in

23  the jury room, the 12 of you.

24                    So with those instructions I'm going to ask

04:09PM  25  you do you want to proceed to begin your deliberations

1  today?  Do you wish to leave at this time?  We are now at

2  your disposal, and we work on your schedule.

3              So if you want to go back there and talk about

4  it, the Bailiff will be in there with you to make sure that

04:09PM 5  we get the last two separated out if need be.  And if you

6  will advise the Bailiff in writing whether or not you want

7  to start your deliberations today or if you want to start

8  them tomorrow, and we will take care of you according to

9  your wishes.

04:09PM 10              (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## COURT REPORTER'S CERTIFICATE

THE STATE OF TEXAS)
COUNTY OF EL PASO )

I, LISA MARIE DE MELLO, CSR, RPR, Official Court Reporter in and for the Council of Judges Administration, El Paso County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record, 5/5/08, is $ _∧ and was paid/will be paid by _∧.

WITNESS MY OFFICIAL HAND this the 14th day of May 2009.

_____
LISA MARIE DE MELLO, Texas CSR 3313
Expiration Date: 12-31-2009
El Paso County Council of Judges
500 East San Antonio Street, Suite 101
El Paso, Texas  79901
(915) 546-2000 ext. 4352