UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION



| | |
|---|---|
| DAVID SANTIAGO RENTERIA, | § |
| TDCJ # 999460, | § |
|     Petitioner, | § |
| | § |
| v. | § |
| | § |
| LORIE DAVIS, | § |
| Director, Texas Department of | § |
| Criminal Justice, Correctional | § |
| Institutions Division, | § |
|     Respondent. | § |

EP-15-CV-62-FM

## ORDER DENYING PETITIONER'S MOTION TO STAY PROCEEDINGS

Petitioner Santiago Renteria, through his counsel, moves the Court to stay these proceedings for ninety days to permit him to explore recently disclosed evidence (ECF No. 107). Respondent Lorie Davis opposes the motion (ECF No. 109). For the reasons outlined below, the Court will deny the motion.

### PROCEDURAL HISTORY

On November 18, 2001, a five-year-old girl named Alexandra Flores disappeared from a Walmart store in El Paso, Texas. The next day, her nude, partially burned body was discovered in an alley sixteen miles from the Walmart. Her autopsy revealed she was manually strangled before she was set on fire. A latent print lifted from the plastic bag found over her head matched Renteria's palm print.

Renteria and his van had been observed at the Walmart on the day the victim disappeared. A Walmart security guard recalled briefly speaking with Renteria. Walmart surveillance videos showed a man, wearing clothing similar to the attire worn by Renteria, walking out of the store with the victim. A search of Renteria's van disclosed blood stains containing the victim's DNA.

-1-

Renteria was arrested on December 3, 2001. He gave the police a written custodial

statement. Renteria claimed that a Barrio Azteca gang member nicknamed "Flaco" and several

others were primarily responsible for the murder. He explained that he met Flaco while in prison

after his conviction for an indecency offense involving an eight-year-old girl, but he did not know

the others. Renteria maintained he participated in the offense out of fear the other participants

would harm his family. He asserted his involvement was limited to luring the victim out of the

Walmart and helping Flaco and the others burn and dispose of the victim's body. At the end of

his statement, Renteria expressed his remorse:

> I want to say that my participation in this was due to the fact that I was in fear of my
> family's life. These guys just knew too much and they came at me full force. I
> was just looking for a way for my family not to be hurt. God I wish there was
> something I could do to make this different for everybody. Right now I am just
> hoping that my family will be protected from those that attempt to harm them. I
> am right now feeling deep confusion and not knowing what other person would
> have done in my shoes or circumstances. I hope that the individuals responsible
> are brought to justice. I hope that somebody out there does know a little bit more
> about this and does come out and forth.

*Renteria v. State*, 206 S.W.3d 689, 694 (Tex. Crim. App. 2006).

Shortly before his trial, Renteria moved for a continuance after the State disclosed that the

victim's mother was the ex-wife of a leader in the Barrio Azteca gang. Renteria claimed the late

disclosure of this relationship prevented him from adequately investigating whether the victim's

murder was gang-related, as Renteria suggested in his December 3, 2001, statement to the police.

The State responded it had just discovered that the victim's mother was the ex-wife of a

Barrio Azteca prison gang leader. The State added, however, that the marriage ended over ten

years before the kidnapping, and the ex-husband of the victim's mother became a Barrio Azteca

gang member sometime after their divorce. The State also asserted the victim's family members

maintained there were no ill feelings or problems arising out of the marriage.

-2-

The trial court denied the continuance. The Texas Court of Criminal Appeals later noted

"[t]he record . . . reflects that defense counsel knew that appellant . . . claimed in his December 3rd

statement, approximately two weeks after the offense and long before trial, that the victim's

murder was gang-related." *Id.* at 702.

The trial court also did not admit Renteria's December 3, 2001, statement into evidence at

trial. According to Texas law:

> self-serving declarations of the accused are ordinarily inadmissible in his behalf,
> unless they come under some exception, such as: being part of the res gestae of the
> offense or arrest, or part of the statement or conversation previously proved by the
> State, or being necessary to explain or contradict acts or declarations first offered
> by the State.

*Allridge v. State*, 762 S.W.2d 146, 152 (Tex. Crim. App. 1988) (quoting *Singletary v. State*, 509

S.W.2d 572, 576 (Tex. Crim. App.1974)). Furthermore, none of the evidence admitted at trial,

including Walmart surveillance videos, supported Renteria's claim that others were involved in

the offense. *Renteria v. State*, 206 S.W.3d at 694 n.2.

