UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

FILED

2019 FEB 12 PM 5:08

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____ TWO
DEPUTY

| | |
|---|---|
| DAVID SANTIAGO RENTERIA,<br>TDCJ # 999460,<br>    Petitioner,<br><br>v.<br><br>LORIE DAVIS,<br>Director, Texas Department of<br>Criminal Justice, Correctional<br>Institutions Division,<br>Respondent. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§      EP-15-CV-62-FM |

## MEMORANDUM OPINION AND ORDER

David Santiago Renteria petitions the Court for a writ of habeas corpus under 28 U.S.C. §§ 2241(d), 2254. Renteria challenges the death sentence imposed by a state trial court after a jury found him guilty of capital murder. After reviewing the record and for the reasons discussed below, the Court finds Renteria is not entitled to federal habeas relief. Accordingly, the Court will deny his petition. The Court will also deny him a certificate of appealability.

## I.    BACKGROUND AND PROCEDURAL HISTORY

### A. Renteria's Offense and Guilt Phase Trial

On November 18, 2001, a five-year-old girl named Alexandra Flores disappeared from a Walmart store in El Paso, Texas. *See Renteria v. State* (*Renteria I*), 206 S.W.3d 689 (Tex. Crim. App. 2006) (providing a detailed summary of the facts). The next day, her nude, partially burned body was discovered in an alley sixteen miles from the Walmart. Her autopsy revealed she was manually strangled before she was set on fire. A latent print lifted from the plastic bag found over her head matched Renteria's palm print.

Several people observed Renteria and his van at the Walmart on the day Flores disappeared. A Walmart security guard recalled briefly speaking with Renteria because he left his van running outside the store. Walmart surveillance videos showed a man—wearing

clothing like the attire worn by Renteria earlier that day—walking out of the store with Flores. A search of Renteria's van disclosed blood stains with Flores's DNA.

Police arrested Renteria on December 3, 2001. They obtained a written custodial statement. *See* Reporter's R., vol. 69 (Voluntary Statement of Accused), pp. 11–15, ECF No. 78-4.[1]

In his statement, Renteria blamed a Barrio Azteca gang member—nicknamed "Flaco"—and several other people for Flores's murder. He explained he met Flaco while serving time in prison, but claimed he did not know the other people. Renteria maintained he participated in the offense out of fear the other participants would harm his family. He claimed he was "scared and . . . didn't know how to react . . . because they were threatening [his] family." *Id.* at 13. Renteria asserted he only lured Flores out of the Walmart and helped Flaco and the others burn and dispose of her body.

At the time of his arrest, Renteria was a registered sex offender on probation for committing an indecency offense against a seven-year-old girl. *Renteria v. State* (*Renteria II*), AP-74,829, 2011 WL 1734067, at *2 (Tex. Crim. App. May 4, 2011). He also had three prior convictions for driving while intoxicated.

Shortly before trial, Renteria moved for a continuance after the State disclosed the victim's mother was the former wife of a Barrio Azteca gang leader. Clerk's R., vol. 2 (part 2 of 3), pp. 14–16 (Mot. for Continuance), ECF No. 73-7; *Renteria I*, 206 S.W.3d at 698–702. Renteria claimed the late disclosure of this relationship prevented him from adequately investigating whether Flores's murder was gang-related, as he suggested in his December 3, 2001, statement to the police.

The State explained it had just discovered the relationship between the victim's mother and the Barrio Azteca gang leader. Clerk's R., vol. 2 (part 2 of 3), p. 10 (District

---

[1] "ECF No." refers to the Electronic Case Filing number for documents docketed in this case. Where a discrepancy exists between page numbers on filed documents and page numbers assigned by the ECF system, the Court will use the latter page numbers.

Attorney Letter), ECF No. 73-7; *Renteria I*, 206 S.W.3d at 698–702. The State added the marriage ended over ten years before Flores's kidnapping, and the ex-husband of the victim's mother became a gang member sometime after their divorce. The State also asserted the victim's family members maintained there were no ill feelings or problems arising out of the failed marriage.

The trial court denied the continuance. The Texas Court of Criminal Appeals later noted "[t]he record . . . reflects that defense counsel knew that appellant . . . claimed in his December 3rd statement, approximately two weeks after the offense and long before trial, that the victim's murder was gang-related." *Renteria I*, 206 S.W.3d at 702.

The trial court also did not admit Renteria's December 3, 2001, statement into evidence at trial because it was self-serving. *Renteria I*, 206 S.W.3d at 694. According to Texas law:

> "self-serving declarations of the accused are ordinarily inadmissible in his behalf, unless they come under some exception, such as: being part of the res gestae of the offense or arrest, or part of the statement or conversation previously proved by the State, or being necessary to explain or contradict acts or declarations first offered by the State."

*Allridge v. State*, 762 S.W.2d 146, 152 (Tex. Crim. App. 1988) (quoting *Singletary v. State*, 509 S.W.2d 572, 576 (Tex. Crim. App.1974)). Furthermore, none of the evidence admitted at trial—including the Walmart surveillance videos—supported Renteria's claim that others were involved in kidnapping and murdering Flores. *Renteria I*, 206 S.W.3d at 694 n.2.

"The State's trial theory was that Renteria, who was a complete stranger to the victim, committed the offense alone." *Renteria I*, 206 S.W.3d at 694 n.2. Renteria did not raise a duress defense. The jury found Renteria guilty of capital murder.

### B. Renteria's First Penalty Phase Trial

According to the Supreme Court, "a state capital sentencing system must: (1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a

-3-

reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Kansas v. Marsh*, 548 U.S. 163, 173–74 (2006).

The Texas capital sentencing statute in force at the time of Renteria's offense set forth two "special issues" for a jury to decide before sentencing. Under the first special issue—the future dangerousness issue—the jury must decide "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Crim. Proc. Code art. 37.071 § 2(b)(1) (Vernon 2001). If the jury unanimously answered this question in the affirmative, it must then consider a second special issue. Under the second special issue—the mitigation issue—the jury must determine "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment . . . rather than a death sentence be imposed." *Id.* § 2(e)(1). Texas law required the trial court to instruct the jurors (1) they must return an answer of "yes" or "no" on the mitigation issue, and (2) they may only answer "no" if they unanimously agree, and they may not answer "yes" unless ten or more jurors agreed. *Id.* § 2(f).

Based upon the jury's answers to the special issues, the trial court set Renteria's punishment at death.

### C. Post-Conviction Proceedings

On direct appeal, the Texas Court of Criminal Appeals affirmed Renteria's conviction, but vacated his sentence. *Renteria I*, 206 S.W.3d at 710. It held the trial court denied Renteria his federal constitutional rights when it prohibited the defense from introducing evidence of Renteria's remorse. Renteria expressed remorse in his statement to the police. But a state expert claimed Renteria would be a future danger because he lacked remorse. And the State argued during closing that Renteria made no statement of remorse.

-4-

*Id.* at 694–99. The Court of Criminal Appeals remanded Renteria's case for a new punishment trial. *Id.* at 710.

### D. Renteria's Second Penalty Phase Trial

#### 1. Voir Dire

Renteria filed a motion to submit a comprehensive, 44-page jury questionnaire before jury selection for his punishment retrial. Clerk's R., vol. 3 (Mem. of Law in Supp. of Def's' Right to Submit a Comprehensive Capital Murder Juror Questionnaire), pp. 18–67, ECF No. 78-20; Reporter's R., vol. 77 ([Proposed] Juror Questionnaire), pp. 87–130, ECF No. 82-9. The trial court heard argument and denied the request. *Id.* at 68. The court instead used its own, 42-page jury questionnaire, which included substantive areas of inquiry like those in Renteria's proposed questionnaire. Reporter's R., vol. 2, pp. 6–14, ECF No. 79-14; Reporter's R., vol. 77 (Juror Questionnaire), pp. 21–62, ECF No. 82-9.

During individual voir dire, the trial court limited Renteria's questions about juror views on specific mitigating evidence. Clerk's R., vol. 9 (Mot. for New Trial), pp. 68–79, ECF No. 79-12. The trial court denied Renteria's for-cause challenges to 22 prospective jurors. *Id.* at pp. 89–135. But the trial court also granted Renteria seven additional peremptory challenges, giving him a total of 22 challenges.[2] Reporter's R., vol. 28 (voir dire of Robert Crosby), p. 63, ECF No. 80-20; Reporter's R., vol. 29 (voir dire of Robert L. Martinez), p. 233, not scanned into ECF; Reporter's R., vol. 30 (voir dire of Margaret A. Jackson), p. 69, not scanned into ECF; Reporter's R., vol. 34 (voir dire of Daniel Gurany), p. 66, not scanned into ECF.

---

[2] Texas state law entitles the defense to fifteen peremptory challenges. See Tex. Code Crim. Pro. art 35.15(a). Texas case law allows a trial court to allocate additional peremptory challenges when the defense expends their original allotment. See Cooks v. State, 844 S.W.2d 697, 717 (Tex.Crim.App.1992) ("It is clearly within the discretion of the trial court to grant additional peremptory challenges upon exhaustion of the statutory number of strikes.").

## 2. The State's Evidence

The State presented evidence of Flores's murder at Renteria's second punishment trial. *See Renteria II*, 2011 WL 1734067, at *1–3 (providing a more complete summary of the State's evidence). The State also presented evidence of Renteria's troubles with the law in the years leading up to Flores's murder.

The State showed that in 1992, Renteria was accused by a seven-year-old girl of molesting her in her home. Renteria pleaded guilty to indecency with a child in 1994, and was placed on deferred-adjudication probation for ten years.

The State further showed that while on probation, Renteria committed driving while intoxicated (DWI) offenses in 1995, 1997, and 2000. He pleaded guilty to the first two DWI offenses and was placed on probation for two years. He pleaded guilty to the third DWI offense—a felony—in September of 2000, and was placed on shock probation for ten years. He was incarcerated for approximately three months and released to community supervision in December 2000.

The State also showed that Renteria violated the terms of probation at various times by drinking alcohol, staying out past curfew, driving without a valid driver's license, traveling to Mexico, and spending time with children. He also failed at times to report to his probation officer. The State described his participation in sex-offender counseling as "inconsistent," "sporadic," and "enough just to get by." Moreover, the State claimed Renteria was dishonest with his sex-offender-treatment counselor, his probation officers, and his employers.

## 3. Renteria's Evidence

Renteria presented evidence through the testimony of his family, his childhood dance instructor, a high school classmate, the staff at his school, and a mental health expert. They described him as a good kid—quiet, friendly, respectful, studious, popular, altar boy,

National Honors Society member, scholarship recipient, and extracurricular activity participant—whose life came apart after his arrest and conviction for indecency with a child.

Renteria's mother, Eva Renteria, testified she grew up in Mexico. Reporter's R., vol. 67 (Testimony of Eva Renteria), p. 6, ECF 81-19. She had two sons and a daughter with her first husband. *Id.* She moved to the United States when she was twenty, and five years later she married Renteria's father. *Id.* at pp. 7, 10–11. She explained Renteria's father was forty-two years old when they married. *Id.* at p. 7. She claimed she stayed at home while Renteria's father worked three jobs. *Id.* at pp. 9–11. She described her family as "not wealthy," but able to pay for Renteria to attend private schools in El Paso. *Id.* at p. 17–20.

Renteria's mother and sister, Cecelia Esparza, described him as a smart student, achieving honors while in school. *Id.* at 30; Reporter's R., vol. 67 (Testimony of Cecelia Esparza), p. 100–01, ECF 81-19. His mother explained he graduated from high school and attended the University of Texas at El Paso. *Id.* 30. His sister described him as studious, popular, but also passive and "wimpy." *Id.* pp. 100–02, 118.

Renteria's mother testified Renteria engaged in extracurricular activities while in school. She said he participated in a dance group, and performed at various community and senior citizen functions. He also took part in the Border Patrol Explorer and Police Explorer programs, which allowed him to assist customs and police officials in their duties. *Id.* at p. 28.

Renteria's mother explained Renteria was also active in the church and served as an altar boy. *Id.* at pp. 21–22, 106. She noted he was once chosen by his school to travel to Rome, Italy, to visit the Pope. *Id.* at p. 28.

Renteria's sister testified that her parents rarely allowed Renteria to go out with friends. *Id.* at p.110. She described the domestic abuse she witnessed with her brother. *Id.* She described their father as occasionally physically abusive to their mother, hitting her with

his fists or a belt. She explained Renteria tried to protect her from witnessing the abuse, and recalled he once tried to intervene and stop his father from hitting their mother. *Id.* at p. 111.

Renteria's mother and sister also described how Renteria's personality changed after his conviction for indecency with a child. Prior to that offense, they depicted Renteria as always happy and frequently socializing with his friends. *Id.* at pp. 32, 119–21. Following the conviction, they described Renteria as often sad and abusing alcohol. *Id.* at pp. 30–36, 119–21, 142–45. They claimed the conviction made it difficult for him to find work. *Id.* at pp. 35–36, 143. Nonetheless, they noted Renteria helped his parents pay their bills when his father became unemployed. *Id.* at p. 35.

Renteria's mother testified the family lived on the Tigua reservation as enrolled tribal members. *Id.* at p. 13. They were "evicted" when the tribal council forced out 600 families. *Id.* at pp. 37–40. She explained the tribal council shut off their water supply and tribal members threatened them. *Id.* at p. 124. She claimed she saw some people walking in the neighborhood carrying guns and other people dragging residents from their homes. *Id.* at p. 124.

Renteria's mother explained Renteria and his father left the Tigua reservation to find work. *Id.* at p. 124. Unable to return, they lived in a van while she barricaded herself in the family's home for a month in her unsuccessful effort to save it. *Id.* at p. 39. After the tribal council forced the family off the Tigua reservation, they lived in a small apartment, which she described as "the worst." *Id.* at p. 38.

The defense also presented testimony of individuals who knew Renteria as a child.

Roberto Parra testified he led a dance group which performed at various locations in the community. Reporter's R., vol. 66 (Testimony of Roberto Parra), p. 19, ECF 81-18. Parra claimed he met Renteria in 1983 when he and his sister joined the dance group. *Id.* at pp. 19–20. Parra said he was impressed with Renteria's close relationship with his parents, although he noted that Renteria's parents did not allow Renteria to travel out of town with the

-8-

dance group. *Id.* at pp. 22–23. Parra described Renteria as very polite and respectful. *Id.* at p. 25.

Jorge Cortez identified himself as a high school classmate. Reporter's R., vol. 66 (Testimony of Jorge Cortez), pp. 34–35, ECF 81-18. Cortez labeled Renteria as quiet, friendly, respectful, and non–violent. *Id.* at p. 37. Cortez claimed he did not often see Renteria out of school. But recalled an incident when Renteria was out with friends, lost his class ring, and got his car stuck in the desert. Cortez described how Renteria's father unexpectedly arrived and argued with Renteria. *Id.* at pp. 38–39.

Lenore Armstrong identified herself as elementary school teacher. Reporter's R., vol. 66 (Testimony of Lenore Armstrong), p. 46, ECF 81-18. Armstrong claimed she knew Renteria from kindergarten through eighth grade. *Id.* at p. 47. Armstrong described Renteria as a good student with above average grades. *Id.* at p. 49.

Maria Schuerman declared she also taught at Renteria's elementary school. Reporter's R., vol. 66 (Testimony of Maria Schuerman), p. 54, ECF 81-18. Schuerman believed Renteria's parents cared very much for his welfare and education—and they always attended parent-teacher conferences. *Id.* at pp. 57–58. Schuerman described how Renteria's parents took him to the school's playground to play because the neighborhood where the family lived—the Tigua reservation— suffered from high rates of alcoholism and crime. *Id.* at p. 58. Schuerman depicted Renteria's parents as over-protective, but added they had good reason because their neighborhood was unsafe. *Id.* at p. 58. Schuerman described Renteria as respectful, an excellent student, artistic, and non-aggressive. *Id.* at p. 59. Schuerman testified that Renteria served in the school's safety patrol, collected certificates for his participation in academic tournaments, and received a scholarship from the Knights of Columbus. *Id.* at 67.

Oscar Santaella explained he served as the principal of Renteria's high school. Reporter's R., vol. 66 (Testimony of Oscar Santaella), p. 132, ECF 81-18. Santaella noted

Renteria was highly recommended by his elementary school teachers for admission into the school. *Id.* at p. 123. Santaella added Renteria was a good student—a member of the National Honor Society—and he participated in student council and in community service activities. *Id.* at p. 134. Santaella also noted Renteria received an award from the Daughters of the American Revolution to recognize his community service. *Id.* at p. 147.

Enrique Vaca claimed he met Renteria in 1986 when Renteria participated in a program called Police Explorers, which allowed young people to work with law enforcement personnel. Reporter's R., vol. 66 (Testimony of Enrique Vaca), p. 123, ECF 81-18. Vaca said he supervised Renteria for at least six months. *Id.* at p. 124. Vaca testified Renteria was the most active program participant, very responsible, and admired by the other participants. *Id.* at pp. 124–25.

Severo Jimenez explained he was a retired officer of the El Paso Police Department. Reporter's R., vol. 67 (Testimony of Severo Jimenez), p. 58, ECF 81-19. Jimenez claimed he met Renteria when Renteria worked as a housing project aid. *Id.* at p. 59. Jimenez described Renteria as dependable, punctual, trustworthy, and polite. *Id.* at p. 60.

The defense also presented testimony regarding Renteria's prior incarcerations.

Robert Kaminski—a correctional officer with the El Paso Sheriff's Department— testified Renteria was held in the county jail where he worked for two years. Reporter's R., vol. 67 (Testimony of Robert Kaminski), p. 64, ECF 81-19. Kaminski explained Renteria was not aggressive and was not a threat to the staff or other inmates. *Id.* at pp. 72–73.

James Nance—also with the El Paso Sheriff's Department—confirmed Renteria had not posed a threat of violence to the staff or other inmates in the county jail. Reporter's R., vol. 67 (Testimony of Robert Kaminski), p. 89, ECF 81-19.

Frank AuBuchon—a classification expert with the Texas Department of Criminal Justice—noted Renteria had no disciplinary records from his prior incarcerations in prison or on death row. Reporter's R., vol. 68 (Testimony of Frank AuBuchon), p. 80, ECF 81-20.

AuBuchon also noted the mental health evaluations Renteria underwent in prison showed he did not pose a risk to himself or others. *Id.* at p. 84. He testified that—if sentenced to life—Renteria would reside in a maximum-security facility. *Id.* at pp. 39–40.

The defense also presented the testimony of a forensic psychologist, Dr. Mark Cunningham.

Dr. Cunningham testified he was an expert in capital sentencing determinations, risk assessment, and forensic psychology. Reporter's R., vol. 69 (Testimony of Dr. Mark Cunningham), p. 41, ECF 82-1. Dr. Cunningham explained in preparation for his testimony, he interviewed Renteria, Renteria's family members, and other individuals who knew Renteria throughout his life. He also reviewed Renteria's education, jail, and prison records. *Id.* at pp. 46–49, 80. Dr. Cunningham testified that—based on his analysis—Renteria would likely have a "positive prison adjustment" and would likely not commit acts of serious violence while in prison. *Id.* at p. 92; Reporter's R., vol. 70 (Testimony of Dr. Mark Cunningham), pp. 84, 90, ECF 82-2. He noted Renteria exhibited no violence in jail or prison during his prior six years of incarceration. Reporter's R., vol. 70, pp. 23–24. Dr. Cunningham opined Renteria would likely die in prison. *Id.* at p. 88.

Like Renteria's mother and sister, Dr. Cunningham testified about Renteria's good character and "pro-social" activities as a child. *Id.* at pp. 33–36. Dr. Cunningham noted several factors indicated Renteria would not pose a future danger: (1) Renteria's "community stability," (2) employment history, (3) education, and (4) close ties to his family. *Id.* at pp. 33–36. Dr. Cunningham professed he had "never observed a childhood behavior pattern that [was] this positive in its involvement in church and school and community activities." *Id.* at p. 60.

Dr. Cunningham also described Renteria's family background. He explained that—while the family outwardly appeared "idyllic"—it was actually "pathological." *Id.* at pp. 60–62. He explained Renteria's mother was only fifteen years old when she first became

pregnant with an older man's child. *Id.* at pp. 62–63. She married that man and later had two more children with him. *Id.* at pp. 62–63. Her husband was murdered while she was pregnant with their third child. *Id.* at pp. 62–63. Renteria's father was also previously married. He married a sixteen-year-old woman with whom he had a child in 1942. *Id.* at pp. 63–64. He started dating Renteria's mother—who was seventeen years younger—soon after his first wife died. *Id.* at pp. 63–64. He proposed to Renteria's mother only three days after he met her. *Id.* at pp. 63–64. He never allowed Renteria's mother to see her children from her first marriage. *Id.* at p. 64. He also verbally and physically abused of Renteria's mother. *Id.* at pp. 64, 65. According to Dr. Cunningham, Renteria's father routinely beat his wife. *Id.* at p. 66. And Renteria and his sister witnessed the abuse, although Renteria was never beaten. *Id.* at pp. 67, 70.

### 4. The Sentence

Based upon the jury's answers to the first special issue—the future dangerousness issue—and the second special issue—the mitigation issue—at the second punishment trial, the trial court re-sentenced Renteria to death. The Court of Criminal Appeals affirmed the sentence. *Renteria II*, 2011 WL 1734067, at *48. The Supreme Court denied certiorari. *Renteria v. Texas*, 132 S. Ct. 1743 (March 19, 2012).

### E. State Habeas Applications

The Court of Criminal Appeals denied Renteria's three pending state applications for writs of habeas corpus. *Ex parte Renteria*, WR-65,627-01 (filed August 28, 2006), -02 (filed August 1, 2012), -03 (filed August 7, 2014); ECF No. 83-14.

### F. Claims for Relief

Renteria alleges the following grounds for federal habeas relief in his petition:

Claim I - Renteria was tried while incompetent in violation of the Due Process Clause of the Fourteenth Amendment. Renteria's trial counsel ineffectively failed to bring clear-cut indicia of incompetence to the attention of the trial court and request a hearing and/or independent determination of competency. Pet'r's Pet. 13–16, ECF No. 53; Br. in Supp. 13–17, ECF No. 58.

Claim II - Renteria's trial counsel ineffectively failed to present mitigating evidence to the second penalty juror in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Pet'r's Pet. 16–20; Br. in Supp. 17–21.

Claim III - Renteria's rights under the Sixth, Eighth and Fourteenth Amendments were violated when (1) the trial court refused to permit him to offer accurate evidence of his lack of parole eligibility; (2) instructed the jury in a misleading and confusing manner and (3) permitted the State to offer false and misleading closing argument that Renteria could be released from prison. Pet'r's Pet. 21–28; Br. in Supp. 21–32.

Claim IV - Renteria's federal constitutional guarantees of effective assistance of counsel, trial by an impartial jury, an individualized sentencing determination, and due process of law were violated when the trial court prohibited questioning during voir dire regarding the jurors' ability to consider and give effect to mitigating circumstances and to consider the full range of punishment, and otherwise follow the law. Pet'r's Pet. 28–90; Br. in Supp. 32–46.

Claim V - Renteria's constitutional rights were violated in multiple respects by the trial court's jury charge at the second penalty trial. Pet'r's Pet. 91–99; Br. in Supp. 46–54.

Claim VI - Renteria's rights under the Fifth, Sixth and Fourteenth Amendments were violated when the State was permitted to question Dr. Cunningham regarding counsels' decision to not permit this expert to discuss the offense with Renteria. Pet'r's Pet. 99–101; Br. in Supp. 55–56.

## II. STANDARD OF REVIEW

In the federal judicial system, "collateral review is different from direct review." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993). The writ of habeas corpus is "an extraordinary remedy," reserved for those petitioners whom "society has grievously wronged." *Id.* at 633–34. It "is designed to guard against extreme malfunctions in the state criminal justice systems." *Jackson v. Virginia*, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring)). It provides an important, but limited, examination of an inmate's conviction and sentence. *See Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("[S]tate courts are the principal forum for asserting constitutional challenges to state convictions."). As a result, the federal habeas courts' role in reviewing state prisoner petitions is exceedingly narrow.

"The federal courts' statutory authority to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act (AEDPA)." *Wilson v. Cain*, 641 F.3d 96, 99–100 (5th Cir. 2011). The AEDPA "imposes a highly deferential standard of review for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per curiam) (quoting *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam)).

### A. Claims Adjudicated in State Court

A federal habeas court presumes that claims raised in state-court proceedings have been adjudicated "on the merits in the absence of any indication or state-law procedural principles to the contrary." *Johnson v. Williams*, 568 U.S. 289, 298 (2013). It reviews adjudicated claims under 28 U.S.C. § 2254(d). *Harrington*, 562 U.S. at 98–99. Under this subsection, a federal habeas court's review "is limited to the record that was before the state

court." *Cullen v. Pinholster*, 536 U.S. 170, 181 (2011). It may not grant habeas relief unless the state-court adjudication of a claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000).

The "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Pursuant to the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) ("A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish that the state court's decision is "contrary to" clearly established federal law; "the state court need not even be aware of [Supreme Court] precedents, so long as neither the reasoning nor the result of the state-court decisions contradicts them." *Mitchell*, 540 U.S. at 16 (citation omitted).

Pursuant to the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme

Court's decisions, but unreasonably applies that principle to the facts of the petitioner's case. *Brown*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132–33 (2010); *see also Wiggins*, 539 U.S. at 520–21. An "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("[I]t is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner."). As the Supreme Court has explained, the petitioner "must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington,* 562 U.S. at 103).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings—as opposed to the dicta—of Supreme Court decisions established those principles at the time of the relevant state-court decisions. *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004); *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). What constitutes "clearly established federal law" is determined through review of the decisions of the Supreme Court—not the precedent of other federal courts. *See Lopez v. Smith*, 135 S. Ct. 1, 2 (2014) (holding that the AEDPA prohibits the federal courts of appeals from relying on their own precedent to conclude that a constitutional principle is "clearly established").

When the state court rejects a claim pursuant to a state procedural rule which provides an adequate basis for the decision—independent of the merits of the claim—the procedural default bars a federal habeas claim. *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008) (citing *Coleman v. Thompson*, 501 U.S. 722, 729–32 (1991)). To be "adequate" to support the judgment, the state law ground must be both "firmly established and regularly followed" by the state courts. *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991).

The AEDPA also significantly restricts the scope of federal habeas review of state courts' findings of fact. Section 2254(d)(2) precludes federal habeas corpus relief on any claim adjudicated on the merits in the state court unless the state court's adjudication resulted in a decision based on an unreasonable determination of the facts considering the evidence presented in the state court proceeding. *Wood v. Allen*, 558 U.S. 290, 301 (2010). Even if reasonable minds reviewing the record might disagree about the factual finding in question— or the implicit credibility determination underlying the factual finding—"on habeas review that does not suffice to supersede the trial court's . . . determination." *Rice v. Collins*, 546 U.S. 333, 342 (2006); *Wood*, 558 U.S. at 301.

Moreover, § 2254(e)(1) requires that a petitioner challenging state court factual findings establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro*, 550 U.S. at 473–74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice*, 546 U.S. at 338–39; *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El*, 545 U.S. at 240 (explaining that the standard is "demanding but not insatiable"); *Miller-El*

*v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

Finally, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality—or lack thereof—of the state court's written opinion supporting its decision. *Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010); *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*).

## B. Claims Not Adjudicated in State Court

The AEDPA requires that a petitioner exhaust his available State remedies before raising a claim in a federal habeas petition. *See* 28 U.S.C. § 2254(b)(1) (stating that habeas corpus relief may not be granted "unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State"). A petitioner satisfies the exhaustion requirement if he presents the substance of his federal habeas claim to the highest state court in a procedurally proper manner. *Baldwin v. Reese*, 541 U.S. 27, 29–32 (2004); *Moore v. Cain*, 298 F.3d 361, 364 (5th Cir. 2002).

In Texas, the highest state court for criminal matters is the Texas Court of Criminal Appeals. *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998). A petitioner must "present the state courts with the same claim he urges upon the federal courts" to properly exhaust a claim. *Picard v. O'Connor*, 404 U.S. 270, 276 (1971).

In *Coleman v. Thompson*, 501 U.S. 722 (1991), the Supreme Court barred federal habeas relief on unexhausted or procedurally defaulted claims unless the petitioner demonstrated cause for the default and actual prejudice arising from the default—or showed

-18-

the failure to consider the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50; *Barrientes v. Johnson*, 221 F.3d 741, 758 (5th Cir. 2000). The Supreme Court added—because a petitioner "had no right to counsel to pursue his appeal in state habeas"—an attorney's negligence in a postconviction proceeding could not serve as "cause." *Coleman*, 501 U.S. at 755, 757. In *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Renteria v. Thaler*, 569 U.S. 413 (2013), however, the Supreme Court revised its position and opined a petitioner could meet the cause element by showing "(1) that his claim of ineffective assistance of counsel at trial is substantial—i.e., has some merit—and (2) that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013).

A petitioner may not escape 28 U.S.C. § 2254(d)'s deferential review by "using evidence that is introduced for the first time" in federal court. *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011). Claims without a state-court merits adjudication are subject to § 2254(e)(2)'s limitation on new evidence. *Pinholster*, 563 U.S. at 185–86. A petitioner must first prove that he "made adequate efforts during state-court proceedings to discover and present the underlying facts." *Williams*, 529 U.S. at 430. If the petitioner was less than diligent in developing the facts, an evidentiary hearing is permissible only where (1) there is a new, retroactive rule of constitutional law, or (2) the facts could not have been discovered with due diligence and such facts demonstrate actual innocence of the crime by clear and convincing evidence. 28 U.S.C. § 2254(e)(2)(A)–(B).

If, on the other hand, the petitioner did exercise diligence, a district court nevertheless has discretion to deny a hearing. *Schriro*, 550 U.S. at 468. A district court should grant a hearing only where the inmate was denied a full and fair hearing in state court and the inmate's allegations, if true, would warrant relief. *Blue*, 665 F.3d at 655. But a district court

may deny a hearing if the federal record is sufficiently developed to make an informed decision. *McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir. 1998).

## C. Ineffective Assistance of Counsel Claims

The standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs ineffective assistance of trial counsel claims. To prove such a claim, a petitioner must satisfy both prongs of the *Strickland* test by showing (1) constitutionally deficient performance by counsel, and (2) actual prejudice to his legal position. *Id.* at 689–94; *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994). A court need not address both components if the petitioner makes an insufficient showing on one. *Strickland*, 466 U.S. at 697.

To demonstrate deficiency, a petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. A court considering such a claim "must indulge a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Id.* at 689.

To demonstrate prejudice, a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Porter v. McCollum*, 558 U.S. 30, 38–39 (2009) (citation omitted). A mere allegation of prejudice is not enough to satisfy the prejudice prong of *Strickland*. *Armstead v. Scott*, 37 F.3d 202, 206 (5th Cir. 1994). The probability "of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. Thus, counsel's performance is entitled to "a heavy measure of deference" by a reviewing court. *Cullen*, 563 U.S. at 197 (citation omitted).

Moreover, where a state court has adjudicated a petitioner's ineffective assistance of counsel claims, the federal court must review those claims "through the deferential lens of §

2254(d)," *id.* at 190, and must consider not only whether the state court's determination was incorrect, but also "whether that determination was unreasonable." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citing *Schriro*, 550 U.S. at 473). Pursuant to 28 U.S.C. § 2254(d), "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.* As such, "[e]stablishing that a state court's application of *Strickland* was unreasonable . . . is all the more difficult." *Harrington*, 562 U.S. at 105. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

In those instances where a state court failed to adjudicate a claim under the *Strickland* test—such as when the state court summarily dismissed the claim under the Texas writ-abuse statute or the petitioner failed to fairly present the claim to the state court—a federal habeas court's review of the un-adjudicated claim is *de novo*. *See Porter*, 558 U.S. at 39 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts failed to address this prong of the *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins*, 539 U.S. at 534.

## III. ANALYSIS

**A. Claim I - Renteria was tried while incompetent in violation of the Due Process Clause of the Fourteenth Amendment. Renteria's trial counsel ineffectively failed to bring clear-cut indicia of incompetence to the attention of the trial court and request a hearing and/or independent determination of competency. Pet'r's Pet. 13–16, ECF No. 53; Br. in Supp. 13–17, ECF No. 58.**

### 1. Background

The trial court appointed the El Paso Public Defender's Office to represent Renteria

on December 3, 2001. Clerk's R., vol. 1, p. 47 (Order Appointing Attorney), ECF No. 73-4.

At an ex parte hearing on March 4, 2002, Renteria's trial counsel asked the trial court to

appoint Dr. James Schutte, a licensed psychologist, to test and evaluate Renteria:

> We need to have Mr. Renteria tested and evaluated.
> Judge, I'm not raising an insanity defense nor am I suggesting that he
> is incompetent to testify or incompetent to stand trial.
> Quite the contrary. I believe -- I'm most assured that he is competent.

Reporter's R., vol. 5 (Ex Parte Hearing), p. 6, ECF No. 74-18. The trial court granted the

request, as well as trial counsels' request on April 15, 2002, for additional funding to pay Dr.

Schutte. *Id.* at 9; Reporter's R., vol. 7 (Ex Parte Hearing), pp. 4–5, ECF No. 74-20.

Dr. Schutte reported Renteria's psychological testing indicated he had obtained a full-

scale IQ score of 102 and "exhibited twelfth-grade skills in reading, spelling, and math."

Schutte Report 1, ECF No. 95-3. Dr. Schutte explained Renteria's performance on measures

of neuropsychological functioning was normal, with only a deficit in "divided attention" and

mild-to-moderate impairment on "the single most sensitive measure of brain impairment."

*Id.* He added Renteria did not exhibit any indication of psychopathology. *Id.*

Dr. Schutte noted, however, Renteria did not respond to test questions on three

personality inventories "in an open and honest manner. [Renteria] tried to present an overly

favorable self-image, and denied even minor problems and flaws most people are willing to

acknowledge." *Id.* He pointed out yet another test showed Renteria exhibited "a strong

tendency towards deceptive self-presentation, characterized both by a tendency to claim unrealistic virtue and a denial of even common problems and flaws most people are willing to acknowledge. [His] responses suggest[ed] he both want[ed] to impress others and lack[ed] insight into his own behavior. As such he appear[ed] to be deceiving both himself and those around him." *Id.* at 2.