The State's trial theory was that Renteria, a complete stranger to the victim, committed the

offense alone. Renteria did not raise a duress defense.

In October 2003, a jury found Renteria guilty of capital murder. During the sentencing

portion of the trial which followed, the State presented evidence that Renteria was not remorseful.

Based upon the jury's answers to the special issues set forth in Texas Code of Criminal Procedure

Article 37.071, the trial court set Renteria's punishment at death.

On direct appeal, the Texas Court of Criminal Appeals affirmed Renteria's conviction, but

vacated his sentence. *Id.* at 719. The appellate court reasoned "with the State having opened the

door to appellant's remorse evidence [in the December 3, 2001, statement], the exclusion of this

evidence violated due process by preventing appellant from rebutting the State's evidence and

argument that appellant was unremorseful." *Id.* at 698. The trial court subsequently
re-sentenced Renteria to death, and on May 4, 2011, the Court of Criminal Appeals affirmed the
judgment. *Renteria v. State*, 2011 WL 1734067 (2011).

On December 17, 2014, the Court of Criminal Appeals denied Renteria's three pending
state applications for writs of habeas corpus. *Ex parte Renteria*, WR-65, 627-01 (filed August 28,
2006), WR-65, 627-02 (filed August 1, 2012), WR-65, 627-03 (filed August 7, 2014).

Renteria then filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in
this Court. Pet'r's Pet., ECF No. 53. In her Answer, Respondent Lori Davis asserted some of
Renteria's claims were unexhausted and procedurally defaulted. Resp't's Answer, ECF No. 84.

On May 25, 2018, Renteria's counsel filed the instant motion to stay these proceedings.
Counsel claimed on May 18, 2018, they received an email from Lori Hughes, the Senior Trial
Division Chief employed by the office that prosecuted Renteria. Pet'r's Mot for Stay. at 1, ECF
No. 107. The email contained a letter with an attached "Witness Statement." The Hughes letter
described the attachment as "a statement from Grace [Redacted by counsel], regarding her
suspicion that her former husband had information relating to the death of Alejandra Flores . . .
given to the police on April 23, 2018." *Id.* at 1-2.

Renteria's counsel now assert the statement supports Renteria's claim that he did not act
alone in the murder:

> The Statement's central revelation is not merely that the witness's former
> husband had "information" relating to the case, but that her former husband, a
> member of the Azteca Gang, was **involved** in the murder of the victim in Mr.
> Renteria's case. This statement provides crucial corroboration of Mr. Renteria's
> statement provided to the police upon his arrest.
> . . . .
> Many of the details in the Witness Statement match up with known facts
> and vouch for its credibility: the girl discussed was the one from the Walmart; her
> body was dumped near a doctor's office; and her body was partially burned. Other

-4-

details do not line-up with other facts presented at trial, including some of the injuries suffered by the victim, e.g. it says that she suffered broken legs and injury to her eyes. Similarly, the witness dates the conversation with her ex-husband to the day before her divorce on October 19, 2001, however, the victim was attacked about one month later, on November 18, 2001.

. . . .

Further, the Witness Statement, the facts contained within it, and those facts that a reasonable investigation may reveal, could be relevant to [unexhausted] issues that would be cognizable in habeas corpus proceedings:

• If the witness attempted to present this information earlier to any law enforcement agent, or if law enforcement knew or should have known of the facts contained in it, the Statement could form the basis of a claim under *Brady v. Maryland*, 373 U.S. 83 (1963);

• If the witness attempted to present this information to a member of the trial defense team, or if the trial defense team unreasonably failed to uncover this information, the Statement's revelations could constitute a new claim of ineffective assistance of counsel;

• The Statement and the facts flowing from it may lead to a showing of actual innocence of the offense or the death penalty, based on its support for a duress defense. Therefore, even if there is no fault on the part of the State and law enforcement, or with trial counsel, such a free-standing innocence claim is cognizable in capital habeas corpus proceedings, *see, Herrera v. Collins*, 506 U.S. 390 (1993).

*Id.* at 2, 4, 5 (emphasis in original). Defense counsel argue it is critical for the Court to permit

them time to explore and verify the statement's contents with a view toward raising new,

unexhausted claims in Renteria's petition for a writ of habeas corpus.