Dr. Elizabeth Doyle evaluated Renteria beginning on January 30, 2003, to determine his competence to proceed to trial. Doyle Report 1, ECF No. 95-4. She reviewed the summary of prior psychological testing administered by Dr. Schutte; a social narrative written by Renteria's mitigation specialist, Amelia Castillo, LMSW-ACP; and prior records from Renteria's school, employment, and sexual offender treatment. *Id.* She interviewed Renteria for twelve hours over a two-day period. *Id.*

Dr. Doyle noted "Renteria did understand that he had been charged with capital murder." *Id.* She observed "Renteria understands the role of the judge, a jury, prosecutor and defense attorney. He was oriented appropriately, he appeared to be able to relate to his attorneys, and generally was able to manage . . . think logically." *Id.* She added "[h]e was able to describe some, but not all, of the events during the period of time in question." *Id.* at 2. Consequently, she diagnosed Renteria with dissociative amnesia:

> [H]e has episodes of amnesia in which he is unable to account for certain periods of time. He has no memory of certain actions he performed, unrelated to the crime, that have been described by others and which are likely to have other means of being corroborated. For instance, he has no-memory of making 2 out of 3 phone calls that he made to his wife during the period of time in question. The extent of this memory lapse is beyond that which would be explained by ordinary forgetfulness and is best characterized by the diagnosis of *dissociative amnesia*.

*Id.* (emphasis in original). Based on Renteria's diagnosis and his claimed inability to recall important events related to his case, Dr. Doyle found that he was not able to properly consult with his counsel and, she believed, he was therefore not competent to proceed to trial:

In my professional opinion, Mr. Renteria is not currently competent to stand trial; that is, he does not have sufficient ability to consult with defense counsel. The symptoms of dissociative amnesia prevent the defendant from consulting with counsel regarding important factual elements of his actions during the evening the crime was committed. While the defendant does have a factual and rational understanding of the charges against him, the possible penalties arising from these charges and understands the relevant legal proceedings, he cannot provide a coherent and complete version of his actions that would allow his attorneys to formulate a competent defense.

*Id.*

On April 29, 2003, the trial court granted trial counsels' request to have Renteria undergo an additional psychiatric examination by Dr. Ann Salo. Clerk's R., vol. 1 (part 2 of 2), p. 40 (Order), ECF No. 73-5. The trial court ordered the "examination and confidential report to be made to the ATTORNEY for the Defendant ONLY." *Id.*

Renteria now claims he was tried while incompetent. He notes Dr. Doyle evaluated and diagnosed him with dissociative amnesia before his trial. *See* Pet'r's Pet. 13–16, ECF No. 53. Renteria observes Dr. Doyle determined—based on this diagnosis and his claimed inability to recall some of the events on the day of Flores's murder—he was incompetent to proceed to trial. He comments—despite this finding—his trial counsel failed to obtain another opinion from a mental health professional or bring this finding to the attention of the trial court. Renteria argues, "[i]n short, trial counsel ineffectively failed to act on this important finding with regard to competency." *Id.* at 15.

Renteria concedes "[t]his ground for relief was not presented on direct appeal or in state post conviction proceedings." *Id.* 15–16. He attributes this failure "to the ineffectiveness of direct appeal counsel, and initial post-conviction counsel." *Id.* at 16. Renteria explains "[t]his claim presents three procedural defaults." Pet'r's Reply 3, ECF No. 94. First, trial counsel did not raise the substantive competency claim during trial. Second, appellate counsel did not raise the competency claim on direct appeal. Finally, state habeas

-24-

counsel did not raise an ineffective assistance of trial and appellate counsel claim for failing to raise the competency issue in his state writ application. He argues "any default of the claim is overcome by prior counsels' ineffective failure to present it." Pet'r's Pet. 16, ECF No. 53.

### 2. Applicable Law

The Due Process Clause of the Fourteenth Amendment requires that a criminal defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and . . . a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). "[T]he failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." *Drope v. Missouri*, 420 U.S. 162, 172 (1975).

In Texas, "[a] person is incompetent to stand trial if the person does not have: (1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against the person." Tex. Code Crim. Proc. Ann. art. 46B.003(a) (West).

While due process requires competency for the trial of an accused person, a habeas court should only consider a claim alleging a defendant was incompetent to stand trial where the facts are "sufficient to positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to the mental capacity of the petitioner" at the time of trial. *Bruce v. Estelle*, 536 F.2d 1051, 1058–59 (5th Cir. 1976). Indeed, "the [habeas] petitioner's initial burden is substantial" and "extremely heavy." *Enriquez v. Procunier*, 752 F.2d 111, 114 (5th Cir. 1984).

### 3. Discussion

Renteria concedes his claim is unexhausted in the state courts. Pet'r's Pet. 15–16, ECF No. 53. He contends he can overcome the procedural default because of his "trial counsel's ineffective failure to pursue it," and "by the ineffective assistance of initial state post-conviction counsel." Pet'r's Reply 6, ECF No 94.

In *Coleman v. Thompson*, 501 U.S. 722 (1991), the Supreme Court barred federal habeas relief on procedurally defaulted claims unless the petitioner demonstrates cause for the default and actual prejudice arising from the default—or shows the failure to consider the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50. In *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Renteria v. Thaler*, 569 U.S. 413 (2013), the Supreme Court opined a petitioner could meet the cause element by showing "(1) that his claim of ineffective assistance of counsel at trial is substantial—i.e., has some merit—and (2) that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza*, 738 F.3d at 676.

The results of Renteria's psychological testing by Dr. Schutte were well within the normal range. Schutte Report at 1, ECF No. 95-3. More telling, Renteria's personality scales all indicated that Renteria "did not respond to the test questions in an open hand honest manner" and he was attempting "to be deceiving both himself and those around him." *Id.* at 2. Dr. Schutte subsequently explained his testing would not have shown dissociative amnesia:

> Dissociative amnesia, if it existed, would not necessarily appear on any of the memory testing that I administered. This is because my testing evaluated gross memory functioning, while a dissociative amnesia is due to the psychological impact of a past trauma and would manifest itself in event-specific amnesia.

Pet'r's Reply, Ex. (Declaration of James Schutte, Ph.D.), ECF No. 94-1.

Dr. Doyle diagnosed Renteria with dissociative amnesia because "[h]e was able to describe some, but not all, of the events during the period of time in question." *Id.* at 2. Importantly, Dr. Doyle based the dissociative amnesia diagnosis solely on Renteria's claim that he could not remember *some* details of Flores's kidnapping and murder.

But Dr. Doyle also found Renteria understood the charge against him and the role of the judge, jury, prosecutor and defense attorney. Doyle Report 1, ECF No. 95-4. She further found he was oriented appropriately, could relate to his attorneys, "and generally was able to manage . . . think logically." *Id.* In other words, she found Renteria had sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him. Thus, Renteria did not meet the requirements for mental incapacity to stand trial established by Texas Code of Criminal Procedure article 46B.003(a).

Other evidence readily contradicted Dr. Doyle's dissociative amnesia diagnosis.

At the time of his arrest on December 3, 2001, Renteria gave a five-page, single-spaced, typewritten custodial statement to the police. Reporter's R., vol. 69 (Voluntary Statement of Accused), pp. 11–15, ECF No. 78-4. In his statement, Renteria provided meticulous details about his trip to the Walmart on November 18, 2001—the day of Flores's murder—including where he parked his van, the entrance he used to enter the store, a detailed description of the clothing he was wearing, a list of items he purchased, a description of the cashier, and a summary of the conversation he had with a security guard in the parking lot:

> About two to three weeks ago on a Sunday I had gone shopping at Sam's on the east side with my family. I was with my mom my dad my wife my niece and maybe my 10 year old nephew Hector Chavez. We had gone to Sam's in my dad's Suburban. We got back home at about 4:00P and we unloaded the groceries. We waited a little while at the house and were watching television. My wife wanted to make a special dish to eat but she needed some chiles [sic] and we didn't have any. So I told her that I would go and get them while she-got-the rest of the stuff ready. So I went alone in my 1984 Chevrolet G-20

conversion van. I went to the Wal-Mart on Alameda and Americas. This was at about 5:00P it was still light outside. I parked the van close to the gas station. The reason I parked there is because I had to leave it on. I was having problems with the starter. I went inside the Wal-Mart and entered through the west doors where the McDonalds is. I got a shopping cart from the parking lot. At the time I was wearing a white adjustable baseball cap that had "Taz" the Tasmanian devil on the front and he is like running, a plain green T-shirt, underneath the green T-shirt I was wearing a plain white T-shirt a pair black nylon swim trunks that are just above my knee, a pair of white socks at come up to the middle of my calf and a pair of white generic tennis shoes that are real old like about two years old. As soon as I walked into the Wal-Mart I headed to the produce section. I grabbed some red chiles [sic], some jalapeno peppers, chile [sic] serranos, some chile [sic] "guero" and I think I grabbed some limes. I also got some Campbell soups and that was it. I went through the check-outs and the cashier was a girl Hispanic. I left the store and went to the van. When I got to the van I saw that there was a security guard there. She asked me if it was my van and I told her yes. She said that she was there because she had seen it running and she wanted to check it out to make sure everything was ok. She wanted to make sure that no one would steal it. I told her the reason I had left it on was because I was having trouble with it. She said ok and that she didn't want nobody to rip it off. I put my groceries in the middle of the front two seats. Then I wanted to get some sweet bread so I went back inside the Wal-Mart.

Reporter's R., vol. 69 (Voluntary Statement of Accused), pp. 11–12, ECF No. 78-4.

Renteria explained how he encountered Flaco—a person he described as an "Azteca" prison gang member he previously met while in jail—and several of Flaco's companions when he went back inside the Walmart:

I was looking over some sweet breads and that's when I was approached. I had made eye contact with two individuals. I recognized one of the guys and he goes by the nickname of "Flaco." He looked at me and he made this gesture like he knew me and then he walked over to where I was at. I know who this guy is from jail. I had met him while I was at the annex. I was at the annex when I got arrested in August of last year on a bench warrant for violation of probation. I know that "Flaco" is a lieutenant in the Azteca prison gang. While I was in jail the Aztecas provided me with protection from other people that were in jail.

*Id.* at 12. Renteria claimed Flaco asked him to lure a little girl outside the store:

"Flaco" . . . motioned with his head and I looked in that direction and I saw some people . . . . He told me the one with the "pelo largo."[3] I did not see the

---

[3] Long hair.

girl's face, I just saw her side and she had long black hair. He then told me
. . . that was the girl he was referring to. I then asked him what he wanted. He
then told me to tell her that Raul or Ruben was waiting for her outside.

*Id.* at 12–13. Renteria described how he escorted Flores to a waiting van and was told to

follow the vehicle in his own van:

> I told her in English "Hey Raul is waiting for you outside." She looked like
> she knew the name and I then turned around and went outside and she
> followed me. . . . I exited through the east door and I paused to see if I could
> see them outside . . . . [A] 1988 or 1989 dark navy blue Grand Marquis with
> tinted windows and an early to mid-90s red or maroon min-van pulled up.
> "Flaco" was driving the Marquis and the other guy was with him. I saw that
> there was [sic] two guys in the min-van, but I did not get a good look at them.
> The stocky guy opened the front passenger door of the Marquis and came out.
> He came around to my side and got the little girl by the hand. He also told her
> "Vamos con Raul." I figured that they knew her or she knew them because
> she didn't say nothing and she went with them in the van. I saw that the guy
> walked the girl to the mini-van. This guy got into the mini-van with the girl
> through the sliding door. . . . Flaco . . . told me to follow them.

*Id.* at 13. Renteria explained how the men later transferred Flores's naked and lifeless body

to his van, and directed him drive to an alley off Mesa Street in El Paso. He added when they

arrived, they told him to take Flores's body from his van and place it on the ground. Then

they covered her body with gasoline and set her on fire:

> I went into the van and got her. I saw that the girl was laying [sic] face up on
> the seat and she had a plastic bag over her head. . . . I knew that she was dead.
> I put my arms underneath her and picked her up from her back and her legs.
> As best as I could I took her out of the van and I just stood there holding her
> and waiting for this guy to tell me what to do. He then told me to put her
> down and pointed down to the ground. . . . He then went over to the Grand
> Marquis and I saw that he took out a container like a gas can from the trunk.
> . . . I saw that he was pouring something a liquid over the little girl all over
> her body. The liquid smelled like gas. . . . That's when he ignited the little
> girl.

*Id.* at 14–15. Renteria maintained he helped Flaco and his companions out of fear they would

harm his family. He also claimed he limited his involvement to persuading Flores to walk

out of the Walmart and helping the others dispose of her body.

Based on Renteria's statement, trial counsel attempted to determine whether Flores's family was involved with a gang. *See, e.g.*, Clerk's R., vol. 2 (part 2 of 3), p. 14 (Second Mot. for Continuance), ECF 73-7 ("The victim's family has close connections with the Azteca gang that the Defendant said in his statement ordered the hit on the child."); Reporter's R., vol. 16 (Hearing on Def's Mot. for Continuance), p. 5, ECF 75-9 ("[W]e received information yesterday from a private source and official notification less than four hours ago that the mother of the victim in this particular case had a ten-year relationship with an Azteca Gang member. The Court I'm sure has read the confession of the defendant in which he says that this was an Azteca Gang hit rather than a sexual assault."); Reporter's R., vol. 64 (Jury Trial – Trial on the Merits), pp. 24-31, ECF 77-19 (questioning Officer Jeffrey Gibson regarding intercepted jail correspondence between Azteca gang members, which included threatening statement directed at Renteria based on "an incident involving the daughter of Mrs. Rubio"). Indeed, trial counsel proffered questions to the victim's mother—outside the presence of the jury—to elicit testimony regarding whether her family had been threatened and to show that her daughter's murder was a gang related:

> Your Honor this was a gang hit. And were [sic] going to show that the family received a death threat prior to this -- this incident that this incident is gang related that -- prison gang related that she has a relative who has been in and out of prison on drug charges that there are a large number of tips that the police received that this was a gang activity involving the uncle. This is our entire defense.

Reporter's R., vol. 53 (Jury Trial – Trial on the Merits), p. 32, ECF 77-8. After hearing the testimony, the trial court concluded the victim's mother had "no personal knowledge of any gang affiliations of anyone." Reporter's R., vol. 53 (Jury Trial – Trial on the Merits), pp. 46–47, ECF 77-8.

A defendant's dissociative amnesia diagnosis—standing alone—does not establish a mental incapacity to stand trial. The Texas Court of Criminal Appeals observed in *Gonzalez*

*v. State*, 313 S.W.3d 840 (Tex. Crim. App. 2010), "that 'no case yet reported . . . has held that the inability to recall the event charged because of amnesia constitutes mental incapacity to stand trial.'" *Id.* at 842 (quoting *Morris v. State*, 301 S.W.3d 281, 292 (Tex. Crim. App. 2009)). The Court or Criminal Appeals reasoned amnesia does not *per se* render a defendant incompetent to stand trial because:

> (1) amnesia is akin to "missing" evidence, (2) a contrary rule "would unduly hamper the State's interest in the prosecution of violators of its criminal laws and jeopardize the safety and security of other citizens," and (3) amnesia can be easily feigned.

*Id.* (quoting *Morris*, 301 S.W.3d at 292-93). *See also United States v. Doke*, 171 F.3d 240, 248 (5th Cir. 1999) ("This court has previously held that amnesia by itself does not render a defendant incompetent; rather, the 'circumstances of each individual case' must be considered.") (citing *Swanson*, 572 F.2d at 526).; *United States v. Mota*, 598 F.2d 995, 998 (5th Cir. 1979) ("In this circuit amnesia does not constitute incompetency *per se* to stand trial."); *Davis v. Wyrick*, 766 F.2d 1197, 1202 (8th Cir. 1985) ("Amnesia alone is not a bar to the prosecution of an otherwise competent defendant."); *United States v. Borum*, 464 F.2d 896, 900 (10th Cir. 1972) ("[W]e must reject the argument that the amnesia is a *per se* deprivation of due process. Prejudice must be shown to exist—that there are, for example, facts available which could not be obtained from the file of the prosecution or from investigation by the defense. There is no suggestion as to the existence of a tenable defense which has been locked in by the amnesia."); *United States v. Stevens*, 461 F.2d 317, 320 (7th Cir. 1972) ("[W]e do not believe that due process requires an amnesiac defendant who claims loss of memory go free without trial."). Rather, the competency determination in a trial of a purportedly amnesiac defendant "is a question to be determined according to the circumstances of each individual case." *Swanson*, 572 F.2d at 526 (recognizing the potential for "amnesia to become an unjustified haven for a defendant").

Renteria's counsel were in the best position to determine their client's competence to stand trial. *Medina v. California*, 505 U.S. 437, 450 (1992) ("[T]he defendant's inability to assist counsel can, in and of itself, constitute probative evidence of incompetence, and defense counsel will often have the best-informed view of the defendant's ability to participate in his defense."). The totality of the facts and circumstances surrounding this case show Renteria consulted with his lawyers with a reasonable degree of rational understanding and exhibited a factual understanding of the proceedings against him. Based on Renteria's multiple mental health examinations, detailed post-arrest statement, and the applicable law, his counsel made a well-reasoned, reasonable, strategic decision not to pursue a competency determination from the trial court.

Against this background, Renteria's claim—that his dissociative amnesia rendered him incompetent—simply fails. *Johnson v. Estelle*, 704 F.2d 232, 238 (5th Cir. 1983) ("Even assuming that Johnson was in fact suffering from a mental illness or disability at the time of trial, on the present facts we are unable to conclude that this mental deficiency precluded petitioner's meaningful participation in his defense."). The facts were not "sufficient to positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to the mental capacity of the petitioner" at the time of trial. *Bruce*, 536 F.2d at 1058–59. Any attempt by counsel to convince the trial court that Renteria was incompetent under Texas law to stand trial based on his dissociative amnesia would have been unavailing.

Renteria has not shown that his trial "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. He has not overcome the presumption that his trial counsel made reasonable strategic decisions concerning his case. *See Richter*, 562 U.S. at 109 ("Although courts may not indulge post hoc rationalization for counsel's decisionmaking that contradicts

-32-

the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions."). He has not overcome the "strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. As a result, Renteria's ineffective assistance of counsel at trial claim is not substantial. *Garza*, 738 F.3d at 676. Therefore, Renteria also fails to show good cause for his state habeas counsel's failure to exhaust his claim.

Consequently, Renteria has not demonstrated cause for his procedural default, actual prejudice arising from the default, or the failure to consider his claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50; *Barrientes*, 221 F.3d at 758. His procedurally defaulted claim is barred.

**B. Claim II - Renteria's trial counsel ineffectively failed to present mitigating evidence [of his impaired mental health] to the second penalty juror in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Pet'r's Pet. 16–20, ECF No. 53; Br. in Supp. 17–21, ECF No. 58.**

### 1. Background

As discussed at length above, Renteria's counsel performed an extensive mental-health investigation. They obtained appointment of, and funding for, Dr. Schutte to evaluate Renteria. Dr. Schutte's report indicated Renteria was of average intelligence, only exhibited deficits in divided attention, and was mildly-to-moderately impaired on "the single most sensitive measure of brain impairment." Schutte Report 1, ECF No. 95-3. Renteria's responses on four personality scales indicated he responded deceptively. *Id.* at 1–2 ("[R]enteria appears to be deceiving both himself and those around him.").

Trial counsel then obtained Dr. Doyle's assistance. Dr. Doyle diagnosed Renteria with dissociative amnesia based on his self-reported inability to recall some of his actions on the night of the Flores's murder, and concluded that he was incompetent to stand trial due to his inability to adequately consult with his counsel. Doyle Report at 1–2, ECF 95-4.

Renteria's counsel also had Dr. Steven Glusman's report recounting Renteria's history of closed head injuries, loss of consciousness, and childhood trauma. Dr. Glusman Report, ECF No. 95-5. And they had Renteria evaluated by psychiatrist Dr. Salo.

But Renteria's counsel did not present this evidence concerning his mental health to the jury.

Renteria claimed his counsel failed to present "readily available" mitigating evidence in allegation 9 of his second state writ application:

> Applicants death sentence violates the Sixth Amendment to the United States Constitution because Applicant was deprived the effective assistance of counsel at the punishment phase of his trial in that his trial counsel failed to investigate and present any substantial readily available evidence in mitigation of the death penalty.

-34-

State Habeas R, WR 65,627-02 (Am. Pet., Nov. 19, 2010), p. 80, ECF No. 83-21.

In response to this claim, the State offered the following proposed findings of fact and conclusions of law:

## FINDINGS OF FACT

. . . .

93. During the punishment retrial defense counsel presented two full days of testimony from witnesses describing Renteria's character specifically that he was respectful and non-aggressive as a child and teenager. Defense counsel also presented testimony from Renteria's mother and sister describing his upbringing and family life including the fact that he was an altar boy and an honor student. Renteria's sister described for the jury some physical abuse of Renteria's mother by his father during Renteria's childhood years. And both Renteria's sister and mother testified that Renteria's personality changed after he was first placed on probation for indecency with a child in 1994 and he started making bad decisions.

94. Defense counsel also presented evidence that Renteria had no disciplinary problems while incarcerated. And counsel also presented the testimony of Dr. Cunningham who likewise described the extent of Renteria's pro-social activities, and who concluded that he Dr. Cunningham had "never observed a childhood behavior pattern that is this positive in its involvement in church and school and community activities. I've never observed th-at [sic] degree of extra curricular pro-social adjustment in a capital offender.

95. In his writ application Renteria does not allege what additional mitigating evidence was available or what additional mitigating evidence could and should have been presented to the jury at the punishment retrial.

. . . .

## CONCLUSIONS OF LAW

. . . .

45. Because Renteria's trial counsel presented extensive mitigation evidence which in essence presented to the jury a complete picture of Renteria's entire life, Renteria's claim of ineffective assistance of counsel for failing to investigate and present mitigating evidence is not firmly founded in the record. See *Ex parte Woods*, 176 S.W.3d 224 226 (Tex. Crim. App. 2005); *Boggess v. State*, 855 S.W.2d 645, 647 (Tex. Crim. App. 1991), *cert. denied* 509 U.S. 921, 113 S. Ct. 3034 125 L.Ed.2d 721 (1993). Renteria has thus failed in his

burden of demonstrating ineffective assistance of counsel in this regard. *See Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

46. Because Renteria has failed to even allege what additional mitigating evidence could and should have been presented he has failed to plead any facts that would show his entitlement to relief. *See Ex parte Dutchover*, 779 S.W.2d 76, 78 (Tex. Crim. App. 1989); *Ex parte Maldonado*, 688 S.W.2d 114, 116 (Tex. Crim. App. 1985).

47. It was a reasonable trial strategy for defense counsel to focus primarily on the positive aspects of Renteria's childhood and upbringing to support the defensive theory that Renteria was not a future danger as opposed to emphasizing any alleged negative aspects of Renteria's childhood and upbringing in support of the mitigation issue such that Renteria has not shown and cannot show that defense counsel was ineffective for failing to further investigate and present evidence of alleged mitigation. *See Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052-2066, 80 L.Ed.2d 674 (1984); *Ex parte Martinez*, 195 S.W.3d 713 728 Tex. Crim. App. (2006); *Ex parte Woods*, 176 S.W.3d at 228; *Butler v. State*, No. 01-94-00756-CR, 1995 WL 416892, at 3 (Tex. App.-Houston [1st Dist.], July 13,1995 pet. ref'd) (not designated for publication).

48. Renteria has failed to show and cannot show a reasonable probability that the presentation of any additional mitigation evidence, whatever that might be, would have resulted in a different answer by the jury to the mitigation special issue. *See Ex parte Gonzalez*, 204 S.W.3d 391, 393-94 (Tex. Crim. App. 2006); *Ex parte Martinez*, 195 S.W.3d at 731; *Ex parte Woods*, 176 S.W.3d at 228.

49. Based on Conclusions of Law 45-48, above Renteria has failed in his burden of showing and cannot show that his trial counsel was ineffective for failing to investigate and present mitigating evidence at the punishment retrial.

State Habeas R, WR 65,627-02 (State' Proposed Findings of Fact & Conclusions of Law), pp

157–58, 189–90, ECF No. 83-24 (citations to the record omitted).

The Court of Criminal Appeals adopted the trial court's findings and conclusions

regarding allegation 9 and denied Renteria's state application for writs of habeas corpus:

The convicting court entered findings of fact and conclusions of law and recommended that relief be denied as to all of the claims. We agree with the convicting courts recommendations and adopt its findings and conclusions as to allegations 1 through 9 . . . Accordingly we deny relief on allegations 1 through 9 . . .

*Ex parte Renteria*, WR-65,627-02 (filed August 1, 2012), p. 5, ECF No. 83-14.

Renteria claims in his federal petition that his trial counsel failed to present mitigating facts related to his impaired mental health at his second penalty trial. Pet'r's Pet. 16, ECF No. 53. Renteria argues "[t]hese failures constituted ineffective assistance of counsel that undermines confidence in the resulting death penalty verdict." *Id.* Renteria explains "[t]he only witness who . . . touched upon issues related to his mental health was Dr. Mark Cunningham." *Id.* And Dr. Cunningham "primarily addressed his view that Mr. Renteria would not pose a future danger while in the custody of the Texas Department of Corrections." *Id.* (citing Reporter's R., vol. 69 (Testimony of Dr. Mark Cunningham), pp. 42–44 (regarding Dr. Cunningham's expertise in assessing future dangerousness), ECF No. 82-1). "[W]hen asked what mental health related materials he reviewed, [Dr. Cunningham] indicated that he reviewed only the information from Norma Reed (a sexual offender therapist) and Mr. Renteria's Texas Correctional files." *Id.* at 17 (citing Reporter's R., vol. 69, p. 49). Notably, Dr. Cunningham did not claim he reviewed copies of Dr. Doyle's report diagnosing Renteria with dissociative amnesia; Dr. Steven Glusman's report recounting Renteria's history of closed head injuries, loss of consciousness, and childhood trauma; or Dr. Schutte's report finding Renteria had a moderate impairment; "and multiple references in the mental health materials showing that Petitioner had unspecified trauma during his young life." *Id.* at 17– 20. Lastly, Renteria asserts that trial counsel were ineffective for failing to present evidence that Renteria might have been sexually abused as a child, possibly at the hands of the local clergy. *Id.* at 15.

Renteria acknowledges these claims remain unexhausted. *Id.* at 20. He argues "[t]he failure to present these claims was the result of the ineffectiveness of direct appeal counsel, as well as initial post-conviction counsel. Accordingly, any arguable procedural default of this claim can be overcome." *Id.*

## 2. Applicable Law

"The fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). "Justice . . . requires . . . that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Pennsylvania v. Ashe*, 302 U.S. 51, 55 (1937).

Under Texas's capital sentencing statute, the jury must answer two "special issues" before a sentence of death may be assessed. Tex. Code. Crim. Proc. art. 37.071 § 2(b) (Vernon 2001). Under the first special issue—the future dangerousness issue—the jury must decide "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Id.* Only after the State proves the defendant constitutes a continuing threat "beyond a reasonable doubt" will the jury consider the second special issue—the mitigation issue—the effect of *mitigating evidence* on the sentence. *Id.* §§ 2(c), (e)(1) (emphasis added).

"[T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). "Highly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Williams v. People of State of N.Y.*, 337 U.S. 241, 247 (1949). Consequently, "counsel has a duty to make

reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

Likewise, counsel must evaluate the information available to them before trial and determine what "conceivable line[s] of mitigating evidence" may exist to meet their professional obligation to their client. *Wiggins*, 539 U.S. at 533. Counsel must decide whether following any of those lines would likely lead to evidence which "would . . . assist the defendant at sentencing." *Id.*

"[A] tactical choice not to pursue one course or another 'should not be confused with the duty to investigate.'" *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990) (quoting *Beavers v. Balkcom*, 636 F.2d 114, 116 (5th Cir.1981)). In some circumstances, limited investigations into mitigating evidence may be reasonable. *See, e.g., Strickland*, 466 U.S. at 699 ("[T]he decision not to seek more character or psychological evidence than was already in hand was likewise reasonable."); *Burger v. Kemp*, 483 U.S. 776, 794-75 (1987) ("[C]ounsel's decision not to mount an all-out investigation into petitioner's background in search of mitigating circumstances was supported by reasonable professional judgment. . . . Having made this judgment, he reasonably determined that he need not undertake further investigation to locate witnesses who would make statements about Burger's past."); *Darden v. Wainwright*, 477 U.S. 168, 186 (1986) ("[T]he State could have responded with a psychiatric report. . . . For that reason, after consultation with petitioner, defense counsel rejected use of the psychiatric testimony."). But "counsel's failure to uncover and present voluminous mitigating evidence at sentencing" may not be justified as a tactical decision if counsel has not "fulfill[ed]" their obligation to conduct a thorough investigation of the defendant's background." *Wiggins*, 539 U.S. at 522.

A reviewing court must decide whether the attorney's decision either to forego investigation, or to stop investigating at some later point, was reasonable "'under prevailing professional norms.'" *Wiggins*, 539 U.S. at 522–23 (quoting *Strickland*, 466 U.S. at 688). In evaluating whether counsel's decisions were reasonable under the norms of the profession, the reviewing court must defer to trial counsel's decisions required by *Strickland*, taking into consideration "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527. Counsel's performance must be viewed objectively and "'from counsel's perspective at the time.'" *Id.* at 533 (quoting *Strickland*, 466 U.S. at 689). Stated simply, the court must decide whether a reasonable attorney would consider the information available to defense counsel worthy of further investigation, and if so, how much additional investigation a reasonable attorney would perform.

After completing the investigation, counsel must then make a strategic decision as to whether there is a "reasonable basis" to believe the evidence will minimize "the risk of the death penalty." *Burger v. Kemp*, 483 U.S. 776, 795 (1987). This decision must be "supported by reasonable professional judgment" and based on the "investigation into petitioner's background in search of mitigating circumstances." *Id.* "'Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Wiggins*, 539 U.S. at 521–22 (quoting *Strickland*, 466 U.S. at 690).

### 3. Discussion

Importantly, Renteria's claim does not allege his trial counsel failed to adequately investigate, but rather he focuses on his trial counsels' decisions about which evidence to present to the jury. Renteria argues that "[t]rial counsel failed to present a number of extant mitigating facts to the second penalty jury. These facts related primarily to Mr. Renteria's

impaired mental health." Pet'r's Pet. 11, ECF No. 53. He alleges Dr. Cunningham could have—and should have—presented such testimony. *Id.* at 11–12. Specifically, Renteria claims his trial counsel failed to elicit through Dr. Cunningham information from Dr. Doyle's competency report, neuropsychologist Dr. Steven Glusman's report, and Dr. Schutte's report, as well as an unsubstantiated allegation that Renteria suffered sexual abuse as a child. *Id.* at 12–15.

Dr. Doyle evaluated Renteria prior to trial and concluded that he was incompetent to stand trial due to his self-reported dissociative amnesia. Doyle Report 1–2, ECF No. 95-4. But Dr. Doyle also noted Renteria recalled some of the events which led to Flores's murder, which suggested Renteria's culpability:

> As part of the competence evaluation the defendant was asked to describe what he remembered about the events leading to his current charges. He was able to describe some, but not all, of the events during the period of time in question. *His descriptions of some of his actions are incredible and appear confabulated; that is, made up to cover an inability to remember.*

*Id.* at 2 (emphasis added).

Renteria next argues that trial counsel should have presented the evidence obtained through Dr. Glusman's neurologic evaluation. Pet'r's Pet. 13–14. He explains the evaluation revealed his "history of closed head injury, loss of consciousness, and childhood trauma." *Id.* at 13.

But Dr. Glusman's evaluation was unremarkable. It concluded Renteria had an "essentially . . . normal bedside neurologic examination." Glusman Report at 5. Dr. Glusman Evaluation, ECF No. 95-5. It noted Renteria had "an old history of closed head trauma." *Id.* at 1. It also noted Renteria claimed, "he drank beer *occasionally.*" *Id.* at 3 (emphasis added).

This last comment would have brought Renteria's credibility in to question, because

Renteria drank so heavily that he "committed three driving while intoxicated (DWI) offenses

in 1995, 1997, and 2000." *Renteria II*, 2011 WL 1734067, at *2. And Renteria's mother,

Eva Renteria, and sister, Cecelia Esparza, described at trial how Renteria's personality

changed following his 1994 conviction for indecency with a child and how he started

drinking to intoxication. They claimed that prior to the indecency with a child offense,

Renteria was always happy and frequently socialized with his friends. Reporter's R., vol. 67

(Testimony of Eva Renteria), p. 31 ("He was always happy. He was a happy young man. He

was studious. He would come home and greet us all. He would come home in a good mood

and be very nice."); (Testimony of Cecelia Esparza) p. 119 ("Oh my brother was a real light

spirited very well liked. He -- you know he still -- he liked going out. Like I said he was a

Dallas dancer. He liked being with his friends."), ECF 81-19. They added after the

conviction, Renteria became "morose" and started drinking alcohol excessively. *Id.*

(Testimony of Eva Renteria) pp. 32–34 ("He started drinking. . . . He was sad he would cry.

. . . It affected all of us a great deal."); (Testimony of Cecelia Esparza) p. 122 ("[B]efore that

I didn't see him intoxicated. Maybe I saw him having a good time but then it got to a point

where I would actually see him that I could tell that he was drunk.").

Renteria's probation officer, Rebecca Gonzales, testified Renteria was detained at the

border under the influence of alcohol, picked up two arrests for DWI while on probation, and

concluded he had a drinking problem. Reporter's R., vol. 63 (Testimony of Rebecca

Gonzales), pp. 14, 25, 33, ECF No. 81-15. Another probation officer, Martha Cortez, gave

evidence Renteria received 90 days' in prison on shock probation after his arrest for a third

DWI. *Id.* (Testimony of Martha Cortez), p. 53, 80. Dr. Cunningham identified Renteria as

"alcohol abusing and then alcohol dependent." Reporter's R., vol. 70 (Testimony of Dr.