## STANDARD OF REVIEW

Before seeking federal habeas corpus relief, state prisoners must exhaust available state

remedies, thereby giving the state the opportunity to pass upon and correct alleged violations of its

prisoners' federal rights. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *O'Sullivan v. Boerckel*, 526

U.S. 838, 842 (1999). A petitioner satisfies the exhaustion requirement when he "fairly presents"

the substance of his habeas claims to the state's highest court in a procedurally proper manner

before filing a petition in federal court. *Baldwin*, 541 U.S. at 29–32; *Morris v. Dretke*, 379 F.3d

199, 204 (5th Cir. 2004). In Texas, the Court of Criminal Appeals is the highest court for criminal

matters. *Richardson v. Procunier*, 762 F.2d 429, 431 (5th Cir. 1985). Thus, a Texas prisoner

may only satisfy the exhaustion requirement by presenting both the factual and legal substance of

his claims to the Texas Court of Criminal Appeals. *Tigner v. Cockrell*, 264 F.3d 521, 526 (5th

Cir. 2001); *Alexander v. Johnson*, 163 F.3d 906, 908-09 (5th Cir. 1998). The Texas Court of

Criminal Appeals will not undertake any disposition of a petitioner's currently unexhausted

habeas corpus claims pending before a federal court unless and until the federal court first stays the

federal habeas corpus proceeding. *See Ex parte Soffar*, 143 S.W.3d 804, 804 (Tex. Crim. App.

2004) (modifying the two-forum rule to "permit consideration of a subsequent state writ . . . if the

federal court with jurisdiction over a parallel writ enters an order staying its proceedings to allow

the habeas applicant to pursue his unexhausted claims in Texas state court").

In *Rhines v. Weber*, 544 U.S. 269 (2005), the Supreme Court held a district court has the

discretion to stay a petition containing unexhausted claims so that the habeas petitioner may return

to state court and exhaust the claims. The *Rhines* Court cautioned, however, that "stay and

abeyance should be available only in limited circumstances"; routinely granting stays would

undermine the goals of encouraging finality and streamlining federal habeas proceedings.

*Rhines*, 544 U.S. at 277. "Under *Rhines*, a stay and abeyance is appropriate when the district

court finds (1) the petitioner has good cause for failure to exhaust his claim, (2) the claim is not

plainly meritless, and (3) the petitioner has not engaged in intentional delay." *Schillereff v.

Quarterman*, 304 F. App'x 310, 314 (5th Cir. 2008) (citing *Rhines*, 544 U.S. at 277-78). When

this three-part test is satisfied, there is no overriding concern of further limiting the availability of a

stay and abeyance because "[i]n such a case, the petitioner's interest in obtaining federal review of

-6-

his claims outweighs the competing interests in finality and speedy resolution of federal petitions."

*Rhines*, 544 U.S. at 278.

## ANALYSIS

Renteria asserts Grace's statement could be relevant to the following unexhausted

claims in his habeas corpus proceeding:

• Does the statement form the basis for a claim under *Brady v. Maryland*, 373 U.S. 83 (1963)?

• Could the statement's revelations provide a new claim of ineffective assistance of counsel?

• Do the facts flowing from the statement lead to a free-standing claim of actual innocence of the offense or the death penalty based on a duress defense?

Pet'r's Mot. to Stay at 5.

### A. Good Cause

Renteria does not specifically argue he has good cause warranting a stay. He asserts the

Court should stay these proceedings to allow him ninety days to investigate the facts and

circumstances surrounding Grace's recently prepared statement. Specifically, Renteria contends

Grace's April 23, 2018, "statement provides crucial corroboration of Mr. Renteria's statement

provided to the police upon his arrest." Pet'r's Mot. to Stay at 2. Renteria suggests, had the

statement been available at his trial, he could have pursued an affirmative defense of duress.

The record shows Renteria gave a written statement on December 3, 2001. In the

statement, Renteria claimed that a Barrio Azteca gang member nicknamed Flaco and several

others were primarily responsible for the murder. Renteria maintained he participated in the

offense out of fear the other participants would harm his family. He also claimed his involvement

was limited to luring the victim out of the Walmart and helping Flaco and the others burn and

-7-

dispose of her body. Renteria's statement put his trial counsel on notice that Barrio Azteca gang members may have threatened and coerced him into committing the offense, but they chose not to pursue a duress defense at trial.