Cunningham), p. 72, ECF No. 78-5. He described Renteria's downward spiral:

> We started out with this approval oriented sensitive kid and this is the downward spiral as I would view it. You know as he is in his late teens he has these aspirations of going to college and having a criminal justice career. And episodic alcohol abuse begins.
>
> And then at age 23 he is charged with his sexual indecency with a minor potentially alcohol related in the aftermath of drinking. That results in a profound loss of career aspirations. You're not going into criminal justice after that conviction nor many other occupations. And that results in some instability of employment some jobs he got and lost because of that. There's escalating alcohol and drug alcohol abuse and dependence.
>
> At age 25 he gets a DWI. That contributes to even greater employment instability exclusion from employment. Age 26 he gets another DWI. His probation is revoked and that's when he does the 90 days of shock probation in TDCJ. He goes into prison for three months. Age 31 there is another DWI and then this tragic offense.

*Id.* at pp. 75–76.

The results of neuropsychological testing administered by Dr. Schutte were also

within the normal range. Schutte Report, ECF No. 95-3. But Renteria's personality testing

indicated that he did not respond honestly and was attempting to deceive himself and others.

*Id.* at 2.

> On the Personality Assessment Inventory (PAL), the validity scales indicate David did not respond to the test questions in an open and honest manner. He tried to present an overly favorable self-image, and denied even minor problems and flaws most people are willing to acknowledge. There was no indication of psychopathology in his profile, but this finding must be viewed with caution due to his test-taking defensiveness.
>
> On the Paulhus Deception Scales, David's responses indicate a strong tendency towards deceptive self-presentation, characterized both by a tendency to claim unrealistic virtue and a denial of even common problems and flaws most people are willing to acknowledge. David's responses suggest he both wants to impress others and lacks insight into his own behavior. As such, he appears to be deceiving both himself and those around him.

*Id.*

-43-

Consequently, the facts related to Renteria's impaired mental health in Dr. Doyle's competency report, Dr. Glusman's neurologic evaluation, and Dr. Schutte's neuropsychological testing present "double-edged mitigating evidence." *Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002). "*Strickland* requires . . . [courts to] defer to counsel's decision . . . not to present a certain line of mitigating evidence when that decision is both fully informed and strategic, in the sense that it is expected, on the basis of sound legal reasoning, to yield some benefit or avoid some harm to the defense." *Moore v. Johnson*, 194 F.3d 586, 615 (5th Cir.1999). In other words, "a tactical decision not to pursue and present potentially mitigating evidence on the grounds that it is double-edged in nature is objectively reasonable, and therefore does not amount to deficient performance." *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir.1997)

Lastly, Renteria asserts that his trial counsel were ineffective for failing to present evidence that he "was sexually abused as a child, possibly at the hands of the local clergy." Pet'r's Pet. 15. He maintains "trial counsel's file is replete with evidence that [Renteria] was the victim of childhood sexual abuse." *Id.* (emphasis added). This evidence consists of lawsuits against the local clergy, "the fact that the victim's body was found outside a doctor's office that used to be the Church rectory," and references in Renteria's mental health records showing he had "unspecified trauma during his young life." *Id.*

Renteria does not identify a single witness willing and able to testify that he was the victim of childhood sexual abuse. For a movant "to demonstrate the requisite *Strickland* prejudice, [he] must show not only that this testimony would have been favorable, but also that the witness would have testified at trial." *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir.1985). Consequently, Renteria's claim cannot form the basis of habeas relief. *Day v. Quarterman*, 566 F.3d 527, 538–39 (5th Cir. 2009).

Dr. Cunningham indicated during the State's voir dire examination that he investigated Renteria's "disturbed sexuality." Reporter's R. vol. 69 (Testimony of Dr. Cunningham), p. 53, ECF 82-1. Dr. Cunningham claimed he discovered that "Father Pete" from Mount Carmel School was seen having sex with a young boy and was transferred the following day. *Id.* at pp. 53–54. Dr. Cunningham said he learned of these incidents through affidavits that had been filed in a lawsuit—not involving Renteria—and during his interview of Renteria's high school principal, Oscar Santaella. *Id.* at 56–57. Dr. Cunningham acknowledged that Renteria did not inform him of the incident. *Id.* at 54. Indeed, Dr. Cunningham did not know whether Renteria knew of this incident or another purported incident of child sexual abuse at Renteria's high school. *Id.* at 54–55.

Renteria's counsel elicited Dr. Cunningham's testimony that Renteria, as a child, witnessed physical abuse against his mother, but did not report physical abuse against him. Reporter's R., vol. 70 (Testimony of Dr. Cunningham), pp. 67–70, ECF No. 82-2. Dr. Cunningham added that observing physical abuse of a mother may cause more harm to a child than physical abuse directed toward him:

> [W]hen you see your momma being demeaned and battered it doesn't wound your skin. It wounds your heart. And the wounds on your heart are so much harder to heal than the cuts on your skin or your butt or your legs. And that's a finding that has been confirmed again in our research data. This is a study by the American Psychological Association.

*Id.* at 70. The jury was aware, therefore, of trauma Renteria reported he sustained as a child.

Renteria piles inference upon speculation to assert that he was the victim of childhood sexual abuse. But he provides no evidence that he was the victim of childhood sexual abuse. "Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his . . . petition (in state and federal court), unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value."

-45-

*Ross v. Estelle*, 694 F.2d 1008, 1011–12 (5th Cir. 1983) (citing *Woodard v. Beto*, 447 F.2d 103, 104 (5th Cir. 1971)).

For these reasons, Renteria's claim—that his trial counsel provided constitutionally ineffective assistance by failing to adequately present mitigating evidence of his purportedly impaired mental health —is meritless. Counsel made a strategic decision that the available mental health information—if presented to the jury—would *not* minimize Renteria's risk of receiving the death penalty. Assessing all the aggravation and mitigation evidence available to trial counsel, Renteria cannot show there is a reasonable probability that—with the additional evidence of his rather unremarkable mental health records and his lack of truthfulness—the results of the proceeding would have been different. Renteria has not overcome the strong presumption that his counsels' representation was within the wide range of reasonable professional assistance.

Consequently, the Texas Court of Criminal Appeals' rejection on the merits of Renteria's broad ineffective assistance of trial counsel claims regarding mitigating evidence was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. Moreover, the decision was not based upon an unreasonable determination of the facts considering the evidence presented in Renteria's trial, direct appeal, and state habeas corpus proceedings.

For the same reasons, any attempt to establish cause and prejudice for any procedural default on this specific ineffective assistance of trial counsel claim also fails. Therefore, to the extent that Renteria did not present his claim to the state court, the claim is procedurally defaulted.

Hence, the Court concludes that Renteria's second ground for relief does not warrant federal habeas corpus relief.

**C. Claim III - Renteria's rights under the Sixth, Eighth and Fourteenth Amendments were violated when the trial court (1) refused to permit him to offer accurate evidence of his lack of parole eligibility; (2) instructed the jury in a misleading and confusing manner; and (3) permitted the State to offer false and misleading closing argument that Renteria could be released from prison. Pet'r's Pet. 21–28, ECF No. 53; Pet'r's Br. in Supp. 21–32, ECF No. 58.**

### 1. Background

Renteria proffered the testimony of William Habern—an attorney-expert on parole eligibility and sentencing—outside the presence of the jury. Reporter's R., vol. 68 (Testimony of William Habern), pp. 5–32, ECF No. 81-20. Renteria wanted Habern to explain to the jury that he "would never parole." *Id.* at p. 11. Renteria sought Habern's testimony to rebut the State's argument that the jury should make a finding under the first special issue—the future dangerousness issue—there was a probability he would commit criminal acts of violence which would constitute a continuing threat to society. Pet'r's Pet. 21, ECF No. 53.

The State objected to the proposed testimony as neither "relevant nor permitted under Texas law." Reporter's R., vol. 68, p. 4, ECF No. 81-20.

Habern conceded his testimony regarding parole was "speculative." *Id.* at pp. 18–19, 26. He suggested Renteria would, at a minimum, serve "47 and a-half years" in prison before he would be eligible for parole. *Id.* at 31.

After a hearing the arguments of counsel, the trial court explained it would "follow the law as it stands today," sustained the State's objection, and did not permit Habern to testify before the jury. *Id.* at 36.

The trial court instructed the jury on the issue of Renteria's parole eligibility if the jury recommended a life sentence in accordance with the Texas Code of Criminal Procedure

art. 37.071 § 2(e)(2)(B). Reporter's R., vol. 72 (Courts Charge to the Jury), p. 44, ECF No. 82-4.

The prosecutor argued during closing argument there was "no evidence" Renteria would be incarcerated "his whole life" if the trial court imposed a life sentence. Pet'r's Pet. 26, ECF No. 53.

Renteria maintains the prosecution's suggestion he "could be released from prison" was both "false and misleading." *Id.* at 21.

Renteria raised a claim challenging the trial court's exclusion of Habern's testimony on direct appeal.

> In point of error one, Renteria challenges the trial judge's exclusion of "evidence of the minimum amount of time [that he] would spend in prison." Renteria complains that the excluded evidence was "highly relevant" to the future dangerousness special issue. He further asserts that the exclusion of this evidence violated due process, destroyed his mitigation argument, and "pushed the jury towards death."

*Renteria II*, 2011 WL 1734067, at *42.

The Texas Court of Criminal Appeals rejected the claim, holding the trial court property excluded Habern's testimony because it was "speculative" and "parole [was] not a proper issue for jury consideration except to the extent explicitly provided for in Article 37.071, Section 2(e)(2)(B)" of the Texas Code of Criminal Procedure." *Id.* at *45. The Court of Criminal Appeals explained:

> Before 1999, parole was not a proper matter for the jury's consideration in any form. *Hankins v. State*, 132 S.W.3d 380, 384 (Tex. Crim. App. 2004). Effective September 1, 1999, the Legislature amended Article 37.071 of the Texas Code of Criminal Procedure to provide that a jury could be instructed on a capital defendant's eligibility for parole. The applicable law in the instant case authorized a trial judge, on written request of defense counsel, to instruct a jury on a capital defendant's parole eligibility as follows:
>
> > Under the law applicable in this case, if the defendant is sentenced to imprisonment in the institutional division of the Texas Department of Criminal Justice for life, the defendant

> will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time. It cannot accurately be predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted. Tex. Code Crim. Proc. art. 37.071 § 2(e)(2)(B).

This amended statute was narrowly drawn and did not render every aspect of parole law an issue for jury consideration. *Hankins*, 132 S.W.3d at 385. It expressly discouraged speculation on the parole process. *Id.* The Legislature could have written it more broadly to impart more information but chose not to. *Id.* Thus, parole is not a proper issue for jury consideration except to the extent explicitly provided for in Article 37.071, Section 2(e)(2)(B). *Id.*

The jury was instructed in accordance with Article 37.071, Section 2(e)(2)(B). Habern's speculative testimony was outside the scope of what was permitted by that statute. Thus, the trial judge did not abuse her discretion in excluding it. *See Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006). Further, no harm is shown by the exclusion of Habern's . . . testimony. Tex. R. App. P. 44.2. Defense witness Cunningham testified that he believed Renteria would "die in prison" and would "never be at large in the community." Further, defense counsel argued at closing that it was undisputed that Renteria would spend the rest of his life in prison and would die in prison.

*Renteria II*, 2011 WL 1734067, at *45–46. Additionally, the Texas Court of Criminal Appeals noted the trial court admitted the indecency and the felony DWI judgments into evidence. "Both judgments showed that the 20-year indecency sentence and the 10-year felony DWI sentence were to run consecutively." *Id.* at *45.

Renteria's claims in his petition that he rights under the Sixth, Eighth and Fourteenth Amendments were violated when the trial court (1) refused to permit him to offer accurate evidence of his lack of parole eligibility; (2) instructed the jury in a misleading and confusing manner; and (3) permitted the State to offer false and misleading closing argument that Renteria could be released from prison. Pet'r's Pet. 21–28, ECF No. 53; Pet'r's Br. in Supp. 21–32, ECF No. 58.

## 2. Applicable Law

The Sixth Amendment provides "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. It "requires a jury . . . to find each fact necessary to impose a sentence of death." *Hurst v. Fla.*, 136 S. Ct. 616, 619 (2016). "The Eighth Amendment entitles a defendant to a jury capable of a reasoned moral judgment about whether death, rather than some lesser sentence, ought to be imposed." *Simmons v. South Carolina*, 512 U.S. 154, 172 (1994). It requires "accurate sentencing information [as] an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die." *Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). It also invalidates "procedural rules that ten[d] to diminish the reliability of the sentencing determination." *Beck v. Alabama*, 447 U.S. 625, 638 (1980). Finally, a sentencer's consideration of false information material to the sentencing decision "renders the entire sentencing procedure invalid as a violation of due process." *Townsend v. Burke*, 334 U.S. 736, 740–741 (1948); *United States v. Tucker*, 404 U.S. 443, 447 (1972) (finding a due process violation when "a sentence [was] founded at least in part upon misinformation of constitutional magnitude." *Roberts v. United States*, 445 U.S. 552, 556 (1980) (reaffirming that due process precludes "sentences imposed on the basis of 'misinformation of constitutional magnitude'").

### 3. Discussion

#### a. Parole Eligibility

Renteria complains the trial court refused to permit him to offer accurate evidence of his lack of parole eligibility. He argues "[h]ere, Petitioner's parole eligibility was highly relevant to the Texas future dangerousness question. When the jury was considering whether Petitioner would be a danger in the future, that decision would reasonably be guided by

whether Petitioner would ever be at liberty, and if so, when." Pet'r's Br. in Supp. 23–24, ECF No. 58 (citing *Simmons*, 512 U.S. at 169 (1994); *id.* at 177–78 (O'Connor, J., concurring) ("[c]ommon sense tells us that many jurors might not know whether a life sentence carries with it the possibility of parole")).

### (1). *Simmons v. South Carolina*

In *Simmons v. South Carolina*, 512 U.S. 154 (1994), the Supreme Court held "where the defendant's future dangerousness is at issue, *and state law prohibits the defendant's release on parole*, due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Id.* at 156 (emphasis added). The *Simmons* Court explained the critical importance of informing the jury about a defendant's possibility of a lifelong prison sentence *without the possibility of parole*:

> Indeed, there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole. The trial court's refusal to apprise the jury of information so crucial to its sentencing determination, particularly when the prosecution alluded to the defendant's future dangerousness in its argument to the jury, cannot be reconciled with our well-established precedents interpreting the Due Process Clause.

*Id.* at 163–64.

But the *Simmons* Court specifically cautioned that, "[i]n a State in which parole is available," it would "not lightly second-guess a decision whether or not to inform a jury of information regarding parole." *Id.* at 168. And the Fifth Circuit noted that the Supreme Court "expressly held that its ruling did *not* apply to Texas because [Texas did] not have a life-without-parole alternative to capital punishment." *Tigner v. Cockrell*, 264 F.3d 521, 525 (5th Cir. 2001) (citing *Simmons*, 512 U.S. at 168 n.8) (emphasis added).

In *Ramdass v. Angelone*, 530 U.S. 156, 169 (2000), a Supreme Court majority clarified that "*Simmons* applies only to instances where, as a legal matter, there is *no*

*possibility of parole* if the jury decides the appropriate sentence is life in prison. *Id.* at 169

(emphasis added). In *Shafer v. South Carolina*, 532 U.S. 36 (2001), the Supreme Court

implicitly acknowledged the continued vitality of the distinction first noted in *Simmons* by

holding South Carolina's new capital sentencing scheme contained the same constitutional

defect identified in *Simmons* because—at least under some circumstances—the sentencing

jury faced a choice between a sentence of death and a sentence of life without the possibility

of parole. *Id.* at 51. In *Kelly v. South Carolina*, 534 U.S. 246 (2002), the Supreme Court

reiterated its holding in *Shafer*, emphasizing once again that South Carolina capital

sentencing juries unanimously finding the presence of an aggravating circumstances were left

to select between one of only two possible sentences: death or life imprisonment without the

possibility of parole. *Id.* at 252 & n. 2. Finally, in *Lynch v. Arizona*, 136 S. Ct. 1818 (2016),

the Supreme Court reaffirmed its holding in *Simmons* that "due process entitled the defendant

to rebut the prosecution's argument that he posed a future danger by informing his sentencing

jury that he [was] parole ineligible." *Id.* at 1819. The *Lynch* Court also observed the

possibility of executive clemency or changes in the law which might permit parole in the

future for capital murderers were not proper grounds for declining to instruct the jury that the

only alternative to a death sentence in a capital case was life without parole. *Id.* at 1819–20.

Hence, "'where a capital defendant's future dangerousness is at issue, and the only

sentencing alternative to death available to the jury is life imprisonment without possibility of

parole,' the Due Process Clause 'entitles the defendant to inform the jury of [his] parole

ineligibility, either by a jury instruction or in arguments by counsel.'" *Id.* at 1818 (quoting

*Shafer*, 532 U.S. at 39).

Consequently, before the Texas Legislature amended Article 37.071 in 2005,[4] the Fifth Circuit consistently ruled that Texas had no constitutional obligation to inform a jury of a defendant's parole eligibility. *See Cantu v. Quarterman*, 341 F. App'x 55, 59 (5th Cir. 2009) ("[T]his circuit has repeatedly refused to apply *Simmons* so as to require that Texas juries be informed of a defendant's future parole eligibility"); *Thacker v. Dretke*, 396 F.3d 607, 617 (5th Cir. 2005) ("Since *Simmons* was decided, we have repeatedly held that neither the Due Process clause nor the Eighth Amendment requires Texas to allow presentation of parole eligibility issues, because Texas does not offer, as an alternative to capital punishment, life imprisonment without possibility of parole."); *Elizade v. Dretke*, 362 F.3d 323, 332–33 (5th Cir. 2004) ("We have repeatedly held that *Simmons* does not require a Texas trial court to instruct a jury as to the meaning of life in prison, because the defendant would not, if sentenced to life imprisonment, be ineligible for parole."); *Woods v. Cockrell*, 307 F.3d 353, 361 (5th Cir. 2002) (" We interpret *Simmons* to require that a jury be informed about the defendant's parole eligibility only when (1) the state argues that a defendant represents a future danger to society, and (2) the defendant is legally ineligible for parole."); *Johnson v. Cockrell*, 306 F.3d 249, 257 (5th Cir. 2002) ("[T]he *Simmons* Court specifically acknowledged that its holding did not apply to Texas, where life without any possibility of parole is not a sentencing option."); *Collier v. Cockrell*, 300 F.3d 577, 583 (5th Cir. 2002) ("[O]ur circuit has consistently emphasized that *Simmons* applies only when there is a life-without-possibility-of-parole alternative to capital punishment, an alternative not available under Texas law."); *Rudd v. Johnson*, 256 F.3d 317, 321 (5th Cir. 2001) ("Here, the jury did not confront a false choice that needed to be denied or explained. Under Texas law, Rudd

---

[4] *See Curry v. State*, AP-77,033, 2017 WL 781740, at *16 (Tex. Crim. App. Mar. 1, 2017) ("the Texas Legislature amended Article 37.071 in 2005, creating life without parole as the only alternative to the death penalty for defendants convicted of capital murder").

would have been eligible for parole after serving fifteen years in prison. Contrary to *Simmons*, the jury would not have been mistaken if it believed that it could only sentence Rudd to death or to a limited period of incarceration. And a jury instruction on Rudd's parole eligibility would not have denied or explained the State's argument that Rudd was a future danger to free society."); *Wheat v. Johnson*, 238 F.3d 357, 361 (5th Cir. 2001) ("We have repeatedly recognized that the *Simmons* rule applies only where there is a life-without-possibility-of-parole alternative to the death penalty, an alternative that does not exist in Texas."); *Miller v. Johnson*, 200 F.3d 274, 290–91 (5th Cir. 2000) ("[B]ecause Miller would have been eligible for parole under Texas law if sentenced to life, we find his reliance on *Simmons* 'unavailing.'"); *Hughes v. Johnson*, 191 F.3d 607, 617 (5th Cir. 1999) ("We have repeatedly rejected identical claims based on *Simmons*."); *Montoya v. Scott*, 65 F.3d 405, 416 (5th Cir. 1995) ("Montoya's *Simmons* claims are foreclosed by recent circuit authority rejecting an extension of *Simmons* beyond situations in which a defendant is statutorily ineligible for parole.").

In *Allridge v. Scott*, 41 F.3d 213 (5th Cir. 1994), the Fifth Circuit read "*Simmons* to mean that due process requires the state to inform a sentencing jury about a defendant's parole ineligibility when, *and only when*, (1) the state argues that a defendant represents a future danger to society, and (2) the defendant is legally ineligible for parole. Because Texas did not statutorily provide for parole ineligibility at the time of Allridge's conviction, we find Allridge's reliance on Simmons to be unavailing." *Id.* at 222 (emphasis in original). The Fifth Circuit reasoned "if a defendant's [parole] ineligibility is a matter of fact, i.e., the defendant *probably* will not be eligible for parole, then the evidence is purely speculative (maybe even inherently 'untruthful') and therefore cannot positively deny future dangerousness. The jury is left only to speculate about what a parole board may, or may not,

-54-

do twenty or thirty years hence." *Id.* (emphasis in original). It explained for that reason, the Supreme Court "reaffirmed that states can properly choose to prevent a jury from engaging in such speculation." *Id.*

As the Court noted above, Renteria argues his "parole eligibility was highly relevant to the Texas future dangerousness question." Pet'r's Br. in Supp. 23–24, ECF No. 58 (citing *Simmons*, 512 U.S. at 169). But clearly established federal law, as determined by the Supreme Court, rejects Renteria's argument that *Simmons* and its progeny require that he should be permitted to raise parole eligibility with the jury.

### (2). Inaccurate Information

Renteria avers in his reply that his claim is not based on *Simmons*. Pet'r's Reply Brief 26, ECF No. 94. He contends that his due process rights were violated because the sentencing jury relied on inaccurate information:

> This claim at its core is about providing a sentencing jury with accurate information. Because of then-existing Texas law, Petitioner's sentencing jury was instructed that if Petitioner were sentenced to life imprisonment, he would become parole eligible in forty-years. Vol. 72, 44. **This was false.** Through the proffer of an expert witness in Texas sentencing and parole practices, Petitioner let the Court know that telling the jury that Petitioner would be parole eligible in forty-years was false. In reality, and as a matter of state law, Petitioner would have not been parole eligible for 47.5 years. Thus viewed, this portion of the claim is not grounded in *Simmons v. South Carolina* – a straw man that the State has erected. This claim is predicated on cases predating *Simmons* requiring that a sentencer not be provided with inaccurate information.

*Id.* So, Renteria now argues he has a constitutional due process right to be sentenced based on accurate information. He is correct.

The Supreme Court has held convicted defendants have a right to a sentence based on accurate information. *Tucker*, 404 U.S. at 447; *Townsend*, 334 U.S. at 741. The foundation of that right is the due process protection against arbitrary government decisions. Indeed, a convicted offender has a right to a fair sentencing process where the court goes through a

rational procedure of selecting a sentence based on relevant considerations and accurate information. As the Supreme Court explained in *Townsend*:

> It is not the duration or severity of this sentence that renders it constitutionally invalid; it is the careless or designed pronouncement of sentence on a foundation so extensively and materially false, which the prisoner had no opportunity to correct by the services which counsel would provide, that renders the proceedings lacking in due process.

*Townsend*, 334 U.S. at 741. In *Tucker*, the Supreme Court reinforced this right to accuracy. There the defendant was sentenced in part because of a prior conviction which was unconstitutional because he was not represented by counsel. The Supreme Court affirmed the court of appeals decision vacating the sentence:

> For we deal here, not with a sentence imposed in the informed discretion of a trial judge, but with a sentence founded at least in part upon misinformation of constitutional magnitude. As in *Townsend v. Burke*, 334 U.S. 736, "this prisoner was sentenced on the basis of assumptions concerning his criminal record which were materially untrue."

*Townsend*, 334 U.S. at 741.

Under *Townsend* and *Tucker*, a sentence must be set aside where the defendant can show that extensively and materially false information was part of the basis for the sentence. The two elements of that showing are (1) the information before the sentencer was inaccurate, and (2) the sentencer relied on the misinformation in passing sentence. But the inaccurate information must be "critical" to the sentencing decision. *Simonson v. Hepp*, 549 F.3d 1101, 1107 (7th Cir. 2008). And the sentencer "demonstrates actual reliance on misinformation when [it] gives 'explicit attention'" to it, "'found[s]' its sentence 'at least in part' on it, or gives 'specific consideration' to the information before imposing sentence." *Lechner v. Frank*, 341 F.3d 635, 639 (7th Cir. 2003) (quoting *Tucker*, 404 U.S. at 447).

In Renteria's case, the information before the sentencer was accurate. The trial court correctly explained to the jury that under Texas Code of Criminal Procedure Article 37.071 §

2(e)(2)(B), a defendant—convicted of capital murder and sentenced to life in prison—would

be eligible for parole after serving 40 years in prison:

> if the defendant is sentenced to imprisonment in the institutional division of
> the Texas Department of Criminal Justice for life, the defendant will become
> eligible for release on parole, but not until the actual time served by the
> defendant equals 40 years, without consideration of any good conduct time. It
> cannot accurately be predicted how the parole laws might be applied to this
> defendant if the defendant is sentenced to a term of imprisonment for life
> because the application of those laws will depend on decisions made by prison
> and parole authorities, but eligibility for parole does not guarantee that parole
> will be granted. Tex. Code Crim. Proc. art. 37.071 § 2(e)(2)(B).

*Renteria II*, 2011 WL 1734067, at *45.

Expert witness "Habern's speculative testimony [about parole eligibility] was outside

the scope of what was permitted by that statute." *Id.* at *46. And even Habern conceded his

testimony regarding parole was "speculative." Reporter's R., vol. 68, pp. 18–19, 26, ECF

No. 81-20. *See Allridge*, 41 F.3d at 222 ("[I]f a defendant's [parole] ineligibility is a matter

of fact, i.e., the defendant *probably* will not be eligible for parole, then the evidence is purely

speculative (maybe even inherently 'untruthful') and therefore cannot positively deny future

dangerousness. The jury is left only to speculate about what a parole board may, or may not,

do twenty or thirty years hence.").

Besides, the indecency and felony DWI judgments were admitted into evidence.

*Renteria II*, 2011 WL 1734067, at *45. Both judgments showed Renteria's twenty-year

indecency sentence and ten-year felony DWI sentence would run consecutively. *Id.*

Finally, Renteria's expert "witness Cunningham testified that he believed Renteria

would 'die in prison' and would 'never be at large in the community.'" *Id.* at *46.

In sum, the jury had before it evidence that Renteria would serve at least 40 calendar

years on a life sentence for capital murder of Flores, Renteria faced additional sentences of

twenty years for indecency with a child and ten years for felony DWI, and Renteria's expert witness opined the State would never release him from prison.

Renteria has not met his burden of showing his due process rights were violated because he was, in fact, sentenced based on accurate information. He is not entitled to habeas relief on his due process claim.

### (3). Mitigating Evidence

Renteria also argues the "ruling also prevented [him] from presenting mitigating evidence, in violation of the Eighth Amendment, and . . . a defense, such right secured by the Sixth and Fourteenth Amendments." Pet'r's Pet. 21–22, ECF No. 53.

Texas defines "mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." Tex. Crim. Proc. Code art. § 37.071 §2(f)(4) (Vernon 2001). The statute adds, if even one juror decides that, "taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed," the court must impose a life sentence. *Id.* §§ 2(e)(1), (f)(2), (g). Notably, the definition does not include evidence regarding parole eligibility.

Renteria "has not cited and this Court has not found any Supreme Court opinion mandating a definition of mitigating evidence broader than the one provided by the Texas statute." *Runnels v. Stephens*, 2:12-CV-0074-J-BB, 2016 WL 1274132, at *26 (N.D. Tex. Mar. 15, 2016), *report and recommendation adopted*, 2:12-CV-0074-J, 2016 WL 1275654 (N.D. Tex. Mar. 31, 2016), *certificate of appealability denied sub nom. Runnels v. Davis*, 664 F. App'x 371 (5th Cir. 2016), *cert. denied*, 138 S. Ct. 2653 (2018); *accord Bartee v.*

*Quarterman*, 574 F.Supp.2d 624, 710 (W.D. Tex. 2008). Indeed, the Supreme Court recently cited with approval a portion of the definition in the Texas statute. *See, e.g., Trevino v. Davis*, 138 S. Ct. 1793, 1795 (2018) ("If even one juror decides that, "taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed," the court must impose a life sentence.") (quoting Tex. Code Crim. Proc. Ann., Art. 37.071 §§ 2(e)(1), (f)(2), (g)).

The Supreme Court has held—in the context of the Eighth Amendment—capital sentencing juries must be permitted to consider and give effect to "constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998); *see also Johnson v. Texas*, 509 U.S. 350, 367 (1993), ("a reviewing court must determine whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence") (quotation marks and citation omitted); *Boyde v. California*, 494 U.S. 370, 380 (1990) ("We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."). Nevertheless, "there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" *Johnson*, 509 U.S. at 362 (quoting *Boyde v. California*, 494 U.S. 370, 377 (1990) (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 181 (1988) (plurality opinion))). In other words, "[t]he State must not cut off full and fair consideration of mitigating evidence;

but it need not grant the jury the choice to make the sentencing decision according to its own whims or caprice." *Saffle v. Parks*, 494 U.S. 484, 493 (1990).

The Supreme Court has consistently employed the phrase "constitutionally relevant mitigating evidence" to describe evidence which tends to diminish a convicted capital murderer's moral blameworthiness or lessen the reprehensible nature of the offense— evidence which relates to the defendant's background or character or to the circumstances of the offense. *See, e.g., Trevino*, 138 S. Ct. at 1795 (noting that mitigating evidence included testimony that Trevino's father was largely absent, his mother had problems with alcohol, he was a loner and dropped out of school, and he was good with children"); *Tennard v. Dretke*, 542 U.S. 274, 288 (2004) ("Reasonable jurists could conclude that the low IQ evidence Tennard presented was relevant mitigating evidence."); *Penry v. Johnson (Penry II)*, 532 U.S. 782, 796–97 (2001) (holding that jury instructions in a Texas capital sentencing proceeding did not adequately afford the jury a means of giving effect to mitigating evidence of the defendant's "mental retardation and childhood abuse"); *Buchanan v. Angelone*, 522 U.S. 269, 278–79 (1998) (holding that jury instructions in a Virginia capital sentencing proceeding adequately permitted consideration of mitigating evidence of the defendant's difficult family background and mental and emotional problems); *Johnson*, 509 U.S. at 368 (holding the Texas capital sentencing special issues given at the defendant's trial permitted adequate jury consideration of the defendant's youth at the time of his offense); *Penry v. Lynaugh (Penry I)*, 492 U.S. 302, 309 (1989) (holding an earlier Texas capital sentencing scheme did not permit the sentencing jury to give effect to the defendant's history of childhood abuse and mental retardation); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) ("[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a *mitigating* factor, any aspect of a defendant's character or record and any of

the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (emphasis in original); *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) ("[W]e believe in capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.").

But the Supreme Court has never declared that "constitutionally relevant mitigating evidence" included information regarding state parole eligibility laws. Rather, the Supreme Court has "noted with approval . . . that "[m]any state courts have held it improper for the jury to consider or to be informed—through argument or instruction—of the possibility of commutation, pardon, or parole. The decision whether or not to inform the jury of the possibility of early release is generally left to the States." *Simmons*, 512 U.S. at 176 (O'Connor, J., concurring) (citing *California v. Ramos*, 463 U.S. 992, 1013 n.30, 1014 (1983)).

Indeed, the Supreme Court has never declared that state statutes and administrative regulations addressing parole eligibility for defendants convicted of capital murder and sentenced to life imprisonment lessen a defendant's moral blameworthiness. There simply is no "clearly established" Supreme Court precedent holding that the Eighth Amendment mandates either the admission of evidence, submission of punishment-phase jury instructions, or voir dire examination of potential jurors regarding parole eligibility for life sentences in jurisdictions that do not furnish capital sentencing juries with the option of life without parole.

And, as the Court has noted above, if parole ineligibility is a question of fact, then evidence concerning that fact is purely speculative—and perhaps inherently untruthful.

-61-

*Allridge*, 41 F.3d at 222. Therefore, a finder of fact may not consider parole ineligibility on the first special issue—the future dangerousness issue. For that reason, "states can properly choose to prevent a jury from engaging in such speculation." *Id.*

### (4). Conclusions

Having carefully reviewed Supreme Court case law, the Court finds the Texas Court of Criminal Appeals' rejection of Renteria's claim that the trial court erred when it refused to permit him to offer evidence of his lack of parole eligibility was neither contrary to, nor involved an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of the United States." 18 U.S.C. § 2254(d). The Supreme Court has never held that the Fourteenth Amendment's Equal Protection Clause, the Eighth Amendment, the Sixth Amendment, or the Fourteenth Amendment's Due Process Clause require a jurisdiction such as Texas—which, at the time of Renteria's sentencing, did not offer a capital sentencing jury the option of sentencing a convicted capital murderer to a term of life imprisonment without the possibility of parole—to allow a jury to hear evidence regarding the intricacies of parole law. In fact, the Supreme Court's Fourteenth Amendment jurisprudence—including *Simmons* and its progeny—makes an express distinction between the rule applied in *Simmons* and the due process requirements in jurisdictions such as Texas, where sentencing choices were not limited to either death or life without parole.

Consequently, the Texas Court of Criminal Appeals' rejection on the merits of Renteria's claims regarding the trial court's refusal to permit him to offer evidence of his lack of parole eligibility was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. Moreover, the decision was not based upon an unreasonable determination of the facts in light of the evidence

presented in Renteria's trial, direct appeal, and state habeas corpus proceedings. Renteria is not entitled to relief on this claim.