Shortly before trial, the State disclosed the victim's mother was the ex-wife of a leader in the Barrio Azteca gang. The State added, however, that the marriage ended over ten years before the kidnapping, and the ex-husband of the victim's mother became a Barrio Azteca gang member after their divorce. The State also asserted the victim's family members maintained there were no ill feelings or problems arising out of the marriage. The State's trial theory was that Renteria, a complete stranger to the victim, committed the offense alone. Renteria's counsel could have pursued the duress theory through the victim's family, but chose not to raise it at trial.

At trial, the court did not admit Renteria's statement into evidence because it was both self-serving and unsupported by other evidence. In fact, none of the evidence admitted at trial supported Renteria's statement to the police that others had threatened and coerced him and others were involved in the offense. *Renteria v. State*, 206 S.W.3d at 694 n.2.

Renteria now offers the hearsay statement of Grace, the former wife of a purported Barrio Azteca member, prepared more than sixteen years after the incident, to suggest that others may have been involved in the victim's murder. Some of the details in the statement matched up with known facts about the case. Grace claimed correctly that the victim was taken from a Walmart; her body was dumped near a doctor's office; and her body was partially burned. Other details did not line-up with other facts presented at trial. Grace incorrectly claimed the victim's legs were broken and her eyes were removed. Furthermore, Grace dated the conversation with her ex-husband to the day before their divorce on October 19, 2001, but the victim was not kidnapped until November 18, 2001.

-8-

Renteria uses a kernel of information in Grace's statement in 2018—"Daniel told me that he would be gone for seven years, and that Azteca gang members would be me sending [sic] money"—to extrapolate that Barrio Azteca gang members threatened and coerced him into committing the offense. *See* Witness Statement, ECF No. 107-1. But Renteria claimed gang members coerced him into kidnapping the victim at the time of his arrest in 2001. The fact that Grace came forward sixteen years after the murder and offered a statement fraught with inaccuracies is insufficient to show good cause for the Court to stay these proceedings.

## B. Merits of the Claims

Insofar as Renteria may raise a *Brady* claim based on the Grace's statement, he is not entitled to a stay because such a claim is plainly meritless. "Any knowledge gained by the prosecution *after* the trial is irrelevant to a *Brady* claim." *United States v. Rouse*, 410 F.3d 1005, 1010 (8th Cir. 2010)) (emphasis in original); *see also Calley v. Callaway*, 519 F.2d 184, 224 (5th Cir. 1975) ("To this date, there has been no holding that *Brady* confers on the defense a right to receive information or evidence greater than that possessed by the prosecution, and we decline to so hold now."). Grace explicitly states she did not inform law enforcement authorities regarding her suspicion of her ex-husband until she went to the police on April 23, 2018:

> I didn't come forward back then because I was afraid for me and my kids. Daniel beat me during our marriage, and he was arrested for that once. For about 10 years, I had no communication with him at all. He was hiding from me and never paid any child support. Now all my children are over 18; now he resumed communication with them. Last year he sent me money several times, because the kids had left, and I was becoming homeless.

*Id.* Consequently, a claim that the prosecution withheld evidence of Grace's statement would fail.

Further, any claim alleging Renteria's counsel were ineffective for failing to obtain or

-9-

present Grace's statement at trial would also fail. "[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). Nothing in Grace's statement indicates she was available or willing to testify at Renteria's trial or that trial counsel could or should have discovered her potential testimony. To the contrary, Grace's statement shows she did not come forward for almost seventeen years because she feared her former husband. A claim that her counsel provided constitutionally ineffective assistance for not calling Grace as a witness would fail.

Finally, Renteria's actual innocence claim is not cognizable in federal habeas proceedings. *See Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."). Renteria cannot justify a stay to exhaust a claim in state court that would not be cognizable in this Court. Renteria could, however, raise an actual innocence claim in state court following the conclusion of these federal habeas proceedings as the Texas Court of Criminal Appeals has recognized a freestanding claim of actual innocence. *See Ex parte Elizondo*, 947 S.W.2d 202, 209 (Tex. Crim. App. 1996) (stating that, to obtain relief for a claim of actual innocence, an applicant "must show by clear and convincing evidence that no reasonable juror would have convicted him in light of" newly discovered or newly available evidence).