### b. Jury Instruction

Renteria maintains the trial court instructed the jury in a misleading and confusing manner. Renteria explains his counsel attempted to secure an instruction on parole eligibility which provided the jury with information concerning his prior sentences. Specifically, his counsel offered the following alternative instructions:

> You are instructed that the Defendant in this case has been previously sentenced in cause No. ___ to TWENTY years in the Institutional Division of the Texas Department of Criminal Justice; and to TEN years in the Institutional Division of the Texas Department of Criminal. Justice in Cause No. _. You are further instructed that the TEN year sentence will not begin to operate until the TWENTY year sentence ceases to operate. You are instructed that, under the law applicable in this case, if the Defendant is sentenced to imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life, the Defendant will become eligible for release on parole, but not until the actual time served by the Defendant equals 40 years, without consideration of any good conduct time, except that the Defendant will not begin serving time on the life sentence until the two prior sentences have each ceased to operate, it cannot accurately be predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted. You are not to consider the manner in which the parole law may be applied to this particular Defendant.

> Or

> You are instructed that the Defendant in this case has been previously sentenced in cause No. ___ to TWENTY years in the Institutional Division of the Texas Department of Criminal Justice; and to TEN years in the Institutional Division of the Texas Department of Criminal Justice in Cause No. ___. You are further instructed that the TEN year sentence will not begin to operate until the TWENTY year sentence ceases to operate. You are instructed that, under the law applicable in this case, if the Defendant is sentenced to imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life, the Defendant will become eligible for release on parole when he has served a fun total of 40 years, day for day, without any credit of any kind, without consideration of any good conduct time, except that the Defendant will not begin serving time on the life sentence

-63-

until the two prior sentences have each ceased to operate. It cannot accurately be predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted. You are not to consider the manner in which the parole law may be applied to this particular Defendant.

*Renteria v. State* (Appellant's Brief), 2009 WL 5453014 (Dec. 15, 2009), at *156–*157.

At the time of Renteria's trial, Texas law provided that, upon written request by defense counsel, a capital sentencing jury be charged as follows:

Under the law applicable to this case, if the defendant is sentenced to life imprisonment, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time. It cannot be accurately predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on the decisions made by the prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted.

Tex. Code. Crim. P. art. 37.071 § 2(e)(2)(B) (Vernon 2001).

The trial court accordingly instructed the jury in accordance with the Texas Code of Criminal Procedure. Reporter's R., vol. 72 (Courts Charge to the Jury), p. 44, ECF No. 82-4. But the trial court also admitted the indecency and felony DWI judgments into evidence. *Renteria II*, 2011 WL 1734067, at *45. Both judgments showed the 20-year indecency sentence and the 10-year felony DWI sentence would run consecutively. *Id.* And "[d]efense witness Cunningham testified that he believed Renteria would 'die in prison' and would 'never be at large in the community.'" *Id.* at *46.

Renteria suggests the state trial court violated his due process rights by failing to instruct the jury that—if the jury elected to impose a life sentence—the trial court would stack his other sentences on his life sentence and he would not be eligible for parole for at least 47 ½ years. Yet, "under regimes that allow for parole eligibility, the decision whether to instruct the jury on that fact is reserved to the states, and the [Supreme] Court 'shall not

-64-

lightly second-guess' the decision." *Thacker*, 396 F.3d at 617 (quoting *Simmons*, 512 U.S. at 169). *Simmons* provides no support for Renteria's due process challenge. And the Fifth Circuit has "rejected the argument that the denial of a parole eligibility instruction violates the Eighth Amendment." *Collier*, 300 F.3d at 583.

Renteria's claim also lacks merit because his proposed jury instruction was, itself, misleading. It asserted as fact that the trial court would stack his prior two sentences onto a life sentence in this case. Reporter's R., vol. 72 (Objections to Courts Charge), p. 30, ECF No. 82-4; Clerk's R., vol. 8, pp. 148–49 (Requested Instruction to the Jury Regarding Parole Law), ECF No. 79-11. At the time of Renteria's second punishment trial, the trial court had not decided whether it would stack a capital-life sentence onto Renteria's prior two sentences. Habern conceded as much. Reporter's R., vol. 68 (Testimony of William T. Habern), p. 19, ECF 81-20. Renteria provides no authority for the proposition that he had a constitutional right to present the jury with his misleading jury instruction.

The Supreme Court has never held that the Fourteenth Amendment's Equal Protection Clause, the Eighth Amendment, the Sixth Amendment, or the Fourteenth Amendment's Due Process Clause require a jurisdiction—which did not offer the option of sentencing a convicted capital murderer to life imprisonment without parole—to allow a jury to receive instructions regarding the intricacies of the parole law applicable to life sentences.

As a result, the Texas Court of Criminal Appeals' rejection on the merits of Renteria's claims regarding the trial court's instructions to the jury on his eligibility for parole was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. Moreover, the decision was not based upon an unreasonable determination of the facts considering the evidence presented in Renteria's trial,

direct appeal, and state habeas corpus proceedings. Hence, Renteria is not entitled to habeas relief on this claim.

### c. Closing Argument

Renteria claims the prosecutor made an improper jury argument which misstated the evidence and misled the jury. At issue is the prosecutor's closing argument that there was "no evidence" Renteria would be incarcerated "his whole life" if the trial court imposed a life sentence. Pet'r's Pet. 26, ECF No. 53. Renteria maintains the prosecution's suggestion that he "could be released from prison" was both "false and misleading." *Id.* at 21.

Renteria's counsel asked Dr. Cunningham, "based on your expertise and your research of prison life and prison sentencing, when is [Renteria] ever going to be at large in the community?" Reporter's R., vol. 71, p. 88, ECF No. 82-3. Dr. Cunningham answered, "I believe that he will die in prison, that he will never be at large in the community." *Id.*

The following exchange then occurred between Dr. Cunningham and Renteria's counsel:

> Q. [Defense Counsel Jaime Gandara] Is David Renteria -- is there a probability that he's going to commit continuing acts of violence that constitute a continuing threat -- that he will commit acts of violence that would constitute a continuing threat to society in the future?
>
> A. That likelihood is very low. It becomes even less likely as the severity of the criminal act increases. He -- as we compare him to other capital offenders his likelihood is well below that of the typical capital offender and well below that of the typical prison inmate. So he is neither disproportionately likely to commit violence in prison nor is he probable in terms of that having a meaningful definition of more likely than not or a substantial or disproportionate.
>
> There is always -- if possibility -- if probability means possibility then the answer is always yes for every capital defendant for everybody in this room the answer would be yes there's always some possibility.

*Id.* at 88–89.

The trial court instructed the jury in accordance with Texas Code of Criminal Procedure Article 37.071 § 2(e)(2)(B). Reporter's R., vol. 72 (Courts Charge to the Jury), p. 44, ECF No. 82-4; Clerk's R., vol. 8, pp. 174–75, ECF No. 79-11. It explained that if the jury elected to sentence Renteria to life in prison for murdering Flores, he would be eligible for parole after serving forty years in prison. *Id.*

During closing argument, Renteria's counsel asserted that Renteria would spend the rest of his life in prison. Reporter's R., vol. 72 (Argument of Defense Counsel), pp. 80 ("it is not undisputed [sic] that David Renteria will live the rest of his life and will die in prison"), 112 ("There is unrebutted and unchallenged testimony that David is going to be [in prison] for the rest of his life. If he gets a life sentence he's going to die in prison. He's not getting out."), ECF No. 79-11.

The State countered in his closing argument that Renteria remained a continuing threat, in or out of prison:

> And he is a continuing threat. He does not deserve the right to go to general population. We have no idea what kind of circumstances, crisis, that he might find possible, and then we'll see this. We'll see this.
>
> And they want to equivocate that continuing threat, the threat -- it doesn't have to be another homicide. It can be a variety of violent conduct and threat. Whether you want to give him credit for living in that prison society or in the free world. But obviously even Dr. Cunningham -- and I don't agree with much of what he says -- but Dr. Cunningham says that in the free world he is a continuing --

Reporter's R., vol. 72 (Argument of Prosecutor), p. 132, ECF No. 79-11.

Renteria's counsel objected, asserting that the "unrebutted testimony" was that, if Renteria received a life sentence, "he's going to be in prison his whole life." Reporter's R., vol. 72 (Argument of Defense Counsel), p. 132, ECF No. 79-11. After the trial court overruled the objection, the prosecution asserted, "[t]here's no evidence in [the record] that

-67-

he'll be in there his whole life. You can read that record all you want. There's no evidence of that." *Id.* Renteria's counsel did not object to the prosecution's claim.

### (1). Procedural Bar

Renteria's appellate counsel raised this claim—that the trial judge improperly permitted the State to argue there was no evidence appellant would likely be in prison for the rest of his life—in Renteria's direct appeal. *Renteria II*, 2011 WL 1734067, at *47. The claim was dismissed under the Texas contemporaneous objection rule because Renteria's trial counsel failed to preserve it:

> Defense counsel objected when the prosecutor stated that Cunningham testified Renteria would be a continuing threat in the free world. But that is not what Renteria is complaining about on appeal. Here, he asserts that the trial judge improperly "permitted the State [to] argue that there was no evidence appellant would likely be in prison for the rest of his life." However, defense counsel did not object when the prosecutor argued that "[t]here's no evidence that he'll be in there his whole life." Thus, Renteria has failed to preserve his right to complain about this particular argument on appeal.

*Id.*

Under the procedural default doctrine, "Federal habeas courts reviewing convictions from state courts will not consider claims that a state court refused to hear based on an adequate and independent state procedural ground." *Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017). "The procedural default doctrine [is] 'grounded in concerns of comity and federalism.'" *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (quoting *Coleman*, 501 U.S. at 730). It "'ensures that federal courts give proper respect to state procedural rules.'" *Muniz v. Johnson*, 132 F.3d 214, 220 (5th Cir. 1998) (quoting *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997).

Indeed, "federal habeas relief will be unavailable when (1) 'a state court [has] declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement,' and (2) 'the state judgment rests on independent and adequate state

procedural grounds.'" *Walker v. Martin*, 562 U.S. 307 (2011) (quoting *Coleman*, 501 U.S. at

729–730). To qualify as an "adequate" procedural ground, the state rule must be "'firmly

established and regularly followed.'" *Beard v. Kindler*, 558 U.S. 53, 60 (2009) (quoting *Lee*

*v. Kemna*, 534 U.S. 362, 376 (2002)).

It is well-settled that the Texas contemporaneous objection rule—which "ordinarily

precludes the raising on appeal of the unpreserved claim of trial error"—constitutes an

adequate and independent state ground for dismissal of a claim. *Puckett v. United States*, 556

U.S. 129, 134 (2009); *Cardenas v. Dretke*, 405 F.3d 244, 249 (5th Cir. 2005).

Renteria's claim was expressly dismissed on a state procedural rule because his

objection was not properly preserved by his trial counsel, and the rule provided an

independent and adequate ground for dismissal. Hence, Renteria procedurally defaulted his

claim in the state courts. *See Allen v. Stephens*, 805 F.3d 617, 635–36 (5th Cir. 2015)

(holding that rejection of claim based on the contemporaneous objection rule is an

independent and adequate state-law procedural ground sufficient to bar federal habeas review

of federal claims); *Amos v. Scott*, 61 F.3d 333, 45 (5th Cir. 1995) ("We hold, therefore, that

the Texas contemporaneous objection rule . . . is an independent and adequate state-law

procedural ground sufficient to bar federal court habeas review of federal claims.").

Renteria maintains the ineffective assistance of his trial, appellate, and state habeas

counsel excuse his procedural default. "That is because if the waiver holding is valid, trial

and appellate counsel were ineffective, and initial post-conviction counsel was also

ineffective for failing to raise this claim." Pet'r's Pet. 27, ECF No. 53.

"Section 2254(i) provides that "the ineffectiveness or incompetence of counsel during

Federal or State collateral post-conviction proceedings shall not be a ground for relief.'

'Cause,' however, is not synonymous with 'a ground for relief.'" *Martinez v. Ryan*, 566 U.S.

1, 17 (2012). "Cause is defined as 'something external to the petitioner, something that cannot fairly be attributed to him' that impedes his efforts to comply with the procedural rule." *Moore v. Roberts*, 83 F.3d 699, 704 (5th Cir. 1996) (quoting *Coleman*, 501 U.S. at 753). A showing of prejudice requires the petitioner to prove "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). "A finding of cause and prejudice does not entitle a petitioner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez*, 566 U.S. at 17.

In *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), the Supreme Court "treats ineffective assistance by a prisoner's state postconviction counsel as cause to overcome the default of a single claim—ineffective assistance of trial counsel—in a single context—where the State effectively requires a defendant to bring that claim in state postconviction proceedings rather than on direct appeal." *Davila*, 137 S. Ct. at 2062–63. But to establish cause to excuse the procedural default, a petitioner must show "(1) that his claim of ineffective assistance of counsel at trial is substantial—i.e., has some merit—and (2) that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Segundo v. Davis*, 831 F.3d 345, 350 (5th Cir. 2016) (quoting *Garza*, 738 F.3d at 676). "Thus, a Section 2254 application seeking to excuse procedural default must show counsel was deficient at two different proceedings—both the counsel at the time of the state criminal conviction and then the counsel at the time of state habeas." *Soliz v. Davis*, No. 17-70019, 2018 WL 4501154, at *7 (5th Cir. Sept. 18, 2018).

While constitutionally ineffective assistance of counsel may provide cause to excuse a procedural default, it must first—like all other constitutional claims—be "presented to the

-70-

state courts as an independent claim before it may be used to establish cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 489 (1986). "The principle of comity that underlies the exhaustion doctrine would be ill served by a rule that allowed a federal district court 'to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation,' and that holds true whether an ineffective assistance claim is asserted as cause for a procedural default or denominated as an independent ground for habeas relief." *Id.* (quoting *Darr v. Burford*, 339 U.S. 200, 2041 (1950)). "In other words, the claim of ineffective assistance of counsel on direct appeal is an independent constitutional violation, which must itself be exhausted using state collateral review procedures." *Hatten v. Quarterman*, 570 F.3d 595, 605 (5th Cir. 2009) (citing *Edwards v. Carpenter*, 529 U.S. 446, 451–53 (2000).

Renteria did not raise his ineffective assistance of counsel claims in state court. His allegations cannot constitute cause for the default of this claim because his claims are unexhausted. *Carrier*, 477 U.S. at 488; *Hatten*, 570 F.3d at 605 (citing *Carpenter*, 529 U.S. at 451–53). Therefore, alleged ineffective assistance of state habeas counsel cannot constitute cause for Renteria's claim regarding the State's closing argument.

Moreover, even if he had raised the claims in state court, he has not shown that something external which cannot fairly be attributed to him impeded his efforts to comply with the procedural rule or that the error infected his entire trial with error of constitutional dimensions.

Consequently, Renteria has failed to show cause and prejudice for the default of this claim and it may be dismissed on this ground alone. Nonetheless, as discussed below, the claim is without merit.

## (2). Merits

"In order to be appropriate, jury argument must fall within the categories of (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or (4) plea for law enforcement." *Darden v. State*, 629 S.W.2d 46, 52 (Tex. Crim. App. 1982). For a reviewing court, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "Such unfairness exists 'only if the prosecutor's remarks evince either persistent and pronounced misconduct or . . . the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred.'" *Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002) (quoting *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir.1985)); *see also Menzies v. Procunier*, 743 F.2d 281, 288–89 (5th Cir.1984) ("[A] prosecutor's improper argument will, in itself, exceed constitutional limitations in only the most 'egregious cases.' ") (quoting *Houston v. Estelle*, 569 F.2d 372, 382 (5th Cir. 1978)).

To the extent Renteria complains that the State improperly argued that there was no evidence he would spend the rest of his life in prison, such an argument was both a reasonable deduction from the evidence and a proper rebuttal to the defense's closing argument. Indeed, the trial court's jury charge properly instructed the jury that Renteria would be eligible for parole release after serving 40 years in prison. Reporter's R., vol. 72 (Courts Charge to the Jury), p. 44, ECF No. 82-4; Clerk's R., vol. 8, pp. 174–75, ECF No. 79-11. And although Dr. Cunningham testified that—in his opinion based on his research of prison life and sentencing—Renteria would spend the rest of his life in prison, Reporter's R., vol. 71, p. 88, ECF No. 82-3, he did not testify that Renteria could not and would not ever

-72-

attain parole eligibility. The State was therefore entitled to rebut Dr. Cunningham's testimony—and the defense's closing argument suggesting Renteria would die in prison—and direct the jury's attention to the trial court's instructions. There was no evidence before the jury that Renteria would never attain eligibility for parole, and the State was entitled to argue as much. Consequently, Renteria fails to show that the State presented an improper closing argument.

Moreover, Renteria fails to demonstrate harm. The complained-of argument by the State was not persistent and pronounced. Further, the argument merely reiterated what the jury charge properly informed the jury—that Renteria would become eligible for parole release. Lastly, Renteria cannot show—in light of the substantial aggravating evidence presented at trial—that but for the remarks no conviction would have occurred.

Renteria's claim is both barred and without merit. He is not entitled to relief.

**D. Claim IV - Renteria's federal constitutional guarantees of effective assistance of counsel, trial by an impartial jury, an individualized sentencing determination, and due process of law were violated when the trial court prohibited questioning during voir dire regarding the jurors' ability to consider and give effect to mitigating circumstances and to consider the full range of punishment, and otherwise follow the law. Pet'r's Pet. at 28–90, ECF No. 53; Br. in Supp. 32–46, ECF No. 56.**

### 1. Background

Renteria presents multiple claims regarding the voir dire process. First, he complains the venire members were "repeatedly instructed . . . that there must be a nexus between mitigation and the offense." Pet'r's Pet. 28–29, ECF No. 53. Second, he notes "the trial court prohibited counsel from any discussion regarding mitigation or providing examples of what the Supreme Court has held are significant [mitigating] factors." *Id.* at 29. Third, he protests "[t]he trial court refused to answer jurors' concerns and prohibited counsel from questioning them about whether they could sentence a defendant convicted of capital murder of a child to life with the possibility of parole." *Id.* Fourth, he claims "[c]ounsel was also disallowed to ask jurors if they could consider a sentence of life with the possibility of parole for a defendant convicted of capital murder who had prior felony convictions." *Id.* Finally, he also complains the jury "included members who were substantially impaired in their ability to follow the law." *Id.* at 30.

Renteria specifically claims Juror Donnie Malpass was seated without "questioning her about her ability to consider mitigating evidence and the full range of punishment." *Id.* at 28. Juror John Harton was seated after the "trial court endorsed an unconstitutional definition of mitigation" and was "unable to consider and give effect to mitigation." *Id.* at 43. Norman Thomas was seated after the trial "court endorsed unconstitutional definition of mitigation" and was "unable to consider and give effect to mitigation." *Id.* at 48. Brett Williams was seated while he was "unable to consider and give effect to mitigation." *Id.* at 49. Roxanne

Castricone was seated after the trial "court endorsed unconstitutional definition of mitigation" and "was unable to consider mitigation." *Id.* at 49. Washington Watley was seated after Renteria's challenged him for cause "on the grounds he is biased and cannot be impartial because he has two young daughters, and because he would automatically believe and lend more credibility to law enforcement officers." *Id.* at 86. "[T]he trial court overruled the challenge for cause, and because the defends had exhausted all peremptory challenges, Mr. Watley was seated as a juror." *Id.* Jeanette Sanchez was seated after stating "she would sentence a defendant to death after determining he was a future danger." *Id.* at 87. Renteria challenged Sanchez "for cause on the basis that she was unable to follow the law regarding sentencing." *Id.* at 89. The trial court denied the challenge for cause. *Id.*

Renteria notes he "requested additional peremptory challenges because the court denied proper challenges for cause." *Id.* at 76.

Renteria also claims the trial court placed unconstitutional and improper limitations on his voir dire of the following peremptorily challenged prospective jurors:

> 2. **Mr. Mark Anthony Tapia** – Peremptory Challenge – Preconceived Decision Regarding Punishment, Unable to Consider Mitigation, Shifts the Burden of Proof to the Defendant
>
> 3. **Mr. Joaquin Rivera** – Peremptory Challenge – Unable to Consider Mitigation
>
> 4. **Ms. Elizabeth Black** – Peremptory Challenge – Unable to Consider and Give Effect to Mitigation and Consider the Full Range of Punishment
>
> . . . .
> 6. **Annette Brigham** – Peremptory Challenge – Biased against Mr. Renteria – Unable to Consider Full Range of Punishment
>
> . . . .
>
> 9. **Mark Williams** – Peremptory Challenge – Unable to Consider the Full Range of Punishment – Unable to Follow the Law – Biased by Publicity

-75-

10. **Mark Robert Williams**[5] – Peremptory Challenge – Unable to Consider Full Range of Punishment – Expert Bias

11. **Carlos Martinez** – Peremptory Challenge – Unable to Consider Mitigation – Court Endorsed Unconstitutional Definition of Shifts Burden of Proof to Defendant

12. **Evangeline Rose Ramirez** – Biased against Mr. Renteria – Unable to Consider Mitigation – Unable to Consider Full Range of Punishment

13. **Paul Steven Watt** – Peremptory Challenge -- Unable to Consider the Full Range of Punishment – Unable to Consider Mitigation – Shifted Burden of Proof to the Defense

. . . .

15. **Lorena Carreon** – Peremptory Challenge – Shifts Burden of Proof to the Defense – Unable to Consider Mitigation

16. **Anna Nava** – Peremptory Challenge – Unable to Consider Mitigation – Shifts Burden of Proof to Defense

17. **Longino Gonzalez** – Peremptory Challenge – Unable to Consider Mitigation – Unable to Consider Full Range of Punishment

18. **Cruz Angel Ochoa, Jr.** – Peremptory Challenge – Court Endorsed Unconstitutional Definition of Mitigation – Unable to Consider Mitigation – Unable to Consider Full Range of Punishment

19. **Howard Bryan** – Peremptory Challenge – Unable to Consider Mitigation – Unable to Consider Full Range of Punishment – Law Enforcement Bias

20. **John Tobias** – Peremptory Challenge – Unable to Consider Mitigation – Unable to Consider Full Range of Sentence

21. **Robert Crosby** – Peremptory Challenge – Unable to Consider Mitigation – Unable to Consider Full Range of Punishment – Unable to Consider Mitigation

22. **Robert Torres**[6] – Peremptory Challenge – Unable to Consider Mitigation – Unable to Consider Full Range of Punishment

---

[5] Mark Williams and Mark Robert Williams are the same person.
[6] The Court believes this person is Robert P. Tomes.

23. **John David Turner** – Peremptory Challenge – Trial Court Endorsed Unconstitutional Definition of Mitigation – Unable to Consider the Full Range of Punishment – Unable to Consider Mitigation

24. **Margaret Jackson** – Peremptory Challenge – Biased against Mr. Renteria – Unable to Consider Mitigation

25. **Mr. Daniel Gurany** – Peremptory Challenge – Unable to Consider Mitigation – Unable to Follow the Law

26. **Leslie Potter** – Peremptory Challenge – Unable to Consider Full Range of Punishment – Unable to Consider Mitigation

27. **John Deslongchamps** – Peremptory Challenge – Unable to Consider the Full Range of Punishment – Unable to Consider Mitigation

. . . .

Pet'r's Br. in Supp. 41-45, ECF No. 58.

The Court of Criminal Appeals reviewed Renteria's claims concerning purported errors during voir dire in his direct appeal. *See Renteria v. State* (Appellant's Brief), 2009 WL 5453014 (Dec. 15, 2009), at \*42–\*154. The Court of Criminal Appeals affirmed the trial court in all respects. *Renteria II*, 2011 WL 1734067, at \*4–\*38.

### 2. Applicable Law

The Sixth and Fourteenth Amendments guarantee a defendant the right to an impartial jury. *Witherspoon v. State of Ill.*, 391 U.S. 510, 518 (1968). For this reason, a defendant is "entitled to be tried . . . by jurors who had no bias or prejudice that would prevent them from returning a verdict according to the law and evidence." *Connors v. United States*, 158 U.S. 408, 413 (1895).

"[T]he Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." *Lockhart v. McCree*, 476 U.S. 162, 184

(1986). "[T]he proper standard for determining when a prospective juror may be excused for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). A court should, for example, excuse a prospective "juror who will automatically vote for the death penalty in every case" because he "will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Morgan v. Illinois*, 504 U.S. 719, 727, 729 (1992).

As a result, a defendant must have an opportunity to expose bias, prejudice among prospective jurors. *Morford v. United States*, 339 U.S. 258 (1950). Voir dire performs a "critical function in assuring a criminal defendant that his Sixth Amendment right to an impartial jury will be honored." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). It enables a defendant to identify biased, prejudiced or unqualified jurors. *Morgan*, 504 U.S. at 727, 729; *Rosales-Lopez*, 451 U.S. at 188. It allows a defendant to challenge prospective jurors for cause before a judge able to rule on their removal. *Morgan*, 504 U.S. at 729–730; *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991).

Still, "the trial court retains great latitude in deciding what questions should be asked on voir dire." *Mu'Min*, 500 U.S. at 424. "'[A] suitable inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried.'" *Id.* at 422 (quoting *Connors*, 158 U.S. at 413). "To be constitutionally compelled . . . it is not enough that such questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." *Id.* at 425–26; *Morgan*, 504 U.S. at 730 n.5.

"[A]lthough although there are no constitutional provisions directly addressing the use of hypothetical questions during voir dire, there may be circumstances where a party's manner of conducting voir dire renders a jury [non-]impartial and thereby triggers a Sixth Amendment violation." *Hobbs v. Lockhart*, 791 F.2d 125, 129 (8th Cir. 1986). For example, asking a potential jurors how they "would weigh evidence [they] had not heard" would "not be a proper line of inquiry." *Sandidge v. Salen Offshore Drilling Co.*, 764 F.2d 252, 257 (5th Cir. 1985).

Finally, a defendant does not have a constitutional right to peremptory challenges. "[T]he right to a peremptory challenge may be withheld altogether without impairing the constitutional guarantee of an impartial jury and a fair trial." *Georgia v. McCollum*, 505 U.S. 42, 57 (1992). "They are a means to achieve the end of an impartial jury. "So long as the jury that sits is impartial, the fact that [the petitioner] had to use a peremptory challenge to achieve that result does not mean that the Sixth Amendment was violated." *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988); *see also Soria*, 207 F.3d at 241–42 ("[B]ecause [the venire member] did not sit on [the petitioner's] jury, [the petitioner] is precluded from making a substantial showing of the denial of a federal right with respect to this claim."). And since the Constitution does not require peremptory challenges, "this benefit cannot be a basis for making 'content' questions . . . a constitutional requirement. *Mu'Min*, 500 U.S. at 424–25. So, "[t]he failure properly to grant a challenge for cause rises to the level of a constitutional violation and warrants reversal only if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him. Absent such a showing, the defendant has not been denied his Sixth Amendment right to an impartial jury." *United States v. Webster*, 162 F.3d 308, 342 n.36 (5th Cir. 1998).

### 3. Discussion

#### a. Nexus Between Mitigation and the Offense

Renteria asserts his "death sentence is invalid because his second penalty jury was repeatedly instructed during the voir dire process there must be a nexus between mitigation and the offense." Pet'r's Pet. 28–29, ECF No. 53. He cites two examples. The first occurred during the voir dire of seated juror John C. Harton:

> THE COURT: I can't go into specific instances of what mitigation is because mitigation means different things to different people. You know what is less bad to some folks might be real bad for other folks. It's entirely up to you. We can only tell you that to be a fair impartial juror you must be able to consider mitigating evidence in compliance with that question and including those type of things like his character and background the circumstances of the offense and the persons moral culpability. My question to you is you limited to yourself when you said --
>
> A. I see. Yes, I do.
>
> THE COURT: And if you feel that way that's fine. And my question is can you consider those other things, his character and his background?
>
> A. Yes, I can consider that.
>
> . . . .
>
> A. So what you're saying is his background his character his moral culpability all that will have a bearing on what happened at -- at the time of the murder that could have affected the reason why he committed that murder is that what you're? I -- I could go along with that.
>
> Q. [Defense Counsel Jaime Gandara] It might or might not. And it doesn't have to have a bearing on what happened at the time of the murder in order to be considered by a juror to be mitigating.
>
> MS. MERAZ: [Prosecutor Diana E. Meraz] Objection misstatement. It has to do -- there has to be a nexus between the two.
>
> MR. GANDARA: Your Honor Tennard v. –
>
> THE COURT: I'm going to overrule the objection.
>
> MR. GANDARA: It doesn't have to be connected to the commission of the offense. Mitigation has been defined by -- by the Supreme Court

-80-

another court as being things that -- that in a juror's mind would -- that is of such a character that it might serve as a basis or a sentence less than death.

MS. MERAZ: Objection misstatement of the law.

THE COURT: As far as quoting any definition out of any cases, I'm going to sustain the objection. We shouldn't be -- the thing is can you consider mitigation as -- as required by that question [special issue two] is the ultimate issue sir?

A. Yes, I can.

Reporter's R., vol. 13 (voir dire of John C. Harton), pp. 83–84, ECF No. 80-5.

The other occurred during the voir dire of peremptorily challenged venire member

Cruz A. Ochoa Jr.:

A. [Cruz A. Ochoa Jr.] And what is mitigating circumstance?

Q. [Prosecutor Lori C. Hughes] Mitigating circumstance is something that makes you think this person deserves life instead of death. It could be anything. And I can't tell you –

A. Oh.

Q. -- and I'm not -- I'm not allowed to ask you what you think that is.

A. Okay.

Q. Because the evidence is what the jury is to look at.

A. That's a big question there for me as far as --

Q. Okay.

A. -- what is mitigating. That would be answered through the trial or --

Q. We'll talk -- yeah its -- well we'll talk a little bit about it. You can have a robbery where someone threat -- I threaten another person to get that property let's say. You can have an aggravated robbery where I threaten them with a gun.

A. Okay.

Q. Would you agree the aggravated robbery is worse?

A. Yes because you actually showed a weapon.

-81-

Q. Right. And it -- it's call -- it's a different offense.

A. Uh-huh.

Q. It's actually a higher level of offense. It's aggravating.

MS. PAYAN: [Defense Counsel Edythe M. Payan] Objection, Your Honor. This is connecting mitigation to the actual crime and there's no requirement for mitigation that it actually be a nexus and I would state that this example is a misstatement and is misstating the law.

THE: COURT: Overruled.

Q. By Ms. Hughes -- Okay. So, we understand what aggravating means?

A. Yes.

Q. Mitigating is the opposite. Mitigating means it's not so bad. It's something that makes a crime less whatever that is.

MS. PAYAN: Objection. And again it's not something that makes the crime less. Under Tennard v. Dretke there is no nexus requiring that mitigation is anything that the evidence is such character that might serve as a basis for a sentence less than death.

Reporter's R., vol. 24 (voir dire of Cruz A. Ochoa Jr.), pp. 144–146, ECF No. 80-16.

### (1). Procedural Bar

The Court of Criminal Appeals specifically declined to address Renteria's claim "the trial judge deprived him of due process and due course of law 'by permitting the State to inform the veniremen that [the] law required a nexus between the crime and mitigation evidence.'" *Renteria II*, 2011 WL 1734067, at *38. It reasoned "Renteria has provided no citation to the record or legal authority in support of this claim. Thus, it is inadequately briefed, and we decline to address it." *Id.* (citing Tex. R. App. P. 38.1).

When the state court rejects a claim pursuant to a state procedural rule which provides an adequate basis for the decision—independent of the merits of the claim—the procedural default bars a federal habeas claim. *Hughes*, 530 F.3d at 341 (citing *Coleman*, 501 U.S. at

729–32). To be "adequate" to support the judgment, the state law ground must be both "firmly established and regularly followed" by the state courts. *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991). "A survey of the [Texas Court of Criminal Appeals'] capital sentencing jurisprudence reveals that it regularly rejects claims—both on direct and postconviction review—on the basis that these claims are inadequately briefed." *Roberts v. Thaler*, 681 F.3d 597, 607 (5th Cir. 2012).

In this case, the Court of Criminal Appeals invoked the briefing requirements of Texas Rule of Appellate Procedure 38.1 to bar Renteria's claim. Its determination constituted an independent and adequate state ground for denial of relief which procedurally bars federal habeas review. *Id.* at 608.

Renteria contends "[t]he State's exhaustion and default arguments fail to take into account that to the extent trial counsel failed to raise the proper grounds during the voir dire, such failure would constitute cause through *Martinez/Trevino*." Pet'r's Reply 37, ECF No. 94.

The Supreme Court bars federal habeas relief on procedurally defaulted claims unless the petitioner demonstrated cause for the default and actual prejudice arising from the default—or showed the failure to consider the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749-50. In *Martinez/Trevino*, the Supreme Court opines a petitioner could meet the cause element by showing "(1) that his claim of ineffective assistance of counsel at trial is substantial—i.e., has some merit—and (2) that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza*, 738 F.3d 676.

Here, Renteria's counsel made appropriate objections when the prosecutor improperly argued Renteria had to show a nexus between his mitigating evidence and the circumstances

surrounding the crime before the jury could consider it. Consequently, Renteria has not shown his trial "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. He has not overcome that "strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Id.* at 689. He has also not shown "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Porter*, 558 U.S. 38–39. As a result, Renteria's ineffective assistance of trial counsel claim has no merit. And Renteria has not shown cause which would permit him to overcome the procedural bar to his claim. He is not entitled to relief on this claim. Nonetheless, as discussed below, the claim is without merit.

### (2). Merits

Renteria argues his "death sentence is invalid because his second penalty jury was repeatedly instructed during the voir dire process there must be a nexus between mitigation and the offense." Pet'r's Pet. 28–29, ECF No. 53. The record does not support his claim.

The prosecution erred when it claimed during voir dire that Renteria must show a nexus between mitigating evidence and Flores's murder. But the prosecution had an historical basis for the argument.