In any event, an actual innocence claim based on Grace's statement would be without merit.

-10-

A person commits murder by (1) intentionally or knowingly causing someone's death; (2) intending to cause serious bodily injury and causing someone's death; or (3) committing or attempting to commit a felony, other than manslaughter, and causing someone's death.   Tex. Penal Code § 19.02(b).   A person commits capital murder by, among other things, intentionally committing the murder in the course of committing or attempting to commit kidnapping.   *Id.* § 19.03(a)(2).

Under the law of parties, a "person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both."   *Id.* § 7.01.   A person is "criminally responsible" for an offense committed by another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.   *Id.* § 7.02(a)(2).   "If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy."   *Id.* § 7.02(b).

Duress is an affirmative defense that applies if the defendant "engaged in the proscribed conduct because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another."   *Id.* § 8.05(a).   Compelled means the force or threat of force "would render a person of reasonable firmness incapable of resisting the pressure."   *Id.* § 8.05(c).   Imminent means the threat is a present threat of harm.   *Anguish v. State*, 991 S.W.2d 883, 886 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd).   Imminent has two components: (1) the person making the threat must intend and be prepared to carry out the threat immediately, and (2) the

-11-

threat must be predicated on the threatened person's failure to commit the charged offense immediately. *Devine v. State*, 786 S.W.2d 268, 270–71 (Tex. Crim. App. 1989); *Anguish*, 991 S.W.2d at 886. Threats of future harm are not sufficient to prove duress. *Devine*, 786 S.W.2d at 270–71.

Duress is a confession-and-avoidance or "justification" type of affirmative defense. *Rodriguez v. State*, 368 S.W.3d 821, 824 (Tex. App.—Houston [14th Dist.] 2012, no pet.). This is because "this justification, by definition, does not negate any element of the offense, including culpable intent; it only excuses what would otherwise constitute criminal conduct." *Id.* (citing *Juarez v. State*, 308 S.W.3d 398, 401–03 (Tex. Crim. App. 2010) (defining defense of necessity as confession-and-avoidance or "justification" defense). The confession-and-avoidance doctrine requires a defendant to first to admit he "engaged in the proscribed conduct" by admitting to all elements of the underlying offense and then to claim that his commission of the offense was justified because of other facts. *Id.* A defendant may not establish that an act is justified without first identifying, or admitting to the commission of, the predicate act. *Id.* A defendant's failure to testify, stipulate, or otherwise proffer evidence admitting that he "engaged in the proscribed conduct" prevents the defendant from benefitting from the defense of duress. *Id.* (citing *Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007)) (explaining a defendant is entitled to jury instruction on such a defense only "when the defendant's defensive evidence essentially admits to every element of the offense, including the culpable mental state, but interposes the justification to excuse the otherwise criminal conduct")).

"The burden of proof of the affirmative defense of duress rests upon the defendant, and . . . the defendant must prove it by a preponderance of the evidence. By the term 'preponderance of the evidence' it is meant the greater weight and degree of the credible evidence in the case."

-12-

*Alford v. State*, 806 S.W.2d 581, 583 (Tex. App.—Dallas 1991), *aff'd*, 866 S.W.2d 619 (Tex. Crim. App. 1993).

"[T]he term 'actual innocence' shall apply, in Texas state cases, only in circumstances in which an accused did not, in fact, commit the charged offense or any of the lesser-included offenses." *State v. Wilson*, 324 S.W.3d 595, 598 (Tex. Crim. App. 2010). An actual innocence claim must be accompanied by new "affirmative evidence of the applicant's innocence." *Ex parte Franklin*, 72 S.W.3d 671, 678 (Tex. Crim. App. 2002). "'The petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" *Ex parte Elizondo*, 947 S.W.2d 202, 209 (Tex. Crim. App. 1996) (quoting *Schlup v. Delo*, 513 U.S. 298, 326 (1995)). "[A] showing of facts which are highly probative of an affirmative defense which if accepted by a jury would result in the defendant's acquittal constitutes a sufficient showing of 'actual innocence' . . ." *Finley v. Johnson*, 243 F.3d 215, 221 (5th Cir. 2001).