In *Penry v. Lynaugh* (*Penry I*), 492 U.S. 302 (1989),[7] Texas Defendant Johnny Paul Penry presented mitigating evidence of mental retardation and organic brain damage resulting in poor impulse control and an inability to learn from experience. *Id.* at 308. Penry offered further mitigating evidence of his physical and mental abuse as a child. *Id.* at 309.

The jury decided Penry's sentence by answering the "special issues" in a former version of Texas Code of Criminal Procedure article 37.071:

---

[7] Abrogated by *Atkins v. Virginia*, 536 U.S. 304 (2002).

"(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

"(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

"(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." Tex. Code Crim. Proc. Ann., Arts. 37.071(b) (Vernon 1981 and Supp.1989).

If the jury unanimously answers "yes" to each issue submitted, the trial court must sentence the defendant to death. Arts. 37.071(c)–(e). Otherwise, the defendant is sentenced to life imprisonment. *Ibid.*

*Penry I*, 492 U.S. at 310.

The Supreme Court held the special issues in the Texas sentencing statute did not

provide the jury with a vehicle to consider and give effect to Penry's mitigating evidence.

The Court stated:

[A] juror who believed that Penry's retardation and background diminished his moral culpability and made imposition of the death penalty unwarranted would be unable to give effect to that conclusion if the juror also believed that Penry committed the crime "deliberately."

. . . .

Penry's mental retardation and history of abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future. . . . The second special issue, therefore, did not provide a vehicle for the jury to give mitigating effect to Penry's mitigating evidence . . .

*Id.* at 323. The Supreme Court found the appropriateness of a death sentence was not ensured

when the jury could not consider and give effect to mitigating evidence relevant to a

defendant's "background, character, or the circumstances of the crime." *Id.* at 328. The

Court did not, however, provide a framework to review "*Penry* claims" and assist courts in

determining whether the jury was able to consider and give effect to specific mitigating evidence under article 37.071.

In response to this ruling, the Texas legislature substantially revised the capital sentencing statute in 1991 to incorporate the current sentencing provisions which address mitigating circumstances. *See* S.B. 880, 72nd Leg., 1991 Reg. Sess. (Tex. 1991) (showing that directives regarding the jury's consideration of mitigation evidence and the offender's moral culpability were added in the 1991 amendment). Under the revised capital sentencing statute—applicable at the time of Renteria's offense—a jury faced two "special issues" before sentencing. The first special issue—the future dangerousness issue—was "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Crim. Proc. Code art. 37.071 § 2(b)(1) (Vernon 2001). If the jury unanimously answered this question in the affirmative, it then considered a second special issue—the mitigation issue—"[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed" *Id.* § 2(e)(1).[8]

And to resolve *Penry I* claims—that the jury was unable to consider and give effect to mitigating evidence—the Texas Court of Criminal Appeals adopted a "nexus" relevancy requirement. It explained that "mitigating evidence is relevant to the jury's individualized assessment of the propriety of death if there is a nexus between the mitigating evidence and the circumstances surrounding the crime that might, from the viewpoint of society, reduce the

---

[8] In 2005, the Texas Legislature amended the statute to allow for life imprisonment without the possibility of parole. *See* Tex. Penal Code § 12.31(a); Tex. Code Crim. Proc. art. 37.071 §§ 1, 2(a)(1), (g); S.B. 1507, 79th Leg., 2005 Reg. Sess. (Tex. 2005).

defendant's 'deathworthiness.'" *Goss v. State*, 826 S.W.2d 162, 165 (Tex. Crim. App. 1992). "This concept of deathworthiness is best understood as an individualized assessment of the appropriateness of the death penalty, given the offense and the offender." *Mines v. State*, 852 S.W.2d 941, 951 (Tex. Crim. App. 1992). Hence, a defendant had to establish a nexus between the mitigating evidence and the circumstances of the offense which tended to excuse or explain the commission of the offense, suggesting that the defendant was less deserving of a death sentence. Otherwise the "evidence [was] not relevant, *beyond the scope of the special issues*, to the jury's individualized assessment of Appellant's moral culpability for the crime." *Nobles v. State*, 843 S.W.2d 503, 506 (Tex. Crim. App. 1992) (quoting *Goss*, 826 S.W.2d at 166) (emphasis in original). Under the Court of Criminal Appeals' "nexus requirement the mitigating evidence must be directly linked to the defendant's moral culpability for the capital murder." *Earhart v. State*, 877 S.W.2d 759, 765 (Tex. Crim. App. 1994).

The Fifth Circuit followed the Texas Court of Criminal Appeals' lead and adopted a "constitutional relevance" screening test to address *Penry I* claims. *See, e.g., Bigby v. Cockrell*, 340 F.3d 259, 273 (5th Cir. 2003) ("The evidence presented must establish "(1) a uniquely severe permanent handicap[ ] with which the defendant was burdened through no fault of his own, and (2) that the criminal act was attributable to this severe permanent condition.") (quoting *Davis v. Scott*, 51 F.3d 457, 460–61 (5th Cir. 1995)), *opinion withdrawn and superseded sub nom. Bigby v. Dretke*, 402 F.3d 551 (5th Cir. 2005), *and abrogated by Tennard*, 542 U.S. 274. Only after the court found that the mitigating evidence was "constitutionally relevant" would it consider whether that evidence was within "'the 'effective reach' of the jurors.'" *Smith v. Cockrell*, 311 F.3d 661, 680 (5th Cir. 2002)

-87-

(quoting *Madden v. Collins*, 18 F.3d 304, 308 (5th Cir. 1994), *abrogated by Tennard*, 542 U.S. 274).

Then in *Tennard v. Dretke*, 542 U.S. 274 (2004), the Supreme Court held the Fifth Circuit's test for determining the constitutional relevance of mitigating evidence had "no foundation in the decisions of this Court." *Id.* at 284. The Supreme Court noted "[n]either *Penry I* nor its progeny screened mitigating evidence for 'constitutional relevance' before considering whether the jury instructions comported with the Eighth Amendment." *Id.* Rather, the Supreme Court held that the jury must be given an effective vehicle with which to weigh mitigating evidence so long as the defendant has met a "low threshold for relevance," which is satisfied by "'evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.'" *Id.* 284–285 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990)). Consequently, "before a jury can undertake the grave task of imposing a death sentence, it must be allowed to consider a defendant's moral culpability *and* decide whether death is an appropriate punishment for that individual in light of his personal history and characteristics and the circumstances of the offense." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 263–64 (2007) (emphasis added).

Renteria's counsel cited *Tennard* when the prosecution asserted the jury could not consider mitigating evidence unless Renteria established a nexus between evidence and the circumstances of the offense. Reporter's R., vol. 13 (voir dire of John C. Harton), p. 84, ECF No. 80-5; Reporter's R., vol. 24 (voir dire of Cruz A. Ochoa Jr.), p. 145, ECF No. 80-16. Renteria's counsel explained "[u]nder Tennard V. Dretke there is no nexus requiring that mitigation is anything that the evidence is such character that might serve as a basis for a sentence less than death." Reporter's R., vol. 24, p. 145. Indeed, Renteria's counsel raised

proper grounds for rejecting the prosecution's nexus argument during the voir dire. And the trial court did not accede to the prosecution's claim of a nexus requirement. The trial court described mitigating evidence as "things like his character and background the circumstances of the offense and the persons moral culpability." Reporter's R., vol. 13, p. 83. Further—as described in detail above—the trial court allowed Renteria's counsel to present substantial mitigating evidence of his personal history and characteristics unrelated to the circumstances of the offense.

Renteria's claim is both barred and without merit. He is not entitled to relief on this claim.

### b. Questions About Specific Mitigating Circumstances

Renteria next asserts that "[b]ecause the trial court prohibited counsel from any discussion regarding mitigation or providing examples of what the Supreme Court has held are significant factors [during voir dire], jurors voted to sentence Mr. Renteria to death believing that mitigating circumstances were guilt defenses like insanity or self-defense." Pet'r's Pet. 29, ECF No. 53. He argues his "federal constitutional guarantees of effective assistance of counsel, trial by an impartial jury, an individualized sentencing determination, and due process of law were violated when the trial court prohibited questioning during voir dire regarding the jurors' ability to consider and give effect to mitigating circumstances . . ." Pet'r's Br. in Supp. 32, ECF No. 58 (citing U.S. Const. amends. VI, VIII, and XIV). He maintains that his "[c]ounsel was not requesting permission to ask improper commitment questions; rather counsel was requesting permission to make the constitutionally permitted, and, indeed, constitutionally-required, inquiry into whether jurors could consider and give effect to mitigating evidence." Pet'r's Reply 35, ECF No. 94.

Prior to Renteria's second punishment trial, his counsel filed a motion to submit a "comprehensive" juror questionnaire and objected to the trial court's proposed questionnaire for venire members. Reporter's R., vol. 2 (Judge's Conference), pp. 6–9, ECF 79-14. The trial court denied the motion and overruled the objection. *Id.* at 13.

During voir dire, Renteria's counsel attempted to question prospective juror Joaquin Rivera about his ability to consider specific factors as mitigating evidence:

> Q. [Defense Counsel Edythe Payan] Now again mitigation evidence can be anything. And you do not have to agree. You -- as jurors one juror may find one specific piece of information to be mitigating and another person might find something else to be different mitigation. You're not going to be asked to agree as to that.
>
> A. Yes.
>
> Q. Mitigating can be -- there are several relevant factors.
>
> MS. HUGHES: Objection, Your Honor, to contracting. Improper question.
>
> MS. PAYAN: I would just ask to give examples . . . so that we can intelligently exercise our peremptory which we are entitled.
>
> THE COURT: I'm not going to allow you to go into specifics.
>
> . . . .
>
> MS. PAYAN: And Your Honor for the record I would like the record to reflect that at this time we would like to ask this juror if he'd consider mitigation which the Court has found to be relevant such factors as drugs –
>
> MS. HUGHES: Objection, Your Honor.
>
> THE COURT: If you're making a Bill then you need to excuse the juror.
>
> MR. GANDARA: Can we go ahead and excuse the juror?
>
> THE COURT: Well not right now. At an appropriate time.

Reporter's R., vol. 9 (voir dire of peremptorily challenged venire member Joaquin Rivera), pp. 173–74, ECF No. 80-1.

Renteria's counsel subsequently presented a bill of exception, asking that the trial court allow the defense to propounded questions to prospective jurors about their ability to consider specific factors:

> MS. PAYAN: Your Honor, . . . under the law we are entitled to have jurors struck for cause who cannot consider and give mitigation. We are entitled to jurors who can consider and give effect to specific mitigating evidence, and a juror must be able to consider the individual defendant's mitigation . . . the questions we would ask the juror would be:
>
> Could you consider the mitigating factor of a person with a drug problem[?]
>
> Could you consider the mitigating factor of a person with a way turbulent family history[?]
>
> Could you consider mitigation of a person, a defendant, with emotional problems[?]
>
> Could you consider mitigation of the defendant's background[?]
>
> Could you consider mitigation of the defendant's upbringing[?]
>
> Could you consider mitigation of the defendant's character[?]
>
> Could you consider mitigation of the defendant's character, good character[?]
>
> And could you consider mitigation of the circumstances of the offense[?]
>
> . . . .
>
> And for the record we would ask that these are the questions we would ask each and every member of this venire under this subject.

*Id.*, pp. 177–79.

Renteria's counsel re-urged this objection while questioning prospective juror Elizabeth Black. *See* Reporter's R., vol. 12 (voir dire of peremptorily challenged venire member Elizabeth Black), p. 130, ECF No. 80-4. The trial court responded with its ruling was "the same. I'll not allow that type of question to be asked regarding specific matters of

-91-

mitigation." *Id.* at 131. Renteria's counsel subsequently made the same bill of exception on several other occasions:

> MR. VELASQUEZ: We're entitled to do hypothetical questions, Your Honor. And in those hypothetical questions we're allowed to put facts to allow us to decide whether were going to use a peremptory challenge for cause or -- or a challenge for cause, Your Honor. And we would ask the Court to allow us to do that type of hypothetical questions, Your Honor.
>
> THE COURT: The Court has ruled already. Okay.
>
> . . . .
>
> THE COURT: Any specific instances of mitigation you cannot go into including defenses. Okay?

Reporter's R., vol. 14 (voir dire of seated Brett K. Williams), pp. 63–64, ECF No. 80-6.

*Id.* at 63–64. Renteria's counsel argued the trial court should allow the defense to conduct a "full, fair, and constitutional voir dire." *Id.* at p. 58.

Renteria's counsel also filed a motion entitled "Propounded Specific Voir Dire Questions to Each Member of the Venire." In this motion, his counsel sought permission to ask the following questions:

1. If you heard evidence of sexual assault of a child and indecency with a child, what are your views regarding the death penalty?

2. Assume that the defendant has been convicted of capital murder, of intentionally and knowing[ly] causing the death of a child under 6, and you heard MATTERS of sexual assault of a child and indecency with a child, what are your views regarding the death penalty?

3. Assume that the defendant has been convicted of capital murder, of intentionally and knowing[ly] causing the death of a child under 6, and the Defendant has a previous conviction of indecency with a child, what are your views regarding the death penalty?

4. Assume that the defendant has been convicted of capital murder, of intentionally and knowing[ly] causing the death of a child under 6, and you and 11 others have found yes, the defendant is a future danger, and the Defendant has a previous conviction of indecency with a child and felony driving while intoxicated, what are your views regarding the death penalty?

5. Assume that the defendant has been convicted of capital murder, of intentionally and knowing[ly] causing the death of a child under 6, and you and 11 others have found yes, the defendant is a future danger, if you hear MATTERS of sexual assault of a child or indecency [with] a child, what are your views regarding the death penalty?

6. Assume that the defendant has been convicted of capital murder, of intentionally and knowing[ly] causing the death of a child under 6, and you and 11 others have found yes, the defendant is a future danger, and assume the most horrible of circumstance of the crime of capital murder, the worst you can think of for yourself, are you open to consider mitigation circumstances?

7. Assume that the defendant has been convicted of capital murder, of intentionally and knowing[ly] causing the death of a child under 6, and you and 11 others have found yes, the defendant is a future danger, if you hear MATTERS of sexual assault of a child or indecency [with] a child, are you open to consider mitigating circumstances?

8. Assume that the defendant has been convicted of capital murder, of intentionally and knowing[ly] causing the death of a child under 6, and you and 11 others have found yes, the defendant is a future danger, and the Defendant has a previous conviction of indecency with a child, are you open to consider mitigation circumstances?

*Renteria II*, 2011 WL 1734067, at *6–7.

The trial court "overrule[d] the motion" and "disallow[ed] Defense counsel being able to ask those specific questions." *Id.* at 7. It reasoned the questions implicated the restrictions imposed by *Standefer v. State*, 59 S.W.3d 177, 181–83 (Tex. Crim. App. 2001), against commitment questions, and by *Barajas v. State*, 93 S.W.3d 36, 39–42 (Tex. Crim. App. 2002), against ambiguous questions.

In his direct appeal, Renteria argued the trial judge "abused her discretion by refusing to give him permission to ask the propounded questions included in his bill of exception . . . and his written motion." *Renteria II*, 2011 WL 1734067, at *7.

The Court of Criminal Appeals overruled the objection. It explained "[t]he trial judge was within her discretion to prohibit defense counsel from asking these improper questions." *Id.* at *8 (citing *Barajas*, 93 S.W.3d at 38).

Renteria claimed on direct appeal that the trial court erred in denying his request to pose questions to venire members regarding their willingness to consider specific factors as mitigating evidence. *Renteria v. State* (Appellant's Brief), 2009 WL 5453014 (Tex. Crim. App. filed Dec. 15, 2009), at *42–64. The Texas Court of Criminal Appeals opined "these questions implicate the restrictions imposed by *Standefer v. State*, against commitment questions." *Renteria II*, 2011 WL 1734067, at *7.

In *Standefer v. State*, 59 S.W.3d 177 (Tex. Crim. App. 2001), the Court of Criminal Appeals explained commitment questions "commit a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact." *Id.* at 179. Commitment questions often ask for a "yes" or "no" answer, which commit jurors to resolve issues in a particular way. *Id.* Commitment questions may be proper or improper, depending on whether they lead to valid challenges for cause. *Id.* at 181. Commitment questions are proper when the law requires a certain type of commitment from jurors and the attorneys ask prospective jurors whether they can follow the law. *Id.* Commitment questions are improper when (1) the law does not require a commitment or (2) when the question adds facts beyond those necessary to establish a challenge for cause. *Id.* at 181–182

> So, the inquiry for improper commitment questions has two steps: (1) Is the question a commitment question, and (2) Does the question include facts-and only those facts-that lead to a valid challenge for cause? If the answer to (1) is "yes" and the answer to (2) is "no", then the question is an improper commitment question, and the trial court should not allow the question.

*Id.* at 182–83.

In *Barajas v. State*, 93 S.W.3d 36 (Tex. Crim. App. 2002), the Court of Criminal Appeals provided an example of an improper commitment question. In *Barajas*, defense counsel attempted to ask whether prospective jurors could be "fair and impartial" in a case involving a nine-year-old victim. *Id.* at 37. The Court of Criminal Appeals explained it could interpret this question as an inquiry about the effect of the victim's age on three different matters: (1) guilt, (2) witness credibility, or (3) punishment. *Id.* at 39–40. It concluded inquiry into the third matter would constitute an attempt to obtain an impermissible commitment. *Id.* at 40.

In *Raby v. State*, 970 S.W.2d 1 (Tex. Crim. App. 1998), the Court of Criminal Appeals correctly noted "the law does not require a juror to consider any particular piece of evidence as mitigating; all the law requires is that a defendant be allowed to present relevant mitigating evidence and that the jury be provided a vehicle to give mitigating effect to that evidence if the jury finds it to be mitigating." *Id.* at 3 (Tex. Crim. App. 1998). If a trial court permitted a party to ask prospective jurors to react to specific mitigating evidence, the party could use peremptory challenges to fashion a favorable jury. While a defendant has a right to an impartial jury, he does not have a right to a sympathetic jury of his own creation. Hence, "[a] trial court does not abuse its discretion by refusing to allow a defendant to ask venire members questions based on facts peculiar to the case on trial (e.g. questions about particular mitigating evidence)." *Id.*

Renteria now argues that the state trial court's limitations on his efforts to voir dire prospective jurors on how they would view his mitigating evidence prevented his trial counsel from intelligently asserting challenges for cause against potentially biased jurors and exercising peremptory challenges. Pet'r's Br. in Supp. 35, ECF No. 58.

Although—as the Court of Criminal Appeals noted in *Raby*—a court must afford a defendant an opportunity to present mitigating evidence at the punishment phase of a capital trial, the fact that a juror might view the evidence as aggravating—as opposed to mitigating—does not implicate the Eighth Amendment. *See Johnson v. Texas*, 509 U.S. 350, 368 (1993) ("As long as the mitigating evidence is within 'the effective reach of the sentencer,' the requirements of the Eighth Amendment are satisfied."). So "a defendant in a capital case is not entitled to challenge prospective jurors for cause simply because they might view the evidence the defendant offers in mitigation of a death sentence as an aggravating rather than a mitigating factor." *Dorsey v. Quarterman*, 494 F.3d 527, 533 (5th Cir. 2007). Thus, Renteria's claim that the trial court deprived him of the ability to discover the basis for a challenge for cause—through questions which would help his counsel determine whether potential jurors viewed specific evidence as mitigating or aggravating—is without merit.

Furthermore, a defendant does not have a constitutional right to peremptory challenges. *McCollum*, 505 U.S. at 57. "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Ross*, 487 U.S. at 88. And since the Constitution does not require peremptory challenges, "this benefit cannot be a basis for making 'content' questions . . . a constitutional requirement. *Mu'Min*, 500 U.S. at 424–25.

In *Soria v. Johnson*, 207 F.3d 232 (5th Cir. 2000), the Fifth Circuit confronted a similar challenge to a Texas trial court's refusal to permit voir dire questions which attempted to bind prospective jurors regarding their positions on the evidence. The Fifth Circuit found no constitutional error in the state trial court's ruling, given the extent of other voir dire questioning into potentially mitigating evidence that the trial judge did allow. *Id.* at 244. The

-96-

Fifth Circuit noted that while "the trial judge did not allow the particular phrasing [the petitioner] sought," it concluded that "the form of questioning permitted by the state trial court was sufficient to allow an intelligent exercise of his peremptory challenges." *Id.* Ultimately, the *Soria* Court found that "the voir dire questioning was sufficient to allow the petitioner to determine whether a prospective juror would consider the evidence proffered in mitigation by the defense" and that he was "entitled to no more" than this. *Id.* Consequently, petitioner "failed to make a substantial showing of the denial of a federal right." *Id.*

The Court reaches the same conclusion in this case. The state trial court used a lengthy questionnaire, which advised the prospective jurors:

> A person commits the offense of murder if he intentionally or knowingly causes the death of an individual.
>
> A person commits the offense of capital murder if he murders a child under 6 years of age.
>
> In asking questions about your feelings on the possible punishments (or sentences), you are not being asked what you would do in this particular case. You are only being asked about cases in general. Neither the attorneys nor the Court can ask you what you would do in this particular case because you have not yet heard evidence regarding the facts and circumstances of this case. And it is important for you to realize that you will not know about the particular facts and circumstances involved in this case during the jury selection process except for the limited language contained in this questionnaire. The details of the case are given to you later in the actual trial itself. The purpose of jury selection is to qualify jurors, to set forth the law applicable to the case, to see if jurors understand and can apply that law and to determine whether each prospective juror will consider the full range of punishment.
>
> Under Texas law, an individual found guilty of capital murder shall be sentenced to either confinement in the Institutional Division of the Texas Department of Criminal Justice prison for life or to the death penalty. In other words, a sentence of life imprisonment or death is mandatory upon a conviction for capital murder.
>
> In this case, the defendant has been convicted of capital murder by a jury of knowingly and intentionally causing the death of a child under six 6 years of age. Under the circumstances of this case, the Court will conduct a sentencing trial with the jury solely to determine the sentence of the defendant. In that hearing evidence may be presented as to any matter that the Court deems

relevant to sentencing. The State and the defense will also be permitted to present arguments to the jury for or against the imposition of the death penalty.

The death penalty is an option in a capital murder case if the defendant has been found guilty of capital murder by unanimous verdict of a jury. In this case the defendant has previously been found guilty of capital murder by unanimous verdict of a jury. In order to serve on a jury where the defendant has been convicted of capital murder each juror must be able to consider the full range of punishment life in prison or the death penalty.

> Given the foregoing please check ONE of the following that most closely describes your views
> \_\_\_\_\_ I am against the death penalty.
> \_\_\_\_\_ I am neither in favor of nor against the death penalty.
> \_\_\_\_\_ I am in favor of the death penalty.

Reporter's R., vol. 77 (Juror Questionnaire), p. 28–29, ECF No. 82-9. The questionnaire included questions which inquired into how potential jurors viewed potentially mitigating evidence and the death penalty.

> 42. A person is a product of his or her environment.
> □ Agree      □ Disagree
> 43. A person who abuses drugs or alcohol is less responsible for his or her actions.
> □ Agree      □ Disagree
> 44. The death penalty is never justified.
> □ Agree      □ Disagree
> 45. I think the death penalty is necessary for some crimes.
> □ Agree      □ Disagree
> 46. Executing a person for capital murder discourages others from committing that crime in the future.
> □ Agree      □ Disagree
> 47. The death penalty is not necessary in modern civilization.
> □ Agree      □ Disagree
> 48. The death penalty should be used more often than it is.
> □ Agree      □ Disagree
> 49. The desire for revenge is a legitimate reason for favoring the death penalty.
> □ Agree      □ Disagree
> 50. It is immoral for society to take a life regardless of the crime the individual has committed.
> □ Agree      □ Disagree
> 51. Society has a right to get revenge when murder has been committed.
> □ Agree      □ Disagree
> 52. Life in prison is a serious punishment.

□ Agree     □ Disagree

53. The death penalty is the best crime preventative.

     □ Agree      □Disagree

54. Regardless of what the law says the accused in a criminal case should testify.

     □ Agree      □ Disagree

55. It is better to free nine guilty people than to convict one innocent man.

     □ Agree      □ Disagree

56. The criminal justice system favors the accused.

     □ Agree      □ Disagree

57. Please rank in order of importance to you the following purposes for punishment in a criminal case

□ Punishment/retribution □ Deterrence/prevention □ Rehabilitation/reform

Please explain your answer.

*Id.* at 29–30.

During individual voir dire, the trial court gave Renteria's trial counsel the latitude to ask potential jurors additional questions. The trial court also allowed Renteria twenty-two peremptory challenges. While the trial court refused to permit Renteria's trial counsel to commit the venire members to whether they could consider the mitigating aspects of double-edged evidence, the Court's independent review of the entirety of defense counsel's voir dire convinces the Court that it was enough to permit Renteria's counsel to determine whether a prospective juror would consider the mitigation evidence they proffered. In other words, the voir dire permitted Renteria's trial counsel to determine whether the potential jurors' views would prevent or substantially impair them in the performance of their duties as jurors in accordance with the trial court's instructions and their oath. Renteria was entitled to nothing more. *See Soria*, 207 F.3d at 244.

In addition, considering the extensive juror questionnaire utilized during jury selection, the restrictions imposed by the trial court, and the scope of the questioning by Renteria's trial counsel, the Court finds the voir dire of the potential jurors did not render Renteria's trial fundamentally unfair. *Mu'Min*, 500 U.S. at 425–26; *Morgan*, 504 U.S. at 730 n.5. And again, insofar as Renteria argues the trial court prevented his counsel from making

fully informed use of peremptory challenges, his argument does not invoke a federal constitutional right. *McCollum*, 505 U.S. at 57.

Consequently, the Texas Court of Criminal Appeals' rejection of Renteria's arguments on the merits in his direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. It also was not based on an unreasonable determination of the facts in light of the evidence presented in Renteria's trial and direct appeal. Renteria is not entitled to relief on this claim.

### c. Questions About Parole Eligibility

Renteria protests "[t]he trial court refused to answer jurors' concerns and prohibited counsel from questioning them about whether they could sentence a defendant convicted of capital murder of a child to life with the possibility of parole." Pet'r's Pet. 29, ECF No. 53. In a related claim, he complains "[c]ounsel was also disallowed to ask jurors if they could consider a sentence of life with the possibility of parole for a defendant convicted of capital murder who had prior felony convictions." *Id.*

Renteria argued in his direct appeal that parole eligibility was a proper inquiry for voir dire because, "for offenses committed on or after September 1, 1999, . . . the jury is now instructed on parole, if requested by the defense." *Renteria II*, 2011 WL 1734067, at *18 (citing Tex. Code Crim. Proc. art. 37.071 § 2(e)(2)).

The Texas Court of Criminal Appeals noted "[a] similar argument was raised in *Sells v. State*," 121 S.W. 3d 748 (Tex. Crim. App. 2003). *Id.* In *Sells*, the defendant wanted to ask the potential jury members the following questions:

1. Would the minimum length of time a defendant could serve in prison before he could be paroled be something you would want to know in answering the special issues?

2. On which special issue would this be important? How would this 40 year minimum sentence be important to you in answering the special issues?

3. Would you be more likely, or less likely, generally, to view a defendant as a continuing threat to society if you knew he could not be paroled for a minimum of 40 years?

4. What kind of evidence would you expect, as a juror, to help you in considering the 40-year parole ineligibility factor when answering the special issue?

*Id.* at 755. The Court of Criminal Appeals assumed the statutory change rendered questioning about parole permissible in some situations. *Id.* at 756. But it held Sells's questions "implicate[d] the strictures imposed by *Standefer* against commitment questions and by *Barajas* against ambiguous questions," and that "any attempt to commit prospective jurors to giving mitigating, aggravating, or even no effect to the parole instruction [was] impermissible." *Id.* at 756–57.

In this case, Renteria wanted to ask venire member Robert Crosby if "the only acceptable alternative to a death penalty in a capital case would be a life in prison without any possibility of parole," and if he "agree[d] with a law that might provide for parole." *Renteria II*, 2011 WL 1734067, at *18. The Court of Criminal Appeals noted Renteria's questions for Crosby were impermissible like the questions at issue in *Sells*. Consequently, the Court of Criminal Appeals held "the trial judge did not abuse her discretion by prohibiting the proposed questions. Further, the trial judge ultimately asked Crosby whether he could follow the instructions with regard to parole." *Id.*

Renteria wanted to ask venire member Robert P. Tomes whether "a life sentence without possibility of parole is the only reasonable range of punishment." *Id.* at *19. The Court of Criminal Appeals found this was essentially the same question he asked of Crosby. *Id.* It held "this is an improper commitment question, and the trial judge was within her

-101-

discretion to prohibit it. Further, defense counsel was ultimately permitted to ask Tomes if the possibility of parole would influence his verdict." *Id.*

In *Simmons*—the case discussed at length above—the Supreme Court held that if a defendant's future dangerousness is at issue and state law prohibits the defendant's release on parole, due process requires the trial court to inform the sentencing jury the defendant is ineligible for parole. *Simmons*, 512 U.S. at 156. The *Simmons* Court specifically cautioned, however, "[i]n a State in which parole is available," it would "not lightly second-guess a decision whether or not to inform a jury of information regarding parole." *Id.* at 168.

Renteria would have been eligible for parole under Texas law after 40 years' imprisonment if sentenced to life by the trial court. *Simmons* is not applicable to his case.

Consequently, the Texas Court of Criminal Appeals' rejection of Renteria's arguments on the merits in his direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. It also was not based on an unreasonable determination of the facts considering the evidence presented in Renteria's trial and direct appeal. Renteria is not entitled to relief on this claim.

### d. Substantially Impaired Members

Renteria complains the jury "included members who were substantially impaired in their ability to follow the law." Pet'r's Pet. 30, ECF No. 53. Renteria specifically alleges Donnie Malpass was seated without "questioning her about her ability to consider mitigating evidence and the full range of punishment." *Id.* at 28. John Harton was seated after the "trial court endorsed an unconstitutional definition of mitigation" and was "unable to consider and give effect to mitigation." *Id.* at 43. Norman Thomas was seated after the trial "court endorsed unconstitutional definition of mitigation" and was "unable to consider and give

effect to mitigation." *Id.* at 48. Brett Williams was seated while he was "unable to consider and give effect to mitigation." *Id.* at 49. Roxanne Castricone was seated after the trial "court endorsed unconstitutional definition of mitigation" and "was unable to consider mitigation." *Id.* at 49. Washington Watley was seated after Renteria's challenged him for cause "on the grounds he is biased and cannot be impartial because he has two young daughters, and because he would automatically believe and lend more credibility to law enforcement officers." *Id.* at 86. "[T]he trial court overruled the challenge for cause, and because the defendants had exhausted all peremptory challenges, Mr. Watley was seated as a juror." *Id.* Jeanette Sanchez was seated after stating "she would sentence a defendant to death after determining he was a future danger." *Id.* at 87. Renteria challenged Sanchez "for cause on the basis that she was unable to follow the law regarding sentencing." *Id.* at 89. The trial court denied the challenge for cause. *Id.* Renteria notes he "requested additional peremptory challenges because the court denied proper challenges for cause." *Id.* at 76.

### (1) Juror Donnie Malpass

Renteria claims Donnie Malpass was seated without "questioning her about her ability to consider mitigating evidence and the full range of punishment." Pet'r's Pet. 28, ECF No. 53. Specifically, Renteria complains the trial court did not permit him to ask Malpass what her verdict would be if the issue of self-defense was raised or where the defendant killed the victim in a "planned" or "cold blooded" manner. *Id.* at 30.

Renteria did not complain on direct appeal or in his state habeas application about the trial court's restrictions on Malpass's voir dire examination. Consequently, any claim alleging error concerning the trial court's ruling is unexhausted and procedurally defaulted. *See Ruiz v. Quarterman*, 460 F.3d 638, 642–43 (5th Cir. 2006) ("[I]n order for a claim to be exhausted, the state court system must have been presented with the same facts and legal

theory upon which the have been presented with the same facts and legal theory upon which the petitioner bases his current assertions."); *Nobles*, 127 F.3d at 420 ("The exhaustion requirement is not satisfied if the prisoner presents new legal theories or factual claims in his federal habeas petition.").

Federal habeas relief is barred on unexhausted or procedurally defaulted claims unless the petitioner demonstrates cause for the default and actual prejudice arising from the default—or shows the failure to consider the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50. A petitioner may meet the cause element by showing "(1) that his claim of ineffective assistance of counsel at trial is substantial—i.e., has some merit—and (2) that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza*, 738 F.3d at 676.

Renteria does not provide an explanation as to how the trial court's limitations on his counsel's questions were improper or how he was harmed by the trial court's rulings. Renteria fails to show the trial court erred in restricting the voir dire examination of Malpass as to how she would consider specific types of mitigating evidence before voting. *See Soria*, 207 F.3d at 244 ("We are not persuaded that the trial court abused its considerable discretion in finding that the questions posed by [the petitioner] constituted an attempt to improperly commit the prospective jurors to a certain view regarding mitigating evidence anticipated to be presented in his case."). Renteria has not shown his counsel provided constitutionally ineffective assistance. Indeed—as the extract from the transcript below shows—his counsel tenaciously pursued his questioning of Malpass despite the prosecutor's multiple objections. He has not shown cause for his default or actual prejudice arising from the default.

In addition, the claims lack merit. Renteria maintains his counsel could not ask Malpass "about her ability to consider mitigating evidence and the full range of punishment."

Pet'r's Pet. 28, ECF No. 53. Specifically, Renteria complains his counsel were not allowed to ask Malpass how she felt about imposing a death penalty on a defendant convicted of murdering a child under six years of age.