The record shows Renteria gave a written custodial statement to the police on December 3, 2001. In this statement, Renteria claimed an Azteca gang member nicknamed Flaco and several other persons were primarily responsible for the victim's murder. Renteria claimed his involvement was limited to luring the victim out of the Walmart and helping Flaco dispose of her. Renteria also claimed he helped these people commit the offense out of fear they would harm his family. Notably, he did not assert these people were prepared to carry out the threat against his family immediately. Threats of future harm are not sufficient to prove duress. Devine, 786 S.W.2d at 270–71.

Shortly before trial, Renteria learned from the State that the victim's mother was the ex-wife of a Barrio Azteca prison gang leader. He also learned, however, that the marriage ended

-13-

over ten years before the murder, and the ex-husband of the victim's mother was not a Barrio

Azteca gang member during their marriage.   He further learned that the victim's family members

maintained there were no ill feelings or problems arising out of the marriage.

Renteria proceeded to trial.   He did not raise a duress affirmative defense.   The State's

theory was that Renteria, a complete stranger to the victim, committed the offense alone.   In

October 2003, a jury found Renteria guilty of capital murder.

On April 23, 2018, Grace came forward and offered a hearsay statement to the police

regarding her suspicion that her former husband, Daniel, was involved in the murder of the victim.

Witness Statement, ECF No. 107-1.   Grace explained she divorced Daniel on October 19, 2001.

*Id.*   Grace added the day before the divorce, Daniel was "tense and upset," and told her to drive to

the west side of El Paso.   When they arrived, Daniel suggested he was involved in the murder:

> I drove to the Westside and he told me to drive by a doctor's office on N. Mesa near
> the [El Paso Community College] Rio Grande campus.   He showed me a dumpster
> in the parking lot on the side of the building.   He said that a girl would be found
> dead there by the dumpster.   I asked him if he was talking about the girl that had
> gone missing from a Walmart and he said yes.   He said that they had removed the
> girl's eyes, broken her legs and burned her body.   The girl had not been found yet,
> and was still in the news as missing.   I told him to get out of the car and that I am
> not his limo driver.   He refused to get out and I drove him to his sister's house near
> •••••.·   He seemed stressed out and nervous, and it looked like he needed to vent and
> talk.   Later I found out through the news that a person by the name of Renteria had
> been arrested for the murder of the girl.
>
> Daniel told me that he would be gone for seven years, and that Azteca gang
> members would be me sending money.
>
> He told me the same, when he was arrested for Attempted Murder; he injected
> somebody with his mother's medication.   He did one year in jail for that.   I did
> talk to detectives on that case, and I gave a written statement back then.   That was
> after the divorce from Daniel.

*Id.*

Nothing in Grace's statement is exculpatory as to Renteria.   Video evidence presented at

-14-

trial showed that Renteria *alone* lured the victim out of the Walmart. His van contained the victim's blood. His palm print was found on the plastic bag covering the victim's face. Renteria's duress theory that gang members coerced him into abducting a young girl so they could murder her was incredible. Grace's statement does not render it any less incredible.

In addition, her statement is facially insufficient to show Renteria's innocence. While the statement accurately restates some publicly-known facts about the murder, it also contains significant inaccuracies. Furthermore, Grace dated the conversation with her ex-husband to the day before their divorce on October 19, 2001, but the victim was not kidnapped until on November 18, 2001.

Assuming, for the sake of argument, that the statement is true, it may support at most a conclusion that Renteria did not act alone and that others were parties to the murder. It does not, however, suggest that Renteria acted under duress or is actually innocent.

## C. Intentional Delay

Renteria does not address the issue of delay. Because the State recently provided the statement to his counsel, the Court will accept that Renteria does not bring his motion for the purpose of delay.

## CONCLUSION AND ORDER

After carefully considering Renteria's "Motion for a Ninety-Day Stay of Proceedings to Permit Exploration of Recently Disclosed Exculpatory Evidence" (ECF No. 107), the Court concludes Renteria does not have good cause for his failure to exhaust his claims in his prior proceedings and they are plainly meritless. The Court further concludes Renteria's interest in obtaining federal review of his unexhausted claims does not outweigh the competing interest in the finality and speedy resolution of his federal petition. Accordingly, the Court **DENIES** the

-15-

motion.

**SIGNED** this ___8___ day of June, 2018.

**FRANK MONTALVO**
**UNITED STATES DISTRICT JUDGE**