The prosecutor objected to this line of questioning, asserting it was global, not relevant, and asked for Malpass to contract. The prosecutor's objections were initially sustained by the trial court:

> Q. [Defense Counsel Jaime Gandara] Now to convict somebody of a murder or a capital murder, a jury has to listen to all the facts and come to a conclusion that they believe beyond a reasonable that this person knowingly and intentionally caused the death of somebody.
>
> And in the case of a child of a child under the age of six years old and the jury has to believe beyond a reasonable doubt that that happened.
>
> And when you convict somebody of murder of capital murder you -- you've gotten past the point where there's any question of insanity or mistake or accident. And there's no defense of third person no self-defense. Is that -- is that clear
>
> A. That's clear um-hmm.
>
> Q. In other words if you had a self-defense issue what would the verdict be?
>
> MS. MERAZ: [Prosecutor Diana Meraz] Your Honor I'm going to object at this point. It's global not relevant to the case.
>
> THE COURT: Counsel?
>
> MR. GANDARA: Your Honor were -- we're discussing the nature of conviction of an offense and that it's clear that when somebody is convicted that all defenses have been set aside and that there's a clear conviction and no defensive matter applies to the case.
>
> THE COURT: I'm going to sustain the objection.
>
> MR. GANDARA: Okay.
>
> Q. (By Mr. Gandara) All right. So, you understand that when you -- when there's a guilty verdict the person is convicted and no defenses or anything are -- all that has been set aside. Do you understand that?

MS. MERAZ: Objection same objection.

THE COURT: Sustained.

MR. GANDARA: Okay. Your Honor, I would like to submit to the court that I believe these questions are aimed at our procedural situation in this case. We have a final conviction. And these prospective jurors are entitled to understand the nature of the fact of the guilty finding and the guilty verdict and the fact that -- that all those matters of defense and justification are set aside.

THE COURT: I understand. I'm going to sustain the objection.

. . . .

Q. (By Mr. Gandara) Okay. Now please assume that a jury has convicted an individual of knowingly and intentionally killing somebody an innocent person that -- and not because he's crazy or because he -- he did it because he wanted to and that it was planned or it was cold blooded or no -- what is your --

MS. MERAZ: Again, were going to object to the nature of the question. It's global and not relevant.

THE COURT: Sustain the objection.

MR. GANDARA: Your Honor were entitled to ask a hypothetical question about feelings of a juror about the death penalty given a conviction in a hypothetical case.

THE COURT: You defined murder as being an intentional act and I think that you can go along in that vein. There's no problem with that. But the way you're going about it you are getting into specifics.

I'll sustain the objection.

Reporter's R. vol. 8 (voir dire of Donnie Malpass), pp.52–55, ECF No. 79-20.

The trial court subsequently allowed the questions after Renteria's counsel explained he needed to know what the individual jurors felt about the death penalty under the circumstances of this case:

MR. GANDARA: Your Honor I have not asked the juror what she's going to decide. I've asked her what her feelings about the death penalty are on the basis of somebody that's been convicted of capital murder of a child

-106-

under six years of age. And were -- that's the base fundamental inquiry in a voir dire jurors -- prospective jurors' feelings about the death penalty.

THE COURT: All right. I'm going to allow it.

. . . .

Q. (By Mr. Gandara) Ms. Malpass what are your feelings about the death penalty under circumstances where a person who has been convicted of killing a child under the age of six?

A. I can't say. I'd have to see the facts and evidence and everything. I can't say.

Q. So you -- you are not -- you're open to the full range of punishment either life in prison or the --

A. Death penalty, yes.

Q. Is that the case? You're sure of that?

A. Yes.

Q. All right. Now assume with me that there's a conviction for capital murder of a child under the age of six and you have heard evidence that convinces you beyond a reasonable doubt that that person is a future danger. Okay?

In other words, you've found that beyond a reasonable doubt you believe that question number one is yes that the person is a future danger. What are your feelings about the death penalty under those circumstances?

MS. MERAZ: I'm going to object again. Your Honor to contracting. He's not asking her if she can be fair. He' asking her for factors to -- to weigh and how she feels about it in other words are you leaning towards this side or this side.

MR. GANDARA: Your Honor, fundamentally we need to know what the individual juror's feelings are about the death penalty under each circumstance given that the law provides it.

THE COURT: The way you put the question, I'm going to allow it. Go ahead.

MR. GANDARA: All right.

-107-

Q. (By Mr. Gandara) What are your feelings about the death penalty when there's been a conviction for killing a child under the age of six years old knowingly and intentionally and you're a juror on a jury and the jurors have found unanimously that the person is a future danger?

You've answered that question number one yes. At that point what are your feelings about the death penalty?

A. I'm open to it.

Q. Okay. And what are your feelings about a life sentence?

A. I'm open to that too.

Q. Now I'd like to go to your questionnaire now. At page -- between pages eight and nine there's a long question. There's a great big preamble and then a three element question. All right?

A. Okay.

Q. Okay. The second paragraph on page nine says in this case the defendant has been convicted of capital murder by a jury of knowingly and intentionally causing the death of a child under six years of age. Under the circumstances of this case the court will conduct a sentencing trial with the jury solely to determine the sentence of the defendant. In that hearing evidence may be presented as to any matter that the court deems relevant to sentencing. The state and the defense will also be permitted to present arguments to the jury for or against the imposition of the death penalty.

Now -- then you're asked the question given the foregoing please check one of the following that most closely describes your views. You're asked how you feel about the death penalty.

Now you've indicated that given the foregoing -- that whole paragraph including the one that I just read word for word -- that you're in favor of the death penalty. That was your response. Correct?

A. Yes.

Q. And does that tell us that given the fact that there is a conviction of capital murder of knowingly and intentionally causing the death of a child under six years of age that you are going into the case in favor of the death penalty?

A. No. That's not the case.

Q. Tell us what you -- what you meant by marking I'm in favor of the death penalty given the foregoing?

A. That I'm just open to the death penalty until I find out what goes on you know.

Q. Well now that you're looking at the three responses how -- tell me what you think of the middle response ["I am neither in favor of nor against the death penalty"]?

A. I probably would have put that one.

Q. Is there -- can you give us any reason why you did not put that one down at the time

A. Probably because I was in a hurry to get home.

Q. You think so?

A. I was tired.

Q. Now when you're on a jury in a case like this and you get -- okay. You've got -- if you're on a jury you've got certain rights and certain obligations and certain work to do. Right now, you've got a right to decide for yourself based on your own moral judgment whether an individual lives or dies. There's nothing in the law is that requires a death penalty. Do you understand that?

A. Yes, I do.

Q. Do you agree with that?

A. Yes.

Q. If there's one vote for a life sentence under any circumstance there will not be a death penalty. Do you understand that?

A. Yes, I do.

*Id.* at 55–59. Hence, the record shows Malpass had the ability to consider mitigating evidence and the full range of punishment.

Renteria is not entitled to relief with respect to his claims concerning Malpass.

### (2). Juror John Harton

Renteria also contends John Harton was seated after the "trial court endorsed an unconstitutional definition of mitigation" and was "unable to consider and give effect to mitigation." Pet'r's Pet. 38, ECF No. 53. Renteria claims the trial court's rulings caused Harton to believe that only the good qualities of a defendant could constitute mitigating evidence and that there must be a nexus between the offense and mitigating evidence. *Id.* at 39–40; Pet'r's Br. in Supp. 38 n.7, ECF No. 58. Renteria also claims trial counsel were ineffective for failing to exercise a peremptory strike as to Harton. Pet'r's Pet. 40.

Renteria did not raise any claim in state court alleging that the trial court erred during Harton's voir dire examination—or that his counsel were ineffective for failing to exercise a peremptory strike as to Harton. Consequently, Renteria's claims about juror Harton are unexhausted and procedurally defaulted. *Ruiz*, 460 F.3d at 642–43; *Nobles*, 127 F.3d at 420. He has also not demonstrated cause for the default and actual prejudice arising from the default—or showed the failure to consider the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50.

In any event, his claims are without merit.

During the State's voir dire examination, Harton stated that he would not be willing to vote in favor of the death penalty in a case where the defendant committed a murder while "high on methamphetamines." Reporter's R., vol. 13 (voir dire of John C. Harton), pp. 19–20, ECF No. 80-5. Harton also stated he would be willing to (1) vote in favor of a life sentence even after finding that a defendant was a future danger, (2) consider mitigating circumstances, and (3) consider the full range of punishment. *Id.* at pp. 32, 37, 54, 73, 75, 98. Harton expressed concern over executing innocent people and explained he had served as a juror in a criminal trial involving a DWI. *Id.* at 38, 40. Harton discussed his experience in

that trial, explaining that he reviewed the evidence "several times" and was "cautious" because he wanted to ensure he reached a proper verdict. *Id.* at 40.

On voir dire examination by Renteria's counsel, Harton did state he would only consider mitigating "factors that might affect the situation at the very moment the crime is being committed." *Id.* at 71. Later, Renteria's counsel sought clarification of Harton's statement. *Id.* at 82. The trial court intervened and the following exchange took place:

> THE COURT: In regard to -- in response to the question [by defense counsel]. You indicated that you could only consider mitigation concerning the events surrounding the commission of the offense. But if you look at this question, sir, it -- it -- tells you that you must take into consideration all the evidence, the circumstances of the offense, the defendant's character and background and the personal moral culpability of the defendant. So --

> A. I guess --

> THE COURT: Like in things it involves things other than events surrounding the offense. Now, I heard that and I said, well, I wonder if Mr. Harton can -- can comply with the whole question? Are you going to reject evidence of defendant's character and background and his personal moral culpability? [B]ecause the only thing that you talked about is you can consider in response to your question remember is that first one, circumstances of the events. So, would you look at that and think about it.

> A. So, we're taking a look at the man's past, lifestyle, was he an outstanding member of society, had a good job, went to school, comes from a good family?

> THE COURT: Yeah.

> A. Or that sort of thing?

> THE COURT: I can't go into specific instances of what mitigation is because mitigation means different things to different people. You know, what is less bad to some folks might be real bad for other folks. It's entirely up to you. We can only tell you that to be a fair and impartial juror, you must be able to consider mitigating evidence in compliance with that question and including those type[s] of things like his character and background, the circumstances of the offense and the person's moral culpability. My question to you is you limited yourself when you said --

> A. I see. Yes, I do.

-111-

THE COURT: And if you feel that way, that's fine. And my question is can you consider those other things, his character and his background?

A. Yes, I can consider that.

THE COURT: Mr. Gandra [sic], follow. Go ahead.

Q. (By Mr. Gandara) All right. So that they have --

A. So, what you're saying is his background, his character, his moral culpability, all that will have a bearing on what happened at -- at the time of the murder that could have affected the reason why he committed that murder, is that what you're? I -- I could go along with that.

Q. It might or might not. And it doesn't have to have a bearing on what happened at the time of the murder in order to be considered by a juror to be mitigating.

MS. MERAZ: Objection, misstatement. It has to do -- there has to be a nexus between the two.

MR. GANDARA: Your honor, *Tennard v.*—

THE COURT: I'm going to overrule the objection.

MR. GANDARA: It doesn't have to be connected to the commission of the offense. Mitigation has been defined by -- by the Supreme Court, another court as being things that -- that in a juror's mind would -- that is of such a character that it might serve as a basis [f]or a sentence less than death.

MS. MERAZ: Objection, misstatement of the law.

THE COURT: As far as quoting any definition out of any cases, I'm going to sustain the objection. We shouldn't be -- the thing is can you consider mitigation as -- as required by that question is the ultimate issue, sir?

A. Yes, I can.

*Id.* at 82–84.

Later, during voir dire examination by the State, Harton offered an example of mitigating circumstances. He explained, in his experience in the military, he was aware that "community health nurses," child advocates, social workers, and mental health experts were assigned to investigate the home environment and background where a child was endangered.

-112-

*Id.* at 94. Harton said he was aware of cases where such children died in the care of their parents. *Id.* He added "when you take a look at those parents that killed [their] own child and you take a look at the background of those parents, those parents were abused and battered when they were kids, and that's the way they think they should bring up their kids." *Id.* Harton concluded he would consider the parents' abusive background in those cases to be mitigating circumstances. *Id.* at 94–95.

Renteria's counsel asked Harton how he would feel if he were the defendant and a juror with his state of mind served on his jury. *Id.* at 99. Harton answered the he would "feel comfortable because" he was fair and open-minded. *Id.*

Renteria's counsel challenged Harton for cause, stating that he could not give full effect to mitigation. *Id.* at 100–01. The trial court denied the challenge for cause. *Id.* at 101. Renteria's counsel did not exercise a peremptory strike, and Harton served as a juror. *Id.*

The record belies Renteria's claim the trial court "provided [Harton] an inaccurate and unconstitutional explanation of mitigation." Pet'r's Pet. 38, ECF No. 53. Indeed, the trial court gave an accurate definition of mitigating evidence, which was consistent with the jury instructions:

> THE COURT: Like in things it involves things other than events surrounding the offense. Now, I heard that and I said, well, I wonder if Mr. Harton can -- can comply with the whole question? Are you going to reject evidence of defendant's character and background and his personal moral culpability? [B]ecause the only thing that you talked about is you can consider in response to your question remember is that first one, circumstances of the events. So, would you look at that and think about it.

> . . . .

> THE COURT: I can't go into specific instances of what mitigation is because mitigation means different things to different people. You know, what is less bad to some folks might be real bad for other folks. It's entirely up to you. We can only tell you that to be a fair and impartial juror, you must be able to consider mitigating evidence in compliance with that question and

including those type[s] of things like his character and background, the circumstances of the offense and the person's moral culpability.

Reporter's R., vol. 13 (voir dire of John C. Harton), pp. 82–83, ECF No. 80-5. And Harton spontaneously offered an example of a case involving mitigating circumstances where the defendant was raised in an abusive home. *Id.* at 94–95. Harton's example undercuts Renteria's assertion the trial court left Harton with the impression that mitigating circumstances only included "positive qualities of the defendant." Pet'r's Pet. 39, ECF No. 53.

The record also refutes Renteria's allegation that the trial court left Harton with the "false impression that there must be a nexus between mitigation and the offense." Pet'r's Pet. 40, ECF No. 53. The trial court overruled the State's objection asserting there must be a "nexus between" mitigating circumstances and the offense. Reporter's R., vol. 13 (voir dire of John C. Harton), p. 84, ECF No. 80-5. The trial court only sustained the State's objection to defense counsels' effort to recite a definition of mitigating circumstances from court opinions. *Id.* The State did not object to—and the trial court did not make any comment regarding—Renteria's counsel stating mitigating circumstances do *not* "have to be connected to the commission of the offense." *Id.*

Renteria does not explain how Harton could have been left with an incorrect impression about his ability to consider mitigating circumstances after his exchanges with the trial court. And Harton offered an appropriate example of a mitigating circumstance he would consider—an example which indicated he could consider mitigating circumstances which did not have a nexus with the offense. *Id.* at 94–95. For these reasons, all of Renteria's claims alleging that the trial court erred are without merit.

Finally, Renteria claims that trial counsel were ineffective for failing to exercise a peremptory strike as to Harton. Pet'r's Pet. 40, ECF No. 53.

-114-

Trial counsel may provide ineffective assistance by failing to exercise a peremptory strike where a venire member "clearly demonstrates actual bias, with no reassurance that she would attempt impartiality." *Seigfried v. Greer*, 372 F. App'x 536, 540–41 (5th Cir. 2010) (citing *Virgil v. Dretke*, 446 F.3d 598, 610 (5th Cir. 2006)). But, trial counsel are presumed to exercise peremptory strikes based on a reasonable trial strategy. *Morales v. Thaler*, 714 F.3d 295, 305 (5th Cir. 2013). And that presumption applies even where trial counsel chooses not to strike a venire member who admitted they would "probably" be biased against the defendant. *Id.*

"Informed strategic decisions of counsel are given a heavy measure of deference and will not be second guessed." *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999). Renteria makes no effort to rebut the presumption that trial counsel exercised a reasonable strategy in deciding not to strike Harton. Indeed, Renteria's counsel no doubt noted Harton's responses to several questions suggested he would serve as a favorable juror. For example, Harton stated that he would consider a defendant's abusive background as a mitigating circumstance. Reporter's R., vol. 13 (voir dire of John C. Harton), pp. 94–95, ECF No. 80-5. Renteria's counsel knew they would present evidence regarding domestic abuse in Renteria's childhood home. Harton also indicated he would consider a defendant's substance abuse as a mitigating circumstance. *Id.* at 19–20. Renteria's counsel knew they would present evidence regarding Renteria's alcohol abuse. Further, Harton suggested he would be a defense-friendly juror because he was "open-minded." *Id.* at 99. Finally, Harton relayed his prior experience on a criminal jury during which he claimed he carefully reviewed the evidence and was "cautious" to ensure a proper verdict. *Id.* at 40.

Renteria does not attempt to demonstrate that his counsel were ineffective for deciding that—based on the above responses—Harton would be an acceptable juror. For the

same reason, Renteria fails to demonstrate prejudice from trial counsels' decision not to exercise a peremptory strike as to Harton. Therefore, Renteria's claim that his counsel were ineffective for failing to exercise a peremptory strike as to Harton is meritless.

Renteria is not entitled to relief with respect to his claims concerning Harton.

### (3). Juror Norman Thomas

Renteria asserts Norman Thomas was seated after the trial "court endorsed [an] unconstitutional definition of mitigation" and was "unable to consider and give effect to mitigation." Pet'r's Pet. 48, ECF No. 53. Renteria claims the trial court improperly sustained the State's objection to his counsel's statement to Thomas that the mitigation special issue is "based on [his] personal moral judgment on what [he] think[s] is mitigation." Pet'r's Pet. 43–44, ECF No. 53.

Renteria did not raise a claim in state court regarding Thomas. Renteria's claim is, therefore, unexhausted and procedurally defaulted in this Court. *Ruiz*, 460 F.3d at 642–43; *Nobles*, 127 F.3d at 420. He has also not demonstrated cause for the default and actual prejudice arising from the default—or showed the failure to consider the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50.

Furthermore, the record does not support a conclusion the trial court endorsed an unconstitutional definition of mitigation during Thomas's voir dire. It also does not support a conclusion that Thomas was unable to give effect to mitigation evidence. With regard to the issue of personal moral judgment, the following exchange occurred:

> Q. [Defense Counsel Jaime Gandara] That the decision on whether to - - whether to give a life sentence or a death penalty in a capital murder case is the individual decision of each juror.
>
> A. Correct.

Q. And -- and it's based on -- on when you get down to questions of talking about mitigation, it's based on your personal moral judgment on what you think is mitigation and what you think --

MS. HUGHES: Objection Your Honor. It -- it's based on the evidence that's presented in the courtroom. It's an improper question.

THE COURT: I'm going to sustain the objection.

Q. (By Mr. Gandara) All right. You -- you know that nobody can tell you how to decide a case when you're in the jury room.

A. Correct.

Q. Correct, Okay. And you know that it's likely that you might be instructed and might already have been in the case you already sat in as a juror that you're not supposed to surrender your honest conviction.

A. Correct.

Q. -- about the case just -- in order to reach a verdict --

A. Correct.

Q. All right. And so -- so when you're in there you're operating on your own values and your own experiences and you're operating as an individual human being, correct?

A. Disagree with that.

Q. Tell me how.

A. Well, you're saying on my own values. I mean correct me if I'm wrong.

Q. Uh-huh.

A. Don't I have to set what I feel is right or wrong and review all the evidence versus what I think.

Q. And --

A. Do you understand what I'm saying?

Q. And -- and then how do you -- how do you gauge the evidence?

A. How its presented to me.

Q. Yeah, what's your scale but I mean once you're judging it what's the --

MS. HUGHES: Objection, Your Honor.

Q. Whose scale is it?

MS. HUGHES: Calls for contracting.

THE COURT: Sustained.

Q. (By Mr. Gandara) Are you going to use somebody else's intellect and somebody else's personality and somebody else's brain --

MS. HUGHES: Same objection --

Q. -- to -- to make decisions

THE COURT: I'm going to sustain the objection.

Q. (By Mr. Gandara) All right. All right. Let me ask you this. If you're on a jury and you've listened to the evidence okay and you feel -- and you've come to the conclusion that the State has not convinced you beyond a reasonable doubt that the defendant is going to be a future danger. And you're one out of 12 and the other 11 feel differently. And you feel honestly about the evidence that you've heard and that's your honest conviction about it, are you going to surrender?

A. No sir.

Reporter's R., vol. 13 (voir dire of Norman Thomas), pp. 253–56, ECF No. 80-5.

While it is true a jury must be provided a vehicle for expressing its reasoned moral response, the jury's reasoned moral response must be in response to the defendant's mitigating evidence. *See Abdul-Kabir*, 550 U.S. at 252–54. Consequently, Renteria fails to show that the trial court erred in sustaining the State's objection to his counsel's suggestion to Thomas that his verdict would be based solely on his values and experiences unconnected to any evidence.

Renteria is not entitled to relief on his claims concerning Thomas.

-118-

### (4). Juror Brett Williams

Renteria claims Brett Williams was seated while he was "unable to consider and give effect to mitigation." Pet'r's Pet. 49, ECF No. 53. Renteria notes the trial court would not permit Renteria's counsel to question Williams whether he would consider specific factors as mitigating evidence. *Id.* at 45–46.

Renteria did not raise any claim in state court regarding juror Williams. Renteria's claim is, therefore, unexhausted and procedurally defaulted. *Ruiz*, 460 F.3d at 642–43; *Nobles*, 127 F.3d at 420. He has also not demonstrated cause for the default and actual prejudice arising from the default—or showed the failure to consider the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50.

Nevertheless, Renteria's claim is without merit. Renteria makes the conclusory assertion that "federal law permits the questions counsel proposed." Pet'r's Pet. 45, ECF No. 53. The Fifth Circuit has held that a trial court may disallow a defendant's "attempt to improperly commit" a prospective juror "to a certain view regarding mitigating evidence anticipated to be presented in his case." *Soria*, 207 F.3d at 244. Consequently, Renteria fails to show that the trial court erred when it would not allow his counsel to question Williams about whether he would consider specific factors as mitigating evidence. Further, Renteria fails to show that Williams would not, in fact, consider mitigating evidence. Reporter's R., vol. 14 (voir dire of Brett Williams), p. 55, ECF No. 80-6 (affirming he would consider mitigating evidence in answering the special issues).

Renteria is not entitled to relief based on his claims concerning Williams.

### (5). Juror Roxanne Castricone

Renteria asserts Roxanne Castricone was seated after the trial "court endorsed unconstitutional definition of mitigation" and "was unable to consider mitigation." Pet'r's

Pet. 50, ECF No. 53. He claims his counsel were ineffective for failing to object to the State's definition of mitigating evidence as "anything you find that tends to make the crime less bad or make it not so bad." Pet'r's Pet. 55; Br. in Supp. 39 n.10, ECF No. 58. He also claims that the trial court erred in disallowing trial counsel from providing Castricone a definition of mitigating evidence. Pet'r's Pet. 55.

Renteria's claims about Castricone are unexhausted and procedurally defaulted because he did not raise any claim in state court as to the voir dire examination of Castricone. *Ruiz*, 460 F.3d at 642–43; *Nobles*, 127 F.3d at 420. He has also not demonstrated cause for the default and actual prejudice arising from the default—or showed the failure to consider the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50.

Additionally, his claims are without merit. During the State's voir dire examination of Castricone, the prosecutor described mitigating evidence as something which makes you think the defendant deserves to live:

> [Sufficient mitigating circumstances are] what the jury is looking for. And the question tells the jury, look at all the evidence. Basically, look at it all again. Okay. Look at everything and decide whether you think there is some reason, some fact, some circumstances, some whatever that makes you think this person deserves life instead of death. So, an answer of yes on this question results in life in prison. Okay.
>
> So, go ahead -- and we can look at the question whether taking into consideration all the evidence including the circumstances of the offense, the defendant's character and background and the personal moral culpability of the defendant. There is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death penalty imposed . . . . Okay. And it can be anything you find that tends to make the crime less bad or make it not so bad. Okay?

Reporter's R., vol. 19 (voir dire of Roxanne Castricone), p. 47, ECF No. 80-11.

The State accurately told Castricone that mitigating evidence included evidence regarding a defendant's character and background and the circumstances of the offense. Renteria does not show that the prosecutor's statements were objectionable. Renteria also

fails to show his counsel were deficient for failing to object to the State's discussion of

mitigating evidence. Further, Renteria's counsel discussed mitigating evidence with

Castricone using similar terms:

> Q. [Defense Counsel Jaime E. Gandara] Okay. Now, are you able to consider -- let's -- let's look at this here. What -- you say that you got an idea [of] what mitigation is?
>
> Second question is whether taking into consideration all the evidence including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant. Is there sufficient mitigating circumstance or circumstances to warrant the sentence of life imprisonment rather than a death sentence be imposed? Okay. Now, does that tell you that mitigation is just something that makes a crime less bad?
>
> MS. HUGHES: Objection, Your Honor. That's contracting.
>
> MR. GANDARA: Your Honor, if I may respond. Counsel for the State asked this juror questions with that definition of mitigation. Do you think you see that there's something that makes the crime less bad? And I'm just asking this juror if she is limited in her consideration of mitigation to something that makes the crime less bad, because it's obvious from question two that that's not the case.
>
> THE COURT: I'm going to sustain the objection.
>
> MR. GANDARA: All right.
>
> Q. Do you -- do you consider -- re you able to consider if you're on this jury, you've answered yes to question one. Are you able to consider all the evidence that -- that you've heard [i]n trial and determine if there's something in that, that to you is such a character that it might serve as a basis for a sentence less than death? In other words, are you able to examine all the evidence and see if there's anything there that says to you I think that means I should -- I should not kill --
>
> A. Yes.
>
> Q. -- Renteria? All right. You're able to do that?
>
> A. Yes.

*Id.* at 63–64.

Because Castricone was asked whether she could consider *all* of the evidence presented in determining whether a sufficient reason existed to impose a life sentence—and she answered that she could—Renteria fails to show that Castricone was an objectionable juror, that she had a misapprehension regarding the mitigation special issue, that the trial court erred in disallowing trial counsel's question, or that he was harmed by the alleged error. For the same reason, Renteria fails to show that his counsel were deficient or that he was prejudiced by the alleged deficiency.

Therefore, the claims are without merit and he is not entitled to habeas relief.

### (6). Juror Washington Watley Jr.

Renteria maintains Washington Watley Jr. was seated after Renteria challenged him for cause "on the grounds he is biased and cannot be impartial because he has two young daughters, and because he would automatically believe and lend more credibility to law enforcement officers." Pet'r's Pet. 86, ECF No. 53. "[T]he trial court overruled the challenge for cause, and because the defendant had exhausted all peremptory challenges, Mr. Watley was seated as a juror." *Id.*

Watley expressed an opinion regarding the credibility of police officers in his response to Question 205 in the juror questionnaire:

> 205. Would you automatically believe the testimony by a law officer simply because he/she is a law enforcement officer? [X] YES [ ] NO
> Please explain: There [sic] are held to a higher standard and should only present the facts as known with no opinion.

*Renteria v. State* (Appellant's Brief), 2009 WL 5453014 (Dec. 15, 2009), at *151.

During questioning by Renteria's counsel about the credibility of police officers, Watley stated he could stay open-minded about the testimony of police officers:

> Q. [Defense Counsel Edythe Payan] So you are open on the possibility of an officer, a policeman in uniform could get up there take the oath and lie and make things up?

A. I've known it to happen.

Reporter's R., vol. 37 (voir dire of Washington Watley Jr.), p. 116, not scanned in ECF.

Watley also reported, in his answer to Question 216 of the questionnaire, that he had

to two daughters close in age to the victim:

> 216. Is there anything not covered in this questionnaire that you feel either of the
> attorneys or the judge should know so that your ability to be a fair and impartial
> juror can be evaluated Please explain.
> "Thought [sic] I do have 2 daughters I believe I can be a fair and impartial Juror.
> Emotional could run high but I'm more of a 'thinker' than a 'Reactor'"

*Renteria v. State* (Appellant's Brief), 2009 WL 5453014 (Dec. 15, 2009), at *152.

During questioning by the State, Watley claimed he could be fair despite having two

daughters close in age to the victim. Reporter's R., vol. 37 (voir dire of Washington Watley

Jr.), p. 90, ECF No. 80-11.

Renteria moved to challenge Watley for cause because (1) his response to Question

205 suggested he could not be impartial about the credibility of a law enforcement witnesses,

and (2) his response to Question 216 suggested he could be biased and unable to fairly decide

the case due to his concern about his two daughters. The trial court denied the challenge. *Id.*

at pp. 118–119. Renteria could not exercise a peremptory challenge because he had already

exhausted his allotted challenges.

Renteria argued on direct appeal that the trial court erred in denying his challenge for

cause. He claimed Watley was biased in favor of the State because he would tend to give

credibility to law enforcement officers and he had two young daughters. *Renteria v. State*

(Appellant's Brief), 2009 WL 5453014 (Dec. 15, 2009), at *151–*154.

The Texas Court of Criminal Appeals rejected his claim.

A federal habeas corpus court must initially presume a jury is impartial. *Smith v.*

*Phillips*, 455 U.S. 209, 218 (1982). A state trial court's refusal of a petitioner's challenge for

cause—which inherently constitutes a finding of impartiality—is entitled to the presumption of correctness found in 28 U.S.C. § 2254(e)(1). *Patton v. Yount*, 467 U.S. 1025, 1038 (1984). "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007) (citation omitted).

The trial court's implicit factual determination that Watley could be fair and impartial has support in the record. Watley stated he could stay open-minded about police testimony. Watley also claimed he could be fair despite having two daughters close in age to the victim. The record is insufficient to show that Watley harbored a disqualifying bias.

Because Renteria has not presented clear and convincing evidence to overcome the trial court's finding that Watley could be impartial, this finding is presumed correct. 28 U.S.C. § 2254(e)(1). As such, this Court can grant federal habeas relief only if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Renteria has not met this showing, and he does not otherwise demonstrate that the state court's decision to reject his constitutional claim was erroneous. It follows that Renteria is not entitled to relief with respect to this claim.

To the extent Renteria raises any claim other than that raised on direct appeal, such a claim is unexhausted and procedurally defaulted. *Ruiz*, 460 F.3d at 642–43; *Nobles*, 127 F.3d at 420. Further, he does not demonstrate cause for any default or actual prejudice arising from the default—or show the failure to consider the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50.

Renteria is not entitled to relief based on his claims concerning Watley.

### (7). Juror Jeanette Sanchez

Renteria claims Jeanette Sanchez was seated following her statement "she would sentence a defendant to death after determining he was a future danger." Pet'r's Pet. 87, ECF No. 53. Renteria challenged Sanchez "for cause on the basis that she was unable to follow the law regarding sentencing." *Id.* at 89. The trial court denied the challenge for cause. *Id.* Renteria argues the trial court erred because Sanchez was unable to follow the law regarding sentencing.

Renteria also argued on direct appeal that the trial court erred in denying his challenge for cause as to Sanchez because she would not consider the mitigation special issue after answering the future dangerousness special issue affirmatively. *Renteria v. State* (Appellant's Brief), 2009 WL 5453014 (Dec. 15, 2009), at *98–*102.

The Court of Criminal Appeals rejected his claim:

> Sanchez ... clarified her understanding as she explained the process for determining punishment in her own words. She stated that "if all 12 of us agree that he will be [a future danger], we have to then go down to number two and revisit all the evidence again ... to see if there's anything that anybody objects to ... any little nagging detail that they may have thought this may have been a mitigating circumstance." She added, "If we decide there that there are no mitigating circumstances, then it's the death penalty." And she also acknowledged that all twelve jurors must find no mitigating circumstances and that "it has to be unanimous" to result in the death penalty.

> Finally, defense counsel asked Sanchez, "[I]f you get to question two ... are you willing to consider elements of the defendant's character and background to see if there's any mitigating circumstance there that would warrant a life sentence rather than a death penalty?" Sanchez responded in the affirmative. Defense counsel then challenged Sanchez for cause because "[s]he stated several times that once she had determined that there was a yes answer to the future danger question, that was the end of the inquiry and that was the death penalty case." Defense counsel further argued that the prosecutor failed to sufficiently "rehabilitate" Sanchez. The trial judge denied the challenge for cause, finding that "from the totality of the inquiry of the State and Defense that the juror understands the process" and that "she understands what's required of her under the law." The trial judge denied defense counsel's request for additional peremptory challenges. Defense counsel protested that Sanchez was an objectionable juror that he would have struck if the trial court

had granted him another peremptory challenge. Sanchez was seated on the jury.

The trial judge's ruling is supported by the totality of the record. Sanchez ultimately stated that she understood and could follow the law with regard to the mitigation special issue. Thus, the trial judge did not abuse her discretion in denying Renteria's challenge for cause.

*Renteria II*, 2011 WL 1734067, at *23–*24.

Renteria rejects this holding, asserting Sanchez indicated on several occasions she would not consider mitigating evidence:

This holding is unreasonable . . . as demonstrated by the record and Ms. Sanchez's own repeated assertions to the contrary. Ms. Sanchez said numerous times that she would vote for the death penalty after finding the defendant to be a future danger, even after counsel painstakingly reviewed the process of answering Special Issue 1 and then Special Issue 2 with her. She also inaccurately described mitigation as a "little magic detail that -- that's just bugging us about it ... something maybe bothering me or something may be bothering somebody else about the case."

Pet'r's Reply 69, ECF No. 94 (citing Reporter's R., vol. 41, not scanned into ECF).

But as the Court noted above, a state trial court's refusal of a petitioner's challenge for cause—which inherently constitutes a finding of impartiality—is entitled to the presumption of correctness found in 28 U.S.C. § 2254(e)(1). *Patton*, 467 U.S. at 1038. Renteria's disagreement with the holding of the Court of Criminal Appeals does not overcome the presumption, especially when, as here, the holding is supported by evidence in the record. Consequently, the Texas Court of Criminal Appeals' rejection on the merits of Renteria's claims regarding the trial court denying his challenge for cause against Sanchez was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. Moreover, the decision was not based upon an unreasonable determination of the facts considering the evidence presented in Renteria's trial, direct appeal, and state habeas corpus proceedings.

To the extent Renteria raises any other claim about the voir dire examination of Sanchez, such a claim is unexhausted and procedurally defaulted. *Ruiz*, 460 F.3d at 642–43; *Nobles*, 127 F.3d at 420. Further, he does not demonstrate cause for any default or actual prejudice arising from the default—or show the failure to consider the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50.

Renteria is not entitled to relief based on his claims concerning Sanchez.

### e. Peremptorily Challenged Venire Members

Renteria also claims the trial court placed unconstitutional and improper limitations on his voir dire of the following peremptorily challenged prospective jurors: Annette Brigham; Elizabeth Black; Anna L. Nava; Howard R. Bryan; John Tobias; Robert Wayne Crosby; Robert P. Tomes; Evangeline Rose Ramirez; Carlos Martinez; Daniel Gurany; Cruz Angel Ochoa, Jr.; Longino Gonzalez, Jr.; Mark Robert Williams; Mark Anthony Tapia; Paul Steven Watt; John David Turner; Leslie D. Potter; John P. Deslongchamps; Joaquin Rivera; Lorena Carreon; and Margaret Jackson. Pet'r's Br. in Supp. 41–45, ECF No. 58. Renteria also contends that, because he "exhausted all his peremptory strikes . . . and . . . two incompetent jurors were seated [Washington Watley, Jr. and Jeanette Sanchez], the court's failure to grant this challenge for cause warrants reversal." Pet'r's Reply 43, ECF No. 94

### (1). Venire Member Anette Brigham

Renteria claims the trial court erred in sustaining the State's objection to his counsels' questions regarding prospective juror Brigham's potential bias. Pet'r's Pet. 46–48, ECF No. 53. "Despite Ms. Brigham's admission that she was molested as a child, the trial court erred in not allowing counsel to question her about the bias she could have in sentencing a defendant who killed, and perhaps sexually assaulted, a child and had previously been

-127-

convicted of indecency with a child." Pet'r's Reply 48, ECF No. 94. Renteria also claims the trial court erred in improperly telling Brigham she could not use her own personal moral judgment in answering the special issues. Pet'r's Pet. 47.

In point of error four in his direct appeal, Renteria argued the trial judge improperly restricted his voir dire questioning of Brigham. *Renteria II*, 2011 WL 1734067, at *8. He complained the trial judge refused to permit an open-ended question about the hypothetical parameters for Brigham's decision-making in a case involving sexual abuse of a child. *Id.* at *9 (citing *Standefer*, 59 S.W.3d at 180). Renteria asserted—as a result—he could not intelligently exercise peremptory challenges and challenges for cause, and he was denied his constitutional rights to due process and effective assistance of counsel.

The Court of Criminal Appeals noted the trial judge limited her ruling to the form of Renteria's question, not its substance. *Id.* (citing *Howard v. State*, 941 S.W.2d 102, 111 (Tex. Crim. App. 1996) (explaining a defendant is not entitled to any particular form of question; rather, a defendant is authorized to ask "proper" questions in a particular area of inquiry)). In fact, the trial judge suggested that defense counsel ask Brigham directly whether she could be fair and impartial in light of her past experience. Defense counsel later asked Brigham if, "given [her] experiences," there was "anything that would affect [her] ability to sit as a juror and be impartial." *Id.* By rephrasing the question, defense counsel was able to elicit whether Brigham could be impartial despite experiencing a childhood sexual assault. *Id.* (citing *Howard*, 941 S.W.2d at 109) (finding no improper voir dire restriction when a trial court limited its ruling only to the form of the questions and not to their substance). The Court of Criminal Appeals overruled Renteria's point of error four.

Renteria now claims the "inquires . . . were far too cursory to root out bias." Pet'r's Reply 49, ECF No. 94.

During the voir dire examination by the State, Brigham stated she would be willing to consider the full range of punishment in a case involving the capital murder of a child under the age of six years old. Reporter's R., vol. 13 (voir dire of Anette Brigham), p. 132, ECF No. 80-5. She acknowledged that she was the victim of child molestation when she was in elementary school. *Id.* at 135. The prosecutor asked whether, considering that, she would be able to decide this case fairly based on the evidence. *Id.* at 137. Brigham stated that she did not "see a real correlation between the two" and that she could decide the case fairly based on the evidence. *Id.*

Renteria's counsel asked Brigham, "based on where you sit, given your experiences, given who you are, do you feel that there's anything that would affect your ability to sit as a juror and be impartial?" *Id.* at 197. Brigham answered, "[n]o." *Id.* She also stated that she could "listen to both sides," despite her experience as a child. *Id.* at 198–200.

Renteria's counsel also told Brigham, "this is going to come down to your own personal moral judgment, your own values, what you believe might fall into that just as your religious beliefs or your own personal values." *Id.* at 195. The State objected, stating the jury's verdict has "to be based on the evidence." *Id.* The trial court sustained the objection. *Id.* Trial counsel later stated, "whatever evidence you hear that—that falls into your personal views, that would be evidence that you can apply to [the mitigation special issue]." *Id.* at 196. Brigham agreed. *Id.*

The record shows the trial court asked the venire members to complete a lengthy questionnaire and allowed counsel latitude in asking potential jurors questions. The Court's independent review of the entirety of defense counsel's voir dire–including defense counsel's voir dire of Brigham—leads to a reasonable conclusion it was enough to permit Renteria's counsel to determine whether Brigham's views "would prevent or substantially impair the

-129-

performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.'"
*Wainwright*, 469 U.S. at 424 (quoting *Adams*, 448 U.S. at 45). Renteria was entitled to
nothing more. *See Soria*, 207 F.3d at 244.

Further, the jury must give a "reasoned moral response" to a defendant's mitigating
evidence. *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 252–54 (2007). Indeed, the Supreme
Court has held that an "anti-sympathy" jury instruction is constitutionally permissible
because "[w]hether a juror feels sympathy for a capital defendant is more likely to depend on
that juror's own emotions than on the actual evidence regarding the crime and the defendant."
*Saffle v. Parks*, 494 U.S. 484, 492–93 (1990).

Because Renteria has not presented clear and convincing evidence to overcome the
Court of Criminal Appeals' conclusion the trial judge did not improperly restricted his voir
dire questioning of Brigham, this finding is presumed correct. 28 U.S.C. § 2254(e)(1). As
such, the Court cannot grant federal habeas relief, since the conclusion was not "based on an
unreasonable determination of the facts in light of the evidence presented in the State court
proceeding." 28 U.S.C. § 2254(d)(2). It follows that Renteria is not entitled to relief with
respect to this claim.

Further, Renteria's counsel exercised a peremptory strike as to Brigham. Reporter's
R., vol. 13, p. 203, ECF No. 80-5. "So long as the jury that sits is impartial, the fact that [the
petitioner] had to use a peremptory challenge to achieve that result does not mean that the
Sixth Amendment was violated." *Ross*, 487 U.S. at 88; *Soria*, 207 F.3d at 241–42. "The
failure properly to grant a challenge for cause rises to the level of a constitutional violation
and warrants reversal only if the defendant exhausts all peremptory challenges and an
incompetent juror is forced upon him. Absent such a showing, the defendant has not been

denied his Sixth Amendment right to an impartial jury." *United States v. Webster*, 162 F.3d 308, 342 n.36 (5th Cir. 1998).

Finally, to the extent Renteria raises claims other than those raised on direct appeal, they are unexhausted and procedurally defaulted. *Ruiz*, 460 F.3d at 642–43; *Nobles*, 127 F.3d at 420. Renteria does not demonstrate cause for any default or actual prejudice arising from the default—or show the failure to consider the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50.

Renteria is not entitled to relief based on his claims concerning Brigham.

### (2). Venire Members Elizabeth Black; Anna L. Nava; Howard R. Bryan; and John Tobias

Renteria claims the trial court improperly prohibited his counsel from asking Elizabeth Black whether she could consider specific factors—such as a defendant's substance abuse, family history, emotional problems, background, upbringing, character, or the circumstances of the offense—as mitigating evidence. Pet'r's Pet. 40–42, ECF No. 53. As a result, he says he was forced to exercise a peremptory strike as to Black. Reporter's R., vol. 12 (voir dire of Elizabeth Black), p. 133, ECF No. 80-4.

Renteria maintains "[t]he trial court erred in denying Petitioner's challenge for cause against [Anna L.] Nava because she was unable to follow the law, either in considering and giving effect to mitigating evidence or by automatically imposing the death penalty for anyone convicted of killing a child." Pet'r's Reply 58–59, ECF No. 94.

Renteria contends "[t]he trial court erred in denying Petitioner's challenge for cause against [Howard R.] Bryan because he has a law enforcement bias and favors the state." *Id.* at 60. He further contends "[t]he trial court also erred in prohibiting counsel from conducting a full and constitutional voir dire to permit development of challenges for cause and the intelligent use of peremptory challenges. *Id.*

Renteria claims "[t]he trial court erred in denying Petitioner's challenge for cause against [John] Tobias because he would automatically vote for the death penalty for certain crimes and could not consider and give effect to mitigating evidence." *Id.* at 62.

In points of error five through eight in his direct appeal, Renteria argued the trial judge improperly restricted his voir dire questioning of prospective jurors Black, Nava, Bryan, and Tobias. *Renteria II*, 2011 WL 1734067, at *9. He complained the trial judge prevented him from asking these prospective jurors if they were "biased against specific evidence that the defense intend[ed] to introduce in mitigation." *Id.* He asserted—as a result—he was unable to "intelligently exercise peremptory challenges and challenges for cause" and was "effectively deprived . . . of effective assistance of counsel." *Id.* The Court of Criminal Appeals explained "[a] prospective juror is not challengeable for cause simply because he or she does not consider a particular type of evidence to be mitigating." *Id.* at *11 (citing *Standefer*, 59 S.W.3d at 181). It further explained "[w]hether a juror considers a specific evidence mitigating is not a proper area of inquiry." *Id.* The Court of Criminal Appeals overruled Renteria's points of error five through eight.

Renteria now asserts he "had a right to an impartial jury and to adequate voir dire in order to identify unqualified jurors." Pet'r's Reply 46, ECF No. 94. He argues that without being able to present Black, Nava, Bryan, and Tobias with any examples of mitigating evidence, his counsel had no way of discerning whether they were qualified. *Id.* at 46, 59, 61, 62. He also maintains the Court of Criminal Appeals' "holding as to Mr. Bryan's bias in favor of law enforcement is also unreasonable." *Id.* at 61.

The Court discussed using examples of mitigating evidence during voir dire in section D above. The Court opined, although a court must afford a defendant an opportunity to present mitigating evidence at the punishment phase of a capital trial, the fact that a juror

-132-

might view the evidence as aggravating—as opposed to mitigating—does not implicate the Eighth Amendment. *Johnson*, 509 U.S. at 368. So "a defendant in a capital case is not entitled to challenge prospective jurors for cause simply because they might view the evidence the defendant offers in mitigation of a death sentence as an aggravating rather than a mitigating factor." *Dorsey*, 494 F.3d at 533. Thus, Renteria's claim that the trial court deprived him of the ability to discover the basis for a challenge for cause—through questions which would help his counsel determine whether potential jurors viewed specific evidence as mitigating or aggravating—is without merit.

The Court may grant federal habeas relief only if the conclusion of the state court "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Because Renteria has not presented clear and convincing evidence to overcome the Court of Criminal Appeals' conclusion the trial judge did not improperly restrict his voir dire questioning of Black, Nava, Bryan, and Tobias, this finding is presumed correct. 28 U.S.C. § 2254(e)(1). It follows that Renteria is not entitled to relief with respect to this claim.

Further, Renteria's counsel exercised peremptory strikes as to Black, Nava, Bryan, and Tobias. Therefore, any complaint about the trial court's rulings as to these potential jurors is necessarily without merit. *Soria*, 207 F.3d at 241–42.

Finally, to the extent Renteria raises any claim other than that raised on direct appeal, such a claim is unexhausted and procedurally defaulted. *Ruiz*, 460 F.3d at 642–43; *Nobles*, 127 F.3d at 420. Renteria has not demonstrated cause for any default or actual prejudice arising from the default—or showed the failure to consider the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50.

Renteria is not entitled to relief based on his claims concerning Black, Nava, Bryan, and Tobias.

### (3). Venire Members Robert Wayne Crosby and Robert P. Tomes

Renteria claims "[t]he trial court erred in denying Petitioner's challenge for cause against Mr. Crosby because he would automatically sentence a defendant to death after finding him to be a future danger." Pet'r's Reply 58–59, ECF No. 94. He further claims "[t]he trial court also unconstitutionally prohibited questioning regarding matters that would have led to a challenge for cause. Here, specifically, it was unclear that Mr. Crosby could consider the full range of punishment." *Id.* In this case, according to Renteria, "the full range of punishment . . . included the possibility of parole." *Id.* at 63.

Renteria also claims "[t]he court erred in denying Petitioner's challenge for cause against Mr. Tomes because he could not consider a punishment of life with the possibility of parole for someone convicted of killing a child." *Id.* at 63. He adds "[t]he trial court also erred in prohibiting counsel from conducting a full and constitutional voir dire that included the right to explicitly inquire as to Mr. Tomes' (and every other veniremember's) ability to consider the full range of punishment in this case. *Id.* (citing U.S. Const. amends. VI, VIII, and XIV); *Franklin v. State*, 138 S.W.3d 351, 354 (Tex. Crim. App. 2004 ("the trial judge's denial of a mistrial based on the juror's withholding of material information . . . violates the constitutional right of a trial by an impartial jury")).

In points of error nine and ten in his direct appeal, Renteria argued the trial judge improperly restricted him from questioning prospective jurors Crosby and Tomes about parole eligibility. *Renteria II*, 2011 WL 1734067, at *16. He claimed—as a result—he was "denied the ability to intelligently exercise his peremptory strikes" and "effectively deprived . . . of effective assistance of counsel." *Id.*

-134-

The Court of Criminal Appeals noted "[t]hese proposed questions were similar to the questions at issue in *Sells*." *Id.* at *18 (citing *Sells*, 121 S.W. 3d at 756–57 ("any attempt to commit prospective jurors to giving mitigating, aggravating, or even no effect to the parole instruction [was] impermissible.")). It also noted the trial court ultimately asked Crosby whether he could follow the instructions on parole. *Id.* Consequently, the Court of Criminal Appeals concluded the trial judge had not abused her discretion by prohibiting the proposed questions. *Id.* The Court of Criminal Appeals overruled points of error nine and ten.

Renteria now argues that while he may not be entitled to question venire members about their views on parole laws, "he *is* entitled to question venire members regarding their ability to consider the full range of punishment, and for Mr. Renteria that included the possibility of parole." Pet'r's Reply 64, ECF No. 94 (emphasis in original).

In a criminal trial in Texas, "both the [defendant] and the State ha[ve] the right to have jurors who believe in the full range of punishment." *Woodkins v. State*, 542 S.W.2d 855, 862 (Tex. Crim. App. 1976). The right of the defendant arises from Texas Code of Criminal Procedure article 35.16(c)(2), and the right of the State arises from article 35.16(b)(3). *Smith v. State*, 573 S.W.2d 763, 764 (Tex. Crim. App. 1977), *overruled by Hernandez v. State*, 757 S.W.2d 744 (Tex. Crim. App. 1988); *Weaver v. State*, 476 S.W.2d 326, 327 (Tex. Crim. App. 1972). "Thus, if it is established that the [defendant] was forced, over objection, to have a juror sit on his case who could not consider the full range of punishment, a reversal of the cause would be warranted." *Smith*, 573 S.W.2d at 764.

In this case, Renteria exercised peremptory challenges against Crosby and Tomes. They did *not* "sit on his case." And, as discussed in Section C – Claim III above, the trial court instructed those who did sit on his case about the possibility of parole, in accordance with Texas Code of Criminal Procedure article 37.071 § 2(e)(2)(B).

The Court may grant federal habeas relief only if the conclusion of the state court "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Because Renteria has not presented clear and convincing evidence to overcome the Court of Criminal Appeals' conclusion the trial judge did not improperly restrict his voir dire questioning of Crosby and Tomes about the possibility of parole, this finding is presumed correct. 28 U.S.C. § 2254(e)(1). It follows that Renteria is not entitled to relief with respect to this claim.

Further, Renteria's counsel exercised peremptory strikes as to Crosby and Tomes. Therefore, any complaint about the trial court's rulings as to these potential jurors is necessarily without merit. *Soria*, 207 F.3d at 241–42.

Finally, to the extent Renteria raises any claim other than that raised on direct appeal, such a claim is unexhausted and procedurally defaulted. *Ruiz*, 460 F.3d at 642–43; *Nobles*, 127 F.3d at 420. Renteria has not demonstrated cause for any default or actual prejudice arising from the default—or showed the failure to consider the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50.

Renteria is not entitled to relief based on his claims concerning Crosby and Tomes.

> **(4). Venire Members Evangeline Rose Ramirez; Carlos Martinez; Daniel Gurany; Cruz Angel Ochoa, Jr.; Longino Gonzalez, Jr.; Mark Robert Williams; Mark Anthony Tapia; Paul Steven Watt; John David Turner; Leslie D. Potter; Margaret Jackson, Lorena Carreon; and John P. Deslongchamps**

Renteria avers the trial court improperly disallowed his counsel from asking Evangeline Rose Ramirez whether she would consider mitigating evidence if the defendant "had a prior indecency with a child conviction." Pet'r's Pet. 55–57, ECF No. 53. He argues "[t]he trial court erred in denying Petitioner's challenge for cause against Ms. Ramirez, who

unequivocally stated that she would automatically sentence someone to death without considering mitigation after answering "yes" to Special Issue 1." Pet'r's Reply 54, ECF No. 94.

Renteria maintains his trial counsel were ineffective for failing to object to the State's "erroneous and unconstitutional definition of" mitigating evidence during the voir dire of Carlos Martinez. Pet'r's Pet. 53–54, ECF No. 53. "Moreover, the trial court erred in failing to grant Petitioner's challenge for cause based on (1) Mr. Martinez's belief that if a defendant did not testify about his remorse, Mr. Martinez 'probably wouldn't have any choice' but to vote for a death sentence; and (2) his belief, based on his religious conviction, that 'an eye for an eye' justifies the automatic imposition of a death sentence." Pet'r's Reply 54, ECF No. 94.

Renteria alleges "the trial court erred in denying counsel's challenge for cause because [Daniel] Gurany would impose the death penalty where a defendant's schools and parents had failed him and the defendant had 'failed himself.'" *Id.* at 65. He argues the Court of Criminal Appeals' rejection of this claim "was unreasonable . . . as they relied on a simple 'yes' given in response to the question of whether Mr. Gurany would be willing to consider Petitioner's character and background in answering the mitigation special issue . . ." *Id* at 65–66.

Renteria contends the trial court erred in denying his "challenge for cause against [Cruz Angel] Ochoa [Jr.] because he was unable to follow the law and consider a life sentence for someone convicted of killing a child under six or consider and give effect to mitigating evidence once he found a defendant to be a future danger." *Id* at 59.

Renteria claims Longino Gonzalez "felt death was the appropriate sentence for someone convicted of killing a child under six years old." Pet'r's Pet. 65, ECF No. 53. He

adds Gonzalez "formed an opinion that death was the appropriate punishment" when he first learned about the case in the media. *Id.*

Renteria asserts "[t]he trial court improperly denied the challenge for cause against Mr. [Mark Robert] Williams because (1) Mr. M. Williams felt death was the appropriate penalty for anyone found guilty of killing a child under the age of six; and (2) he could not guarantee that his preconceived notions of the case would not influence his verdict." Pet'r's Reply 51, ECF No. 94.

Renteria alleges "[t]he trial court erred in denying Petitioner's challenge for cause against [John] Tobias because he would automatically vote for the death penalty for certain crimes and could not consider and give effect to mitigating evidence." *Id.* at 62.

Renteria claims "[Margaret] Jackson expressed that her personal history and attitude toward child abuse and family abuse would prevent her from being fair and impartial." Pet'r's Pet. 79, ECF No. 53. He further claims "[t]he trial court denied [his] challenge, and [his] counsel was forced to exercise a peremptory challenge." *Id.* at 80.

Renteria maintains "[t]he trial court erred in denying Petitioner's challenge for cause against [Lorena] Carreon because she could not consider and give effect to mitigating evidence as required under *Penry I* if the circumstance of the crime were heinous." Pet'r's Reply 57, ECF No. 94.

Renteria complains Mark Anthony Tapia had a predetermined punishment verdict concerning the future dangerousness special issue, was unable to consider mitigating evidence, and indicated he would improperly shift the burden of proof regarding the mitigation special issue to Renteria. Pet'r's Pet. 36–38. He also claims that the trial court improperly disallowed his counsels' question to Tapia regarding his willingness to consider mitigating evidence. *Id.* at 37.

Renteria maintains his constitutional rights were violated "[b]ecause the [trial] court prevented [his] counsel from questioning [Paul Steven Watt and other] jurors about how evidence of a prior conviction for indecency of a child might affect their ability to consider mitigation and the full range of punishment." *Id.* at 57–60. He also claims that the trial court's ruling denied him effective assistance of counsel because the ruling prevented trial counsel from "intelligently exercise[ing] peremptories or develop challenges for cause." *Id.* at 60.

Renteria suggests his constitutional rights were violated because the State provided John David Turner with an unconstitutional definition of mitigating evidence. *Id.* at 77–79. Renteria also claims his counsel were not permitted to ask, "Turner proper questions that would have led to a challenge for cause." *Id.* at 78.

Renteria avers "[t]he trial court erred in denying Petitioner's challenge for cause against [Leslie] Potter because he could not consider and give effect to mitigating evidence and would automatically vote for a death sentence for a heinous crime." Pet'r's Reply 66, ECF No. 94.

Finally, Renteria contends the trial court improperly disallowed his counsel from explaining the definition of mitigating circumstances to John Deslongchamps. *Id.* at 82–85.

In points of error eleven through thirty-seven in his direct appeal, Renteria alleged the trial judge improperly denied his challenges for cause against eighteen venire members: Robert Wynn Crosby; Jeanette Sanchez; Evangeline Rose Ramirez; Anna L. Nava; Carlos Martinez; Howard R. Bryan, Jr.; Daniel Gurany; Cruz Angel Ochoa, Jr.; Longino Gonzalez, Jr.; Robert P. Tomes; Mark Robert Williams; Mark Anthony Tapia; John Tobias; Paul Steven Watt; John David Turner; Leslie D. Potter; John P. Deslongchamps; and Washington Watley, Jr. *Renteria II*, 2011 WL 1734067, at *19.

The Court of Criminal Appeals explained that—to establish harm—a defendant must show he asserted a clear and specific challenge for cause. *Id.* (citing *Green v. State*, 934 S.W.2d 92, 105 (Tex. Crim. App. 1996)). A defendant must also show "he used all his peremptory strikes, asked for and was refused additional peremptory strikes, and was then forced to take an identified objectionable juror whom he would have struck had the trial court granted his challenge for cause or granted him additional peremptory strikes." *Id.* (citing *Lewis v. State*, 911 S.W.2d 1, 4 (Tex. Crim. App. 1995). The Court of Criminal Appeals found Renteria had complied with these requirements for eleven venire members: Robert Wynn Crosby; Jeanette Sanchez; Carlos Martinez; Howard R. Bryan, Jr.; Daniel Gurany; Cruz Angel Ochoa Jr.; Longino Gonzalez Jr.; Mark Williams; Mark Anthony Tapia; John Tobias; and Paul Watt. *Id.* at *19–*36.

But it further found the trial judge did not abuse her discretion in denying Renteria's challenges for cause to these eleven venire members. "Because Renteria has failed to show that at least eight of his complained-of challenges for cause were erroneously denied, he cannot show harm on appeal." *Id.* at *36 (citing *Chambers v. State*, 866 S.W.2d 9, 23 (Tex. Crim. App. 1993) ("Error is preserved for review by this Court only if appellant (1) used all of his peremptory strikes, (2) asked for and was refused additional peremptory strikes, and (3) was then forced to take an identified objectionable juror whom appellant would not otherwise have accepted had the trial court granted his challenge for cause (or granted him additional peremptory strikes so that he might strike the juror)." *Chambers*, 866 S.W.2d at 23). The Court of Criminal Appeals accordingly overruled points of error eleven through thirty-seven.

"So long as the jury that sits is impartial, the fact that [the petitioner] had to use a peremptory challenge to achieve that result does not mean that the Sixth Amendment was violated." *Ross*, 487 U.S. at 88; *Soria*, 207 F.3d at 241–42. "The failure properly to grant a

challenge for cause rises to the level of a constitutional violation and warrants reversal only if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him. Absent such a showing, the defendant has not been denied his Sixth Amendment right to an impartial jury." *Webster*, 162 F.3d at 342 n.36.

Renteria contends that, because he "exhausted all his peremptory strikes . . . and . . . two incompetent jurors were seated (Mr. Watley and Ms. Sanchez . . .), the court's failure to grant this challenge for cause warrants reversal." Pet'r's Reply 43, ECF No. 94 (citing *Webster*, 162 F.3d at 342 n.36.

Renteria claims Watley was incompetent because he "answered 'yes' when asked on his juror questionnaire if he would automatically believe the testimony of a law enforcement officer *simply because he or she is a law enforcement officer*, which is constitutionally impermissible." Pet'r's Reply 68–69, ECF No. 94 (emphasis in original). He claims Sanchez was incompetent because she "said numerous times that she would vote for the death penalty after finding the defendant to be a future danger, even after counsel painstakingly reviewed the process of answering the first special issue—the future dangerousness issue—and the second special issue—the mitigation issue. *Id.* at 69 (citing Reporter's R., vol. 41 (voir dire of Jeanette Sanchez), pp. 70; 71; 73; 77–78, not scanned in ECF . He notes Sanchez also inaccurately described mitigation as a "little magic detail that -- that's just bugging us about it . . . something maybe bothering me or something may be bothering somebody else about the case." *Id.* (citing Reporter's R., vol. 41, p. 82).

A state court's factual findings are presumed to be correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "This deference extends not only to express findings of fact, but to the implicit findings of the state court." *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (citing

*Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005); *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004)). If there is "some indication of the legal basis for the state court's denial of relief," the district court may infer the state court's factual findings even if they were not expressly made. *Goodwin v. Johnson*, 132 F.3d 162, 184 (5th Cir. 1997). *See also Thompson v. Linn*, 583 F.2d 739, 742 (5th Cir. 1978) (per curiam) (quoting *Townsend v. Sain*, 372 U.S. 293, 314 (1963)) (permitting the district court to "reconstruct the findings of the state court, 'either because (the state trial judge's) view of the facts is plain from his opinion, or because of other indicia'").

The trial court's implicit factual determination that Watley could be fair and impartial has support in the record. Watley stated he could stay open-minded about police testimony. Reporter's R., vol. 37 (voir dire of Washington Watley Jr.), p. 116, not scanned in ECF. He also claimed he could be fair—despite having two daughters close in age to the victim. *Id.* at 90. These views would not prevent or substantially impair Watley's performance of his duties as a juror in accordance with his instructions and his oath. The record is insufficient to show that Watley harbored a disqualifying bias.

A court may grant federal habeas relief only if the state court finding "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Renteria has not done this. He has not demonstrated the state court's decision to reject his constitutional claim was erroneous. Because Renteria has not presented clear and convincing evidence to overcome the trial court's finding that Watley could be impartial, this finding is presumed correct. *Id.* § 2254(e)(1).

Renteria argued on direct appeal that the trial court erred in denying his challenge for cause as to Sanchez because she would not consider the mitigation special issue after answering the future dangerousness special issue affirmatively. *Renteria v. State*

-142-

(Appellant's Brief), 2009 WL 5453014 (Dec. 15, 2009), at \*98–\*102. The Court of Criminal

Appeals rejected his argument. It noted Sanchez said she would consider mitigating

evidence:

> Sanchez ... clarified her understanding as she explained the process for determining punishment in her own words. She stated that "if all 12 of us agree that he will be [a future danger], we have to then go down to number two and revisit all the evidence again ... to see if there's anything that anybody objects to ... any little nagging detail that they may have thought this may have been a mitigating circumstance." She added, "If we decide there that there are no mitigating circumstances, then it's the death penalty." And she also acknowledged that all twelve jurors must find no mitigating circumstances and that "it has to be unanimous" to result in the death penalty.
>
> Finally, defense counsel asked Sanchez, "[I]f you get to question two ... are you willing to consider elements of the defendant's character and background to see if there's any mitigating circumstance there that would warrant a life sentence rather than a death penalty?" Sanchez responded in the affirmative.

*Renteria II*, 2011 WL 1734067, at \*23. The Court of Criminal Appeals reasoned "[t]he trial

judge's ruling is supported by the totality of the record. Sanchez ultimately stated that she

understood and could follow the law about the mitigation special issue. Thus, the trial judge

did not abuse her discretion in denying Renteria's challenge for cause." *Id.* at \*24.

Again, a state trial court's denial of a petitioner's challenge for cause is entitled to the

presumption of correctness. 28 U.S.C. § 2254(e)(1); *Patton*, 467 U.S. at 1038. Renteria's

disagreement with the Court of Criminal Appeals' holding does not overcome the

presumption, especially when, as here, the holding is supported by evidence in the record.

Consequently, the Texas Court of Criminal Appeals' rejection on the merits of Renteria's

claims regarding the trial court denying his challenge for cause against Sanchez was neither

contrary to, nor involved an unreasonable application of, clearly established federal law as

determined by the Supreme Court. It was also not based upon an unreasonable determination

of the facts considering the evidence presented in Renteria's trial, direct appeal, and state

habeas corpus proceedings.

The evidence does not support a conclusion Watley, Sanchez or any venire member who sat on the jury was unqualified. Renteria's complaints concerning the trial court's rulings as to the venire members are without merit. Renteria is not entitled to relief on these claims.

### f. Cumulative Error

Renteria also suggests the "cumulative impact of [the alleged errors during voir dire] worked to deny [him] the above enumerated rights under the Federal Constitution." Pet'r's Pet. 84–85, ECF No. 53. But a federal habeas court may only grant relief on a cumulative error claim when the petitioner identifies individual errors of a constitutional magnitude, establishes the alleged errors are not procedurally defaulted, and shows the errors resulted in a due process violation. *Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007); *Moore v. Quarterman*, 526 F. Supp. 2d 654, 710 (W.D. Tex. 2007) (citing *Spence v. Johnson*, 80 F.3d 989, 1000–01 (5th Cir. 1996)). As discussed above, *all* of Renteria's purported errors concerning the voir dire process are meritless, procedurally defaulted, or both. Consequently, he cannot allege any errors to cumulate.

Further, Renteria raised a claim on direct appeal alleging the cumulative effect of the trial court's alleged errors during voir dire denied him his right to due process. *Renteria v. State* (Appellant's Brief), 2009 WL 5453014 (Dec. 15, 2009), at *154–*156.

The Court of Criminal Appeals rejected the claim, holding Renteria failed to allege any error to cumulate. *Renteria II*, 2011 WL 1734067, at *37.

Renteria does not attempt to show that the state court's rejection of the claim was unreasonable. Therefore, he is not entitled to relief. *Coble*, 496 F.3d at 440 ("Coble has not identified errors of constitutional dimension. Accordingly, we cannot say that the state habeas court's rejection of Coble's cumulative error claim was objectively unreasonable).

**E. Claim V - Renteria's constitutional rights were violated in multiple respects by the trial court's jury charge at the second penalty trial. Pet'r's Pet. 91–99, ECF No. 53; Br. in Supp. 43–50, ECF No. 58.**

### 1. Background.

Renteria next complains about the admissibility of extraneous offenses, the constitutionality of the both special issues, and the jury charge.

First, Renteria notes that under Texas Code of Criminal Procedure Articles 30.07 and 37.071, "the State is permitted wide latitude to introduce evidence of 'extraneous' offenses during the penalty phase." Pet'r's Pet. 92, ECF No. 53. Indeed, the State may introduce evidence "'regardless of whether [the defendant] has previously been charged with or finally convicted of the crime or act.'" *Id.* at 93 (quoting Tex. Code Crim. Proc. art 37.07 § 3(a)(1)). But, he argues, "[t]he presentation of extraneous conduct to support a finding of the first special issue violates the Fifth Amendment's presumption of innocence, the Sixth Amendment's jury trial guarantee, and creates a risk of arbitrary and unreliable capital sentencing, in violation of the Eighth and Fourteenth Amendments." *Id.* He concedes "[t]his issue was not presented to the state courts." *Id.* at 94.

Second, Renteria asserts "[t]he first special issue is unconstitutionally vague, and fails to provide the Constitutionally-required guided discretion to the sentencing jury" in the Eighth and Fourteenth Amendments. *Id.* at 94. He notes "[n]either the statute nor the required jury charge define the terms 'probability,' 'criminal acts of violence,' and 'continuing threat to society.'" *Id.* And both use the term "'probability' in conjunction with an issue which the trial court instructs the jury to determine beyond a reasonable doubt. *Id.* Renteria adds his defense raised these issues before trial and on direct appeal. *Renteria v. State* (Appellant's Brief), 2009 WL 5453014 (Tex. Crim. App. filed Dec. 15, 2009), at *188–

*195. Yet the Court of Criminal Appeals affirmed the lower court in all respects. *Renteria II*, 2011 WL 1734067, at *47–*48.

Third, Renteria protests the "10–12 rule"—which "requires capital jurors to be instructed that they can answer 'Yes' to the future-dangerousness special issue and 'No' to the mitigation special issue only if all twelve of them agree to do so and that they can give the opposite answers only if ten or more of them agree to do so"[9]—is unconstitutional and the sentencing statute improperly bars the trial court from instructing the jury that, if it is unable to reach "a unanimous or at-least-ten verdict on either special issue, the trial court is required to sentence the defendant to life in prison." Pet'r's Pet. 95, ECF No. 53 (citing Tex. Code Crim. Proc. Art 37.071 § 2(a) (barring instruction on the effect of a failure to agree)).

Renteria raised this issue on direct appeal. *Renteria v. State* (Appellant's Brief), 2009 WL 5453014 (Tex. Crim. App. filed Dec. 15, 2009), at *197–*201. The Court of Criminal Appeals affirmed the lower court in all respects. *Renteria II*, 2011 WL 1734067, at *47–*48.

Finally, Renteria complains the trial court did not instruct "the jury that mitigating circumstances need not be proven beyond a reasonable doubt." Pet'r's Pet. 97, ECF No. 53. He explains "[t]he statute does not specify a burden of proof for mitigating circumstances." *Id.* at 98. He argues "any reasonable juror would assume that the only burden of proof described in the instructions applied to all the issues . . . . This violated Petitioner's Eighth and Fourteenth Amendment rights to individualized, reliable capital sentencing." *Id.* at 97.

Renteria raised this issue at trial and on direct appeal. *Renteria v. State* (Appellant's Brief), 2009 WL 5453014 (Tex. Crim. App. filed Dec. 15, 2009), at *208–*211. The Court

---

[9] *Blue v. Thaler*, 665 F.3d 647, 669 (5th Cir. 2011).

of Criminal Appeals affirmed the lower court in all respects. *Renteria II*, 2011 WL 1734067, at *47–*48.

### 2. Discussion

#### a. "Extraneous" Evidence

Renteria claims that the trial court erred by permitting the State wide latitude to introduce extraneous offenses into evidence during his sentencing trial. He argues the trial court's error violated his Fifth, Eighth, and Fourteenth Amendment rights.

Renteria concedes this claim is unexhausted and procedurally defaulted. Pet'r's Pet. 89, ECF No. 53. He argues his default is excused because his appellate and state habeas counsel were ineffective for failing to raise the claim. *Id.*

#### (1). Procedural Bar

"[T]he exhaustion doctrine, which is 'principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings,' generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Carrier*, 477 U.S. at 488–89 (quoting *Rose v. Lundy*, 455 U.S. 509, 518 (1982)). "In other words, the claim of ineffective assistance of counsel on direct appeal is an independent constitutional violation, which must itself be exhausted using state collateral review procedures." *Hatten*, 570 F.3d at 605 (citing *Edwards v. Carpenter*, 529 U.S. at 451-53). Further—as noted above—the exception to procedural default recognized in *Martinez* and *Trevino* applies only to defaulted ineffective assistance of trial counsel claims.

Here—because Renteria did not exhaust his ineffective counsel argument—his claim is procedurally barred and cannot furnish the basis for cause and prejudice enabling federal review of the underlying unexhausted habeas claims.

### (2). Merits

Nonetheless, Renteria's claim fails on the merits for two reasons.

First, the jury was instructed it could only consider evidence of Renteria's extraneous offenses if it found—beyond a reasonable doubt—that he committed the offenses:

> The State has introduced evidence of extraneous crimes or bad acts other than the one charged in the indictment in this case. This evidence was admitted only for the purpose of assisting you if it does in determining the proper punishment for the offense for which you have found the Defendant guilty. You cannot consider the testimony for any purpose unless you find and believe beyond a reasonable doubt that the Defendant committed such other acts if any were committed.

Clerk's R., vol. 8 (Jury Charge), p. 175, ECF No. 79-11.

Second, "the Supreme Court has never held that the federal constitution requires a state to prove an extraneous offense beyond a reasonable doubt." *Hughes*, 412 F.3d at 593. "[T]here is no constitutional prohibition on the introduction at a trial's punishment phase of evidence showing that the defendant has engaged in extraneous, unadjudicated, criminal conduct. . . . [T]he 'admission of unadjudicated offenses in the sentencing phase of a capital trial does not violate the eighth and fourteenth amendments.'" *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005) (quoting *Williams v. Lynaugh*, 814 F.2d 205, 208 (5th Cir. 1987). Even "[t]he introduction of evidence of extraneous offenses of which the defendant has been acquitted is consistent with due process." *Harris*, 313 F.3d at 246.

Consequently, Renteria's claim is meritless. Renteria is not entitled to relief on this claim.

### b. Defective Jury Instruction

Renteria claims the trial court provided the jury with a defective jury instruction on special issue one—the future dangerousness issue—because it did not define the terms "probability," "criminal acts of violence," and "continuing threat to society."

-148-

The jury verdict form asked the jury:

SPECIAL ISSUE NO. 1

Do you find from the evidence beyond a reasonable doubt that there is a *probability* that the Defendant DAVID RENTERIA would commit *criminal acts of violence* that would constitute a *continuing threat to society*?

Clerk's R., vol. 8 (Jury Charge), p. 177, ECF No. 79-11 (emphasis added).

Renteria argues the verdict form was infirm because the jury charge did not define the terms "probability," "criminal acts of violence," and "continuing threat to society." He also notes the verdict form inexplicably used the term "'probability' in conjunction with an issue which the trial court instructs the jury it must determine beyond a reasonable doubt.

The Fifth Circuit has held the terms used in the future dangerousness verdict form are permissible because they "have a plain meaning of sufficient content that the discretion left to the jury [is] no more than that inherent in the jury system itself." *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009). The Fifth Circuit has specifically rejected challenges to the failure to define these terms. *See Blue v. Thaler*, 665 F.3d 647, 667–68 (5th Cir. 2011) ("Blue has not identified any authority that holds that the absence of such a supplemental instruction renders Texas's amended special-issues scheme constitutionally infirm."); *Scheanette v. Quarterman*, 482 F.3d 815,827–28 (5th Cir. 2007) ("The future dangerousness issue has been held constitutional by the Supreme Court and we have repeatedly held that the term 'probability' as used in the Texas special issue is not so vague as to require additional instructions (such as definition by the court).") (citing *Jurek v. Texas*, 428 U.S. 262 (1976)); *Hughes*, 191 F.3d at 615–16 (holding that the lack of a definition for the term "probability" in future dangerousness instruction did not render the instruction constitutionally infirm); *Woods v. Johnson*, 75F.3d 1017, 1033–34 (5th Cir. 1996) (collecting cases). Renteria cites

-149-

no constitutional authority which would have required the trial court to give any express definition to these terms.

The Court of Criminal Appeals rejected these claims in Renteria's direct appeal. *Renteria II*, 2011 WL 1734067, at *47–*48. Renteria fails to cite Supreme Court precedent suggesting that the Constitution requires that Texas define the terms expressly or that the Court of Criminal Appeals unreasonably rejected the claim. Renteria's claim amounts to a request for a new rule which would be barred by the rules against retroactivity. *Kerr v. Thaler*, 384 F. App'x 400, 404(5th Cir. 2010) (unpublished) (citing *Teague v. Lane*, 489 U.S. 288, 310 (1989) ("The "costs imposed upon the State[s] by retroactive application of new rules of constitutional law on habeas corpus . . . generally far outweigh the benefits of this application." *Solem v. Stumes*, 465 U.S. 638, 654 (1984) (Powell, J., concurring in judgment). In many ways the application of new rules to cases on collateral review may be more intrusive than the enjoining of criminal prosecutions, *cf. Younger v. Harris*, 401 U.S. 37, 43–54 (1971), for it continually forces the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards. Furthermore, as we recognized in *Engle v. Isaac*, 456 U.S. 107, 128 n.33 (1982), "[s]tate courts are understandably frustrated when they faithfully apply existing constitutional law only to have a federal court discover, during a [habeas] proceeding, new constitutional commands.")).

The Texas Court of Criminal Appeals' rejection on the merits of Renteria's claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court.

Renteria is not entitled to relief on this claim.

### c. The "12/10" Rule

Renteria asserts the Texas "12/10 Rule" violates the Eighth Amendment by failing to accurately instruct the jury that the vote of a single juror could result in a life sentence. Pet'r's Pet. 95–96, ECF No. 53. He explains, instead, the jury is only told that it may answer "no" to the future dangerousness issue or "yes" to the mitigation issue only if "10 or more jurors agree." In other words, he complains the jury is instructed that answers in favor of a life sentence require ten votes and answers in favor of a death sentence require unanimity, but they are not told that if less than ten jurors vote in favor of a life sentence, the defendant will still be given a life sentence.

The Court of Criminal Appeals rejected this claim in Renteria's direct appeal. *Renteria II*, 2011 WL 1734067, at *47–*48.

The Supreme Court has specifically rejected the argument that the Eighth Amendment requires jurors to be instructed regarding the consequences of their failure to agree or on a breakdown in the deliberative process. *Jones v. United States*, 527 U.S. 373, 383 (1999). "*Jones* insulates the 10–12 Rule from constitutional attack." *Blue*, 665 F.3d at 670.

The Fifth Circuit has consistently held the "12/10" Rule does not violate the Eighth Amendment or the Fourteenth Amendment. *See Reed v. Stephens*, 739 F.3d 753, 779 (5th Cir. 2014) ("Reed's second argument, that the jury should have been informed that a lack of unanimity during the penalty phase would result in a life sentence, is a challenge to Texas's so-called '12–10 Rule.' Arguments similar to Reed's repeatedly have been rejected by this court and Texas courts."); *Sprouse v. Stephens*,748 F.3d 609,623 (5th Cir. 2014) ("Clear Supreme Court and Fifth Circuit precedent forecloses granting a COA on this issue."); *Druery v. Thaler*, 647 F.3d 535, 544 (5th Cir. 2011) ("To the extent Petitioner's challenge to

Texas's 12–10 rule rests on . . . the Eighth Amendment, . . . it is foreclosed by Fifth Circuit precedent.").

Renteria has not shown that the state court's rejection of this issue involved an unreasonable application of Supreme Court precedent. 28 U.S.C. § 2254(d). Any attempt to extend the Supreme Court's precedent to this case is barred by the rules against retroactive application of a new constitutional rule in habeas proceedings. *See Teague*, 489 U.S. at 311.

Consequently, Renteria is not entitled to relief on this claim.

### d. Burden of Proof

Renteria claims the trial court erred by failing to instruct his jury he was not required to prove the existence of mitigating circumstances beyond a reasonable doubt. Pet'r's Pet. 97–98, ECF No. 53. He notes "the statute does not specify a burden of proof for mitigating circumstances." Pet'r's Pet. 98. He contends that "any reasonable juror would assume that the only burden of proof described in the instructions applied to all the issues to be determined at the penalty phase." Br. in Supp. 53, ECF No. 58.

The jury verdict form explained the burden of proof for special issue one—the continuing threat issue—was beyond a reasonable doubt:

> SPECIAL ISSUE NO. 1
> Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant DAVID RENTERIA would commit criminal acts of violence that would constitute a continuing threat to society?

Clerk's R., vol. 8 (Jury Charge), p. 177, ECF No. 79-11 (emphasis added). Notably, the jury verdict form did not establish a burden of proof for special issue two—the mitigation issue:

> SPECIAL ISSUE NO. 2
> Taking into consideration all of the evidence including the circumstances of the offense, the Defendant's background, and the personal moral culpability of the Defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

*Id.* at p. 178.

Renteria provides no support for his suggestion that his jury would have or could have improperly inferred—based on the instructions—a burden of proof attended the mitigation special issue. Indeed, the lack of a burden of proof in the mitigation special issue plainly indicates there is no such burden, especially where the charge instructed the jury the State was required to prove the future dangerousness special issue beyond a reasonable doubt.

Further, the Fifth Circuit has repeatedly held Texas's mitigation instruction is constitutional. *Blue*, 665 F.3d at 668–69. And because Renteria identifies no Supreme Court precedent requiring that a jury be informed that mitigating circumstances need not be proven beyond a reasonable doubt, this claim is barred by *Teague*. *See Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005) (stating "[n]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof.").

Renteria is not entitled to relief on this claim.

**F. Claim VI - Renteria's rights under the Fifth, Sixth and Fourteenth Amendments were violated when the State was permitted to question Dr. Cunningham regarding counsels' decision to not permit this expert to discuss the offense with Renteria. Pet'r's Pet. 99–101, ECF No. 53; Pet'r's Br. in Supp. 54–56, ECF No. 58.**

### 1. Background

Lastly, Renteria claims that the trial court erred by allowing the State to ask his expert, Dr. Cunningham, whether he discussed Flores's murder with Renteria. Pet'r's Pet. 99–101, ECF No. 53. Renteria argues the question violated his Fifth Amendment and Sixth Amendment rights.

Dr. Cunningham—a board certified forensic psychologist—first testified outside the presence of the jury. Reporter's R., vol. 69 (testimony of Dr. Cunningham), pp. 41–62, ECF No. 82-1. Dr. Cunningham explained to the trial court that Renteria's counsel engaged him to address two issues. First, "whether there [was] a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Id.* at 61. Second, "how he came to be damaged." *Id.* at 50.

As part of his evaluation, Dr. Cunningham interviewed Renteria, his family, and one of his high school teachers. *Id.* at 46–47. Dr. Cunningham also reviewed Renteria's criminal history and sex offender treatment records. *Id.* at 49. Dr. Cunningham did not, however, ask Renteria questions about Flores's murder or any unadjudicated offenses for two reasons. First, Renteria's counsel instructed him not to ask questions about these matters. *Id.* at 50. Second, he believed the information was not relevant to his assessment of Renteria's future dangerousness. *Id.*

The prosecution did not object to Dr. Cunningham appearing as an expert witness. *Id.* at 63. Dr. Cunningham continued testifying before the jury.

During the State's cross-examination, the prosecutor probed whether Dr. Cunningham asked Renteria about Flores's murder. Reporter's R., vol. 71 (testimony of Dr. Cunningham), p. 12, ECF No. 82-3. Renteria's counsel objected, claiming "[i]t invade[d] the defendant's right to invoke his Fifth Amendment." *Id.*

The trial court initially overruled the objection, but then held a bench conference. *Id.* at 12–17. During the bench conference, defense counsel argued Renteria did not waive his Fifth Amendment rights regarding Flores's murder when Dr. Cunningham interviewed him:

> MR. GANDARA: [Defense Counsel Jaime Gandara] Your Honor. <u>Soria</u> says that you waive your Fifth Amendment right when you talk to your own mental health expert, that you've effectively waived it for the purposes of having a state's expert interview him and so forth. Well he did not. And that's the point. He says I'm not going to answer any questions about the offense. He invoked his Fifth Amendment right. Bottom line.
>
> Now . . . neither <u>Soria</u> nor <u>Chamberlain</u>[10] nor any of the other cases that's [sic] construct <u>Soria</u> say that it's proper to let the jury know that a man's [sic] invoked his Fifth Amendment right. And in all cases, in every case, to traditionally historically you don't tell the jury, well, he took the Fifth. It's improper.
>
> THE COURT: I'm going to sustain the objection to that question. However, I believe based on the law he's entitled to ask your expert witness why he did not ask about the capital murder offense.

*Id.* at 13–14.

Renteria's counsel objected to this ruling, maintaining it also related to an "invocation of the Fifth Amendment right." *Id.* at 14. At that point—and while not objecting to the trial court's ruling—the State proposed a "compromise":

> [T]he Fifth Amendment right goes to the defendant, not to his lawyers. The answers go into that my lawyers told me -- on my lawyer's advice I'm not answering any questions regarding the offense.
>
> The problem with that is then I have to further inquire that the Fifth Amendment is his right and belongs to no one but him, and he asserts his

---

[10] *Chamberlain v. State,* 998 S.W.2d 230, 234 (Tex. Crim. App. 1999).

right. And so we're going to have to go on a and he's a forensic psychologist, and so he meshes the law with his mental health issues. I prefer just to tell him that the defendant refused to answer the questions period. And then I think Soria and Lagrone[11] clearly say that I can go into that without ever having him say he has to assert his Fifth, so that the jury never hears that. Although I think that's fair game, but as a compromise we don't talk about the Fifth. I just lead him into it, he says no, and we move on.

*Id.* at 14–15.

Renteria's counsel objected to the so-called "compromise" and pointing out the proposed questions still invaded Renteria's right to remain silent. Renteria's counsel also noted in Dr. Cunningham's voir dire—initially conducted outside the presence of the jury— Dr. Cunningham testified he did not ask Renteria any questions about the offense on the direction of counsel, and therefore, Renteria never refused to answer such questions. *Id.* at 15.

The trial court overruled the second objection. *Id.* at 17.

The State proceeded to ask Dr. Cunningham whether he asked Renteria about Flores's murder. *Id.* at 17–18. Dr. Cunningham answered he did not. *Id.* at 18. The State then asked Dr. Cunningham why. *Id.* Dr. Cunningham testified he did not ask Renteria about the capital murder because Renteria's counsel instructed him not to ask and a discussion of the facts surrounding the murder would not inform either of the two issues before him:

> Well there were two reasons for that. One of them is that I was instructed by defense counsel not to inquire of the defendant about the capital offense or about any prior unadjudicated conduct which means offenses that he might have committed and never been convicted of.
>
> Additionally there is nothing about that inquiry that would inform either of the two issues before me. A report from him of his conduct or his thoughts or feelings during the offense itself would not tell me what had happened to him developmentally that had damaged him. It would represent an expression of that damage but it wouldn't tell me how he came to be damaged.
>
> Individuals whose bad life decisions and criminal behavior is an expression of the bad things, things that have happened to them aren't thinking

---

[11] *Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997).

at the time that occurs, gee, I think that I'll beat up this person because I was beaten up. It's more like you've been exposed to radiation and then later on you grow tumors from that without any conscious connection of the two events being connected.

So it wasn't going to tell me how he became to be damaged and it also -- beyond defense reports and beyond what he was convicted of his own personal report doesn't tell me anything about what kind of inmate he's likely to be in the future.

Those are the two issues that were before me, how did we get here and where do we go from here. And his self-report of his thoughts, feelings, and actions during the time period of events don't inform either one of those.

Now if there was an issue of what sort of psychological disturbance he was having at that moment then that kind of inquiry would have been relevant but under the two issues that I was looking at it was not.

*Id.* at 18–19.

Renteria raised the Fifth Amendment issue on direct appeal. *See Renteria v. State* (Appellant's Brief), 2009 WL 5453014 (Dec. 15, 2009), at * 172–*181. Renteria argued that under *Soria*, the scope of the State's cross-examination was "limited to the issues raised by the defense expert." *Renteria II*, 2011 WL 1734067, at *42 (citing *Soria v. State*, 933 S.W.2d 46, 58 (Tex. Crim. App. 1996)). Renteria maintained Dr. Cunningham "did not question [him] about the offense and did not testify to any conversations with [him] about the offense." *Id.* Thus, Renteria asserted, he "did not raise any issues that would open the door" for the State to cross-examine Dr. Cunningham as to why he did not question Renteria about the offense. *Id.* The Court of Criminal Appeals affirmed the trial court in all respects. It reasoned:

The State did not exceed the scope of proper cross-examination. Defense counsel called Cunningham to testify that Renteria would not be a future danger in prison. It was permissible for the State to test Cunningham's credibility by questioning him as to how he arrived at that conclusion. A criminal defendant may not testify through a defense expert and then use the Fifth Amendment as a shield against cross-examination on disputed issues.

*Id.* (citing *Lagrone*, 942 S.W.2d at 611).

## 2. Applicable Law

The Fifth Amendment forbids comment by the prosecution on a defendant's silence. *Griffin v. California,* 380 U.S. 609, 615 (1965); *Gongora v. Thaler,* 710 F.3d 267, 274 (5th Cir. 2013). The prosecution may not treat the defendant's exercise of his Fifth Amendment rights as substantive evidence of guilt. *Gongora,* 710 F.3d at 274 (citing *United States v. Robinson,* 485 U.S. 25, 34 (1988)). A defendant may, however, waive his Fifth Amendment right.

Where a defendant presents psychiatric evidence at trial, the defendant has no Fifth Amendment privilege against the introduction of rebuttal psychiatric testimony by the prosecution. *Kansas v. Cheever,* 571 U.S. 87, 94 (2013); *Buchanan v. Kentucky,* 483 U.S. 402, 422–23 (1987) ("if a defendant . . . presents psychiatric evidence, then . . . the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution."); *Vanderbilt v. Collins,* 994 F.2d 189, 196 (5th Cir. 1993) ("If a defendant requests an examination on the issue of future dangerousness or presents psychiatric evidence at trial, the defendant may be deemed to have waived Fifth Amendment privilege."); *Williams v. Lynaugh,* 809 F.2d 1063, 1068 (5th Cir. 1987) ("[W]hen a defendant introduces psychiatric evidence on a critical issue, he waives his [F]ifth and [S]ixth [A]mendment objections to the state's psychiatric testimony, provided that the state's evidence is used solely in rebuttal and properly limited to the issue raised by the defense.").

Further, once privilege is waived, the defendant cannot dictate the questions the State may ask on cross-examination. *See Cheever,* 571 U.S. at 94 ("The admission of rebuttal testimony harmonizes with the principle that when a defendant chooses to testify in a

-158-

criminal case, the Fifth Amendment does not allow him to refuse to answer related questions on cross-examination."); *see also McGautha v. California*, 402 U.S. 183, 213 (1971) ("It does no violence to the privilege [against compelled self-incrimination] that a person's choice to testify in his own behalf may open the door to otherwise inadmissible evidence which is damaging to his case."), *overruled on other grounds, Crampton v. Ohio*, 408 U.S. 941 (1972). And while cross-examination must be limited to the issues raised by the defense expert, *Williams*, 809 F.2d at 1068, the State is certainly permitted to test the expert's opinion by asking how he arrived at that opinion. *See* Tex. R. Evid. 705(a) ("[A]n expert may state an opinion—and give the reason for it—without first testifying to the underlying facts or data. But the Expert may be required to disclose those facts or data on cross-examination."); *Chamberlain*, 998 S.W.2d at 234 ("Appellant cannot claim a fifth amendment privilege in refusing to submit to the State's psychiatric examinations and then introduce evidence gained through his participation in his own psychiatric examination."); *Milam v. State*, 2012 WL 1868458, at *18 (Tex. Crim. App. 2012) ("Appellant may not testify through a defense expert and then use the Fifth Amendment as a shield against cross-examination of that expert on disputed issues.").

### 3. Discussion

Here, Renteria waived his Fifth Amendment rights by speaking with his expert, Dr. Cunningham, and then introducing Dr. Cunningham's testimony at trial. *Cheever*, 571 U.S. at 94. Dr. Cunningham's testimony addressed Renteria's future dangerousness. The State's inquiry as to the basis of Dr. Cunningham's conclusion—that Renteria was not a future danger—fell squarely within this issue. *Williams*, 809 F.2d at 1068. The State did not exceed the scope of proper cross-examination by asking whether Dr. Cunningham discussed the facts of the crime with Renteria before arriving at his conclusion. Tex. R. Evid. 705(a).

Hence, the State acted permissibly by inquiring into the evidence relied on by Dr. Cunningham to arrive at his conclusion.

Given that Renteria waived his Fifth Amendment rights, he was not entitled to dictate the questions the State could ask on cross-examination. *Cheever*, 571 U.S. at 94. This was especially true where—as the Court of Criminal Appeals has recognized— "the facts of the crime alone, if severe enough, can be sufficient to support [an] affirmative finding to the special issue." *Miller*, 200 F.3d at 286 (citing *Vuong v. State*, 830 S.W.2d 929, 935 (Tex. Crim. App. 1992)). Consequently, whether Dr. Cunningham discussed the facts of the crime with Renteria before he reached his conclusion on Renteria's future dangerousness was an appropriate subject for inquiry and for the jury to consider.

Indeed, a defendant cannot testify through an expert and then use his Fifth Amendment right to silence as a shield against cross-examination of the expert on relevant issues. *Milam*, 2012 WL 1868458, at *18. Once Dr. Cunningham testified, the State was entitled to ask—and the jury was entitled to know—the basis for his opinion. *Cheever*, 571 U.S. at 94. Renteria had "no right to set forth to the jury all the facts which tend[ed] to his favor without laying himself open to a cross-examination upon those facts." *Id.* (citing *Fitzpatrick v. United States*, 178 U.S. 304, 315 (1900)). The rule advocated by Renteria "would undermine the adversarial process, allowing a defendant to provide the jury, through an expert operating as proxy, with a one-sided and potentially inaccurate view of his mental state at the time of the alleged crime" and would undermine "the core truth-seeking function of the trial." *Id.* at 95.

The Court of Criminal Appeals rejected Renteria's Fifth Amendment claim on direct appeal, holding that he waived his privilege by presenting Dr. Cunningham's testimony and that the State was entitled to probe the credulity of Dr. Cunningham's conclusions by asking

whether he discussed the capital murder with Renteria. *Renteria II*, 2011 WL 1734067, at

*42; *see also Cheever*, 571 U.S. at 94; *Buchanan*, 483 U.S. at 408. Renteria fails to show

that the state court's rejection of this claim involved an unreasonable application of

controlling Supreme Court precedent. *Richter*, 562 U.S. at 99–102.

But even if Renteria could show that the State's questioning of Dr. Cunningham

violated his Fifth Amendment rights, an improper comment on a defendant's silence at trial is

subject to harmless error analysis. *See Gongora*, 710 F.3d at 274. Therefore, Renteria "must

still clear the hurdle of [*Brecht v. Abrahamson*, 507 U.S. 619 (1993)]." *Id.* at 275. Under

that analysis, a court must "assess the prejudicial impact of the [prosecutor's comments on

the defendant's silence] under the 'substantial and injurious effect' standard set forth in

*Brecht*, whether or not the state appellate court recognized the error and reviewed it for

harmlessness under . . . *Chapman*." *Id.* (citing *Fry v. Plier*, 551 U.S. 112, 121–22 (2007)).

Factors a court should consider include whether (1) the comment was extensive, (2) an

inference of guilt is stressed as the basis of conviction, and (3) there is evidence that could

have supported acquittal. *Anderson v. Nelson*, 390 U.S. 523, 524 (1968); *Gongora*, 710 F.3d

at 278.

The State's questions about Dr. Cunningham's failure to discuss the facts of the crime

with Renteria were neither extensive nor stressed as a basis for a death sentence. The State

limited its inquiry into this issue during a rather lengthy direct and cross-examination of Dr.

Cunningham. The State did not reference Dr. Cunningham's failure to inquire into the facts

of the crime during closing argument, although the State posed several reasons for the jury to

discount Dr. Cunningham's opinion on future dangerousness. Reporter's R., vol. 72 (Closing

Argument by Prosecutor Lori C. Hughes), pp. 49–74, 115–40, ECF No. 82-4. The State

never suggested Dr. Cunningham's failure to question Renteria about the facts of the capital

murder provided a basis for the jury to answer the future dangerousness special issue in the affirmative or to sentence Renteria to death.

Further, Renteria does not attempt to—and cannot—show harm.

Dr. Cunningham addressed his decision not to inquire into the facts of the crime with Renteria, and he noted the information was not relevant to his inquiry. Reporter's R., vol. 71, p. 18, ECF No. 82-3. In other words, Dr. Cunningham posed a separate and independent basis for his decision not to ask those questions of Renteria. Therefore, it is unlikely that the State's inquiry regarding Dr. Cunningham's failure to discuss Flores's murder with Renteria had any impact on the jury's determination of the future dangerousness issue.

For the same reason, Renteria cannot show harm from the State's questioning of Dr. Cunningham. Dr. Cunningham's failure to question Renteria regarding the capital murder was used to impeach Dr. Cunningham's credibility and his conclusion that Renteria was not a future danger. It was not used to suggest that Renteria had something to hide from the jury. And, as noted above, the jury was made aware Renteria did not discuss the capital murder with Dr. Cunningham. Further, the jury was made aware that Dr. Cunningham believed Renteria's self-reporting of the facts was irrelevant to his future dangerousness assessment.

Finally, the trial court instructed the jury it could not use the fact that Renteria elected remain silent and not testify against him in any way. Clerk's R., vol. 8, p. 175, ECF No. 79-11. The court's instruction presumably cured any error. *See Gongora,* 710 F.3d at 278 (explaining a court should consider the effect of any cautionary or curative instruction given to jury); *see also Zafiro v. United States,* 506 U.S. 534, 540–41 (1993) (explaining jurors are presumed to follow instructions). Any error was harmless beyond a reasonable doubt, and there is no reasonable likelihood that the State's questions, even if erroneous, had a "substantial and injurious effect or influence" on the jury's verdict. *Brecht,* 507 U.S. at 637.

As the state court found, "[t]he State did not exceed the scope of proper cross-examination," as it was "permissible for the State to test [Dr.] Cunningham's credibility by questioning him as to how he arrived at" the conclusion that Renteria was not a future danger. *Renteria II*, 2011 WL 1734067, at *42. For the reasons discussed above, Renteria fails to rebut the state court's findings or show that the state court's rejection of this claim was unreasonable. Consequently, he is not entitled to relief. *Richter*, 562 U.S. at 99–102.

Insofar as Renteria alleges a Sixth Amendment violation arising from the State's cross-examination of Dr. Cunningham, his claim is unexhausted and procedurally defaulted. Renteria did not argue on direct appeal or in his state habeas application that his Sixth Amendment rights were violated because the jury learned that he followed the advice of his counsel and did not discuss Flores's murder with Dr. Cunningham. *Compare* Pet'r's Pet. 96, ECF No. 53, and Pet'r's Br. in Supp. 52, ECF No. 58, *with Renteria v. State* (Appellant's Brief), 2009 WL 5453014 (Dec. 15, 2009), at *171–*182. Furthermore, Renteria identifies no authority supporting the claim. Consequently, the claim is conclusory and Renteria is not entitled to relief. *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990).

## IV. REQUEST FOR A FEDERAL EVIDENTIARY HEARING

Renteria requested an evidentiary hearing to permit more factual development of his claims. Pursuant to the AEDPA, the proper place for development of the facts supporting a claim is in the state court. *See Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir. 1997) (explaining that the AEDPA clearly places the burden on a petitioner to raise and litigate as fully as possible his federal claims in state court). Renteria had a full and fair opportunity during in his state habeas corpus proceedings to present the state habeas trial court with all available evidence supporting his claims.

In addition, where a petitioner's claims have been rejected on the merits, further factual development in federal court is effectively precluded by the Supreme Court's holding in *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011):

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.*, the record before the state court.

*Cullen*, 563 U.S. at 181–82.

Thus, Renteria is not entitled to a federal evidentiary hearing on any of his claims the state courts rejected on the merits, either on direct appeal or during his state habeas corpus proceedings. *See Woodfox v. Cain*, 772 F.3d 358, 368 (5th Cir. 2014).

Likewise, where a federal habeas corpus petitioner's claims lack merit on their face, further factual development is not necessary. *See Register v. Thaler*, 681 F.3d 623, 627–30 (5th Cir. 2012) (recognizing that district courts possess discretion regarding whether to allow factual development, especially when confronted with claims foreclosed by applicable legal

authority). This Court has conducted a *de novo* review of all of Renteria's unexhausted claims and concludes that all lack merit.

"In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court." *Richards v. Quarterman,* 566 F.3d 553, 562 (5th Cir. 2009) (quoting *Schriro,* 550 U.S. at 468). "In determining whether to grant a hearing, under Rule 8(a) of the habeas Court Rules 'the judge must review the answer [and] any transcripts and records of state-court proceedings . . . to determine whether an evidentiary hearing is warranted.'" *Richards,* 566 F.3d at 562–63 (quoting *Hall v. Quarterman,* 534 F.3d 365, 368 (5th Cir. 2008). In making this determination, a court must consider whether an evidentiary hearing could "enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Richards,* 566 F.3d at 563 (quoting *Schriro,* 550 U.S. at 474).

Here, the state courts properly rejected many of Renteria's claims on their merits during either his direct appeal or state habeas corpus proceedings. Renteria is not entitled to further evidentiary or factual development of those claims. Additionally, Renteria's unexhausted claims are procedurally defaulted, without legal merit, and do not require factual or evidentiary development.

Therefore, Renteria is not entitled to an evidentiary hearing to developing any of his claims. *See Segundo,* 831 F.3d at 350–51 ("Given the extent of the factual development during trial and during the state habeas proceedings, the district court did not abuse its discretion in determining it had sufficient evidence and declining to hold a hearing.").

## V. CERTIFICATE OF APPEALABILITY

Before a petitioner may appeal the denial of a habeas corpus petition, he must obtain a certificate of appealability. 28 U.S.C. § 2253(c)(2); *Miller-El*, 537 U.S. at 335–36. Further, appellate review of a habeas petition is limited to the issues on which a certificate of appealability is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002) (holding that a certificate of appealability is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding that the scope of appellate review of denial of a habeas petition is limited to the issues on which certificate of appealability has been granted). In other words, a certificate of appealability is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which a certificate of appealability is granted. 28 U.S.C. § 2253(c)(3); *Crutcher*, 301 F.3d at 658 n.10.

A certificate of appealability will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). To make such a showing, the petitioner need *not* show that he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) that the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard*, 542 U.S. at 282; *Miller-El*, 537 U.S. at 336. A habeas court is required to issue or deny a certificate of appealability when it enters a final order, such as this one, adverse to a federal habeas petitioner. Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.

The showing necessary to obtain a certificate of appealability on a claim depends upon the way a district court has disposed of it. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El*, 537 U.S. at 338 (quoting *Slack*, 529 U.S. at 484). In a case where the petitioner wishes to challenge on appeal a court's dismissal of a claim for a reason not of a constitutional dimension, such as a procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether the federal habeas court was correct in its procedural ruling. *See Slack*, 529 U.S. at 484.

In death penalty cases, any doubt as to whether a certificate of appealability should issue must be resolved in the petitioner's favor. *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir. 2009); *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir. 2005). Nonetheless, a certificate of appealability is not automatically granted in every death penalty habeas case. *See Miller-El*, 537 U.S. at 337 ("It follows that issuance of a COA must not be *pro forma* or a matter of course.").

In this case, reasonable minds could not disagree with the Court's reasoned conclusions. No certificate of appealability will issue.

## VI. CONCLUSION AND ORDERS

For the reasons discussed above, the Court concludes that Renteria is not entitled to an evidentiary hearing, federal habeas corpus relief, or a certificate of appealability. Accordingly, the Court enters the following orders:

**IT IS ORDERED** that Petitioner David Santiago Renteria's request for an evidentiary hearing is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner David Santiago Renteria's "Petition for a Writ of Habeas Corpus" (ECF No. 53) is **DENIED**, and his cause is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Petitioner David Santiago Renteria is **DENIED** a certificate of appealability.

**IT IS FURTHER ORDERED** that all pending motions are **DENIED AS MOOT**.

**IT IS FINALLY ORDERED** that the Clerk shall **CLOSE** this case.

SIGNED this _12_ day of February 2019.

FRANK MONTALVO
UNITED STATES DISTRICT JUDGE